Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Attorneys for Lead Plaintiffs*

[Additional counsel on signature page.]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re VAXART, INC. SECURITIES LITIGATION | Master Case No.: 3:20-cv-05949-VC <u>CLASS ACTION</u> |
| | **PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| This Document Relates to:<br>    ALL ACTIONS | JURY TRIAL DEMAND |
| | Judge: Vince Chhabria |

1

**TABLE OF CONTENTS**

2

**Page**

3   I.     NATURE OF THE ACTION .................................................................. 1

4   II.    JURISDICTION AND VENUE .............................................................. 8

5   III.   PARTIES .............................................................................................. 9

6          A.    Plaintiffs .................................................................................... 9

7          B.    Vaxart ........................................................................................ 9

8          C.    Individual Defendants ............................................................. 10

9          D.    Armistice .................................................................................. 12

10  IV.    SUBSTANTIVE ALLEGATIONS ...................................................... 13

11         A.    Armistice Takes Control of Struggling Pharmaceutical Company
                 Vaxart ...................................................................................... 13

12

13         B.    Defendants Capitalize on COVID-19 to Pump Up Vaxart's Common
                 Stock Price ............................................................................... 15

14         C.    With a Now-Elevated Stock Price, Armistice Begins to Cash Out of Its
                 Vaxart Common Stock Position from April 28 to June 3, 2020 ........... 19

15

16         D.    Defendants' Fraudulent Scheme to Unfairly Enrich Themselves and
                 Armistice Through Spring-Loaded Options and Unrestricted Sales ...... 20

17         E.    Defendants Spike Vaxart's Common Stock Price High Enough to
                 Allow Armistice to Reap a $267 Million Windfall ................................ 24

18

19         F.    The Truth Emerges: Corrective Disclosure and Post-Class Period
                 Events ....................................................................................... 28

20  V.     MATERIALLY FALSE AND MISLEADING STATEMENTS AND
           OMISSIONS ....................................................................................... 30

21

22         A.    Pre-Class Period Statements – Despite Cancelling the Norovirus
                 Program in Late 2019, Throughout 2020 Vaxart Materially Misled
                 Investors to Believe It Had an Ongoing Norovirus Program ................ 30

23

24         B.    Vaxart Materially Misled Investors When It Claimed Attwill Had the
                 Capacity to Manufacture a Billion or More Doses of Vaxart's COVID-
                 19 Vaccine ................................................................................ 33

25

26         C.    Vaxart Materially Misled Investors When It Conflated Participation in
                 a Non-Human Primate Study with Selection and Funding by Operation
                 Warp Speed ............................................................................... 35

27

28  VI.    LOSS CAUSATION ........................................................................... 37

VII.    NO SAFE HARBOR ................................................................ 38

VIII.   CONTEMPORANEOUS TRADING ...................................... 39

IX.     ADDITIONAL SCIENTER ALLEGATIONS ........................ 41

    A.    Boyd, Maher, and the Armistice Defendants Had Motive and Opportunity to Commit Fraud and Participate in the "Pump and Dump" Scheme ......................................................................... 41

    B.    Defendants' Involvement in the Modification of the Warrants for the Benefit of the Armistice-Affiliated Defendants and the Related Grants of "Spring-loaded" Options to the Remaining Defendants ..................................... 43

    C.    Vaxart's Desperate Financial Position, Need to Raise Cash and Actually Raising Cash Three Times in the Class Period Show Additional Motive ................................................................. 45

    D.    Defendants' Imputed Knowledge of Facts Critical to the Core Operations ......................................................................... 46

X.      CLASS ACTION ALLEGATIONS ....................................... 47

FIRST CAUSE OF ACTION  VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 (A)-(C) PROMULGATED THEREUNDER (AGAINST VAXART AND THE INDIVIDUAL DEFENDANTS) ................................................................. 50

SECOND CAUSE OF ACTION  VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT (AGAINST ARMISTICE AND THE INDIVIDUAL DEFENDANTS) ................................................................. 52

THIRD CAUSE OF ACTION  VIOLATION OF SECTION 20A OF THE EXCHANGE ACT (AGAINST ARMISTICE) ......................... 53

XI.     PRAYER FOR RELIEF ....................................................... 54

XII.    JURY DEMAND ................................................................. 54

1    Plaintiffs, by and through their undersigned counsel, bring this action under the Securities

2    Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and a class of other similarly

3    situated investors against Vaxart, Inc. ("Vaxart" or the "Company") and the other Defendants named

4    herein.  Plaintiffs allege the following based upon personal knowledge as to themselves and their own

5    acts, and upon information and belief as to all other matters.  Plaintiffs' information and belief is based

6    on the ongoing independent investigation of their undersigned counsel, which includes review of:

7    Defendants' press releases, conference call transcripts, filings with the United States Securities and

8    Exchange Commission ("SEC"), and other public statements; news stories, analyst reports and other

9    public information concerning Vaxart and the industry within which it operates; and interviews with

10   former Vaxart employees and/or others familiar with the Company.

## I.    NATURE OF THE ACTION

11

12   1.    This securities class action is brought on behalf of a class (the "Class") consisting of all

13   persons or entities other than Defendants who purchased or otherwise acquired Vaxart common stock

14   between June 25, 2020 to August 19, 2020, inclusive (the "Class Period").  Plaintiffs bring claims

15   against Vaxart, certain of its current and former officers and directors, and Armistice Capital, LLC

16   ("Armistice Capital" or "Armistice"), Vaxart's controlling shareholder/control person during the Class

17   Period (collectively, "Defendants").  The claims arise under §§ 10(b), 20(a), and 20A of the Exchange

18   Act and Rule 10b-5(a)-(c) promulgated thereunder.

19   2.    This action arises from a brazen scheme orchestrated by officers and directors of a

20   struggling pharmaceutical company and a rapacious hedge fund to take full advantage of a global rush

21   to develop a workable vaccine for COVID-19 and help quell a raging pandemic.  In a classic pump-

22   and-dump scheme, Defendants fraudulently capitalized on the potential for a breakthrough in vaccine

23   technology and extracted over $320 million from Vaxart shareholders.

24   3.    Vaxart is a small clinical-stage biotechnology company in South San Francisco,

25   California, with only 14 employees, and is primarily focused on the development of oral, tablet-based

26   vaccines.  Founded in 2004, it has never successfully brought a vaccine to market and has yet to make

27   a single dollar in net income in any individual year or quarter of its existence.  Throughout 2019,

28   Vaxart repeatedly informed investors that the Company's top research and development ("R&D")

priorities were vaccines for norovirus, seasonal influenza, respiratory syncytial virus ("RSV"), and human papillomavirus ("HPV").

4.     Throughout most of 2019, Vaxart's common stock traded below $1.00 and its relatively small market capitalization made it a low-budget target for a takeover by an investment group or hedge fund.  By the end of September 2019, Defendant Armistice Capital, a New York-based hedge fund, had accumulated a majority of Vaxart's common stock, putting it and its two principals, Steven J. Boyd ("Boyd") and Keith Maher, M.D., firmly in control of the small pharmaceutical company. Almost immediately after, Armistice directed Vaxart to (1) expand its board of directors to include Boyd and Maher; and (2) issue Armistice warrants that would allow Armistice to purchase 16.7 million shares of Vaxart's common stock at $0.30 per share; a substantial benefit, considering that just a few months earlier Vaxart had issued Armistice warrants to purchase just 4 million shares at the significantly higher price of $1.10 per share.

5.     At the time of the Armistice acquisition, Vaxart common stock traded between $0.30 and $0.40, where it would largely remain through the end of 2019 and start of 2020.

6.     With new owners and board members searching for a profit, the day after Christmas 2019, Vaxart's Board voted to lay off its entire manufacturing division, informing the terminated employees that, effective January 31, 2020, they would need to find new employment.  Further, the Company also decided to terminate its *norovirus* vaccine program, which it had spent much of 2019 touting, and layoff CW1, who served as the Company's lead norovirus researcher from May 2018 until December 31, 2019, and spearheaded its norovirus vaccine research.  Henceforth, Vaxart misleadingly announced on January 2, 2020, the Company would increase its focus on its vaccine research and development efforts, aimed primarily at the time on *norovirus* and influenza.  This was a partial falsity because Vaxart had just discontinued its norovirus vaccine development efforts and expected to shut down within a few months if it could not find a partner.

7.     Then an opportunity arose that would allow Armistice, the entire Board of Directors, and several of its officers to enrich themselves, as well as raise desperately needed cash.  By late January 2020, the first cases of COVID-19 outside of China were reported and on January 30, 2020, the World Health Organization ("WHO") declared the outbreak a "Public Health Emergency of

International Concern."  Vaxart wasted no time, declaring before the market opened the following day that, despite never successfully developing and commercializing a vaccine over its 16 years in business, the Company had begun work to "develop a coronavirus vaccine candidate based on its proprietary oral vaccine platform."  That day, Vaxart's stock price spiked, closing at $1.25 per share.  There would be many days like it throughout the spring and summer of 2020, as Vaxart's stock spiked each time the Company announced new steps in its supposedly ongoing and robust efforts to research, develop, and manufacture an effective COVID-19 vaccine.

8.      Armistice, in complete control of Vaxart, now had an opportunity to profit.  With the market – and the entire world – desperate for a solution to the deadly COVID-19 pandemic and stock prices of potential COVID-19 vaccine developers spiking with each announcement, Armistice began to sell its millions of shares, including by exercising its warrants while Defendants made less than candid statements.  Seizing on Vaxart's elevated stock prices in the $2.00 to $3.00 range, Armistice dumped 18,200,000 shares of Vaxart common stock through June 3, 2020, when the hedge fund abruptly stopped selling.  By that date, Armistice had sold over $53 million in Vaxart common stock profiting handsomely on its Vaxart investment.  The Company also had the opportunity to raise funding.  On the heels of its claim to be developing a COVID vaccine, the Company raised $10 million in a registered direct offering priced at-the-market of 4 million shares at $2.50 per share including warrants to purchase up to 2 million at same price.

9.      As if this was not enough, at this point in late May and early June 2020, the Defendants, now emboldened, ratched up their scheme made a few critical decisions that would allow Defendants to significantly enrich Vaxart's officers and directors, as well as Armistice, well beyond what the hedge fund had already reaped.  This was helped and set in motion by the White House's announcement to throw billions of dollars of funding to a small yet-to-be-named group of vaccine manufacturers through a highly secretive program.

10.      On April 29, 2020, the *New York Times* and *Bloomberg* reported that the federal government had created Operation Warp Speed ("OWS"), which would provide billions of dollars in funding to a select few pharmaceutical companies in order to speed the development and manufacture of multiple COVID-19 vaccines.  The government kept the particulars of the program out of the public

eye and would neither confirm nor deny rumors of who the select few candidates were or would be. Defendants knew this and knew of the swirling rumors and impact on the stock price of those who were the subject of those rumors. Accordingly, when the White House officially confirmed OWS' existence on May 15, 2020, and announced that the program had narrowed its evaluation of 100 candidates down to 14, and would narrow the list even further, Defendants knew investor sentiment toward their stock rested heavily on whether or not Vaxart was part of this elite group.

11. Not uncoincidentally, Armistice suddenly stopped selling its shares of Vaxart, June 3, 2020, when the news media leaked that OWS had selected seven or eight companies for funding out of the 14 finalists, the identity of five of which were announced. Vaxart was ***not*** one of the five publicly announced but two or three remained to be revealed. Further speculation of the two or three other finalist companies began to swirl. Vaxart then took full advantage, utilizing the speculation to orchestrate a scheme to dramatically increase Vaxart's common stock price and extract as much value as possible from ordinary shareholders.

12. Shortly thereafter, as formalized on June 8, 2020 and shortly prior to the start of the Class Period, Defendants conspired to change the terms of Vaxart's warrant agreements with Armistice Capital, making it possible for the hedge fund to rapidly acquire nearly 21 million shares at prices as low as $0.30 a share and dump them immediately. Simultaneously, Defendants also issued millions of dollars in favorable stock options to Vaxart's most senior executives.

13. First, the Board removed restrictions that had previously limited Armistice's ability to immediately obtain and sell shares of Vaxart. Heretofore, Armistice (1) had to provide Vaxart with 60 days' notice before it could increase its beneficial ownership of the Company (*i.e.*, provide at least two months warning to Vaxart before Armistice would increase its ownership stake in Vaxart through the exercising of the warrants to obtain Vaxart common stock); and (2) was restrained by two sets of "beneficial ownership limitations" on the warrants, one of 4.99% on the $1.10 Warrants and 9.99% on the $0.30 Warrants (*i.e.*, Armistice was limited in how many shares it could obtain through the warrants based on the percentage of its overall ownership in Vaxart). Mandatory notice periods and beneficial ownership limitations are common restrictions issuers impose on warrant-holders to protect themselves against wild swings in their stock price, preventing warrant-holders from immediately converting

warrants to common stock and dumping the entirety of its shares, which would dilute the number of outstanding shares and then drive down the company's stock price.  The 60-day notice period and respective beneficial ownership limitations represented the key provisions of Vaxart's bargained-for agreement with Armistice in 2019, designed to protect the Company and its shareholders.

14.     Contrary to common practice and the bargained-for agreement Vaxart had originally reached with Armistice in 2019, on June 8, 2020, the Board, at Armistice's behest, amended the warrant agreements between Vaxart and Armistice and *entirely* removed the 60-day notice period and *dramatically* increased the beneficial ownership limitation to 19.99% on both sets of warrants, essentially allowing Armistice to dump its shares of Vaxart as quickly as possible and at any possible date.

15.     Next, in exchange for allowing Armistice unimpeded ability to convert its warrants to common stock and sell, Vaxart's Board struck a corrupt bargain: each of the Board members and multiple officers were granted between 65,000 and 900,000 "spring-loaded" options to purchase Vaxart common stock.  An individual option gives the holder the right to buy shares of the Company at a set price, known as a "strike price."  Therefore, by issuing its officers and directors 3,572,100 options at prices ranging from $1.70 per share to $2.46, Vaxart granted them the right to buy shares which can then be sold for a profit if Vaxart's stock price exceeds the strike price, the profit being the difference between the actual price and the strike price at the time of sale.  An option is considered "spring-loaded" when the issuer is in possession of material non-public information that is reasonably expected to drive the market price of the stock.  At that time, the Defendants knew of two critical pieces of information that when revealed would substantially impact Vaxart's common stock price.  First, the Board knew that Vaxart was *not* one of the seven or eight pharmaceutical companies selected for participation and funding by OWS.  However, the Board also knew that Vaxart *did* qualify for a tangentially related program: participation in a non-human primate ("NHP") challenge study nominally under the OWS umbrella and conducted by the Biomedical Advanced Research and Development Authority ("BARDA"), a division of the federal government's Department of Health and Human Services ("HHS").  It was Defendants' decision to reveal only the second piece of information – while simultaneously withholding the first – that would shortly send Vaxart's common

1    stock price skyward. Even worse, they drafted language which would make it appear to the reasonable

2    investor that they had been selected and were ready to manufacture over a billion doses.

3        16.    With the mechanism to handsomely profit in place, on June 25 and 26, 2020, Vaxart

4    issued materially misleading statements that drove a phenomenal increase in Vaxart's common stock,

5    allowing Armistice to cash out and placing the newly-issued options firmly in-the-money, before the

6    truth was at first partially and then fully revealed, sending Vaxart's common stock price tumbling.

7        17.    First, before the market opened on June 25, 2020, Vaxart misleadingly announced that

8    it had partnered with Attwill Medical Solutions Sterilflow, LP ("Attwill") "to manufacture a billion or

9    more doses per year . . . of our COVID-19 vaccine for the US, Europe and other countries in need."

10    In reality, as CW2 and CW3, former Attwill employees who conducted an assessment of Attwill's

11    manufacturing capabilities at this exact point can attest, Attwill lacked (1) the certification from the

12    FDA under the applicable regulations, 21 C.F.R. §§ 210 and 211, to produce *any* vaccines and, (2)

13    according to CW2, the personnel or operational capabilities to produce a billion doses of the vaccine.

14    The suggestion that Attwill had anything close to this capability is demonstrably false and Defendants,

15    in making this announcement, either knew it was false and misleading or were deliberately reckless as

16    to the truth of the statement. Nonetheless, the market reacted extremely favorably to this

17    announcement, doubling Vaxart's stock price from the prior day's closing price of $3.19 to close at

18    $6.26.

19        18.    The following day (June 26, 2020), Vaxart issued another false and misleading

20    statement before the market opened, this time issuing an announcement with the bold headline,

21    "**Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed**," with

22    Vaxart's Chief Executive Officer ("CEO"), Andrei Floroiu, declaring "[w]e are very pleased to be one

23    of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being

24    evaluated." The press release also states that Vaxart would participate in an NHP challenge study,

25    which in reality was a tangentially related U.S. government side program. However, Vaxart was not

26    "selected for the U.S. Government's Operation Warp Speed" or funding with NHP study participation,

27    and by claiming to be "one of the few companies selected by Operation Warp Speed" at a time when

28    the identities of the remaining two or three pharmaceutical companies actually selected were still a

secret yet to be revealed to the public, Defendants again materially misled the market.  And again, Vaxart's stock price reacted enthusiastically, with Vaxart closing that day at $8.04, a 28% one-day increase, and up an incredible 152% in just two days.

19.     With Vaxart's stock price fraudulently elevated, Armistice immediately got to work exercising its warrants and dumping its shares.  No longer encumbered by the previously-limiting 60-day notice period or the restrictive beneficial ownership limitations, the hedge fund took full advantage of the stratospheric prices on Friday, June 26th and Monday, June 29th, dumping over 27.6 million shares at an average price of $9.67 per share and raking in an astounding $267 million.

20.     The truth, however, would not be long concealed.

21.     First, on Saturday, July 25, 2020, the truth was partially revealed by a *New York Times* article headlined, "**Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine**." Focusing largely on Vaxart, the article partially cleared up the obfuscation created by Vaxart's June 26 press release that conflated OWS selection and NHP participation, noting "Vaxart is ***not*** among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses."  [Emphasis added.]  Instead, the article explained, Vaxart's NHP participation was merely a trial "organiz[ed] in conjunction with Operation Warp Speed," but not equivalent to OWS selection and funding. The article quoted HHS' assistant secretary for public affairs who confirmed that HHS had neither agreed to fund Vaxart's COVID-19 vaccine, nor even negotiated with Vaxart to do so.  In fact, the article stated that after HHS reviewed Vaxart's exaggerated claims about its participation in OWS and concurrent stock sales, HHS "relayed those concerns to the Securities and Exchange Commission."

22.     That same day, HHS' Twitter handle, @SpoxHHS, tweeted the *New York Times* article and reiterated that Vaxart was ***not*** selected for OWS selection and funding and instead had merely been granted the ability to participate in a "***preliminary***" study "to determine ***potential*** areas for ***possible*** Operation Warp Speed partnership and support."  [Emphasis added.]

23.     With the truth partially revealed, Vaxart's common stock tumbled that Monday, July 27, 2020, falling 9% against Friday's closing price.

24.     After the market closed on Wednesday, August 19, 2020, *Business Insider*, quoting

Moncef Slaoui ("Slaoui"), the head of OWS, informed the investing public what Defendants long knew to be true, that Vaxart had "misled" shareholders by erroneously tying themselves to OWS in order to drive up their common stock price:

> There's been a number of cases where companies have, frankly, made press releases that have frustrated the hell out of me because they misled, I think, their shareholders and their share price went up the roof just by saying the words Operation Warp Speed in the title of the press release.

25.     In response, Vaxart's common stock price fell a further 4.3% the following day.

26.     Since then, Vaxart has reported that in July 2020, the U.S. Attorney's Office for the Northern District of California served a grand jury subpoena on Vaxart seeking "information pertaining to the Company's participation in, and disclosure of, an Operation Warp Speed-funded ("OWS") non-human primate study of the Company's oral COVID-19 vaccine and certain corporate, financing and stock transactions." Further, in October 2020, Vaxart was informed that "the investigation was being transferred to the Office of the U.S. Attorney for the Eastern District of New York and the Fraud Section of Main Justice of the Department of Justice. In November 2020, the Company received another grand jury subpoena from DOJ.  Also, in August 2020, the Enforcement Division of the SEC requested that Vaxart to provide information relating to the same subject matter.To date, those investigatons are not complete. So too,Vaxart has yet to produce any results from its supposed participation in the NHP study, has similarly failed to produce results from clinical trials of its vaccine on humans that allegedly began in the fall of 2020, and with Armistice almost entirely sold out of its Vaxart investment, has left ordinary shareholders holding the bag.  As of the date of the filing of this Amended Complaint, Vaxart appears to be back where it started in 2020: a struggling pharmaceutical company without any viable product it can commercialize and without revenue or profit, except now there is one very, very successful hedge fund and a number of officers and directors holding options deep in-the-money. On the date of this filing, January 29, 2021, the Armistice directors, who controlled Vaxart throughout, resigned.

## II.     JURISDICTION AND VENUE

27.     The claims asserted herein arise under and pursuant to §§ 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1) and Rule 10b-5 promulgated thereunder (17

1    C.F.R. § 240.10b-5).

2        28.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27

3    of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4        29.    Venue is proper in this District pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)

5    and (c).  At all relevant times, Vaxart was headquartered and conducted business in this District at 385

6    Oyster Point Boulevard, Suite 9A, South San Francisco, California 94080.  In addition, many of the

7    acts charged herein, including the preparation and dissemination of materially false and misleading

8    information, occurred in substantial part in this District.

9        30.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the

10   means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails,

11   interstate telephone communications, and the facilities of national securities exchanges.

12                              **III.    PARTIES**

13   **A.    Plaintiffs**

14       31.    Lead Plaintiffs Wei Huang and Langdon Elliot ("Lead Plaintiffs"), as set forth in their

15   certifications previously filed with the Court, purchased Vaxart common stock during the Class Period

16   and were damaged by Defendants' conduct as alleged herein.

17       32.    Plaintiffs Najaf Zaidi and Ani Hovhannisyan ("Additional Plaintiffs") purchased

18   Vaxart common stock during the Class Period and were damaged by Defendants' conduct alleged

19   herein.  They purchased contemporaneously with the false and misleading statements issued by the

20   Defendants, as well as Defendant Armistice's sale of Vaxart common stock.

21   **B.    Vaxart**

22       33.    Defendant Vaxart, Inc. is a corporation organized under Delaware law and

23   headquartered at 385 Oyster Point Boulevard, Suite 9A, South San Francisco, California 94080.  The

24   Company effectively went public on February 13, 2018, via a reverse merger with the then-publicly-

25   traded Aviragen Therapeutics, Inc.  Vaxart's common stock trades on the Nasdaq Capital Market

26   ("NASDAQ") under the symbol "VXRT."  Vaxart purports to be a clinical-stage biotechnology

27   company primarily focused on the development of oral recombinant vaccines based on its proprietary

28   oral vaccine platform.  As of December 31, 2019, Vaxart had only 14 full-time employees, of which

only seven were engaged in research and development. The remaining employees were engaged in finance, human resources, administration, and business and general management.

**C.    Individual Defendants**

34.    Defendant Steven J. Boyd served as a director of Vaxart from October 25, 2019 until his resignation on January 28, 2021.  Boyd is Armistice's founder, sole owner, Chief Investment Officer ("CIO"), and Managing Partner.  At all material times, Boyd has also served as a director of the Armistice Master Fund.  Armistice Capital is the parent entity of multiple Armistice entities all with the Armistice name, including Armistice Capital Master Fund, Ltd, which held the shares of Vaxart at issue here.  Boyd authorized and approved the issuance of the spring-loaded options and the Armistice warrant amendments, which he benefited from as sole owner of Armistice.  Throughout the events in question, Boyd signed all of Armistice's corporate filings on Armistice's behalf.

35.    Defendant Keith Maher, M.D. ("Maher") served as a director of Vaxart from October 25, 2019 until his resignation on January 28, 2021, and at all material times was a member of Vaxart's Compensation Committee.  Since 2019, he has served as Armistice's Managing Director.  Maher authorized and approved the issuance of the spring-loaded options and the Armistice warrant amendments.

36.    Defendant Cezar Andrei Floroiu ("Floroiu") has served as Vaxart's CEO since June 14, 2020, after having first been appointed as a member of Vaxart's Board of Directors on April 13, 2020 (a position he also continues to hold).  Prior to being appointed to these positions at Vaxart, Defendant Floroiu had been employed by Armistice Capital, as a Senior Analyst from January to August 2013.  Floroiu had also previously worked with Defendant Boyd at McKinsey & Company ("McKinsey").  Floroiu approved the issuance of the spring-loaded options and the Armistice warrant amendments.  On June 8, 2020, Floroiu received spring-loaded options to purchase 54,720 shares of Vaxart stock with a $1.71 strike price, $0.68 below the closing price that day.  On June 15, 2020, Floroiu received additional spring-loaded options to purchase 1,745,280 shares of Vaxart stock with a $2.46 strike price.  Floroiu personally benefited from his receipt of the spring-loaded options.

37.    Defendant Wouter W. Latour ("Latour") became Vaxart's President and CEO as well as a member of its board of directors in February 2018.  He was thereafter appointed Chairman of

Vaxart's Board of Directors in December 2019.  Although Latour was replaced as Vaxart's CEO by Defendant Floroiu on June 14, 2020, Latour continues to serve as a director and as Chairman of Vaxart's Board.  Latour approved the issuance of the spring-loaded options and the Armistice warrant amendments, as described herein.  On June 8, 2020, Latour received spring-loaded options to purchase 900,000 shares of Vaxart stock with a $1.70 strike price, $0.69 below the closing price that day.  Latour personally benefited from his receipt of the spring-loaded options.

38.     Defendant Robert A. Yedid ("Yedid") has served as a Vaxart director since October 25, 2019.  Yedid is a member of Vaxart's Audit Committee.  Yedid approved the issuance of the spring-loaded options and the Armistice warrant amendments, as described herein.  On June 8, 2020, Yedid received spring-loaded options to purchase 65,700 shares of Vaxart stock with a $2.39 strike price. Yedid personally benefited from his receipt of the spring-loaded options.

39.     Defendant Todd C. Davis ("Davis") has served as a director of Vaxart and a member of its Compensation Committee since October 25, 2019.  Davis authorized and approved Vaxart's manipulated stock options and the amendment to the warrant agreements with Armistice.  On June 8, 2020, Davis received spring-loaded options to purchase 65,700 shares of Vaxart stock with a $2.39 strike price.  Davis personally benefited from his receipt of the spring-loaded options.

40.     Defendant Michael J. Finney, PhD ("Finney"), has served as a director of Vaxart since February 2018.  Previously, he served as a member of Vaxart's Board of directors since July 2007. From 2009 until 2011, Finney served as CEO of Vaxart.  Finney is a member of Vaxart's Audit Committee.  Finney approved the issuance of the spring-loaded options and the Armistice warrant amendments, as described herein.  On June 8, 2020, Finney received spring-loaded options to purchase 65,700 shares of Vaxart stock with a $2.39 strike price.  Finney personally benefited from his receipt of the spring-loaded options.

41.     Defendant Sean N. Tucker ("Tucker") is Vaxart's founder and Chief Scientific Officer. He has served as Chief Scientific Officer since February 2010.  On June 8, 2020, Tucker received 360,000 Vaxart stock options with $1.70 strike price, $0.69 below the closing price that day.  Tucker personally benefited from his receipt of the spring-loaded options.

42.     Defendant Margaret A. Echerd ("Echerd") has served as Vaxart's Vice President,

Controller and Principal Accounting Officer since December 2018.  On June 8, 2020, Echerd received 315,000 Vaxart stock options with a $1.70 strike price, $0.69 below the closing price that day.  Echerd personally benefited from her receipt of the spring-loaded options.

43.     The Defendants named in ¶¶34-42 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, by virtue of their positions with the Company, possessed the power and authority to control the contents of Vaxart's SEC filings, public statements, and presentations to securities analysts, investors, and other market participants.   Each Individual Defendant was provided with copies of the Vaxart statements and public filings alleged herein to be materially false or misleading prior to, or shortly after, their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each of these Defendants knew that the material adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were materially false and/or misleading when made.  Each Individual Defendant is liable for the false statements pleaded herein, as those statements were each "group-published" information and the result of the collective actions of these Defendants pursuant to a common scheme and wrongful course of conduct.

**D.     Armistice**

44.     Defendant Armistice Capital, LLC, is a New York, New York-based hedge fund focused on health and consumer companies.   Founded in April 2012 by Defendant Boyd, it is incorporated in Delaware.  Boyd continues to operate Armistice, serving as its CIO and Managing Partner, along with Defendant Maher, who has served since 2019 as Armistice's Managing Director. Collectively Armistice, Boyd and Maher are occasionally referred to herein as the "Armistice Defendants".

45.     Armistice is the parent and controlling entity of several Armistice-labeled funds, including Armistice Capital Master Fund Ltd., which is incorporated in the Cayman Islands, lists Armistice Capital's headquarters as its mailing address, and lists Steven Boyd as its director and Managing Member.

46.     Armistice began investing in Vaxart in August 2018 and became a controlling

shareholder in late 2019.  As of September 30, 2019, Armistice owned approximately 52% of the voting power of Vaxart's outstanding shares of common stock, making Vaxart a "controlled company" within the meaning of applicable NASDAQ listing rules.  According to the 13D/A Vaxart filed on October 7, 2019, by October 2, 2019, Armistice owned 65.2% of the shares.  Throughout all relevant periods discussed herein, Armistice controlled Vaxart by virtue of its outsized holdings of Vaxart common stock and the multiple directors it placed on Vaxart's Board.

## IV.    SUBSTANTIVE ALLEGATIONS

**A.    Armistice Takes Control of Struggling Pharmaceutical Company Vaxart**

47.    Founded in March 2004, Vaxart has yet to successfully develop and commercialize a single product of its own.  The Company has not generated any product revenue on any product it has ever developed, nor has it ever earned a profit.

48.    In February 2018, Vaxart became a public company through a reverse merger when it completed its combination with Aviragen Therapeutics, Inc. ("Aviragen"), a publicly-traded company on the NASDAQ.  The newly-combined company then adopted the name "Vaxart" and switched its ticker symbol to "VXRT."

49.    From the start, Vaxart promised to reinvent vaccines by ditching the need for needles and visits to the doctor or pharmacy.  Instead, as the Company declared in its January 2, 2018 Prospectus mailed to shareholders of Aviragen and Vaxart urging approval of the proposed merger:

> Vaxart's oral vaccines are administered using a convenient room temperature-stable tablet, rather than by injection.  Vaxart believes that tablet vaccines are easier to distribute and administer than injectable vaccines, and have the potential to significantly increase vaccination rates.

50.    Despite initial investor excitement following the reverse merger, along with Vaxart's touting of its "proprietary oral vaccine platform," Vaxart's common stock price slid from a high of $9.50 on its first day of trading on February 14, 2018, throughout the remainder of the year and the first four months of 2019 to close below $1.00 on April 9, 2019.  With a market capitalization of just $8 million and a rock-bottom share price, Vaxart was a ripe target for takeover by almost any interested investment group or hedge fund.

51.    In stepped Armistice Capital, a self-described "long/short, value-oriented and event-

driven hedge fund" that primarily targets "health care and consumer" companies. Pursuant to a public offering of both common stock and warrants, on April 11, 2019, Vaxart sold Armistice warrants to purchase 4,090,909 shares of Vaxart common stock at $1.10 per share. Warrants are instruments used to obtain other securities, including common stock, whereby the warrant-holder (in this case, Armistice) can convert individual warrants held into a pre-determined number of shares (in this case, one warrant could be converted into one share of Vaxart common stock that could be purchased for $1.10 per share). The warrant-holder is then permitted to sell its newly-acquired shares, subject to any number of restrictions.

52.     Pursuant to the terms of the Offering, Armistice was limited from entirely exercising its warrants in two key respects. First, the warrants prohibited the holder from converting the warrants to common stock "to the extent that the holder would own more than *4.99%* of the outstanding common stock immediately after exercise." [Emphasis added.] Second, the warrants required the holder to provide 60-days' notice to Vaxart of an increase in beneficial ownership.

53.     These two provisions are standard terms in public offerings of warrants and other instruments that issuers rely on to protect the integrity of the company, its common stock price, and its shareholders. In the absence of such protections, warrant-holders like Armistice could seize on good news or positive momentum in the company's stock price and immediately convert its warrants into common stock and sell, diluting the overall number of outstanding shares, depressing the stock price, and inhibiting the company's ability to *itself* utilize an elevated stock price to issue and sell new shares. For a company like Vaxart that had never earned a single dollar in profit, public issuances of common stock serves as one of the primary methods the Company has to fund its operations.

54.     On September 30, 2019, pursuant to another mixed public offering of common stock and warrants, Armistice obtained warrants to purchase 16,666,667 shares of Vaxart common stock at $0.30 per share. Again, Vaxart imposed a beneficial ownership limitation (*9.99%*) and a 60-day notice requirement on Armistice's ability to convert its warrants to common stock and sell.

55.     In addition to holding an outsized number of warrants, by September 30, 2019, Armistice had also acquired a majority stake in Vaxart through its holdings in the Company's common stock. As Vaxart reported in its 3Q 2019 Form 10-Q, as of September 30, 2019, Armistice held

approximately 52% of Vaxart's outstanding shares of common stock and "[a]s a result, Armistice has the ability to substantially influence us and exert significant control through this ownership position." On October 8, 2019, Armistice filed an amended Schedule 13D form noting that it controlled 25 million shares of Vaxart common stock, representing 65.2% of all outstanding shares, signed by Defendant Boyd.

56.     Indeed, Armistice wasted no time in exerting its control over Vaxart, expanding the Company's Board to eight seats in October 2019 and appointing Boyd, Armistice's Founder and Managing Member, and Maher, Armistice's Managing Director, to Vaxart's Board.

**B.      Defendants Capitalize on COVID-19 to Pump Up Vaxart's Common Stock Price**

57.     Vaxart's common stock price continued to struggle throughout the second half of 2019 and by October 2019 fell below $0.40 per share, never closing above that threshold again for the remainder of the year.

58.     To pull the Company out of its free-fall, on December 26, 2019, Vaxart's Board under Armistice control voted to terminate between 15 and 20 employees, about half of the Company's personnel – mainly manufacturing – and cut ties with KPMG LLP, Vaxart's registered public accounting firm, and switched to an accounting firm with whom Armistice has worked with in companies in which it has previously invested.

59.     Moving forward, Vaxart announced, it planned to focus its remaining resources on developing at long last an oral vaccine for norovirus and seasonal influenza.  Unfortunately, this was a material misstatement.  Shortly after Armistice took control of the Company, Vaxart announced to employees that the Company's financial health was in such poor shape that to conserve corporate resources it had decided to terminate the norovirus program.

60.     CW1 was retained in May 2018, and served as Vaxart's lead norovirus researcher until December 31, 2019.  CW1 was tasked with overseeing Vaxart's norovirus clinical trials and reported directly to Defendant Latour, Vaxart's then-CEO.

61.     Prior to CW1's employment with the Company, Vaxart had retained a contract manufacturing organization, Lonza Pharma & Biotech ("Lonza"), to develop its norovirus vaccine. After Vaxart retained CW1, it terminated its relationship with Lonza.  However, in the fall of 2019,

1   Vaxart retained Lonza again to supplement CW1's work.  Shortly thereafter, Defendant Latour
2   informed CW1 and other Vaxart personnel that Armistice executives sought to cease all operations
3   relating to norovirus vaccine development, as a cost cutting measure.  CW1 – along with multiple
4   Vaxart finance personnel – challenged this decision, emphasizing that Vaxart had already executed the
5   manufacturing agreement with Lonza, and noting that breaching the agreement – for which Lonza had
6   already commenced performance – would be a costly endeavor.  More particularly, in late December
7   2019, CW1 received a phone call from Defendant Latour, where they discussed the cancellation/breach
8   of the Lonza contract.  Latour explained that this contract termination effectively meant that the
9   Company could no longer pursue development of the norovirus vaccine.  Latour further stated that
10  Vaxart would be "on life support for the next three months" and that if Vaxart could not obtain a
11  partnership with a third party in that timeframe "it was over."  Nonetheless, Vaxart went ahead,
12  terminated its agreement with Lonza, and discontinued its norovirus vaccine program.  At this point in
13  time, the Company only retained a single partnership agreement, with Johnson & Johnson, to develop
14  Vaxart's influenza vaccine (not norovirus).  Shortly thereafter, citing the discontinuance of the
15  norovirus program, Vaxart terminated CW1, effective December 31, 2019.

16          62.     Two days later, on January 2, 2020, Vaxart announced that it had laid off its
17  manufacturing division and announced, "We plan to prioritize and focus our resources on partnering
18  opportunities, including our *norovirus* and universal influenza programs, and not on manufacturing
19  capabilities." [Emphasis added.]  Throughout the Class Period, Vaxart repeatedly claimed to the public
20  investors that the Company has "development programs . . . that are designed to protect against
21  coronavirus, *norovirus*, seasonal influenza and respiratory syncytial virus (RSV)." [Emphasis added.]
22  At no point does Vaxart inform the public that it had discontinued its norovirus program in the fall of
23  2019, only informing the public in March 2020 that, (after it raised an additional $10 million in a direct
24  offering) in light of the Company's effort to develop a COVID-19 vaccine, "we have put several
25  vaccine programs *on hold*, including the norovirus vaccine program." [Emphasis added.]

26          63.     Unfortunately for Vaxart and its new owners, the announced cost savings and declared
27  corporate focus on January 2, 2020, had virtually no impact on the Company's stock price, which
28  continued to languish as a penny stock, well-below any meaningful level at which Vaxart could issue

1    a follow-on offering to raise additional funding to pay for continued operations.

2          64.     Then an opportunity arose that presented Vaxart with the ability to boost its stock price

3    and Armistice an opportunity to recoup its investment in Vaxart's common stock and possibly exercise

4    its warrants as well.

5          65.     By the middle of January 2020, the Coronavirus first identified in China approximately

6    one month earlier was detected in multiple countries, including Thailand, Japan, South Korea, and the

7    United States, which confirmed its first case on January 20, 2020.  Ten days later, the WHO declared

8    the outbreak a "Public Health Emergency of International Concern" as the virus continued to spread

9    unabated.  Seizing on the fear and uncertainty presented by the oncoming pandemic, Vaxart issued a

10   press release before the market opened the following day (January 31, 2020), with the bold headline,

11   "**Vaxart Announces Initiation of Coronavirus Vaccine Program**," declaring that it had "initiated a

12   program to develop a coronavirus vaccine candidate based on its proprietary oral vaccine platform,"

13   failing to mention that its oft-touted "proprietary platform" had ***never once*** in the Company's history

14   actually led to the creation of a viable, commercializable product.  In fact, according to CW1, this was

15   the exact same platform the Company had utilized in its secretly shuttered norovirus program.  That

16   day, Vaxart's stock price closed above $1.00 for the first time since early April 2019, closing at $1.25,

17   a 71% gain against the prior day's closing price.

18         66.     Throughout almost the entirety of February, the stock sat parked in the low $1.00-range,

19   until another announcement, this one on February 27, 2020, sent Vaxart soaring again.  The Company

20   announced that it would shortly engage in another public offering, selling common stock and warrants

21   "at a combined purchase price of $2.50 per share and associated warrant," which would raise Vaxart

22   $10 million.  That day, Vaxart closed at $2.47, an almost 50% gain against the prior day's closing

23   price.  But it stayed there only briefly.

24         67.     Again, Vaxart's share price stalled-out.  Without any new positive information,

25   Vaxart's common stock price sat in the lower $2.00 range dropping to below $1.30 by mid-March

26   2020.

27         68.     With the world in the grips of a global pandemic, Defendants' scheme to enrich

28   themselves began to take form.

PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT - 17
Case No.: 3:20-cv-05949-VC

69.     Then, out of the blue and before the market opened on March 18, 2020, Vaxart issued a press release, boldly titled, "**Vaxart Announces It Entered Into An Agreement With Emergent BioSolutions For The Development And Manufacturing Of Oral Coronavirus (COVID-19) Vaccine Candidate**," declaring that it had entered into an agreement with Emergent BioSolutions Inc. ("Emergent") to "develop and manufacture Vaxart's experimental oral vaccine candidate for coronavirus disease," adding that it expected "to initiate a Phase 1 clinical study early in the second half of 2020." Again, Vaxart touted the potential benefits of its orally-administered, room temperature-stable tablet vaccine, "based on its proprietary oral vaccine platform." Having just laid off its manufacturing team, Vaxart now needed a contractor to produce the vaccine samples with which it would need to test potential subjects in clinical trials and Emergent appeared to be the company that would fill that need.

70.     Again, Vaxart's shares skyrocketed, closing at $2.34, a 21% gain against the prior day's closing price.

71.     Vaxart now had established the pattern of the scheme: announcement, followed by a stock-spike, and then share-price stagnation or retreat. More announcements, many of larger significance, would follow.

72.     After announcing on March 31, 2020 that "it had produced five COVID-19 vaccine candidates for testing in its preclinical models" and "currently expects to initiate" a Phase 1 clinical study of a COVID-19 vaccine "early in the second half of 2020," which produced a modest 4% spike in the Company's stock price, on April 14, 2020, Vaxart announced that the Board had named Andrei Floroiu, a seasoned pharmaceutical and biotech hand, as the Company's newest director. What went unsaid were Floroiu's extensive connections to Armistice and its two principals, Boyd and Maher.

73.     A "personal friend" of Armistice Founder and Managing Member Steven Boyd, Floroiu first met Boyd when they both worked for the consulting firm McKinsey. Later, in 2013, Floroiu worked at Armistice as a Senior Analyst.

74.     The Floroiu announcement created a splash, driving Vaxart's share price up to a closing price of $2.04, a 16.5% gain against the prior day's closing price.

75.     Before the market opened on April 21, 2020, Vaxart declared that the Company

"obtained positive pre-clinical results for its COVID-19 vaccine candidates, with several of the vaccine candidates generating immune responses in all tested animals after a single dose." Though extremely light on details – including animal type and number of test subjects – the press release again proclaimed the genius of Vaxart's proprietary platform and the advantages a room temperature-stored, orally-administered COVID-19 vaccine would provide. "These early pre-clinical results are in line with those for our oral influenza vaccine which was protective in a clinical Phase 2 efficacy study," Sean N. Tucker, Vaxart's Chief Scientific Officer, declared, analogizing the incipient COVID-19 vaccine research to the Company's discontinued influenza vaccine research.

76.     The market reacted extremely favorably that day, sending Vaxart's common stock price up over 33% against the prior day's closing price, giving the stock the momentum to finally re-cross the $3.00 mark at a closing price of $3.16.

77.     Vaxart's stock price continued to climb following additional announcements on April 28 and 30, 2020, the former announcing 1Q 2020 results and a reiteration of the Company's "focus[] on developing a vaccine candidate for COVID-19," and the latter revealing additional positive pre-clinical animal results, yet again failing to reveal anything of substance to the investing public and merely reiterating the benefits of the Company's proprietary platform. On each day, the Company experienced substantial intra-day share price spikes: April 28, 2020 saw Vaxart's common stock reach a high of $3.85, before retreating to close at $3.27; April 30, 2020, saw Vaxart hit a high of $3.34, followed by another retreat, this time to $2.70.

**C.     With a Now-Elevated Stock Price, Armistice Begins to Cash Out of Its Vaxart Common Stock Position from April 28 to June 3, 2020**

78.     With Vaxart now riding high in the $3.00-range, up an astonishing 750% since the start of 2020, Armistice began to sell. On April 28, 2020, in conjunction with the intra-day stock spike following the announcement of the Company's 1Q 2020 results and updated business strategy, Armistice sold almost 1.3 million shares, sending the stock price down. The following day, it sold approximately 875,000 shares, again depressing prices. One day later, in conjunction with yet another announcement – the April 30, 2020 positive pre-clinical animal results – Armistice dumped an astounding 4.4 million shares, again sending Vaxart's common stock on yet another retreat.

79.    This would become a familiar theme over the course of May 2020, as Vaxart's controlling entity and directors sought to enrich themselves from the COVID-related announcements.

80.    In an effort to maintain its share price long enough to allow Armistice to sell out of the Company, positive news continued to pour out of Vaxart and, like clockwork, Armistice then simultaneously dumped millions of shares.

81.    On May 12, 2020, the Company announced updated corporate results, including reiterating its prior animal results, and noting that "[t]he manufacturing collaboration with Emergent BioSolutions is progressing well and, provided Vaxart elects to proceed, Emergent is on schedule to produce bulk cGMP vaccine in time for initiation of a Phase 1 clinical study during the second half of 2020." Vaxart's common stock price surged in response, hitting an intra-day high of $3.18, an 11.5% gain against the prior day's close, only to then retreat following a massive contemporaneous sale of approximately 1.6 million shares by Armistice, to close up only 2.8%.

82.    Before the market opened on May 20, 2020, Vaxart again released highly significant news, (1) announcing that it had "selected its lead COVID-19 vaccine candidate" and (2) noting that it had inked a contract with another manufacturer, Kindred Biosciences, "to manufacture bulk vaccine under cGMP to complement the manufacturing capacity of partner Emergent BioSolutions."   In response, Vaxart's common stock surged, reaching an intra-day high of $3.47, a 13% gain against the prior day's closing price, before yet again retreating under the weight of Armistice's sale of 1.15 million shares to close at $3.19, a modest 4% gain.

83.    Ultimately, from April 28 through the first three days of June 2020, Armistice sold an astonishing 18,200,000 shares of Vaxart, reducing its common stock holdings down to 7,000,000 shares, and earning gross sales of $53 million, a staggering amount of money, considering Vaxart had a market capitalization of under $8 million when Armistice bought its first warrants approximately one year earlier.

**D.    Defendants' Fraudulent Scheme to Unfairly Enrich Themselves and Armistice Through Spring-Loaded Options and Unrestricted Sales**

84.    Defendants' fraudulent scheme to dramatically increase Vaxart's share price, grant Individual Defendants spring-loaded options, and allow Armistice unrestricted sales began in April

2020, with the motion to shareholders (in the April 24, 2020 Proxy Statement) to increase the amount of shares Vaxart could issue, built up steam in June with approval and the grant of options to allow the issuance of millions of shares, and the near complete removal of the restrictions on Armistice ability to exercise its warrants and sell the stock – restrictions needed to protect the Company from insider trading – and culminated with material misstatements they knew would raise the value of the struggling Vaxart allowing for Armistice to cash out.  The scheme succeeded with a $267 million windfall for Armistice.

85.     Armistice needed more shares, and the 2019 Plan no longer had any shares available for future stock option grants.  Therefore, to move the fraudulent scheme forward, Vaxart would need to amend the 2019 Plan to increase the number of shares by 6,400,000 shares, in order to enable Vaxart to continue to grant stock options under the 2019 Plan.

86.     After months of pumping up Vaxart's common stock and an almost five-week period in which Armistice dumped two-thirds of its common stock holdings on sales exceeding $53 million – a mind-boggling sum, which would represent over 25% of Vaxart's market capitalization of $203 million that day – on June 3, 2020, Armistice abruptly halted its sales entirely.  As of that day, Armistice retained, in addition to its 7,000,000 shares of common stock, the entirety of both sets of warrants, 16,666,667 warrants to purchase Vaxart common stock at $0.30 per share and 4,090,909 warrants to purchase Vaxart common stock at $1.10 per share.  The encumbrances previously placed on Armistice's ability to sell – the 60-day notice period and the beneficial ownership limitations – remained.  However, as set forth below, Defendants' scheme to change those limitations and increase available shares was, at that time, in the hands of the Board, controlled by Armistice and their outsized amount of common stock.

87.     That same day, June 3, 2020, *Bloomberg* and the *New York Times* identified the names of five companies selected for funding by the recently announced U.S. federal government-sponsored program to speed the development of multiple COVID-19 vaccines, known as Operation Warp Speed.  The publicly-identified companies were Moderna, AstraZeneca, Johnson & Johnson, Merck & Co., and Pfizer.  Vaxart was not among those listed.  When OWS was initially announced on May 15, 2020, HHS' press release noted that there were "about eight candidates, which will go through further testing

in early stage small clinical trials."  Now, with five of those candidates identified, speculation mounted as to the identities of the unknown two or three.

88.     Vaxart was *not* one of the unidentified two or three vaccine candidates selected for OWS, a fact Defendants knew on June 3, 2020.   Defendants continued to scheme to keep this information from the market and the shareholders who did not have this inside information.

89.     At the time, OWS had imposed a strict set of selection criteria that Vaxart obviously did not qualify for, but would have known from required information it would have had to submit. Though the selection criteria were a secret to the public at the time, under no circumstances could Defendants have been under the mistaken belief that Vaxart's inchoate oral vaccine was selected.  As Moncef Slaoui and Matthew Hepburn, OWS' head and development lead, wrote in the *New England Journal of Medicine* ("*NJEM*") on August 26, 2020:

> OWS selected vaccine candidates on the basis of four criteria.  **We required candidates to have robust** preclinical data or early-stage clinical trial data supporting their potential for clinical safety and efficacy.  **Candidates had to have the potential, with our acceleration support, to enter large phase 3 field efficacy trials this summer or fall (July to November 2020)** and, assuming continued active transmission of the virus, to deliver efficacy outcomes by the end of 2020 or the first half of 2021.   Candidates had to be based on vaccine-platform technologies permitting fast and effective manufacturing, and their developers had to demonstrate the industrial process scalability, yields, and consistency necessary to reliably produce more than 100 million doses by mid-2021. **Finally, candidates had to use one of four vaccine-platform technologies that we believe are the most likely to yield a safe and effective vaccine against Covid-19: the mRNA platform, the replication-defective live-vector platform, the recombinant-subunit-adjuvanted protein platform, or the attenuated replicating live-vector platform.**

[Emphasis added.]

90.     Additionally, as Alex M. Azar II ("Azar"), HHS Secretary, and Slaoui wrote on September 2, 2020, in *USA Today*, OWS "aim[ed] to select eight candidates for support, *two from each platform*," in order to "buil[d] a portfolio that will maximize our chances at success." [Emphasis added.]

91.     As noted in the *NEJM* article, OWS sought vaccine candidates with "the potential . . . to enter large *phase 3* field efficacy trials this summer or fall (July to November 2020)." [Emphasis added.]  At the time, Vaxart's COVID-19 vaccine candidate was nowhere near that stage and the

Company had *repeatedly* informed the public, "Manufacturing of our COVID-19 vaccine is on track to start a first *phase 1* study in the second half of this year, possibly as early as the summer." [Emphasis added.]

92.    Further, as the *NEJM* article noted, OWS targeted "four vaccine-platform technologies" and as the *USA Today* article noted, OWS aimed to select "two from each platform." Vaxart's COVID-19 candidate utilized a "replication defective" platform, the *same* platform utilized by two of the publicly-named companies, Johnson & Johnson and AstraZeneca. Therefore, even if Vaxart was prepared to promptly launch a "large *phase 3* field efficacy trial[]" for its COVID-19 vaccine candidate – which it was absolutely *not* – OWS still would not have selected the Company anyway. For this additional reason, it would have been impossible for Vaxart to believe that their COVID-19 candidate was selected.

93.    Despite the fact that OWS had *not* selected Vaxart's COVID-19 vaccine candidate, Defendants took full advantage of the public uncertainty around the unknown two or three vaccine candidates, leveraging the global need for a viable COVID-19 vaccine – and the market's desire to figure out the remaining identities of the OWS participants – into a massive windfall, dwarfing the sum Armistice had already acquired.

94.    First, Defendants struck a corrupt bargain: in exchange for allowing Armistice the unimpeded ability to convert its warrants into common stock and immediately sell, seven officers and directors were granted "spring-loaded options," which Defendants knew would almost immediately be worth a significant sum in the weeks to come.

95.    Between June 1 and June 5, 2020, Vaxart's Board, including Boyd and Maher, met and approved amendments to the warrant agreements by unanimous written consent. Gone entirely was the 60-day notice period and both beneficial ownership limitations were hiked up to 19.99%. Henceforth, Armistice would be unencumbered in converting its warrants to common stock and immediately selling.

96.    On June 8, 2020, these amendments became effective when they were signed on behalf of Armistice by Boyd on that date.

97.    On June 8, 2020, the shareholder, based on the April Poxy approved by the Board also

1    approved the increase in Vaxart shares from 1.6 to 8 million and the granted to Defendants Yedid,

2    Davis, Latour, Floroiu, Finney, Tucker, Echerd a total of 3,572,100 options to purchase Vaxart

3    common stock at prices ranging from $1.70 to $2.46.

4           98.     Six days later, on June 14, 2020, Defendant Latour, heretofore Vaxart's CEO, was

5    replaced by Board member and former Armistice employee, Defendant Floroiu, a "personal friend" of

6    Armistice Founder, Managing Member and current Board colleague, Defendant Boyd, who also served

7    as his boss when Floroiu worked for the hedge fund.  That same day, Floroiu was granted options to

8    purchase an additional 900,000 shares of the Company's common stock.

9           99.     Following Armistice's conclusion of their massive stock sale on June 3, 2020,

10    throughout the next three weeks, Vaxart's common stock floundered in the low- to mid-$2.00 range,

11    pressed down under the weight of the hedge fund's sale of an astounding 18.2 million shares.

12           100.    With the structure of the fraudulent scheme now in place to allow Armistice to dump

13    the entirety of its warrants to purchase almost 20.7 million shares and its remaining 7 million shares

14    of common stock, Defendants devised one more stock spike, bolder and more aggressive than ever

15    before.

16    **E.**      **Defendants Spike Vaxart's Common Stock Price High Enough to Allow Armistice to Reap a $267 Million Windfall**

17

18           101.    Armistice's golden opportunity for profit came three weeks later at the end of June

19    when the fraudulent scheme provided the windfall.

20           102.    Before the market opened on June 24, 2020, Vaxart announced that effective Monday,

21    June 29, 2020, it would join the Russell 3000, a stock market index benchmarked to the 3,000 largest

22    publicly-traded U.S. companies.  That day, Vaxart closed at $3.19, a 20% jump against the prior day's

23    closing price.

24           103.    The following day, June 25, 2020, Vaxart common stock almost doubled after the

25    Company declared in a pre-market press release that it had signed a memorandum of understanding

26    ("MOU") with the manufacturer Attwill "to manufacture a billion or more doses per year . . . of our

27    COVID-19 vaccine for the US, Europe and other countries in need."  Vaxart common stock closed at

28    $6.26 that day, a 96% gain against the prior day's closing price.

104.   Vaxart failed to mention, however, that at the time of its Attwill MOU, the contract manufacturer lacked the critically necessary FDA certifications to manufacturer **any** doses of Vaxart's COVID-19 vaccine and, almost as important, lacked the personnel and operational capabilities to manufacturer a **billion or more** doses as well.

105.   Attwill is a small contract manufacturer currently based in Lodi, Wisconsin. Originally based in a suburb of Salt Lake City, Utah, in the residential home of its co-founder, managing partner, and Chief Operating Officer, Attilio Di Fiore ("Di Fiore"), in 2017 Attwill moved to its current location when it purchased pharmaceutical manufacturer Anteco Pharma LLC and its Wisconsin facility. At all relevant periods, Attwill had 25 to 30 personnel in total at the Company.

106.   Currently, Attwill has three manufacturing lines of business: (1) lyophilization, a process whereby water is removed from a pharmaceutical ingredient (*i.e.*, a chemical compound) or food product by freeze-drying it (instead of heating it) and placing it under a vacuum; (2) vascular accessory medical products; and (3) peptide – short chemical chains of amino acids, linked by peptide bonds – biomaterial.

107.   CW2 worked for Attwill from September 2016 to July 2020. In 2018, CW2 was promoted to the position of Quality Control Specialist. In that role, CW2 reported to CW3, Attwill's Quality Assurance Manager. CW3, who was employed by Attwill from October 2016 to June 2020, reported directly to Di Fiore.

108.   In early 2020, CW2 was instructed to conduct a "Gap Assessment" of Attwill's capabilities. The goal of the review was to determine what would be required in order for Attwill to be able to obtain FDA certification to produce pharmaceutical products under 21 C.F.R. §§ 210 and 211, two of the most critical FDA provisions that drug manufacturers must adhere to before they are permitted to manufacture drugs under federal law. These two sections form the FDA's **current Good Manufacturing Practices** ("cGMP") and set forth the "minimum" methods and controls that drug producers must follow to "assure" that a treatment for human consumption has the safety, identity, and other characteristics that the treatment "purports or is represented to possess." Food & Drugs, 21 C.F.R. § 210.1(a) (2020). Obtaining and maintaining compliance with §§ 210 and 211 is no easy task for any company and is almost impossible for a company as small as Attwill. For example, the FDA

estimated the annual record-keeping burden of 21 C.F.R. § 211.100(b) alone (requiring that compliance with written procedures be documented at time of performance and that any deviations be recorded and justified) to be 25,104 hours. Similarly, creating 25 new standard operating procedures – required by the FDA to assure drug quality, identity, and purity under 21 C.F.R. §§ 211 – might, per the FDA's estimation, take 20 hours per person and 50,000 hours in one year. Rules and Regulations, 76 Fed. Reg. 188, 60055 (Sept. 18, 2011).

109.    CW2 handled the majority of the "Gap Assessment" review and drafted the final report summarizing the findings. CW3 reviewed the memo and assented to its findings. The report painted a dire picture. The report concluded that Attwill faced several significant regulatory gaps, which would require substantial time and expense to address, before the FDA would certify Attwill as complying with §§ 210 and 211. The report, and its findings, were conveyed to Attwill leadership, including to co-founders and managing partners William Jackson and Di Fiore.

110.    Further, CW2 explained that at the time Attwill was severely short staffed, a further factor that would not only hinder the company's ability to gain cGMP compliance, but also would have impacted Attwill's ability to manufacture the "billion or more doses per year" that Vaxart claimed in its June 25, 2020 press release. CW2 also said that Attwill also lacked the operational capacity to manufacture one billion doses per year. According to both CW2 and CW3, Attwill was so short-staffed, that personnel in one area or role occasionally had to assume duties in other areas, and both of these CWs, in their critical roles of maintaining product quality, often felt overworked and/or overwhelmed in their positions.

111.    Both CW2 and CW3 indicated that by the time each left Attwill, the company had not obtained cGMP certification under sections §§ 210 and 211. In fact, CW3 noted that they conducted two or three similar Gap Assessments in 2019 for related cGMP certifications, and in each instance, Attwill had opted not to pursue certification due to the substantial resource investment it would require. The financial constraint experienced by Attwill is corroborated by a *Dun & Bradstreet* Business Information Report ("D&B Report") on the Company. The D&B report characterizes Attwill as having a "high" overall business risk, which was supported by a "high" delinquency predictor score and a "moderate-high" financial stress score; all of which indicate that Attwill was strained for cash

and therefore could not move forward with obtaining regulatory certification to manufacture pharmaceutical drugs.

112.    In short, at the time Vaxart and Attwill inked their MOU, Attwill lacked the ability from a regulatory, personnel, or operational standpoint to manufacturer Vaxart's COVID-19 vaccine, a fact Vaxart either knew or recklessly disregarded.

113.    Before the market opened the following day, Friday, June 26, 2020, Vaxart issued a press release titled "**Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed.**"  The sub-head and the text of the announcement then stated that Vaxart's COVID-19 candidate "has been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed."  In the following paragraph, Vaxart's new CEO, Defendant Floroiu, declared, "We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated."

114.    Immediately, Vaxart's common stock soared, reaching an intra-day all-time high of $14.30, before ultimately closing at $8.04, a 28% gain against the prior day's closing price.  That same day, Armistice revived its old script and timed its sales with the announcement, converting the entirety of its $0.30 warrants to common stock – 16,666,667 shares – and then selling those shares, along with an additional 1,560,000 of its existing common stock holdings.  This contemporaneous sale of over 18.2 million shares grossed Armistice $189 million and dragged down Vaxart's common stock price from its intra-day high.

115.    The following trading day, Monday, June 29, 2020, Armistice converted the entirety of its $1.10 warrants into common stock and sold those shares, along with 5,294,477 shares of existing common stock holdings.  This sale of almost 9.4 million shares grossed Armistice a further $77.8 million.

116.    Thus, Armistice almost completely liquidated all of its common stock ownership in Vaxart, retaining just 0.2% of Vaxart's outstanding common stock.  All together, these contemporaneous stock sales of over 27.6 million shares grossed Armistice approximately $267 million.  When combined with its earlier sales, Armistice grossed approximately $320 million.

117.    Unfortunately, Defendants' artfully-worded press release dramatically overstated the

Company's involvement with OWS.  In truth, despite Defendant Floroiu's declaration, Vaxart was **not** "one of the few companies selected by Operation Warp Speed."  Vaxart deliberately blurred the line between the two programs, willfully misleading investors and convincing the market that Vaxart's COVID-19 vaccine candidate was one of the two or three unknown vaccine candidates selected for federal funding.  Instead, Vaxart was **not** selected for **any** federal funding.  Vaxart was **merely** granted **permission** to test its COVID-19 vaccine candidate on non-human primates, the results of which, as of the date of the filing of this Amended Complaint, have never been released to the public.

**F.     The Truth Emerges: Corrective Disclosure and Post-Class Period Events**

118.     On Saturday, July 25, 2020, the *New York Times* published an article primarily focused on Vaxart headlined "Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine," which highlighted the astonishing sums Armistice earned from its contemporaneous stock sales and pierced the deliberately misleading obfuscation created by Vaxart's June 26, 2020 press release conflating OWS *selection and funding* with NHP *participation*.

119.     The article threw cold water on the idea that Vaxart was set to receive federal funding to develop its COVID-19 vaccine – the central tenet of OWS selection – and, further, denied that Vaxart was currently even under consideration:

> Vaxart's vaccine candidate was included in a trial on primates that a federal agency was organizing in *conjunction* with Operation Warp Speed.  But *Vaxart is not among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses.*

> "The U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers, and we are negotiating with others.  *Neither is the case with Vaxart*," said Michael R. Caputo, the department's assistant secretary for public affairs.  "Vaxart's vaccine candidate was selected to participate in *preliminary* U.S. government studies to determine *potential* areas for *possible* Operation Warp Speed partnership and support.  At this time, those studies are ongoing, and no determinations have been made."

[Emphasis added.]

120.     NHP *participation* and OWS *selection and funding* are two distinct areas, the article explained.  According to the HHS Spokesperson quoted in the article, the former is a "*preliminary*" study that may assist the federal government "to determine *potential* areas for *possible* Operation Warp

Speed partnership and support." [Emphasis added.]  These are contingent words, spoken in the future tense, by the HHS Spokesperson, showing what *may* happen at a later date, not the past tense language from Vaxart's June 26, 2020 press release – "We are very pleased to be one of the few companies selected by Operation Warp Speed." – indicating Vaxart already belonged to the group of companies selected for OWS funding.

121.    In fact, the article stated, HHS officials took note of the misleading press release and upon learning about Armistice's contemporaneous stock sales, alerted the SEC:

> Some officials at the Department of Health and Human Services have grown concerned about whether companies including Vaxart are trying to inflate their stock prices by exaggerating their roles in Warp Speed, a senior Trump administration official said.  The department has relayed those concerns to the Securities and Exchange Commission, said the official, who spoke on the condition of anonymity.

122.    HHS' concerns were justified and on October 14, 2020, Vaxart released a Form 8-K that admitted that their June 26, 2020 press release and the contemporaneous trades by Armistice have drawn scrutiny from federal investigators at the SEC and Department of Justice.  According to the 8-K, in July 2020 the Company received a Grand Jury Subpoena from the U.S. Attorney's Office for the Northern District of California, calling for documents "which broadly pertain to the Company's participation in, and disclosure of, an Operation Warp Speed ('OWS')-funded nonhuman primate study, and option grants, warrant transactions, and other corporate and financing matters." Additionally, the same 8-K admitted that in August 2020 the SEC requested "a variety of documents that broadly pertain to same subject matters of the documents provided to the U.S. Attorney's Office, and related matters."  One month later, in its 3Q 2020 10-Q, the Company also revealed that as of October 2020, the U.S. Attorney for the Eastern District of New York and the Fraud Section of the Department of Justice ("DOJ") were also investigation and that shortly thereafter the Company received a DOJ grand jury subpoena seeking substantially the same information as the subpoena from the Northern District of California.

123.    Shortly after the *New York Times* published its Saturday, July 25, 2020 article, HHS' Office of Public Affairs' Twitter handle, @SpoxHHS, tweeted out the *New York Times* article and copied-and-pasted key language from the article, reiterating that Vaxart had *not* earned OWS selection

and funding, was **not** in negotiations with OWS for selection and funding, and had merely been selected for a "**preliminary**" study "to determine **potential** areas for **possible** Operation Warp Speed partnership and support." [Emphasis added.]

124.    The following trading day, Monday, July 27, 2020, Vaxart's common stock fell to $11.16, a 9% drop from the prior trading day's closing price.

125.    Over the next three weeks, as the market digested the news that Vaxart overstated its participation with the federal government in developing a COVID-19 vaccine, its common stock slid, falling a further 17.5% through August, 19, 2020.

126.    After the market closed that day, *Business Insider* released an interview with OWS head Moncef Slaoui that put the hammer down on Vaxart and its claim that it had been selected by OWS in an article entitled, **"The leader of Operation Warp Speed says some biotechs 'misled their shareholders" and 'frustrated the hell' out of him by playing up connections to the secretive government program."**  In relevant part the article states:

> The head of Operation Warp Speed, the US government's secretive coronavirus vaccine initiative, has had it with companies that put out press releases claiming they're involved in the program.

> . . .

> "There's been a number of cases where companies have, frankly, made press releases that have frustrated the hell out of me because they **misled**, I think, **their shareholders** and their share price went up the roof just by saying the words Operation Warp Speed in the title of the press release," Slaoui told *Business Insider*.

[Emphasis added.]

127.    As a result, Vaxart fell a further 4.3% the following day, August 20, 2020.

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    Pre-Class Period Statements – Despite Cancelling the Norovirus Program in Late 2019, Throughout 2020 Vaxart Materially Misled Investors to Believe It Had an Ongoing Norovirus Program

128.    On January 2, 2020, Vaxart issued a press release announcing that the Board had terminated about half of the Company's employees, primarily in the manufacturing division, and henceforth, Vaxart would "prioritize and focus" its resources on its "norovirus and universal influenza programs":

1

2

3

> On December 26, 2019, the Board of Directors of Vaxart, Inc. approved a reduction-in-force affecting approximately 50% of our employees, which primarily impacted our manufacturing personnel.  We expect to incur approximately $375,000 in severance and termination costs and to complete the reduction-in-force by January 31, 2020.

4

5

> We plan to prioritize and focus our resources on partnering opportunities, including our norovirus and universal influenza programs, and not on manufacturing capabilities.

6

[Emphasis added.]

7

129.     In Vaxart's January 22, 2020 press release announcing publication in the *Lancet* of

8

positive results from a 2016-2017 clinical study of its influenza vaccine, the Company stated in its

9

"About Vaxart" section that "Vaxart's development programs include oral tablet vaccines that are

10

designed to protect against **norovirus**, seasonal influenza and respiratory syncytial virus (RSV), as

11

well as a therapeutic vaccine for human papillomavirus (HPV)."   [Emphasis Added.]  This exact

12

statement is repeated no less **20 more times** throughout the end of August 2020 in press releases and

13

8-Ks.

14

130.     Additionally, in that same January 22, 2020 press release, Vaxart claimed that "[t]hese

15

results also confirm the value of our oral vaccine platform, particularly for mucosal pathogens such as

16

flu, **norovirus**, RSV, as well as coronaviruses such as SARS, MERS and the virus that recently

17

emerged in China."  [Emphasis added.]

18

131.     In Vaxart's January 31, 2020 press release announcing initiation of COVID-19 vaccine

19

program, then-CEO Defendant Latour stated "We believe our oral tablet vaccines provide substantial

20

potential advantages, especially when targeting mucosal pathogens such as flu, **norovirus**, RSV and

21

the recently emerged coronavirus."  [Emphasis added.]

22

132.     In Vaxart's March 19, 2020 press release announcing its agreement with Emergent, its,

23

4Q and full year 2019 results, and its commitment to initiating a Phase 1 clinical study of its COVID-

24

19 vaccine "early in the second half of 2020," the Company also explained that in light of its new focus

25

on COVID-19, the norovirus program would be put "on hold":

26

> "This outbreak is a call to duty for all of us here at Vaxart and we are highly focused on the development of the COVID-19 vaccine," Dr. Latour continued.  "***Accordingly, we have put several vaccine programs on hold, including the norovirus vaccine program*** for which we recently successfully completed a Phase 1 study and for which we are

27

28

1

2

> actively seeking a development partner, as well as our therapeutic HPV vaccine program. The Janssen-partnered Universal Flu program is fully active and on track to be completed in the coming weeks."

3 [Emphasis added.]

4      133.   In Vaxart's April 28, 2020 press release announcing 1Q 2020 results and updated

5 business strategy, the press release indicated that the Company's norovirus program was ongoing,

6 stating:

7

8

> The Company continues to pursue strategic, financial and public-private partnerships to advance its development candidates, including its coronavirus vaccine candidates, norovirus and seasonal influenza vaccine programs.

9

10 [Emphasis added.]

11      134.   In Vaxart's May 12, 2020 press release announcing updated financial results, a

12 reiteration of its prior animal results, and a statement that "[t]he manufacturing collaboration with

13 Emergent BioSolutions is progressing well," the Company (i) repeated the April 28, 2020 statement

14 indicating that the norovirus program was ongoing and (ii) cited a "decrease" in R&D expenses,

15 "mainly due to a reduction in personnel costs after we ceased internal manufacturing as part of our

16 December 2019 restructuring and *a reduction in expenditure on our norovirus vaccine candidate*."

17 [Emphasis added.]

18      135.   The foregoing statements in ¶¶128-134 were materially false and misleading because,

at the time they were made:

19

20      (a)    Vaxart had *cancelled* its norovirus vaccine program in the fall of 2019 and

21 discontinued its relationship with Lonza, the contract manufacturer tasked with supplementing

22 the Company's norovirus efforts, and shortly thereafter terminated CW1, Vaxart's lead

23 norovirus researcher, who had been tasked with developing Vaxart's norovirus vaccine,

24 effective December 31, 2019. At the beginning of 2020, Vaxart had *no* norovirus program,

25 nor *any* norovirus partners, as Johnson & Johnson served as the Company's lone partner,

26 working with Vaxart to develop an influenza vaccine. Starting with Vaxart's January 2, 2020

27 8-K, any and all statements that conveyed to reader that idea that Vaxart would "prioritize and

28 focus" on norovirus and/or described Vaxart as a Company with development programs that

"include" norovirus are false.  Further, there was *no* "norovirus program" to put on hold, as the Company suggested in its March 19, 2020 statement.  Nor was the Company was continuing to pursue partnership efforts in its nonexistent norovirus program, as the Company suggested on April 28 and May 12, 2020.  Moreover, and Vaxart's May 12, 2020 statements about norovirus expenses omit the material fact that Vaxart had eliminated ***all*** norovirus expenses and not merely reduced them.

**B.     Vaxart Materially Misled Investors When It Claimed Attwill Had the Capacity to Manufacture a Billion or More Doses of Vaxart's COVID-19 Vaccine**

136.    On June 25, 2020, Vaxart issued a press release declaring that the Company had signed an MOU with Attwill "to manufacture a billion or more doses per year" of Vaxart's COVID-19 vaccine.  The title of the press release boldly exclaimed, "**Vaxart, Inc. Signs Memorandum of Understanding with Attwill Medical Solutions Sterilflow, LP**, *Enabling Production of A Billion or More COVID-19 Vaccine Doses Per Year Through Large Scale Lyophilization, Tableting and Coating*," and in relevant part states:

> "We believe [Attwill] experience coupled with ***its ability to manufacture a billion or more doses per year*** would be a beneficial addition to our group of CDMO [contract development and manufacturing] partners ***and enable the large scale manufacturing and ultimate supply of our COVID-19 vaccine for the US, Europe and other countries in need***," said Andrei Floroiu, CEO of Vaxart Inc.  "We believe our oral vaccines, generated on our proven platform, have the potential to offer superior protection against airborne viruses such as SARS-CoV-2 by triggering both mucosal and systemic immunity while being administered by a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns."

[Emphasis added.]

137.    The foregoing statement in ¶136 was materially false and misleading because, at the time it was made:

(a)     Attwill lacked the ability from a regulatory, personnel, or operational capacity to manufacturer Vaxart's COVID-19 vaccine.  At that time, Attwill lacked FDA certification under 21 C.F.R. §§ 210 and 211, two key federal provisions known as current Good Manufacturing Practices – or cGMP – that drug manufacturers must adhere to before they are permitted to manufacture drugs under federal law.  Obtaining and maintaining compliance with

cGMP regulations is a time and resource consuming task, as federal regulations have long stated. *See, supra* 76 Fed. Reg. 188, 60055 (Sept. 18, 2011).  As CW2, who served as Attwill's Quality Control Specialist from 2018 through July 2020, attests, in early 2020 Attwill directed CW2 to create a "Gap Assessment" report to determine what the Company would need to do to obtain cGMP certification.  That report, which was conveyed to Attwill leadership, repeated what multiple prior "Gap Assessment" reports stated: Attwill faced several significant regulatory gaps, which would require substantial time and expense to address, before the FDA would certify Attwill as complying with §§ 210 and 211.  Further, CW2 explained that at the time Attwill was severely short staffed.  This fact was corroborated by CW3, who supervised CW2 and served as Attwill's Quality Assurance Manager from October 2016 to June 2020 and reported directly to Attwill co-founder, managing partner, and Chief Operating Officer Di Fiore.  According to both of these CWs, Attwill was so short-staffed that personnel in one area or role occasionally had to assume duties in other areas, and CW2 and CW3, in their critical roles of maintaining product quality, often felt overworked and/or overwhelmed in their positions.  In sum, Attwill was not the manufacturer Vaxart purported it to be, a fact Vaxart either knew or recklessly disregarded when it purportedly signed its MOU with Attwill.

(b)      The press release suggested that Vaxart was closer to production than it actually was in context of its other statements, including statements that day at the H.C. Wainwright Virtual Fireside Chat Series where Defendant Tucker stated referring to a slide previously shown at the June 18 Raymond James Conference, "Again, we're working really fast, as fast as we've ever been able to do in for and we're about really [sic] submit our IND [Investigational New Drug Application] and really open up the regulatory path to start dosing people soon in the summer of this – this summer that is."  The slide stated that the IND would be submitted in June (it was not submitted and was nowhere near ready as it was not submitted until August) and thus there was not real prospect of dosing people in Phase 1 clinical trials that summer.  In fact, a small clinical trial of about 30 participants was not started until October at the earliest.

(c)      The press release would appear even more material when, the next day's announcement that Vaxart "was selected" as one of the few companies to participate in

Operation Warp Speed would come out.

**C.     Vaxart Materially Misled Investors When It Conflated Participation in a Non-Human Primate Study with Selection and Funding by Operation Warp Speed**

138.     On June 26, 2020, Vaxart issued a press release titled "**Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed**," with a sub-head stating "OWS to Test First Oral COVID-19 Vaccine in Non-Human Primates." The text of the press release then announced that Vaxart's "oral COVID-19 vaccine has been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed" before adding the following from Vaxart's newly-appointed CEO, Defendant Floroiu:

> "*We are very pleased to be one of the few companies selected by Operation Warp Speed*, and that ours is the only oral vaccine being evaluated.  SARS-CoV-2, the coronavirus that causes COVID-19, is primarily transmitted by viral particles that enter through the mucosa – nose, mouth or eyes – strongly suggesting that mucosal immunity could serve as the first line of defense," said Andrei Floroiu, Chief Executive Officer of Vaxart Inc.  "In addition, our vaccine is a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns."

[Emphasis added.]

139.     The foregoing statement in ¶138 was materially false and misleading because, at the time it was made:

(a)     Vaxart was *not* one of the two or three unidentified vaccine candidates selected for funding by OWS.  At the time, OWS imposed strict selection criteria.  According to the August 26, 2020 *NEJM* article by OWS' Slaoui and Hepburn, OWS sought vaccine candidates with "the potential . . . to enter large *phase 3* field efficacy trials this summer or fall (July to November 2020)."     [Emphasis added.]     At the time, according to multiple Vaxart announcements, the Company's COVID-19 vaccine candidate was merely "on track to start a first *phase 1* study in the second half of this year, possibly as early as the summer." [Emphasis added.]  Further, according to the September 2, 2020 *USA Today* article by HHS' Azar and OWS' Slaoui, OWS targeted "four vaccine-platform technologies" and aimed to select "two from each platform."  Since Vaxart's COVID-19 candidate utilized a "replication defective" platform, the *same* platform utilized by two of the publicly-named companies, Johnson &

Johnson and AstraZeneca, it could not have been one of the companies under consideration at the time.

(b)     As the *New York Times* reported on July 25, 2020, "Vaxart is not among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses." [Emphasis added.]  The article quoted a top HHS official as stating "The U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers, and we are negotiating with others. Neither is the case with Vaxart." [Emphasis added.]  That same day, HHS' Office of Public Affairs' Twitter handle tweeted out a link to the story, confirming the Times' report.  On August 19, 2020, *Business Insider* quoted OWS' Slaoui in an article about companies, including Vaxart, misleadingly touting their connections to OWS as stating, "There's been a number of cases where companies have, frankly, made press releases that have frustrated the hell out of me because they misled, I think, their shareholders and their share price went up the roof just by saying the words Operation Warp Speed in the title of the press release." [Emphasis added.]

(c)     Vaxart, instead, conflated OWS selection and funding with a tangentially-related program to test Vaxart's COVID-19 vaccine candidate.  As the *New York Times* reported in its July 25, 2020 story "Vaxart's vaccine candidate was included in a trial on primates that a federal agency was organizing in ***conjunction*** with Operation Warp Speed." [Emphasis added.]  That same article also quoted HHS' spokesperson as stating that "Vaxart's vaccine candidate was selected to participate in ***preliminary*** U.S. government studies to determine ***potential*** areas for ***possible*** Operation Warp Speed partnership and support.  At this time, those studies are ongoing, and no determinations have been made."  [Emphasis added.]

140.     On Vaxart's purported selection by OWS, its stock soared, closing up over 22% against the prior day's closing price – despite the massive sell-off by Armistice – and up and incredible 152% in just two days.  At one point on June 26, 2020, before the Armistice sale, Vaxart's common stock went as high as $14.30, a 348% jump in two days.  With the world searching for an answer to the pandemic, this was big news.  Joe Teneruso of *The Motley Fool* wrote in a column carried by NASDAQ

on its website called "Why Vaxart Stock Skyrocketed Today" that "Shares of Vaxart . . . soared on Friday after the biotech company said that its oral COVID-19 vaccine had been selected to receive funding from a federal government program . . . ." So too, *Business Insider* reported during the day on June 26, 2020, in an article entitled, "A little-known biotech working on a COVID-19 vaccine has surged 304% in 2 days – and it just said it was picked for the US government's Operation Warp Speed program (VXRT)," noting the significance of Vaxart's selection as "the only oral vaccine being evaluated" within the Operation Warp Speed program.

141.    Defendants did not correct either *The Motley Fool* or *Business Insider*, or issue any corrections or clarifications whatsoever. Rather, Armistice immediately began exercising its warrants and dumping its stock before the market caught on.

## VI.    LOSS CAUSATION

142.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market, and engaged in a fraudulent course of conduct that artificially inflated the price of Vaxart common stock and operated as a fraud or deceit on Class Period purchasers of Vaxart common stock. By failing to disclose the true state of Vaxart's business and operations, Defendants presented a misleading picture of Vaxart's condition and value. Defendants' scheme to present a company on the edge of a massive breakthrough, while systematically removing the controls in place to prevent insider trading, led to a massive sell-off that benefited insiders, while punishing common shareholders. Shareholders invested based on a false premise that Vaxart was moving quickly to creating a vaccine needed to address a global epidemic, while insiders knew they were not on that path and the only money to be made was through selling after price spikes based on false and misleading statements.

143.    As Defendants' materially false, misleading, and incomplete statements, and fraudulent scheme were disclosed, the price of Vaxart common stock fell, as the prior inflation came out of the Company's stock price. Following the revelations in the *New York Times* on Saturday July 25, 2020, the market reacted. That Monday, July 27, 2020, Vaxart common stock fell to $11.16, a 9% drop from the prior trading day's closing price. Vaxart common stock continued to slide over the next three weeks, falling an additional 17.5%. Following the revelations in the *Business Insider* article after the market closed on August 19, 2020, Vaxart common stock fell a further 4.3% the following day, August

1  20, 2020.  As a result of their purchases of Vaxart common stock during the Class Period, Plaintiffs

2  and the other Class members suffered economic losses.

3      144.   Additional prior inflation from the false statements also came out of Vaxart's stock

4  price when on June 30, 2020, after the market closed, Vaxart filed with the Securities Exchange

5  Commission Form 4 disclosing the two day large series of sales of Vaxart stock on June 26 and 29 by

6  Defendant Armistice identified above in ¶¶114-116, 119 and below in ¶150.  Large and unusual insider

7  trading is often seen as a signal that the insiders know something the market does not.  As a direct

8  result of this disclosure filed after the market closed on June 30, 2020, Vaxart's stock dropped from

9  $8.85 on June 30 to $8.00 on the July 1 closing.  As this news was further digested by the market

10  leading up to the Fourth of July holiday weekend, Vaxart's stock fell to $7.37 on the July 2 closing.

11  Over the holiday weekend, Zacks Investment Research downgraded Vaxart from a "hold" rating to a

12  "sell" rating after seeing the insider sales, causing the stock to drop to a low of $6.02 on Monday, July

13  6, 2020 (the same day *Bloomberg* reported that Vaxart insiders posted the most insider sales of any

14  company during the week ended July 3, 2020.)

15      145.   The decline in the price of Vaxart's common stock was a direct result of the nature and

16  extent of Defendants' fraud (or results of its fraud) being revealed to investors and the market.  The

17  timing and magnitude of Vaxart's common stock price declines negates any inference that the loss

18  suffered by Plaintiffs and other Class members was caused by changed market conditions,

19  macroeconomic, or industry factors, or other matters unrelated to the Defendants' fraudulent conduct.

20  ## VII.   NO SAFE HARBOR

21      146.   The federal statutory safe harbor provided for forward-looking statements under certain

22  circumstances does not apply to any of the allegedly false statements pled herein, as the statements

23  alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition,

24  to the extent any of the statements alleged to be false may be characterized as forward-looking, they

25  were not identified as "forward-looking statements" when made, and were unaccompanied by

26  meaningful cautionary statements that identified important factors that could cause actual results to

27  differ materially from those in the purportedly forward-looking statements.

28      147.   Alternatively, to the extent that the statutory safe harbor is found to apply to any

1   forward-looking statements pleaded herein, Defendants are nonetheless liable for such statements

2   because, at the time each such statement was made, the speaker had actual knowledge that it was

3   materially false or misleading, and/or the statement was authorized or approved by an executive officer

4   of Vaxart who knew that the statement was materially false or misleading when made.

5   ### VIII.   CONTEMPORANEOUS TRADING

6   148.    During the Class Period, Plaintiffs relied on the integrity of the market for Vaxart,

7   which was presumed to be determined by supply and demand and free from market manipulation,

8   distortion, and insider trading made on the basis of material, nonpublic information.

9   149.    As set forth above, during the Class Period Defendants Boyd and Maher, acting on

10  behalf of and motivated by their substantial financial interests in Armistice Capital and/or the

11  Armistice entities it managed, caused Armistice Capital (acting for its own account and/or the account

12  of one or more of the Armistice entities), to sell 45,812,053 shares of Vaxart common stock.

13  150.    Defendant Armistice Capital (acting for its own account and/or the account of one or

14  more of the Armistice Funds) and Defendant Davis sold shares of Vaxart common stock on the dates

15  and in the amounts set forth in the charts below while they (including Defendants Boyd and Maher)

16  were in possession of material, nonpublic information as alleged herein, including material nonpublic

17  information concerning (a) Vaxart's termination of its norovirus vaccine program; (b) Vaxart's actual

18  (in)ability to develop a COVID-19 vaccine; (c) the true (*i.e.*, non-existent) value of Vaxart's touted

19  contract with Attwill; and (d) Vaxart's failure to be selected to receive any OWS funding to help

20  develop a COVID-19 vaccine, and the lack of any reasonable basis to believe that Vaxart could or

21  would ever qualify to receive such OWS funding.

22
23
24

**Insider Sales by Defendant Armistice Capital**
**for its own account and/or the account of one or more Armistice entities**
**(and showing pre-sale exercise of Vaxart warrants)**
**Class Period Sales Highlighted in Yellow**

25
26

| Date | Acquisition/ Sale | No. of Shares Sold or (*Acquired*) | Share Price | Total Sale Proceeds or (*Acquisition Cost*) | No. of Remaining Shares Held |
|---|---|---|---|---|---|
| 4/28/2020 | S | 1,292,070 | $3.38 | $4,367,196.60 | 23,907,930 |
| 4/29/2020 | S | 873,634 | $3.01 | $2,629,638.34 | 23,034,296 |

27
28

| Date | Acquisition/ Sale | No. of Shares Sold or (*Acquired*) | Share Price | Total Sale Proceeds or (*Acquisition Cost*) | No. of Remaining Shares Held |
|---|---|---|---|---|---|
| 4/30/2020 | S | 4,434,296 | $2.96 | $13,125,516.16 | 18,600,000 |
| 5/1/2020 | S | 1,000,000 | $2.71 | $2,710,000.00 | 17,600,000 |
| 5/4/2020 | S | 957,469 | $2.65 | $2,537,292.85 | 16,642,531 |
| 5/5/2020 | S | 692,531 | $2.66 | $1,842,132.46 | 15,950,000 |
| 5/6/2020 | S | 50,000 | $2.58 | $129,000.00 | 15,900,000 |
| 5/7/2020 | S | 100,000 | $2.51 | $251,000.00 | 15,800,000 |
| 5/8/2020 | S | 100,000 | $2.52 | $252,000.00 | 15,700,000 |
| 5/11/2020 | S | 1,300,000 | $2.79 | $3,627,000.00 | 14,400,000 |
| 5/12/2020 | S | 1,581,076 | $3.02 | $4,774,849.52 | 12,818,924 |
| 5/13/2020 | S | 525,616 | $2.97 | $1,561,079.52 | 12,293,308 |
| 5/14/2020 | S | 834,669 | $3.02 | $2,520,700.38 | 11,458,639 |
| 5/15/2020 | S | 458,639 | $2.82 | $1,293,361.98 | 11,000,000 |
| 5/18/2020 | S | 650,000 | $2.86 | $1,859,000.00 | 10,350,000 |
| 5/20/2020 | S | 1,150,000 | $3.19 | $3,668,500.00 | 9,200,000 |
| 5/21/2020 | S | 400,000 | $2.97 | $1,188,000.00 | 8,800,000 |
| 5/22/2020 | S | 200,000 | $2.86 | $572,000.00 | 8,600,000 |
| 5/27/2020 | S | 200,000 | $2.61 | $522,000.00 | 8,400,000 |
| 6/1/2020 | S | 200,000 | $2.74 | $548,000.00 | 8,200,000 |
| 6/2/2020 | S | 800,000 | $2.75 | $2,200,000.00 | 7,400,000 |
| 6/3/2020 | S | 400,000 | $2.77 | $1,108,000.00 | 7,000,000 |
| 6/26/2020 | A (exercise of warrants @ below mkt px) | (16,666,667) | $0.30 | ($5,000,000.10)[1] | 23,666,667 |
| 6/26/2020 | S | 18,226,667 | $10.38 | $189,192,803.46 | 5,440,000 |
| 6/29/2020 | A (exercise of warrants @ below mkt px) | (4,090,909) | $1.10 | ($4,499,999.90)[2] | 9,530,909 |
| 6/29/2020 | S | 9,385,386 | $8.29 | $77,804,849.94 | 145,523 |

**Total shares sold:**          **45,812,053**

**Gross Sale Proceeds:**          **$319,283,921**

**Estimated total realized profits:**          **approximately $300,000,000**

---

[1] The acquisition cost of the warrants went directly to Vaxart, such that non-Armistice related Defendants also benefitted.

[2] *Id.*

**Insider Sales by Defendant Todd Davis**

| Date | Acquisition/ Disposition | No. of Shares | Share Price | Total | No. of Remaining Shares Held |
|------|--------------------------|---------------|-------------|-------|------------------------------|
| 4/28/2020 | D | 60,000 | $3.275 | $196,500.00 | 120,000 |

151.     By virtue of their substantial equity interests in and control of Armistice Capital and the Armistice entities, for purposes of liability under Section 20A Defendants Boyd and Maher should also be deemed constructive sellers of the shares referenced above that were sold by the Armistice Defendants.

152.     As set forth in their sworn certifications previously filed in this action, Lead Plaintiff Langdon Elliott and Plaintiffs Ani Hovhannisyan and Najaf Zaidi purchased Vaxart common stock during the Class Period on the dates and for the prices indicated, and thus traded contemporaneously with Armistice.  Lead Plaintiff Langdon Elliott purchased 5,000 shares of Vaxart common stock on Friday, June 26, 2020.  Plaintiff Ani Hovhannisyan purchased 20 and 10 shares of Vaxart common stock on Friday, June 26, 2020 and Monday, June 29, 2020, respectively.  Similarly, Plaintiff Najaf Zaidi purchased 43,134 shares of Vaxart common stock on Monday, June 29, 2020.

## IX.     ADDITIONAL SCIENTER ALLEGATIONS

153.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

### A.     Boyd, Maher, and the Armistice Defendants Had Motive and Opportunity to Commit Fraud and Participate in the "Pump and Dump" Scheme

154.     Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their association with and control over the Company, which made them privy to confidential information, participated in the fraudulent scheme designed to mask (a) Vaxart's actual capabilities; (b) Vaxart's termination of its norovirus vaccine program; (c) its

inability to timely develop a COVID-19 vaccine, if at all; (d) the true (*i.e.*, non-existent) value of Vaxart's touted contract with Attwill; and (e) Vaxart's failure to be selected to receive any OWS funding to help develop a COVID-19 vaccine, and the lack of any reasonable basis to believe that Vaxart could or would ever qualify to receive such OWS funding.

155.   Boyd, Maher, and the Armistice Defendants engaged in this scheme in order to inflate the price of Vaxart common stock, enhance the value of their holdings of Vaxart common stock and warrants, and to allow for massive insider sales that yielded total proceeds of approximately $320 million *and insider trading profits in the astounding total amount of <u>approximately $300 million</u>*. By virtue of their substantial equity interests in Armistice Capital and the Armistice entities, Defendants Boyd and Maher, directly or indirectly, were the primary beneficiaries of all or a substantial portion of the Armistice Defendants' insider selling profits.

156.   Defendants' insider sales are probative of Defendants' scienter and are part of Defendants' scheme, artifice to defraud or acts, practices or course of business in violation of § 10(b) and Rule 10b-5.   In particular, while Defendants were issuing materially false and misleading statements about Vaxart's business and concealing material adverse information about its operations and business dealings, Defendants Boyd and Maher (and, through Boyd and Maher, Armistice ), who had access to confidential information and were aware of the truth about the Company and its business, reaped massive financial benefits from this illegal scheme and course of conduct by:

(a)      causing the Armistice Defendants to sell roughly 18 million shares of Vaxart common stock at artificially inflated prices during the first five months of the Class Period (through June 3, 2020); and

(b)      causing the Armistice Defendants to (i) renegotiate the terms of their Warrants to eliminate the timing and volume restrictions on their exercise, so as to allow the Armistice Defendants to promptly acquire (at prices substantially below the market) more than 20.7 million additional Vaxart shares; and to shortly thereafter, in late June 2020, (ii) exercise those renegotiated Warrants so as to acquire (at prices ranging between only $0.30 and $1.10 per share) an additional 20,757,576 shares – *and to then immediately sell* (at artificially prices ranging between $8.29 and $10.38 per share) those shares (as well as more than 7 million of

their previously purchased and still retained shares.

157.   All of the foregoing sales were made by Defendants Boyd, Maher, and Armistice without disclosing the materially adverse facts about Vaxart that they were privy to.  The table previously set forth at ¶150, in the section entitled "Contemporaneous Trading", shows the heavy insider sales by the Armistice Defendants, as directed by Defendants Boyd and Maher, during the Class Period.

158.   The foregoing sales by the Armistice Defendants and directed by Defendants Boyd and Maher (including the timing of the exercise of the Warrants and the immediate sale of the resulting shares in June 2020) were unusual in their amount and in their timing.  Indeed, these sales constituted over 99.5% of the Armistice Defendants total beneficial holdings of Vaxart shares.

159.   In addition to the sales outlined above, on April 28, 2020, Defendant Todd Davis sold 60,000 shares of his personal holdings of Vaxart common stock at an artificially inflated price of $3.275 per share, reaping total insider profits of $196,500.  Such sales were unusual in timing and amount – indeed, Defendant Davis had not previously sold any Vaxart shares.

**B.   Defendants' Involvement in the Modification of the Warrants for the Benefit of the Armistice-Affiliated Defendants and the Related Grants of "Spring-loaded" Options to the Remaining Defendants**

160.   As detailed in above, in June 2020 each of the Individual Defendants participated in a *quid pro quo* scheme whereby (a) the Armistice Defendants (and, by virtue of their substantial equity interests in those entities, Defendants Boyd and Maher) obtained from Vaxart's Board of Directors certain extremely lucrative abatements from the restrictions on their existing Vaxart warrants (which allowed them to be exercised without the previously required 60-day notice period, and without regard to certain significant limitations of the number of warrants that could be exercised at any given time); (b) the Individual Defendants who were not currently affiliated with the Armistice Defendants would receive new grants of options that were both significant in number and of particularly enhanced value because they were "spring-loaded"; and (c) all Defendants agreed to advance (or to at least not interfere with) anticipated further opportunities to artificially "pump up" the value of Vaxart shares through the making of materially false, misleading and/or incomplete public statements concerning Vaxart's purported abilities to profit from the ongoing COVID crisis.

161.    As detailed at above, as a result of the amendments to the Warrants, the Armistice Defendants (by, and largely for the direct or indirect financial benefit of, Defendants Boyd and Maher), obtained the ability (a) to *immediately exercise* 16,666,667 of their existing Vaxart warrant holdings and convert them to an equivalent number of saleable Vaxart common stock at a price of only $0.30 per share, and (b) to *immediately exercise* an additional 4,090,909 of their existing Vaxart warrants holdings and convert them to an equivalent number of saleable Vaxart common stock at a price of only $1.10 per share – and to sell such shares without regard to the prior restrictions (eliminated as part of the Warrant Amendments) that significantly limited the total number of warrants and/or shares that the Armistice Defendants could sell in any given period.

162.    As detailed at above, as their part of the *quid pro quo*, the non-Armistice Defendants received the following numbers of options to purchase Vaxart shares on June 8 and June 15, 2020 with strike prices at the then-market price for Vaxart shares from $1.70 to 2.46 per share.[3]  These option grants are reflected in the chart below:

| Date | Name | Position | No. of Stock Options Granted | Strike Price |
|---|---|---|---|---|
| 6/8/2020 | Wouter W. Latour, M.D. | Director | 900,000 | $1.70 |
| 6/8/2020 | Todd C. Davis | Director | 65,700 | $2.39 |
| 6/8/2020 | Robert A. Yedid | Director | 65,700 | $2.39 |
| 6/8/2020 | Michael J. Finney, PhD | Director | 65,700 | $2.39 |
| 6/8/2020 | Sean N. Tucker | Chief Scientific Officer | 360,000 | $1.70 |
| 6/8/2020 | Margaret A. Echerd | VP, Corporate Controller | 315,000 | $1.70 |
| 6/8/2020 | Andrei Floroiu | Director | 54,720 | $1.71 |
| 6/15/2020 | Andrei Floroiu | Director | 900,000 | $2.46 |
| 6/15/2020 | Andrei Floroiu | Director | 845,280 | $2.46 |

163.    On August 13, 2020, Defendant Latour, exercised 333,334 of his warrants for the same

---

[3]    Though the "spring-loaded" options were approved by the *Board* on multiple dates, they were "subject to stockholder approval of an amendment to the Vaxart, Inc. 2019 Equity Incentive Plan" on June 8, 2020.  As controlling shareholder at all relevant periods, Armistice had the power to grant – or deny – any options to any officer or director.

amount of shares at a cost of $.30 each. These warrants would not expire until September 30, 2024. With the publicity of the *New York Time* article and HHS referring Vaxart to the SEC, Latour held off dumping these shares until after the storm passed – but only a bit. On November 23, 2020, Latour dumped all of these shares for proceeds of $2,106,670.88.

| Date | Name | No. of Shares Sold | Share Price |
|------|------|-------------------|-------------|
| 11/23/2020 | Wouter W. Latour, M.D. | 333,334 | $6.32 |

164.    The issuance of the foregoing option grants was unusual in their amount and in their timing; indeed, as alleged herein, they were granted and issued immediately prior to the issuance of further materially false and misleading statements on June 25 and 26, 2020, that caused the price of Vaxart shares to more than **triple** in value within just a few weeks of their issuance, and allowed the controlling Armistice Defendants to cash out, strongly hinting at a quid pro quo Latour's sales are suspicious in that he exercise them as the market beginning to understand the truth of Vaxart's non-involvement but held off selling with HHS stating they were referring to legal authorities such insider sales and false statements tying companies to OWS. Then, after things quieted down, Latour dumped **all** of his common stock received from these warrant exercises. According to his SEC filings he no longer owns any stock despite being the former CEO a current director, and chairman of the Board.

C.    **Vaxart's Desperate Financial Position, Need to Raise Cash and Actually Raising Cash Three Times in the Class Period Show Additional Motive**

165.    As admitted to CW1, by December 31, 2019 it was "all over" for Vaxart unless it found a partner within three months. At that time Vaxart terminated its only lead norovirus researcher, and shut down its norovirus program (which it continued to hide until it blamed its efforts to develop a COVID vaccine as the reason it put norovirus "on hold"). Thus Vaxart was in desperate need for cash, and Armistice needed a way out to monetize its diminishing asset.

166.    Defendants then proceeded, before admitting that the norovirus program was shut down, to utilize COVID as an opportunity to raise $10 million in case through the sale of 4 million shares and associated warrants in February, closing the deal on March 2, 2020. But Vaxart's stock languished and more needed to be said to sell investors on Vaxart.

167.    Vaxart then raised an additional near $9.5 million for Vaxart by enabling Armistice to

exercise its warrants in an accelerated manner, virtually without restriction, by amending the warrant agreement with Armistice for no additional consideration as outlined above, just days before releasing its fraudulent June 25 and 26 press releases.

168.     Finally, just days after the June 25 and 26 press releases, and before the market learned the truth, Vaxart raised an additional $90 million in an at-the-market stock offering, at a price of $7.98 suggesting that it was preparing to make major investments in its clinical development pipeline or its manufacturing capacity.  That offering was led by SVB Leerink, with B. Riley FBR acting as co-lead sales agent.  Suspiciously, the financial press reported that B. Riley FBR initiated coverage for the first time of Vaxart on Sunday evening.  The initiating and timing of coverage is something Defendants would have known from their long standing relationship with B. Riley FBR and the fact that it acted as sales agent in the $90 million offering.  Not surprising, B. Riley issued a "BUY" recommendation. Surprising, however was the recommended target price of $22 – almost ***three times*** the current price, causing Vaxart's stock to soar once more.

169.     The need to raise cash (motive), and the fact that the less than candid or false press releases gave Defendants the opportunity to raise cash, and they did three times, strongly infers that each Defendant knew the false and misleading nature of their press releases and participated in the scheme to defraud investors.

**D.     Defendants' Imputed Knowledge of Facts Critical to the Core Operations**

170.     At all relevant times during the Class Period, Vaxart was an extremely small company, with only about 15 employees.  Prior to terminating it, Vaxart's norovirus vaccine development program had been one of the Company's most heavily touted program, and by late March 2020 had publicly announced that it was putting "several" of its (few) other vaccine development projects "on hold" in order to focus on its efforts to develop its "experimental oral vaccine candidate for Coronavirus vaccine."

171.     Given Vaxart's extremely small size, and given that Vaxart's norovirus vaccine program (through late 2019) and Coronavirus program (beginning in early 2020) purported to be the major focus of Vaxart's limited business and core operations, it may be strongly inferred that Defendant Latour (who had served as Vaxart's President, Chief Executive Officer and a Company

director from February 2018 to June 2020, who had previously served as President and Chief Executive Officer of Vaxart's predecessor entities, and who continued to serve as Chairman of Vaxart's board after June 2020) was fully aware of the status of all material matters involving Vaxart's core operations throughout the Class Period, including the truth as to the matters alleged herein to have been materially misrepresented to and/or concealed from Plaintiffs and the members of the Class.

172.    Similarly, by virtue of the combination of Vaxart's small size and limited operations, the due diligence that Armistice Capital and Defendants Boyd and Maher conducted into Vaxart's business and operations before acquiring a majority stake in the Company in 2020, and Boyd's and Maher's ability to access material non-public information concerning Vaxart (and in particular information concerning Vaxart's core operations and (purported) primary research and development initiatives) by virtue of their position as directors and controlling shareholders of Vaxart, it may be strongly inferred that Defendants Boyd and Maher – and by imputation the Armistice Defendants with which they were affiliated – were all fully aware at all times during the Class Period of the status of all material matters involving Vaxart's core operations, including the truth as to the matters alleged herein to have been materially misrepresented to and/or concealed from Plaintiffs and the members of the Class.

173.    Given Vaxart's extremely small size, and given that Vaxart's Coronavirus program (from early 2020 on) purported to be the major focus of Vaxart's limited business and core operations, and given his former role as a former employee of Armistice Capital and longstanding personal and professional associations with Defendant Boyd, it may be strongly inferred that Defendant Floroiu (who had been installed by Defendants Boyd and Maher to replace Defendant Latour as Vaxart's Chief Executive Officer as of June 2020, and who had previously been installed by them as a Company director in April 2020) was fully aware of the status of all material matters involving Vaxart's core operations from no later than April 2020 through the end of the Class Period, including the truth as to the matters alleged herein to have been materially misrepresented to and/or concealed from Plaintiffs and the members of the Class.

## X.    CLASS ACTION ALLEGATIONS

174.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure

23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired shares of Vaxart common stock between On June 25, 2020 and August 19, 2020 inclusive (the "Class Period"), and were damaged thereby.  Excluded from the Class are Defendants, Vaxart's and Armistice Capital's current and former officers, directors, parents, and subsidiaries, members of, their immediate family members, legal representatives, heirs, successors or assigns of any such excluded person and any entity in which Defendants have or had a controlling interest.

175.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Vaxart common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time, and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Stock owners and other members of the Class may be identified from records maintained by Vaxart or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

176.    Plaintiffs' claims are typical of the claims of other Class members, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as alleged herein.

177.    Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

178.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Common questions include:

(a)    whether Defendants violated the federal securities laws as alleged herein;

(b)    whether Defendants made public statements during the Class Period that were materially false, misleading or incomplete or otherwise omitted material facts;

(c)    whether Armistice and the Individual Defendants caused Vaxart to issue false and misleading statements;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(e)      whether the prices of Vaxart common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

179.      A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damages suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for them to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

180.      Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)      the omissions and misrepresentations were material;

(c)      Vaxart common stock are traded in an efficient market;

(d)      Vaxart's shares were liquid and traded with moderate to heavy volume during the Class Period;

(e)      Vaxart traded on the NASDAQ and was covered by multiple analysts;

(f)      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Vaxart's securities; and

(g)      Plaintiffs and Class members purchased or acquired Vaxart common stock without knowledge of the omitted or misrepresented facts.

181.      Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

182.      Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FIRST CAUSE OF ACTION

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 (a)-(c)**
**Promulgated Thereunder (Against Vaxart and the Individual Defendants)**

183.    Plaintiffs repeat and reallege each allegation contained above as if fully set forth herein. This claim is asserted on behalf of all members of the Class against Vaxart and the Individual Defendants.

184.    During the Class Period, Defendants, by their acts and omissions as alleged herein, carried out a plan, scheme and course of conduct which was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the other Class members; (ii) artificially inflate and maintain the market price of Vaxart common stock; and (iii) cause Plaintiffs and Class members to purchase and hold Vaxart common stock at artificially inflated prices as Defendants cashed out causing a sharp decrease in value.

185.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of Vaxart common stock in an effort to maintain artificially high market prices for Vaxart securities in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants are sued as primary participants in the wrongful conduct charged herein.

186.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the materially false, misleading and incomplete statements detailed above and the continuous course of conduct to undermine the rules protecting Vaxart from insider trading, through warrant amendments and issuance of spring-loaded shares.

187.    By virtue of their positions at Vaxart, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive Plaintiffs and the other members of the Class; alternatively, Defendants acted with reckless disregard for the truth in that they recklessly failed to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, even though such facts were readily

1   available to Defendants.

2       188.    Information showing that Defendants acted knowingly or with reckless disregard for

3   the truth is peculiarly within Defendants' knowledge and control.  As Vaxart's senior officers and/or

4   directors, the Individual Defendants had knowledge of the details of Vaxart's internal affairs.

5       189.    The Individual Defendants are liable both directly and indirectly for the wrongs

6   complained of herein. Because of their positions of control and authority, the Individual Defendants

7   were able to and did, directly or indirectly, control the content of the statements of Vaxart.  As officers

8   and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate

9   timely, accurate, and truthful information with respect to Vaxart's businesses, operations, future

10   financial condition and future prospects.  As a result of the dissemination of the false and misleading

11   reports, releases and public statements, the market price of Vaxart common shares was artificially

12   inflated throughout the Class Period.  In ignorance of the adverse facts concerning Vaxart's business

13   and financial condition which were concealed by Defendants, Plaintiffs and the other members of the

14   Class purchased or otherwise acquired Vaxart common shares at artificially inflated prices in reliance

15   on the integrity of the market for such securities, and were damaged thereby.

16       190.    During the Class Period, Vaxart securities were traded on an active and efficient market.

17   Plaintiffs and the other members of the Class, relying on the materially false and misleading statements

18   described herein, purchased or otherwise acquired shares of Vaxart common stock at prices artificially

19   inflated by Defendants' wrongful scheme and course of conduct.  Had Plaintiffs and the other members

20   of the Class known the truth, they would not have purchased or otherwise acquired said securities, or

21   would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time

22   of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Vaxart common stock

23   was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The

24   market price of Vaxart common stock declined sharply upon public disclosure of the facts alleged

25   herein to the injury of Plaintiffs and Class members.  Plaintiffs and the Class have suffered damages

26   in that, in reliance on the integrity of the market, they paid artificially inflated prices for Vaxart

27   securities, which inflation was removed from its price as the true facts became known.

28       191.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and

1
2

the other members of the Class have suffered damages in connection with their purchases of Vaxart common stock during the Class Period.

3
4

192.    By reason of the conduct alleged herein, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

5

### SECOND CAUSE OF ACTION

6

### Violation of Section 20(a) of the Exchange Act
### (Against Armistice and the Individual Defendants)

7
8

193.    Plaintiffs repeat and reallege each allegation contained above as if fully set forth herein.

9
10

194.    This Count is asserted on behalf of Plaintiffs and all members of the Class against Armistice and the Individual Defendants for violations of Section 20(a) of the Exchange Act ("Section 20(a)"), 15 U.S.C. § 78t(a).

11
12
13
14
15
16
17
18
19
20

195.    Armistice and the Individual Defendants were and acted as controlling persons of Vaxart within the meaning of Section 20(a) as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Each of these Defendants was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

21
22
23
24

196.    In addition, Armistice and the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the transactions giving rise to the securities violations as alleged herein and exercised the same.

25
26
27
28

197.    As set forth above, Vaxart and the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their control over Vaxart, Armistice and the Individual Defendants are also liable for Vaxart's violation of Section 10(b)

pursuant to § 20(a).

## THIRD CAUSE OF ACTION

### Violation of Section 20A of the Exchange Act
### (Against Armistice)

198.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

199.    This Count is asserted for violations of § 20A of the Exchange Act, 15 U.S.C. § 78t- 1, on behalf of Plaintiffs and all other members of the Class, who purchased shares of Vaxart common stock contemporaneously with the sale of Vaxart common stock by Armistice while they were in possession of material, nonpublic information, as alleged herein, including concerning Vaxart's true business and financial condition, which they had a duty to disclose and which they failed to disclose.

200.    Section 20A(a) of the Exchange Act provides that:

> Any person who violates any provision of the [Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased securities of the same class.

201.    Contemporaneously with Armistice's insider sales of Vaxart common stock, Plaintiffs and the other Class members purchased shares of Vaxart common stock on a national securities exchange and in an open and efficient market, while Armistice was in possession of material, nonpublic information they had a duty to disclose, but failed to disclose, as alleged herein, including information concerning Vaxart's true business and financial condition.

202.    Plaintiffs and the other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein.

203.    By reason of the violations of the Exchange Act alleged herein, Armistice is liable to Plaintiffs and the other members of the Class who purchased shares of Vaxart common stock contemporaneously with Armistice's sales of Vaxart common stock during the Class Period.

204.    Plaintiffs and the other members of the Class, who purchased contemporaneously with Armistice's insider sales of Vaxart securities, seek disgorgement by Armistice of profits gained or losses avoided from Armistice's transactions in Vaxart common stock contemporaneous with the

1   Plaintiffs and the other members of the Class.

2      205. This action was brought within five years after the date of the last transaction that is the

3   subject of Armistice's violation of Section 20A.

4   **XI. PRAYER FOR RELIEF**

5     WHEREFORE, Plaintiffs pray for relief and judgment as follows:

6      A. Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the

7   Federal Rules of Civil Procedure on behalf of the Class defined herein;

8      B. Awarding all damages and other remedies available under the Exchange Act in favor

9   of Plaintiffs and the members of the Class against Defendants in an amount to be proven at trial,

10  including interest thereon;

11     C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this

12  action, including attorneys' fees and expert fees; and

13     D. Such other and further relief as the Court may deem just and proper.

14  **XII. JURY DEMAND**

15    Plaintiffs demand a trial by jury.

16           Respectfully submitted,

17  DATED:  January 29, 2021     **HAGENS BERMAN SOBOL SHAPIRO LLP**

18            */s/ Reed R. Kathrein*

19           Reed R. Kathrein (139304)
             Lucas E. Gilmore (250893)

20           715 Hearst Avenue, Suite 202
             Berkeley, CA 94710

21           Telephone: (510) 725-3000
             Facsimile:  (510) 725-3001

22           reed@hbsslaw.com
             lucasg@hbsslaw.com

23

24           **HAGENS BERMAN SOBOL SHAPIRO LLP**
             Steven W. Berman (*pro hac vice forthcoming*)

25           1301 Second Avenue, Suite 2000
             Seattle, WA 98101

26           Telephone: (206) 623-7292
             Facsimile:  (206) 623-0594

27
             *Lead Counsel*
28

1

2

&ndash; and &ndash;

3

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
John T. Jasnoch (281605)

4

600 W. Broadway, Suite 3300
San Diego, CA  92101

5

Telephone: (619) 233-4565
Facsimile:  (619) 233-0508

6

jjasnoch@scott-scott.com

7

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
William C. Fredericks (*pro hac vice* forthcoming)

8

Heather H. Volik (*pro hac vice* forthcoming)
Jeffrey P. Jacobson (*pro hac vice* forthcoming)

9

The Helmsley Building
230 Park Avenue, 17th Floor

10

New York, NY  10169
Telephone: (212) 233-6444

11

Facsimile:  (212) 233-6334
wfredericks@scott-scott.com

12

hvolik@scott-scott.com
jjacobson@scott-scott.com

13

**THE SCHALL LAW FIRM**

14

Brian J. Schall (290685)
1880 Century Park East, Suite 404

15

Los Angeles, CA  90067
Telephone: (310) 301-3335

16

Facsimile:  (310) 388-0192
brian@schallfirm.com

17

*Additional Counsel*

18

19

20

21

22

23

24

25

26

27

28