Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Attorneys for Plaintiffs*

[Additional counsel on signature page.]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re VAXART, INC. SECURITIES LITIGATION<br><br>_____<br><br>*This Document Relates to:*<br><br>*ALL ACTIONS* | Master Case No.: 3:20-cv-05949-VC<br><br>CLASS ACTION<br><br>**PLAINTIFFS' CORRECTED FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMAND<br><br>Judge: Vince Chhabria |

**TABLE OF CONTENTS**

**Page**

I. NATURE OF THE ACTION .................................................................................1

II. JURISDICTION AND VENUE ...........................................................................14

III. PARTIES ............................................................................................................15

    A. Plaintiffs ................................................................................................15

    B. Vaxart ...................................................................................................15

    C. Individual Defendants ...........................................................................15

    D. Armistice ...............................................................................................18

IV. BACKGROUND ALLEGATIONS .....................................................................20

    A. Armistice Takes Control of Struggling Pharmaceutical Company
       Vaxart ...................................................................................................20

    B. Armistice Shuts Down Vaxart's Norovirus Program While Trying to
       Sell Vaxart's Technology or Find a Partner ..........................................22

    C. COVID-19 Presents Vaccine Manufacturers a New Opportunity –
       Defendants Jump at the Opportunity to Attract Investors and Potential
       Partners – and See a Pattern of Investor Reactions to Their Press
       Releases ................................................................................................24

    D. With the Leak of a New Secretive Government Program Called
       Operation Warp Speed to Develop a Coronavirus Vaccine, Vaxart
       Intensifies Issuing Press Releases While Armistice Unloads a Majority
       Its Common Stock Holdings in Vaxart ..................................................29

V. DEFENDANTS' SCHEME TO MANIPULATE VAXART'S STOCK PRICE
   AHEAD OF ITS UNDISCLOSED INTENT TO UNLOAD NEARLY ALL
   OF ITS HOLDINGS BY THE END OF JUNE IN VIOLATION OF RULE
   10B-5(A) AND (C)..............................................................................................37

    A. Armistice Demands and Receives the Right to Exercise and Dump All
       of Its Interests in Vaxart in Exchange for Which Defendants Receive
       Approval of Stock Option Grants and Receive Other Compensation
       and Rewards ...........................................................................................38

    B. Defendants Seize the Opportunity of HHS Secrecy Around OWS and
       the Ability to Confuse and Mislead a Material Number of Investors to
       Manipulate Vaxart's Stock Price Ahead of Armistice's Exit...................41

    C. Defendants Oust Latour as CEO Only Days After He is Re-elected as
       Chairman and Install the Armistice-Friendly Floroiu as CEO in
       Furtherance of Their Scheme .................................................................43

D.   With Latour Out and Floroiu at the Helm to Control the Press Releases, Defendants Implement Their Stock Manipulation and Sale Scheme Through an Unprecedented Ten-Day Blizzard of Press Releases and Public Statements Aimed to Convince a Material Portion of the Investing Public that Vaxart had Meaningful OWS Support and that It was Quickly Moving Towards Production ........................................45

1.   The June 15, 2020 Press Release Where Armistice and Boyd Express "Great Confidence" in Vaxart and its New CEO as "Vaxart's Largest Institutional Investor" ........................................46

2.   On June 18th, Defendants State "Covid-19 Program Advancing Rapidly," "Phase 1 to Start in Summer," and "Manufacturing in Place" ........................48

3.   The June 23, 2020 Press Release — Defendant Floroiu to Participate in Live Broadcast on June 25, 2020 (Timed with the Attwill Manufacturing Press Release) ........................................50

4.   In a June 24, 2020 Press Release, Vaxart Proudly Announces It Would Join the Russell 3000 ........................................50

5.   In a June 25, 2020 Press Release, Defendants Claim They Signed a Contract Enabling the Production of a Billion or More Doses a Year........................52

6.   On the Morning of June 25th, Defendant Floroiu and Tucker Present at the H.C. Wainwright Virtual Fireside Chat Series and Reiterate the Importance of the Attwill Manufacturing "Agreement" and Reaffirm Submission of IND Within Days, and Preview "Besides, There May Be Other News, Partnering and So On" Shortly........................................55

7.   In a June 26, 2020 Press Release, Defendants Announce "Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed" ........56

E.   Defendants' Scheme Strongly Appears to Have Included Raising $90 Million Less on the Heels of the Press Release Through an ATM Facility to Private Investors........................................60

F.   As Late as July 22, 2020, the Financial Press and Investors are Continuing to Interpret Vaxart's "Selection for" OWS Press Release as Defendants Hoped ........................................61

G.   The Truth Emerges: Corrective Disclosure and Post-Class Period Events ........................................62

VI.   MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS........................................69

A.   Pre-Class Period Statements – Despite Cancelling the Norovirus Program in Late 2019, Throughout 2020 Vaxart Materially Misled Investors to Believe It Had an Ongoing Norovirus Program ........69

B.   Vaxart Materially Misled Investors When It Claimed Attwill Had the Capacity to Manufacture a Billion or More Doses of Vaxart's COVID-19 Vaccine ........................................72

C.   Vaxart Materially Misled Investors When It Claimed it was "Selected For" Operation Warp Speed ..................................................74

D.   Analysts and Journalists Interpreted Defendants' Press Releases the Way Defendants Thought They Would — Erroneously .......................75

VII.   NO SAFE HARBOR ..................................................................................80

VIII.   CONTEMPORANEOUS TRADING ..........................................................81

IX.   ADDITIONAL SCIENTER ALLEGATIONS ............................................83

A.   Boyd, Maher, and the Armistice Defendants Had Motive and Opportunity to Commit Fraud and Participate in the Pump-and-Dump Scheme ....................................................................................................83

B.   Defendants' Involvement in the Modification of the Warrants for the Benefit of the Armistice-Affiliated Defendants and the Related Grants of "Spring-loaded" Options to the Remaining Defendants .....................85

C.   Vaxart's Desperate Financial Position, Need to Raise Cash and Actually Raising Cash Three Times in the Class Period Show Additional Motive ................................................................................87

D.   Defendants' Imputed Knowledge of Facts Critical to the Core Operations.............................................................................................88

FIRST CAUSE OF ACTION  VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5(B) PROMULGATED THEREUNDER (AGAINST VAXART AND THE INDIVIDUAL DEFENDANTS)...........................................................................................92

SECOND CAUSE OF ACTION  VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5(A) AND (C) PROMULGATED THEREUNDER (AGAINST ALL DEFENDANTS) ............................................94

THIRD CAUSE OF ACTION  VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT (AGAINST ARMISTICE AND THE INDIVIDUAL DEFENDANTS)...........................................................................................95

FOURTH CAUSE OF ACTION  VIOLATION OF SECTION 20A OF THE EXCHANGE ACT (AGAINST ARMISTICE) ...................................................96

PRAYER FOR RELIEF ................................................................................97

JURY DEMAND..........................................................................................97

1
2
3
4
5
6
7
8
9
10

Plaintiffs, by and through their undersigned counsel, bring this action under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and a class of other similarly situated investors against Vaxart, Inc. ("Vaxart" or the "Company") and the other Defendants named herein. Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the ongoing independent investigation of their undersigned counsel, which includes review of: Defendants' press releases, conference call transcripts, filings with the U.S. Securities and Exchange Commission ("SEC"), and other public statements; news stories, analyst reports and other public information concerning Vaxart and/or the industry within which it operates; and interviews with former Vaxart employees and/or others familiar with the Company.

11

## I.   NATURE OF THE ACTION

12
13
14
15
16
17
18

1.      This securities class action is brought on behalf of a class (the "Class") consisting of all persons or entities other than Defendants who purchased or otherwise acquired Vaxart common stock between June 15, 2020 to August 19, 2020, inclusive (the "Class Period"). Plaintiffs bring claims against Vaxart, certain of its current and former officers and directors, and Armistice Capital, LLC ("Armistice Capital" or "Armistice"), Vaxart's controlling shareholder/control person during the Class Period (collectively, "Defendants"). The claims arise under §§ 10(b), 20(a), and 20A of the Exchange Act and Rule 10b-5(a)-(c) promulgated thereunder.

19
20
21
22
23
24
25
26
27
28

2.      This action arises from a brazen scheme and stock manipulation orchestrated by officers and directors of a struggling pharmaceutical company and a rapacious hedge fund to deliberately exploit the global rush to develop and manufacture an effective vaccine for COVID-19. Defendants' classic pump-and-dump scheme constituted a device, scheme, or artifice to defraud investors through the agreement and concerted action of the Defendants to issue a series of deceptive statements, all with the intent of artificially inflating Vaxart's stock price long enough for Armistice to unload its controlling interest in Vaxart shares and warrants (to the tune of $320 million) in violation of Rule 10b-5(a). Plaintiffs further allege that Defendants' string of misleading half-truths and falsehoods constituted an agreed-upon and coordinated act, practice, or course of business in violation of Rule 10b-5(c) that was intended to operate – and did operate – as a fraud or deceit upon investors who

1    purchased Vaxart's stock during the Class Period and were damaged thereby as Armistice dumped

2    tens of millions of Vaxart shares on buyers who were not in on the scheme. Finally, even if there had

3    been no agreement or concerted action by the Defendants to perpetrate this scheme, Defendants

4    violated Rule 10b-5(b) by issuing materially false or misleading statements.

5        3.    Vaxart is a small clinical-stage biotechnology company in South San Francisco,

6    California, that purports to be primarily focused on the development of oral, tablet-based vaccines.

7    Founded in 2004, it has never successfully brought a vaccine to market and has yet to make a single

8    dollar in net income in any individual year or quarter of its existence. Throughout 2019, Vaxart stated

9    that its top research and development ("R&D") priorities were vaccines for norovirus, seasonal

10   influenza, respiratory syncytial virus ("RSV"), and human papillomavirus ("HPV"). After cutting staff

11   in late 2019, by early 2020 Vaxart had only about 14 employees.

12       4.    During virtually all of 2019, Vaxart's common stock traded at or well below $1.00

13   (having traded above $20 per share in 2016), and its decline (and resulting diminished market

14   capitalization) made it a low-budget target for a possible takeover. Indeed, by the end of September

15   2019, Defendant Armistice Capital, a New York-based hedge fund, had accumulated a majority of

16   Vaxart's common stock at prices ranging primarily between $0.30 and $0.40 per share. Armistice

17   quickly used its large stake in Vaxart to put Armistice and its two principals – Defendants Steven J.

18   Boyd ("Boyd") and Keith Maher ("Maher") – in control of Vaxart. For example, in 2019, Armistice

19   used its control to cause Vaxart to (1) expand its board of directors to include Boyd and Maher, and

20   (2) issue warrants to Armistice that would allow Armistice to purchase 4 million shares of Vaxart

21   common stock at $1.10 per share, and an additional 16.7 million shares of Vaxart common stock at

22   only $0.30 per share, which was roughly where Vaxart common shares continued to trade during the

23   4th quarter of 2019 and early 2020.

24       5.    With a new controlling shareholder looking for ways to "flip" its Vaxart holdings for a

25   profit, on the day after Christmas of 2019 Armistice caused Vaxart's Board to vote to lay off everyone

26   in Vaxart's manufacturing division, and those terminated employees were informed that they would

27   need to find new employment effective as of January 31, 2020. Further, unbeknownst to investors, the

28   Company also decided to shut down its *norovirus* vaccine program, which it had spent much of 2019

1    touting. For example, Vaxart decided to lay off CW1 — who had served as the Company's lead

2    norovirus researcher from the spring of 2018 until December 31, 2019. In public, Vaxart sought to

3    conceal just how precarious its position was, for example by falsely assuring investors on January 2,

4    2020, that the Company was going to *increase* its efforts to develop a **norovirus** vaccine (when it had

5    actually just canceled that program). And in reality, Vaxart's troubles went far beyond its now-

6    canceled norovirus program; indeed, as CW1 was told by a senior Vaxart officer shortly before being

7    laid off, Vaxart management expected the Company to **run out of money and go out of business in**

8    **just a few months** unless it could somehow find new investor financing or a new development partner.

9         6.     Then an extraordinary opportunity arose that would allow Armistice (and various

10   cooperating Individual Defendants, including several Vaxart officers and directors) to enrich

11   themselves by exploiting a tragic health crisis. By late January 2020, the first cases of COVID-19

12   outside of China were reported, and on January 30, 2020, the World Health Organization ("WHO")

13   declared the outbreak a "Public Health Emergency of International Concern." What was a disaster for

14   humanity proved to be an extraordinary opportunity for Armistice to execute a pump-and-dump

15   scheme, and Defendants wasted no time in testing investors' appetite for buying shares of companies

16   that touted some kind of connection to a possible COVID-19 vaccine. For example, before the market

17   opened on January 31, 2020, Vaxart – despite never having successfully developed a commercial

18   vaccine over its 16 years in business – issued a press release stating that the Company had begun work

19   to "**develop a coronavirus vaccine candidate based on its proprietary oral vaccine platform**." In

20   response, Vaxart's stock price soared that day to close at $1.25 per share, up from the prior day's

21   closing of $0.73 per share — a stunning one day increase of 71%.

22        7.     As detailed below, during the early spring of 2020, Defendants had numerous additional

23   opportunities to observe how easily Vaxart could cause its stock price to materially increase every time

24   the Company issued a statement (including those constituting misleadingly incomplete half-truths) that

25   purported to announce positive developments in connection with it its purportedly robust efforts to

26   research, develop, and manufacture an effective COVID-19 vaccine. As a result of those statements,

27   between the close on March 17 and early trading on April 28, 2020, Vaxart stock roughly doubled in

28   value, from $1.93 to $3.85. And Armistice began to take advantage on April 28, 2020, selling

1   approximately 1.3 million shares that day, for proceeds of $4.37 million, at an average price $3.38

2   (with its heavy selling causing Vaxart's share price to retreat from its earlier highs by the close of the

3   markets on that date).

4          8.      However, press reports in late April that the White House had created a program called

5   "Operation Warp Speed" ("OWS") that would provide huge amounts of government support to fund

6   a small (but as yet unnamed) group of vaccine manufacturers would lead to far more lucrative

7   opportunities for the Defendants to manipulate investors in order to reap far greater rewards and the

8   price of Vaxart stock. The opportunity to exploit investor uncertainties about the nature and scope of

9   OWS was partly the result of government secrecy. For example, although both the *New York Times*

10   ("*NYT*") and *Bloomberg* reported on April 29, 2020 that the federal government had created OWS and

11   that it would provide ***billions*** of dollars in funding to selected private companies to speed development

12   and manufacture of multiple COVID-19 vaccine candidates, the government kept the particulars of

13   OWS secret, and would neither confirm nor deny rumors of who the select few candidates might be.

14   After two weeks of swirling rumors and resulting swings in the stock prices of numerous

15   pharmaceutical companies that were the subject of those rumors, investor excitement only heightened

16   when the White House officially confirmed OWS's existence on May 15, 2020, and announced that

17   the program had narrowed its evaluation of 100 candidates down to 14. As Defendants knew, investor

18   sentiment toward Vaxart stock – and Vaxart's resulting stock price – could be readily manipulated by

19   misleading a significant portion of the buy-side market for vaccine stocks into believing that Vaxart's

20   vaccine had a realistic shot at making OWS's short list or had otherwise shown sufficient promise to

21   be a serious candidate for expedited development and mass-scale production. In so doing, they could

22   create at least a short-lived "pop" in their stock price, giving them the opportunity to sell into that

23   "pop." The only problem was that restriction on Armistice's warrants made selling all their holdings

24   into such a "pop" extremely difficult, if not impossible.

25          9.      Still, the Armistice Defendants did not hesitate to use their control of Vaxart to exploit

26   the combination of investor uncertainty and excitement over OWS to profit at the expense of

27   unsuspecting investors. From April 29 to May 1, 2020, the Armistice Defendants dumped a further 6.3

28   million Vaxart shares for another roughly $18 million. And with the help of a few well-timed Company

statements in May that further touted Vaxart's alleged plans and the narrowing of its focus on its purportedly most promising "vaccine candidate," Armistice unloaded *over 10 million* additional Vaxart shares between May 4 and June 3, 2020, at average prices between $2.50 and $3.19, for more than $30 million in additional proceeds. In total, Armistice dumped 18.2 million of its Vaxart shares between April 28 and June 3, 2020, reaping total insider proceeds in excess of $53 million.

10.    But the Armistice scheme with Defendants was still far from finished. Indeed, although Armistice had, in just five weeks, succeeded in offloading 72.8% (18.2 million) of the 25 million Vaxart shares it owned outright for an enormous profit, Armistice still owned 7 million shares outright — and even more significantly it still held *warrants* for 21 million more. But Armistice's warrant positions came with a most troublesome restriction — namely, conditions that (a) limited the amount of warrants that could be exercised at any one time so that, as of their exercise, the holder's total holding of actual Vaxart common shares did not exceed a certain percentage of all such shares outstanding and (b) placed a 60-day moratorium between providing notice to the Company that Armistice sought to increase its beneficial ownership, and the increase taking effect.[1] Since one of the purposes of warrant exercise restrictions, is to protect current shareholders from dilution without notice and a chance to sell before that dilution, plaintiffs question but do not rely on an interpretation that Armistice could not just tell the company to hand it new shares up to the limit, flip them instantly, and then do it again to effectively run around the exercise restrictions.[2]

---

[1] Specifically, the warrant restrictions, identical in both prospectuses (both filed on SEC Form 424B4), provided that:

"A holder (together with its affiliates) may not exercise any portion of the pre-funded warrant to the extent that the holder would own more than 4.99% [9.99%] of the outstanding common stock immediately after exercise, except that upon at least 61 days' prior notice from the holder to us, the holder may increase the amount of ownership of outstanding stock after exercising the holder's pre-funded warrants **up to 9.99%** of the number of shares of our common stock outstanding immediately after giving effect to the exercise." [Emphasis added.]

These two provisions therefore (1) restricted Armistice from ever exercising the warrants to the extent it would then hold more than 4.99% or 9.99% of Vaxart common stock and (2) required 60 days' notice before it could increase those beneficial ownership limitations  to the extent it would exceed the 4.99% threshold (up to the secondary 9.99% threshold).

[2] This interpretation is informed in part by the derivative plaintiffs' complaint in *In re Vaxart, Inc. Stockholder Litigation*, Consolidated C.A. No. 2020-0767-PAF (Del. Ch.) Public [Redacted] Version as filed on October 23, 2020, in ¶61, where Armistice required the derivative plaintiffs to redact their

11.     The Armistice Defendants, having observed how readily they could exploit investor uncertainty to reap tens of millions in insider profits, were not, however, now going to let the exercise restrictions attached to their massive warrant positions get in the way of a lucrative "Part II" of their scheme — a Part II that would make the profits they had already banked by early June look like mere peanuts by comparison.

12.     To remove the restrictions on Armistice's 21 million warrants without giving the required 60-day notice period to increase those beneficial ownership limitations ("conversion cap"), Armistice needed to obtain the consent of Vaxart's Board. Because a company will typically be able to reap the benefits of positive investor sentiment and "good news" (or prospective good news) by, for example, selling additional shares into the market, exercise restrictions will often have significant value to a company because they will limit the ability of a large warrant holder to quickly reap the benefit of a heated market by selling its shares to interested investors — sales which, in turn, are highly likely to have the effect of limiting the amount of remaining investor demand should the issuing company want to sell new shares (which sales would actually benefit the company, rather than enrich its warrant-holding investor). Accordingly, one would expecta corporate board, such as Vaxart's, to extract some consideration from Armistice in exchange for on the removal of the existing beneficial ownership restrictions on Armistice's 21 million warrants.

13.     Armistice, however, had a different plan, which was to use the timing of the upcoming Vaxart annual meeting on June 8, 2020 – and the opportunity it presented to approve (or withhold approval of) lucrative grants of Vaxart options to the non-Armistice-affiliated Defendants – as a carrot (or stick) to assure that the non-Armistice-affiliated Defendants would not object to dropping the warrant restrictions at no cost to Armistice.[3]

---

support for the conclusion and stock exchange rules seeking to protect shareholders from such dilution by the exercise of warrants known as the 20% rule. *See* NASDAQ Rule 5635(d). *But see*, *Levy v. Southbrook International Investments, Ltd.*, 263 F.3d 10, 16 (2nd Cir. 2001).

[3] The option grants at issue included: (1) options granted to CEO Wouter M. Latour, CSO Sean M. Tucker, and Controller Margaret Echerd, approved on March 24, 2020, but not exercisable until approved by stockholders and the Board on June 8; (2) options granted to Cezar Andrei Floroiu, approved on April 13, 2020, but not exercisable until approved by stockholders and the Board on June 8; (3) the Warrant Amendments with Armistice, benefitting Maher and Boyd, approved on June

14.     On June 8, 2020, at Armistice's behest, Vaxart's Board agreed to remove the 60-day notice restrictions that had prevented Armistice from immediately exercising and cashing in its 21 million shares' worth of Vaxart warrants,  by dramatically increasing the beneficial ownership limitations to 19.99% on both sets of warrants.[4] As a result, Armistice was now free to immediately convert and sell (without notice) not merely some, but **all**, of its 21 million Vaxart warrants, while also being free to dump the remaining 7 million Vaxart shares that it already held (but had not sold earlier that spring).

15.     Vaxart's Board also got its reward for entering into this corrupt bargain with Armistice: namely, with Armistice's support, the non-Armistice board members and several senior Vaxart officers were granted options to buy a total of 3,572,100 shares of Vaxart common stock. Moreover, these options came with two valuable benefits. First, they were to a significant extent already "in the money", because at issuance they had exercise prices (or "strike prices") ranging from $1.70 to $2.46 per share – compared to Vaxart's opening trading price of only $2.91 on June 3 – meaning that they could be exercised immediately at a profit. And second, the options were "spring-loaded," as the Individual Defendants were in possession of material non-public information about the final phase of Armistice's pump-and-dump plan that the Defendants reasonably expected would succeed in again driving up the market price of Vaxart shares.

16.     The final piece of the Defendants' scheme may well have been inspired by the conduct of another small pharmaceutical company, NantKwest, when NantKwest and the privately held-ImmunityBio (which NantKwest had recently partnered with) announced on May 27, 2020 that ImmunityBio had been "selected to participate in Operation Warp Speed" — which in turn caused shares of NantKwest to jump sharply. Moreover, Defendants also doubtless noted that on June 1, 2020,

---

5, 2020; (4) options granted to Michael J. Finney, Todd C. Davis, and Robert A. Yedid on June 8, 2020; and (5) options granted to Floroiu on June 15, 2020, which were undoubtedly discussed, negotiated and drafted earlier.

[4] Vaxart's June 9, 2020 Form 8-K stated: "Each of the Warrant Amendments increases the beneficial ownership limitation in those instruments from 4.99%, in the case of the $1.10 Warrant, and 9.99%, in the case of the $0.30 Warrant, to 19.99% in each. The Warrant Amendments also remove the requirement to provide 60 days' notice to the Company of an increase in the beneficial ownership limitation."

*Science Magazine* reported that the federal government's Department of Health and Human Services ("HHS") did ***not*** intend to confirm "anyone's involvement in the initial group [of vaccines] unless a company is bound by fiduciary requirements to report contractual agreements." Defendants had previously been able to get away with touting Vaxart's purported vaccine candidate (and pumping up the price of Vaxart shares) without going so far as to make misleading claims about actual involvement with OWS that the government was in a position to immediately refute. But did the HHS's newly-revealed official posture of "neither confirming nor denying" a company's claims about being "selected" for OWS provide yet one superlative opportunity for Defendants to manipulate the market for Vaxart shares and defraud investors? Events would show the answer to that question to be an unequivocal "Yes."

17. On June 3, 2020, *Bloomberg* reported that OWS had selected seven or eight companies for funding out of the 14 finalists, and identified five of the final "7 or 8" that had purportedly made the final cut. Vaxart was not one of the five finalists identified in press reports — but as *Bloomberg* and other press reports confirmed, there were still two or three companies with vaccine candidates whose identities remained secret. And significantly, continuing its "no comment" approach, nobody in the federal government was talking about who might or might not still be in the running for OWS selection. Accordingly — although each of the Defendants ***knew*** that Vaxart had not been "selected for" OWS and that its purported lead COVID-19 vaccine candidate was not remotely close to being ready for consideration for widespread use (let alone ready to be produced in sufficient quantity to provide enough dosed samples for use on a few non-human primates and a bare minimum of ***possible*** Phase I trial participants) – Defendants ***also*** knew that investors were effectively operating in the dark as to Vaxart's actual (*i.e.*, negligible) capabilities and OWS's (non-existent) interest in including Vaxart in OWS's accelerated vaccine development program.

18. At the same time, however, Defendants also knew that Vaxart's purported vaccine candidate had been chosen in an "unrelated" government study: namely, participation in a non-human primate ("NHP") challenge study to demonstrate the efficacy of Vaxart's oral COVID-19 vaccine candidate being conducted by the Biomedical Advanced Research and Development Authority

("BARDA"), a division of the federal government's Department of Health and Human Services.[5] In sum, at the same time as the Defendants were finalizing the warrant amendment aspects of their corrupt bargain on June 8, unbeknownst to investors the Defendants had almost all the pieces in place needed to launch the final stage of their scheme to allow Armistice to cash out its remaining interests in Vaxart — and to do so at the expense of the large number of investors that were the intended dupes of Defendants' manipulations.

19.     On June 14, 2020, the Armistice Defendants completed one last important preparatory step, when it arranged for Defendant Floroiu – a friend and former colleague of Armistice Defendants Boyd and Maher – to replace Defendant Latour as Vaxart's CEO. The Armistice Defendants could now be confident that there would be no unexpected deviations from the cleverly-prepared script that they, with their hand-picked public relations firm (managed by Defendant Yedid) and the other Defendants' complicity, had prepared to facilitate the final steps in Armistice's scheme.

20.     First, Defendants orchestrated an unprecedented-for-Vaxart **ten-day** press release and public relations blitz timed and orchestrated to drive up Vaxart's stock price ahead of Armistice

_____

[5] Defendants admit the NHP study was unrelated to OWS's selection of the final cut of OWS candidates mentioned in the June 3, 2020 *Bloomberg* article. *See* Defendants' Armistice Capital, LLC, Steven Boyd, and Keith Maher's Opening Brief in Support of their Motion to Dismiss the derivative complaint ("Armistice MTD Delaware") filed in *In re Vaxart, Inc. Stockholder Litigation*, Consolidated C.A. No. 2020-0767-PAF Redacted Public Version filed February 19, 2021 in the Court of Chancery of the State of Delaware, at page 13. The *Bloomberg* article stated that "Operation Warp Speed seeks to compress a process that is typically years long into a matter of months, in part by spending as much as $10 billion on research, manufacturing and agreements to guarantee purchase of the vaccines, according to one of the people" and that a "spokesperson for the Department of Health and Human Services declined to comment." Defendants argue that "The Primate Study was **unrelated** to the June 3, *Bloomberg* article." [Emphasis added.] At the same time Defendants redacted the preceding language in their motion, which presumably describes in more detail how the NHP was "unrelated" to the selection of final candidates by the OWS described in the *Bloomberg* article but are facts they do not want the Plaintiffs in this action to have. *See also* Opening Brief in Support of the Vaxart Defendants' Motion to Dismiss the Verified Derivative and Class Action Complaint, also filed in the same case on February 19, 2021 at 20-21. "This announcement had nothing to do with Vaxart, which is not one of the seven companies identified or alluded to in this release." And "The Primate Study was unrelated to the June 3, 2020 Bloomberg release." *Id.* Defendants also admit that the NHP was not material insider news as "the alleged omission was not material as no 'stockholder would consider' news of the Primate Study selection "important in deciding how to vote" on whether to increase the number of shares available for equity awards. *Id.* at 56.

dumping all of its remaining interest by the end of June. On June 15, 2020 Armistice's Boyd proclaimed "great confidence" as "Vaxart's largest investor" in Floroiu's "ability to generate substantial shareholder value by unlocking [Vaxart's] tremendous potential," while omitting their intent to exit Vaxart by the end of the month.

21.     Second, they then announced and filed SEC filings containing presentations they would make in a Raymond James and H.C Wainwright investor conference within the week claiming they were ready to submit their Investigative New Drug application before the end of the month, comparing themselves to the five known OWS selected vaccines and claiming their "GMP Bulk Vaccine [was] in Progress."

22.     Third, though Defendants knew they had not been selected for OWS as early as June 5, 2020 (and most likely earlier) they issued a press release on June 23, 2020 announcing that Vaxart would join the Russell 3000 stock market index in the annual reshuffling which would take place (as known by the market) three days later, driving up demand for the stock as index funds and institutional investors would need to rebalance their portfolios to include Vaxart.

23.     Fourth, before the market opened on June 25, 2020, Vaxart announced that it had partnered with Attwill Medical Solutions Sterilflow, LP ("Attwill") "to manufacture a billion or more doses per year . . . of our COVID-19 vaccine for the US, Europe and other countries in need." This statement was clearly calculated to create the totally false and misleading impression that Vaxart's vaccine candidate was somehow sufficiently promising and far along in research and development that it was commercially reasonable for Vaxart and a putative manufacturer (Attwill) to have engaged in serious talks about producing "billions" of doses of Vaxart's vaccine candidate. Unbeknownst to investors, however, in reality Attwill lacked the required certifications from the U.S. Food and Drug Administration ("FDA") to produce any vaccines, lacked the ability to meet FDA manufacturing standards for commercial vaccine production at any time in the foreseeable future, and lacked the necessary personnel or operational capabilities to even begin to contemplate the production of a billion or more vaccine doses. Nonetheless, the market predictably reacted extremely favorably to this announcement – just as Defendants had intended – as it caused Vaxart's stock price to **double**, closing at $6.26 (up $3.07 from its closing price of $3.19 the previous day).

24.     Fifth, at the broadcasted H.C. Wainwright Fireside Chat, also on June 25, 2020, Defendants reiterated their "June" IND submission and "news" of the Attwill "agreement with a major player that had great (inaudible) capabilities. So now that solves one of, what I would say, our biggest technical bottleneck in terms of manufacturing." And then, finishing up their presentation, as a preview to building the excitement for the next day's bombshell, Defendant Floroiu stated: "***Besides that, there may be some other news on other fronts, partnering and so on that we'll release whenever they happen***."

25.     Having primed the market to believe that Vaxart was ready for the "big time" and already making serious plans to produce at least a billion COVID-19 vaccines per year, the next day – June 26, 2020 – Defendants delivered the master stroke of their carefully calculated deception to create the pop in the stock price they expected. Specifically, Armistice caused Vaxart to issue a press release, before the market opened, that was boldly headlined: "**Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed**." With artfully worded care in support of their artifice to defraud, the release went on to quote Vaxart's newly installed CEO, Defendant Floroiu, as stating: "We are very pleased to be *one of the few* companies *selected by* Operation Warp Speed, and that ours is the only oral vaccine being evaluated." [Emphasis added.] The press release also noted that Vaxart "has been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed" – language that was plainly calculated to give the Defendants at least some basis to later claim that they had adequately disclosed their "selection" involved only selection for the NHP study. But as Defendants plainly understood, the NHP challenge study was a BARDA-run program – and one that was separate from Operation Warp Speed's well-publicized support of a select few vaccine manufacturers by spending billions of dollars to develop at "warp speed" an effective vaccine that could be produced commercially in massive amounts in a year or less. Vaxart's vaccine had not, in any sense of the word, been "selected for" Operation Warp Speed. And the June 26 press release's emphasis on Vaxart having been "one of the few companies selected by Operation Warp Speed" was plainly a calculated effort to exploit investor uncertainty at a time when the identities of

the remaining two or three pharmaceutical companies *actually* "selected for" OWS – as that term was widely understood from well-publicized prior media reports – was a focus of intense investor interest.[6]

26.     As planned, in response to Vaxart's June 26 press release, Vaxart' stock price not only "popped," it skyrocketed, *climbing to an intraday high of $14.30* – a stunning increase of nearly 130% from its June 25 close of $6.26, and more than *quadrupling* in less than two full trading days compared its closing price of only $3.19 on June 24.

27.     Armistice, having orchestrated the events leading up to this moment, was ready to act without delay immediately after the press release was issued---and the speed with which it acted evidences much planning ahead of time to both convert its warrants into common stock and sell. On Friday, June 26th, Armistice not only exercised all of its 16.667 million "30 cent" warrants, but sold all of the resulting shares – an additional 1.56 million of its pre-existing holdings of Vaxart common shares – at an average price of $10.38 per share. Although this extraordinary post-press-release selling by Armistice ultimately drove the price of Vaxart common shares down to $8.04 at the close, the size of the insider selling profits that Armistice reaped from just this single day of trading was nothing short of astonishing, as Armistice collected proceeds of *nearly $190 million* on its insider selling of 18.226 million shares.

28.     But even this was not the end of Armistice's greed and resulting profits. On Monday, June 29, Armistice exercised its remaining 4,090,909 warrants (its "$1.10 Warrants"), and sold all of those resulting shares – plus another 5,294,477 of its pre-existing holdings of Vaxart common shares – at an average price of $8.29. These sales – which left Armistice with a mere 145,523 shares of the more than 45 million shares that it had owned or had warrants on as of just two months earlier – produced further insider selling proceeds of *over $77.8 million*. Few of these exercises would have been possible without the removal of the exercise limitations.[7]

---

[6] *See* n. 5 above where Defendants disclaim any relationship between the "Primate Study" and article talking about the OWS program and candidates "selected for" the program.

[7] Armistice admits that even with the 19.99% increased exercise restrictions, it could not exercise all of its 20,757,576 Warrants at once. Rather, it had to do so in blocks following a notice — exercise-sale-exercise-sale cycle over two days. *See* below at footnote 12 and ¶171. Plaintiffs believe, at best the exercise and flipping, so that the 4.99% ownership limitation would not be passed, would have

29.      In sum, the Armistice Defendants **grossed over $320 million** from the scheme that they had orchestrated, and had been able to successfully pull off in concert with the actions of the other Defendants. Plaintiffs estimate that at least $290 million of this $320 million represented pure profit.

30.      The truth about Defendants' manipulative scheme was partially revealed on Saturday, July 25, 2020, in a *New York Times* article entitled "Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine." Focusing largely on Vaxart, the article stated that "Vaxart is not among the companies selected to receive significant financial support from Operation Warp Speed to produce hundreds of millions of vaccine doses." Moreover, the article also explained that Vaxart's NHP participation was merely a trial "organiz[ed] in conjunction with Operation Warp Speed" — but in no way represented "selection for" OWS. The article also quoted HHS's assistant secretary for public affairs as stating that HHS had neither agreed to fund Vaxart's COVID-19 vaccine, **nor even negotiated with Vaxart to do so**. Indeed, the *NYT* article reported that, after HHS had reviewed Vaxart's misleading claims about its participation in OWS and Armistice's concurrent stock sales, HHS had "relayed [its] concerns to the Securities and Exchange Commission." In response to this news, Vaxart's common stock tumbled the next trading day, on Monday, July 27, 2020, falling 9% compared to Friday's closing price.

31.      After the close of the market on Wednesday, August 19, 2020 (the last day of the Class Period), *Business Insider* published an article quoting Moncef Slaoui ("Slaoui"), the head of OWS, as stating that companies, such as Vaxart, had "misled" their shareholders by intentionally trying to mislead them as to their purported connections to OWS in order to drive up their common stock price. As Slaoui stated:

> There's been a number of cases where companies have, frankly, made press releases that have frustrated the hell out of me because they misled, I think, their shareholders and their share price went up the roof just by saying the words Operation Warp Speed in the title of the press release.

In response, Vaxart's common stock price fell 4.3% the following trading day.

---

taken Armistice every single business day through to the following Tuesday, July 7, 2020 — just one day before the $90 million at the market offering, which, they released the S-3 for on July 8, 2020.

32.     Since the end of the Class Period, Vaxart has reported that the U.S. Attorney's Office for the Northern District of California served a grand jury subpoena on Vaxart in July 2020 seeking "information pertaining to the Company's participation in, and disclosure of, an OWS non-human primate study of the Company's oral COVID-19 vaccine and certain corporate, financing and stock transactions." In October 2020, Vaxart was informed that this investigation was being transferred to the Office of the U.S. Attorney for the Eastern District of New York and the Fraud Section of the Department of Justice. Vaxart has also disclosed that the Enforcement Division of the SEC has launched its own investigation into the same matters.

33.     By this action, Plaintiffs, on behalf of themselves and the class they seek to represent, seek to obtain a recovery for, *inter alia,* the substantial losses that they have suffered as a result of the fraudulent scheme, course of conduct and actionably false and misleading statements alleged herein, as well disgorgement by the Armistice Defendants of the massive ill-gotten profits (estimated to be roughly $290 million) that they reaped in connection with their insider selling activities while in the possession of material, non-public information about Vaxart.

## II.     JURISDICTION AND VENUE

34.     The claims asserted herein arise under and pursuant to §§ 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

35.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

36.     Venue is proper in this District pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) and (c). At all relevant times, Vaxart was headquartered and conducted business in this District at 385 Oyster Point Boulevard, Suite 9A, South San Francisco, California 94080. In addition, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

37.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of national securities exchanges.

## III.   PARTIES

**A.   Plaintiffs**

38.   Lead Plaintiffs Wei Huang and Langdon Elliot ("Lead Plaintiffs"), as set forth in their certifications previously filed with the Court, purchased Vaxart common stock during the Class Period and were damaged by Defendants' conduct as alleged herein.

39.   Plaintiffs Najaf Zaidi and Ani Hovhannisyan ("Additional Plaintiffs") purchased Vaxart common stock during the Class Period and were damaged by Defendants' conduct alleged herein. They purchased contemporaneously with the false and misleading statements issued by the Defendants, as well as Defendant Armistice's sale of Vaxart common stock.

**B.   Vaxart**

40.   Defendant Vaxart, Inc. is a corporation organized under Delaware law and headquartered at 385 Oyster Point Boulevard, Suite 9A, South San Francisco, California 94080. The Company effectively went public on February 13, 2018, via a reverse merger with the then-publicly traded Aviragen Therapeutics, Inc. Vaxart's common stock trades on the Nasdaq Capital Market ("NASDAQ") under the symbol "VXRT". Vaxart purports to be a clinical-stage biotechnology company primarily focused on the development of oral recombinant vaccines based on its proprietary oral vaccine platform. As of December 31, 2019, Vaxart had only 14 full-time employees, of which only seven were engaged in research and development. The remaining employees were engaged in finance, human resources, administration, and business and general management.

**C.   Individual Defendants**

41.   Defendant Steven J. Boyd served as a director of Vaxart from October 25, 2019 until his resignation on January 28, 2021. Boyd is Armistice's founder, sole owner, Chief Investment Officer ("CIO"), and Managing Partner. At all material times, Boyd has also served as a director of the Armistice Master Fund. Armistice Capital is the parent entity of multiple Armistice entities all with the Armistice name, including Armistice Capital Master Fund, Ltd, which held the shares of Vaxart at issue here. Boyd authorized and approved the issuance of the spring-loaded options and the Armistice warrant amendments, which he benefited from as sole owner of Armistice. Throughout the events in question, Boyd signed all of Armistice's corporate filings on Armistice's behalf.

42.     Defendant Keith Maher, M.D. served as a director of Vaxart from October 25, 2019 until his resignation on January 28, 2021, and at all material times was a member of Vaxart's Compensation Committee. Since 2019, he has served as Armistice's Managing Director. Maher authorized and approved the issuance of the spring-loaded options and the Armistice warrant amendments.

43.     Defendant Cezar Andrei Floroiu ("Floroiu") has served as Vaxart's CEO since June 14, 2020, after having first been appointed as a member of Vaxart's Board of Directors on April 13, 2020 (a position he also continues to hold). Prior to being appointed to these positions at Vaxart, Defendant Floroiu had been employed by Armistice Capital, as a Senior Analyst from January to August 2013. Floroiu had also previously worked with Defendant Boyd at McKinsey & Company ("McKinsey"). Floroiu approved the issuance of the spring-loaded options and the Armistice warrant amendments. On June 8, 2020, Floroiu received spring-loaded options to purchase 54,720 shares of Vaxart stock with a $1.71 strike price, $0.68 below the closing price that day. On June 15, 2020, Floroiu received additional spring-loaded options to purchase 1,745,280 shares of Vaxart stock with a $2.46 strike price. Floroiu personally benefited from his receipt of the spring-loaded options.

44.     Defendant Wouter W. Latour ("Latour") became Vaxart's President and CEO as well as a member of its board of directors in February 2018. He was thereafter appointed Chairman of Vaxart's Board of Directors in December 2019. Although Latour was replaced as Vaxart's CEO by Defendant Floroiu on June 14, 2020, Latour continues to serve as a director and as Chairman of Vaxart's Board. Latour approved the issuance of the spring-loaded options and the Armistice warrant amendments, as described herein. On June 8, 2020, Latour received spring-loaded options to purchase 900,000 shares of Vaxart stock with a $1.70 strike price, $0.69 below the closing price that day. Latour personally benefited from his receipt of the spring-loaded options.

45.     Defendant Robert A. Yedid ("Yedid") has served as a Vaxart director since October 25, 2019. Yedid is a member of Vaxart's Audit Committee. Since 2014, Yedid has been Managing Director of LifeSci Advisors, LLC, a healthcare-dedicated investor relations/public relations firm. At approximately the same time that Armistice took control of Vaxart and Yedid was brought on to Vaxart's Board, his company, LifeSci Advisors, took over the role of public relations and was the

contact point on every single press release starting on June 3, 2020 and for the duration of the Class Period. LifeSci Advisors was brought in to maximize Armistice's investment in Vaxart.  According to LifeSci's website, the company "works with clients to develop an impactful investor communications program that starts with investment thesis development and corporate positioning. Our corporate communications team—unique in our Wall Street experience and credibility—works with our clients on developing an effective corporate presentation with an emphasis on highlighting key messages for investors. We draft and revise news releases and earnings call scripts. Moreover, we advise the drafting of other corporate materials including IR websites, fact sheets, FAQ's and shareholder letters." Yedid approved the issuance of the spring-loaded options and the Armistice warrant amendments, as described herein. On June 8, 2020, Yedid received spring-loaded options to purchase 65,700 shares of Vaxart stock with a $2.39 strike price. Yedid personally benefited from his receipt of the spring-loaded options.

46.    Defendant Todd C. Davis ("Davis") has served as a director of Vaxart and a member of its Compensation Committee since October 25, 2019. Davis authorized and approved Vaxart's manipulated stock options and the amendment to the warrant agreements with Armistice. On June 8, 2020, Davis received spring-loaded options to purchase 65,700 shares of Vaxart stock with a $2.39 strike price. Davis personally benefited from his receipt of the spring-loaded options.

47.    Defendant Michael J. Finney, PhD ("Finney"), has served as a director of Vaxart since February 2018. Previously, he served as a member of Vaxart's Board of directors since July 2007. From 2009 until 2011, Finney served as CEO of Vaxart. Finney is a member of Vaxart's Audit Committee. Finney approved the issuance of the spring-loaded options and the Armistice warrant amendments, as described herein. On June 8, 2020, Finney received spring-loaded options to purchase 65,700 shares of Vaxart stock with a $2.39 strike price. Finney personally benefited from his receipt of the spring-loaded options.

48.    Defendant Sean N. Tucker ("Tucker") is Vaxart's founder and Chief Scientific Officer. He has served as Chief Scientific Officer since February 2010. On June 8, 2020, Tucker received 360,000 Vaxart stock options with $1.70 strike price, $0.69 below the closing price that day. Tucker personally benefited from his receipt of the spring-loaded options.

49.      The Defendants named in ¶¶41-48 are collectively referred to herein as the "Individual Defendants." The Individual Defendants, by virtue of their positions with the Company, possessed the power and authority to control the contents of Vaxart's SEC filings, public statements, and presentations to securities analysts, investors, and other market participants. Each Individual Defendant was provided with copies of the Vaxart statements and public filings alleged herein to be materially false or misleading prior to, or shortly after, their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of these Defendants knew that the material adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were materially false and/or misleading when made. Each Individual Defendant is liable for the false statements pleaded herein, as those statements were each "group-published" information and the result of the collective actions of these Defendants pursuant to a common scheme and wrongful course of conduct.

**D.      Armistice**

50.      Defendant Armistice Capital, LLC, is a New York, New York-based hedge fund focused on health and consumer companies. Founded in April 2012 by Defendant Boyd, it is incorporated in Delaware. Boyd continues to operate Armistice, serving as its CIO and Managing Partner, along with Defendant Maher, who has served since 2019 as Armistice's Managing Director. Collectively Armistice, Boyd and Maher are occasionally referred to herein as the "Armistice Defendants".

51.      Armistice is the parent and controlling entity of several Armistice-labeled funds, including Armistice Capital Master Fund Ltd., which is incorporated in the Cayman Islands, lists Armistice Capital's headquarters as its mailing address, and lists Steven Boyd as its director and Managing Member.

52.      Armistice began investing in Vaxart in August 2018 and became a controlling shareholder in late 2019.

53.      After becoming Vaxart's controlling stockholder, Armistice promptly took over Vaxart's Board. Armistice's founder, Defendant Boyd, became and remained a member of Vaxart's

eight-member Board during the Class Period, as did an Armistice Managing Director, Defendant Maher. At the same time that Boyd and Maher joined the Board, so did Defendants Yedid and Davis who Boyd and Maher, by virtue of their control of Armistice, had previously worked with when Armistice held over 3 million shares of BioDelivery Sciences International, Inc. ("BDSI"), about 5.86% of that company's equity, and participated in a $50 million equity financing deal with that company. At one point, in May 2016, Armistice was BDSI's second-largest beneficial owner, after Broadfin Capital, LLC, who also served as a major Vaxart shareholder. Throughout Armistice's ownership of BDSI, Armistice worked with Davis, a BDSI board member, and Yedid, who served as managing director of BDSI's public relations firm and frequently signed BDSI press releases himself. As a result of their prior collaboration, Plaintiffs believe Armistice deliberately placed Yedid and Davis on the Board by virtue of this timing, and thus they were deferential to Armistice. In April, a former Armistice senior analyst, Defendant Floroiu joined Boyd and Maher on Vaxart's Board, becoming Vaxart's Chief Executive Officer on June 15, 2020.

54.    As of September 30, 2019, Armistice owned approximately 52% of the voting power of Vaxart's outstanding shares of common stock, making Vaxart a "controlled company" within the meaning of applicable NASDAQ listing rules. According to the 13D/A Vaxart filed on October 7, 2019, by October 2, 2019, Armistice owned 65.2% of the shares. Throughout all relevant periods discussed herein, Armistice controlled Vaxart by virtue of its outsized holdings of Vaxart common stock and the multiple directors it placed on Vaxart's Board.

55.    In its Form 10- K filed March 19, 2020, the Company recognized Armistice's continuing effective control, publicly stating that:

> Armistice . . . as of March 17, 2020, still beneficially owned more than 35% of the voting power of our outstanding shares.
>
> As a result, Armistice has the ability to substantially influence us and exert significant control through this ownership position. Armistice may significantly influence the elections of directors, issuance of equity, including to our employees under equity incentive plans, amendments of our organizational documents, or approval of any merger, sale of assets or other major corporate transaction. Armistice's interests may not always align with our corporate interests or the interests of other stockholders. . . .

## IV.   BACKGROUND ALLEGATIONS

**A.   Armistice Takes Control of Struggling Pharmaceutical Company Vaxart**

56.   Founded in March 2004, Vaxart has yet to successfully develop and commercialize a single product of its own. The Company has not generated any revenue on any product it has ever developed, nor has it ever earned a profit.

57.   In February 2018, Vaxart became a public company through a reverse merger when it completed its combination with Aviragen Therapeutics, Inc. ("Aviragen"), a publicly-traded company on the NASDAQ. The newly-combined company then adopted the name "Vaxart" and switched its ticker symbol to "VXRT."

58.   From the start, Vaxart promised to reinvent vaccines by ditching the need for needles and visits to the doctor or pharmacy. Instead, as the Company declared in its January 2, 2018 Prospectus mailed to shareholders of Aviragen and Vaxart urging approval of the proposed merger:

> Vaxart's oral vaccines are administered using a convenient room temperature-stable tablet, rather than by injection. Vaxart believes that tablet vaccines are easier to distribute and administer than injectable vaccines, and have the potential to significantly increase vaccination rates.

59.   Despite initial investor excitement following the reverse merger, along with Vaxart's touting of its "proprietary oral vaccine platform," Vaxart's common stock price slid from a high of $9.50 on its first day of trading on February 14, 2018, throughout the remainder of the year and the first four months of 2019 to close below $1.00 on April 9, 2019. With a market capitalization of just $8 million and a rock-bottom share price, Vaxart was a ripe target for takeover by almost any interested investment group or hedge fund.

60.   Nor was Vaxart profitable. During the fiscal years of 2018 and 2019, the Company lost nearly $39 million (on revenues of $9.7 million in 2019 and $4.2 million in 2018). The Company acknowledges that "[o]ur ability to generate significant revenue and achieve and maintain profitability will depend on our ability to successfully complete the development of our tablet vaccine candidates . . . and to obtain the necessary regulatory approvals." Accordingly, the Company has been dependent on outside financing to fund its operations.

61.     In stepped Armistice Capital, a self-described "long/short, value-oriented and event-driven hedge fund" that primarily targets "health care and consumer" companies. Pursuant to a public offering of both common stock and warrants, on April 11, 2019, Vaxart sold Armistice warrants to purchase 4,090,909 shares of Vaxart common stock at $1.10 per share. Warrants are instruments used to obtain other securities, including common stock, whereby the warrant-holder (in this case, Armistice) can convert individual warrants held into a pre-determined number of shares (in this case, one warrant could be converted into one share of Vaxart common stock that could be purchased for $1.10 per share). The warrant-holder is then permitted to sell its newly-acquired shares, subject to any number of restrictions.

62.     Pursuant to the terms of the Offering, Armistice was limited from entirely exercising its warrants in two key respects. First, the warrants prohibited the holder from converting the warrants to common stock "to the extent that the holder would own more than ***4.99%*** of the outstanding common stock immediately after exercise." [Emphasis added.] Second, the warrants required the holder to provide 60-days' notice to Vaxart to increase this percentage, up to a 9.99% threshold.

63.     These two provisions are standard terms in public offerings of warrants and other instruments that issuers rely on to protect the integrity of the company, its common stock price, and its shareholders. In the absence of such protections, warrant-holders like Armistice could seize on good news or positive momentum in the company's stock price and immediately convert its warrants into common stock and sell, diluting the overall number of outstanding shares, depressing the stock price, and inhibiting the company's ability to ***itself*** utilize an elevated stock price to issue and sell new shares. For a company like Vaxart that had never earned a single dollar in profit, public issuances of common stock serves as one of the primary methods the Company has to fund its operations.

64.     On September 30, 2019, pursuant to another mixed public offering of common stock and warrants, Armistice obtained warrants to purchase 16,666,667 shares of Vaxart common stock at $0.30 per share. Again, Vaxart imposed a beneficial ownership limitation of 4.99% and a 60-day notice requirement on Armistice's ability to increase this percentage, up to 9.99%.

65.     In addition to holding an outsized number of warrants, by September 30, 2019, Armistice had also acquired a majority stake in Vaxart through its holdings in the Company's common

stock. As Vaxart reported in its 3Q 2019 Form 10-Q, as of September 30, 2019, Armistice held approximately 52% of Vaxart's outstanding shares of common stock and "[a]s a result, Armistice has the ability to substantially influence us and exert significant control through this ownership position." On October 8, 2019, Armistice filed an amended Schedule 13D form noting that it controlled 25 million shares of Vaxart common stock, representing 65.2% of all outstanding shares, signed by Defendant Boyd. Indeed, Armistice wasted no time in exerting its control over Vaxart, expanding the Company's Board to eight seats in October 2019 and appointing Boyd, Armistice's Founder and Managing Member, and Maher, Armistice's Managing Director, to Vaxart's Board along with Defendants Yedid and Davis who replaced two former pre-Armistice directors.

**B.**   **Armistice Shuts Down Vaxart's Norovirus Program While Trying to Sell Vaxart's Technology or Find a Partner**

66.    Vaxart's common stock price continued to struggle throughout the second half of 2019 and by October 2019 fell below $0.40 per share, never closing above that threshold again for the remainder of the year. During the prior two fiscal years, the Company had lost nearly $39 million. In multiple filings, the Company acknowledged that "[o]ur ability to generate significant revenue and achieve and maintain profitability will depend on our ability to successfully complete the development of our tablet vaccine candidates . . . and to obtain the necessary regulatory approvals." Accordingly, the Company has been dependent on outside financing to fund its operations.

67.    To pull the Company out of its free fall, on December 26, 2019, Vaxart's Board under Armistice control voted to terminate between 15 and 20 employees, about half of the Company's personnel – mainly manufacturing – and cut ties with KPMG LLP, Vaxart's registered public accounting firm, and switched to an accounting firm with whom Armistice has worked with in companies in which it has previously invested.

68.    Vaxart announced to employees that the Company's financial health was in such poor shape that to conserve corporate resources it had decided to terminate the norovirus program.

69.    CW1 was retained in May 2018 and served as Vaxart's lead norovirus researcher until December 31, 2019. CW1 was tasked with overseeing Vaxart's norovirus clinical trials and reported directly to Defendant Latour, Vaxart's then-CEO.

70.     Prior to CW1's employment with the Company, Vaxart had retained a contract manufacturing organization, Lonza Pharma & Biotech ("Lonza"), to develop its norovirus vaccine. After Vaxart retained CW1, it terminated its relationship with Lonza. However, in the fall of 2019, Vaxart retained Lonza again to supplement CW1's work. Shortly thereafter, Defendant Latour informed CW1 and other Vaxart personnel that Armistice executives sought to cease all operations relating to norovirus vaccine development, as a cost cutting measure. CW1 – along with multiple Vaxart finance personnel – challenged this decision, emphasizing that Vaxart had already executed the manufacturing agreement with Lonza, and noting that breaching the agreement – for which Lonza had already commenced performance – would be a costly endeavor. More particularly, in late December 2019, CW1 received a phone call from Defendant Latour, where they discussed the cancellation/breach of the Lonza contract. ***Latour explained that this contract termination effectively meant that the Company could no longer pursue development of the norovirus vaccine. Latour further stated that Vaxart would be "on life support for the next three months" and that if Vaxart could not obtain a partnership with a third party in that timeframe "it was over."*** Nonetheless, Vaxart went ahead, terminated its agreement with Lonza, and discontinued its norovirus vaccine program. At this point in time, the Company only retained a single partnership agreement, with Johnson & Johnson, to develop Vaxart's influenza vaccine (not norovirus). Shortly thereafter, citing the discontinuance of the norovirus program, Vaxart terminated CW1, effective December 31, 2019.

71.     Two days later, on January 2, 2020, Vaxart announced that it had laid off its manufacturing division, but continued to claim to investors throughout the Class Period that the Company has "development programs . . . that are designed to protect against coronavirus, ***norovirus***, seasonal influenza and respiratory syncytial virus (RSV)." [Emphasis added.] At this point Vaxart did not inform investors that it had discontinued its norovirus program in the fall of 2019, only informing the public in March 2020 that, (after it raised an additional $10 million in a direct offering) in light of the Company's effort to develop a COVID-19 vaccine, "we have put several vaccine programs ***on hold***, including the norovirus vaccine program." [Emphasis added.]

72.     The announced cost savings and declared corporate focus on January 2, 2020, had virtually no impact on the Company's stock price, which continued to languish as a penny stock at

1    $0.36, well-below any meaningful level at which Vaxart could issue a follow-on offering to raise

2    additional funding to pay for continued operations.

3    **C.    COVID-19 Presents Vaccine Manufacturers a New Opportunity – Defendants Jump at
         the Opportunity to Attract Investors and Potential Partners – and See a Pattern of
4        Investor Reactions to Their Press Releases**

5           73.    By the middle of January 2020, the Coronavirus first identified in China approximately

6    one month earlier was detected in multiple countries, including Thailand, Japan, South Korea, and the

7    United States, which confirmed its first case on January 20, 2020. Ten days later, on January 30, 2020,

8    the WHO declared the outbreak a "Public Health Emergency of International Concern" as the virus

9    continued to spread unabated.

10          74.    Seizing on the fear and uncertainty presented by the oncoming pandemic, Vaxart issued

11   a press release before the market opened the following day (January 31, 2020), with the bold headline,

12   "**Vaxart Announces Initiation of Coronavirus Vaccine Program**," declaring that it had "initiated a

13   program to develop a coronavirus vaccine candidate based on its proprietary oral vaccine platform."

14   The press release failed to mention that its oft-touted "proprietary platform" had ***never once*** in the

15   Company's history actually led to the creation of a viable, commercializable product. In fact, according

16   to CW1, this was the exact same platform the Company had utilized in its secretly shuttered norovirus

17   program.

18          75.    That day, Defendants would have noticed that the COVID-19 headline, merely claiming

19   that Vaxart had initiated a Coronavirus vaccine program, caused Vaxart's stock price to close above

20   $1.00 for the first time since early April 2019, closing at $1.25, a 71% gain against the prior day's

21   closing price.

22          76.    Throughout almost the entirety of February, the stock sat parked in the low $1.00-range,

23   until another announcement, this one on February 27, 2020, sent Vaxart soaring again. That day, the

24   Company announced that it would shortly engage in another direct offering priced-at-the market,

25   selling to several institutions 4,000,000 shares of common stock and warrants to purchase up to

26   2,000,000 shares "at a combined purchase price of $2.50 per share and associated warrant," which

27   would raise Vaxart $10 million. The press release stated that Vaxart intended to use the net proceeds

28   to support clinical and preclinical development of its vaccine candidates.

77.    As a result of the press release, Defendants would have noticed that Vaxart's stock price rose from $1.65 to close at $2.47 the next day and then $2.87 the next, a 73.94% gain against the prior day's closing price. But it stayed there only briefly.

78.    Again, Vaxart's share price stalled-out. Without any new positive information, Vaxart's common stock price sat in the lower $2.00 range dropping to as low as $1.08 on March 16, 2020.

79.    With the world in the grips of a global pandemic, Defendants' scheme to enrich themselves began to take form.

80.    Then, out of the blue and before the market opened on March 18, 2020, Vaxart issued a press release, in bold capital letters titled, "**VAXART ANNOUNCES IT ENTERED INTO AN AGREEMENT WITH EMERGENT BIOSOLUTIONS FOR THE DEVELOPMENT AND MANUFACTURING OF ORAL CORONAVIRUS (COVID-19) VACCINE CANDIDATE**," (bold and capital letters in original) declaring that it had entered into an agreement with Emergent BioSolutions Inc. ("Emergent") to "develop and manufacture Vaxart's experimental oral vaccine candidate for coronavirus disease (COVID-19)." The press release continued with language emphasizing that the contract would "help advance" Vaxart's vaccine to the clinic, and that "Emergent is expected to produce bulk cGMO vaccine", "immediately", and to meet Vaxart's "potential need for future scalability and large-scale capacity for commercial quantities":

> 'I'm pleased that we are joining forces with an experienced manufacturer such as Emergent to help advance our oral COVID-19 vaccine to the clinic,' said Wouter Latour, MD, chief executive officer of Vaxart. 'We believe an oral vaccine administered using a room temperature-stable tablet may offer enormous logistical advantages in the roll-out of a large vaccination campaign, and Emergent is a great partner to help in this endeavor.'
>
> Under the terms of the agreement, development services will begin immediately, and upon Vaxart's election, Emergent is expected to produce bulk cGMP vaccine allowing Vaxart to initiate a Phase 1 clinical study early in the second half of 2020. Emergent will provide development services out of its Gaithersburg, MD location and manufacture drug substance at its Bayview facility in Baltimore, MD, designated a Center for Innovation in Advanced Development and Manufacturing (CIADM) by the U.S. Department of Health and Human Services.
>
> 'Emergent is pleased to deploy our nimble CDMO expertise to support fellow innovators, like Vaxart, and advance an experimental COVID-19 vaccine candidate,' said Syed T. Husain, senior vice president and

CDMO business unit head at Emergent BioSolutions. 'We look forward to applying our broad molecule-to-market services, including our ability to work with a multitude of delivery systems, execute under expedited timelines, and meet Vaxart's potential need for future scalability and large-scale capacity for commercial quantities.'

81.     Again, Defendants would have noticed Vaxart's shares skyrocketed with the COVID-19 headline, closing at $2.34, a 21% gain against the prior day's closing price and over 100% from the close on March 16th. But again, Vaxart's stock price retreated within days to $1.68 on March 25, 2020 after Vaxart reported its results for the fourth quarter and full year 2019.

82.     Defendants now had seen the established the pattern of a potential scheme, device and practice to artificially inflate Vaxart's stock price – if only for a few days – in a manner from which they could profit, and Armistice could exit Vaxart, at the expense of unsuspecting and/or gullible investors: make an announcement hyping Vaxart's COVID-19 vaccine prospects, followed by a stock-spike, and then share-price stagnation or retreat. To make the scheme and stock manipulation work, the Armistice Defendants would need the ability to sell their stock immediately upon the announcements with the cooperation of the other Defendants. More announcements, many of larger significance, would follow.

83.     On March 31, 2020, Defendants caused Vaxart to issue a press release entitled, "**Vaxart Provides Update on its Oral COVID-19 Vaccine Program**." And that "it had produced five COVID-19 vaccine candidates for testing in its preclinical models." Virtually nothing new was stated in the press release that had not been said before.

84.     Defendants again would notice that the press release produced a modest 4.12% spike in the Company's stock price to $1.77, before it dropped over the next two days to $1.68. Clearly, Defendants realized that bolder headlines with bolder claims were required to get investor attention.

85.     On April 14, 2020, Vaxart filed a Form 8-K[8] with the SEC announcing that the Board had named Defendant Cezar Andrei Floroiu, a seasoned pharmaceutical and biotech hand, as the Company's newest and "independent" director. What went unsaid were Floroiu's extensive

---

[8] An 8-K is a report of unscheduled material events or corporate changes at a company that could be of importance to the shareholders or the Securities and Exchange Commission.

connections to Armistice and its two principals, Boyd and Maher. A "personal friend" of Armistice Founder and Managing Member Steven Boyd, Floroiu first met Boyd when they both worked for the consulting firm McKinsey. Later, in 2013, Floroiu worked at Armistice as a senior analyst. Accordingly, even if Floroiu was independent from a regulatory standpoint, he was not independent in reality, but indebted to Armistice for his new role. Only because of his prior relationship with Armistice, was he appointed to the Board.

86.     Because of Floroiu's purported experience, the announcement created a splash, driving Vaxart's share price up to a closing price of $2.04, a 16.5% gain against the prior day's closing price.

87.     Now with Floroiu on the Board, Armistice controlled five out of the current seven directors, with only Latour and Finney pre-existing Armistice's control. In less than six weeks, the Armistice-controlled Board would oust Latour as CEO, but seek to appease him, Defendants Tucker, Finney, as well as reward Yedid and Davis through grants of equity-based compensation (see below) to be approved by shareholders and the Board on June 8, 2020.

88.     Before the market opened on April 21, 2020, Vaxart issued a press release entitled in bold letters, "**Vaxart Announces Positive Pre-Clinical Data for its Oral COVID-19 Vaccine Program**," in which Defendants declared that the Company "obtained positive pre-clinical results for its COVID-19 vaccine candidates, with several of the vaccine candidates generating immune responses in all tested animals after a single dose." Though extremely light on details – including animal type and number of test subjects – the press release again proclaimed the genius of Vaxart's proprietary platform and the advantages a room temperature-stored, orally-administered COVID-19 vaccine would provide. "These early pre-clinical results are in line with those for our oral influenza vaccine which was protective in a clinical Phase 2 efficacy study," Sean N. Tucker, Vaxart's Chief Scientific Officer, declared, analogizing the incipient COVID-19 vaccine research to the Company's discontinued influenza vaccine research.

89.     Defendants would have noticed that the market reacted extremely favorably that day to this positive and promising sounding press release, despite it being extremely light on details, sending Vaxart's common stock price up over 33% against the prior day's closing price, giving the stock the momentum to finally re-cross the $3.00 mark at a closing price of $3.16.

90.     On April 28, 2020, before the market opened, Vaxart issued a press release entitled "Vaxart Announces Corporate Update for First Quarter 2020" with a subheading "Preparations for the Manufacturing of GMP Vaccine at Emergent BioSolutions Ongoing." Defendant Latour was quoted as saying, "This has been a busy quarter at Vaxart, as we have focused on developing a vaccine candidate for COVID-19 . . . . We believe our oral tablet vaccine could be an important tool to help protect the global population from COVID-19." The press release also highlighted:

- On April 21, 2020, Vaxart announced that its lead vaccine candidates generated anti-SARS CoV-2 antibodies in all tested animals after the first dose. The Company expects to announce additional four-week data within days and the selection of lead development candidate shortly thereafter.

- Vaxart is continuing with its manufacturing collaboration with Emergent and provided Vaxart elects to proceed, is on schedule to produce bulk cGMP vaccine in time for initiation of a Phase 1 clinical study during the second half of 2020.

91.     Again, the market reacted favorably and Vaxart's common stock price spiked to an intra-day high of $3.85, a 5.2% jump. However, the stock then sank after Armistice dumped 1,292,070 shares – its very first sale of Vaxart stock and about 11% of volume – driving down the stock to close at $3.27, an 11% loss and the beginning of a new phenomenon: Armistice's well-timed sales in conjunction with positive news about Vaxart and its COVID-19 vaccine candidate.

92.     In summary, between January 2, 2020 and April 28, 2020 – a period of four months – Vaxart issued eight press releases at an average of two press releases per month, including the two mandatory quarterly earnings releases. With each, Defendants could easily see the impact of press releases relating to their supposed COVID-19 vaccine effort as greatly influencing Vaxart's stock price, if only momentarily:

| Date | Title | Stock Reaction |
|------|-------|----------------|
| 1/22/2020 | Results from Influenza Challenge Study Published in Lancet Infectious Diseases | 11% |
| 1/31/2020 | Vaxart Announces Initiation of Coronavirus Vaccine Program | 71% |
| 2/27/2020 | Vaxart Announces $10.0 Million Registered Direct Offering Priced At-the-Market | 74% |

| Date | Title | Stock Reaction |
|------|-------|----------------|
| 3/18/2020 | Vaxart Announces Agreement with Manufacturer Emergent BioSolutions to Produce Vaxart's COVID-19 Vaccine Candidate | 21% |
| 3/31/2020 | Vaxart Provides Update on its Oral COVID-19 Vaccine Program | 4.1% |
| 4/21/2020 | Vaxart Announces Positive Pre-Clinical Data for its Oral COVID-19 Vaccine Program | 33% |
| 4/28/2020 | Vaxart Announces Corporate Update for First Quarter 2020 | 5.2% (*intra-day*) |

**D.     With the Leak of a New Secretive Government Program Called Operation Warp Speed to Develop a Coronavirus Vaccine, Vaxart Intensifies Issuing Press Releases While Armistice Unloads a Majority Its Common Stock Holdings in Vaxart**

93.     On April 29, 2020, news began to leak of a new secretive U.S. Government "Manhattan Project-style" to develop a coronavirus vaccine. As reported by *Bloomberg* in an article entitled, "***Trump's 'Operation Warp Speed' Aims to Rush Coronavirus Vaccine***," the Trump administration was organizing a Manhattan Project-style effort to drastically cut the time needed to develop a coronavirus vaccine, with a goal of making enough doses for most Americans by year's end. Called "Operation Warp Speed," the program was "to pull together private pharmaceutical companies, government agencies and the military to try to cut the development time for a vaccine by as much as eight months, according to two people familiar with the matter. As part of the arrangement, taxpayers will shoulder much of the financial risk that vaccine candidates may fail, instead of drug companies. . . ."

94.     Armistice took immediate advantage of the prospects of government support and funding, dumping 873,634 shares on April 29, 2020 – its second sale of Vaxart stock and about 10% of volume – again driving down the stock to close at $3.00, an 8% loss.

95.     The next day, on April 30, 2020, Vaxart issued a press release entitled, "Vaxart Announces Additional Positive Pre-Clinical Data for its Oral COVID-19 Vaccine Program" with a subheading, "Robust Boosting of Immune Responses Observed after Second Dose." The press release stated:

> Vaxart, Inc., a clinical-stage biotechnology company developing oral recombinant vaccines that are administered by tablet rather than by

injection, today announced that it has obtained positive pre-clinical results for its COVID-19 vaccine candidates, with several of the vaccine candidates generating immune responses in all tested animals after a single dose.

'These pre-clinical results confirm that all constructs are immunogenic as measured by IgG antibodies in serum, and we observed a robust boosting effect after the second dose.' said Sean Tucker, Ph.D., chief scientific officer of Vaxart. 'This latest data set will help to select the lead candidate for manufacturing, and we remain on track to start a first phase 1 study in the second half of this year.'

In January 2020, Vaxart initiated a program to develop a COVID-19 vaccine based on its VAASTTM oral vaccines platform. The Company is currently evaluating multiple vaccine candidates in its preclinical models. In this second round of preclinical testing, all animals received two doses of the Vaxart vaccines, two weeks apart. Antibody responses in all vaccinated groups were statistically significant compared to the untreated controls. Vaxart plans to select one or more vaccine candidates for cGMP manufacturing and clinical testing based on the magnitude and the breadth of the immune response.

96.    April 30, 2020, saw Vaxart hit a high of $3.34. Despite this supposedly positive good news, Armistice this time dumped 4,434,296 shares – almost one third of the trading volume that day and 20% of its holdings – causing the stock to drop from $3.00 the day before to close at $2.70.

97.    Between April 29th with the first press reports of Operation Warp Speed, and June 3, 2020, Vaxart would issue four more press releases, while Armistice dumped 18.2 million of its 25 million shares. The chart below shows sales by Armistice, with the red dates having not sales — along with significant news or Defendants' press releases.

| Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|
| | | **4/29** <br><br> 873,634 <br> Bloomberg Article Leaking OWS | **4/30** <br><br> 4,434,296 | **5/1** <br><br> 1,000,000 |
| **5/4** <br><br> 957,469 | **5/5** <br><br> 692,531 <br> WSJ Article Confirms OWS | **5/6** <br><br> 50,000 | **5/7** <br><br> 100,000 | **5/8** <br><br> 100,000 |

| 5/11 | 5/12 | 5/13 | 5/14 | 5/15 |
|---|---|---|---|---|
| 1,300,000 | 1,581,076 Vaxart 2 Q Results and Update | 525,616 | 834,669 | 458,639 White House Confirms OWS |
| **5/18** | **5/19** | **5/20** | **5/21** | **5/22** |
| 650,000 | | 1,150,000 *Vaxart PR Announcing Choice of Vaccine Candidate* | 400,000 | 200,000 |
| **5/25** | **5/26** | **5/27** | **5/28** | **5/29** |
| *Memorial Day* | | | 200,000 | |
| **6/1** | **6/2** | **6/3** | **6/4** | **6/5** |
| 200,000 | 800,000 | 400,000 *Bloomberg Article* | | |
| **6/8** | **6/9** | **6/10** | **6/11** | **6/12** |
| *Vaxart Annual Meeting* | | | | |
| **6/15** | **6/16** | **6/17** | **6/18** | **6/19** |
| *Vaxart PR Armistice Has "Great Confidence"* | | *Vaxart Present as Raymond James says IND to be filed June* | *Vaxart publishes presentation "Bulk Vaccine in Progress"* | |
| **6/22** | **6/23** | **6/24** | **6/25** | **6/26** |
| | *Vaxart PR to Present at HC Wainwright Thursday* | *Vaxart PR "Set to Join" Russell 3000 (in two days)* | *Vaxart PR Obtains Ability to Manufacture a Billion or more* | **18,226,667** *Vaxart PR Selected for OWS* |
| **6/29** | Armistice Retains only 145,000 shares | | | |
| 9,385,386 | | | | |

98.     On May 5, 2020, the *Wall Street Journal* reported that the White House was stepping up efforts to assist companies to quickly develop a vaccine for the virus through the newly announced Operation Warp Speed:

> Health and Human Services Secretary Alex Azar said the president has set a goal of manufacturing 100 million doses of coronavirus vaccine by the fall and 300 million by January. The lofty goal is part of the administration's "Operation Warp Speed," which seeks to speed up the development, production and distribution of a vaccine, which often take years to bring to market, according to experts.

99.     On May 12, 2020, *Science Magazine* published an article entitled, "Unveiling 'Warp Speed,' the White House's America-first push for a coronavirus vaccine", stating "[t]he project, vaguely described to date but likely to be formally announced by the White House in the coming days, will pick a diverse set of vaccine candidates and pour essentially limitless resources into unprecedented comparative studies in animals, fast-tracked human trials, and manufacturing. . . . [I]t hopes to have 300 million doses by January 2021 of a proven product, reserved for Americans."

100.    Also on May 12, 2020, Vaxart issued a press release announcing first quarter results and providing a "Corporate Update" reiterating previous announcements. That day, Vaxart's common stock price surged in response, hitting an intra-day high of $3.18, an 11.5% gain against the prior day's close, only to then retreat following a massive contemporaneous sale of approximately 1.6 million shares by Armistice, to close up only 2.8%.

101.    On May 15, 2020, the White House formally introduced Operation Warp Speed to the public stating that through the secretive OWS the U.S. government had already identified 14 of the most promising candidates and was narrowing down the list to which it will provide "unprecedented" support. In the President's remarks he stated:

> Today I want to update you on the next stage of this momentous medical initiative. It's called Operation Warp Speed. . . .

> Its objective is to finish developing and then to manufacture and distribute a proven coronavirus vaccine as fast as possible. . . .

> The great national project will bring together the best of American industry and innovation, the full resources of the United States government, and the excellence and precision of the United States military. . . .

In preparation for this initiative, experts throughout the government have been collaborating to evaluate roughly 100 vaccine candidates from all over the world. ***They have identified 14 that they believe are the most promising, and they're working to narrow that list still further. So we started off with over 100, we're down to 14, and we have some really interesting choices to be made***. . . .

Through Operation Warp Speed, the federal government is providing unprecedented support and resources to safely expedite the trials, moving on at record, record, record speed. . . .

Typically, pharmaceutical companies wait to manufacture a vaccine — a vaccine until it has received all of the regulatory approvals necessary, and this can delay vaccines' availability to the public as much as a year and even more than that. However, our task is so urgent that, under Operation Warp Speed, the federal government will invest in manufacturing all of the top vaccine candidates before they're approved. So we're knowing exactly what we're doing before they're approved. That means they better come up with a good vaccine because we're ready to deliver it.[9]

[Emphasis added.] HHS also issued a press release, on that date entitled, "**Trump Administration Announces Framework and Leadership for 'Operation Warp Speed'**" which reaffirmed that OWS had narrowed the candidates it would support down to 14 and planned to narrow it down further to eight. In relevant part the press release stated:

On Friday, the Trump Administration announced the appointment of Moncef Slaoui as chief advisor and General Gustave F. Perna as chief operating officer of Operation Warp Speed (OWS), the administration's national program to accelerate the development, manufacturing, and distribution of COVID-19 vaccines, therapeutics, and diagnostics (medical countermeasures). . . .

Among its other objectives, Operation Warp Speed aims to have substantial quantities of a safe and effective vaccine available for Americans by January 2021. . . .

**Elements of Operation Warp Speed**

Operation Warp Speed is a public-private partnership to facilitate, at an unprecedented pace, the development, manufacturing, and distribution of COVID-19 countermeasures, between components of HHS, including CDC, FDA, NIH, and. . . .

- **Financial resources**: Congress has directed almost $10 billion to this effort through supplemental funding, including the CARES Act, and Congress has appropriated other flexible

---

[9] Remarks by President Trump on Vaccine Development (May 15, 2020), https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-vaccine-development/.

funding. Over $6.5 billion has been designated by Congress for countermeasure development through BARDA, along with $3 billion for NIH research. . . .

*Development*

- ***Operation Warp Speed will select the most promising countermeasure candidates and provide coordinated government support to support their development. . . .***

- For example, this process has proceeded for vaccines in the following manner:

  o Fourteen promising candidates have been chosen from the 100+ vaccine candidates currently in development — some of them already in clinical trials with U.S. government support.

  o ***The 14 vaccine candidates are being winnowed down to about eight candidates, which will go through further testing in early stage small clinical trials.*** (Bold and Italics added)

102.    The news that OWS had identified 14 COVID-19 candidates as possibilities and that it would select eight most promising and provide coordinated government support for their development and testing in early-stage small clinical trials and that large-scale randomized trials would proceed in three to five of them, was widely reported in the financial and regular press.[10] That day, May 15, 2020, Armistice dumped 458,639 shares of Vaxart common stock, grossing approximately $1.3 million.

103.    On May 20, 2020, Vaxart issued a press release entitled, "Vaxart Announces Selection of its Oral COVID-19 Vaccine Lead Candidate," with a subheading entitled, "KindredBio Selected as Second Contract Manufacturing Organization — GMP Production for Phase 1 Study Initiated." Again, following yet another stock "pop," Armistice dumped a further 1.15 million shares of Vaxart common stock, grossing approximately $3.7 million.

---

[10] *See e.g.,* Elizabeth Weise, *In the race for a coronavirus vaccine, can Operation Warp Speed avoid politics?*, USA Today (May 24, 2020), https://www.usatoday.com/story/news/2020/05/24/coronavirus-vaccine-covid-19-operation-warp-speed-moncef-slaoui/5242123002/; Julie Steenhuysen, *Exclusive: US Plans Massive Covid-19 Vaccine Testing Effort to Meet Year-end Deadline*, Reuters (May 22, 2020), https://www.reuters.com/article/us-health-coronavirus-usa-vaccine-exclus/exclusive-u-s-plans-massive-coronavirus-vaccine-testing-effort-to-meet-year-end-deadline-idUSKBN22Y2L3 (Director of NIH identifying some candidates already getting support but refusing to name other candidates on the shortlist of 14).

104.   On May 21, 2020, the *Wall Street Journal* reported that the U.S. Government agreed to fund its first vaccine candidate as part of OWS:

> **U.S. to Invest \$1.2 Billion to Secure Potential Coronavirus Vaccine From AstraZeneca, Oxford University**
>
> **Government to bankroll human trial and ramp-up of manufacturing capacity, hoping to get doses in October**
>
> The U.S. government has agreed to hand AstraZeneca AZN -0.87% PLC up to \$1.2 billion to secure the supply of a potential coronavirus vaccine that could be ready as early as October.
>
> Under the deal, the government will bankroll a 30,000-person vaccine trial in the U.S. starting in the summer, plus the ramp-up of manufacturing capacity to make at least 300 million doses. The first doses will be ready in the fall should the vaccine prove effective, it said.
>
> Alex Azar, the Health and Human Services secretary, called the deal a "major milestone" in the administration's effort – code-named "Operation Warp Speed" – to make a safe, effective vaccine widely available to Americans by 2021.

105.   On May 27, 2020, a competitor of Vaxart in vaccine development issued a press release stating that its affiliate, ImmunityBio was selected for 'Operation Warp Speed.' The press release states in relevant part:

> NantKwest, Inc. (Nasdaq: NK), a clinical-stage, natural killer cell-based therapeutics company, and ImmunityBio, a privately-held immunotherapy company, today announced ***ImmunityBio has been selected to participate in Operation Warp Speed***, a new national program aiming to provide substantial quantities of safe, effective vaccine for Americans by January 2021. Efforts will focus on the development, testing, and large-scale manufacturing of ImmunityBio's COVID-19 human adenovirus vaccine (hAd5) candidate. . . .
>
> To support these coordinated efforts from vaccine to therapeutics, the two companies have signed a binding term sheet to jointly develop, manufacture, and market therapeutics and vaccines for COVID-19. The binding agreement outlines how development costs will be shared, how profits will be apportioned for any successfully marketed products, and the structure of shared governance of the joint work.
>
> "ImmunityBio is honored to have been selected as one of the 14 companies for Operation Warp Speed and is committed to moving our vaccine candidate through the process to prevent people from contracting this deadly virus," said Patrick Soon-Shiong, M.D., Chairman and CEO of ImmunityBio and NantKwest (Bold and italics added)

106.     Defendants could not help but notice NantKwest's stock soar on this news of a competitor having been "selected to participate in Operation Warp Speed," from $5.45 on May 26th with a volume of 800,055 trades to $7.58 on May 27th with a volume of over 22 million trades.

107.     In reality, NantKwest's ImmunityBio's vaccine selection was trivial and NantKwest was not "one of the companies selected to participate in Operation Warp Speed." Instead, NantKwest was only being invited to be evaluated as one of many vaccines in a non-human primate study for possible consideration by OWS. Unfortunately, HHS secrecy kept this information to itself. As reported by *Science Magazine* on June 1, 2020, HHS would not confirm:

> "We're not confirming anyone's involvement in the initial group [of vaccines] unless a company is bound by fiduciary requirements to report contractual agreements," says Michael Caputo, an HHS spokesperson for Warp Speed. . . . Warp Speed has said it plans to whittle down the 14 candidates from its initial selection to about eight for early stage human trials. "We will inform the public very soon about the candidates that make the first cut," Caputo says.[11]

108.     *Science Magazine* also reported that NantKwest's chairman placed the time of its presentation to HHS as being on April 9, 2020, after which they were invited to submit a proposal, and that they signed an agreement for the monkey studies protocol on "Friday" (*i.e.*, May 29, 2020).

109.     The NantKwest press release, and *Science Magazine* article demonstrates that a reasonable investor would consider being invited to participate in the monkey trial was synonymous with being one of the 14 companies being considered by OWS to be whittled down to eight. At the very least, a reasonable investor would be confused.

110.     The timing of NantKwest's presentation to HHS and the signing of the monkey studies protocol strongly suggests that Defendants would have known by June 1, 2020, that Vaxart's oral vaccine would also be evaluated by the US Government in a non-human primate trial. It is highly unlikely that ImmunityBio knew this but others being evaluated did not. For the same reason it is more likely than not that Vaxart was presented with the same agreement for protocol studies on or about May 29, 2020.

---

[11] Jon Cohen, *Operation Warp Speed selects billionaire scientist's COVID-19 vaccine for monkey tests*, Science Magazine (June 1, 2020), https://www.sciencemag.org/news/2020/06/operation-warp-speed-selects-billionaire-scientist-s-covid-19-vaccine-monkey-tests.

111.    Despite these seemingly positive developments – but with no public ties to OWS selection of the final 14 companies being considered by OWS to be whittled down to the final eight – Vaxart's stock price continued to languish at around $3.00 per share in late May and the first few days of June while Armistice continued to unload its common stock holdings almost every single trading day and exit Vaxart.

112.    In summary, between January 1, 2020 and the news of Operation Warp Speed on April 27th, Armistice sold none of its 25,200,000 shares in Vaxart, nor converted any of its warrants into common stock. But with the hype and speculation surrounding OWS and the possibility of substantial government support, Armistice began to systematically unload all of its stock in a clear show of a complete lack of faith in Vaxart's prospects.

113.    Ultimately, from April 28 through the first three days of June 2020, Armistice sold an astonishing 72% of its holdings in Vaxart, or 18,200,000 shares, reducing its common stock holdings down to 7,000,000 shares at an average price of $2.93 per share, and earning gross sales of $53 million — a staggering amount of money, considering Vaxart had a market capitalization of under $8 million when Armistice bought its first warrants less than one year earlier and Vaxart traded for mere pennies. But then Armistice stopped selling.

## V.    DEFENDANTS' SCHEME TO MANIPULATE VAXART'S STOCK PRICE AHEAD OF ITS UNDISCLOSED INTENT TO UNLOAD NEARLY ALL OF ITS HOLDINGS BY THE END OF JUNE IN VIOLATION OF RULE 10B-5(A) AND (C)

114.    Based the strong inferences from the facts set forth herein, Plaintiffs believe Defendants' scheme to manipulate Vaxart's stock price through deceptive press releases and withholding Armistice's intent to dump all of its controlling interest in Vaxart, in violation of Rule 10b-5(a) and (c) was informed by the above facts and implemented in early June 2020.

115.    The following allegations do not rely on the press releases necessarily being material misrepresentations to a reasonable investor, but intended to mislead at least a material number of unsophisticated or uninformed investors and reporters known by Defendants to be waiting for the winners of the Operation Warp Speed contest to be announced. Alternatively, and as set forth below, Plaintiffs allege that the press releases were materially false or misleading by way of omission to the reasonable investor.

116.    The scheme involved Defendants plan to use the temporary reaction of a material number of investors to overstated/deceptive headlines, and the opaqueness of Operation Warp Speed, to enable Armistice to dump all of its remaining ownership of Vaxart into the expected buying frenzy the headlines would create, and the temporary price inflation created by that manipulation. The deception for this claim is Defendants' knowing use of the misleading headlines and quotes in the press releases, their knowledge of the market reaction to those headlines and quotes to temporarily increase Vaxart's stock price, with the intent to use that temporary stock spike as an opportunity for Armistice to dump its shares immediately to take advantage of the temporary stock increase.

**A.      Armistice Demands and Receives the Right to Exercise and Dump All of Its Interests in Vaxart in Exchange for Which Defendants Receive Approval of Stock Option Grants and Receive Other Compensation and Rewards**

117.    By June 1, 2020, only one conclusion can be drawn about Armistice's intent: Armistice had decided to exit Vaxart and accordingly had no faith in its prospects or for the stock price to meaningfully rise.[12]

118.    The rate of Armistice's sales through May meant that Armistice would exit its holdings in common stock within days. However, to completely exit, and recognize the full potential of its profits, Armistice still had 7,000,000 shares of common stock, 16,666,667 warrants to purchase Vaxart common stock at $0.30 per share and 4,090,909 warrants to purchase Vaxart common stock at $1.10 per share. The encumbrances previously placed on Armistice's ability to sell –the beneficial ownership limitations and the 60 day notice period to change those limitation – remained and meant that it would take Armistice days if not weeks to exercise the warrants and sell off the resulting stock.[13]

---

[12] After months of pumping up Vaxart's common stock and an almost five-week period in which Armistice dumped two-thirds of its common stock holdings on sales exceeding $53 million – a mind-boggling sum, which would represent over 25% of Vaxart's market capitalization of $203 million that day – on June 3, 2020, Armistice abruptly halted its sales entirely. As of that day, Armistice retained, in addition to its 7,000,000 shares of common stock, the entirety of both sets of warrants, 16,666,667 warrants to purchase Vaxart common stock at $0.30 per share and 4,090,909 warrants to purchase Vaxart common stock at $1.10 per share. The encumbrances previously placed on Armistice's ability to to increase its beneficial ownership so that it could exercise the warrants and sell them more quickly through inseriatum immediate larger conversions and sales– the 60-day notice period – remained.

[13] Armistice admits that even with the 19.99% increase Armistice still had to email exercise notices to Vaxart, identifying the Warrant series and number of shares it was exercising each time it sold off

119.     Defendants also knew that an announcement like NantKwest's claim that its subsidiary, ImmunityBio, had been "selected" for OWS was a sure ticket to "pop" Vaxart's stock price for a tidy additional profit. But without such an announcement to "pop" Vaxart's stock price, Armistice suddenly stopped selling off its shares on June 3, 2020. Armistice needed the other Defendants to cooperate and issue a similar a press release, and to amend the restrictions on the exercise and sale of Armistice's warrants so that it could quickly dump its remaining interest in Vaxart. With the necessity of June 8, 2020 Board approval of the stock option grants proposed in April, Armistice demanded that the warrants be amended for no apparent – or publicly-disclosed – consideration.

120.     By June 1, 2020, Armistice demanded that it be allowed to exercise its warrants and sell off all of its Vaxart stock. On that date Vaxart's Board had a telephone conference without the two Armistice Directors, Boyd and Maher, to discuss a request by Armistice to amend the warrants.[14] No minutes were taken of this June 1, 2020 call and a list or "pros and cons" of whether to approve the warrant amendments requested by Boyd and Maher appears to have been discussed. But the amendments could only be for one purpose — for Armistice to fully dispose of its shares by the end of June. Evidence of this intent is the fact that the Board approved the amendments by written consent on June 5, 2020.[15] Those amendments became effective when they were signed on behalf of Armistice by Boyd on June 8, 2020, in conjunction with the stock option approvals that day.[16]

---

enough shares not to go over the limit: "Armistice could not exercise all 20,757,576 Warrants at once due to the 19.99% blocker." (Citations omitted) Instead, it had to do so in blocks, successively selling down its holdings and then exercising its Warrants and receiving shares up to the 19.99% threshold. Following each exercise, Armistice paid Vaxart the exercise prices established for the warrants when they were first acquired in 2019. Armistice MTD Delaware at 14. Moreover, if the amendments were immaterial to Defendants, one needs to ask why they were so important to remove.

[14] According to complaints filed in the derivative lawsuits against Defendants, where the plaintiffs received documents from § 220 document demands under Delaware law — though much is redacted. [BLBG *Jaquith* Delaware Complaint ¶¶74-74] [Second Am. Compl., *Ennis, et al. v Wouter et. al.*, Case No. 20-CIV-03253 at ¶¶51-52 (Sup. Ct. of San Mateo Cty., filed on Nov. 25, 2020)].

[15] *See* ECF No. 101-8 Action by Unanimous Written Consent of the Board of Directors of Vaxart, dated June 5, 2020; ECF No. 101-9 Common Stock Purchase Warrant between Armistice and Vaxart, dated April 11, 2019; and ECF No. 101-10 Common Stock Purchase Warrant between Armistice and Vaxart, dated September 30, 2019.

[16] *Ennis, supra* note 13 at ¶59.

121.     Defendants' full knowledge of the *quid pro quo* and scheme is further evidenced by a presentation created ahead of and for the June 8, 2020 Board meeting which contained a slide setting forth Vaxart's forecasted cash receipts that included the following: "Assuming $5M Raised **in June** from Armistice Warrant Exercises."[17] $5 million was the cost to Armistice of exercising at least half of its remaining warrants.

122.     Vaxart received no compensation for agreeing to the Warrant Amendments other than the payments to which it was already entitled upon exercise of the warrants pursuant to their terms. However, the amendments enormously enriched Armistice. The Warrant Amendments, however are timed such that they appear to have been a "favor" to Armistice to enable it to quickly exit Vaxart at an enormous profit. In return, as an apparent *quid pro quo* by the convenient timing, Armistice and its representative on the Vaxart Compensation Committee (Maher) and Armistice's representatives on Vaxart's Board (Boyd and Maher) approved the now spring-loaded options and other compensation to Defendants Floroiu, Davis, Finney, Yedid, Latour, and Tucker, first proposed in the April 24, 2020 Proxy Statement. These still needed June 8, 2020 Board approval,[18] as well as Board approval to amend the 2019 Plan to increase the number of shares by 6,400,000 shares, in order to enable Vaxart to continue to grant stock options under the 2019 Plan.[19]

---

[17] *Ennis, supra* note 13 at ¶62.
[18] *See* Item 5.02 from the June 9, 2020 8-K: "On June 8, 2020, as described below, the stockholders of Vaxart, Inc. ('Vaxart' or the 'Company') approved the amendment to the Vaxart, Inc. 2019 Equity Incentive Plan (as so amended, the 'Amended Plan') to increase the number of shares of common stock reserved for issuance thereunder by 6,400,000 shares to 8,000,000 shares. . . . As previously disclosed, the Amended Plan authorizes the grant of equity-based compensation to the Company's employees, directors and consultants, and provides for the grant of incentive stock options, nonstatutory stock options, stock appreciation rights, restricted stock awards, restricted stock unit awards, other stock awards, and performance awards that may be settled in cash, stock, or other property."
[19] On June 8, 2020, the shareholder, based on the April Proxy approved by the Board also approved the increase in Vaxart shares from 1.6 to 8 million and the granted to Defendants Yedid, Davis, Latour, Floroiu, Finney, Tucker, and non-defendant Echerd a total of 3,572,100 options to purchase Vaxart common stock at prices ranging from $1.70 to $2.46.

**B.      Defendants Seize the Opportunity of HHS Secrecy Around OWS and the Ability to Confuse and Mislead a Material Number of Investors to Manipulate Vaxart's Stock Price Ahead of Armistice's Exit**

123.      Simultaneously, while negotiating the warrant amendments, another critical development occurred that presented Defendants with further ammunition to manipulate Vaxart's stock price ahead of Armistice's plan to exercise all of its warrants by the end of June and sell off all of its stock holdings in Vaxart.

124.      On June 3, 2020, *Bloomberg* and the *New York Times* identified the names of five companies selected for funding by the recently announced U.S. federal government-sponsored program to speed the development of multiple COVID-19 vaccines, known as Operation Warp Speed. More specifically, the widely-read *New York Times* article stated:

> The Trump administration has **selected** five companies as the most likely candidates to produce a vaccine for the coronavirus, senior officials said, a critical step in the White House's effort to deliver on its promise of being able to start widespread inoculation of Americans by the end of the year.
>
> By **winnowing the field in a matter of weeks from a pool of around a dozen companies**, the federal government is betting that it can identify the most promising vaccine projects at an early stage, speed along the process of determining which will work and ensure that the winner or winners can be quickly manufactured in huge quantities and distributed across the country.
>
> **The announcement of the decision will be made at the White House in the next few weeks**, government officials said.

[Emphasis added.]

125.      The publicly-identified companies were Moderna, AstraZeneca, Johnson & Johnson, Merck & Co., and Pfizer. When OWS was initially announced on May 15, 2020, HHS's press release noted that there were "about eight candidates, which will go through further testing in early stage small clinical trials." Now, with five of those candidates identified, speculation mounted as to the identities of the unknown two or three.[20] As noted above, "We're not confirming anyone's involvement in the

---

[20] Other news media repeated the report, and noted that the "selection as finalists will give all five companies access to additional government funding to help accelerate the development of their vaccines." Lucas Manfredi, *White House picks five coronavirus vaccine candidates for 'Operation Warp Speed' initiative*, FoxBusiness (June 3, 2020), https://www.foxbusiness.com/healthcare/white-house-picks-five-covid-vaccine-candidates-for-operation-warp-speed-initiative.

1   initial group [of vaccines] unless a company is bound by fiduciary requirements to report contractual

2   agreements," said Michael Caputo, an HHS spokesperson for Warp Speed, as reported by *Science*

3   *Magazine* on June 1st.

4       126.    Vaxart was not one of the unidentified two or three vaccine candidates selected for

5   OWS, a fact Defendants knew on June 3, 2020. Defendants also knew it never could be one of the

6   remaining two or three candidates selected by OWS and that any interaction with HHS or OWS at this

7   point was trivial with potential pay-off years away.

8       127.    Based on NantKwest's statements above, Vaxart would have made a presentation to

9   HHS by early April to be considered for OWS. At that time, HHS would have informed Vaxart whether

10  they were being invited to be one of those selected for support, or rejected. Any further invitations to

11  submit proposals would be trivial, at best a consolation prize. The non-human primate trials were just

12  such a prize. As would be later learned by the investors, the NHP studies were merely one of many

13  "U.S. government preliminary studies" that might assist the government in later determining "potential

14  areas for possible [OWS] partnership and support."[21]

15      128.    From this process Defendants also would have known that OWS had imposed a strict

16  set of selection criteria that Vaxart obviously did not qualify for, but would have known from required

17  information it would have had to submit. Though the selection criteria were a secret to the public at

18  the time, under no circumstances could Defendants have been under the mistaken belief that Vaxart's

19  inchoate oral vaccine was selected. As Moncef Slaoui and Matthew Hepburn, OWS's head and

20  development lead, co-wrote in the *New England Journal of Medicine* ("*NJEM*") on August 26, 2020:

21  > OWS selected vaccine candidates on the basis of four criteria. **We**
22  > **required candidates to have robust** preclinical data or early-stage
    > clinical trial data supporting their potential for clinical safety and
    > efficacy. **Candidates had to have the potential, with our acceleration**
23  > **support, to enter large phase 3 field efficacy trials this summer or fall**
    > **(July to November 2020)** and, assuming continued active transmission
24  > of the virus, to deliver efficacy outcomes by the end of 2020 or the first
    > half of 2021. Candidates had to be based on vaccine-platform
25  > technologies permitting fast and effective manufacturing, and their
    > developers had to demonstrate the industrial process scalability, yields,
26  > and consistency necessary to reliably produce more than 100 million
    > doses by mid-2021. **Finally, candidates had to use one of four vaccine-**
27  > **platform technologies that we believe are the most likely to yield a safe**

28  [21] Statement of HHS spokesperson. *See* ¶167.

*and effective vaccine against Covid-19: the mRNA platform, the replication-defective live-vector platform, the recombinant-subunit-adjuvanted protein platform, or the attenuated replicating live-vector platform.*

[Emphasis added.]

129.     Alex M. Azar II ("Azar"), HHS Secretary, and Slaoui wrote on September 2, 2020, in *USA Today*, that OWS "aim[ed] to select eight candidates for support, ***two from each platform***," in order to "buil[d] a portfolio that will maximize our chances at success." [Emphasis added.]

130.     In addition, as noted in the *NEJM* article, OWS sought vaccine candidates with "the potential . . . to enter large ***phase 3*** field efficacy trials this summer or fall (July to November 2020)." [Emphasis added.] At the time, Vaxart's COVID-19 vaccine candidate was nowhere near that stage and the Company had ***repeatedly*** informed the public, "Manufacturing of our COVID-19 vaccine is on track to start a first ***phase 1*** study in the second half of this year, possibly as early as the summer." [Emphasis added.]

131.     Further, as the *NEJM* article noted, OWS targeted "four vaccine-platform technologies" and as the *USA Today* article noted, OWS aimed to select "two from each platform." Vaxart's COVID-19 candidate utilized a "replication defective" platform, the ***same*** platform utilized by two of the publicly named companies, Johnson & Johnson and AstraZeneca. Therefore, even if Vaxart was prepared to promptly launch a "large ***phase 3*** field efficacy trial[]" for its COVID-19 vaccine candidate – which it was absolutely ***not*** – OWS still would not have selected the Company anyway. For this additional reason, it would have been impossible for Vaxart to believe that their COVID-19 candidate was selected.

132.     Defendants' scheme above was non-public and unknown to investors, including Armistice's intent to unload all of its equity in Vaxart at a time when it was still in control of Vaxart and its largest investor.

**C.     Defendants Oust Latour as CEO Only Days After He is Re-elected as Chairman and Install the Armistice-Friendly Floroiu as CEO in Furtherance of Their Scheme**

133.     As noted above, on Monday, June 8, 2020, after the Shareholder meeting, Defendants solidified their agreement and plan to allow Armistice to exit Vaxart through a dump of 28 million

shares (which is what they did leaving with only 145,000 shares) by the end of June, and in return approve the stock grants and other rewards to Defendants.

134. On that date, the Board minutes also confirm that each Board member was aware that Vaxart was invited to submit its vaccine to comparative NHP trials being conducted by the federal government, as conveyed by Latour.

135. Over the next few days Defendants lost little time in orchestrating the removal of Latour (one of the two pre-Armistice directors remaining) as CEO. Instead Latour was replaced by Board member and former Armistice employee, Defendant Floroiu, a "personal friend" of Armistice Founder, Managing Member and current Board colleague, Defendant Boyd, who also served as his boss when Floroiu worked for the hedge fund.

136. On Saturday, June 13, 2020, by unanimous written consent, the Board resolved to: (i) allow Latour to step down from the CEO position; (ii) treat the resignation as a termination without cause; (iii) provide him with severance benefits under the Company's Severance Benefit Plan upon the purported termination without cause; and (iv) allow his outstanding stock options to continue to vest during his new, materially less demanding position as non-executive Chairman of the Board.

137. On the same date, the Board approved a Letter Agreement with Floroiu providing for a base salary of up to $400,000, a target bonus opportunity of up to 50% of base salary, 845,280 time-based stock options, 900,000 performance-based stock options, a $100,000 success bonus, and a three-month severance under the Company's Severance Benefit Plan.[22]

---

[22] On June 14, 2020, the director defendants granted Floroiu two series of manipulated, spring-loaded options under the 2019 Plan. The first were "Time Based Options" for 845,280 shares and the second were "Performance Based Options" for 900,000 shares. All of those options had an exercise price of $2.46 per share, which was the closing price of the Vaxart stock on June 15, 2020. The Time Based Options granted to Floroiu vest according to a typical timeline structure over four years and all vest if there is a change in control as defined by the 2019 Plan. The Performance Based Options vest based on the closing price of Vaxart stock for 10 consecutive days prior to November 30, 2020 (or such later date as determined by the Board). One-third of the 900,000 options (300,000) vest if and when Vaxart's stock closes at $5 or higher for any 10 consecutive days prior to November 30, 2020. Another one third (300,000) vest if Vaxart's stock closes at $7.50 or higher for any 10 consecutive days prior to November 30, 2020. The last 300,000 options vest if Vaxart's stock closes at $10.00 or more prior to November 30, 2020 for any 10 consecutive days. If those closing stock price points did not occur, the Performance Based Options granted to Floroiu, if not amended, expire worthless. The vesting terms of Floroiu's Performance Based Options are highly unusual. In light of the November

138.    No reason for the change has been given. Regardless, such a change of control is consistent with the nature of the 900,000 performance-based stock options given to Floroiu — to control the narrative of the upcoming press releases in preparation for Armistice to unload its stock at prices above $5, $7.50 or $10 per share.

**D.    With Latour Out and Floroiu at the Helm to Control the Press Releases, Defendants Implement Their Stock Manipulation and Sale Scheme Through an Unprecedented Ten-Day Blizzard of Press Releases and Public Statements Aimed to Convince a Material Portion of the Investing Public that Vaxart had Meaningful OWS Support and that It was Quickly Moving Towards Production**

139.    Following Armistice's conclusion of their massive stock sale on June 3, 2020, throughout the next three weeks, Vaxart's common stock floundered in the low- to mid-$2.00 range, pressed down under the weight of the hedge fund's sale of an astounding 18.2 million shares.

140.    Despite the fact that OWS had ***not*** selected Vaxart's COVID-19 vaccine candidate, Defendants decided to take full advantage of the public uncertainty around the unknown two or three vaccine candidates, leveraging the global need for a viable COVID-19 vaccine – and the market's desire to figure out the remaining identities of the OWS participants – into a massive windfall, dwarfing the sum Armistice had already acquired.

141.    Defendants also knew that the financial press would pick up on and amplify headlines in the rush to publish or out of a lack of deep understanding of the situation from watching articles published over the past six months regarding COVID-19 vaccine development and the NantKwest/ImmunityBio press release. Thus, if Defendants buried some of the detail under the headline, a material portion of investors and the financial press would be deceived, especially given the opaqueness surrounding OWS.

---

30, 2020 drop dead date, these options only vest if Vaxart's stock price doubled, tripled, and quadrupled in just five and a half months. The structure created an enormous incentive for Floroiu, as Vaxart's new Chief Executive Officer, to cause the price of Vaxart stock to rise quickly and dramatically. In fact, when Floroiu received his stock options they were valued at about $4.3 million. After the PR blitz and purported "selected for" OWS announcement, they were worth more than $28 million — greater than a six-fold increase. Moreover, all of Floroiu's 900,000 performance-based options vested. Starting on July 13, 2020, Vaxart's stock price closed at above $10 per share for ten days in a row. Accordingly, within less than a month of his appointment as CEO, Floroiu "attained" his performance-based goals.

142.    Defendants quickly orchestrated an unprecedented-for-Vaxart **ten-day** press release and public relations blitz timed and orchestrated to drive up Vaxart's stock price ahead of Armistice dumping all of its remaining interest by the end of June. By the time Armistice would eventually dump its stock, Defendants would issue five press releases during the course of 10 days (one every two days) and present at two investment conferences.

143.    Also during this timeframe, Defendants would have determined it was equally a good time to raise cash for Vaxart through an at-the-market facility for $90 million in gross proceeds a couple of weeks after Armistice dumped its shares, but while the stock price was still inflated. It takes weeks to put together such a facility, and the necessary SEC filings, not days.[23]

| Date | Title |
|---|---|
| 6/15/2020 | Vaxart, Inc. Appoints New CEO to Accelerate Advancement of COVID-19 and Other Programs |
| 6/18/2020 | Vaxart Publishes Corporate Presentation on Website and Presents at Raymond James Human Health Innovation Conference |
| 6/23/2020 | Vaxart, Inc. to Present at the H.C. Wainwright Virtual Fireside Chat Series |
| 6/24/2020 | Vaxart, Inc. Set to Join Russell 3000® Index |
| 6/25/2020 | Vaxart, Inc. Signs Memorandum of Understanding with Attwill Medical Solutions Steriflow, LP |
| 6/25/2020 | Floroiu and Tucker Present at H.C. Wainwright Fireside Chat Series |
| 6/26/2020 | Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed |

**1.    The June 15, 2020 Press Release Where Armistice and Boyd Express "Great Confidence" in Vaxart and its New CEO as "Vaxart's Largest Institutional Investor"**

144.    On June 15, 2020, Defendants caused Vaxart to issue a press release entitled, "**Vaxart, Inc. Appoints New CEO to Accelerate Advancement of COVID-19 and Other Programs**" with

---

[23] The Form S-3 registration statement was filed by Vaxart on July 8, 2020.

PLAINTIFFS' FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - 46
Case No.: 3:20-cv-05949-VC

1    the subheading, "Andrei Floroiu Appointed Chief Executive Officer Wouter Latour, MD, to continue

2    as Chairman of the Board." The press release stated in relevant part:

3           Vaxart, Inc. ('Vaxart' or the 'Company'), a clinical-stage biotechnology
            company developing oral recombinant vaccines that are administered by
4           tablet rather than by injection, announced that effective today it has
            appointed Andrei Floroiu as Chief Executive Officer. Mr. Floroiu is a
5           highly experienced biopharma executive, with a proven track record of
            value creation, with substantial financial, strategic and operational
6           experience in the vaccine and biopharmaceutical industry. He has served
            as a member of Vaxart's Board of Directors since April 2020 and will
7           continue on the board while serving as Chief Executive Officer. Wouter
            Latour, MD will remain as Chairman of the Board and a director of the
8           Company.

9           'I am delighted to welcome Andrei to Vaxart and want to express my
            deepest confidence in him as we transition Vaxart's leadership,' said Dr.
10          Latour. 'It has been an honor to lead this incredibly talented team and
            advance the clinical programs of the Company for the last eight years,
11          and the Board of Directors and I are looking forward to working with
            Andrei and the management team to drive the Company to the next stage
12          of growth.'

13          Mr. Floroiu was most recently with Agenus, Inc., an immuno-oncology
            and vaccine pioneer, where he held executive positions and was
14          responsible for structuring strategic partnerships and other transactions,
            including the origination and execution of a $115 million royalty
15          transaction based on GSK's Shingrix vaccine. Prior to Agenus, Mr.
            Floroiu was a Managing Director at Exigo Capital providing strategic
16          advice to C-suite executives and Boards. Mr. Floroiu also brings prior
            biopharma investment and advisory experience with The Invus Group,
17          a leading healthcare investment firm, and McKinsey & Co, a leading
            management consultancy. Mr. Floroiu holds an MBA from the Wharton
18          School, an MSc from the University of Maryland, and an Engineering
            degree from the Politecnica University of Bucharest.

19
            'This is an exciting time for Vaxart, with tremendous prospects for
20          growth and value creation in the new world ushered in by the
            coronavirus crisis,' said Andrei Floroiu. **'Wouter and the Vaxart team**
21          **brought the company to the remarkable position of playing a**
            **potentially crucial role in the reopening of America, and the world, by**
22          **rapidly advancing the development of what could be the most effective**
            **and most convenient COVID-19 vaccine**. I am convinced that our work
23          on COVID-19 will further validate the unique potential of Vaxart's oral
            vaccine technology against other viral threats and as a rapid response
24          pandemic platform. Our strong balance sheet, with almost $30 million
            in cash as of March 31st, enables us to intensify our efforts, while also
25          building upon the interest in the Company's disruptive vaccine
            platform.'

26
            '**With Andrei's appointment, we are pleased to have a seasoned**
27          **executive with experience in vaccines and business development to**
            **build out the Company and set it on a path of sustainable growth**,' said
28          **Steven Boyd, a member of Vaxart's Board of Directors**. 'As Vaxart's

> *largest institutional investor, and having personally known Andrei since we both worked at McKinsey, I have great confidence in his ability to generate substantial shareholder value by unlocking the Company's tremendous potential. . . .'*

[Emphasis added.]

145.    The June 15th press release was an important part of the stock manipulation scheme in three ways. First, the fact the Defendant Boyd is quoted in the press release, shows that Boyd and the Armistice Defendants had control over Vaxart's press releases at least as of June 15, 2020 — the first in which Floroiu was acting in his official capacity as CEO. Second, Boyd's quote demonstrates Armistice knowledge of the importance of "***Vaxart's largest investor***" publicly displaying and claiming "***great confidence*** in [Floroiu's] ability to generate substantial shareholder value by unlocking [Vaxart's] tremendous potential." [Emphasis added.] Had this display of support to investors not been considered critical and material by Defendants, there would have been no good reason to put the quote by Boyd in the press release.

146.    Third, the June 15th press release is demonstrably false as Boyd and Armistice had so little confidence in Vaxart that it – Vaxart's largest institutional investor – was planning to sell almost the entirety of its remaining stock in the company just 11 days later.[24] At the very least, Defendants knew that this omission was necessary to make its display of "great confidence" not misleading.

**2.      On June 18th, Defendants State "Covid-19 Program Advancing Rapidly," "Phase 1 to Start in Summer," and "Manufacturing in Place"**

147.    On June 18, 2020, Vaxart filed a Form 8-K with the SEC stating that it intended to present an updated corporate presentation at the Raymond James Human Health Innovation Conference that day, attaching a copy. A copy was also posted on Vaxart's website. The presentation touted the speed with which the "Vaccine Program is Advancing Expeditiously," and posted a chart comparing its advantages to the seven other vaccines which included the four of the five selected by OWS, highlighting Vaxart's vaccine, conveniently, as the eighth vaccine (which was the number of vaccines OWS announced it would support) as if Vaxart was in contention for OWS's eighth slot:

---

[24] As of June 2, 2020, Armistice and Boyd reported that they held 19.99% of Vaxart's common stock based on 83,969,905 outstanding. They would later reduce their ownership to a nominal amount representing 0.2% based on 94,941,898 outstanding.

## Advantages of our COVID-19 vs others



|  | Technology | Limitations | Likely Immune | Needles |
|---|---|---|---|---|
| **Vector-based** | | | | |
| CanSinoBio | rAd5 injected | | | |
| AZ/ Oxford | Chimp rAd | Antivector Immunity | nAb, T cells | Yes |
| Janssen | rAd26 injected | | | |
| **DNA/RNA** | | | | |
| Moderna | Stabilized RNA | New technology | nAb | Yes |
| Pfizer/BioNTech | RNA | | | |
| **Protein** | | | | |
| Novavax | Insect cell culture | ADE, only makes Ab | Ab | Yes |
| Sanofi/PS | | | | |
| **Oral Vaccine** | | | | |
| Vaxart | rAd5 oral tablet | Smaller company | IgA, Mucosal T | No Needles |

VAXART                                                                | 9

148.    The corporate presentation, which has been taken down from Vaxart's website, also stated that Good Manufacturing Practice ("GMP") for "Bulk Vaccine in Progress" and that the Vaxart would submit its Investigative New Drug application ("IND") to the FDA within 12 days (June month end):

## Oral COVID-19 Vaccine – Phase 1 Ready

**CDMO Partners**
- Tech Transfers Complete
- GMP Bulk Vaccine in Progress

emergent
biosolutions

KindredBio

- **Clinical/Regulatory Activities**
  - IND submission in June
  - Clinical Study FPI Summer 2020
    - *Phase 1 open label, dose ranging*

VAXART                                                                | 10

## Highlights

- **Disruptive Oral vaccine platform**
  - Validated approach: BARDA-funded flu challenge study
  - Could emerge as the ideal solution for COVID-19
    - Potentially best in class efficacy: mucosal & systemic immunity
    - Appeal of oral administration, low cost across supply chain, environmentally friendly
  - Advantages apply to other airborne & mucosal viruses - e.g., flu, norovirus, etc.)
- **Covid-19 program advancing rapidly**
  - Phase 1 to start in Summer 2020
  - Manufacturing in place
- **Norovirus program phase 2 ready**
- **Rapid response pandemic platform**: plug-n-play, ready for future pandemics
- **Strong balance sheet**: ~$30M cash on hand per March 31

 VAXART

| 14

149.    In fact, Defendants had no real expectation that human clinical trials would start in June and were not ready to file their IND, which was a necessary requirement before starting clinical trials. The IND was not submitted to the FDA until August 10, 2020.[25]

### 3.   The June 23, 2020 Press Release — Defendant Floroiu to Participate in Live Broadcast on June 25, 2020 (Timed with the Attwill Manufacturing Press Release)

150.    Next, on June 23, 2020, Defendants caused Vaxart to issue a press release entitled, "Vaxart, Inc. to Present at the H.C. Wainwright Virtual Fireside Chat Series" announcing the Defendant Floroiu would participate in a live broadcast chat at the H.C. Wainwright Fireside Chat Series on Thursday, June 25, at 10:25 am ET.

151.    This "live chat" was perfectly timed to occur with another planned announcement and just one day before Armistice's planned massive sale of stock.

### 4.   In a June 24, 2020 Press Release, Vaxart Proudly Announces It Would Join the Russell 3000

152.    Before the market opened on June 24, 2020, Vaxart announced that effective Monday, June 29, 2020, it would join the Russell 3000, a stock market index benchmarked to the 3,000 largest publicly traded U.S. companies. The press release stated in relevant part:

---

[25] Vaxart's August 10, 2020 press release admits, "Filing the IND is the first major step of many we are taking to advance our oral vaccine in the prevention of COVID-19."

'I am extremely pleased with our progress to date in our ongoing effort to disrupt the vaccine industry by developing a transformative oral vaccine that is not only more convenient to administer, but has the potential to offer better protection than injectables against airborne viruses such as SARS-CoV-2, which causes COVID-19. Inclusion in the Russell 3000 Index has the potential to increase the liquidity of our stock and expose us to a wide range of institutions, investors, and index funds that reference them, facilitating the Company's growth, and drive the Company on its pathway to success,' said Andrei Floroiu President and Chief Executive Officer of Vaxart, Inc.

153.    That day, Vaxart closed at $3.19, a 20% jump against the prior day's closing price.

154.    Vaxart had known its common stock had been selected as early as June 5, 2020, when the Russell 3000, at approximately 6:00 PM that day, released its preliminary "add and delete list" for the index, on which Vaxart appears as one of the tickers set to be added to the index.[26]

155.    Therefore, Defendants knew before June 24, 2020 that it would become part of the Russell index, which represents approximately 98% of the investable U.S. equity market. But Defendants also knew that the Russell index rebalances on the last Friday of June each year — June 26, 2020.[27] By building up the deceptive press releases ahead of the rebalancing, and timing the most important one to occur on the day of rebalancing, Armistice and Defendants could guarantee greater liquidity to dump its large holdings of Vaxart stock to take full advantage of the planned bump in its stock created by the PR campaign. And announcing the rebalancing two days ahead, Defendants could generate further demand against Armistice's sell off.

---

[26] On June 5, 2020, the preliminary US index add & delete lists were posted to the FTSE Russell website after 6:00 PM eastern time. *See* Press Release, FTSE Russell (Mar. 3, 2020), https://www.ftserussell.com/press/ftse-russell-announces-2020-russell-us-indexes-reconstitution-schedule. Vaxart appears on the preliminary list. *See* Reconstitution: Russell 3000® Index - Additions, FTSE Russell, https://content.ftserussell.com/sites/default/files/ru3000_additions_20200619.pdf (last visited June 9, 2021).

[27] In March of 2020, FTSE Russell announced the 2020 schedule for the annual reconstitution, or rebalancing, of its Russell US Indexes. On June 5 the preliminary additions were posted on the FTSE Russell website. On June 15, 2020, the "lock-down" period began, when US index adds & deletes lists are considered final. On June 26, the Russell Reconstitution would become final after the close of the US equity markets. On June 29, equity markets would open with the newly-reconstituted Russell US Indexes. *See supra* note 24.

**5.     In a June 25, 2020 Press Release, Defendants Claim They Signed a Contract Enabling the Production of a Billion or More Doses a Year**

156.     On the morning of June 25, 2020, at 8:00 am, Defendants issued a press release entitled, "**Vaxart, Inc. Signs Memorandum of Understanding with Attwill Medical Solutions Sterilflow, LP**, *Enabling Production of A Billion or More COVID-19 Vaccine Doses Per Year Through Large Scale Lyophilization, Tableting and Coating*," which misleadingly suggested that Vaxart was close to production of a vaccine. The press release also stated that Attwill "***will be assigning dedicated resources and equipment for the scale up and commercial production of the vaccine upon entering a formal agreement***," and quoting Defendant Floroiu as saying, "We believe AMS' experience coupled with its ***ability to manufacture a billion or more doses per year would be a beneficial addition to our group of CDMO partners and enable the large scale manufacturing and ultimate supply of our COVID-19 vaccine for the US, Europe and other countries in need***." [Emphasis added.]



**Vaxart, Inc. Signs Memorandum of Understanding with Attwill Medical Solutions Sterilflow, LP**

June 25, 2020

*Enabling Production of A Billion or More COVID-19 Vaccine Doses Per Year*
*Through Large Scale Lyophilization, Tableting and Coating*

SOUTH SAN FRANCISCO, Calif., June 25, 2020 (GLOBE NEWSWIRE) -- Vaxart, Inc. ("Vaxart" or the "Company"), a clinical-stage biotechnology company developing oral vaccines that are administered by tablet rather than by injection, announced today that it signed a Memorandum of Understanding with Attwill Medical Solutions Sterilflow, LP (AMS) affirming the parties' intent to establish AMS as a resource for lyophilization development and large scale manufacturing including tableting and enteric coating for Vaxart's oral COVID-19 vaccine. AMS will be assigning dedicated resources and equipment for the scale up and commercial production of the vaccine upon entering a formal agreement.

"We believe AMS' experience coupled with its ability to manufacture a billion or more doses per year would be a beneficial addition to our group of CDMO partners and enable the large scale manufacturing and ultimate supply of our COVID-19 vaccine for the US, Europe and other countries in need," said Andrei Floroiu, CEO of Vaxart Inc. "We believe our oral vaccines, generated on our proven platform, have the potential to offer superior protection against airborne viruses such as SARS-CoV-2 by triggering both mucosal and systemic immunity while being administered by a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns."

**About Vaxart**
Vaxart is a clinical-stage biotechnology company focused on developing oral tablet vaccines designed to generate mucosal and systemic immune responses that protect against a wide range of infectious diseases and has the potential to provide sterilizing immunity for diseases such as COVID-19. Vaxart believes that a room temperature stable tablet vaccine is easier to distribute, store and administer than injectable vaccines and may provide significantly faster response to a pandemic than injectable vaccines, enabling a greater portion of the population to be protected. Vaxart's development programs include oral tablet vaccines that are designed to protect against coronavirus, norovirus, seasonal influenza and respiratory syncytial virus (RSV), as well as a therapeutic vaccine for human papillomavirus (HPV). For more information, please visit www.vaxart.com.

157.     VXRT shares opened 13% higher with the Attwill announcement at $3.61 (+$0.42, +13.17%) over Wednesday's $3.19 closing price and reached a new 52-week high price on Thursday

of $6.48. That day, the stock closed at $6.26, up $3.07 for a 96% gain against the prior day's closing price.

159. Vaxart's new-found manufacturing ability, along with that day's H.C. Wainwright statements, including Defendant Floroiu's statement that "there may be other news, partnering and so on" that they would announce shortly, primed investors for the next day's planned "selected for" OWS announcement they had been withholding until the right time.

159. But, at the time of its Attwill MOU, Defendants also would have known in the course of doing any due diligence, their knowledge of the industry, and the boldness of their claims in the press release — that the Attwill press release was deceptive and/or misleading. Attwill did not have the critically necessary FDA certifications to manufacturer *any* doses of Vaxart's COVID-19 vaccine and lacked the personnel and operational capabilities to manufacturer a ***billion or more*** doses as well as evidenced by the following:

> (a) Attwill is a small contract manufacturer currently based in Lodi, Wisconsin. Originally based in a suburb of Salt Lake City, Utah, in the residential home of its co-founder, managing partner, and Chief Operating Officer, Attilio Di Fiore ("Di Fiore"), in 2017 Attwill moved to its current location when it purchased pharmaceutical manufacturer Anteco Pharma LLC and its Wisconsin facility. At all relevant periods, Attwill had 25 to 30 personnel in total at the Company.

> (b) Currently, Attwill has three manufacturing lines of business: (1) lyophilization, a process whereby water is removed from a pharmaceutical ingredient (*i.e.*, a chemical compound) or food product by freeze-drying it (instead of heating it) and placing it under a vacuum; (2) vascular accessory medical products; and (3) peptide – short chemical chains of amino acids, linked by peptide bonds – biomaterial.

> (c) CW2 worked for Attwill from September 2016 to July 2020. In 2018, CW2 was promoted to the position of Quality Control Specialist. In that role, CW2 reported to CW3, Attwill's Quality Assurance Manager. CW3, who was employed by Attwill from October 2016 to June 2020, reported directly to Di Fiore.

> (d) In early 2020, CW2 was instructed to conduct a "Gap Assessment" of Attwill's capabilities. The goal of the review was to determine what would be required in order for Attwill to be able to obtain FDA certification to produce pharmaceutical products under 21 C.F.R. §§ 210 and 211, two of the most critical FDA provisions that drug manufacturers must adhere to before they are permitted to manufacture drugs under federal law. These two sections form the FDA's ***current Good Manufacturing Practices*** ("cGMP") and set forth the "minimum" methods and controls that drug producers must follow to "assure" that a treatment for human consumption has the safety, identity, and other

characteristics that the treatment "purports or is represented to possess." Food & Drugs, 21 C.F.R. § 210.1(a) (2020). Obtaining and maintaining compliance with §§ 210 and 211 is no easy task for any company and is almost impossible for a company as small as Attwill. For example, the FDA estimated the annual record-keeping burden of 21 C.F.R. § 211.100(b) alone (requiring that compliance with written procedures be documented at time of performance and that any deviations be recorded and justified) to be 25,104 hours. Similarly, creating 25 new standard operating procedures – required by the FDA to assure drug quality, identity, and purity under 21 C.F.R. §§ 211 – might, per the FDA's estimation, take 20 hours per person and 50,000 hours in one year. Rules and Regulations, 76 Fed. Reg. 188, 60055 (Sept. 18, 2011).

(f) CW2 handled the majority of the "Gap Assessment" review and drafted the final report summarizing the findings. CW3 reviewed the memo and assented to its findings. The report painted a dire picture. The report concluded that Attwill faced several significant regulatory gaps, which would require substantial time and expense to address, before the FDA would certify Attwill as complying with §§ 210 and 211. The report, and its findings, were conveyed to Attwill leadership, including to co-founders and managing partners William Jackson and Di Fiore.

(g) Further, CW2 explained that at the time Attwill was severely short staffed, a further factor that would not only hinder the company's ability to gain cGMP compliance, but also would have impacted Attwill's ability to manufacture the "billion or more doses per year" that Vaxart claimed in its June 25, 2020 press release. CW2 also said that Attwill also lacked the operational capacity to manufacture one billion doses per year. According to both CW2 and CW3, Attwill was so short-staffed, that personnel in one area or role occasionally had to assume duties in other areas, and both of these CWs, in their critical roles of maintaining product quality, often felt overworked and/or overwhelmed in their positions.

(h) Both CW2 and CW3 indicated that by the time each left Attwill, the company had not obtained cGMP certification under sections §§ 210 and 211. In fact, CW3 noted that they conducted two or three similar Gap Assessments in 2019 for related cGMP certifications, and in each instance, Attwill had opted not to pursue certification due to the substantial resource investment it would require. The financial constraint experienced by Attwill is corroborated by a *Dun & Bradstreet* Business Information Report ("D&B Report") on the Company. The D&B report characterizes Attwill as having a "high" overall business risk, which was supported by a "high" delinquency predictor score and a "moderate-high" financial stress score; all of which indicate that Attwill was strained for cash and therefore could not move forward with obtaining regulatory certification to manufacture pharmaceutical drugs.

160.    In short, at the time Vaxart and Attwill inked their MOU, Attwill lacked the ability from a regulatory, personnel, or operational standpoint to manufacturer Vaxart's COVID-19 vaccine, a fact Vaxart either knew or recklessly disregarded as any reasonable company would perform due diligence

1   before claiming that a contract was "Enabling Production of A Billion or More COVID-19 Vaccine

2   Doses Per Year."

3        161.    In fact, in a February 3, 2021 presentation to the New York Academy of Sciences,

4   Defendant Tucker admitted that the size of Vaxart's Phase 1 human clinical study was limited due to

5   "the amount of drug product we had available," providing further confirmation that Vaxart and its

6   partners lacked the ability to produce even a modest amount of the Company's vaccine candidate,

7   much less a billion or more doses.

8        **6.**    **On the Morning of June 25th, Defendant Floroiu and Tucker Present at the H.C.**
    **Wainwright Virtual Fireside Chat Series and Reiterate the Importance of the**

9              **Attwill Manufacturing "Agreement" and Reaffirm Submission of IND Within**
    **Days, and Preview "Besides, There May Be Other News, Partnering and So On"**

10             **Shortly**

11       162.    On Thursday morning, June 25, 2020, Vaxart participated in H.C. Wainwright Virtual

12  Fireside Chat Series. Both Defendants Floroiu and Tucker, Vaxart's Founder and Chief Scientific

13  Officer, participated and presented to the audience. During the conference Tucker stated, referring to

14  a slide previously shown at the June 18 Raymond James Conference, "Again, we're working really

15  fast, as fast as we've ever been able to do in for and we're about really [sic] submit our IND

16  [Investigational New Drug Application] and really open up the regulatory path to start dosing people

17  soon in the summer of this — this summer that is." The same corporate presentation used a week

18  earlier showing the IND submission *in June* was shown to investors.

19       163.    Also at the conference, Defendant Tucker made reference to the press release (below)

20  in response to a question by the host as to "what are the technical challenges you think is specific to

21  Vaxart developing its coronavirus vaccine?" Defendant Tucker stated, highlighting the press release,

22  "there's a press release that just came out today that, we've just signed an ***agreement with a major***

23  ***player*** that has great (inaudible) capabilities. So now that solves one of, what I would say, our biggest

24  technical bottleneck in terms of manufacturing."

25       164.    Defendant Floroiu then reaffirmed that the "IND . . . should happen pretty soon and

26  then following the start of human clinical trials which as Sean noticed should happen this summer."

27

28

165.   Finally, as a preview to building the excitement for the next days' OWS "selection for" OWS press release, Defendant Floroiu stated: "Besides that, there may be some other news on other fronts, partnering and so on that will release whenever they happen."

**7.    In a June 26, 2020 Press Release, Defendants Announce "Vaxart's COVID-19 Vaccine <u>Selected for</u> the U.S. Government's Operation Warp Speed"**

166.   Before the market opened the following day, Friday, June 26, 2020, playing on investors' thirst to learn who the next three companies OWS would select for its program, and knowing that Armistice was ready to pull the trigger to exercise its warrants and dump its shares that day and the next, Defendants agreed to, caused, condoned and let Vaxart issue a press release titled in bold letters, "**Vaxart's COVID-19 Vaccine <u>Selected for</u> the U.S. Government's Operation Warp Speed**." [Underlining Added] The sub-head and the text of the announcement then stated that Vaxart's COVID-19 candidate "has been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed." In the following paragraph, Vaxart's new CEO, Defendant Floroiu, declared, "We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated."



**Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed**

June 26, 2020

**OWS to Test First Oral COVID-19 Vaccine in Non-Human Primates**

SOUTH SAN FRANCISCO, Calif., June 26, 2020 (GLOBE NEWSWIRE) -- Vaxart, Inc., a clinical-stage biotechnology company developing oral vaccines that are administered by tablet rather than by injection, today announced that its oral COVID-19 vaccine has been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed, a new national program aiming to provide substantial quantities of safe, effective vaccine for Americans by January 2021.

The study is designed to demonstrate the efficacy of Vaxart's oral COVID-19 vaccine candidate.

"We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated. SARS-CoV-2, the coronavirus that causes COVID-19, is primarily transmitted by viral particles that enter through the mucosa - nose, mouth or eyes - strongly suggesting that mucosal immunity could serve as the first line of defense," said Andrei Floroiu, Chief Executive Officer of Vaxart Inc. "In addition, our vaccine is a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns."

**About Vaxart**
Vaxart is a clinical-stage biotechnology company focused on developing oral tablet vaccines designed to generate mucosal and systemic immune responses that protect against a wide range of infectious diseases and has the potential to provide sterilizing immunity for diseases such as COVID-19. Vaxart believes that a room temperature stable tablet vaccine is easier to distribute, store and administer than injectable vaccines and may provide significantly faster response to a pandemic than injectable vaccines, enabling a greater portion of the population to be protected. Vaxart's development programs include oral tablet vaccines that are designed to protect against coronavirus, norovirus, seasonal influenza and respiratory syncytial virus (RSV), as well as a therapeutic vaccine for human papillomavirus (HPV). For more information, please visit www.vaxart.com.

167.     The press release, and especially the bold headline and quote from Defendant Floroiu was intended by Defendants to create the impression that Vaxart's vaccine had been selected by OWS as one of the eight recipients under consideration for significant support or consideration from OWS to produce billions of vaccines by January 2021. In reality, Vaxart was not among the companies selected to receive significant support or consideration from OWS to produce hundreds of millions of vaccine doses. As later clarified by Michael R. Caputo, the HHS assistant secretary for public affairs, "The U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers, and we are negotiating with others. Neither is the case with Vaxart. . . . Vaxart's vaccine candidate was selected to participate in preliminary U.S. government studies to determine potential areas for possible Operation Warp Speed partnership and support. At this time, those studies are ongoing, and no determinations have been made."

168.     Immediately, Vaxart's common stock soared, reaching an intra-day all-time high of $14.30, before ultimately closing at $8.04, a 28% gain against the prior day's closing price.

169.     As planned, that same day Armistice timed its sales with the announcement, converting the entirety of its $0.30 Warrants to common stock – 16,666,667 shares – and then selling those shares, along with an additional 1,560,000 of its existing common stock holdings at prices between $7.97 and $12.89 per share for an average price of $10.38 per share. This contemporaneous sale of over 18.2 million shares grossed Armistice $189 million and dragged down Vaxart's common stock price from its intra-day high.

170.     The following trading day, Monday, June 29, 2020, Armistice converted the entirety of its $1.10 Warrants into common stock – 4,090,909 shares – and sold those shares, along with 5,294,477 shares of existing common stock holdings at prices between $6.58 and $9.90 per share for an average sales price of $8.29 per share. This sale of almost 9.4 million shares grossed Armistice a further $77.8 million.

171.     Even with the 19.99% ownership limitation amended warrant threshold, Armistice could not exercise all of its warrants at once and sell the common stock — it still took two days. As admitted by Armistice:

> Following Vaxart's pre-market public announcement regarding the Primate Study on June 26, 2020, Vaxart's stock price increased, rising from $6.26 per share to close at $8.04. Armistice only began to exercise the Warrants after the Primate Study information was made public. To facilitate the exercises, Armistice emailed exercise notices to Vaxart, identifying the Warrant series and number of shares it was exercising each time. Armistice could not exercise all 20,757,576 Warrants at once due to the 19.99% exercise restriction (20,757,576 Warrants); (May 12, 2020 Form 10-Q) (as of May 11, 2020, Vaxart had 74,184,322 shares). Instead, it necessarily had to do so in blocks, successively selling down its holdings and then buying back below the 19.99% threshold. Armistice paid Vaxart the exercise price for the shares it received following each exercise. In total, Armistice paid Vaxart $9.5 million for the 20,757,576 warrant shares it received between June 26 and June 29. (Citations omitted)[28]

172.     Thus, Armistice almost completely liquidated all of its common stock ownership in Vaxart, retaining just 0.2% of Vaxart's outstanding common stock. All together, these

---

[28] Armistice Defs.' Notice of Demurrer and Demurrer To Pls.' Second Am. Compl.; Mem. P. & A. In Support Thereof, *Ennis, et al. v Wouter et. al.*, Case No. 20-CIV-03253 at 6 (Sup. Ct. of San Mateo Cty., filed on Dec. 30, 2020).

contemporaneous stock sales of over 27.6 million shares grossed Armistice approximately $267 million. When combined with its earlier sales, Armistice grossed approximately $320 million.

173.    Defendants' artfully worded press release dramatically overstated the Company's involvement with OWS. In truth, despite Defendant Floroiu's declaration, Vaxart was ***not*** "one of the few companies selected by Operation Warp Speed." Vaxart deliberately blurred the line between the two programs, willfully misleading investors and convincing the market that Vaxart's COVID-19 vaccine candidate was one of the two or three unknown vaccine candidates selected for federal funding. Instead, Vaxart was ***not*** selected for ***any*** federal funding. Vaxart was ***merely*** granted ***permission*** to test its COVID-19 vaccine candidate on non-human primates.

174.    Defendants knew that this bold headline and Floroiu's quote was at best an over-statement that would be misunderstood by a material number of investors who would then jump at the chance to buy Vaxart shares. In September they toned down the language to more accurately reflect that this was nothing more than a "**preclinical program . . . being conducted in collaboration with the Biomedical Advanced Research and Development Authority (BARDA) and other entities working with Operation Warp Speed**." But Armistice, watching Vaxart's stock price languishing around $3.00 per share, hoped to see the same temporary spike to Vaxart's stock that Defendants witnessed with NantKwest's claim that it had been "selected" and was one of the select few in May.

175.    Defendants had weeks to think about how to word their NHP program press release. As noted above, the Defendants had discussed the NHP program as early as the June 8th Board meeting, if not earlier. By now this was old and obviously immaterial news to Defendants.

176.    The lack of materiality of the "selection for" OWS is further demonstrated by the fact that Defendants knew of this program as early as June 5, 2020 while it was discussing and made changes to the warrant amendments, stock option grants, compensation, and held a shareholder meeting and vote all without mentioning this supposed "selection" to its shareholders.

177.    To this day, the number of other vaccines selected for the NHP challenge study, or the real purpose of the study is unknown despite multiple Freedom of Information Act ("FOIA") requests sent by Plaintiffs' counsel to the government agencies (FDA, NIH, and HHS) likely overseeing the studies. To date, none of the filed FOIA requests have been answered by any of the agencies.

178.    In fact, further diminishing the import of these trials, on February 3, 2021, Vaxart revealed that it had prematurely terminated its primate trial without results. Vaxart, Inc., Current Report (Form 8-K) (Feb. 3, 2021). Defendants also disclosed for the first time that it had "previous experience with the NHP model and the difficulties of oral administration in this model" and therefore strongly inferred that it was not surprised by the failure of the study to evaluate its vaccines, an important omission to their "selection for" OWS press release:

> *Non-Human Primate Study Update*
>
> As previously disclosed, the Company's oral COVID-19 vaccine was selected to participate in a non-human primate challenge ("NHP") study, organized by Operation Warp Speed and funded by the Biomedical Advanced Research and Development Authority ("BARDA") under contract with a research laboratory and in collaboration with USG partners. The Company recently received data from the NHP challenge study of its COVID-19 vaccine candidate. After reviewing the information provided by BARDA, the Company concluded that the study was unable to evaluate the Company's COVID-19 vaccine candidate because of oral vaccine delivery challenges in non-human primate model systems. ***The Company has significant previous experience with the NHP model and the difficulties of oral administration in this model***. Therefore, the Company asked that an active control arm be included in the study, with a vaccine (norovirus) that has previously shown high immunogenicity in both NHP and clinical (human) studies, to validate that protocols and procedures were adequate for the NHP model. Data from the active control arm led the Company to conclude that the NHP study was unable to evaluate either vaccine.

[Emphasis added.]

**E.      Defendants' Scheme Strongly Appears to Have Included Raising $90 Million Less on the Heels of the Press Release Through an ATM Facility to Private Investors**

179.    On July 10, 2020, after the close of the market, Vaxart raised gross proceeds of approximately $90 million through its At-the-Market (ATM) facility with participation based on "interest received" from RA Capital Management and Invus.[29] Vaxart sold approximately 11.2 million shares at $7.98 per share, the market price at the time of sale. SVB Leerink served as lead sales agent

---

[29] Defendant Floroiu had a close relationship with Invus where he was formerly a portfolio manager at Invus, a principal at the Invus Public Equities Advisors LLC. From 2004 to 2008, he served as a principal for The Invus Group, a private equity investment firm.

and B. Riley FBR served as co-sales agent for the ATM facility. This sale was not announced until Monday, July 13, 2020, in a press release and SEC filing.

180.    Implementation (planning and drafting of the necessary SEC filings) of an ATM facility usually takes weeks, and finding and courting two investors to commit to paying $90 million, would similarly likely take weeks if not months.

**F.    As Late as July 22, 2020, the Financial Press and Investors are Continuing to Interpret Vaxart's "Selection for" OWS Press Release as Defendants Hoped**

181.    On July 22, 2020, *The Motley Fool* analyst Alex Carchidi wrote an article published by NASDAQ entitled, "Everything You Need to Know About Operation Warp Speed's Coronavirus Vaccine Accelerator," stating in relevant part:

> With the coronavirus pandemic gripping the world, governments everywhere are desperate to speed up the discovery of a vaccine. In the U.S., since May, this dire need has been addressed by a vaccine accelerator project called Operation Warp Speed (OWS), which subsidizes public and private companies to the tune of billions of dollars, to incentivize vaccine development at the fastest possible pace.

> Given the high stakes and the formidable impact of the program's grants, savvy healthcare investors looking to create a portfolio of coronavirus stocks need to learn about Operation Warp Speed and its implications for the global vaccine race.

> Ambitious timetables and meaty grants make OWS a potential equalizer for participants

> According to the Department of Health and Human Services (HHS), which sponsors the program, Operation Warp Speed aims to "deliver 300 million doses of a safe, effective vaccine for COVID-19 by January 2021, as part of a broader strategy to accelerate the development, manufacturing, and distribution of COVID-19 vaccines, therapeutics, and diagnostics." HHS runs the accelerator with the help of the Biomedical Advanced Research and Development Authority (BARDA), a lesser-known government organization responsible for developing vaccines or therapies for novel epidemics and bioweapon attacks.

> **So far, it's thought that OWS has funded at least nine independent coronavirus vaccine efforts** and a smattering of related projects, with **awards split almost evenly between large pharmas and clinical-stage biotech companies**. Most investors know big pharma participants like Pfizer (NYSE: PFE), AstraZeneca (NYSE: AZN), and Johnson & Johnson (NYSE: JNJ), whereas biotechs like Moderna (NASDAQ: MRNA), Novavax (NASDAQ: NVAX), and **Vaxart (NASDAQ: VXRT)** are newcomers to the limelight created by the program.

> Most of the biotech companies funded by OWS have no products with regulatory approval for sale, but that hasn't stopped them from getting

large infusions of cash. Moderna received $500 million from the program, and Novavax accepted a stunning $1.6 billion award. These OWS grants have been favorable for investors, with stocks skyrocketing on news of each company's selection for the program.

**However, it's impossible to confirm exactly which projects are receiving funding, or how much funding is being disbursed in total, thanks to ongoing and opaque negotiations about commercialization between authorities and participants in the operation**. Similarly, it's unclear which criteria OWS uses to pick vaccine candidates to accelerate, but positive preliminary results are likely a decisive factor. One thing is certain: The accelerator is only intended to aid American companies in producing vaccine doses for domestic use, and competitors from China are explicitly excluded.

[Emphasis added.]

## G.  The Truth Emerges: Corrective Disclosure and Post-Class Period Events

182.  On Saturday, July 25, 2020, the *New York Times* published an article primarily focused on Vaxart headlined, "Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine," which highlighted the astonishing sums Armistice earned from its contemporaneous stock sales and pierced the deliberately misleading obfuscation created by Vaxart's June 26, 2020 "selection for" OWS press release. The *New York Times* article stated in relevant part:

**Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine**

Well-timed stock bets have generated big profits for senior executives and board members at companies developing vaccines and treatments.

On June 26, a small South San Francisco company called Vaxart made a surprise announcement: A coronavirus vaccine it was working on had been selected by the U.S. government to be part of Operation Warp Speed, the flagship federal initiative to quickly develop drugs to combat Covid-19.

Vaxart's shares soared. Company insiders, who weeks earlier had received stock options worth a few million dollars, saw the value of those awards increase sixfold. And a hedge fund that partly controlled the company walked away with more than $200 million in instant profits.

The race is on to develop a coronavirus vaccine, and some companies and investors are betting that the winners stand to earn vast profits from selling hundreds of millions – or even billions – of doses to a desperate public.

Across the pharmaceutical and medical industries, senior executives and board members are capitalizing on that dynamic.

They are making millions of dollars after announcing positive developments, including support from the government, in their efforts to fight Covid-19. After such announcements, insiders from at least 11 companies – most of them smaller firms whose fortunes often hinge on the success or failure of a single drug – have sold shares worth well over $1 billion since March, according to figures compiled for The New York Times by Equilar, a data provider.

In some cases, company insiders are profiting from regularly scheduled compensation or automatic stock trades. But in other situations, senior officials appear to be pouncing on opportunities to cash out while their stock prices are sky high. And some companies have awarded stock options to executives shortly before market-moving announcements about their vaccine progress.

The sudden windfalls highlight the powerful financial incentives for company officials to generate positive headlines in the race for coronavirus vaccines and treatments, even if the drugs might never pan out.

***Some companies are attracting government scrutiny for potentially using their associations with Operation Warp Speed as marketing ploys.***

For example, the headline on Vaxart's news release declared: 'Vaxart's Covid-19 Vaccine Selected for the U.S. Government's Operation Warp Speed.' ***But the reality is more complex.***

Vaxart's vaccine candidate was included in a trial on primates that a federal agency was organizing in conjunction with Operation Warp Speed. But Vaxart is not among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses.

'The U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers, and we are negotiating with others. Neither is the case with Vaxart,' said Michael R. Caputo, the department's assistant secretary for public affairs. 'Vaxart's vaccine candidate was selected to participate in preliminary U.S. government studies to determine potential areas for possible Operation Warp Speed partnership and support. At this time, those studies are ongoing, and no determinations have been made.'

***Some officials at the Department of Health and Human Services have grown concerned about whether companies including Vaxart are trying to inflate their stock prices by exaggerating their roles in Warp Speed, a senior Trump administration official said. The department has relayed those concerns to the Securities and Exchange Commission, said the official, who spoke on the condition of anonymity.***

* * *

***Vaxart, though, is where the most money was made the fastest.***

1      At the start of the year, its shares were around 35 cents. Then in late
2  January, Vaxart began working on an orally administered coronavirus
   vaccine, and its shares started rising.

3      Vaxart's largest shareholder was a New York hedge fund, Armistice
   Capital, which last year acquired nearly two-thirds of the company's
4  shares. Two Armistice executives, including the hedge fund's founder,
   Steven Boyd, joined Vaxart's board of directors. The hedge fund also
5  purchased rights, known as warrants, to buy 21 million more Vaxart
   shares at some point in the future for as little as 30 cents each.

6
   Vaxart has never brought a vaccine to market. It has just 15 employees.
7  But throughout the spring, Vaxart announced positive preliminary data
   for its vaccine, along with a partnership with a company that could
8  manufacture it. By late April, with investors sensing the potential for big
   profits, the company's shares had reached $3.66 — a tenfold increase
9  from January.

10     On June 8, Vaxart changed the terms of its warrants agreement with
   Armistice, making it easier for the hedge fund to rapidly acquire the 21
11 million shares, rather than having to buy and sell in smaller batches.

12     One week later, Vaxart announced that its chief executive was stepping
   down, though he would remain chairman. The new C.E.O., Mr. Floroiu,
13 had previously worked with Mr. Boyd, Armistice's founder, at the hedge
   fund and the consulting firm McKinsey.
14
   On June 25, Vaxart announced that it had signed a letter of intent with
15 another company that might help it mass-produce a coronavirus vaccine.
   Vaxart's shares nearly doubled that day.
16
   The next day, Vaxart issued its news release saying it had been selected
17 for Operation Warp Speed. Its shares instantly doubled again, at one
   pointing hitting $14, their highest level in years.
18
   'We are very pleased to be one of the few companies selected by
19 Operation Warp Speed, and that ours is the only oral vaccine being
   evaluated,' Mr. Floroiu said.
20
   Armistice took advantage of the stock's exponential increase – at that
21 point up more than 3,600 percent since January. On June 26, a Friday,
   and the next Monday, the hedge fund exercised its warrants to buy nearly
22 21 million Vaxart shares for either 30 cents or $1.10 a share – purchases
   it would not have been able to make as quickly had its agreement with
23 Vaxart not been modified weeks earlier.

24     Armistice then immediately sold the shares at prices from $6.58 to
   $12.89 a share, according to securities filings. The hedge fund's profits
25 were immense: more than $197 million.

26     'It looks like the warrants may have been reconfigured at a time when
   they knew good news was coming,' said Robert Daines, a professor at
27 Stanford Law School who is an expert on corporate governance. 'That's
   a valuable change, made right as the company's stock price was about
28 to rise.'

1
2
At the same time, the hedge fund also unloaded some of the Vaxart shares it had previously bought, notching tens of millions of dollars in additional profits.

3
4
By the end of that Monday, June 29, Armistice had sold almost all of its Vaxart shares.

5
Mr. Boyd and Armistice declined to comment.

6
7
Mr. Floroiu said the change to the Armistice agreement "was in the best interests of Vaxart and its stockholders" and helped it raise money to work on the Covid-19 vaccine.

8
9
He and other Vaxart board members also were positioned for big personal profits. When he became chief executive in mid-June, Mr. Floroiu received stock options that were worth about $4.3 million. A month later, those options were worth more than $28 million.

10
11
12
Normally when companies issue stock options to executives, the options can't be exercised for months or years. Because of the unusual terms and the run-up in Vaxart's stock price, most of Mr. Floroiu's can be cashed in now.

13
14
Vaxart's board members also received large grants of stock options, giving them the right to buy shares in the company at prices well below where the stock is now trading. The higher the shares fly, the bigger the profits.

15
16
17
'Vaxart is disrupting the vaccine world,' Mr. Floroiu boasted during a virtual investor conference on Thursday. He added that his impression was that 'it's OK to make a profit from Covid vaccines, as long as you're not profiteering.'

[Emphasis added.]

18
19
183.    The article threw cold water on the idea that Vaxart was "selected for" OWS – and, further, denied that Vaxart was currently even under consideration:

20
21
22
23
Vaxart's vaccine candidate was included in a trial on primates that a federal agency was organizing in **conjunction** with Operation Warp Speed. But **Vaxart is not among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses.**

24
25
26
27
'The U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers, and we are negotiating with others. **Neither is the case with Vaxart,**' said Michael R. Caputo, the department's assistant secretary for public affairs. 'Vaxart's vaccine candidate was selected to participate in **preliminary** U.S. government studies to determine **potential** areas for **possible** Operation Warp Speed partnership and support. At this time, those studies are ongoing, and no determinations have been made.'

28
[Emphasis added.]

184.    The NHP study **participation** and "selection for" OWS are two distinct areas, the article explained. According to the HHS Spokesperson quoted in the article, the former is a "***preliminary***" study that may assist the federal government "to determine ***potential*** areas for ***possible*** Operation Warp Speed partnership and support." [Emphasis added.] These are contingent words, spoken in the future tense, by the HHS Spokesperson, showing what ***may*** happen at a later date, not the past tense language from Vaxart's June 26, 2020 press release – "We are very pleased to be one of the few companies selected by Operation Warp Speed." – hammering home the Vaxart headline of already belonged to the group of companies "selected for" OWS.

185.    In fact, the article stated, HHS officials took note of the misleading press release and upon learning about Armistice's contemporaneous stock sales, alerted the SEC:

> Some officials at the Department of Health and Human Services have grown concerned about whether companies including Vaxart are trying to inflate their stock prices by exaggerating their roles in Warp Speed, a senior Trump administration official said. The department has relayed those concerns to the Securities and Exchange Commission, said the official, who spoke on the condition of anonymity.

186.    That same day, HHS Office of the Assistant Secretary of Public affairs issued a message on the official account HHS Public Affairs twitter site @SpotHHS. The tweet stated:

> The US Department of Health and Human Resources has entered into funding agreements with certain vaccine manufacturers and we are negotiating with others. **Neither is the case with Vaxart**. [Emphasis added.]

187.    HHS even sent out a second tweet further clarifying the *de-minimis* nature of Vaxart's connection with OWS:

> Vaxart's vaccine candidate was selected to participate in preliminary US government studies to ***determine potential areas for possible*** Operation Warp Speed partnership and support. At this time, those studies are ongoing and ***no determinations have been made***. [Emphasis added.]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



25   188.    HHS' concerns were justified and on October 14, 2020, Vaxart released a Form 8-K

26   that admitted that their June 26, 2020 press release and the contemporaneous trades by Armistice have

27   drawn scrutiny from federal investigators at the SEC and Department of Justice. According to the 8-

28   K, in July 2020 the Company received a Grand Jury Subpoena from the U.S. Attorney's Office for the

Northern District of California, calling for documents "which broadly pertain to the Company's participation in, and disclosure of, an Operation Warp Speed ('OWS')-funded nonhuman primate study, and option grants, warrant transactions, and other corporate and financing matters." Additionally, the same 8-K admitted that in August 2020 the SEC requested "a variety of documents that broadly pertain to same subject matters of the documents provided to the U.S. Attorney's Office, and related matters." One month later, in its 3Q 2020 10-Q, the Company also revealed that as of October 2020, the U.S. Attorney for the Eastern District of New York and the Fraud Section of the Department of Justice ("DOJ") were also investigation and that shortly thereafter the Company received a DOJ grand jury subpoena seeking substantially the same information as the subpoena from the Northern District of California.

189.    The following trading day after the *NYT* article, Monday, July 27, 2020, Vaxart's common stock fell to $11.16, a 9% drop from the prior trading day's closing price.

190.    Over the next three weeks, as the market digested the news that Vaxart overstated its participation with the federal government in developing a COVID-19 vaccine, its common stock slid, falling a further 17.5% through August, 19, 2020.

191.    After the market closed that day, *Business Insider* released an interview with OWS head Moncef Slaoui that put the hammer down on Vaxart and its claim that it had been selected by OWS in an article entitled, **The leader of Operation Warp Speed says some biotechs 'misled their shareholders" and 'frustrated the hell' out of him by playing up connections to the secretive government program**." In relevant part the article states:

> The head of Operation Warp Speed, the US government's secretive coronavirus vaccine initiative, has had it with companies that put out press releases claiming they're involved in the program.
>
> . . .
>
> 'There's been a number of cases where companies have, frankly, made press releases that have frustrated the hell out of me because they *misled*, I think, *their shareholders* and their share price went up the roof just by saying the words Operation Warp Speed in the title of the press release,' Slaoui told *Business Insider*.

[Emphasis added.]

192.    While Vaxart was not named on the record by Slaoui, the article identified Vaxart as fitting the description, and in particular Vaxart's press release entitled, "Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed," noting Vaxart was not selected for Operation Warp Speed. The head of Operation Warp Speed went on to explain why OWS had been secretive of its selection process and why it could now talk about it.

> Warp Speed was seeking to back eight vaccines that range across four different types of technology, Slaoui said.

> If the program was publicly upfront about what it was looking for, Slaoui said 'you'll have 25 companies with their shares going up the roof, 25 with their shares going down, every board being sued, shareholders, et cetera, et cetera. Because people will speculate what is it we are going after.'

> Now, with the major funding deals in place and announced, Slaoui said Warp Speed is undergoing a 'natural progression' where it can talk more openly about its work.

193.    As a result, Vaxart fell a further 4.3% the following day, August, 20, 2020, to close at $8.81.

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

194.    The allegations set forth above are incorporated herein by reference as further basis for this claim based on Rule 10b-5(b). Specifically Plaintiffs incorporate by reference the press release statements, and the reasons they were false and misleading as plead in section V.D. above.

## A.    Pre-Class Period Statements – Despite Cancelling the Norovirus Program in Late 2019, Throughout 2020 Vaxart Materially Misled Investors to Believe It Had an Ongoing Norovirus Program

195.    On January 2, 2020, Vaxart issued a press release announcing that the Board had terminated about half of the Company's employees, primarily in the manufacturing division, and henceforth, Vaxart would "prioritize and focus" its resources on its "norovirus and universal influenza programs":

> On December 26, 2019, the Board of Directors of Vaxart, Inc. approved a reduction-in-force affecting approximately 50% of our employees, which primarily impacted our manufacturing personnel. We expect to incur approximately $375,000 in severance and termination costs and to complete the reduction-in-force by January 31, 2020.

1

> We plan to prioritize and focus our resources on partnering opportunities, including our norovirus and universal influenza programs, and not on manufacturing capabilities.

2

196.   In Vaxart's January 22, 2020 press release announcing publication in the *Lancet* of

3

4    positive results from a 2016-2017 clinical study of its influenza vaccine, the Company stated in its

5    "About Vaxart" section that "Vaxart's development programs include oral tablet vaccines that are

6    designed to protect against ***norovirus***, seasonal influenza and respiratory syncytial virus (RSV), as

7    well as a therapeutic vaccine for human papillomavirus (HPV)." [Emphasis Added.] This exact

8    statement is repeated no less ***20 more times*** throughout the end of August 2020 in press releases and

9    8-Ks.

10

197.   Additionally, in that same January 22, 2020 press release, Vaxart claimed that "[t]hese

11   results also confirm the value of our oral vaccine platform, particularly for mucosal pathogens such as

12   flu, ***norovirus***, RSV, as well as coronaviruses such as SARS, MERS and the virus that recently

13   emerged in China." [Emphasis added.]

14

198.   In Vaxart's January 31, 2020 press release announcing initiation of COVID-19 vaccine

15   program, then-CEO Defendant Latour stated "We believe our oral tablet vaccines provide substantial

16   potential advantages, especially when targeting mucosal pathogens such as flu, ***norovirus***, RSV and

17   the recently emerged coronavirus." [Emphasis added.]

18

199.   In Vaxart's March 19, 2020 press release announcing its agreement with Emergent, its,

19   4Q and full year 2019 results, and its commitment to initiating a Phase 1 clinical study of its COVID-

20   19 vaccine "early in the second half of 2020," the Company also explained that in light of its new focus

21   on COVID-19, the norovirus program would be put "on hold":

22

> 'This outbreak is a call to duty for all of us here at Vaxart and we are highly focused on the development of the COVID-19 vaccine,' Dr. Latour continued. '***Accordingly, we have put several vaccine programs on hold, including the norovirus vaccine program*** for which we recently successfully completed a Phase 1 study and for which we are actively seeking a development partner, as well as our therapeutic HPV vaccine program. The Janssen-partnered Universal Flu program is fully active and on track to be completed in the coming weeks.'

23

24

25

26

[Emphasis added.]

27

28

200.    In Vaxart's April 28, 2020 press release announcing 1Q 2020 results and updated business strategy, the press release indicated that the Company's norovirus program was ongoing, stating:

> The Company continues to pursue strategic, financial and public-private partnerships to advance its development candidates, including its coronavirus vaccine candidates, norovirus and seasonal influenza vaccine programs.

201.    In Vaxart's May 12, 2020 press release announcing updated financial results, a reiteration of its prior animal results, and a statement that "[t]he manufacturing collaboration with Emergent BioSolutions is progressing well," the Company (i) repeated the April 28, 2020 statement indicating that the norovirus program was ongoing and (ii) cited a "decrease" in R&D expenses, "mainly due to a reduction in personnel costs after we ceased internal manufacturing as part of our December 2019 restructuring and *a reduction in expenditure on our norovirus vaccine candidate*." [Emphasis added.]

202.    The foregoing statements in ¶¶195-201 were materially false and misleading because, at the time they were made:

(a)     Vaxart had *cancelled* its norovirus vaccine program in the fall of 2019 and discontinued its relationship with Lonza, the contract manufacturer tasked with supplementing the Company's norovirus efforts, and shortly thereafter terminated CW1, Vaxart's lead norovirus researcher, who had been tasked with developing Vaxart's norovirus vaccine, effective December 31, 2019. At the beginning of 2020, Vaxart had *no* norovirus program, nor *any* norovirus partners, as Johnson & Johnson served as the Company's lone partner, working with Vaxart to develop an influenza vaccine. Starting with Vaxart's January 2, 2020 8-K, any and all statements that conveyed to reader that idea that Vaxart would "prioritize and focus" on norovirus and/or described Vaxart as a Company with development programs that "include" norovirus are false. Further, there was *no* "norovirus program" to put on hold, as the Company suggested in its March 19, 2020 statement. Nor was the Company was continuing to pursue partnership efforts in its nonexistent norovirus program, as the Company suggested on April 28 and May 12, 2020. Moreover, and Vaxart's May 12, 2020 statements about norovirus

expenses omit the material fact that Vaxart had eliminated **all** norovirus expenses and not merely reduced them.

**B.      Vaxart Materially Misled Investors When It Claimed Attwill Had the Capacity to Manufacture a Billion or More Doses of Vaxart's COVID-19 Vaccine**

203.     On June 25, 2020, Vaxart issued a press release declaring that the Company had signed an MOU with Attwill "to manufacture a billion or more doses per year" of Vaxart's COVID-19 vaccine. The title of the press release boldly exclaimed, "**Vaxart, Inc. Signs Memorandum of Understanding with Attwill Medical Solutions Steriflow, LP**, *Enabling Production of A Billion or More COVID-19 Vaccine Doses Per Year Through Large Scale Lyophilization, Tableting and Coating*," and in relevant part states:

> 'We believe [Attwill] experience coupled with *its ability to manufacture a billion or more doses per year* would be a beneficial addition to our group of CDMO [contract development and manufacturing] partners *and enable the large scale manufacturing and ultimate supply of our COVID-19 vaccine for the US, Europe and other countries in need*,' said Andrei Floroiu, CEO of Vaxart Inc. 'We believe our oral vaccines, generated on our proven platform, have the potential to offer superior protection against airborne viruses such as SARS-CoV-2 by triggering both mucosal and systemic immunity while being administered by a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns.'

[Emphasis added.]

204.     The foregoing statement in ¶203 was materially false and misleading, in addition to reasons set forth in Section V.D. above, because, at the time it was made:

(a)      Attwill lacked the ability from a regulatory, personnel, or operational capacity to manufacturer Vaxart's COVID-19 vaccine. At that time, Attwill lacked FDA certification under 21 C.F.R. §§ 210 and 211, two key federal provisions known as current Good Manufacturing Practices – or cGMP – that drug manufacturers must adhere to before they are permitted to manufacture drugs under federal law. Obtaining and maintaining compliance with cGMP regulations is a time and resource consuming task, as federal regulations have long stated. *See, supra*, 76 Fed. Reg. 188, 60055 (Sept. 18, 2011). As CW2, who served as Attwill's Quality Control Specialist from 2018 through July 2020, attests, in early 2020 Attwill directed CW2 to create a "Gap Assessment" report to determine what the Company would need to do

1    to obtain cGMP certification. That report, which was conveyed to Attwill leadership, repeated

2    what multiple prior "Gap Assessment" reports stated: Attwill faced several significant

3    regulatory gaps, which would require substantial time and expense to address, before the FDA

4    would certify Attwill as complying with §§ 210 and 211. Further, CW2 explained that at the

5    time Attwill was severely short staffed. This fact was corroborated by CW3, who supervised

6    CW2 and served as Attwill's Quality Assurance Manager from October 2016 to June 2020 and

7    reported directly to Attwill co-founder, managing partner, and Chief Operating Officer Di

8    Fiore. According to both of these CWs, Attwill was so short-staffed that personnel in one area

9    or role occasionally had to assume duties in other areas, and CW2 and CW3, in their critical

10    roles of maintaining product quality, often felt overworked and/or overwhelmed in their

11    positions. In sum, Attwill was not the manufacturer Vaxart purported it to be, a fact Vaxart

12    either knew or recklessly disregarded when it purportedly signed its MOU with Attwill.

13            (b)      The press release suggested that Vaxart was closer to production than it actually

14    was in context of its other statements, including statements that day at the H.C. Wainwright

15    Virtual Fireside Chat Series where Defendant Tucker stated referring to a slide previously

16    shown at the June 18 Raymond James Conference, "Again, we're working really fast, as fast

17    as we've ever been able to do in for and we're about really [sic] submit our IND [Investigational

18    New Drug Application] and really open up the regulatory path to start dosing people soon in

19    the summer of this — this summer that is." The slide stated that the IND would be submitted

20    in June (it was not submitted and was nowhere near ready as it was not submitted until August)

21    and thus there was not real prospect of dosing people in Phase 1 clinical trials that summer. In

22    fact, a small clinical trial of about 30 participants was not started until October at the earliest.

23            (c)      The press release would appear even more material when, the next day's

24    announcement that Vaxart "was selected" as one of the few companies to participate in

25    Operation Warp Speed would come out.

C.   **Vaxart Materially Misled Investors When It Claimed it was "Selected For" Operation Warp Speed**

205.   On June 26, 2020, Vaxart issued a press release titled "**Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed**," with a sub-head stating "*OWS to Test First Oral COVID-19 Vaccine in Non-Human Primates*." In the body, Vaxart's newly appointed CEO, Defendant Floroiu repeated, "***We are very pleased to be one of the few companies selected by Operation Warp Speed***, and that ours is the only oral vaccine being evaluated. [Emphasis added.]. In full the press release stated:

> **Vaxart's Covid-19 Vaccine Selected for the U.S. Government's Operation Warp Speed**
>
> OWS to Test First Oral COVID-19 Vaccine in Non-Human Primates
>
> Vaxart, Inc., a clinical-stage biotechnology company developing oral vaccines that are administered by tablet rather than by injection, today announced that its oral COVID-19 vaccine has been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed, a new national program aiming to provide substantial quantities of safe, effective vaccine for Americans by January 2021.
>
> The study is designed to demonstrate the efficacy of Vaxart's oral COVID-19 vaccine candidate.
>
> 'We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated. SARS-CoV-2, the coronavirus that causes COVID-19, is primarily transmitted by viral particles that enter through the mucosa – nose, mouth or eyes – strongly suggesting that mucosal immunity could serve as the first line of defense,' said Andrei Floroiu, Chief Executive Officer of Vaxart Inc. 'In addition, our vaccine is a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns.'

206.   The foregoing statement was materially false and misleading because, at the time it was made. Vaxart was **not** selected for OWS.[30] Rather, as shown above in Section V.D. and as Defendants

---

[30] For example, at the time, OWS imposed strict selection criteria. According to the August 26, 2020 *NEJM* article by OWS's Slaoui and Hepburn, OWS sought vaccine candidates with "the potential . . . to enter large **phase 3** field efficacy trials this summer or fall (July to November 2020)." [Emphasis added.] At the time, according to multiple Vaxart announcements, the Company's COVID-19 vaccine candidate was merely "on track to start a first **phase 1** study in the second half of this year, possibly as early as the summer." [Emphasis added.] Further, according to the September 2, 2020 *USA Today* article by HHS's Azar and OWS' Slaoui, OWS targeted "four vaccine-platform technologies" and aimed to select "two from each platform." Since Vaxart's COVID-19 candidate

now admit, BARDA, who Vaxart already worked with under contracts, merely invited Vaxart to submit its vaccine for challenge trials that would then be used to determine "selection for" the OWS program. Rather, as stated by HHS's spokesperson, "Vaxart's vaccine candidate was selected to participate in *preliminary* U.S. government studies to determine *potential* areas for *possible* Operation Warp Speed partnership and support. At this time, those studies are ongoing, and no determinations have been made." [Emphasis added.]

**D.     Analysts and Journalists Interpreted Defendants' Press Releases the Way Defendants Thought They Would — Erroneously**

207.    On Vaxart's purported "selection for" OWS, its stock soared, closing up over 22% against the prior day's closing price – despite the massive sell-off by Armistice – and up and incredible 152% in just two days. At one point on June 26, 2020, before the Armistice sale, Vaxart's common stock went as high as $14.30, a 348% jump in two days.

208.    With the world searching for an answer to the pandemic, the ability to manufacture billions of doses and being "selected for OWS" was big news to investors even if a sophisticated investor might have seen through the smoke and mirrors.

209.    For example, Joe Teneruso of *The Motley Fool* wrote in a column carried by NASDAQ on its website called "Why Vaxart Stock Skyrocketed Today" that "Shares of Vaxart . . . soared on Friday after the biotech company said that its oral COVID-19 vaccine had been selected to receive funding from a federal government program . . . ."

210.    So too, *Business Insider* reported during the day on June 26, 2020, in an article entitled, "A little-known biotech working on a COVID-19 vaccine has surged 304% in 2 days – and it just said it was picked for the US government's Operation Warp Speed program (VXRT)," noting the significance of Vaxart's selection as "the only oral vaccine being evaluated" within the Operation Warp Speed program.

---

utilized a "replication defective" platform, the *same* platform utilized by two of the publicly-named companies, Johnson & Johnson and AstraZeneca, it could not have been one of the companies under consideration at the time.

211.   On June 30, 2020, *The Motley Fool* published an article by Keith Speights[31] entitled, "Is It Too Late to Buy Vaxart Stock?" stating, "But the biggest news of all for Vaxart was only a couple of days away. On June 26, the biotech announced that its oral COVID-19 vaccine had been selected for funding by the U.S. government's Operation Warp Speed."[32]

212.   On July 6, 2020, *Seeking Alpha*[33] author Damien Robbins published an article entitled, "Vaxart's Technology Could Be A COVID-19 Game Changer" again buying into Vaxart's press release that it had been selected for OWS and that the Attwill agreement meant they could manufacture billions of doses. In relevant part the article states:

> **Summary**
>
> - VXRT is developing enterically coated vaccine tablets as an alternate method of immunization.
>
> - The technology stimulates the innate immune response through the mucosal membranes, which provide the first-line response through the nose and mouth.
>
> - VXRT has received highly-selective Operation Warp Speed designation for its preclinical COVID-19 tablet.
>
> Vaxart (NASDAQ:VXRT) has soared over 2,000% YTD amid an acceptance to the Russell 3000, joining Operation Warp Speed, and the possibility of an effective COVID-19 'tablet' vaccine. The COVID-19 hype in other small-cap, speculative vaccine players like Novavax (NVAX), Inovio (INO), and Sorrento Therapeutics (SRNE) has fueled similar strong rallies. Yet, Vaxart is producing a completely different style of vaccine technology, which could, if it shows efficacy and safety, could unlock a realm of possibilities for COVID-19 and with other viral infections as well.
>
> * * *

[31] Speights bio on *The Motley Fool* states, "Keith began writing for the Fool in 2012 and focuses primarily on healthcare investing topics. His background includes serving in management and consulting for the healthcare technology, health insurance, medical device, and pharmacy benefits management industries."

[32] Keith Speights, *Is It Too Late to Buy Vaxart Stock?*, The Motley Fool (June 30, 2020), https://www.fool.com/investing/2020/06/30/is-it-too-late-to-buy-vaxart-stock.aspx.

[33] According to Wikipedia in 2013, *Wired* named *Seeking Alpha* one of the "core nutrients of a good data diet." In 2007, *Seeking Alpha* received a *Forbes's* Best of the Web designation and was selected by *Kiplinger's* as Best Investment Informant. In 2011, Seeking Alpha Market Currents was listed as number one in Constantine von Hoffman's list of Essential Economic blogs. Seeking Alpha, WIKIPEDIA, https://en.wikipedia.org/wiki/Seeking_Alpha (last visited June 9, 2021).

Vaxart has also reached an agreement with Attwill Medical Solutions Sterilflow to mass-produce tablets. The agreement includes 'lyophilization development and large scale manufacturing including tableting and enteric coating for Vaxart's oral COVID-19 vaccine' and an aim "to manufacture a billion or more doses per year." Should this be feasible, the mass production would "enabl[e] a greater portion of the population to be protected" bringing us closer to the herd immunity that we need.

Vaxart is now among the highly-selective Warp Speed crowd, alongside major drug makers AstraZeneca (AZN), Merck (MRK), Pfizer (PFE), Johnson & Johnson (JNJ) as well as other speculative play Moderna (MRNA). The operation is offering billions of dollars of support in its quest to provide 300 million or more doses of a vaccine by January 2021. By choosing the "most promising countermeasure candidates and providing coordinated government support", the operation is streamlining funding and trial times to search for a safe, effective vaccine with the ability to produce hundreds of millions of doses in a quick turnaround time.

Unlike some of the names mentioned above, which are already moving through clinical trials and showing positive data (Pfizer/BioNTech (PFE/BNTX); Moderna; Inovio), Vaxart is still in its preclinical, IND filing phase, leaving it behind the pack. Yet Vaxart now has the support of Warp Speed and multiple government agencies, which is very necessary, given Vaxart's minuscule $30 million cash balance as of its last quarterly report. Warp Speed designation could provide the very funding that Vaxart needs, without having to turn towards dilution or debt yet; but should Vaxart fail to convince the government of the safety and efficacy of its tablets, it could spell disaster.

\* \* \*

To conclude . . . Operation Warp Speed is now backing Vaxart's tablet technologies, which provide funding and streamlined development times, as well as the trust and faith in the company from the government. Vaxart's tablet technologies could be the game changer in the COVID-19 vaccination race, as it provides a unique immune response compared to the other vaccine candidates in Warp Speed.

213. On July 15, 2020 Steven Adams, of *Investors Alley*, published an article entitled, "**VXRT Stock Price Jumps on COVID-19 Operation Warp Speed Announcement**." In relevant part the press release stated:

Vaxart, Inc. (VXRT) has moved substantially higher recently based on high hopes for the company's COVID-19 vaccine.

***VXRT was chosen by the U.S. government for inclusion in Operation Warp Speed (OWS), the government's national program with a goal of providing safe and effective vaccine doses by January of 2021.*** VXRT is one of a number of companies participating in OWS.

When announcing VXRT's participation in the program, CEO Andrei Floroiu said, 'We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated.'

\* \* \*

**While news of the company's inclusion in the program has been out for several weeks, VXRT leaped higher this week when a B. Riley FBR analysis of the vaccine, led the company to place a buy recommendation on the stock and give it a price target of $22.** The stock closed last Friday at $7.98.

\* \* \*

It should be noted that just before the B. Riley FBR buy recommendation, Vaxart raised over $90 million in an at-the-market stock offering, at a price of $7.98. That offering was led by SVB Leerink, with B. Riley FBR acting as co-lead sales agent.

Vaxart said, 'The additional funds raised through the ATM facility will support the clinical and preclinical development of Vaxart's product candidates, to conduct clinical trials, to manufacture its products, and for general corporate and working capital purposes.'

After the selling stock at $7.98, and following the B. Riley FBR buy recommendation, the stock has recently traded as high as $16.40.

[Emphasis added]

214.    Also on July 15th, Allie Nawart, of *Pharmaceutical Technology*, in an article entitled, "Covid-19 pandemic: the need for second-generation vaccines" wrote:

Like ImmunityBio and NantKwest's candidate, ***Vaxart's oral approach is one of the projects chosen to be part of the US Government's Operation Warp Speed.*** Following on from positive pre-clinical results in April, Vaxart's candidate is on track to move into clinical studies this summer.

Talking about this announcement, Vaxart CEO Andrei Floroiu said: "We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated.

[Emphasis added.][34]

_____

[34] Allie Nawrat, *Covid-19 pandemic: the need for second-generation vaccines*, Pharmaceutical Technology (July 15, 2020), https://www.pharmaceutical-technology.com/features/covid19-second-generation-vaccines/.

1   And as late as July 22, 2020, *The Motley Fool* analyst Alex Carchidi wrote an article
2   published by NASDAQ, identifying Vaxart as one of the nine companies to receive
    OWS awards:

3           **So far, it's thought that OWS has funded at least nine independent
            coronavirus vaccine efforts** and a smattering of related projects, with
4           **awards split almost evenly between large pharmas and clinical-stage
            biotech companies**. Most investors know big pharma participants like
5           Pfizer (NYSE: PFE), AstraZeneca (NYSE: AZN), and Johnson &
            Johnson (NYSE: JNJ), whereas biotechs like Moderna (NASDAQ:
6           MRNA), Novavax (NASDAQ: NVAX), and **Vaxart (NASDAQ**:
            VXRT) are newcomers to the limelight created by the program.
7
    [Emphasis added.]
8
        215.    Defendants did not correct the authors of *The Motley Fool*, *Business Insider*, *Seeking*
9
    *Alpha*, *Investors Alley*, *Pharmaceutical Technology*, or *NASDAQ*.com. They were parroting the
10
    misleading message Defendants wanted the market to hear, allowing Armistice to dump its stock and
11
    Vaxart to raise an additional $90 million through an at-the-market facility, before the market caught
12
    on.
13
        216.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive
14
    the market, and engaged in a fraudulent course of conduct that artificially inflated the price of Vaxart
15
    common stock and operated as a fraud or deceit on Class Period purchasers of Vaxart common stock.
16
    By failing to disclose the true state of Vaxart's business and operations, Defendants presented a
17
    misleading picture of Vaxart's condition and value. Defendants' scheme to present a company on the
18
    edge of a massive breakthrough, while systematically removing the controls in place to prevent insider
19
    trading, led to a massive sell-off that benefited insiders, while punishing common shareholders.
20
    Shareholders invested based on a false premise that Vaxart was moving quickly to create a vaccine
21
    needed to address a global epidemic, while insiders knew they were not on that path and the only
22
    money to be made was through selling after-price spikes based on false and misleading statements.
23
        217.    As Defendants' materially false, misleading, and incomplete statements, and fraudulent
24
    scheme were disclosed, the price of Vaxart common stock fell, as the prior inflation came out of the
25
    Company's stock price. Following the revelations in the *New York Times* on Saturday July 25, 2020,
26
    the market reacted. That Monday, July 27, 2020, Vaxart common stock fell to $11.16, a 9% drop from
27
    the prior trading day's closing price. Vaxart common stock continued to slide over the next three
28

weeks, falling an additional 17.5%. Following the revelations in the *Business Insider* article after the market closed on August 19, 2020, Vaxart common stock fell a further 4.3% the following day, August 20, 2020. As a result of their purchases of Vaxart common stock during the Class Period, Plaintiffs and the other Class members suffered economic losses.

218.    Additional prior inflation from the false statements also came out of Vaxart's stock price when on June 30, 2020, after the market closed, Vaxart filed with the Securities Exchange Commission a Form 4 disclosing the two-day large series of sales of Vaxart stock on June 26 and 29 by Defendant Armistice identified above. Large and unusual insider trading is often seen as a signal that the insiders know something the market does not. As a direct result of this disclosure filed after the market closed on June 30, 2020, Vaxart's stock dropped from $8.85 on June 30 to $8.00 on July 1, 2020. As this news was further digested by the market leading up to the Fourth of July holiday weekend, Vaxart's stock fell further, closing on July 2, 2020 at $7.37. Over the holiday weekend, Zacks Investment Research downgraded Vaxart from a "hold" rating to a "sell" rating after seeing the insider sales, causing the stock to drop further to $6.44 on Monday, July 6, 2020 (the same day *Bloomberg* reported that Vaxart insiders posted the most insider sales of any company during the week ended July 3, 2020.).

219.    The decline in the price of Vaxart's common stock was a direct result of the nature and extent of Defendants' fraud (or results of its fraud) being revealed to investors and the market. The timing and magnitude of Vaxart's common stock price declines negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic, or industry factors, or other matters unrelated to the Defendants' fraudulent conduct.

## VII.    NO SAFE HARBOR

220.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled herein, as the statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent any of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and were unaccompanied by meaningful

cautionary statements that identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

221.    Alternatively, to the extent that the statutory safe harbor is found to apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for such statements because, at the time each such statement was made, the speaker had actual knowledge that it was materially false or misleading, and/or the statement was authorized or approved by an executive officer of Vaxart who knew that the statement was materially false or misleading when made.

## VIII.   CONTEMPORANEOUS TRADING

222.    During the Class Period, Plaintiffs relied on the integrity of the market for Vaxart, which was presumed to be determined by supply and demand and free from market manipulation, distortion, and insider trading made on the basis of material, nonpublic information.

223.    As set forth above, during the Class Period Defendants Boyd and Maher, acting on behalf of and motivated by their substantial financial interests in Armistice Capital and/or the Armistice entities it managed, caused Armistice Capital (acting for its own account and/or the account of one or more of the Armistice entities), to sell 45,812,053 shares of Vaxart common stock.

224.    Defendant Armistice Capital (acting for its own account and/or the account of one or more of the Armistice Funds) and Defendant Davis sold shares of Vaxart common stock on the dates and in the amounts set forth in the charts below while they (including Defendants Boyd and Maher) were in possession of material, nonpublic information as alleged herein, including material nonpublic information concerning (a) Vaxart's termination of its norovirus vaccine program; (b) Vaxart's actual (in)ability to develop a COVID-19 vaccine; (c) the true (*i.e.*, non-existent) value of Vaxart's touted contract with Attwill; and (d) Vaxart's failure to be selected to receive any OWS funding to help develop a COVID-19 vaccine, and the lack of any reasonable basis to believe that Vaxart could or would ever qualify to receive such OWS funding.

**Insider Sales by Defendant Armistice Capital
for its own account and/or the account of one or more Armistice entities
(and showing pre-sale exercise of Vaxart warrants)
Class Period Sales Highlighted in Yellow**

| Date | Acquisition/ Sale | No. of Shares Sold or (*Acquired*) | Share Price | Total Sale Proceeds or (*Acquisition Cost*) | No. of Remaining Shares Held |
|---|---|---|---|---|---|
| 4/28/2020 | S | 1,292,070 | $3.38 | $4,367,196.60 | 23,907,930 |
| 4/29/2020 | S | 873,634 | $3.01 | $2,629,638.34 | 23,034,296 |
| 4/30/2020 | S | 4,434,296 | $2.96 | $13,125,516.16 | 18,600,000 |
| 5/1/2020 | S | 1,000,000 | $2.71 | $2,710,000.00 | 17,600,000 |
| 5/4/2020 | S | 957,469 | $2.65 | $2,537,292.85 | 16,642,531 |
| 5/5/2020 | S | 692,531 | $2.66 | $1,842,132.46 | 15,950,000 |
| 5/6/2020 | S | 50,000 | $2.58 | $129,000.00 | 15,900,000 |
| 5/7/2020 | S | 100,000 | $2.51 | $251,000.00 | 15,800,000 |
| 5/8/2020 | S | 100,000 | $2.52 | $252,000.00 | 15,700,000 |
| 5/11/2020 | S | 1,300,000 | $2.79 | $3,627,000.00 | 14,400,000 |
| 5/12/2020 | S | 1,581,076 | $3.02 | $4,774,849.52 | 12,818,924 |
| 5/13/2020 | S | 525,616 | $2.97 | $1,561,079.52 | 12,293,308 |
| 5/14/2020 | S | 834,669 | $3.02 | $2,520,700.38 | 11,458,639 |
| 5/15/2020 | S | 458,639 | $2.82 | $1,293,361.98 | 11,000,000 |
| 5/18/2020 | S | 650,000 | $2.86 | $1,859,000.00 | 10,350,000 |
| 5/20/2020 | S | 1,150,000 | $3.19 | $3,668,500.00 | 9,200,000 |
| 5/21/2020 | S | 400,000 | $2.97 | $1,188,000.00 | 8,800,000 |
| 5/22/2020 | S | 200,000 | $2.86 | $572,000.00 | 8,600,000 |
| 5/27/2020 | S | 200,000 | $2.61 | $522,000.00 | 8,400,000 |
| 6/1/2020 | S | 200,000 | $2.74 | $548,000.00 | 8,200,000 |
| 6/2/2020 | S | 800,000 | $2.75 | $2,200,000.00 | 7,400,000 |
| 6/3/2020 | S | 400,000 | $2.77 | $1,108,000.00 | 7,000,000 |
| 6/26/2020 | A (exercise of warrants @ below mkt px) | (16,666,667) | $0.30 | ($5,000,000.10)[35] | 23,666,667 |
| 6/26/2020 | S | 18,226,667 | $10.38 | $189,192,803.46 | 5,440,000 |
| 6/29/2020 | A (exercise of warrants @ below mkt px) | (4,090,909) | $1.10 | ($4,499,999.90)[36] | 9,530,909 |
| 6/29/2020 | S | 9,385,386 | $8.29 | $77,804,849.94 | 145,523 |

**Total shares sold:**      **45,812,053**

**Gross Sale Proceeds:**      **$319,283,921**

**Estimated total**

---

[35] The acquisition cost of the warrants went directly to Vaxart, such that non-Armistice related Defendants also benefitted.

[36] *Id.*

realized profits:                    approximately $300,000,000

**Insider Sales by Defendant Todd Davis**

| Date | Acquisition/ Disposition | No. of Shares | Share Price | Total | No. of Remaining Shares Held |
|---|---|---|---|---|---|
| 4/28/2020 | D | 60,000 | $3.275 | $196,500.00 | 120,000 |

225.     By virtue of their substantial equity interests in and control of Armistice Capital and the Armistice entities, for purposes of liability under Section 20A, Defendants Boyd and Maher should also be deemed constructive sellers of the shares referenced above that were sold by the Armistice Defendants.

226.     As set forth in their sworn certifications previously filed in this action, Lead Plaintiff Langdon Elliott and Additional Plaintiffs Ani Hovhannisyan and Najaf Zaidi purchased Vaxart common stock during the Class Period on the dates and for the prices indicated, and thus traded contemporaneously with Armistice. Lead Plaintiff Langdon Elliott purchased 5,000 shares of Vaxart common stock on Friday, June 26, 2020. Additional Plaintiff Ani Hovhannisyan purchased 20 and 10 shares of Vaxart common stock on Friday, June 26, 2020 and Monday, June 29, 2020, respectively. Similarly, Additional Plaintiff Najaf Zaidi purchased 43,134 shares of Vaxart common stock on Monday, June 29, 2020.

## IX.     ADDITIONAL SCIENTER ALLEGATIONS

227.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

**A.     Boyd, Maher, and the Armistice Defendants Had Motive and Opportunity to Commit Fraud and Participate in the Pump-and-Dump Scheme**

228.     Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their association with and control over the Company, which

made them privy to confidential information, participated in the fraudulent scheme designed to mask (a) Vaxart's actual capabilities; (b) Vaxart's termination of its norovirus vaccine program; (c) its inability to timely develop a COVID-19 vaccine, if at all; (d) the true (*i.e.*, non-existent) value of Vaxart's touted contract with Attwill; and (e) Vaxart's failure to be selected to receive any OWS funding to help develop a COVID-19 vaccine, and the lack of any reasonable basis to believe that Vaxart could or would ever qualify to receive such OWS funding.

229.     Defendants Boyd, Maher, and the Armistice Defendants engaged in this scheme in order to inflate the price of Vaxart common stock, enhance the value of their holdings of Vaxart common stock and warrants, and to allow for massive insider sales that yielded total proceeds of approximately $320 million ***and insider trading profits in the astounding total amount of approximately $300 million***. By virtue of their substantial equity interests in Armistice Capital and the Armistice entities, Defendants Boyd and Maher, directly or indirectly, were the primary beneficiaries of all or a substantial portion of the Armistice Defendants' insider selling profits.

230.     Defendants' insider sales are probative of Defendants' scienter and are part of Defendants' scheme, artifice to defraud or acts, practices or course of business in violation of § 10(b) and Rule 10b-5. In particular, while Defendants were issuing materially false and misleading statements about Vaxart's business and concealing material adverse information about its operations and business dealings, Defendants Boyd and Maher (and, through Boyd and Maher, Armistice), who had access to confidential information and were aware of the truth about the Company and its business, reaped massive financial benefits from this illegal scheme and course of conduct by:

(a)     causing the Armistice Defendants to sell roughly 18 million shares of Vaxart common stock at artificially inflated prices during the first five months of the Class Period (through June 3, 2020); and

(b)     causing the Armistice Defendants to (i) renegotiate the terms of their Warrants to eliminate the timing and volume restrictions on their exercise, so as to allow the Armistice Defendants to promptly acquire (at prices substantially below the market) more than 20.7 million additional Vaxart shares; and to shortly thereafter, in late June 2020, (ii) exercise those renegotiated Warrants so as to acquire (at prices ranging between only $0.30 and $1.10 per

share) an additional 20,757,576 shares – **and to then immediately sell** (at artificially prices ranging between $8.29 and $10.38 per share) those shares (as well as more than 7 million of their previously purchased and still retained shares.

231.    All of the foregoing sales were made by Defendants Boyd, Maher, and Armistice without disclosing the materially adverse facts about Vaxart that they were privy to. The table previously set forth entitled, "Contemporaneous Trading", shows the heavy insider sales by the Armistice Defendants, as directed by Defendants Boyd and Maher, during the Class Period.

232.    The foregoing sales by the Armistice Defendants and directed by Defendants Boyd and Maher (including the timing of the exercise of the Warrants and the immediate sale of the resulting shares in June 2020) were unusual in their amount and in their timing. Indeed, these sales constituted over 99.5% of the Armistice Defendants total beneficial holdings of Vaxart shares.

233.    In addition to the sales outlined above, on April 28, 2020, Defendant Davis sold 60,000 shares of his personal holdings of Vaxart common stock at an artificially inflated price of $3.275 per share, reaping total insider profits of $196,500. Such sales were unusual in timing and amount – indeed, Defendant Davis had not previously sold any Vaxart shares.

**B.      Defendants' Involvement in the Modification of the Warrants for the Benefit of the Armistice-Affiliated Defendants and the Related Grants of "Spring-loaded" Options to the Remaining Defendants**

234.    As detailed in above, in June 2020 each of the Individual Defendants participated in a *quid pro quo* scheme whereby (a) the Armistice Defendants (and, by virtue of their substantial equity interests in those entities, Defendants Boyd and Maher) obtained from Vaxart's Board of Directors certain extremely lucrative abatements from the restrictions on their existing Vaxart warrants (which allowed them to be exercised without the previously required 60-day notice period to increase those beneficial ownership limitations, and without regard to certain significant limitations of the number of warrants that could be exercised at any given time); (b) the Individual Defendants who were not currently affiliated with the Armistice Defendants would receive new grants of options that were both significant in number and of particularly enhanced value because they were "spring-loaded"; and (c) all Defendants agreed to advance (or to at least not interfere with) anticipated further opportunities to artificially "pump up" the value of Vaxart shares through the making of materially false, misleading

and/or incomplete public statements concerning Vaxart's purported abilities to profit from the ongoing COVID crisis.

235.    As detailed at above, as a result of the amendments to the Warrants, the Armistice Defendants (by, and largely for the direct or indirect financial benefit of, Defendants Boyd and Maher), obtained the ability (a) to *more quickly exercise* 16,666,667 of their existing Vaxart warrant holdings and convert them to an equivalent number of saleable Vaxart common stock at a price of only $0.30 per share, and (b) to *more quickly exercise* an additional 4,090,909 of their existing Vaxart warrants holdings and convert them to an equivalent number of saleable Vaxart common stock at a price of only $1.10 per share – and to *immediately* sell such shares without regard to the prior restrictions (eliminated as part of the Warrant Amendments) that significantly limited the total number of warrants and/or shares that the Armistice Defendants could exercise in any given period.

236.    As detailed at above, as their part of the *quid pro quo*, the non-Armistice Defendants received the following numbers of options to purchase Vaxart shares on June 8 and June 15, 2020 with strike prices at the then-market price for Vaxart shares from $1.70 to 2.46 per share.[37] These option grants are reflected in the chart below:

| Date | Name | Position | No. of Stock Options Granted | Strike Price |
|------|------|----------|------------------------------|--------------|
| 6/8/2020 | Wouter W. Latour, M.D. | Director | 900,000 | $1.70 |
| 6/8/2020 | Todd C. Davis | Director | 65,700 | $2.39 |
| 6/8/2020 | Robert A. Yedid | Director | 65,700 | $2.39 |
| 6/8/2020 | Michael J. Finney, PhD | Director | 65,700 | $2.39 |
| 6/8/2020 | Sean N. Tucker | Chief Scientific Officer | 360,000 | $1.70 |
| 6/8/2020 | Andrei Floroiu | Director | 54,720 | $1.71 |
| 6/15/2020 | Andrei Floroiu | Director | 900,000 | $2.46 |
| 6/15/2020 | Andrei Floroiu | Director | 845,280 | $2.46 |

---

[37]    Though the "spring-loaded" options were approved by the Board on multiple dates, they were "subject to stockholder approval of an amendment to the Vaxart, Inc. 2019 Equity Incentive Plan" on June 8, 2020. As controlling shareholder at all relevant periods, Armistice had the power to grant – or deny – any options to any officer or director.

237.    On August 13, 2020, Defendant Latour, exercised 333,334 of his warrants for the same amount of shares at a cost of $0.30 each. These warrants would not expire until September 30, 2024. With the publicity of the *New York Time* article and HHS referring Vaxart to the SEC, Latour held off dumping these shares until after the storm passed — but only a bit. On November 23, 2020, Latour dumped all of these shares for proceeds of $2,106,670.88.

| Date | Name | No. of Shares Sold | Share Price |
|------|------|--------------------|-------------|
| 11/23/2020 | Wouter W. Latour, M.D. | 333,334 | $6.32 |

238.    The issuance of the foregoing option grants was unusual in their amount and in their timing; indeed, as alleged herein, they were granted and issued immediately prior to the issuance of further materially false and misleading statements on June 25 and 26, 2020, that caused the price of Vaxart shares to more than *triple* in value within just a few weeks of their issuance, and allowed the controlling Armistice Defendants to cash out, strongly hinting at a quid pro quo Latour's sales are suspicious in that he exercise them as the market beginning to understand the truth of Vaxart's non-involvement but held off selling with HHS stating they were referring to legal authorities such insider sales and false statements tying companies to OWS. Then, after things quieted down, Latour dumped *all* of his common stock received from these warrant exercises. According to his SEC filings he no longer owns any stock despite being the former CEO a current director, and chairman of the Board.

**C.     Vaxart's Desperate Financial Position, Need to Raise Cash and Actually Raising Cash Three Times in the Class Period Show Additional Motive**

239.    As admitted to CW1, by December 31, 2019 it was "all over" for Vaxart unless it found a partner within three months. At that time Vaxart terminated its lead norovirus researcher, and shut down its norovirus program (which it continued to hide until it blamed its efforts to develop a COVID vaccine as the reason it put norovirus "on hold"). Thus Vaxart was in desperate need for cash, and Armistice needed a way out to monetize its diminishing asset.

240.    Defendants then proceeded, before admitting that the norovirus program was shut down, to utilize COVID-19 as an opportunity to raise $10 million in case through the sale of 4 million shares and associated warrants in February, closing the deal on March 2, 2020. But Vaxart's stock languished and more needed to be said to sell investors on Vaxart.

241.     Vaxart then raised an additional near $9.5 million for Vaxart by enabling Armistice to exercise its warrants in an accelerated manner, virtually without restriction, by amending the warrant agreement with Armistice for no additional consideration as outlined above, just days before releasing its fraudulent June 25 and 26 press releases.

242.     Finally, just days after the June 25 and 26 press releases, and before the market learned the truth, Vaxart raised an additional $90 million in an at-the-market stock offering, at a price of $7.98 suggesting that it was preparing to make major investments in its clinical development pipeline or its manufacturing capacity. That offering was led by SVB Leerink, with B. Riley FBR acting as co-lead sales agent. Suspiciously, the financial press reported that B. Riley FBR initiated coverage for the first time of Vaxart on Sunday evening. The initiating and timing of coverage is something Defendants would have known from their long-standing relationship with B. Riley FBR and the fact that it acted as sales agent in the $90 million offering. Not surprising, B. Riley issued a "BUY" recommendation. Surprising, however was the recommended target price of $22 — almost ***three times*** the current price, causing Vaxart's stock to soar once more.

243.     The need to raise cash (motive), and the fact that the less than candid or false press releases gave Defendants the opportunity to raise cash, and they did three times, strongly infers that each Defendant knew the false and misleading nature of their press releases and participated in the scheme to defraud investors.

**D.     Defendants' Imputed Knowledge of Facts Critical to the Core Operations**

244.     At all relevant times during the Class Period, Vaxart was an extremely small company, with only about 15 employees. Prior to terminating it, Vaxart's norovirus vaccine development program had been one of the Company's most heavily touted program, and by late March 2020 had publicly announced that it was putting "several" of its (few) other vaccine development projects "on hold" in order to focus on its efforts to develop its "experimental oral vaccine candidate for Coronavirus vaccine."

245.     Given Vaxart's extremely small size, and given that Vaxart's norovirus vaccine program (through late 2019) and Coronavirus program (beginning in early 2020) purported to be the major focus of Vaxart's limited business and core operations, it may be strongly inferred that

Defendant Latour (who had served as Vaxart's President and Chief Executive Officer from February 2018 to June 2020, who had previously served as President and Chief Executive Officer of Vaxart's predecessor entities, and who continued to serve as Chairman of Vaxart's board after June 2020) was fully aware of the status of all material matters involving Vaxart's core operations throughout the Class Period, including the truth as to the matters alleged herein to have been materially misrepresented to and/or concealed from Plaintiffs and the members of the Class.

246.    Similarly, by virtue of the combination of Vaxart's small size and limited operations, the due diligence that Armistice Capital and Defendants Boyd and Maher conducted into Vaxart's business and operations before acquiring a majority stake in the Company in 2019, and Boyd's and Maher's ability to access material non-public information concerning Vaxart (and in particular information concerning Vaxart's core operations and (purported) primary research and development initiatives) by virtue of their position as directors and controlling shareholders of Vaxart, it may be strongly inferred that Defendants Boyd and Maher – and by imputation the Armistice Defendants with which they were affiliated – were all fully aware at all times during the Class Period of the status of all material matters involving Vaxart's core operations, including the truth as to the matters alleged herein to have been materially misrepresented to and/or concealed from Plaintiffs and the members of the Class.

247.    Given Vaxart's extremely small size, that Vaxart's Coronavirus program (from early 2020 on) purported to be the major focus of Vaxart's limited business and core operations, and that his former role as a former employee of Armistice Capital and long-standing personal and professional associations with Defendant Boyd, it may be strongly inferred that Defendant Floroiu (who had been installed by Defendants Boyd and Maher to replace Defendant Latour as Vaxart's Chief Executive Officer as of June 2020, and who had previously been installed by them as a Company director in April 2020) was fully aware of the status of all material matters involving Vaxart's core operations from no later than April 2020 through the end of the Class Period, including the truth as to the matters alleged herein to have been materially misrepresented to and/or concealed from Plaintiffs and the members of the Class.

248.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired shares of Vaxart common stock between June 15, 2020 and August 19, 2020 inclusive (the "Class Period"), and were damaged thereby. Excluded from the Class are Defendants, Vaxart's and Armistice Capital's current and former officers, directors, parents, and subsidiaries, their immediate family members, legal representatives, heirs, successors or assigns of any such excluded person and any entity in which Defendants have or had a controlling interest.

249.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Vaxart common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Stock owners and other members of the Class may be identified from records maintained by Vaxart or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

250.     Plaintiffs' claims are typical of the claims of other Class members, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as alleged herein.

251.     Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

252.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Common questions include:

(a)     whether Defendants violated the federal securities laws as alleged herein;

(b)     whether Defendants made public statements during the Class Period that were materially false, misleading or incomplete or otherwise omitted material facts;

(c)     whether Armistice and the Individual Defendants caused Vaxart to issue false and misleading statements;

(d)       whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(e)       whether the prices of Vaxart common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)       whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

253.     A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damages suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for them to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

254.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)       Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)       the omissions and misrepresentations were material;

(c)       Vaxart common stock is traded in an efficient market;

(d)       Vaxart's shares were liquid and traded with moderate to heavy volume during the Class Period;

(e)       Vaxart traded on the NASDAQ and was covered by multiple analysts;

(f)       the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Vaxart's securities; and

(g)       Plaintiffs and Class members purchased or acquired Vaxart common stock without knowledge of the omitted or misrepresented facts.

255.     Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

256.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United*

*States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## FIRST CAUSE OF ACTION

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder
(Against Vaxart and the Individual Defendants)**

257.    Plaintiffs repeat and reallege each allegation contained above as if fully set forth herein. This claim is asserted on behalf of all members of the Class against Vaxart and the Individual Defendants.

258.    During the Class Period, Defendants, by their acts and omissions as alleged herein, carried out a plan, scheme, and course of conduct which was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the other Class members; (ii) artificially inflate and maintain the market price of Vaxart common stock; and (iii) cause Plaintiffs and Class members to purchase and hold Vaxart common stock at artificially inflated prices as Defendants cashed out causing a sharp decrease in value.

259.    Each of the Defendants, in violation of § 10(b) of the Exchange Act and Rule 10b-5(b), made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading, which operated as a fraud and deceit upon the purchasers of Vaxart common stock in an effort to maintain artificially high market prices for Vaxart common stock. Defendants' material misrepresentations and omissions are alleged in § VI, *supra*. Defendants are sued as primary participants in the wrongful conduct charged herein.

260.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the materially false, misleading and incomplete statements detailed above and the continuous course of conduct to undermine the rules protecting Vaxart from insider trading, through warrant amendments and issuance of spring-loaded shares.

261.    By virtue of their positions at Vaxart, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive Plaintiffs and the other members of the Class; alternatively, Defendants acted with reckless

disregard for the truth in that they recklessly failed to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, even though such facts were readily available to Defendants.

262.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As Vaxart's senior officers and/or directors, the Individual Defendants had knowledge of the details of Vaxart's internal affairs.

263.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Vaxart. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Vaxart's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the false and misleading reports, releases and public statements, the market price of Vaxart common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Vaxart's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Vaxart common stock at artificially inflated prices in reliance on the integrity of the market for such securities, and were damaged thereby.

264.    During the Class Period, Vaxart common stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, purchased or otherwise acquired shares of Vaxart common stock at prices artificially inflated by Defendants' wrongful scheme and course of conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Vaxart common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Vaxart common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members. Plaintiffs and the Class have suffered

1   damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for

2   Vaxart common stock, which inflation was removed from its price as the true facts became known.

3   265.   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and

4   the other members of the Class have suffered damages in connection with their purchases of Vaxart

5   common stock during the Class Period.

6   266.   By reason of the conduct alleged herein, Defendants violated Section 10(b) of the

7   Exchange Act and Rule 10b-5(b) promulgated thereunder.

8   **SECOND CAUSE OF ACTION**

9   **Violation of Section 10(b) of the Exchange Act and**
    **Rule 10b-5(a) and (c) Promulgated Thereunder**
10  **(Against All Defendants)**

11  267.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set

12  forth herein.

13  268.   This Count is brought under the provisions of Rule 10b-5(a) and (c). Accordingly,

14  Plaintiffs need not allege in this Count, nor prove in this case, that each of the Defendants made any

15  misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-

16  5(b) and/or any other provisions of law.

17  269.   During the Class Period, the Defendants carried out a common plan, scheme, and

18  unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including

19  Plaintiffs and the Class; (ii) artificially inflate the market price of Vaxart common stock; and (iii) cause

20  Plaintiffs to purchase Vaxart common stock at artificially inflated prices.

21  270.   In furtherance of this unlawful plan, scheme, and course of conduct, Defendants

22  employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts,

23  transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and

24  the Class in connection with their purchases of Vaxart common stock, in violation of Section 10(b) of

25  the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

26  271.   Defendants' fraudulent devices, schemes, artifices, and deceptive acts, practices, and

27  course of business included deliberately releasing well-timed, but false and misleading, and therefore

28  fraudulent, statements about Vaxart and its COVID-19 vaccine candidate. Ultimately, this conduct

resulted in the Company making false statements to the market about the likelihood of its financial success and the reasons underlying the success, by, for example, falsely claiming that one of its manufacturing partners had the ability to manufacture a billion or more doses of Vaxart's COVID-19 vaccine and that the vaccine had been selected for Operation Warp Speed.

272.     Plaintiffs and the Class reasonably relied upon the integrity of the market in which Vaxart common stock traded.

273.     During the Class Period, Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct. Had Plaintiffs and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Vaxart common stock, or if they had, would not have done so at the artificially inflated prices paid for such securities.

274.     As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of Vaxart common stock during the Class Period.

275.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiffs and the Class for damages suffered in connection with their purchases of Vaxart common stock during the Class Period.

### THIRD CAUSE OF ACTION

**Violation of Section 20(a) of the Exchange Act**
**(Against Armistice and the Individual Defendants)**

276.     Plaintiffs repeat and reallege each allegation contained above as if fully set forth herein.

277.     This Count is asserted on behalf of Plaintiffs and all members of the Class against Armistice and the Individual Defendants for violations of Section 20(a) of the Exchange Act ("Section 20(a)"), 15 U.S.C. § 78t(a).

278.     Armistice and the Individual Defendants were and acted as controlling persons of Vaxart within the meaning of Section 20(a) as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company,

including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Each of these Defendants was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

279.    In addition, Armistice and the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the transactions giving rise to the securities violations as alleged herein and exercised the same.

280.    As set forth above, Vaxart and the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their control over Vaxart, Armistice and the Individual Defendants are also liable for Vaxart's violation of Section 10(b) pursuant to § 20(a).

**FOURTH CAUSE OF ACTION**

**Violation of Section 20A of the Exchange Act**
**(Against Armistice)**

281.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

282.    This Count is asserted for violations of § 20A of the Exchange Act, 15 U.S.C. § 78t- 1, on behalf of Plaintiffs and all other members of the Class, who purchased shares of Vaxart common stock contemporaneously with the sale of Vaxart common stock by Armistice while they were in possession of material, nonpublic information, as alleged herein, including concerning Vaxart's true business and financial condition, which they had a duty to disclose and which they failed to disclose.

283.    Section 20A(a) of the Exchange Act provides that:

> Any person who violates any provision of the [Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased securities of the same class.

284.    Contemporaneously with Armistice's insider sales of Vaxart common stock, Plaintiffs and the other Class members purchased shares of Vaxart common stock on a national securities exchange and in an open and efficient market, while Armistice was in possession of material, nonpublic information they had a duty to disclose, but failed to disclose, as alleged herein, including information concerning Vaxart's true business and financial condition.

285.    Plaintiffs and the other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein.

286.    By reason of the violations of the Exchange Act alleged herein, Armistice is liable to Plaintiffs and the other members of the Class who purchased shares of Vaxart common stock contemporaneously with Armistice's sales of Vaxart common stock during the Class Period.

287.    Plaintiffs and the other members of the Class, who purchased contemporaneously with Armistice's insider sales of Vaxart common stock, seek disgorgement by Armistice of profits gained or losses avoided from Armistice's transactions in Vaxart common stock contemporaneous with the Plaintiffs and the other members of the Class.

288.    This action was brought within five years after the date of the last transaction that is the subject of Armistice's violation of Section 20A.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding all damages and other remedies available under the Exchange Act in favor of Plaintiffs and the members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

1

2    DATED: August 9, 2021

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By  _/s/ Reed R. Kathrein_
      REED R. KATHREIN
Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steven W. Berman (_pro hac vice_ forthcoming)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steveb@hbsslaw.com

_Lead Counsel_

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
John T. Jasnoch (281605)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
William C. Fredericks (admitted _Pro Hac Vice_)
Heather H. Volik (admitted _Pro Hac Vice_)
Jeffrey P. Jacobson (admitted _Pro Hac Vice_)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 233-6444
Facsimile: (212) 233-6334
wfredericks@scott-scott.com
hvolik@scott-scott.com
jjacobson@scott-scott.com

**THE SCHALL LAW FIRM**
Brian J. Schall (290685)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile: (310) 388-0192
brian@schallfirm.com

*Additional Counsel*