UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re VAXART, INC. SECURITIES
LITIGATION

Case No.  20-cv-05949-VC

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS**

Re: Dkt. Nos. 138, 139

This is an unusual securities fraud case. The complaint easily satisfies the "scienter" requirement that private plaintiffs often struggle with. It cogently alleges that Vaxart issued a series of statements with the intent to mislead the investing public into believing that the company was—like Pfizer and Moderna—on the precipice of mass-producing a successful coronavirus vaccine.

Private plaintiffs tend to have less difficulty alleging that a company's statements were materially misleading. But here, the question whether the complaint adequately alleges that Vaxart's statements were materially misleading to a reasonable investor is somewhat challenging. That is because the company's press releases and other statements included several accurate passages alongside highly misleading ones, thus potentially allowing an investor to sift through the statements and discern that Vaxart's statements about its vaccine development project were not to be trusted. But considering the totality of the statements and the unique context in which they were made—with the investing public on the edge of its seat waiting to

learn which other companies would join the likes of Pfizer and Moderna in Operation Warp Speed—the plaintiffs have managed to successfully allege that a reasonable investor would have been misled in a material way by Vaxart. It is only the sophisticated investor who might have been able to avoid being fooled by the company's series of head-fakes. That is not enough for Vaxart to escape liability for securities fraud.

Accordingly, the motion to dismiss the complaint is denied as to Vaxart and its current officers, Cezar Andrei Floroiu, Wouter W. Latour, Robert A. Yedid, Todd C. Davis, Michael J. Finney, and Sean N. Tucker. It is likewise denied with respect to individual defendants Steven J. Boyd and Keith Maher, former Vaxart officers. However, as explained below, the motion to dismiss is granted with leave to amend as to Armistice—the hedge fund that sold shares in the wake of Vaxart's misleading statements. Although it is certainly plausible that Armistice was involved in the alleged fraud, the allegations in the complaint are insufficient to state a claim against that defendant.

## I

### A

As its name suggests, Vaxart is a vaccine development company based in San Francisco. According to the complaint, taken as true at this stage, Vaxart has long struggled to bring a product to market. As of mid-2019, its stock languished "at or well below $1.00," a ninety percent decline from its public market debut a year and a half earlier. The company was also bleeding cash, netting sizeable losses in both 2018 and 2019. Armistice, a hedge fund, took an interest in the cheap stock, acquiring a majority stake in Vaxart by September 2019 with the hope that it might turn the company around.

To stem losses and "pull the Company out of its free fall," Vaxart terminated half of its

personnel and jettisoned internal projects that had failed to yield results. It then saw an opportunity. As the world reeled in response to the coronavirus, Vaxart announced that it had "initiated a program to develop a coronavirus vaccine candidate based on its proprietary oral vaccine platform." The market responded favorably, sending Vaxart's shares north of $1.00. Building on market enthusiasm, Vaxart issued more shares and committed to use the capital to help develop its vaccines. Again, the stock rose. Vaxart then announced an "agreement" with another company to develop and manufacture an oral coronavirus vaccine. As with other statements relating to its vaccine development, Vaxart's stock spiked. The company followed these announcements with more still, updating the market about the development of its oral vaccine and the addition of a "seasoned pharmaceutical and biotech hand" to its Board of Directors. In total, the Complaint alleges, Vaxart published eight press statements over four months about its coronavirus vaccine effort, each of which (at least temporarily) sent the company's shares higher.

More hype followed. With the federal government's announcement of Operation Warp Speed in May 2020, speculation bubbled about which companies might be chosen for an influx of taxpayer funds to develop a vaccine. The announcement suggested that as many as eight companies might be chosen. News reports identified five recipients (none Vaxart) by early June. "[W]ith five of those candidates identified, speculation mounted as to the identities of the unknown two or three."

**B**

Vaxart allegedly seized on public uncertainty as to the remaining vaccine candidates to artificially bolster its share price. Over ten days, the complaint alleges, the company issued a series of press releases designed to mislead the market about the nature of its vaccine

development.

On June 15, the first day of the class period, Vaxart published a press release announcing the appointment of a new CEO "to Accelerate Advancement of COVID-19 and Other Programs." The release touted the company's progress "advancing the development of what could be the most effective and most convenient COVID-19 vaccine." Three days later, on June 18, Vaxart posted slides from an investor presentation on its website. The deck boasted that Vaxart's "Covid-19 program" was "advancing rapidly," that manufacturing was "in place," and that "Phase 1" would "start in Summer 2020." Vaxart also included a slide comparing its vaccine to those of competitors (CanSinoBio, AstraZeneca/Oxford, Janssen, Moderna, Pfizer/BioNTech, Novavax, Sanofi/PS), four of which had already been chosen for Operation Warp Speed funding, suggesting that Vaxart might be picked next.

On June 24, less than a week after the investor presentation, Vaxart issued another press release. This time it announced that the company would join the Russell 3000. And it touted Vaxart's "progress to date in our ongoing effort to disrupt the vaccine industry by developing a transformative oral vaccine that . . . has the potential to offer better protection than injectables against airborne viruses such as SARS-CoV-2, which causes COVID-19."

The next day, June 25, Vaxart announced that it signed a "Memorandum of Understanding" with Attwill Medical Solutions to manufacture and distribute its oral coronavirus vaccine, "Enabling Production of a Billion or More COVID-19 Vaccine Doses Per Year." Vaxart's CEO, Andrei Floroiu, lauded the partnership and doubled-down on the "billion" doses claim: "We believe AMS' experience coupled with its ability to manufacture a billion or more doses per year would . . . enable the large scale manufacturing and ultimate supply of our COVID-19 vaccine." At a fireside chat for investors that same day, Vaxart's Chief Scientific

Officer played up the partnership, telling the audience that the company had "signed an agreement with a major player." The partnership, in his view, solved Vaxart's "biggest technical bottleneck in terms of manufacturing." In reality, the complaint alleges, "Attwill did not have the critically necessary FDA certifications to manufacture[] *any* doses of Vaxart's COVID-19 vaccine" and lacked the ability to produce one billion or more doses—crucial facts that Vaxart knew, or at least recklessly disregarded.

The last press release identified in the complaint, which Vaxart issued on June 26, boldly proclaimed: "Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed." The small print below explained that the company's vaccine candidate had "been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed." As the Department of Health and Human Services later confirmed, the federal government had not, in fact, chosen Vaxart as one of its leading vaccine developers, or for that matter to receive federal funding. Still, on the heels of Vaxart's Operation Warp Speed announcement, its stock peaked at $14.30 before closing at $8.04, up 28% from the day prior.

The complaint also suggests a motive for Vaxart's ten-day press "blitz." Armistice, which once maintained a majority stake in Vaxart, had sold most of its shares by the time the company issued its series of press releases beginning on June 15. But as of early June, the hedge fund still held seven million shares of common stock and warrants to purchase over twenty million additional shares at a low strike price. The complaint alleges that Armistice and Vaxart conspired to pop Vaxart's share price, thereby enabling Armistice to exit its remaining position at a handsome profit.

According to the complaint, Vaxart's story fell apart with the publication of an article in the *New York Times* on July 25, 2020. The story highlighted Armistice's considerable profits

5

from selling Vaxart stock as hype built around the company's vaccine development. And it explained that "[s]ome officials at the Department of Health and Human Services have grown concerned about whether companies including Vaxart are trying to inflate their stock prices by exaggerating their roles in Warp Speed." The same day, the Department tweeted that it had "entered into funding agreements with certain vaccine manufacturers" and was "negotiating with others." But, the tweet clarified, "[n]either is the case with Vaxart." *Id.* Following the *Times*'s account and the Department's tweet, the complaint alleges that Vaxart's stock dropped 9% the next day and 18% over the next three weeks.

## II

### A

Section 10(b) of the Securities Exchange Act of 1934 prohibits using "any manipulative or deceptive device or contrivance in contravention" of the Securities and Exchange Commission's rules. 15 U.S.C. § 78j(b). The Commission has fashioned an implementing regulation: Rule 10b-5 renders it unlawful for any person "[t]o make any untrue statement of a material fact . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b).

Plaintiffs must typically prove each of the following five elements to recover under Rule 10b-5(b): "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Investment Partners, LLC v. Scientific-Atlanta Inc.*, 552 U.S. 148, 157 (2008).

To get past a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But

private securities fraud actions present additional hurdles: a complaint must clear Rule 9(b), which requires that the plaintiffs "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). A complaint must also satisfy two relevant requirements set forth in the Private Securities Litigation Reform Act of 1995 (PSLRA). Where plaintiffs allege "that the defendant . . . made an untrue statement of a material fact," they must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). A similar standard also applies to intent allegations. A complaint must, "with respect to each act . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A).

**B**

The complaint adequately alleges that the Vaxart defendants knowingly misled the investing public about the company's progress in developing a vaccine for the coronavirus. The plaintiffs identify two statements in particular that plausibly count as material misrepresentations under Rule 10b-5(b): Vaxart's announcement that it had partnered with Attwill, enabling the company to "manufacture a billion or more doses per year," and Vaxart's press release the next day announcing that it had been "[s]elected for the U.S. Government's Operation Warp Speed."

1. *Material misrepresentations*. The securities laws prohibit making statements that "create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Whether a misleading statement counts as material turns on whether the statement has "actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Put another way, a misleading statement must "significantly" shift the

"'total mix' of information made available." *Id.* The securities laws protect not only

"conservative traders" but the "speculators and chartists of Wall and Bay Streets" all the same.

*Securities and Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.

1968).

Statements are evaluated through a fisheye, not a telescope. Words, after all, cannot be

viewed "in complete isolation" but must instead be "read in light of all the information then

available to the market" to decide if they "conveyed a false or misleading impression." *In re*

*Convergent Technologies Securities Litigation*, 948 F.2d 507, 512 (9th Cir. 1991). With that in

mind, statements "literally true on their face may nonetheless be misleading when considered in

context." *Miller v. Thane International, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Circumstance,

setting, and even "manner of presentation" all matter. *McMahan & Co. v. Wherehouse*

*Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

Both the Attwill and Warp Speed press releases—when considered together and in the

context of Vaxart's prior statements—created the materially misleading impression that Vaxart

stood at the precipice of pioneering a successful coronavirus vaccine. In the period leading up to

the statements, investors knew five of the government's funding recipients but could only

speculate as to which two or three other companies might benefit from an influx of government

funds. Vaxart, for its part, claimed swift progress on its vaccine development, positioned its

vaccine candidate alongside the likes of Moderna, Pfizer, and J&J, and highlighted that

manufacturing was "in place." The company also lauded its vaccine as having the "potential to

offer better protection than injectables." Taken together, "the information then available to the

market" gave the impression that Vaxart could well be on the cusp of achieving something

momentous. *In re Convergent*, 948 F.2d at 512.

Against that backdrop, Vaxart's announcement that it had partnered with Attwill was materially misleading. Recall Vaxart's assertion that the agreement enabled production of one billion vaccine doses per year. Remember too that the company did not stop at a press release—its Chief Scientific Officer lauded the partnership as "an agreement with a major player" that would solve key manufacturing hiccups. But the complaint plausibly alleges that Attwill lacked the regulatory capacity, personnel, and wherewithal to produce even one dose, never mind one billion. Through the eyes of a reasonable (and, by this point, eager) investor, it is easy to see how Vaxart's announcement about Attwill would have changed the game. The announcement seemed to turn potentials into realities, "significantly alter[ing] the 'total mix' of information" in investors' hands. *TSC Industries*, 426 U.S. at 449.

Much the same can be said of the Operation Warp Speed press release announced the next day. As with the Attwill release, Vaxart capitalized on hype it had generated around its vaccine candidate. And it exploited a gap in the public's knowledge: investors were still eager to learn the identity of the remaining Warp Speed recipients. With that context in mind, Vaxart's bold headline that it had been "[s]elected" for Warp Speed would have misled a reasonable investor into thinking that the company would be flush with funds, enabling it to quickly bring a vaccine to market. But as later reports confirmed, the government had not in fact chosen Vaxart to receive significant government funding to create and manufacture a coronavirus vaccine.

In short, the complaint adequately alleges that both the Attwill and Warp Speed press releases would have misled a reasonable investor. It "specif[ies] each statement" and offers clear "reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Materiality is, after all, a "fact-specific inquiry." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). It would be inappropriate to dismiss the claims against Vaxart at this stage where the plaintiffs have

identified specific statements that plausibly would have misled the investing public.

To be fair, Vaxart responds with some arguments that—at least in light of the heightened pleading standard for private securities fraud plaintiffs—have some force. As for the Attwill press release, Vaxart contends that it did not announce a formal partnership, just a "Memorandum of Understanding," which is merely an agreement to try to reach an agreement. And thus (the argument appears to go), the headline that reads "Enabling Production of a Billion or More COVID-19 Vaccine Doses Per Year" should be understood as merely describing an agreement to try to reach an agreement that might ultimately result in the production of a billion doses per year. In other words, if you parse the press release carefully, you might be able to cut through the hype and realize that the Attwill partnership is not as big a deal as it seems. Vaxart also notes that the release contained no specific representations about Attwill's production capacity. But again, the press release must be considered in context, including the context of the investor expectations created by Vaxart's other statements. Vaxart not only announced that it had signed a "Memorandum of Understanding," but its own Chief Scientific Officer characterized the deal as an "agreement" and touted its ability to accelerate manufacturing. Any suggestion that the companies had merely agreed to try to reach an agreement was dwarfed by this context, not to mention the headline trumpeting that the deal would enable Vaxart to produce "a billion doses."

Nor is the Attwill announcement protected as a "forward-looking statement" under the PSLRA. It made a claim about the "current . . . state" of Attwill's manufacturing capabilities. *In re Quality Systems, Inc. Securities Litigation*, 865 F.3d 1130, 1144 (9th Cir. 2017). Even if some portion of the release included forward-looking projections, "the non-forward-looking statements are not protected by the safe harbor of the PSLRA." *Id.* at 1142.

As for the Warp Speed announcement, Vaxart similarly argues that its press release was literally true, and therefore cannot count as materially misleading. But as already discussed, even statements "literally true on their face" can mislead a reasonable investor "when considered in context." *Miller*, 519 F.3d at 886. Context is particularly potent in a case like this. As the complaint plausibly alleges, the trickle of information about Warp Speed prompted investors to perch at the edge of their seats, eager to find the next rocket stock in the healthcare space. Those circumstances proved ripe for companies hoping to capitalize on hype and speculation. And the complaint plausibly alleges that Vaxart designed its press release to take advantage of just this environment. The headline announced that it had been "selected" for "Warp Speed," while the body—in smaller font set below—disclosed the crucial reality that Vaxart had been chosen only to participate in a primate study and not to receive a vast influx of federal funds. The release also came immediately on the heels of the company's announcement about being "enabled" to manufacture one billion doses. Just as words matter, so too does "manner of presentation." *McMahan*, 900 F.2d at 579.[1]

Vaxart invokes *McDermid v. Inovio Pharmaceuticals, Inc.*, 520 F.Supp.3d 652 (E.D. Pa. 2021), where a different pharmaceutical company issued a similar press release claiming that its vaccine was "[s]elected for the U.S. Government's Operation Warp Speed." *Id.* at 669. As with Vaxart's press release, the statement in *McDermid* later clarified that the company "had been chosen 'to participate in a non-human primate (NHP) challenge study.'" *Id.* The district court dismissed the complaint as to that press release, finding that the plaintiffs did "not explain how

---

[1] In a prior hearing, the Court expressed the view that the Operation Warp Speed press release was not actionable because of the more accurate statements that the company including following the misleading headline. On reflection, the Court was viewing the statement through a telescope rather than a fisheye.

or why a reasonable investor with access to all this information would have thought [the company] would receive government funding for its vaccine." *Id.* But *McDermid* does not detail the context and circumstances surrounding the press release that might have influenced a reasonable investor, leaving one to wonder if the plaintiffs in that case included adequate allegations about context (and if so, whether the district court gave those allegations adequate weight). Nor does *McDermid* seem to wrestle with the Supreme Court's admonition that materiality is an "inherently fact-specific finding." *Basic*, 485 U.S. at 236.

2. *Scienter*. To the extent the PSLRA renders this a close case, it is not due to the scienter question. Private securities fraud complaints "can plead scienter by raising a strong inference that the defendant possessed actual knowledge or acted with deliberate recklessness." *New Mexico State Investment Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011). The question at this stage is whether, "consider[ing] the complaint in its entirety" and "tak[ing] into account plausible opposing inferences," "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–24 (2007). The inquiry embraces "a practical and common-sense perspective" to evaluate allegations "as a part of a holistic review." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Complaints must typically do more than simply assert that management played "an important role in the company." *Id.* at 784. But allegations "in a more bare form" can suffice "in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Id.* at 786 (quotations and citation omitted).

Gauged by these standards, the complaint alleges more than enough to infer intent. As to

the Attwill release, the plaintiffs assert that Attwill had just "25 to 30 personnel in total at the Company." They identify an internal "Gap Assessment" report that had been "conveyed to Attwill leadership," documenting deficiencies hampering the company's ability to manufacture even just one vaccine dose. Among those gaps: regulatory shortcomings and few staff. Attwill did not have regulatory approval to manufacture vaccines, and "opted not to pursue certification" enabling production "due to the substantial resource investment it would require."

It is plausible—indeed almost certain—that the Vaxart defendants either knew all this or "were reckless as to the truth or falsity" of their claim about Attwill's capabilities. *Gebhart v. S.E.C.*, 595 F.3d 1034, 1041 (9th Cir. 2010). It is difficult to imagine that a fledgling firm like Vaxart—a firm that has never taken a successful vaccine to market—would fail to do basic diligence on its key partner in developing a crucial product. Vaxart touted the partnership on its website and lauded the agreement as a key breakthrough. It strains credulity to think the company would have acted without ensuring that Attwill could actually produce the one billion doses it claimed. Looked at another way, Attwill played such a central role in Vaxart's vaccine plan that it would be "absurd to suggest that management was without knowledge" of its deficiencies. *South Ferry*, 542 F.3d at 784. In view of the context and circumstances, the complaint raises a "strong inference" that the Vaxart defendants knew their statements about Attwill were false or misleading. 15 U.S.C. § 78u-4(b)(2)(A).

Even more so for the Operation Warp Speed press release. The complaint alleges that the Vaxart defendants knew that the company had not been selected to receive federal funding through Warp Speed. It asserts that the defendants knew the company had been selected for the primate study long before the press release, giving them ample time to craft a statement that would mislead the market. And it notes that the company later "toned down the language to more

accurately reflect" that it had been selected only for a "preclinical program." The headline itself creates a strong inference that the defendants were acting with intent to mislead and to elicit an unduly favorable reaction by the market. All these facts taken together and in context create an even stronger inference that the Vaxart defendants deliberately crafted a press release designed to make it seem as if the company had achieved something significant—a trough of federal funding through Warp Speed—when in fact it had accomplished nothing of the sort.

3. *Reliance*. Courts may presume reliance in two circumstances, one of which is relevant on these facts: "[U]nder the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public." *Stoneridge Investment Partners, LLC v. Scientific-Atlanta Inc.*, 552 U.S. 148, 159 (2008). The doctrine relies on an efficient market hypothesis—that "public information is reflected in the market price of the security." *Id.* "[W]here materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." *Basic*, 485 U.S. at 247.

The complaint alleges that the defendants made materially misleading statements and that Vaxart's "common stock" was "traded in an efficient market." Those allegations suffice at this stage to plead reliance. Vaxart argues that because the company's statements would not have misled a reasonable investor, the complaint cannot plead reliance. But having concluded above that the complaint plausibly alleges materiality, Vaxart's reliance argument falls flat.

4. *Loss Causation*. A securities fraud complaint must plead that the "truth became known" and that the "revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re Bofl Holding, Inc. Securities Litigation*, 977 F.3d 781, 789 (9th Cir. 2020). Identifying "one or more corrective disclosures" is the typical route to alleging loss

causation. *Id.* at 790. "A corrective disclosure can come from any source, and can take any form from which the market can absorb" the truth, including news reports, investigations, and even tweets. *Public Employees' Retirement System of Mississippi v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014). "It is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *In re BofI Holding*, 977 F.3d at 790.

The complaint plausibly alleges that the *Times* article, and the Department of Health and Human Services's subsequent tweet, disclosed the truth about Vaxart's vaccine progress and caused a decline in Vaxart's share price. The *Times* piece directly refuted Vaxart's claim that it had been "selected" for Warp Speed by explaining that the company had not been selected to receive any federal funding: "Vaxart is not among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses." And the Department's tweet only reinforced the point. A reasonable investor could plausibly have read those disclosures as refuting Vaxart's earlier announcement, even if only in part.

Again, Vaxart argues that it disclosed the truth about Warp Speed by including, in the press release, the information that it had been selected for a non-human primate study. But as already discussed, a reasonable investor could have thought, having read the release and all the company's other statements leading up to it, that Vaxart's participation would amount to something more. The *Times* article dispelled any notion that the company would receive federal funding, which a reasonable investor plausibly could have assumed when Vaxart issued its original announcement.

What of the reality that the *Times* article said nothing about Vaxart's partnership with Attwill? True enough, the complaint does not identify a specific statement that directly refutes

Vaxart's claim that its partnership with Attwill enabled the production of one billion or more vaccine doses per year. But the news reports and the Department's statements rendered "some aspect" of the Attwill release "false or misleading" by making clear that Vaxart was nowhere near producing a single dose of the coronavirus vaccine, and certainly not well-positioned to take on the likes of Pfizer, Moderna, or J&J. *In re Bofl Holding*, 977 F.3d at 790.

Thus, the plaintiffs have stated a Rule 10b-5 claim against Vaxart and its officers.[2] That leaves the question whether they have also stated a claim under Section 20(a) of the Exchange Act, which imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable" under other provisions of the securities laws. 15 U.S.C. § 78t(a). The plaintiff must prove both "a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b-5, and then show that the defendant exercised actual power over the primary violator." *In re NVIDIA Corp. Securities Litigation*, 768 F.3d 1046, 1052 (9th Cir. 2014). The complaint does enough to assert that Boyd, Maher, Floroiu, Latour, Yedid, Davis, Finney, and Tucker directly or indirectly controlled Vaxart's decisionmaking, "including the content and dissemination of the various statements" giving rise to a claim under Rule 10b-5. For that reason, the defendants' motion to dismiss the claim under Section 20(a) is likewise denied.

As for the class period, the complaint asserts that it began on June 15, 2020, ten days prior to the first actionable statement, the Attwill press release. Although this order denies the motion to dismiss on the ground that the plaintiffs have adequately pleaded materially misleading statements, the class period will presumably need to be adjusted at the class certification stage.

---

[2] Vaxart does not meaningfully challenge that the complaint adequately states "a connection between the misrepresentation or omission and the purchase or sale of a security" and "economic loss," the third and fifth elements of a Rule 10b-5 claim. *Stoneridge*, 552 U.S. at 157.

**C**

Although the complaint adequately pleads a claim against the Vaxart defendants, it falls short with respect to Armistice. Rule 10b-5 imposes liability only where a person "make[s] any untrue statement of a material fact." 17 C.F.R. § 240.10b-5(b). Not just anyone "makes" a statement for purposes of the rule. Only a person "with ultimate authority over the statement, including its content and whether and how to communicate it" qualifies as "the maker." *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

The complaint does not assert that Armistice made or meaningfully controlled Vaxart's public statements about its vaccine development. To get around this problem, the plaintiffs allege that Armistice participated in a wide-ranging scheme to sell its remaining shares in the company, and to exercise warrants to realize even greater profits, after "popping" Vaxart's share price by misleading the public about its vaccine development. But this theory hits a few snags. Armistice had already sold the vast majority of its shares before the class period, punching a hole in the plaintiffs' view that it coordinated a pop in the share price all along. The complaint identifies roughly eight statements Vaxart issued relating to its vaccine development in the early part of 2020, each of which allegedly caused a rise in the share price. Yet Armistice did not sell a single share during that period.

Nor, upon close inspection, does the lynchpin of the plaintiffs' theory cross the plausibility threshold. The complaint asserts that Armistice schemed with the Vaxart defendants to allow Armistice to exercise all its outstanding warrants for Vaxart's shares more quickly. So far as the complaint suggests, Armistice held warrants to purchase just under 21 million shares at a comparatively low strike price. Those warrants imposed a limitation: Armistice could not exercise those shares such that its holdings in Vaxart would exceed a set percentage of the

17

company's total outstanding shares. So, the plaintiffs allege, Armistice conspired with Vaxart's board to raise the percentage cap, allowing Armistice to exercise more of its warrants and realize profits—the difference between the current share price and the strike price—more quickly. Allegedly in return for smoothing Armistice's profit-producing plan, Vaxart's Board received more stock options.

But the theory as pleaded does not add up. The warrants provided that Armistice would immediately "be deemed . . . to have become the holder of record of the Warrant Shares" "[u]pon delivery of" its exercise notice. Put simply, the agreement made Armistice an owner of the shares the moment it exercised the warrants, meaning that Armistice could then sell those same shares instantly. So far as the complaint suggests, nothing in the warrants prohibited Armistice from exercising shares right up to the percentage cap on its ownership in Vaxart, selling whatever shares it exercised, and repeating the process in short order until it had exercised all its warrants. Whatever the percentage cap on Armistice's ownership—whether 5, 10, or 20 percent—it could have fully exercised its warrants anyway. The complaint fails to explain why the warrants proved necessary, and therefore how Vaxart's decision to approve a higher ownership cap for Armistice shows that Armistice schemed alongside Vaxart to pop the company's share price. Nor do the plaintiffs meaningfully respond to this point in their opposition brief.

*Lorenzo v. S.E.C.* does not change the story. 139 S.Ct. 1094 (2019). It held that "dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5," which impose liability for fraudulent schemes, even if not subsection (b), which governs material misstatements. *Id.* at 1100. Even so, the complaint does not plausibly allege that Armistice disseminated—or even assisted in disseminating—any

of Vaxart's press releases. "[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Janus*, 564 U.S. at 142–43. Vaxart's logo appears on the relevant misstatements, not Armistice's.

### III

The motion to dismiss is denied as to Vaxart, its current officers, and its former officers. The complaint makes a strong case that Vaxart and its officers intended to mislead the investing public. On the question whether the statements were materially misleading, it's true that the statements were crafted carefully, mixing intentionally misleading statements with more accurate ones. A meticulous investor—scrutinizing every word and fluent in the opaque vocabulary that pervades corporate press releases—may have seen through the misleading aspects of Vaxart's statements. On these unusual facts, however, the fact that the Vaxart defendants can describe their statements as "literally true" based on a close and isolated reading does not require dismissal of the complaint. Considering the context, circumstances, and the manner in which the company communicated its progress to the market, the complaint does enough to identify specific statements that would have misled a reasonable investor.

The motion to dismiss the claims against Armistice is granted with leave to amend. If the plaintiffs believe they are able to articulate additional facts suggesting that Armistice can be held liable for the misstatements identified in this order or that Armistice engaged in an actionable scheme to manipulate Vaxart's stock price, they must file an amended complaint within 21 days of this ruling. Of course, as with any case, if the plaintiffs conclude that they do not currently have additional facts that would allow them to state a claim against Armistice, and if such facts are later revealed through discovery as to the Vaxart defendants, the plaintiffs may seek leave to

add Armistice as a defendant.

A case management conference is scheduled for January 26, 2022 at 1:00 p.m. A joint case management statement is due January 19.

**IT IS SO ORDERED.**

Dated: December 22, 2021

VINCE CHHABRIA
United States District Judge