Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Attorneys for Plaintiffs*

[Additional counsel on signature page.]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re VAXART, INC. SECURITIES LITIGATION | Master Case No.: 3:20-cv-05949-VC |
| | <u>CLASS ACTION</u> |
| | **PLAINTIFFS' CORRECTED SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| *This Document Relates to:* | |
| *ALL ACTIONS* | JURY TRIAL DEMAND |
| | Judge: Vince Chhabria |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    SUMMARY OF THE ACTION .............................................................................4

III.   JURISDICTION AND VENUE ............................................................................14

IV.    PARTIES ..............................................................................................................15

    A.     Plaintiffs ...................................................................................................15

    B.     Vaxart Defendants ....................................................................................15

    C.     Individual Defendants ..............................................................................15

    D.     Armistice ..................................................................................................18

    E.     Other Relevant Persons and Entities ........................................................20

V.     BACKGROUND ALLEGATIONS ......................................................................21

    A.     Armistice Takes Control of Struggling Pharmaceutical Company Vaxart .............21

    B.     Armistice Shuts Down Vaxart's Norovirus Program While Trying to Sell
        Vaxart's Technology or Find a Partner ........................................................24

    C.     COVID-19 Emerges and Armistice Moves to Install More Insiders .....................25

    D.     COVID-19 Presents Defendants a New Opportunity to Attract Investors
        and Potential Partners as the Market Repeatedly Responds Positively to
        Vaxart's Press Releases ...........................................................................31

    E.     With the Leak of a New Government Program Called Operation Warp
        Speed to Develop a Coronavirus Vaccine, Vaxart Intensifies Its Issuance
        of Press Releases While the Armistice Defendants Unload a Majority of
        Their Vaxart Stock Holdings ....................................................................37

VI.    DEFENDANTS' SCHEME TO MANIPULATE VAXART'S STOCK PRICE
      AHEAD OF THE ARMISTICE DEFENDANTS' UNDISCLOSED PLAN TO
      UNLOAD NEARLY ALL OF THEIR VAXART HOLDINGS BY THE END OF
      JUNE ...................................................................................................46

    A.     Defendants Seize on the Opportunity Presented by HHS Secrecy Around
        OWS and the Ability to Confuse and Mislead a Material Number of
        Investors to Manipulate Vaxart's Stock Price Ahead of Armistice's Exit ..............46

    B.     The Armistice Defendants Demand and Receive Amendments to Warrant
        Blockers ...................................................................................................51

C.  The Armistice Defendants Oust Latour as CEO Only Days After He Is Re-elected as Chairman and Install Floroiu as CEO in Furtherance of Their Scheme ..............................................................................................52

D.  Defendants Implement Their Stock Manipulation and Sale Scheme Through an Unprecedented Blitz of Public Statements Aimed to Convince the Investing Public that Vaxart Had Meaningful OWS Support and Was Quickly Moving Towards Production ...........................................................57

   1.  The June 15, 2020 Press Release Where Armistice and Boyd Express "Great Confidence" in Vaxart and Its New CEO as "Vaxart's Largest Institutional Investor" .......................................59

   2.  On June 18, 2020, Defendants State "Covid-19 Program Advancing Rapidly," "Phase 1 to Start in Summer," and "Manufacturing in Place" ................................................................62

   3.  The June 23, 2020 Press Release—Defendant Floroiu to Participate in Live Broadcast on June 25, 2020 (Timed with the Attwill Manufacturing Press Release) .................................................64

   4.  The June 24, 2020 Press Release: Vaxart Announces It Is Joining the Russell 3000 ......................................................................64

   5.  In a June 25, 2020 Press Release, Defendants Claim They Signed a Contract Enabling the Production of a Billion or More Doses a Year ...........................................................................................66

   6.  On June 25, 2020, Defendants Floroiu and Tucker Present at the H.C. Wainwright Virtual Fireside Chat Series, Reiterating the Importance of the Attwill Manufacturing "Agreement," Reaffirming Submission of IND Within Days, and Previewing "Besides, There May Be Other News, Partnering and So On" Shortly ...........................................................................................72

   7.  In a June 26, 2020 Press Release, Defendants Announce "Vaxart's COVID-19 Vaccine *Selected for* the U.S. Government's Operation Warp Speed" ................................................................................73

E.  The Market Reacts—Financial Press and Investors Continuously Interpret Vaxart's "Selection for" OWS Press Release as Defendants Hoped, up through July 22, 2020 ...............................................................................80

F.  The Armistice Defendants Liquidate Their Vaxart Holdings ........................85

G.  Defendants Raise $90 Million for Vaxart on the Heels of the Ten-Day Press Release Blitz Through an ATM Facility to Private Investors..........................87

H.  The Truth Emerges: Corrective Disclosure and Post-Class Period Events ..............88

VII.  MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS..................................................................................................96

A.  Pre-Class Period Statements—Despite Cancelling the Norovirus Program in Late 2019, Throughout 2020 Vaxart Materially Misled Investors to Believe It Had an Ongoing Norovirus Program .........................................................96

B.  Vaxart Materially Misled Investors When It Claimed Attwill Had the Capacity to Manufacture a Billion or More Doses of Vaxart's COVID-19 Vaccine .........................................................................................................99

C.  Vaxart Materially Misled Investors When It Claimed It Was "Selected For" Operation Warp Speed ...................................................................101

D.  Analysts and Journalists Interpreted Defendants' Press Releases the Way Defendants Thought They Would—Erroneously....................................102

VIII.  ARMISTICE'S CONTROL OVER DEFENDANTS' FALSE STATEMENTS ...............108

A.  Armistice Controlled Vaxart's Board of Directors .................................108

B.  Armistice Controlled Vaxart's Day-to-Day Operations Through the CEO ...........114

C.  Armistice Controlled a Majority, and then Plurality, of Vaxart's Common Stock ........................................................................................................117

D.  Vaxart's Advisors Were Beholden to Armistice ....................................118

E.  Armistice Directly Participated in the Drafting and/or Dissemination of Press Releases........................................................................................118

IX.  NO SAFE HARBOR.........................................................................................120

X.  CONTEMPORANEOUS TRADING .................................................................120

XI.  ADDITIONAL SCIENTER ALLEGATIONS .........................................................123

A.  Boyd, Maher, and the Armistice Defendants Had Motive and Opportunity to Commit Fraud and Participate in the Pump-and-Dump Scheme .......................123

B.  Vaxart's Desperate Financial Position, Need to Raise Cash, and Actually Raising Cash Three Times in the Class Period Show Additional Motive..............125

C.  Defendants' Imputed Knowledge of Facts Critical to the Core Operations...........126

XII.  CLASS ACTION ALLEGATIONS.....................................................................128

FIRST CAUSE OF ACTION  VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5(B) PROMULGATED THEREUNDER..............130

SECOND CAUSE OF ACTION  VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5(A),(C) PROMULGATED THEREUNDER ........................................................................................132

THIRD CAUSE OF ACTION  VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AS TO VAXART ........................................................133

FOURTH CAUSE OF ACTION  VIOLATIONS OF SECTION 20A OF THE
        EXCHANGE ACT ..........................................................................................135

FIFTH CAUSE OF ACTION  VIOLATIONS OF SECTION 20(A) OF THE
        EXCHANGE ACT AS TO ARMISTICE'S INSIDER TRADING...................139

PRAYER FOR RELIEF ........................................................................................141

JURY DEMAND....................................................................................................141

1

**TABLE OF DEFINED TERMS**

| TERM | DEFINITION |
|---|---|
| ¶ | Paragraph |
| F.# | Figure # |
| T.# | Table # |
| Armistice | Defendants Armistice Capital and Armistice Master Fund |
| Armistice Capital | Defendant Armistice Capital, LLC—the New York-based hedge fund founded by Defendant Boyd, which controlled a majority of Vaxart's Board members, installed Vaxart's present CEO, and owned a plurality of Vaxart's common stock in the first half of 2020. Armistice Capital also acted as the investment manager of Armistice Master Fund. |
| Armistice Master Fund | Defendant Armistice Capital Master Fund Ltd.—the Cayman Islands corporation owned by Armistice Capital, which was the beneficial owner of the Vaxart shares sold by the Armistice Defendants during the Class Period |
| Armistice Defendants | Defendants Armistice, Boyd, and Maher |
| Armistice Directors | Defendants Boyd, Maher, Davis, Floroiu, and Yedid (also referred to herein as the "Armistice-Controlled Directors") |
| Attwill | Attwill Medical Solutions Sterilflow, LP—contract manufacturer sought out by Vaxart to purportedly "manufacture a billion or more doses per year" of Vaxart's oral COVID-19 vaccine candidate |
| Attwill Press Release | The June 25, 2020 press release published by Vaxart in which Defendants claimed Vaxart had entered into an agreement with Attwill "to manufacture a billion or more doses per year" of its COVID-19 vaccine |
| BARDA | Biomedical Advanced Research and Development Authority |
| Board | Vaxart's Board of Directors |
| Boyd | Defendant Steven Boyd—Armistice Capital's founder, CIO, and managing partner and the director of Armistice Master Fund |
| Class | All persons or entities who purchased or otherwise acquired Vaxart securities during the Class Period and were thereby damaged |
| Class Period | The period from June 15, 2020, to August 19, 2020, inclusive |
| Davis | Todd Davis—a long-time business partner and "friend of Armistice's" appointed to Vaxart's Board at the direction of Armistice |
| Exchange Act | Securities Exchange Act of 1934 |
| FAC | The Corrected First Consolidated Amended Complaint (ECF No. 184) |
| FDA | U.S. Food and Drug Administration |
| Finney | Defendant Michael J. Finney—Vaxart Director |
| Floroiu | Defendant Andrei Floroiu—Vaxart CEO, former-Vaxart Director, and longtime friend of Defendant Boyd who was installed by the Armistice Defendants to further Armistice's plans for Vaxart |
| HHS | U.S. Department of Health and Human Services |

| Individual Defendants | Defendants Boyd, Davis, Finney, Floroiu, Latour, Maher, Tucker, and Yedid |
|---|---|
| Latour | Defendant Wouter Latour—former Vaxart CEO who was ousted by the Armistice Defendants to install Armistice-insider Floroiu |
| LifeSci | LifeSci Advisors, LLC—the public relations firm that consulted with Vaxart on its public statements and press releases during the Class Period, at which Defendant Yedid serves as a Managing Director |
| Maher | Defendant Keith Maher—Armistice Capital's managing director during the Class Period |
| NHP | Non-human primate challenge study |
| OWS | Operation Warp Speed—the United States's national program to accelerate the development, manufacture, and distribution of COVID-19 vaccines, therapeutics, and diagnostics |
| Partial Settlement | Refers to the July 27, 2022 Stipulation and Agreement of Settlement (ECF No. 224-2) between Plaintiffs and the Settling Defendants, which purports to release all claims in this action against the Settling Defendants in all capacities. The Partial Settlement also purports to release all claims against Non-Settling Defendants Boyd and Maher only in their capacities as Vaxart Directors, but in no way releases these Defendants in any other capacity. Further, the Partial Settlement does not purport to release Armistice from any liability.

On October 3, 2022, the Court granted preliminary approval (ECF No. 242) of the Partial Settlement and ordered that a Final Fairness Hearing shall be held on January 12, 2023. |
| Plaintiffs | Refers to Lead Plaintiffs Wei Huang and Langdon Elliot and Additional Plaintiff Ani Hovhannisyan |
| PSLRA | The Private Securities Litigation Reform Act of 1995 |
| "[R]oyaltyco" | In the healthcare field, a company that purchases the rights to royalty streams from a pharmaceutical product or service—typically, payments by a pharmaceutical company to a patent holder |
| SEC | U.S. Securities and Exchange Commission |
| Section 20A Subclass or Subclass | All persons or entities who purchased shares of Vaxart common stock contemporaneously with the Armistice Defendants' sales of Vaxart common stock on or about June 26 and June 29, 2020 |
| Settling Defendants | Defendants Vaxart, Davis, Finney, Floroiu, Latour, Tucker, and Yedid |
| "Selected for" OWS Press Release | The June 26, 2020 press release published by Vaxart in which Defendants claimed, among other things, that "Vaxart's COVID-19 Vaccine [had been] Selected for the U.S. Government's Operation Warp Speed" |
| Tucker | Defendant Sean Tucker—Vaxart's chief science officer |
| Yedid | Defendant Bob Yedid—the long-time personal and business friend of Defendant Maher, whom Armistice had appointed to Vaxart's Board |
| Vaxart or the Company | Defendant Vaxart, Inc. |

1

## I.    INTRODUCTION

2      1.    Pursuant to the Court's September 29, 2022 Oral Order (ECF No. 240) granting

3   Plaintiffs leave to amend, Plaintiffs Wei Huang, Langdon Elliot, and Ani Hovhannisyan, by and

4   through their respective undersigned counsel, bring this Corrected Second Amended Consolidated

5   Class Action Complaint alleging claims under the Securities Exchange Act of 1934 (the "Exchange

6   Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 against Vaxart, Inc.

7   ("Vaxart" or the "Company"), Armistice Capital, LLC ("Armistice Capital"), Armistice Capital

8   Master Fund, Ltd. ("Armistice Master Fund," and together with Armistice Capital, "Armistice"), and

9   certain current/former directors of Vaxart. Plaintiffs bring this action on behalf of themselves and (i) all

10  other persons or entities who purchased or otherwise acquired Vaxart securities between June 15, 2020

11  and August 19, 2020, inclusive (the "Class Period") and were thereby damaged (collectively, the

12  "Class") and (ii) all persons or entities who purchased or otherwise acquired Vaxart securities

13  contemporaneously with Defendants Armistice, Boyd, and Maher's sales of Vaxart securities on or

14  about June 26 and 29, 2020 ("Section 20A Subclass").

15     2.    Since filing the Corrected First Consolidated Amended Complaint (ECF No. 184)

16  ("FAC") on August 9, 2021, Plaintiffs have uncovered new and previously unreported information

17  regarding Defendants' knowing and purposeful scheme to exploit the global rush to develop and

18  manufacture an effective vaccine for COVID-19. This scheme involved the issuance of false and

19  deceptive statements regarding Vaxart's purported capacity to produce a COVID-19 vaccine and its

20  purported "selection for" Operation Warp Speed ("OWS"), all so that Defendants could inflate

21  Vaxart's stock price, and allow Armistice to unload its Vaxart holdings for approximately $267 million

22  in unlawful insider sales. Plaintiffs have thus amended the FAC to re-plead claims against Defendants

23  Armistice Capital, Boyd, and Maher and add new Defendant Armistice Master Fund (collectively,

24  "Armistice Defendants"). These new allegations and claims include:

25     ▪ **The Armistice Defendants Controlled Vaxart's Board, Management, and Press Releases.**

26        From September 30, 2019 (the date Armistice reported it owned a majority of Vaxart's publicly

27        traded common stock) through June 26, 2020 (the date Defendants publicly claimed Vaxart

28        had been "selected for" Operation Warp Speed), the Armistice Defendants exerted control over

the entirety of Vaxart's operations. The Armistice Defendants selected a majority of Vaxart's Board. They installed Defendant Floroiu, a former employee and longtime friend of Armistice Founder Steven Boyd, as CEO less than two weeks before the issuance of the false statements in dispute. Perhaps, most importantly, they drafted, approved, and/or directed the dissemination of Vaxart's pertinent press releases, including the drafting and/or dissemination of the (i) CEO Transition, (ii) Attwill, and (iii) "Selected for" OWS Press Releases.

- **The Armistice Defendants Had Long Plotted to Install Floroiu as CEO if Vaxart Did Not Get Government Funding.** In or before February 2020, the Armistice Defendants began a secret campaign, unknown by Vaxart management, to install Defendant Floroiu—a 20-year-long friend of Defendant Boyd and a former Armistice employee—as Vaxart's CEO to further consolidate Armistice's control over Vaxart and ultimately transform the Company into a New York-based pharmaceutical "royaltyco." The Armistice Defendants only paused the planned regime change when they saw an opportunity to position Vaxart as a potential recipient of COVID-19/BARDA funding from the U.S. Government (deciding to appoint Floroiu to the Vaxart Board in the interim). They resumed their plan, however, on or before Vaxart's June 8, 2020 Board meeting—as, by that date, they concluded that Vaxart would not receive BARDA funding. To that end, Defendants Boyd and Maher instructed Defendants Davis and Yedid to work with Vaxart's counsel and investment relations firm to quickly resolve Defendant Latour's resignation, and oversaw the drafting of a press release announcing the CEO change.

- **The Armistice Defendants Directed the Timing of the Attwill and "Selected For" OWS Press Releases and Forced Through Eleventh-Hour Changes to Vaxart's Insider Trading Policy.** On June 24 and 25, 2020, Defendants Boyd and Maher, knowing that Armistice intended to sell off its remaining Vaxart shares and warrants, instructed Defendant Floroiu to ensure that Vaxart's upcoming press releases, including the June 25 and 26, 2020 press releases at issue in this case, would be published before markets opened so that the news within would "hit the wire" (thereby inflating Vaxart's stock). Additionally, Defendants Boyd and Maher caused the Armistice-controlled Vaxart Board to amend Vaxart's insider trading policy (last modified just two weeks earlier) so that Armistice could cash out its Vaxart holdings on June

26 and 29, 2020, concurrent with the expected increase in trading volume caused by the press release blitz and institutions rebalancing their portfolios due to Vaxart joining the Russell Index. Absent an emergency insider trading policy amendment, Armistice would have been prohibited from trading during Vaxart's end-of-quarter stock blackout period, which prohibited insiders from stock transactions from June 24 (one week prior to the June 30 fiscal quarter end) until August 8, 2020 (two trading days after Vaxart released its quarterly report for that period).

- **The Armistice Defendants Drafted and Ordered the Publication of the "Selected for" OWS Press Release.** Within an hour of forcing through the eleventh-hour changes to Vaxart's insider trading policy (so that Armistice could sell stock during an otherwise prohibited blackout period), Defendant Boyd, on behalf of Armistice, instructed Defendant Floroiu to issue a press release (revised, approved, and/or reviewed by Boyd) falsely representing that Vaxart had been "[s]elected for the U.S. Government's Operation Warp Speed." Company emails confirm that, but for Armistice's interference, the Company planned not to announce its participation in a government-run non-human primate ("NHP") study—a fact management had deemed not to be material—until after the first primate had been dosed with Vaxart's vaccine (an as-yet unscheduled event). Boyd, however, threatened Floroiu that if Vaxart did not issue the press release immediately, Armistice would. Under this ultimatum, Vaxart issued the "Selected for" OWS Press Release before markets opened on June 26. Armistice, knowing that Vaxart had not actually been selected for OWS, then converted and liquidated the entirety of its Vaxart holdings—thereby reaping nearly $320 million in insider trading proceeds.

3.     Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, documents obtained from the Company and certain Defendants, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the ongoing independent investigation of their undersigned counsel, which includes a review of: Defendants' press releases, conference call transcripts, filings with the SEC, and other public statements; news stories, analyst reports, and other public information concerning Vaxart and/or the industry within which it operates; and interviews with former Vaxart employees and/or others familiar with the Company, as well as the review of documents obtained to date.

## II.     SUMMARY OF THE ACTION

4.     This action arises from a brazen fraud and stock manipulation scheme orchestrated by officers and directors of a struggling pharmaceutical company and a rapacious hedge fund to deliberately exploit the global rush to develop and manufacture an effective vaccine for COVID-19. Defendants' classic pump-and-dump scheme constituted a device, scheme, or artifice to defraud investors through the agreement and concerted action of the Defendants to issue and/or disseminate a series of deceptive statements, all with the intent of artificially inflating Vaxart's stock price long enough for the Armistice Defendants to unload their controlling interest in Vaxart shares and warrants (to the tune of nearly $320 million) in violation of Rule 10b-5(a). Defendants' string of misleading half-truths and falsehoods constituted an agreed-upon and coordinated act, practice, or course of business in violation of Rule 10b-5(c) that was intended to operate—and did operate—as a fraud or deceit upon investors who purchased Vaxart's stock during the Class Period and were damaged thereby as Armistice dumped tens of millions of Vaxart shares on buyers who were not in on the scheme. Finally, even if there had been no agreement or concerted action by the Defendants to perpetrate this scheme, Defendants violated Rule 10b-5 by issuing and/or disseminating materially false or misleading statements. The Armistice Defendants further violated Section 20A by virtue of their sales of over $320 million in Vaxart shares while in possession of material adverse nonpublic information.

5.     Vaxart is a small clinical-stage biotechnology company in South San Francisco, California, that purports to be primarily focused on the development of oral, tablet-based vaccines. Founded in 2004, it has never successfully brought a vaccine to market and has yet to make a single dollar in net income in any individual year or quarter of its existence. Throughout 2019, Vaxart stated that its top research and development ("R&D") priorities were vaccines for norovirus, seasonal influenza, respiratory syncytial virus ("RSV"), and human papillomavirus ("HPV"). During virtually all of 2019, Vaxart's common stock traded at or well below $1.00, and its decline (and resulting diminished market capitalization) made it a low-budget target for a possible takeover. Indeed, by the end of September 2019, Defendant Armistice Capital, a New York-based hedge fund, had accumulated a majority of Vaxart's common stock at prices ranging between $0.30 and $0.40 per share.

6.     The Armistice Defendants quickly used their large stake in Vaxart to put Armistice and

its two principals—Defendants Steven J. Boyd and Keith Maher—in control of Vaxart and expand the Board of Directors to eight seats, four of which were filled by Boyd, Maher, and their close personal/business friends—Defendants Bob Yedid and Todd Davis. Looking for ways to flip their Vaxart holdings for a profit, the Armistice Defendants, on the day after Christmas 2019, caused Vaxart's Board to lay off everyone in Vaxart's manufacturing division, and shut down its norovirus vaccine program, which the Company had spent much of 2019 touting. After cutting staff, Vaxart had only about 12 to 16 full-time employees. The Armistice Defendants then pursued their plan to transform Vaxart into a pharmaceutical "royaltyco" (meaning Vaxart would license its technology or purchase the rights to royalty streams from another pharmaceutical company)—that is, until a once-in-a-lifetime pandemic interfered.

7.      On January 30, 2020, the World Health Organization ("WHO") declared the outbreak of COVID-19 a "Public Health Emergency of International Concern." What was a disaster for humanity proved to be an extraordinary opportunity for Armistice (and various cooperating Individual Defendants) to execute a pump-and-dump scheme. Defendants wasted no time in testing investors' appetite for buying shares of companies that touted some kind of connection to a possible COVID-19 vaccine. Before the market opened on January 31, 2020, Vaxart—despite never having successfully developed a commercial vaccine over its 16 years in business—issued a press release, reviewed and edited by the Armistice Defendants, stating that the Company had begun work to "develop a coronavirus vaccine candidate based on its proprietary oral vaccine platform." In response, Vaxart's stock price soared that day to close at $1.25 per share, up from the prior day's closing of $0.73 per share—a stunning one day increase of 71%.

8.      Thereafter, Defendants repeatedly observed how easily they could cause Vaxart's stock price to materially increase every time the Company issued a statement (including those constituting misleadingly incomplete half-truths) that purported to announce positive developments in connection with it its purportedly robust efforts to research, develop, and manufacture an effective COVID-19 vaccine. Between March 18 and April 28, 2020, Defendants caused Vaxart to publish four press releases related to the Company's purported vaccine program—each of which were reviewed, edited, and/or sent to the Armistice Defendants for approval prior to release. After each publication,

Defendants witnessed a noticeable jump in Vaxart's stock price. Between the close of trading on March 17 and opening of early trading on April 28, 2020, Vaxart' stock roughly doubled from $1.93 to $3.85.

9.      On April 29, 2020, news began to leak of a new (as of then, non-publicly known) U.S. Government "Manhattan Project-style" initiative called "Operation Warp Speed" that would provide huge amounts of government support to fund a small (but yet then unnamed) group of vaccine manufacturers. The Armistice Defendants immediately took advantage of the speculation-induced spike in Vaxart's stock price by dumping nearly 10% of their Vaxart holdings in a single day. They also quickly surmised that the prospect of government funding could lead to far more lucrative opportunities for the Defendants to manipulate investors in order to reap far greater rewards. Indeed, while a news-starved public fretted about whether government efforts could temper the pandemic, Defendants had already begun private discussions with U.S. Government agencies on Vaxart's longshot chance of producing an actually viable, oral COVID-19 vaccine.

10.     After two weeks of swirling rumors and resulting swings in the stock prices of numerous pharmaceutical companies, the White House officially confirmed OWS's existence on May 15, 2020, and announced that the program had narrowed its evaluation of 100 candidates down to a short list of 14. Before long, Bloomberg and the *New York Times* further reported (on June 3, 2020) that OWS had selected a final list of seven or eight companies for funding, and identified five that had purportedly made the final cut—all of which were "big pharma" companies. With five candidates identified, speculation mounted as to the identities of the unknown two or three. Continuing its "no comment" approach, nobody in the federal government was talking about who might or might not still be in the running for OWS selection.

11.     Though secrecy surrounded the remaining two or three OWS participants, the Armistice Defendants and Controlled Directors knew by June 3, 2020, that there was little hope in Vaxart's prospects for OWS selection. As Floroiu noted in a May 10, 2020 email to Boyd and Maher (and later circulated to Yedid and Davis), the Armistice-Controlled Defendants had doubted whether Vaxart's platform could compete in the "conventional race" against "big-pharma" companies like Moderna— whose OWS selection had been announced days later. By June 3, 2020, Defendants knew or recklessly disregarded that Vaxart's COVID-19 vaccine candidate was not remotely close to satisfying the strict

selection criteria for OWS. Defendants also knew of the extent of Vaxart's limited communications with U.S. Government entities regarding government funding. In the immediate aftermath of the June 3, 2020 Bloomberg and *New York Times* articles, Floroiu acknowledged defeat, texting Boyd and Maher: "I think this means no BARDA money, right?" And on June 4, 2020, Floroiu followed up with Boyd: "I have no doubt that we should've and could've done a lot better on both government support and corporate partnerships. But this company just can't sell. And the window of opportunity is closing up soon (if it already hasn't on BARDA . . .)."

12.    Nevertheless, Defendants knew at the same time that investors were effectively operating in the dark as to Vaxart's actual (*i.e.*, negligible) capabilities and OWS's (non-existent) interest in including Vaxart in OWS's accelerated vaccine development program. Additionally, Defendants knew that investor sentiment toward Vaxart stock—and Vaxart's resulting stock price—could be readily manipulated by misleading a significant portion of the buy-side market for vaccine stocks into believing that Vaxart's vaccine had a realistic shot at making OWS's short list or otherwise had sufficient promise to be a serious candidate for expedited development and mass-scale production. If successful, Defendants could create at least a short-lived "pop" in their stock price, giving them the opportunity to sell into that "pop." The final catalyst for this pop would be the announcement of Vaxart's purported involvement in a minor government study of dubious value to Vaxart: namely, participation in a non-human primate challenge study to demonstrate the efficacy of Vaxart's oral COVID-19 vaccine candidate conducted by the Biomedical Advanced Research and Development Authority ("BARDA"), a division of the federal government's Department of Health and Human Services ("HHS").[1] Defendants' scheme would further be aided by government secrecy, which declined to disclose the particulars of OWS or the NHP study, and would neither confirm nor deny rumors of who the select few unnamed shortlist candidates might be.

13.    Accordingly, Defendants—knowing that (i) false and misleading headlines regarding

---

[1] As discussed below, *see* Part VI.D.7, *infra*, ¶ 184, Vaxart's participation in the NHP study had been deemed "non-material information" by the Company, during the June 8, 2020 Board meeting and later after a discussion amongst management and outside legal counsel. As such, Vaxart management elected to wait to issue a press release until after primates had been dosed—that is, until they were ordered otherwise by the Armistice Defendants.

the Company's COVID-19 vaccine would likely inflate (even temporarily) Vaxart's stock price and (ii) U.S. Government officials would likely remain silent about the particulars of OWS—plotted to inflate Vaxart's stock price. If successful, the Armistice Defendants would earn hundreds of millions of dollars from the liquidation of their Vaxart holdings. Vaxart, in turn, could obtain additional financing for its pharmaceutical developments using an artificially high stock price—all at the expense of the large number of investors that were the intended dupes of Defendants' manipulations.

14.     Rather than take any chances, the Armistice Defendants further solidified their ability to force Vaxart's hand in the days leading up to Vaxart's June 8, 2020 Annual Shareholder Meeting. To do so, the Armistice Defendants first needed to restart their efforts to oust Defendant Latour and install Boyd's longtime friend and ally, Defendant Floroiu, as an even more pliant, Armistice-controlled Vaxart CEO. Internal Vaxart communications confirm that the Armistice Defendants had plotted this replacement as early as February 2020 but had placed the plan on hold when COVID-19 lockdowns in the United States raised the possibility that Vaxart could earn funding from BARDA, with the plan to recommence if Vaxart did not get the funding. Additionally, these communications show that on or about June 3, 2020, when it became clear to the Armistice Defendants that BARDA funds were not going materialize, the plan of Floroiu "becoming CEO [wa]s again on the front burner."

15.     On June 8, 2020, Vaxart held its Shareholder Meeting, at which Defendants Boyd, Maher, Davis, Yedid, and Floroiu were reapproved as directors, followed by a 10:00 AM meeting with the Board. Defendant Latour began this Board meeting by providing an update as to the status of Vaxart's COVID-19 program and its invitation to participate in a BARDA-administered non-human primate challenge study. Text message communications show that within minutes of this update— which further confirmed to Armistice that Vaxart was not getting OWS funding—Boyd texted Floroiu to confirm that Latour's ouster and Floroiu's CEO installation would go forward that day. Floroiu, in turn, circulated to Defendants Boyd and Maher a PowerPoint presentation outlining his plans for the Company, including an aggressive, public relations ("PR") campaign to raise Vaxart's media profile.

16.     Over the next few days, the Armistice-Controlled Directors wasted little time in orchestrating Latour's removal through an email-based transition group managed by Defendant Davis. At Armistice's direction, Davis was charged with finalizing Floroiu's employment terms. Meanwhile,

Defendant Yedid, with the aid of LifeSci Advisors (Vaxart's PR firm, referred to herein as "LifeSci"), was instructed to draft a press release regarding the CEO transition, which was further dictated and refined by Defendants Boyd and Maher. The Armistice-Controlled Directors completed the forced CEO transition by June 13, 2020. The Armistice Defendants could now be confident that there would be no unexpected deviations from the cleverly prepared script for the final steps of the Armistice-led pump-and-dump scheme.

17.     Over the next ten days, Defendants orchestrated an unprecedented-for-Vaxart, press-release and public-relations blitz orchestrated to drive up Vaxart's stock price ahead of Armistice's liquidation of its remaining Vaxart holdings, to be completed by the end of June. First, on June 15, 2020, Defendants caused the Company to publish a press release announcing the CEO transition, in which Defendant Boyd proclaimed "'great confidence'" as "'Vaxart's largest . . . investor'" in Floroiu's "'ability to generate substantial shareholder value by unlocking [Vaxart's] tremendous potential.'" The release omitted the Armistice Defendants' plan to exit Vaxart by the end of the month. The next morning, Boyd shared with Floroiu that Vaxart's stock price was 10% up and noted that short interest had significantly increased over the past three weeks, stating "That's a lot of shares to cover!"[2]

18.     Second, on June 18, 2020, Defendants announced and filed with the SEC a presentation they would make at a Raymond James and H.C. Wainwright investor conference within the week. In that presentation, Defendants claimed the Company's "COVID-19 program [was] advancing rapidly" and that they were ready to submit their Investigative New Drug application before the end of the month. Defendants also compared themselves to the five known OWS-selected vaccines and claimed their "GMP Bulk Vaccine [was] in Progress."

19.     Third, on June 24, 2020, Defendants announced that Vaxart would join the Russell 3000 stock market index in the annual reshuffling, which would take place (as known by the market) three days later, driving up demand for the stock as index funds and institutional investors would need to rebalance their portfolios to include Vaxart.

---

[2] With many traders short, these traders would need to cover their short positions to limit their losses if Vaxart's stock price somehow rose, thus creating more buying pressure on Vaxart's stock and causing its stock price to increase further.

20.    Fourth, before the market opened on June 25, 2020, Vaxart announced that it had partnered with Attwill Medical Solutions Sterilflow, LP ("Attwill") "'to manufacture a billion or more doses per year . . . of our COVID-19 vaccine for the US, Europe, and other countries in need.'" The timing of the press release was dictated by the Armistice Defendants so that it would hit the news wires and drive up the opening price for Vaxart shares. *See* ¶ 173. Further, the statements therein were calculated to create the materially false and misleading impression that Vaxart's vaccine candidate was sufficiently promising and far enough along in development that it was commercially reasonable for Vaxart to engage a putative manufacturer (Attwill) about producing "a billion or more" doses of Vaxart's vaccine candidate. Indeed, internal communications confirm that it was Defendant Floroiu—not Attwill—who specifically added the "billion or more" language to the Attwill press release. Moreover, after Floroiu spoke with Maher on June 24, Floroiu told the team to "flip the subtitles, start with the Big Bang first"—meaning the "billion or more" phrase. Unbeknownst to investors, however, in reality Attwill lacked the required certifications from the U.S. Food and Drug Administration ("FDA") to produce any vaccines, lacked the ability to meet FDA manufacturing standards for commercial vaccine production at any time in the foreseeable future, and lacked the necessary personnel or operational capabilities to even begin to contemplate the production of "a billion or more" vaccine doses. Nonetheless, the market predictably reacted extremely favorably to this announcement—just as Defendants had intended—as it caused Vaxart's stock price to double, closing at $6.26 (up $3.07 from its closing price of $3.19 the previous day).

21.    Fifth, at the broadcasted H.C. Wainwright Fireside Chat, also on June 25, 2020, Defendants reiterated their purported plans to submit an investigative new drug ("IND") application by the end of June 2020 and "news" of the Attwill "agreement with a major player that had great (inaudible) capabilities. So now that solves one of, what I would say, our biggest technical bottleneck in terms of manufacturing." Finishing up their presentation, Defendant Floroiu stated, as a preview for the next day's bombshell: "Besides that, there may be some other news on other fronts, partnering and so on that we'll release whenever they happen."

22.    Finally, having primed the market to believe that Vaxart was ready to produce at least a billion COVID-19 vaccines per year, the next day—June 26, 2020—Defendants delivered the master

stroke of their carefully calculated deception to create the pop in the stock price they expected. Specifically, the Armistice Defendants caused Vaxart to issue a press release boldly headlined: "**Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed**." With artfully worded care in support of their artifice to defraud, the release quoted Vaxart's newly installed CEO, Defendant Floroiu, as stating: "'We are very pleased to be *one of the few* companies *selected by* Operation Warp Speed, and that ours is the only oral vaccine being evaluated.'" (Emphasis added.) The press release also noted that Vaxart "has been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed"—language that was plainly calculated to give the Defendants at least some basis to later claim that they had adequately disclosed their "selection" was only for the NHP study.

23.    Though Vaxart's management and outside legal counsel had planned to publish a press release for the NHP study *after* Vaxart had actually dosed primates (and had deemed Vaxart's mere selection for the NHP study to be immaterial), Defendant Boyd, in his capacity as Armistice's owner, ordered Vaxart to issue the press release less Armistice do it itself, writing: "With all due respect, as a Firm, we are unsure if we agree with your assessment [that the NHP news is not material]. If the Company is not willing to release the information, Armistice may choose to do so."

**F.1    Excerpt from June 25, 2020 Email Exchange from Boyd to Floroiu Demanding that Vaxart Publish the "Selected For" OWS Press Release by the Following Morning**

| | |
|---|---|
| **From:** | Steven Boyd [██████@armisticecapital.com] |
| **Sent:** | 6/25/2020 7:36:03 PM |
| **To:** | Andrei Floroiu [██████@vaxart.com] |
| **CC:** | Margaret Echerd [██████@vaxart.com]; Daniel Radden [██████@armisticecapital.com]; Faith Charles [██████@thompsonhine.com] |
| **Subject:** | Re: Preclearance |

With all due respect, as a Firm, we are unsure if we agree with your assessment. If the Company is not willing to release the information, Armistice may choose to do so.

Best,
Steve

24.     Defendants' artfully worded press release dramatically overstated the Company's involvement with OWS. As Defendants plainly understood, the NHP challenge study was a BARDA-run program—and one that was separate from Operation Warp Speed's well-publicized support of a select few vaccine manufacturers by spending billions of dollars to develop at "warp speed" an effective vaccine that could be produced commercially in massive amounts in a year or less. Vaxart's vaccine had not, in any sense of the word, been "selected for" Operation Warp Speed. And the June 26 press release's emphasis on Vaxart having been "'one of the few companies selected by Operation Warp Speed'" was plainly a calculated effort to exploit investor uncertainty at a time when the identities of the remaining two or three pharmaceutical companies actually "selected for" OWS—as that term was widely understood from well-publicized prior media reports—was a focus of intense investor interest. Indeed, in drafting the press release, Defendants added "OWS" to the title to "move the needle," as the "[k]ey message [wa]s to link Vaxart to OWS, that's the only thing people will see." Additionally, Vaxart's management and outside counsel had all agreed that Vaxart's participation in the NHP trials was immaterial news and was not required to be disclosed under federal law.

25.     Within minutes of hitting the wire, Vaxart received inquiries from sophisticated news outlets—including Bloomberg, *Business Insider*, Investor's Business Daily, and NBC—all seeking to speak with the Company's CEO regarding its purported selection for OWS from the shortlist of developers (narrowed from 14 to 8). Yet despite LifeSci's numerous requests that Vaxart provide an "informed answer" to the media response, Floroiu refused to provide any public clarity, suggesting at one point maybe they should respond, "We don't know anything about lists. Or better not to answer this at all?"

26.     As planned by the Armistice Defendants, Vaxart's stock price skyrocketed in response to the June 26, 2020 press release, climbing to an intraday high of $14.30—a stunning increase of nearly 130% from its June 25 close of $6.26, and more than quadrupling in less than two full trading days compared to its closing price of only $3.19 on June 24, 2020.

27.     The Armistice Defendants, having orchestrated the events leading up to this moment, were ready to act immediately after the press release was issued—and the speed with which they acted evidences their planning ahead of time to both convert Armistice's warrants into common stock and

sell. On Friday, June 26, the Armistice Defendants not only exercised the entirety of their 16,666,667 "0.30 Warrants," but sold all of the resulting shares—and an additional 1,560,000 of their pre-existing holdings of Vaxart common shares—at an average price of $10.38 per share. Although this extraordinary post-press-release selling by the Armistice Defendants ultimately drove the price of Vaxart common shares down to $8.04 at the close, the size of the insider selling profits that the Armistice Defendants reaped from just this single day of trading was nothing short of astonishing, as they collected proceeds of nearly $190 million on their insider selling of 18,226,667 million shares.

28.     But even this was not the end of the Armistice Defendants' greed and resulting profits. On Monday, June 29, Armistice exercised its remaining 4,090,909 warrants (its "$1.10 Warrants"), and sold all of those resulting shares—plus another 5,294,477 of its pre-existing holdings of Vaxart common shares—at an average price of $8.29. These sales—which left Armistice with a mere 145,523 shares of the more than 45 million shares that it had owned or had warrants on as of just two months earlier—produced further insider selling proceeds of over $77.8 million.

29.     In sum, the Armistice Defendants grossed over $320 million from the scheme that they had orchestrated and had been able to successfully pull off in concert with the actions of the other Defendants. Plaintiffs estimate that at least $290 million of this $320 million represented pure profit.

30.     The truth about Defendants' manipulative scheme was partially revealed on Saturday, July 25, 2020, in a *New York Times* article entitled "Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine." Focusing largely on Vaxart, the article stated that "Vaxart is not among the companies selected to receive significant financial support from Operation Warp Speed to produce hundreds of millions of vaccine doses." Moreover, the article also explained that Vaxart's NHP participation was merely a trial "organiz[ed] in conjunction with Operation Warp Speed"—but in no way represented "selection" for OWS. The article also quoted HHS's assistant secretary for public affairs as stating that HHS had neither agreed to fund Vaxart's COVID-19 vaccine, nor even negotiated with Vaxart to do so. Indeed, the *New York Times* article reported that, after HHS had reviewed Vaxart's misleading claims about its participation in OWS and Armistice's concurrent stock sales, HHS had "relayed [its] concerns to the Securities and Exchange Commission." In response to this news, Vaxart's common stock tumbled the next trading day, on Monday, July 27, 2020, falling 9%

compared to Friday's closing price.

31.    After the close of the market on Wednesday, August 19, 2020 (the last day of the Class Period), *Business Insider* published an article quoting Moncef Slaoui ("Slaoui"), the head of OWS, as stating that companies, such as Vaxart, had "'misled'" shareholders as to their purported connections to OWS in order to drive up their common stock price. As Slaoui stated:

> There's been a number of cases where companies have, frankly, made press releases that have frustrated the hell out of me because they misled, I think, their shareholders and their share price went up the roof just by saying the words Operation Warp Speed in the title of the press release.

In response, Vaxart's common stock price fell 4.3% the following trading day.

32.    By this action, Plaintiffs, on behalf of themselves and the class they seek to represent, seek to obtain a recovery for, *inter alia*, the substantial losses that they have suffered as a result of the fraudulent scheme, course of conduct, and actionably false and misleading statements alleged herein, as well disgorgement by the Armistice Defendants of the massive ill-gotten profits (estimated to be roughly $290 million) that they reaped in connection with their insider selling activities while in the possession of material, nonpublic information about Vaxart.

## III.    JURISDICTION AND VENUE

33.    This action arises under Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

34.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

35.    Venue is proper in this District pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) and (c). At all relevant times, Vaxart was headquartered and conducted business in this District at 385 Oyster Point Boulevard, Suite 9A, South San Francisco, California 94080. In addition, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

36.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of national securities exchanges.

1  **IV.    PARTIES**

2  **A.    Plaintiffs**

3       37.    Lead Plaintiffs Wei Huang and Langdon Elliot ("Lead Plaintiffs"), as set forth in their

4  certifications previously filed with the Court, purchased Vaxart common stock during the Class Period

5  and were damaged by Defendants' conduct as alleged herein.

6       38.    Additional Plaintiff Ani Hovhannisyan ("Additional Plaintiff") purchased Vaxart

7  common stock during the Class Period and was damaged by Defendants' conduct alleged herein. She

8  purchased contemporaneously with the false and misleading statements issued by the Defendants, as

9  well as Defendant Armistice's sale of Vaxart common stock.

10 **B.    Vaxart Defendants**

11      39.    Defendant Vaxart, Inc. is a corporation organized under Delaware law and

12 headquartered at 385 Oyster Point Boulevard, Suite 9A, South San Francisco, California. The

13 Company effectively went public on February 13, 2018, via a reverse merger with the then-publicly

14 traded Aviragen Therapeutics, Inc. Vaxart's common stock trades on the Nasdaq Capital Market

15 ("NASDAQ") under the symbol "VXRT." Vaxart purports to be a clinical-stage biotechnology

16 company primarily focused on the development of oral recombinant vaccines based on its proprietary

17 oral vaccine platform. Throughout the first half of 2020, Vaxart had 12 to 16 full-time employees, of

18 which approximately half were engaged in research and development. The remaining employees were

19 engaged in finance, human resources, administration, and business and general management.

20 **C.    Individual Defendants**

21      40.    Defendant Steven J. Boyd ("Boyd") served as a director of Vaxart from October 25,

22 2019 until his resignation on January 28, 2021. Boyd is Armistice Capital's founder, sole owner, Chief

23 Investment Officer ("CIO"), and Managing Partner. At all material times, Boyd also served as director

24 of Armistice Master Fund, which held the shares of Vaxart at issue here. Boyd authorized and approved

25 the Armistice warrant amendments, which he benefited from as sole owner of Armistice. Throughout

26 the events in question, Boyd signed all of Armistice's corporate filings on Armistice's behalf and

27 reviewed and controlled the timing of several press releases, including the Attwill and OWS press

28 releases discussed below.

41.    Defendant Keith Maher ("Maher") served as a director of Vaxart from October 25, 2019 until his resignation on January 28, 2021, and at all material times was a member of Vaxart's Compensation Committee and reviewed and controlled the timing of several press releases, including the Attwill and OWS press releases discussed below. From 2019 to 2022, Maher also served as Armistice's Managing Director. Maher authorized and approved the Armistice warrant amendments.

42.    Defendant Cezar Andrei Floroiu ("Floroiu")—Defendant Boyd's friend of nearly 20 years—has served as Vaxart's CEO since June 14, 2020, after having first been appointed as a member of Vaxart's Board of Directors on April 13, 2020 (a position he also continues to hold), at the direction of the Armistice Defendants. Prior to being appointed to these positions at Vaxart, Defendant Floroiu had been employed by Armistice Capital, as a Senior Analyst from January to August 2013. Floroiu also previously worked with Defendant Boyd at McKinsey & Company ("McKinsey"). During the Class Period, Floroiu was viewed by others working closely with Vaxart as a "first time CEO" who was "smart, but clueless . . . and a plaything of Armistice." As a member of the Board, Floroiu worked at the behest of the Armistice Defendants, and outside the knowledge of Vaxart's independent directors or management, on potential "deals" concerning Vaxart's platform, as well as Armistice's plan to install Floroiu as Vaxart's CEO. After his appointment, Floroiu communicated with the Armistice Defendants multiple times per week by phone, email, and text message regarding how to manage Vaxart's affairs according to Armistice's game plan. Floroiu frequently ran Vaxart management decisions by the Armistice Defendants and asked for their permission to engage in certain actions even after Armistice sold off the bulk of, and then the entirety of, its Vaxart holdings.

43.    Defendant Wouter W. Latour ("Latour") became Vaxart's President and CEO, as well as a member of its Board of Directors, in February 2018. He was thereafter appointed Chairman of Vaxart's Board of Directors in December 2019. Although Latour was replaced as Vaxart's CEO by Defendant Floroiu on June 14, 2020, Latour continues to serve as a director and as Chairman of Vaxart's Board.

44.    Defendant Robert A. Yedid ("Yedid")—a close personal friend of Defendant Maher—is a Vaxart Director selected by the Armistice Defendants and was appointed when Armistice was in control of Vaxart. Yedid has served on Vaxart's Board since October 25, 2019, and is a member of

Vaxart's Audit Committee. Since 2014, Yedid has been Managing Director of LifeSci Advisors, LLC, a healthcare-dedicated investor relations/public relations firm. At all relevant times, Yedid frequently did business with Armistice and privately shared contacts with Maher to build up each other's respective business networks. The two also texted frequently during the course of their work together on personal, religious, and familial matters. In the words of one Vaxart Director, Maher and Yedid were "like brothers." After working with Maher on Vaxart for over a year, Yedid relayed that he "value[d] [Maher's] advise and friendship" and thanked Maher for giving him a "seat at the table."

45.     Defendant Todd C. Davis ("Davis") is a Vaxart director selected by the Armistice Defendants and was appointed when Armistice was in control of Vaxart. Davis has served on the Board and as a member of its Compensation Committee since October 25, 2019. Davis is the founder and managing partner of RoyaltyRx Capital, LLC, a bio-pharma investment fund, and had previously invested alongside Armistice in at least one other company. As Boyd himself stated in an email from April 2020, Davis was a "friend of Armistice's." Davis also authorized and approved the amendment to the warrant agreements with Armistice. *See also* ¶¶ 70-71, 253 (elaborating on Davis's connections with Armistice and Boyd).

46.     Defendant Michael J. Finney ("Finney") has served as a director of Vaxart since 2007. From 2009 until 2011, Finney served as CEO of Vaxart. Finney is a member of Vaxart's Audit Committee.

47.     Defendant Sean N. Tucker ("Tucker") is Vaxart's founder and Chief Scientific Officer. He has served as Chief Scientific Officer since February 2010.

48.     The Defendants named in ¶¶ 40-47 are collectively referred to herein as the "Individual Defendants." The Individual Defendants, by virtue of their positions with the Company, possessed the power and authority to control the contents of Vaxart's SEC filings, public statements, and presentations to securities analysts, investors, and other market participants. Each Individual Defendant was provided with copies of the Vaxart statements and public filings alleged herein to be materially false or misleading prior to, or shortly after, their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material nonpublic information, each of these Defendants knew that the material adverse

facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were materially false and/or misleading when made. Each Individual Defendant is liable for the false statements pleaded herein, as those statements were each "group-published" information and the result of the collective actions of these Defendants pursuant to a common scheme and wrongful course of conduct.

49.    Defendants Davis, Floroiu, Finney, Latour, Tucker, and Yedid are collectively referred to as the "Settling Individual Defendants." On July 27, 2022, Plaintiffs, Vaxart, and the Settling Individual Defendants entered into a Partial Settlement (ECF No. 224-2), which proposes to release all claims in this action against Vaxart and the Settling Individual Defendants in all capacities. The Partial Settlement also proposes to release claims against Non-Settling Defendants Boyd and Maher, but only in their capacities as Vaxart Directors. On October 3, 2022, the Court granted preliminary approval (ECF No. 242) of the Partial Settlement and ordered that a Final Fairness Hearing shall be held on January 12, 2023.

**D.    Armistice**

50.    Defendant Armistice Capital, LLC ("Armistice Capital") is a New York, New York-based hedge fund founded in April 2012 by Defendant Boyd, which focuses on health and consumer companies. Armistice is the parent and controlling entity of several Armistice-labeled funds, including Defendant Armistice Capital Master Fund Ltd. During the Class Period, Defendant Boyd was the Founder, CIO, and Managing Partner of Armistice Capital, and Defendant Maher served as Armistice Capital's Managing Director.

51.    Defendant Armistice Capital Master Fund Ltd. ("Armistice Master Fund") is incorporated in the Cayman Islands. The Armistice Master Fund is headquartered at Armistice Capital's mailing address. The Armistice Master Fund held the shares of Vaxart at issue here. Defendant Boyd is Armistice Master Fund's director.

52.    Collectively, Armistice Capital and Armistice Master Fund, are referred to as "Armistice" herein. Additionally, Armistice, Boyd, and Maher are referred to herein as the "Armistice Defendants."

53.    In August 2018, Armistice began acquiring shares in Vaxart and, by late 2019, became

a controlling shareholder by purchasing Vaxart shares during a September 2019 public offering and in the open market. As of September 30, 2019, Armistice owned approximately 52% of the voting power of Vaxart's outstanding shares of common stock, making Vaxart a "controlled company" within the meaning of applicable NASDAQ listing rules. According to the Schedule 13D/A[3] the Armistice Defendants filed on October 7, 2019 with the SEC, by October 2, 2019, Armistice owned 65.2% of Vaxart's shares.

54.     After becoming Vaxart's controlling stockholder, Armistice, under the control and direction of Defendants Boyd and Maher, promptly took over Vaxart's Board and appointed Boyd and Maher as directors of Vaxart's then-eight-member Board. At the same time, Armistice also directed the appointment of Defendant Yedid—a close and longtime personal friend of Defendant Maher—and (in Defendant Boyd's words) "friend of Armistice's" Defendant Davis.

55.     Prior to Vaxart, Boyd and Maher, by virtue of their control of Armistice, had previously worked with Defendants Yedid and Davis when Armistice held over 3 million shares of specialty pharmaceutical company BioDelivery Sciences International, Inc. ("BDSI"), and participated in a $50 million equity financing deal with that company. At one point, in May 2016, Armistice was BDSI's second-largest beneficial owner, after Broadfin Capital, LLC, who also served as a major Vaxart shareholder. Throughout Armistice's ownership of BDSI, Armistice worked with Davis, a BDSI board member, and Yedid, who served as managing director of BDSI's public relations firm and frequently signed BDSI press releases himself. As discussed in detail herein, Defendants Yedid and Davis, given their deep, personal and business ties to Defendants Boyd and Maher, served as Armistice-controlled members of Vaxart's Board during the Class Period.

56.     Additionally, in February 2020, after installing Yedid and Davis as Armistice-Controlled Vaxart Directors, Defendants Boyd and Maher began steps to install Defendant Floroiu—Boyd's friend for over 20 years—as Vaxart's CEO, thus further consolidating Armistice's control. As

---

[3] Schedule 13D is a form that must be filed with the SEC when a person or entity acquires more than 5% of a voting class of a company's shares. Schedule 13D is intended to provide transparency to the public regarding who a company's significant shareholders are and the extent of their stake. A Schedule 13D/A is an amendment to a prior Schedule 13D, providing an update on a previously reported person or entity's holdings.

discussed herein, Boyd offered Floroiu the position via text message, and Defendant Maher assisted Floroiu with preparing his résumé, including by deleting references to Floroiu's past employment at Armistice. Throughout February and March 2020, Boyd, Maher, and Floroiu frequently texted on the strategy for Floroiu's takeover, beginning with his introduction to Vaxart's other directors, including, in Floroiu's words, "the two that are not [Armistice]"—*i.e.*, Defendant Finney and non-party, former-director Anne VanLent. In April 2020, Boyd and Maher had Floroiu appointed as a director to Vaxart's Board. And on June 8, 2020, Boyd and Maher formally initiated the ouster of Defendant Latour to install Defendant Floroiu as Vaxart's CEO.

57. Throughout all relevant periods discussed herein, Armistice controlled Vaxart by virtue of its outsized holdings of Vaxart securities, the directors it placed on Vaxart's Board, and its influence over Floroiu as CEO. *See also* Part VIII, *infra*, ¶¶ 250-282 (additional allegations of Armistice's control).

58. In its Form 10-K filed March 19, 2020, the Company recognized Armistice's continuing effective control, publicly stating that:

> Armistice . . . as of March 17, 2020, still beneficially owned more than 35% of the voting power of our outstanding shares.
>
> As a result, Armistice has the ability to substantially influence us and exert significant control through this ownership position. Armistice may significantly influence the elections of directors, issuance of equity, including to our employees under equity incentive plans, amendments of our organizational documents, or approval of any merger, sale of assets or other major corporate transaction. Armistice's interests may not always align with our corporate interests or the interests of other stockholders . . . .

**E.    Other Relevant Persons and Entities**

59. LifeSci Advisors, LLC ("LifeSci") is a healthcare-dedicated investor relations/public relations firm founded in 2014. Since 2014, Defendant Yedid has served as LifeSci's Managing Director. LifeSci took over the role of Vaxart's public relations in the Spring of 2020 and was the contact point on every single press release starting on June 8, 2020, and for the entirety of the Class Period. According to LifeSci's website, the company "works with clients to develop an impactful investor communications program that start with investment thesis development and corporate

1
2
3

positioning. . . . Our corporate communications team—unique in our Wall Street experience and credibility—works with our clients on developing an effective corporate presentation with an emphasis on highlighting key messages for investors."

4
5
6
7
8
9
10

60.     Attwill Medical Solutions Sterilflow, LP ("Attwill") is a contract manufacturer based in Lodi, Wisconsin, specializing in lyophilization and related "freeze drying" processing of pharmaceutical intermediates, medical devices, and specialty food and nutritional ingredients. On June 25, 2020, Defendants announced Vaxart had signed a memorandum of understanding ("MOU") with Attwill for the production of "a billion or more Covid-19 vaccine doses per year through large scale lyophilization, tableting[,] and coating" (capitalization altered), even though Attwill lacked critically necessary FDA certifications to manufacturer any doses of Vaxart's COVID-19 vaccine at the time.

11

## V.     BACKGROUND ALLEGATIONS

12

### A.     Armistice Takes Control of Struggling Pharmaceutical Company Vaxart

13
14
15

61.     Founded in March 2004, Vaxart has yet to successfully develop and commercialize a single product of its own. The Company has not generated any revenue on any product it has ever developed, nor has it ever earned a profit.

16
17

62.     From the start, Vaxart promised to reinvent vaccines by ditching the need for needles and visits to the doctor or pharmacy. As the Company declared in its January 2, 2018 Prospectus:

18
19
20

> Vaxart's oral vaccines are administered using a convenient room temperature-stable tablet, rather than by injection. Vaxart believes that tablet vaccines are easier to distribute and administer than injectable vaccines, and have the potential to significantly increase vaccination rates.

21
22
23

The Company has acknowledged that its "ability to generate significant revenue and achieve and maintain profitability will depend on [its] ability to successfully complete the development of our tablet vaccine candidates . . . and to obtain the necessary regulatory approvals."

24
25
26
27

63.     Despite initial investor excitement, along with Vaxart's touting of its "proprietary oral vaccine platform," the Company lost nearly $39 million (on revenues of $9.7 million in 2019 and $4.2 million in 2018) during the fiscal years of 2018 and 2019. Accordingly, Vaxart's common stock price steadily slid from a high of $9.50 on its first day of trading on February 14, 2018, to close below $1.00

28

1    on April 9, 2019. Additionally, the Company remains dependent on outside financing to fund its

2    operations.

3           64.    With a market capitalization of just $8 million and a rock-bottom share price, Vaxart

4    was a ripe target for takeover by almost any interested investment group or hedge fund. In stepped

5    Armistice Capital, a self-described "long/short, value-oriented and event-driven hedge fund" that

6    primarily targets "health care and consumer" companies.

7           65.    In August 2018, Armistice began acquiring Vaxart common stock on the open market

8    and through public offerings. In 2019, Armistice also sought to purchase large swaths of warrants for

9    Vaxart common stock. Similar to stock options, warrants are instruments used to obtain other

10    securities, including common stock, whereby the warrant-holder (in this case, Armistice) can convert

11    individual warrants into a pre-determined number of shares (in this case, one warrant could be

12    converted into one share of Vaxart common stock that could be purchased for $0.30 or $1.10 per

13    share). The warrant-holder is then permitted to sell its newly acquired shares, subject to any number

14    of restrictions.

15           66.    Pursuant to a public offering of both common stock and warrants, on April 11, 2019,

16    Armistice acquired warrants to purchase up to 4,090,909 shares of Vaxart common stock at a $1.10

17    per share price. Under the terms of the April 11, 2019 public offering, Armistice was limited from

18    entirely exercising its warrants in two key respects. First, Armistice was prohibited from converting

19    its warrants to common stock "to the extent that the holder [Armistice] would own more than 4.99%

20    of the outstanding common stock immediately after exercise." Second, the warrants required the holder

21    (Armistice) to provide 60-days' notice to Vaxart to increase the 4.99% cap up to a 9.99% threshold.

22           67.    These two provisions are standard terms in public offerings of warrants and other

23    instruments that issuers rely on to protect the integrity of the company, its common stock price, and its

24    shareholders. For a company like Vaxart, which has never earned a single dollar in profit, public

25    issuances of common stock serve as one of the primary methods the Company has to fund its

26    operations.

27           68.    On September 30, 2019, pursuant to another mixed public offering of common stock

28    and warrants, Armistice obtained warrants to purchase 16,666,667 shares of Vaxart common stock at

1    $0.30 per share. Again, Vaxart imposed a beneficial ownership limitation of 4.99% and a 60-day notice

2    requirement on Armistice's ability to increase this percentage, up to 9.99%.

3           69.     In addition to holding an outsized number of warrants, by September 30, 2019,

4    Armistice had also acquired a majority stake in Vaxart through its holdings in the Company's common

5    stock. As Vaxart reported in its 3Q 2019 Form 10-Q, as of September 30, 2019, Armistice held

6    approximately 52% of Vaxart's outstanding shares of common stock and "[a]s a result, Armistice has

7    the ability to substantially influence us and exert significant control through this ownership position."

8    On October 8, 2019, Armistice filed an amended Schedule 13D signed by Defendant Boyd noting that

9    it controlled 25 million shares of Vaxart common stock, representing 65.2% of all outstanding shares.

10           70.     In seizing majority ownership, Armistice wasted no time in exerting its control over

11    Vaxart by, among other things, expanding the Company's Board to eight seats in October 2019 and

12    installing Armistice-Controlled Directors—Defendants Yedid and Davis—to replace two pre-

13    Armistice directors. Days after the September 30, 2019 Offering, Defendants Boyd and Maher

14    personally reached out to Defendants Davis and Yedid regarding the new Board positions. Davis—a

15    strategic investor who had prior business relations with Armistice and had worked with the hedge fund

16    in the past—was tapped to enact Armistice and Boyd's vision to transform Vaxart into a New York-

17    based royalty pharmaceutical company. Yedid—a close, personal friend who was "like [a] brother[]"

18    to Defendant Maher—frequently did business with Armistice and privately shared contacts with Maher

19    to build up each other's respective business networks.

20           71.     Upon his nomination by Armistice to join the Board, Defendant Yedid emailed

21    Defendant Boyd, stating he was "thrilled to be working side by side with you [Boyd], Keith, and Todd

22    on the Vaxart Board" (omitting all other directors) and that he "sincerely appreciate[d]" Boyd

23    including him as a director. Following Yedid and Davis's appointments, Boyd instructed Defendant

24    Maher to call Yedid and other people "to make sure no one [was] talking about anything about Vaxart

25    in terms of what we're [i.e., Armistice was] hoping to do, in terms of changing the nature of the

26    business," as Armistice was "trying to keep it really confidential because no one knows it."

27           72.     Together, Defendants Boyd, Maher, Yedid, and Davis initially comprised four of

28    Vaxart's eight Board seats. On November 30, 2019, however, Vaxart announced that its longtime

Chairman, Richard J. Markham, had resigned, from the Board effective immediately, shifting the balance of power to a four-three split in Armistice's favor.

**B.    Armistice Shuts Down Vaxart's Norovirus Program While Trying to Sell Vaxart's Technology or Find a Partner**

73.    Despite (or perhaps because of) Armistice's control over Vaxart, Vaxart's common stock price continued to struggle in the fourth quarter of 2019. By October 2019, Vaxart's stock price fell below $0.40 per share, never closing above that threshold again for the remainder of the year.

74.    To pull the Company out of its free fall, on December 26, 2019, Vaxart's Board under the Armistice Defendants' control voted to terminate about half of the Company's personnel—mainly manufacturing—and cut ties with KPMG LLP, Vaxart's registered public accounting firm. The Armistice Defendants then had Vaxart switch to an accounting firm that the Armistice Defendants had used in other companies Armistice had invested in.

75.    In addition to these employee terminations, Vaxart announced to employees that the Company's financial health was in such poor shape that to conserve corporate resources it had decided to terminate the norovirus program.

76.    CW1 was retained in May 2018 and served as Vaxart's lead norovirus researcher until December 31, 2019. CW1 was tasked with overseeing Vaxart's norovirus clinical trials and reported directly to Defendant Latour, Vaxart's then-CEO.

77.    Prior to CW1's employment with the Company, Vaxart had retained a contract manufacturing organization, Lonza Pharma & Biotech ("Lonza"), to develop its norovirus vaccine. After Vaxart retained CW1, it terminated its relationship with Lonza. However, in the Fall of 2019, Vaxart retained Lonza again to supplement CW1's work. Shortly thereafter, Defendant Latour informed CW1 and other Vaxart personnel that Armistice executives sought to cease all operations relating to norovirus vaccine development as a cost cutting measure. CW1—along with multiple Vaxart finance personnel—challenged this decision, emphasizing that Vaxart had already executed the manufacturing agreement with Lonza, and noting that breaching the agreement—for which Lonza had already commenced performance—would be a costly endeavor. More particularly, in late December 2019, CW1 received a phone call from Defendant Latour, where they discussed the cancellation/breach

of the Lonza contract. Latour explained that this contract termination effectively meant that the Company could no longer pursue development of the norovirus vaccine. Latour further stated that Vaxart would be "on life support for the next three months" and that if Vaxart could not obtain a partnership with a third party in that timeframe, "it was over." Nonetheless, Vaxart went ahead, terminated its agreement with Lonza, and discontinued its norovirus vaccine program. At this point in time, the Company only retained a single partnership agreement, with Johnson & Johnson, to develop Vaxart's influenza vaccine (not norovirus). Shortly thereafter, citing the discontinuance of the norovirus program, Vaxart terminated CW1, effective December 31, 2019.

78.     Two days later, on January 2, 2020, Vaxart announced that it had laid off its manufacturing division but continued to claim to investors that it had "development programs . . . that are designed to protect against coronavirus, norovirus, seasonal influenza and respiratory syncytial virus (RSV)." At this point, Vaxart did not inform investors that it had discontinued its norovirus program in the Fall of 2019 and instead waited until March 2020 (after it raised an additional $10 million in a direct offering) to inform the public that, due to the Company's effort to develop a COVID-19 vaccine, "we have put several vaccine programs on hold, including the norovirus vaccine program."

79.     The announced cost savings and declared corporate focus on January 2, 2020, had virtually no impact on the Company's stock price, which continued to languish as a penny stock at $0.36, well-below any meaningful level at which Vaxart could issue a follow-on offering to raise additional funding to pay for continued operations.

**C.    COVID-19 Emerges and Armistice Moves to Install More Insiders**

80.     By the middle of January 2020, the Coronavirus first identified in China approximately one month earlier was detected in multiple countries, including Thailand, Japan, South Korea, and the United States, which confirmed its first case on January 20, 2020. Ten days later, on January 30, 2020, the WHO declared the outbreak a "Public Health Emergency of International Concern" as the virus continued to spread unabated.

81.     In the wake of this news, Defendants, including Boyd and Latour, began to contemplate whether Vaxart's vaccine platform could be repurposed to combat COVID-19. By January 28, 2020, Latour reported to Boyd that the remaining Vaxart science employees believed it made sense for

Vaxart to invest in developing prototype vaccine candidates targeting coronavirus. Latour circulated a formal proposal to the rest of Vaxart's Board later that evening.

82.     Seizing on the fear and uncertainty presented by the oncoming pandemic, Vaxart issued a press release, reviewed and edited by Defendants Boyd and Maher, before the market opened on January 31, 2020. Featuring the bold headline, "Vaxart Announces Initiation of Coronavirus Vaccine Program," the release declared that Vaxart had "initiated a program to develop a coronavirus vaccine candidate based on its proprietary oral vaccine platform." The press release failed to mention that Vaxart's oft-touted "proprietary platform" had never once in the Company's history actually led to the creation of a viable, commercializable product. According to CW1, this was the exact same platform the Company had utilized in its secretly shuttered norovirus program.

83.     That day, Defendants would have noticed that the COVID-19 headline, merely claiming that Vaxart had initiated a Coronavirus vaccine program, caused Vaxart's stock price to close above $1.00 for the first time since early April 2019, closing at $1.25, a 71% gain against the prior day's closing price.

84.     Throughout almost the entirety of February, the stock sat parked in the low $1.00-range. It was at this time that Defendant Boyd sought to enact the Armistice Defendants' then-plan to transform Vaxart into a pharmaceutical "royaltyco." To do so, he first proposed to Vaxart's outside directors that the Company explore a transaction with Aytu Biopharma—another pharmaceutical company controlled by Armistice and Boyd—under which Vaxart would provide Aytu financing, given Vaxart's increased stock price, to market and manufacture a name-brand pharmaceutical treatment for inflammation. At about the same time, Boyd reached out to his friend of 20 years, Andrei Floroiu, to bring in another Armistice-controlled person, to see if he would be interested in leading Vaxart and the planned "royaltyco" transformation. Boyd text messaged Floroiu regarding the opportunity, as reflected in the following February 17 & 18, 2020 messages:

1

**F.2    Feb. 17, 2020 Text Chain (Excerpt) from Defendant Boyd to Defendant Floroiu Asking**
2    **Whether Floroiu Wanted to Be the CEO of Vaxart**

3

4



5

6

7

8

9

10



11

12

13

14

15    *\* \* \* Boyd and Floroiu discuss timing of meeting of breakfast or lunch \* \* \**

16

17

18

19    

20

21

22

23

24

25

26

27

28    *\* \* \* Boyd and Floroiu discuss timing of meeting of breakfast or lunch \* \* \**



*\* \* \* Link above is to Vaxart's webpage for investors \* \* \**

**F.3     Continued (Feb. 18, 2020) Text Chain Excerpt from Defendant Boyd to Defendant Floroiu Asking Whether Floroiu Wanted to Be the CEO of Vaxart**



85.     After meeting with Floroiu, Boyd then connected him with Maher, with the task of introducing Floroiu to the Armistice-Controlled Directors (Yedid and Davis) before introducing Vaxart's soon-to-be CEO to the "other" directors—which Floroiu construed to mean the two that did not belong to Boyd/Armistice, (Finney and VanLent). During this preparatory phase, Floroiu also commented to Maher that Armistice's "slate of 4 directors [wa]s one of the strongest [he had] seen."

1

**F.4    Feb. 21, 2020 Text Chain Excerpt in Which Defendant Floroiu Distinguishes Vaxart Directors as the Four Belonging to Armistice Versus the "Others"**



**F.5    Feb. 21, 2020 Text Chain Excerpt in Which Defendant Floroiu, After Meeting with Defendant Davis, Discusses Armistice's "Slate of 4 Directors"**



86.    On February 27, 2020, Vaxart awoke to the surprising news that its share price had surged overnight, resulting in the stock trading above $3.00 and almost 30 million shares trading hands in the first hour the market opened. In an email chain amongst the directors regarding the news,

Defendant Boyd noted that not just Vaxart, but "[m]ost other corona based stocks [we]re up SEVERAL HUNDRED percent." As such, Vaxart, under Armistice and Boyd's control, moved rapidly to, in Boyd's words, "fire our single bullet and execute a small registered direct [offering] today." The Company thus announced that it would shortly engage in another direct offering priced-at-the market, selling to several institutions 4,000,000 shares of common stock and warrants to purchase up to 2,000,000 shares "at a combined purchase price of $2.50 per share and associated warrant," which would raise Vaxart $10 million. The press release stated that Vaxart intended to use the net proceeds to support clinical and preclinical development of its vaccine candidates.

87.    Vaxart earned nearly $10 million ($9.2 million net proceeds) from its "single bullet." As Boyd predicted, however, Vaxart's share price stalled out compared to its competitors after the direct offering. Without any new positive information, Vaxart's common stock price sat in the lower $2.00 range dropping to as low as $1.08 on March 16, 2020.

88.    Cash in hand, Armistice plodded forward with its "royaltyco" plan for Vaxart. In the first week of March, Defendants Boyd, Maher, Davis, Yedid, and Floroiu met at Armistice's offices to clarify their strategic goals for Vaxart and fix up their execution plan. Thereafter, Floroiu worked with Davis to flush out the "Vaxart plan of action." Under that plan: Floroiu first would be appointed as "an advisor to the Board (or a subsection of the Board—the Transaction [C]ommittee) to advise on" the target financial/royalty transaction. Second, Floroiu would privately work with the Board's Compensation Committee to draft a new CEO employment contract. Third, Boyd and Maher would drive further changes to Vaxart's Board, including replacing director Anne VanLent. Fifth, Vaxart would finalize and file its 2019 Annual Report no later than March 19, 2020. Lastly, after the 2019 Annual Report had been filed and the markets had closed, the Armistice-Controlled Board would vote on the "new strategy," the CEO change, and the planned Board changes in one fell swoop, all before announcing the changes in a press release published before markets opened the following Monday. Unknown to Defendant Floroiu at the time, this multipoint plan would be routed by the then-alarmingly severe outbreak of COVID-19 in the United States.

1

2

**D.    COVID-19 Presents Defendants a New Opportunity to Attract Investors and Potential Partners as the Market Repeatedly Responds Positively to Vaxart's Press Releases**

89.    In early March 2020, U.S. health experts' predictions for COVID-19 held true: the novel coronavirus known as COVID-19 had reached pandemic status. On March 11, the World Health Organization declared that the outbreak had reached a global scale. On March 13, the U.S. Government declared a national emergency and instituted travel bans. And by March 15, 2020, several states began implementing shutdowns to mitigate against the spread of the virus.

90.    With the world in the grips of a global pandemic, Defendants' scheme to enrich themselves began to take form. Rather than go forward with transforming Vaxart into a "royaltyco," Armistice, Davis, and Yedid would put Floroiu's installation and royalty deals on hold and instead focus on maximizing the opportunity presented to Vaxart by the emerging pandemic, including getting a grant from the U.S. Government to develop a vaccine. As explained in the text message below, Armistice intended to sell Vaxart if the Company obtained government funding. However, if Armistice believed that Vaxart would not get federal funding for a COVID-19 vaccine, they would again move forward with installing Floroiu as CEO.

**F.6    Mar. 19, 2020 Text Chain Excerpt in Which Defendant Floroiu Tells Friends and Family that He Was Chosen to Be Vaxart's CEO and Will Be Installed f the Company Does Not Get COVID-19 Vaccine Funding from BARDA**



*   *   *   Commentary from other text chain participants omitted   *   *   *

1
2
3
4
5
6
7
8



9
10
11
12
13
14
15



16

*   *   * Commentary from other text chain participants omitted *   *   *

17
18
19
20
21
22
23
24
25
26
27



28

91.     Before the market opened on March 18, 2020, Defendants made their next play to show the U.S. Government and the public that Vaxart could meet the moment by issuing a press release, in bold capital letters titled, "**VAXART ANNOUNCES IT ENTERED INTO AN AGREEMENT WITH EMERGENT BIOSOLUTIONS FOR THE DEVELOPMENT AND MANUFACTURING OF ORAL CORONAVIRUS (COVID-19) VACCINE CANDIDATE**" (emphasis in original). Therein, Defendants declared that Vaxart had entered into an agreement with Emergent BioSolutions Inc. ("Emergent") to "develop and manufacture Vaxart's experimental oral vaccine candidate for coronavirus disease (COVID-19)." The press release continued with language emphasizing that the contract would "help advance" Vaxart's vaccine to the clinic, and that "Emergent is expected to produce bulk cGMP vaccine," "immediately," and to meet Vaxart's "potential need for future scalability and large-scale capacity for commercial quantities."

92.     Again, Defendants would have noticed that Vaxart's shares skyrocketed with the COVID-19 headline, closing at $2.34 on March 18, 2020, a 21% gain against the prior day's closing price and over 100% from the close on March 16. But again, Vaxart's stock price retreated within days to $1.68 on March 25, 2020, after Vaxart reported its results for the fourth quarter and full year 2019.

93.     Defendants now had seen the established pattern of a potential scheme, device, or practice to artificially inflate Vaxart's stock price—if only for a few days—in a manner from which they could profit. Under such circumstances, the Armistice Defendants could exit Vaxart, at the expense of unsuspecting and/or gullible investors by making an announcement hyping Vaxart's COVID-19 vaccine prospects, followed by a stock spike, and selling before the share price stagnated or retreated. To make the scheme and stock manipulation work, the Armistice Defendants would need the ability to sell their stock immediately upon the announcements with the cooperation of the other Defendants. More announcements, many of larger significance, would follow.

94.     On March 31, 2020, Defendants caused Vaxart to issue a press release, reviewed by Boyd, Maher, and other directors, entitled, "Vaxart Provides Update on its Oral COVID-19 Vaccine Program." And that "it had produced five COVID-19 vaccine candidates for testing in its preclinical models." Virtually nothing new was stated in the press release that had not been said before.

95.     Defendants again would notice that the press release produced a modest 4.12% spike

in the Company's stock price to $1.77, before it dropped over the next two days to $1.68. Clearly, Defendants realized that bolder headlines with bolder claims were required to get investor attention.

96.    On April 14, 2020, Vaxart filed a Form 8-K[4] with the SEC announcing that the Board had named Defendant Cezar Andrei Floroiu as the Company's newest and "independent" director. What went unsaid were Floroiu's extensive connections to Armistice and its two principals, Boyd and Maher. A "personal friend" of Armistice Founder and Managing Member Steven Boyd, Floroiu first met Boyd when they both worked for the consulting firm McKinsey. Later, in 2013, Floroiu worked at Armistice as a senior analyst. In part, because of these relationships, the Armistice Defendants intended to install Floroiu as Vaxart's CEO as early as February 2020, and had decided to appoint him to the Board (in Maher's words) as "a show of good faith" given the change in plan, due to Defendants' evolved scheme. Accordingly, even if Floroiu was independent from a regulatory standpoint, he was not independent in reality, but instead indebted to Armistice for his new role. Only because of his prior relationship with Armistice was he appointed to the Board.

97.    The announcement of Floroiu's appointment created a splash, driving Vaxart's share price up to a closing price of $2.04, a 16.5% gain against the prior day's closing price.

98.    Now with Floroiu on the Board, Armistice controlled five out of the current eight directors, with only Latour, Finney, and VanLent pre-existing Armistice's control. In less than six weeks, the Armistice-controlled Board would oust Latour as CEO, but before doing so, would seek to appease him, Tucker, and Finney, and reward Yedid and Davis, through grants of equity-based compensation (see below) to be approved by shareholders and the Board on June 8, 2020.

99.    On April 16, 2020, news broke that BARDA had awarded Moderna $483 million to develop and test its mRNA COVID-19 vaccine in an (then) initial clinical trial. That same day, Defendant Boyd texted Tucker asking if Vaxart would be next. Boyd speculated that the Moderna award may have been granted under the same Broad Agency Announcement ("BAA") that Vaxart had applied under for its vaccine candidate.

100.    Over the next few days, Boyd repeatedly texted Tucker, bypassing both Latour and the

---

[4] A Form 8-K is a report of material corporate events or changes at a company that could be of importance to the shareholders and/or the SEC.

Board, to ask whether there were any hints or interactions as to BARDA. Hearing nothing from BARDA, Defendant Boyd approved for publication a press release regarding the Company's vaccine development.

101.    Before the market opened on April 21, 2020, Vaxart issued a press release headlined in bold letters, "**Vaxart Announces Positive Pre-Clinical Data for its Oral COVID-19 Vaccine Program**," in which Defendants declared that the Company "obtained positive pre-clinical results for its COVID-19 vaccine candidates, with several of the vaccine candidates generating immune responses in all tested animals after a single dose." Though extremely light on details—including animal type and number of test subjects—the press release again proclaimed the genius of Vaxart's proprietary platform and the advantages a room temperature-stored, orally-administered COVID-19 vaccine would provide.

102.    Defendants noticed that the market reacted extremely favorably that day to this positive and promising-sounding press release, despite it being extremely light on details, sending Vaxart's common stock price up over 33% against the prior day's closing price, giving the stock the momentum to finally re-cross the $3.00 mark at a closing price of $3.16. Before trading closed, LifeSci also emailed Vaxart regarding the "nice pop in the stock."

103.    On April 28, 2020, before the market opened, Vaxart issued a press release entitled "Vaxart Announces Corporate Update for First Quarter 2020" with a subheading "Preparations for the Manufacturing of GMP Vaccine at Emergent BioSolutions Ongoing." Defendant Latour was quoted as saying, "This has been a busy quarter at Vaxart, as we have focused on developing a vaccine candidate for COVID-19 . . . . We believe our oral tablet vaccine could be an important tool to help protect the global population from COVID-19." The press release also highlighted:

- On April 21, 2020, Vaxart announced that its lead vaccine candidates generated anti-SARS CoV-2 antibodies in all tested animals after the first dose. The Company expects to announce additional four-week data within days and the selection of lead development candidate shortly thereafter.

- Vaxart is continuing with its manufacturing collaboration with Emergent and provided Vaxart elects to proceed, is on schedule

> to produce bulk cGMP vaccine in time for initiation of a Phase 1
> clinical study during the second half of 2020.

The day prior, April 27, 2020, Defendants Boyd and Maher had reviewed the press release, with Boyd noting, among other things, that he "prefer[red] that last bullet point on our [Armistice's] version." The Armistice Defendants then instructed Latour to issue their approved version before the market opened. While Latour tried to push back against the pre-market release, Armistice continued to pressure Latour, causing him to email others at Vaxart, including Vaxart's outside legal counsel, at 8:51 PM, "I have both Steve and Keith calling me now that this HAS to go out tomorrow before the markets open." Upon information and belief, Armistice forced the publication so that it could benefit from a bump in Vaxart's stock price before engaging in its first sale of Vaxart securities.

104.    Again, the market reacted favorably and Vaxart's common stock price spiked to an intra-day high of $3.85, a 5.2% jump. However, the stock then sank after the Armistice Defendants dumped 1,292,070 shares—their very first sale of Vaxart stock and about 11% of Armistice's holdings—driving down the stock to close at $3.27, an 11% loss. Thus emerged a new, and soon to be repeated, phenomenon: Armistice's "well-timed" sales in conjunction with positive news about Vaxart and its COVID-19 vaccine candidate.[5]

105.    In summary, between January 2, 2020, and April 28, 2020—a period of four months—Vaxart issued eight press releases at an average of two press releases per month, including the two mandatory quarterly earnings releases. With each, Defendants could easily see the impact of press releases relating to their supposed COVID-19 vaccine effort as greatly influencing Vaxart's stock price, if only momentarily:

---

[5] In engaging in such trades, Armistice violated the "short-swing" profit rule under Section 16(b) of the Exchange Act. Under that rule, company insiders—*i.e.*, any officer, director, or shareholder who owns more than 10% of a company's shares—are barred from earning any profit from the purchase and sale of company stock if both transactions occur within a six-month period. This rule is intended to prevent insiders like Armistice, who have greater access to material company information, from taking advantage of information for the purpose of making short-term profits. As a result of the sales, Vaxart investors filed demand letters regarding Armistice's unlawful conduct, and Armistice ultimately disgorged more than $611,000 in unlawful proceeds.

**T.1    Vaxart's 2020 Press Releases Prior to Leaks About Operation Warp Speed**

| Date | Press Release Title | Stock Reaction |
|---|---|---|
| 1/22/2020 | Results from Influenza Challenge Study Published in Lancet Infectious Diseases | 11% |
| 1/31/2020 | Vaxart Announces Initiation of Coronavirus Vaccine Program | 71% |
| 2/27/2020 | Vaxart Announces $10.0 Million Registered Direct Offering Priced At-the-Market | 74% |
| 3/18/2020 | Vaxart Announces Agreement with Manufacturer Emergent BioSolutions to Produce Vaxart's COVID-19 Vaccine Candidate | 21% |
| 3/31/2020 | Vaxart Provides Update on Its Oral COVID-19 Vaccine Program | 4.1% |
| 4/21/2020 | Vaxart Announces Positive Pre-Clinical Data for its Oral COVID-19 Vaccine Program | 33% |
| 4/28/2020 | Vaxart Announces Corporate Update for First Quarter 2020 | 5.2% (*intra-day*) |

**E.    With the Leak of a New Government Program Called Operation Warp Speed to Develop a Coronavirus Vaccine, Vaxart Intensifies Its Issuance of Press Releases While the Armistice Defendants Unload a Majority of Their Vaxart Stock Holdings**

106.    On April 29, 2020, news began to leak of a new secretive U.S. Government "Manhattan Project-style" initiative to develop a coronavirus vaccine. As reported by Bloomberg in an article entitled, "Trump's 'Operation Warp Speed' Aims to Rush Coronavirus Vaccine," the Trump administration was organizing a Manhattan Project-style effort to drastically cut the time needed to develop a coronavirus vaccine, with a goal of making enough doses for most Americans by year's end. Called "Operation Warp Speed," the program was "to pull together private pharmaceutical companies, government agencies and the military to try to cut the development time for a vaccine by as much as eight months, according to two people familiar with the matter. As part of the arrangement, taxpayers will shoulder much of the financial risk that vaccine candidates may fail, instead of drug companies."

107.    Armistice took immediate advantage of the prospects of government support and funding, dumping 873,634 shares on April 29, 2020—its second sale of Vaxart stock and about 10% of volume—again driving down the stock to close at $3.00, an 8% loss.

108.    The next day, on April 30, 2020, Vaxart issued a press release entitled, "Vaxart Announces Additional Positive Pre-Clinical Data for its Oral COVID-19 Vaccine Program" with a subheading, "Robust Boosting of Immune Responses Observed after Second Dose." The press release stated:

Vaxart, Inc., a clinical-stage biotechnology company developing oral recombinant vaccines that are administered by tablet rather than by injection, today announced that it has obtained positive pre-clinical results for its COVID-19 vaccine candidates, with several of the vaccine candidates generating immune responses in all tested animals after a single dose.

"These pre-clinical results confirm that all constructs are immunogenic as measured by IgG antibodies in serum, and we observed a robust boosting effect after the second dose." said Sean Tucker, Ph.D., chief scientific officer of Vaxart. "This latest data set will help to select the lead candidate for manufacturing, and we remain on track to start a first phase 1 study in the second half of this year."

In January 2020, Vaxart initiated a program to develop a COVID-19 vaccine based on its VAAST™ oral vaccines platform. The Company is currently evaluating multiple vaccine candidates in its preclinical models. In this second round of preclinical testing, all animals received two doses of the Vaxart vaccines, two weeks apart. Antibody responses in all vaccinated groups were statistically significant compared to the untreated controls. Vaxart plans to select one or more vaccine candidates for cGMP manufacturing and clinical testing based on the magnitude and the breadth of the immune response.

109.    April 30, 2020 saw Vaxart's stock price hit a high of $3.34. Despite this supposedly positive good news, the Armistice Defendants this time dumped 4,434,296 shares—almost one-third of the trading volume that day and 20% of Armistice's holdings—causing the stock to drop to a closing price of $2.70, a 10% decline against the prior day's closing price of $3.00.

110.    Between April 29, with the first press reports of Operation Warp Speed, and June 3, 2020, Vaxart would issue four more press releases, while the Armistice Defendants dumped 18.2 million of their 25 million shares. The chart below shows sales by the Armistice Defendants, with the red dates having no sales—along with significant news or Defendants' press releases.

1    **T.2    The Armistice Defendants' Sales of Their Vaxart Holdings up through June 29, 2020**

| Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|
| | **4/28**<br><br>1,292,070 | **4/29**<br><br>873,634<br>Bloomberg Article<br>Leaking OWS | **4/30**<br><br>4,434,296 | **5/1**<br><br>1,000,000 |
| **5/4**<br><br>957,469 | **5/5**<br><br>692,531<br>WSJ Article<br>Confirms OWS | **5/6**<br><br>50,000 | **5/7**<br><br>100,000 | **5/8**<br><br>100,000 |
| **5/11**<br><br>1,300,000 | **5/12**<br><br>1,581,076<br>Vaxart 2Q Results<br>and Update | **5/13**<br><br>525,616 | **5/14**<br><br>834,669 | **5/15**<br><br>458,639<br>White House<br>Confirms OWS |
| **5/18**<br><br>650,000 | **5/19** | **5/20**<br><br>1,150,000<br>*Vaxart Press<br>Release Announces<br>Choice of Vaccine<br>Candidate* | **5/21**<br><br>400,000 | **5/22**<br><br>200,000 |
| **5/25**<br><br>Memorial Day | **5/26** | **5/27** | **5/28**<br><br>200,000 | **5/29** |
| **6/1**<br><br>200,000 | **6/2**<br><br>800,000 | **6/3**<br><br>400,000<br>Bloomberg<br>Article | **6/4** | **6/5** |
| **6/8**<br><br>*Vaxart Annual<br>Meeting* | **6/9** | **6/10** | **6/11** | **6/12** |

| 6/15 | 6/16 | 6/17 | 6/18 | 6/19 |
|---|---|---|---|---|
| *Vaxart Press Release, Armistice Has "Great Confidence"* | | *Vaxart Presents at Raymond James, Says IND To Be Filed in June* | *Vaxart Publishes Presentation, "Bulk Vaccine in Progress"* | |
| **6/22** | **6/23** | **6/24** | **6/25** | **6/26** |
| | *Vaxart Press Release, To Present at HC Wainwright Thursday* | *Vaxart Press Release "Set to Join" Russell 3000* | *Vaxart Attwill Press Release, Ability To Manufacture "a Billion or more doses"* | **18,226,667** *Vaxart "Selected For" OWS Press Release* |
| **6/29** 9,385,386 | Armistice Retains Only 145,000 Shares | | | |

111.    On May 5, 2020, the *Wall Street Journal* reported that the White House was stepping up efforts to assist companies to quickly develop a vaccine for the virus through the newly announced Operation Warp Speed:

> Health and Human Services Secretary Alex Azar said the president has set a goal of manufacturing 100 million doses of coronavirus vaccine by the fall and 300 million by January. The lofty goal is part of the administration's "Operation Warp Speed," which seeks to speed up the development, production and distribution of a vaccine, which often take years to bring to market, according to experts.

112.    On May 12, 2020, *Science Magazine* published an article entitled, "Unveiling 'Warp Speed,' the White House's America-first push for a coronavirus vaccine," stating "[t]he project, vaguely described to date but likely to be formally announced by the White House in the coming days, will pick a diverse set of vaccine candidates and pour essentially limitless resources into unprecedented comparative studies in animals, fast-tracked human trials, and manufacturing. . . . [I]t hopes to have 300 million doses by January 2021 of a proven product, reserved for Americans."

113.    Also on May 12, 2020, Vaxart issued a press release announcing first quarter results and providing a "Corporate Update" reiterating previous announcements. That day, Vaxart's common

stock price surged in response, hitting an intra-day high of $3.18, an 11.5% gain against the prior day's close, only to then retreat following a massive contemporaneous sale of approximately 1.6 million shares by the Armistice Defendants, to close up only 2.8%.

114.    On May 15, 2020, the White House formally introduced Operation Warp Speed to the public, stating that the U.S. Government had already identified 14 of the most promising candidates and was narrowing down the list to those which it would provide "unprecedented" support. In the President's remarks, he stated:

> Today I want to update you on the next stage of this momentous medical initiative. It's called Operation Warp Speed. . . .
>
> Its objective is to finish developing and then to manufacture and distribute a proven coronavirus vaccine as fast as possible. . . .
>
> The great national project will bring together the best of American industry and innovation, the full resources of the United States government, and the excellence and precision of the United States military. . . .
>
> In preparation for this initiative, experts throughout the government have been collaborating to evaluate roughly 100 vaccine candidates from all over the world. *They have identified 14 that they believe are the most promising, and they're working to narrow that list still further. So we started off with over 100, we're down to 14, and we have some really interesting choices to be made.* . . .
>
> Through Operation Warp Speed, the federal government is providing unprecedented support and resources to safely expedite the trials, moving on at record, record, record speed. . . .
>
> Typically, pharmaceutical companies wait to manufacture a vaccine—a vaccine until it has received all of the regulatory approvals necessary, and this can delay vaccines' availability to the public as much as a year and even more than that. However, our task is so urgent that, under Operation Warp Speed, the federal government will invest in manufacturing all of the top vaccine candidates before they're approved. So we're knowing exactly what we're doing before they're approved. That means they better come up with a good vaccine because we're ready to deliver it.

(Emphasis added.) HHS also issued a press release on that date entitled, "Trump Administration Announces Framework and Leadership for 'Operation Warp Speed,'" which reaffirmed that OWS had

narrowed the candidates it would support down to 14 and planned to narrow it down further to 8. In

relevant part, the press release stated:

> On Friday, the Trump Administration announced the appointment of Moncef Slaoui as chief advisor and General Gustave F. Perna as chief operating officer of Operation Warp Speed (OWS), the administration's national program to accelerate the development, manufacturing, and distribution of COVID-19 vaccines, therapeutics, and diagnostics (medical countermeasures). . . .
>
> Among its other objectives, Operation Warp Speed aims to have substantial quantities of a safe and effective vaccine available for Americans by January 2021. . . .
>
> **Elements of Operation Warp Speed**
>
> Operation Warp Speed is a public-private partnership to facilitate, at an unprecedented pace, the development, manufacturing, and distribution of COVID-19 countermeasures, between components of HHS, including CDC, FDA, NIH, and. . . .
>
> - **Financial resources**: Congress has directed almost $10 billion to this effort through supplemental funding, including the CARES Act, and Congress has appropriated other flexible funding. Over $6.5 billion has been designated by Congress for countermeasure development through BARDA, along with $3 billion for NIH research. . . .
>
> *Development*
>
> - *Operation Warp Speed will select the most promising countermeasure candidates and provide coordinated government support to support their development.* . . .
>
> - For example, this process has proceeded for vaccines in the following manner:
>
>   o Fourteen promising candidates have been chosen from the 100+ vaccine candidates currently in development— some of them already in clinical trials with U.S. government support.
>
>   o *The 14 vaccine candidates are being winnowed down to about eight candidates, which will go through further testing in early stage small clinical trials.*

(Emphasis added.)

115.    The news that OWS had identified 14 possible COVID-19 vaccine candidates, would select the 8 most promising vaccines, and would provide coordinated government support for their development and testing in early-stage small clinical trials before proceeding with large-scale randomized trials for three to five candidates, was widely reported in the financial and regular press.[6] That day, May 15, 2020, Armistice dumped 458,639 shares of Vaxart common stock, grossing approximately $1.3 million. That same day, Defendant Boyd also called Defendant Latour regarding amending Armistice's warrant blockers.

116.    On May 20, 2020, Vaxart issued a press release, edited by Defendant Boyd, entitled, "Vaxart Announces Selection of its Oral COVID-19 Vaccine Lead Candidate," with a subheading entitled, "KindredBio Selected as Second Contract Manufacturing Organization—GMP Production for Phase 1 Study Initiated." Again, following yet another stock pop, Armistice dumped a further 1.15 million shares of Vaxart common stock, grossing approximately $3.7 million.

117.    On May 21, 2020, the *Wall Street Journal* reported that the U.S. Government had agreed to fund its first vaccine candidate as part of OWS:

> **U.S. to Invest $1.2 Billion to Secure Potential Coronavirus Vaccine From AstraZeneca, Oxford University**
>
> **Government to bankroll human trial and ramp-up of manufacturing capacity, hoping to get doses in October**
>
> The U.S. government has agreed to hand AstraZeneca AZN -0.87% PLC up to $1.2 billion to secure the supply of a potential coronavirus vaccine that could be ready as early as October.
>
> Under the deal, the government will bankroll a 30,000-person vaccine trial in the U.S. starting in the summer, plus the ramp-up of manufacturing capacity to make at least 300 million doses. The first doses will be ready in the fall should the vaccine prove effective, it said.

---

[6] *See, e.g.*, Elizabeth Weise, *In the race for a coronavirus vaccine, can Operation Warp Speed avoid politics?*, USA TODAY (May 24, 2020), https://www.usatoday.com/story/news/2020/05/24/coronavirus-vaccine-covid-19-operation-warp-speed-moncef-slaoui/5242123002/; Julie Steenhuysen, *Exclusive: US Plans Massive Covid-19 Vaccine Testing Effort to Meet Year-end Deadline*, REUTERS (May 22, 2020), https://www.reuters.com/article/us-health-coronavirus-usa-vaccine-exclus/exclusive-u-s-plans-massive-coronavirus-vaccine-testing-effort-to-meet-year-end-deadline-idUSKBN22Y2L3 (Director of NIH identifying some candidates already getting support but refusing to name other candidates on the shortlist of 14).

Alex Azar, the Health and Human Services secretary, called the deal a "major milestone" in the administration's effort—code-named "Operation Warp Speed"—to make a safe, effective vaccine widely available to Americans by 2021.

118.    On May 27, 2020, NantKwest—a competitor of Vaxart in vaccine development—issued a press release stating that its affiliate, ImmunityBio, was selected for Operation Warp Speed. The press release states in relevant part:

> NantKwest, Inc. (Nasdaq: NK), a clinical-stage, natural killer cell-based therapeutics company, and ImmunityBio, a privately-held immunotherapy company, today announced *ImmunityBio has been selected to participate in Operation Warp Speed*, a new national program aiming to provide substantial quantities of safe, effective vaccine for Americans by January 2021. Efforts will focus on the development, testing, and large-scale manufacturing of ImmunityBio's COVID-19 human adenovirus vaccine (hAd5) candidate. . . .

> To support these coordinated efforts from vaccine to therapeutics, the two companies have signed a binding term sheet to jointly develop, manufacture, and market therapeutics and vaccines for COVID-19. The binding agreement outlines how development costs will be shared, how profits will be apportioned for any successfully marketed products, and the structure of shared governance of the joint work.

> "ImmunityBio is honored to have been selected as one of the 14 companies for Operation Warp Speed and is committed to moving our vaccine candidate through the process to prevent people from contracting this deadly virus," said Patrick Soon-Shiong, M.D., Chairman and CEO of ImmunityBio and NantKwest.

(Emphasis added.)

119.    Defendants could not help but notice NantKwest's stock soar on this news of having been "selected to participate in Operation Warp Speed," from $5.45 on May 26 with a volume of 800,055 trades to $7.58 on May 27 with a volume of over 22 million trades.

120.    In reality, NantKwest and ImmunityBio's purported vaccine selection was trivial, and NantKwest was not one of the companies selected to participate in Operation Warp Speed. Instead, NantKwest was only being invited to be evaluated as one of many vaccines in a non-human primate study for possible consideration by OWS. Unfortunately, HHS kept this information to itself. As reported by *Science Magazine* on June 1, 2020, HHS would state:

"We're not confirming anyone's involvement in the initial group [of vaccines] unless a company is bound by fiduciary requirements to report contractual agreements," says Michael Caputo, an HHS spokesperson for Warp Speed. . . . Warp Speed has said it plans to whittle down the 14 candidates from its initial selection to about eight for early stage human trials. "We will inform the public very soon about the candidates that make the first cut," Caputo says.[7]

121.    *Science Magazine* also reported that NantKwest's chairman placed the time of its HHS presentation as being on April 9, 2020, after which the company was invited to submit a proposal, and that it signed an agreement for the monkey studies protocol on "Friday" (*i.e.*, May 29, 2020).

122.    NantKwest's experience was not novel to Vaxart. Similar to NantKwest, Vaxart began discussions with the National Institute of Allergy and Infectious Disease ("NIAID") and BARDA regarding small animal testing for its vaccine candidate no later than May 6, 2020, and had signed a Material Transfer Agreement on or about May 13, 2020, with BARDA—the leading coordinator for the NHP. Defendants also knew, or should have known, from their communications with other U.S. Government entities, including communications with NIH's Vaccine Research Center, that the NHP study was distinct from the final candidate selection process (from 14 companies to 8) for OWS. Defendants thus knew, or should have known, from the news following the NantKwest announcement that any release of information regarding the evaluation of Vaxart's oral vaccine by the U.S. Government in a non-human primate trial—including the false and misleading statements at issue in this case—could similarly confuse or mislead investors.

123.    Despite these seemingly positive developments—but with no public ties to the selection of the final 14 companies being whittled down to eight by OWS—Vaxart's stock price continued to languish at around $3.00 per share in late May and the first few days of June 2020 while Armistice continued to unload its common stock holdings almost every single trading day and exit Vaxart.

124.    Ultimately, from April 28 through the first three days of June 2020, Armistice sold 72% of its holdings in Vaxart, or 18,200,000 shares, reducing its common stock holdings down to 7,000,000

---

[7] Jon Cohen, *Operation Warp Speed selects billionaire scientist's COVID-19 vaccine for monkey tests*, SCIENCE MAGAZINE (June 1, 2020), https://www.sciencemag.org/news/2020/06/operation-warp-speed-selects-billionaire-scientist-s-covid-19-vaccine-monkey-tests.

shares at an average price of $2.93 per share, and earning gross sales of $53 million—a staggering amount of money, considering Vaxart had a market capitalization of under $8 million when Armistice bought its first warrants less than one year earlier and Vaxart traded for mere pennies. But then Armistice stopped selling.

**VI.    DEFENDANTS' SCHEME TO MANIPULATE VAXART'S STOCK PRICE AHEAD OF THE ARMISTICE DEFENDANTS' UNDISCLOSED PLAN TO UNLOAD NEARLY ALL OF THEIR VAXART HOLDINGS BY THE END OF JUNE**

125.    Defendants' scheme to manipulate Vaxart's stock price through deceptive press releases in violation of Rule 10b-5(a) and (c), though informed by the above facts, came into full form and was put into motion beginning in early June 2020.

126.    As alleged herein, Defendants planned to use the temporary market reaction of a material number of investors to overstated and/or deceptive headlines, and the opaqueness of OWS, to enable (i) Armistice to dump all of its remaining holdings of Vaxart shares (including converted warrants) into the expected buying frenzy the headlines would create, and the temporary price inflation created by that manipulation, and (ii) Vaxart to obtain additional financing with an artificially inflated stock price. In doing so, Defendants also made materially false and misleading statements in violation of Rule 10b-5(b).

127.    Defendants' scheme above was nonpublic and unknown to investors, including the Armistice Defendants' intent to unload all of Armistice's equity in Vaxart at a time when they were still in control of Vaxart and were the Company's largest investor.

**A.    Defendants Seize on the Opportunity Presented by HHS Secrecy Around OWS and the Ability to Confuse and Mislead a Material Number of Investors to Manipulate Vaxart's Stock Price Ahead of Armistice's Exit**

128.    On June 3, 2020, Bloomberg and the *New York Times* identified the names of five of the seven to eight companies selected for funding by the recently announced U.S. Government-sponsored program to speed the development of multiple COVID-19 vaccines, known as Operation Warp Speed.[8] More specifically, the widely read *New York Times* article stated:

_____

[8] Alex M. Azar II ("Azar"), HHS Secretary, and OWS Leader Moncef Slaoui wrote on September 2, 2020 in *USA Today*, that OWS "aim[ed] to select eight candidates for support, two from each platform," in order to "buil[d] a portfolio that will maximize our chances at success."

> The Trump administration has *selected* five companies as the most likely candidates to produce a vaccine for the coronavirus, senior officials said, a critical step in the White House's effort to deliver on its promise of being able to start widespread inoculation of Americans by the end of the year.
>
> By *winnowing the field in a matter of weeks from a pool of around a dozen companies*, the federal government is betting that it can identify the most promising vaccine projects at an early stage, speed along the process of determining which will work and ensure that the winner or winners can be quickly manufactured in huge quantities and distributed across the country.
>
> *The announcement of the decision will be made at the White House in the next few weeks*, government officials said.

(Emphasis added.)

129.    The publicly identified companies were Moderna, AstraZeneca, Johnson & Johnson, Merck & Co., and Pfizer. When OWS was initially announced on May 15, 2020, HHS's press release noted that there were "about eight candidates, which will go through further testing in early stage small clinical trials." Now, with five of those candidates identified, speculation mounted as to the identities of the unknown two or three.[9] And as reported by *Science Magazine* on June 1, 2020, the U.S. government was not likely to fill in the unreported gaps, with Michael Caputo, an HHS spokesperson for Warp Speed, stating, "We're not confirming anyone's involvement in the initial group [of vaccines] unless a company is bound by fiduciary requirements to report contractual agreements."

130.    Vaxart was not one of the unidentified two or three vaccine candidates selected for OWS, prompting the Armistice Defendants to lose faith in Vaxart's prospects. As noted by Floroiu in a May 10, 2020 email to Boyd and Maher (and later circulated to Yedid and Davis, omitting the three non-Armistice Directors), it was doubtful whether Vaxart's platform could compete in the "conventional race" against "big-pharma" companies like Moderna—whose OWS selection had been confirmed days later. Floroiu stated to Boyd and Maher, even if they were to be awarded "BARDA

---

[9] Other news media repeated the report and noted that the "selection as finalists will give all five companies access to additional government funding to help accelerate the development of their vaccines." Lucas Manfredi, *White House picks five coronavirus vaccine candidates for 'Operation Warp Speed' initiative*, FOXBUSINESS (June 3, 2020), https://www.foxbusiness.com/healthcare/white-house-picks-five-covid-vaccine-candidates-for-operation-warp-speed-initiative.

money we'll lag behind them" and suggested that Vaxart explore clinical trials overseas. In response, Maher directed Floroiu to explore partnerships instead, bringing a dose of reality to Floroiu: "I think that as a board member it make [sic] sense if you want to lead the way on reaching out to the various parties that you mentioned. At present the company doesn't have the capacity nor the capabilities internally to pursue the aforementioned projects." Boyd and Maher's control over Floroiu was so complete that shortly thereafter on May 28, 2020, and prior to being made CEO, Floroiu implored Boyd and Maher to make him Chairman instead, as efforts to date had been failing:

> [I]f titles are split, the Board can elect me Chairman, which is what I realized I need to continue to pursue all the outwards deal-making & partnership efforts I mentioned 2 weeks ago. . . .
>
> But, I also realized that to connect in a credible way and get the results we want, I need a title/role (and the implied mandate) that would facilitate these discussions and subsequent negotiations. You know how it is, important people are super-busy, have big egos, so they wanna [sic] talk to a top guy. Chairman would do the trick, and allow me to move fast, and only involve Sean when needed. And while I focus outwards, we let the CEO manage internally, with more focus.
>
> Without that, I decided it's better to pause all efforts for now, despite the great momentum. Very anticlimactic! But, we only have one bite at the apple with most of these discussions, and we risk killing options if I pursue them in the current set up.
>
> I want you to know how frustrating pausing for a week has been given that I'm convinced speed here is essential. And seeing moves by Merck, ALT, and others, makes me cringe that we're not moving aggressively too.

The June 3, 2020 Bloomberg and *New York Times* leaks confirmed the reality that Vaxart would not receive BARDA funding.

131.    From Vaxart's limited communications with U.S. Government agencies throughout April and May 2020, Defendants also knew, or should have been aware, that OWS had imposed a strict set of selection criteria that Vaxart obviously did not qualify for, but would have known from required information it would have had to submit. Though the selection criteria were a secret to the public at the time, under no circumstances could Defendants have been under the mistaken belief that Vaxart's inchoate oral vaccine was selected. As Moncef Slaoui and Matthew Hepburn, OWS's head and

development lead, co-wrote in the *New England Journal of Medicine* ("*NJEM*") on August 26, 2020:

> OWS selected vaccine candidates on the basis of four criteria. *We required candidates to have robust* preclinical data or early-stage clinical trial data supporting their potential for clinical safety and efficacy. *Candidates had to have the potential, with our acceleration support, to enter large phase 3 field efficacy trials this summer or fall (July to November 2020)* and, assuming continued active transmission of the virus, to deliver efficacy outcomes by the end of 2020 or the first half of 2021. Candidates had to be based on vaccine-platform technologies permitting fast and effective manufacturing, and their developers had to demonstrate the industrial process scalability, yields, and consistency necessary to reliably produce more than 100 million doses by mid-2021. *Finally, candidates had to use one of four vaccine-platform technologies that we believe are the most likely to yield a safe and effective vaccine against Covid-19: the mRNA platform, the replication-defective live-vector platform, the recombinant-subunit-adjuvanted protein platform, or the attenuated replicating live-vector platform.*

(Emphasis added.)

132.    As noted in the *NEJM* article, OWS sought vaccine candidates with "the potential . . . to enter large *phase 3* field efficacy trials this summer or fall (July to November 2020)." (Emphasis added.) At the time, Vaxart's COVID-19 vaccine candidate was nowhere near that stage and the Company had *repeatedly* informed the public, "Manufacturing of our COVID-19 vaccine is on track to start a first *phase 1* study in the second half of this year, possibly as early as the summer." (Emphasis added.)

133.    Further, as the *NEJM* article noted, OWS targeted "four vaccine-platform technologies" and as the *USA Today* article noted, OWS aimed to select "two from each platform." Vaxart's COVID-19 candidate utilized a "replication defective" platform, the same platform utilized by two of the publicly named companies, Johnson & Johnson and AstraZeneca. Therefore, even if Vaxart was prepared to promptly launch a "large phase 3 field efficacy trial[]" for its COVID-19 vaccine candidate—which it was absolutely not—OWS still would not have selected the Company anyway after selecting Johnson & Johnson and AstraZeneca. For this additional reason, any belief internal to Vaxart that its COVID-19 candidate was selected for OWS defied plausibility.

134.    Dismayed by the media articles about the five named OWS selectees, Floroiu texted

Boyd and Maher on June 3, stating, "I think this means no BARDA money, right?" The following day, June 4, Boyd sent Floroiu an email containing an announcement that a competitor (Novavax) had been awarded a contract by the Department of Defense for the manufacture of a vaccine candidate with funding of $60 million. Floroiu responded to Boyd: "I have no doubt that we should've and could've done a lot better on both government support and corporate partnerships. But this company just can't sell. And the window of opportunity is closing up soon (if it already hasn't on BARDA . . .)  I mean, given how many programs are out there, how do you think BARDA reacts to an application saying we'll file a BLA in 2022/2023?!?!? Do you think they have time to say . . . oh well, maybe it can be sooner, let's help these guys out because the tech is interesting?"

135.    As such, the Armistice Defendants decided at or about this time to completely exit and recognize the full potential of Armistice's remaining Vaxart holdings, including 7,000,000 shares of common stock, 16,666,667 warrants to purchase Vaxart common stock at $0.30 per share and 4,090,909 warrants to purchase Vaxart common stock at $1.10 per share. Defendants also knew that an announcement like NantKwest's claim that its subsidiary, ImmunityBio, had been "selected for" OWS was a sure ticket to pop Vaxart's stock price for a tidy additional profit.

136.    But with Vaxart's stock price remaining stagnant in the face of its competitors' positive news, Armistice needed the other Defendants to cooperate and issue a press release that could similarly pop Vaxart's stock price. Additionally, Armistice needed to maintain substantial control over Vaxart while it positioned for exit by, among other things, amending its warrant blockers and repurposing its previous plan to install Floroiu as CEO.[10]

137.    To that end, after the release of the June 3, 2020 Bloomberg and *New York Times* articles, the Armistice Defendants reached out to Floroiu to have him outline his path as CEO. Floroiu relayed this information to a colleague, stating "My becoming CEO is again on the front burner . . . ."

---

[10] Shareholder voting power for the June 8, 2020 Annual Meeting was based on investor holdings as of April 9, 2020, with one vote for each share of common stock owned. On April 8, 2020, Armistice owned 25.2 million shares (about 35%) of Vaxart common stock (about 46% fully diluted), and each measure to be voted on at the June 8, 2021 required a simple majority for approval. Given that the Annual Meeting required a simple majority quorum, Defendant Latour opined in private communications, if Armistice was in favor of a measure (and was allowed to vote on the measure), there was "no way" the measure "would not pass."

Two days later, Floroiu sent his colleague an updated PowerPoint presentation for his "New CEO plan" with the cover message "I'm already opening the wine :-) [*i.e.*, a smiling emoji]."

**B.     The Armistice Defendants Demand and Receive Amendments to Warrant Blockers**

138.     At the same time the Armistice Defendants were coming to terms with the fact that Vaxart would not obtain OWS funding, they pursued an aggressive campaign to push Vaxart to amend the blocker provisions on Armistice's $0.30 and $1.10 warrants from 4.99% and 9.99%, respectively, to 19.99%—thus ensuring that (i) the Armistice Defendants could effectively maintain plurality ownership over Vaxart until they were prepared to exit, and/or (ii) as Yedid would say to Latour, "If Vaxart is a candidate to be added to one of Russell indexes, the board should consider removing the 9.9% blocker on the warrant exercise which will get more shares outstanding and maximize the number of Vaxart shares that would have to be bought in on the open market by the index funds that mimic the Russell 2000 or 3000," thus providing more liquidity and demand for the time when Armistice would dump its shares. First, on May 15, 2020, Boyd texted Latour with a direct request that the warrant blockers be lifted. Thereafter, the Armistice Defendants' proxies—particularly, Yedid and Floroiu—persuaded the three non-Armistice-Controlled Directors to support the warrant blocker amendments.[11]

139.     On June 1, 2020, Vaxart's Board had a telephone conference among the "disinterested" directors to discuss Armistice's requests to amend the warrants. Though Boyd and Maher were not permitted to join the call, their position was advanced by the Armistice-Controlled Directors. In the days prior to the call, Defendant Yedid communicated with Boyd and Maher via phone and email, presumably regarding warrant amendment talking points. Additionally, Defendant Boyd prepared Floroiu over the phone, texting him afterwards: "Just so we're clear. We'd like the blocker increased to 19.9% or higher."

140.     No minutes were taken of this June 1, 2020 call, though a list of "pros and cons" of whether to approve the warrant amendments requested by Boyd and Maher appears to have been

---

[11] Because of their explicit Armistice ties, Boyd and Maher could not formally vote in favor of Armistice's request, resulting in a 3-3 composition tie between the Armistice-Controlled Directors—Floroiu, Davis, and Yedid—and the non-Armistice-Controlled Directors—Finney, Latour, and VanLent. Notably, the Armistice Defendants did not push to remove the blockers until after they had Floroiu appointed to Vaxart's Board.

discussed. Because the Armistice Defendants had no plans to buy Vaxart shares, the amendments could only be for one purpose—for the Armistice Defendants to maintain control until fully disposing of their shares by the end of June 2020. Those amendments became effective when signed on behalf of Armistice by Boyd on June 8, 2020.

141.    Vaxart received no compensation for agreeing to the warrant amendments other than the payments to which it was already entitled upon exercise of the warrants pursuant to their terms. However, the amendments enormously enriched Armistice.

## C.    The Armistice Defendants Oust Latour as CEO Only Days After He Is Re-elected as Chairman and Install Floroiu as CEO in Furtherance of Their Scheme

142.    As noted above, on Monday, June 8, 2020, after the Annual Shareholder Meeting, Defendants solidified their agreement and plan to allow the Armistice Defendants to exit Vaxart through a dump of 27.6 million shares (which is what they did, keeping only 145,523 shares after their sales) by the end of June.

143.    After the Shareholder Meeting, the Company held a 10:00 AM Board meeting at which Latour updated the Board on the status of the Company's COVID-19 vaccine development program, including that Vaxart had been invited to participate in a BARDA-administered non-human primate challenge study (and that Vaxart's request for BARDA funding had been languishing since March 23). Within minutes of this update—which confirmed to Armistice that Vaxart was not getting OWS funding—Boyd texted Floroiu the follow message, building on their June 3 communications regarding the five OWS participants identified by Bloomberg, the ouster of Latour, and the installation of Floroiu as CEO being on the "front burner":

### F.7    June 8 Text Chain Excerpt in Which Defendant Boyd Confirms to Floroiu that Armistice Will Install Floroiu as CEO in the Coming Days (EST time stamps)



1

2

3

4

5

6



7

8

9

10

11



12

13

14

15

16

17



18

19

20

21

22

23

24

25

26

27

28





1

2

3

4

5

6

7



Thereafter, Boyd also questioned via text message whether Armistice should keep Latour on the Board—a decision on which Armistice ultimately relented by allowing Latour to remain.

144.    To supplement their text chain, Floroiu circulated to Boyd, Maher, and Davis a draft PowerPoint of his revised plans for Vaxart. *See* Part VI.A, *supra*, ¶ 137. On page 2 of the presentation, Floroiu stressed that "COVID-19 is a *huge, once-in-a-lifetime opportunity*" but also "an asset that is depreciating very fast" with a "2-3 months window of opportunity to capitalize on." (Emphasis in original.) He also admitted that "Vaxart is small, alone, coming from behind very larger front-runners in a very crowded field." Later on, he also created a graphic for his plan's four pillars. Notably, the plan was built on an aggressive PR campaign to raise Vaxart's profile, but in no way mentioned OWS (on the image displayed below or elsewhere in the presentation) with a "90-day goal[]" to "[t]ell a much more compelling, current, inspirational story . . . introduc[ing] Vaxart 3.0 to all stakeholders" to obtain "[n]on-dilutive financing from vaccine non-profits and select wealthy countries' governments" (not mentioning BARDA or OWS). The first 30 days included "Craft New Message."

**F.8    Slide from June 8 Presentation Drafted by Defendant Floroiu Titled "Building a New Vaxart," Which Was Circulated to the Armistice Defendants**



145.    Over the next few days, the Armistice Defendants wasted little time in orchestrating the removal of Latour (one of the two pre-Armistice directors remaining after the June 8, 2020 Annual Shareholder Meeting) as CEO through an email-based transition group consisting of Defendants Boyd, Maher, Davis, and Yedid, as well as Vaxart's outside legal counsel, which was recommended to Vaxart by Maher. Defendant Davis took the lead in coordinating the steps of the Armistice-forced transition.

146.    On Wednesday, June 9, Davis reported to Boyd, Maher, and Yedid that:

- Davis had discussed and agreed to employment terms with Floroiu, with 95% of contract negotiations complete;

- Boyd had informed Latour of the CEO change; and

- Legal counsel had drafted Latour's separation agreement, allowing Latour to remain on the Board as Chair.

Additionally, Davis summarized the necessary targets for the following days. Among other things:

- By Wednesday, Davis aimed to finalize Floroiu's special incentive options—a matter that Davis stated "*is in our control*, but we must discuss as a board." (Emphasis added.) (At this time, Armistice controlled five of Vaxart's seven directors—Latour and Finney being the two outliers.) During the course of

negotiations, Floroiu conceded that in the interest of moving his installation along quickly, he did not take the time to properly discuss the terms of his employment with his lawyer.

▪ By Thursday, Yedid, with the aid of LifeSci, was to circulate a draft press release regarding the transition. As part of this process, Boyd directed Yedid, Floroiu, and LifeSci to include quotes from him, Floroiu, and Latour—even though LifeSci advised that including a quote from Boyd "may message that [Floroiu] is there just to do [Boyd's] bidding."

▪ And by Monday, the Board would "approve" the transition and issue a press release and required SEC disclosures.

147.    On Friday, June 12, 2020, the Vaxart Board held a meeting at which it agreed that "it would be in the best interests of the Company and its stockholders to accept the resignation of Dr. Latour as an officer of the Company, to appoint Mr. Floroiu as CEO of the Company, and to request that Dr. Latour remain a director and Chairman of the Board." After the meeting, Floroiu thanked Boyd personally for the opportunity.

**F.9    June 12, 2020 Text Chain Excerpt in Which Defendant Boyd Congratulates Floroiu and the Two Note that the Following Week Will Be "Fun!"**





148.    On Saturday, June 13, 2020, by unanimous written consent, the Board resolved to: (i) allow Latour to step down from the CEO position; (ii) treat the resignation as a termination without cause; (iii) provide him with severance benefits under the Company's Severance Benefit Plan upon the purported termination without cause; and (iv) allow his outstanding stock options to continue to vest during his new, materially less demanding position as non-executive Chairman of the Board.

149.    On the same date, the Board approved a Letter Agreement with Floroiu providing for a base salary of up to $400,000, a target bonus opportunity of up to 50% of base salary, 845,280 time-based stock options, 900,000 performance-based stock options, a $100,000 success bonus, and a three-month severance under the Company's Severance Benefit Plan.[12]

**D.    Defendants Implement Their Stock Manipulation and Sale Scheme Through an Unprecedented Blitz of Public Statements Aimed to Convince the Investing Public that Vaxart Had Meaningful OWS Support and Was Quickly Moving Towards Production**

150.    Vaxart's common stock floundered in the low- to mid-$2.00 range throughout the three weeks following Armistice's halting of its stock sales on June 3, 2020, pressed down under the weight of the hedge fund's sale of an astounding 18.2 million shares.

151.    Despite the fact that OWS had not selected Vaxart's COVID-19 vaccine candidate, Defendants decided to take full advantage of the public uncertainty around the unknown two or three

---

[12]All Floroiu's options had an exercise price of $2.46 per share, which was the closing price of the Vaxart stock on June 15, 2020. The time-based options granted to Floroiu vest according to a typical timeline structure over four years and all vest if there is a change in control as defined by the 2019 Plan. The performance-based options vest based on the closing price of Vaxart stock for 10 consecutive days prior to November 30, 2020 (or such later date as determined by the Board). One-third of the 900,000 options (300,000) vest if and when Vaxart's stock closes at $5 or higher for any 10 consecutive days prior to November 30, 2020. Another one-third (300,000) vest if Vaxart's stock closes at $7.50 or higher for any 10 consecutive days prior to November 30, 2020. The last 300,000 options vest if Vaxart's stock closes at $10.00 or more prior to November 30, 2020, for any 10 consecutive days. If those closing stock price points did not occur, the performance-based options granted to Floroiu, if not amended, expire worthless. The vesting terms of Floroiu's performance-based options are highly unusual. In light of the November 30, 2020 drop dead date, these options only vested if Vaxart's stock price doubled, tripled, and quadrupled in just five-and-a-half months. The structure created an enormous incentive for Floroiu, as Vaxart's new CEO, to cause the price of Vaxart stock to rise quickly and dramatically. In fact, when Floroiu received his stock options they were valued at about $4.3 million. After the press release blitz and purported "selected for" OWS announcement, they were worth more than $28 million—greater than a six-fold increase. Moreover, all of Floroiu's 900,000 performance-based options vested. Starting on July 13, 2020, Vaxart's stock price closed at above $10 per share for ten days in a row. Accordingly, within less than a month of his appointment as CEO, Floroiu "attained" his performance-based goals.

vaccine candidates, leveraging the global need for a viable COVID-19 vaccine—and the market's desire to figure out the remaining identities of the OWS participants—into a massive windfall, dwarfing the sum Armistice had already acquired.

152.    Defendants also knew that the financial press would pick up on and amplify headlines in the rush to publish or out of a lack of deep understanding of the situation from watching articles published over the past six months regarding COVID-19 vaccine development and the NantKwest/ImmunityBio press release. Thus, if Defendants buried some of the detail under the headline, a sizeable portion of investors and the financial press would be deceived, especially given the opaqueness surrounding OWS.

153.    Further, Armistice was aware (as Boyd shared with Floroiu) that in the three weeks preceding Floroiu's appointment, the short interest against Vaxart had nearly tripled, with nearly 4.7 million outstanding shorts as of June 15, 2022.[13] As such, investors with short interests would be pressured to buy "to cover" Vaxart securities—including those released by the exercise of Armistice warrants—if the price of Vaxart securities were to spike from positive COVID-19 news.

154.    Defendants thus orchestrated an unprecedented-for-Vaxart press release and public relations blitz timed and orchestrated to drive up Vaxart's stock price ahead of Armistice dumping all of its remaining interest by the end of June. By the time Armistice would eventually dump its stock, Defendants would issue five press releases during the course of 10 business days (one every two days) and present at two investment conferences.

**T.3    Vaxart's Press Releases and Public Statements During the Ten-Day Blitz**

| Date | Press Release Title |
|------|---------------------|
| 6/15/2020 | Vaxart, Inc. Appoints New CEO to Accelerate Advancement of COVID-19 and Other Programs |
| 6/18/2020 | Vaxart Publishes Corporate Presentation on Website and Presents at Raymond James Human Health Innovation Conference |

---

[13] A "short" occurs when a trader sells a stock they do not own and instead has borrowed. If the price drops, the trader can buy a replacement stock at a lower price, return the share borrowed, and make a profit; however, if a stock price rises when the trader needs to return their borrowed stock, the trader will incur a loss by buying back a replacement at a higher price.

| Date | Press Release Title |
|------|---------------------|
| 6/23/2020 | Vaxart, Inc. to Present at the H.C. Wainwright Virtual Fireside Chat Series |
| 6/24/2020 | Vaxart, Inc. Set to Join Russell 3000® Index |
| 6/25/2020 | Vaxart, Inc. Signs Memorandum of Understanding with Attwill Medical Solutions Sterilflow, LP |
| 6/25/2020 | Floroiu and Tucker Present at H.C. Wainwright Fireside Chat Series |
| 6/26/2020 | Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed |

1.      **The June 15, 2020 Press Release Where Armistice and Boyd Express "Great Confidence" in Vaxart and Its New CEO as "Vaxart's Largest Institutional Investor"**

155.    On June 15, 2020, Defendants caused Vaxart to issue a press release, edited and approved by the Armistice Defendants, entitled, "Vaxart, Inc. Appoints New CEO to Accelerate Advancement of COVID-19 and Other Programs" with the subheading, "Andrei Floroiu Appointed Chief Executive Officer Wouter Latour, MD, to continue as Chairman of the Board." The press release stated in relevant part:

> Vaxart, Inc. ("Vaxart" or the "Company"), a clinical-stage biotechnology company developing oral recombinant vaccines that are administered by tablet rather than by injection, announced that effective today it has appointed Andrei Floroiu as Chief Executive Officer. Mr. Floroiu is a highly experienced biopharma executive with a proven track record of value creation, with substantial financial, strategic and operational experience in the vaccine and biopharmaceutical industry. He has served as a member of Vaxart's Board of Directors since April 2020 and will continue on the board while serving as Chief Executive Officer. Wouter Latour, MD will remain as Chairman of the Board and a director of the Company.
>
> "I am delighted to welcome Andrei to Vaxart and want to express my deepest confidence in him as we transition Vaxart's leadership," said Dr. Latour. "It has been an honor to lead this incredibly talented team and advance the clinical programs of the Company for the last eight years, and the Board of Directors and I are looking forward to working with Andrei and the management team to drive the Company to the next stage of growth."

Mr. Floroiu was most recently with Agenus, Inc., an immuno-oncology and vaccine pioneer, where he held executive positions and was responsible for structuring strategic partnerships and other transactions, including the origination and execution of a $115 million royalty transaction based on GSK's Shingrix vaccine. Prior to Agenus, Mr. Floroiu was a Managing Director at Exigo Capital providing strategic advice to C-suite executives and Boards. Mr. Floroiu also brings prior biopharma investment and advisory experience with The Invus Group, a leading healthcare investment firm, and McKinsey & Co, a leading management consultancy. Mr. Floroiu holds an MBA from the Wharton School, an MSc from the University of Maryland, and an Engineering degree from the Politechnica University of Bucharest.

"This is an exciting time for Vaxart, with tremendous prospects for growth and value creation in the new world ushered in by the coronavirus crisis," said Andrei Floroiu. *"Wouter and the Vaxart team brought the company to the remarkable position of playing a potentially crucial role in the reopening of America, and the world, by rapidly advancing the development of what could be the most effective and most convenient COVID-19 vaccine.* I am convinced that our work on COVID-19 will further validate the unique potential of Vaxart's oral vaccine technology against other viral threats and as a rapid response pandemic platform. Our strong balance sheet, with almost $30 million in cash as of March 31st, enables us to intensify our efforts, while also building upon the interest in the Company's disruptive vaccine platform."

*"With Andrei's appointment, we are pleased to have a seasoned executive with experience in vaccines and business development to build out the Company and set it on a path of sustainable growth,'* said Steven Boyd, a member of Vaxart's Board of Directors. '*As Vaxart's largest institutional investor, and having personally known Andrei since we both worked at McKinsey, I have great confidence in his ability to generate substantial shareholder value by unlocking the Company's tremendous potential. . . .*"

(Emphasis added.)

156.    As discussed above, the Armistice Defendants tasked Yedid and LifeSci to draft the June 15 press release. As part of his demands, Boyd relayed that he be quoted "to show continued commitment to Vaxart (despite recent stock sales)" and because the two of them (Boyd and Floroiu) had "worked together twice (at McKinsey & Armistice)." Thereafter, Boyd reviewed and suggested changes to the operative draft, instructing that the press release should not give the impression that Floroiu was coming in to do a big equity transaction. (Presumably, a big equity transaction would be

considered dilutive by investors and could depress Vaxart's stock price ahead of Armistice's sales.) Maher also wanted the press release to give the impression that Vaxart did not need cash and that royalty income would cover operating expenses. Boyd's quote was changed to reflect this concern:

**F.10    Excerpt of Redline Version of Draft June 15, 2020 CEO Transition Press Release Reviewed and Edited by the Armistice Defendants**

"With Andrei's appointment, we are pleased to have a seasoned executive with experience in vaccines and business development to build out the Company and set it on a path of sustainable growth," said Steven Boyd, ~~Director of Vaxart~~ a member of Vaxart's Board of Directors. "As Vaxart"s largest institutional investor and having personally known Andrei since we both worked at McKinsey, I have great confidence in his ability to generate substantial shareholder value by unlocking the Company's tremendous potential. Vaxart has a strong balance sheet, a recurring royalty stream from Inavir® marketed by Daiichi Sankyo to provide working capital, and multiple exciting partnership opportunities."

On June 14, 2020, Maher and Boyd signed off, with Boyd telling the Armistice-Controlled Directors, "Great work team. Looks good!" and "Absolutely. It reads well. Thanks for all your help." Still, Boyd made one further edit demonstrating his close attention to press releases, telling Yedid to make one last grammatical correction (a missing word).

157.    The June 15, 2020 press release is demonstrably false as the Armistice Defendants had so little confidence in Vaxart that they—Vaxart's largest institutional investor—were planning to sell almost the entirety of their remaining stock in the Company just 11 days later.[14] At the very least, Defendants knew that this omission was necessary to make its display of "great confidence" not misleading. The Armistice Defendants' "show of continued commitment to Vaxart" was false.

158.    The next morning, Floroiu texted Boyd to tell him that the "first reaction to our news is 10% up [emojis]." Within minutes, Boyd pointed out the short interest in Vaxart saying, "Pls don't share. But take a look at the last three weeks. That's a lot of shares to cover!"

---

[14] As of June 2, 2020, Armistice and Boyd reported that they held 19.99% of Vaxart's common stock based on 83,969,905 outstanding. They would soon reduce their ownership to a nominal amount, representing 0.2% based on 94,941,898 outstanding.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**2.     On June 18, 2020, Defendants State "Covid-19 Program Advancing Rapidly," "Phase 1 to Start in Summer," and "Manufacturing in Place"**

159.     On June 18, 2020, Vaxart filed a Form 8-K with the SEC stating that it intended to present an updated corporate presentation at the Raymond James Human Health Innovation Conference that day, attaching a copy. A copy was also posted on Vaxart's website. The presentation touted the speed with which the "Vaxart Program is Advancing Expeditiously," and posted a chart comparing its advantages to seven other vaccines, which included four of the five publicly named companies selected by OWS, highlighting Vaxart's vaccine, conveniently, as the eighth vaccine listed (which was the number of vaccines OWS announced it would support) as if Vaxart was in contention for OWS's eighth slot:

**F.11   Slide from Vaxart Presentation to Raymond James Conference Regarding Where Vaxart's COVID-19 Vaccine Candidate Stood Against Its Competitors**



160.     Floroiu attempted to share the deck with the Board of Directors the day before, on June 17, 2020, but did not know how, so he suggested getting it from Armistice: "We have a new deck, and we'll be testing a new way of telling the story. Not sure how you can access it, perhaps Armistice or LifeSci can help you?" (implying Boyd, Maher, and Armistice had the deck the day before and approved it).

161.    The corporate presentation, which has been taken down from Vaxart's website, also stated Good Manufacturing Practices ("GMP") for "Bulk Vaccine in Progress" and that Vaxart would submit its Investigative New Drug application to the FDA within 12 days (June 2020 month-end):

**F.12    Slides from Vaxart Presentation to Raymond James Conference Regarding Projected FDA Approval Cycle for Vaxart's COVID-19 Vaccine Candidate**

## Oral COVID-19 Vaccine – Phase 1 Ready

**CDMO Partners**
- Tech Transfers Complete
- GMP Bulk Vaccine in Progress




- **Clinical/Regulatory Activities**
  - IND submission in June
  - Clinical Study FPI Summer 2020
    - *Phase 1 open label, dose ranging*

                                                                    | 10

## Highlights

- **Disruptive Oral vaccine platform**
  - Validated approach: BARDA-funded flu challenge study
  - Could emerge as the ideal solution for COVID-19
    - Potentially best in class efficacy: mucosal & systemic immunity
    - Appeal of oral administration, low cost across supply chain, environmentally friendly
  - Advantages apply to other airborne & mucosal viruses - e.g., flu, norovirus, etc.)
- **Covid-19 program advancing rapidly**
  - Phase 1 to start in Summer 2020
  - Manufacturing in place
- **Norovirus program phase 2 ready**
- **Rapid response pandemic platform**: plug-n-play, ready for future pandemics
- **Strong balance sheet**: ~$30M cash on hand per March 31

                                                                    | 14

162.     In fact, Defendants had no real expectation that human clinical trials would start in June and were not ready to file their IND, which was a necessary requirement before starting clinical trials. The IND was not submitted to the FDA until August 10, 2020.[15]

163.     In the days after the release issued, on June 20, 2020, Defendants Maher and Floroiu held a call to discuss getting into as many conferences as possible "retail / Robin hood" interest in Vaxart,[16] presumably to strategize on how to drum up excitement for Vaxart's securities amongst such investors through the Company's press release and health care conference campaigns.

**3.     The June 23, 2020 Press Release—Defendant Floroiu to Participate in Live Broadcast on June 25, 2020 (Timed with the Attwill Manufacturing Press Release)**

164.     Next, on June 23, 2020, Defendants caused Vaxart to issue a press release entitled, "Vaxart, Inc. to Present at the H.C. Wainwright Virtual Fireside Chat Series," announcing that Defendant Floroiu would participate in a live broadcast for the H.C. Wainwright Fireside Chat Series on Thursday, June 25, at 10:25 AM EDT.

165.     This "live chat" was timed to occur with another planned announcement and just one day before the Armistice Defendants' planned massive sale of stock.

**4.     The June 24, 2020 Press Release: Vaxart Announces It Is Joining the Russell 3000**

166.     Before the market opened on June 24, 2020, Vaxart announced that effective Monday, June 29, 2020, it would join the Russell 3000, a stock market index benchmarked to the 3,000 largest publicly traded U.S. companies. The press release stated in relevant part:

> "I am extremely pleased with our progress to date in our ongoing effort to disrupt the vaccine industry by developing a transformative oral vaccine that is not only more convenient to administer, but has the potential to offer better protection than injectables against airborne viruses such as SARS-CoV-2, which causes COVID-19. Inclusion in the Russell 3000 Index has the potential to increase the liquidity of our stock and expose us to a wide range of institutions, investors, and index funds that reference them, facilitating the Company's growth, and drive the

---

[15] Vaxart's August 10, 2020 press release admits, "Filing the IND is the first major step of many we are taking to advance our oral vaccine in the prevention of COVID-19."

[16] A "retail investor" is a nonprofessional investor who buys and sells securities through a brokerage firm or savings account. "Robinhood" is an online discount brokerage that provides web- and mobile-based brokerage platforms to investors to buy and sell securities. The brokerage is popular among a subset of retail investors.

Company on its pathway to success," said Andrei Floroiu President and Chief Executive Officer of Vaxart, Inc.

167.     Floroiu dutifully reported to Maher that the press release was issued on *GlobeNewswire* at 8:00 AM. That day, Vaxart closed at $3.19, a 20% jump against the prior day's closing price.

168.     Vaxart knew its common stock qualified for the Russell Index in May 2020 and its selection was confirmed on June 5, 2020, when the Russell 3000, at approximately 6:00 PM that day, released its preliminary "add & delete lists" for the index, on which Vaxart appears as one of the tickers set to be added to the index.[17]

169.     Therefore, Defendants knew before June 24, 2020, that it would become part of the Russell Index, which represents approximately 98% of the investable U.S. equity market. But Defendants also knew that the Russell Index rebalances on the last Friday of June each year—June 26, 2020.[18] By building up the deceptive press releases ahead of the rebalancing, and timing the most important one to occur on the day of rebalancing, Armistice and Defendants could guarantee greater liquidity to dump its large holdings of Vaxart stock to take full advantage of the planned bump in its stock created by the PR campaign. And announcing the rebalancing two days ahead—and days ahead of when companies typically announced their inclusion in the Russell Index (companies generally announced their inclusion on the Russell Index when it became final—*i.e.*, after June 26, 2020)—Defendants could generate further demand against Armistice's sell off.

170.     With the market primed to receive Vaxart's final two announcements, the Armistice Defendants prepared the final steps for their planned sell-off. At Armistice's request, Vaxart's corporate controller, Margaret Echerd, confirmed for Boyd during the evening of June 24 that

---

[17] On June 5, 2020, the preliminary U.S. index add & delete lists were posted to the FTSE Russell website after 6:00 PM Eastern Time. *See* Press Release, FTSE RUSSELL (Mar. 3, 2020), https://www.ftserussell.com/press/ftse-russell-announces-2020-russell-us-indexes-reconstitution-schedule. Vaxart appears on the preliminary list. *See* Reconstitution: Russell 3000® Index - Additions, FTSE Russell, https://content.ftserussell.com/sites/default/files/ru3000_additions_20200619.pdf.

[18] In March 2020, FTSE Russell announced the 2020 schedule for the annual reconstitution, or rebalancing, of its Russell U.S. Indexes. Under that schedule: On June 5, the preliminary additions were posted on the FTSE Russell website. On June 15, 2020, the "lock-down" period began, when U.S. index add & delete lists were considered final. On June 26, the Russell Reconstitution would become final after the close of the U.S. equity markets. On June 29, equity markets would open with the newly reconstituted Russell U.S. Indexes.

Armistice could exercise its warrants "similar to the exercise of options." However, Ms. Echerd's email noted an unforeseen barrier to the Armistice Defendants' plans: though "Armistice [wa]s free to exercise the warrants at any time . . . the sale of shares [wa]s still restricted to trading in an open window"—that is, they were subject to the blackout trading window set by Vaxart's insider trading policy, as amended and approved during the June 8, 2020 Board Meeting.[19] As such, the Armistice Defendants were barred from trading between June 24 (one week prior to the June 30 fiscal quarter end) and August 8 (two full trading days after Vaxart publicly released its 2Q 2020 earnings).

171.    Not willing to abandon the pump-and-dump scheme, the Armistice Defendants decided to take extraordinary measures, specifically, by forcing through eleventh-hour changes to Vaxart's insider trading blackout policies—during an active blackout window—so that it could then dump its holdings on June 26, 2020, after the false and misleading OWS press release hit the wires. To that end, Armistice pushed Vaxart to have the regular blackout period begin "on the last day of each fiscal quarter"—here, June 30, 2020. And the following day, June 25, 2020, Defendants Boyd and Maher text messaged and/or called each Vaxart director to ensure they had e-signed the amended policy just hours before commanding Floroiu to publish the false and misleading "Selected for" OWS press release. *See* Part VI.D.7, *infra*.

**5.     In a June 25, 2020 Press Release, Defendants Claim They Signed a Contract Enabling the Production of a Billion or More Doses a Year**

172.    On the morning of June 25, 2020, at 8:00 AM, Defendants issued a press release entitled, "Vaxart, Inc. Signs Memorandum of Understanding with Attwill Medical Solutions Sterilflow, LP, Enabling Production of A Billion or More COVID-19 Vaccine Doses Per Year Through Large Scale Lyophilization, Tableting and Coating," which misleadingly suggested that Vaxart was

---

[19] Specifically, Vaxart's June 8, 2020 Insider Trading Policy provided that:

> Regular Blackout Periods Applicable to Restricted Persons. In addition to the general policy prohibiting trading while in possession of material nonpublic information, all Restricted Persons, and all family members of such persons and members of their household, are also prohibited from purchasing or selling our securities during the period beginning one week prior to the last day of each fiscal quarter and ending after the passage of two full trading days after earnings have been publicly released with respect to such quarter or fiscal year (each, a "regular blackout period").

close to production of a vaccine. The press release also stated that Attwill "*will be assigning dedicated resources and equipment for the scale up and commercial production of the vaccine upon entering a formal agreement*," and quoted Defendant Floroiu as saying, "We believe AMS' experience coupled with its *ability to manufacture a billion or more doses per year would be a beneficial addition to our group of CDMO partners and enable the large scale manufacturing and ultimate supply of our COVID-19 vaccine for the US, Europe and other countries in need.*" (Emphasis added.)

**F.13    Vaxart June 25, 2020 Press Release Regarding Attwill Memorandum of Understanding**



**Vaxart, Inc. Signs Memorandum of Understanding with Attwill Medical Solutions Steriflow, LP**

June 25, 2020

*Enabling Production of A Billion or More COVID-19 Vaccine Doses Per Year*

*Through Large Scale Lyophilization, Tableting and Coating*

SOUTH SAN FRANCISCO, Calif., June 25, 2020 (GLOBE NEWSWIRE) -- Vaxart, Inc. ("Vaxart" or the "Company"), a clinical-stage biotechnology company developing oral vaccines that are administered by tablet rather than by injection, announced today that it signed a Memorandum of Understanding with Attwill Medical Solutions Steriflow, LP (AMS) affirming the parties' intent to establish AMS as a resource for lyophilization development and large scale manufacturing including tableting and enteric coating for Vaxart's oral COVID-19 vaccine. AMS will be assigning dedicated resources and equipment for the scale up and commercial production of the vaccine upon entering a formal agreement.

"We believe AMS' experience coupled with its ability to manufacture a billion or more doses per year would be a beneficial addition to our group of CDMO partners and enable the large scale manufacturing and ultimate supply of our COVID-19 vaccine for the US, Europe and other countries in need," said Andrei Floroiu, CEO of Vaxart Inc.  "We believe our oral vaccines, generated on our proven platform, have the potential to offer superior protection against airborne viruses such as SARS-CoV-2 by triggering both mucosal and systemic immunity while being administered by a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns."

**About Vaxart**
Vaxart is a clinical-stage biotechnology company focused on developing oral tablet vaccines designed to generate mucosal and systemic immune responses that protect against a wide range of infectious diseases and has the potential to provide sterilizing immunity for diseases such as COVID-19. Vaxart believes that a room temperature stable tablet vaccine is easier to distribute, store and administer than injectable vaccines and may provide significantly faster response to a pandemic than injectable vaccines, enabling a greater portion of the population to be protected. Vaxart's development programs include oral tablet vaccines that are designed to protect against coronavirus, norovirus, seasonal influenza and respiratory syncytial virus (RSV), as well as a therapeutic vaccine for human papillomavirus (HPV). For more information, please visit www.vaxart.com.

173.    The timing of the Attwill press release—"before 8 am"—was dictated by the Armistice Defendants in a way that it would hit the news wires and impact the opening price for Vaxart securities, as instructed by Defendant Maher in a text message to Floroiu the night before. At 1:30 PM, on June 24, 2020, Maher texted Floroiu, asking Floroiu to call. Thereafter, Floroiu confirmed that he would after his flight. At 7:30 PM, Defendant Maher followed up on their conversation over text: "Can you please make sure that when we release news that it hits the tape and that it hits early in the morning, like before 8 am, etc." Floroiu responded, "I will. Though I see all our PR s [sic] came out at 8am. I

guess you didn't like the +20% [referring to that day's earlier Russell 3000 press release], and thought it should've been +50%? [emojis]." Defendant Maher responded, "No . . . I didn't see them hit the tape, please make sure that lifsci [sic] and [B]rant [Biehn, Vaxart press contact] put them out in a way that they hit the new wires." Floroiu responded, "OK, I will."

**F.14    June 24, 2020 Text Chain Excerpt in Which Defendant Maher Instructs Floroiu to Issue Upcoming Press Releases—That Is, for Attwill and OWS—Before Markets Open**







Floroiu followed Maher's dictate and made sure the press releases were issued as directed. As such, VXRT shares opened 13% higher with the Attwill announcement at $3.61 (+$0.42, +13.17%) on Thursday, June 25, 2020, over Wednesday's $3.19 closing price and reached a new 52-week high price of $6.48 that day. Ultimately, the stock closed at $6.26 that day, up $3.07, for a 96% gain against the prior day's closing price.

174.    Vaxart's purported new-found manufacturing ability, along with that day's H.C. Wainwright statements, including Defendant Floroiu's statement that "there may be other news, partnering and so on" that they would announce shortly, primed investors for the next day's planned "selected for" OWS announcement they had been withholding until the right time.

175.    But, at the time of its Attwill MOU, Defendants knew, or should have known, in the course of doing due diligence, their knowledge of the industry, and the boldness of their claims in the press release—that the Attwill press release was deceptive and/or misleading. Attwill did not have the critically necessary FDA certifications to manufacture any doses of Vaxart's COVID-19 vaccine and lacked the personnel and operational capabilities to manufacture a billion or more doses as well, as evidenced by the following investigation into Attwill that Plaintiffs conducted:

(a) Attwill is a small contract manufacturer currently based in Lodi, Wisconsin. Originally based in a suburb of Salt Lake City, Utah, in the residential home of its co-founder, managing partner, and Chief Operating Officer, Attilio Di Fiore ("Di Fiore"), in 2017 Attwill moved to its current location when it purchased pharmaceutical manufacturer Anteco Pharma LLC and its Wisconsin facility. At all relevant periods, Attwill had 25 to 30 personnel in total at the Company.

(b) At all relevant times, Attwill had three manufacturing lines of business: (1) lyophilization, a process whereby water is removed from a pharmaceutical ingredient (*i.e.*, a chemical compound) or food product by freeze-drying it (instead of heating it) and placing it under a vacuum; (2) vascular accessory medical products; and (3) peptide—short chemical chains of amino acids, linked by peptide bonds—biomaterial.

(c) CW2 worked for Attwill from September 2016 to July 2020. In 2018, CW2 was promoted to the position of Quality Control Specialist. In that role, CW2 reported to CW3, Attwill's Quality Assurance Manager. CW3, who was employed by Attwill from October 2016 to June 2020, reported directly to Di Fiore.

(d) In early 2020, CW2 was instructed to conduct a "Gap Assessment" of Attwill's capabilities. The goal of the review was to determine what would be required in order for Attwill to be able to obtain FDA certification to produce pharmaceutical products under 21 C.F.R. §§ 210 and 211, two of the most critical FDA provisions that drug manufacturers must adhere to before they are permitted to manufacture drugs under federal law. These two sections form the FDA's *current Good Manufacturing Practices* ("cGMP") and set forth the "minimum" methods and controls that drug producers must follow to "assure" that a treatment for human consumption has the safety, identity, and other characteristics that the treatment "purports or is represented to possess." Food & Drugs, 21 C.F.R. § 210.1(a) (2020). Obtaining and maintaining compliance with §§ 210 and 211 is no easy task for any company and is almost impossible for a company as small as Attwill. For example, the FDA estimated the annual record-keeping burden of 21 C.F.R. § 211.100(b) alone (requiring that compliance with written procedures be documented at time of performance and that any deviations be recorded and justified) to be 25,104 hours. Similarly, creating 25 new standard operating procedures—required by the FDA to assure drug quality, identity, and purity under 21 C.F.R. §§ 211—might, per the FDA's estimation, take 20 hours per person and 50,000 hours in one year. Rules and Regulations, 76 Fed. Reg. 188, 60055 (Sept. 18, 2011).

(e) CW2 handled the majority of the "Gap Assessment" review and drafted the final report summarizing the findings. CW3 reviewed the memo and assented to its findings. The report painted a dire picture. The report concluded that Attwill faced several significant regulatory gaps, which would require substantial time and expense to address, before the FDA would certify Attwill as complying with §§ 210 and 211. The report, and its findings, were conveyed to Attwill leadership, including to co-founders and managing partners William Jackson and Di Fiore.

(f) Further, CW2 explained that at the time Attwill was severely short staffed, a further factor that would not only hinder the company's ability to gain cGMP compliance, but also would have impacted Attwill's ability to manufacture the "billion or more doses per year" that Vaxart claimed in its June 25, 2020 press release. CW2 also said that Attwill also lacked the operational capacity to manufacture one billion doses per year. According to both CW2 and CW3, Attwill was so short-staffed, that personnel in one area or role occasionally had to assume duties in other areas, and both of these CWs, in their critical roles of maintaining product quality, often felt overworked and/or overwhelmed in their positions.

(g) Both CW2 and CW3 indicated that by the time each left Attwill, the company had not obtained cGMP certification under sections §§ 210 and 211. In fact, CW3 noted that they conducted two or three similar

Gap Assessments in 2019 for related cGMP certifications, and in each instance, Attwill had opted not to pursue certification due to the substantial resource investment it would require. The financial constraint experienced by Attwill is corroborated by a *Dun & Bradstreet* Business Information Report ("D&B Report") on the Company. The D&B report characterizes Attwill as having a "high" overall business risk, which was supported by a "high" delinquency predictor score and a "moderate-high" financial stress score; all of which indicate that Attwill was strained for cash and therefore could not move forward with obtaining regulatory certification to manufacture pharmaceutical drugs.

176.    Vaxart's internal communications confirm that it was Defendant Floroiu—not Attwill—who specifically added the "'billion or more'" language to the Attwill press release, and that after Floroiu spoke with Maher on June 24 at 2:57 PM, *see supra*, ¶ 173, Floroiu told the team that "I'm thinking maybe we flip the subtitles, start with the Big Bang first"—meaning the "'billion or more.'" Vaxart's staff, as well as Attwill, on the other hand, were surprised to see such language, as "'one billion or more'" tablets were more than the 100 million initially requested by Vaxart staff prior to Defendants' intervention. As put by one Vaxart employee: "Vaxart is trying to make a point to the world," and that point was that it "like[d] to think big [and] crazy."

177.    But as summarized above, at the time Vaxart and Attwill inked their MOU, Attwill lacked the ability from a regulatory, personnel, and operational standpoint to manufacturer Vaxart's COVID-19 vaccine in the short-to-medium term—a fact Defendants either knew or recklessly refused to confirm, as any reasonable company would perform due diligence before claiming that a contract was "Enabling Production of A Billion or More COVID-19 Vaccine Doses Per Year." Additionally, Vaxart was nowhere near ready to have Attwill prepare for manufacturing. On July 13, 2020, when Attwill reached out to Vaxart to say they were ready to start purchasing equipment to manufacture the vaccine tablets, Floroiu told his staff, "I assume you guys will reply to this? Is he a bit rushed?" Vaxart eventually responded, after telling Attwill that Vaxart first needed to inspect their facilities: "Ordering the tablet maker is premature unless it's also intended for significant use by other clients and that's how you're going to fund it. As a PMP and one who managed a fairly large biopharmaceutical construction project as a CFO, I would be against taking this step until the formal project plan is in place and signed off by both parties. In other words, this is at your risk if done ahead of that."

178.    Much later, in a February 3, 2021 presentation to the New York Academy of Sciences, Defendant Tucker admitted that the size of Vaxart's Phase 1 human clinical study was limited due to "the amount of drug product we had available," providing further confirmation that Vaxart and its partners lacked the ability to produce even a modest amount of the Company's vaccine candidate, much less "a billion or more" doses.

**6.      On June 25, 2020, Defendants Floroiu and Tucker Present at the H.C. Wainwright Virtual Fireside Chat Series, Reiterating the Importance of the Attwill Manufacturing "Agreement," Reaffirming Submission of IND Within Days, and Previewing "Besides, There May Be Other News, Partnering and So On" Shortly**

179.    On Thursday morning, June 25, 2020, Vaxart participated in H.C. Wainwright Virtual Fireside Chat Series. Both Defendants Floroiu and Tucker, Vaxart's Founder and Chief Scientific Officer, participated and presented to the audience. During the conference, Tucker stated, referring to a slide previously shown at the June 18 Raymond James Conference, "Again, we're working really fast, as fast as we've ever been able to do in for and we're about really [sic] submit our IND [Investigational New Drug Application] and really open up the regulatory path to start dosing people soon in the summer of this—this summer that is." The same corporate presentation used a week earlier showing the IND submission in June was shown to investors.

180.    Also at the conference, Defendant Tucker made reference to the press release (above) in response to a question by the host as to "what are the technical challenges you think is specific to Vaxart developing its coronavirus vaccine?" Defendant Tucker stated, highlighting the press release, "there's a press release that just came out today that, we've just signed an agreement with a major player that has great (inaudible) capabilities. So now that solves one of, what I would say, our biggest technical bottleneck in terms of manufacturing."

181.    Defendant Floroiu then reaffirmed that the "IND . . . should happen pretty soon and then following the start of human clinical trials which as Sean [Tucker] noticed should happen this summer."

182.    Finally, as a preview to building the excitement for the next days' OWS "selection for" OWS press release, Defendant Floroiu stated: "Besides that, there may be some other news on other fronts, partnering and so on that will release whenever they happen."

**7.    In a June 26, 2020 Press Release, Defendants Announce "Vaxart's COVID-19 Vaccine *Selected for* the U.S. Government's Operation Warp Speed"**

183.    By 5:05 PM on June 25, 2020, Armistice had received confirmation that all necessary parties had approved its desired changes to Vaxart's insider trading policy regular blackout period, such that it could now liquidate the entirety of its holdings. *See also* Part VI.D.5 (discussing Vaxart's June 8, 2020 insider trading policy blackout period, which blocked Armistice from selling Vaxart shares between June 24 and August 8, 2020). Accordingly, the only pump-and-dump precondition left to clear was to have Vaxart publish the false and misleading OWS press release.

184.    Defendant Boyd wasted no time in instructing Floroiu to "put out" the news release that Vaxart's staff had drafted regarding the NHP study (and which Boyd reviewed and/or was aware of the contents thereof). Though Vaxart staff had told LifeSci (who helped draft the release) that the Company did not plan to publish the news until after Vaxart actually had begun dosing primates in the NHP study, Boyd (and thus Armistice) issued Vaxart an ultimatum to publish the press release. Floroiu protested: "Steve, We just had *a full management team meeting, with [legal counsel] also, and concluded that what was discussed at the last Board meeting was not MNI, and therefore we confirm the previous CEO's decision that we do not need to put out a press release*. Therefore, you are cleared to trade in accordance with the new insider trading policy. Thanks!" (Emphasis added.) Threatening to put out the press release themselves, Boyd and Armistice shot back, "With all due respect, as a Firm, we are unsure if we agree with your assessment. *If the Company is not willing to release the information, Armistice may choose to do so*." (Emphasis added.)

185.    After several hours of meetings with Vaxart staff (Biehn and Tucker), and over the protest of Tucker, who stated, "Well, I disagree with the approach but it's your call. Please don't quote me in the PR." Floroiu relented without consulting any other Vaxart directors. It was not until July 20, 2020, and investigations ensued, that Floroiu shared Boyd's ultimatum and Tucker's disagreement with the non-Armistice members of the Board, Latour (then Chairman) and Finney, stating: "Just so you have the email I mentioned . . . from Steve before our PR on OWS."

1

2

**F.15    Excerpt from June 25, 2020 Email Chain in Which Defendant Boyd, on Behalf of Armistice, Orders Vaxart to Publish the "Selected For" OWS Press Release**

3

4

5

6

| From: | Steven Boyd [█████@armisticecapital.com] |
|---|---|
| Sent: | 6/25/2020 7:36:03 PM |
| To: | Andrei Floroiu [█████@vaxart.com] |
| CC: | Margaret Echerd [█████@vaxart.com]; Daniel Radden [█████@armisticecapital.com]; Faith Charles [█████@thompsonhine.com] |
| Subject: | Re: Preclearance |

7

With all due respect, as a Firm, we are unsure if we agree with your assessment. If the Company is not willing to release the information, Armistice may choose to do so.

8

Best,
Steve

9

10

11

12

On Jun 25, 2020, at 7:05 PM, Andrei Floroiu <█████@vaxart.com> wrote:

13

Steve,

14

15

We just had a full management team meeting, with Faith also, and concluded that what was discussed at the last Board meeting was not MNI, and therefore we confirm the previous CEO's decision that we do not need to put out a press release.

16

17

Therefore, you are cleared to trade in accordance with the new insider trading policy.

18

Thanks!
Andrei

19

20

**From:** Steven Boyd <█████@armisticecapital.com>
**Sent:** Thursday, June 25, 2020 6:57 PM
**To:** Andrei Floroiu <█████@vaxart.com>; Margaret Echerd <█████@vaxart.com>
**Cc:** Daniel Radden <█████@armisticecapital.com>; Faith Charles <█████@thompsonhine.com>
**Subject:** Preclearance

21

22

23

Team,

24

Through the course of discussions this evening we learned of a news release you intend to put out tomorrow AM. In accordance with the Company's policy, we'd like to request preclearance to trade after such news is disseminated. I can attest that neither I nor Keith nor Armistice is in possession of material non-public information. Thank you.

25

26

Congrats on all the progress.

27

Best,
Steve

28

186.     Before the market opened the following day, Friday, June 26, 2020, playing on investors' thirst to learn who the next two or three companies OWS would select for its program, and knowing that Armistice was ready to pull the trigger to exercise its warrants and dump its shares that day and the next, Defendants agreed to, caused, condoned, and let Vaxart issue a press release titled in bold letters, "**Vaxart's COVID-19 Vaccine *Selected for* the U.S. Government's Operation Warp Speed.**" (Emphasis added.) The subheading and the text of the announcement then stated that Vaxart's COVID-19 candidate "has been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed." In the following paragraph, Vaxart's new CEO, Defendant Floroiu, declared, "We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated."

**F.16     Vaxart's June 26, 2020 Press Release Claiming Its Vaccine Had Been "Selected For" OWS**



187.     The press release, and especially the bold headline and quote from Defendant Floroiu was intended by Defendants to create the impression that Vaxart's vaccine had been selected by OWS as one of the seven or eight recipients under consideration for significant support or consideration from

1   OWS to produce billions of vaccines by January 2021. In reality, Vaxart was not among the companies

2   selected to receive significant support or consideration from OWS to produce billions of vaccine doses.

3   As later clarified by Michael R. Caputo, the HHS assistant secretary for public affairs, "The U.S.

4   Department of Health and Human Services has entered into funding agreements with certain vaccine

5   manufacturers, and we are negotiating with others. Neither is the case with Vaxart. . . . Vaxart's vaccine

6   candidate was selected to participate in preliminary U.S. government studies to determine potential

7   areas for possible Operation Warp Speed partnership and support. At this time, those studies are

8   ongoing, and no determinations have been made."

9        188.    Defendants' artfully worded press release dramatically overstated the Company's

10   involvement with OWS. In truth, despite Defendant Floroiu's declaration, Vaxart was not "one of the

11   few companies selected by Operation Warp Speed." Vaxart deliberately blurred the line between the

12   two programs, willfully misleading investors and convincing the market that Vaxart's COVID-19

13   vaccine candidate was one of the two or three unknown vaccine candidates selected for federal funding.

14   Instead, Vaxart was not selected for any federal funding. Vaxart was merely granted permission to test

15   its COVID-19 vaccine candidate on non-human primates under a Material Transfer Agreement with

16   BARDA.

17        189.    Defendants knew that this bold headline was misleading and Floroiu's quote would be

18   misunderstood by investors who would then jump at the chance to buy Vaxart shares. In drafting the

19   press release, Defendants were aware that Operation Warp Speed was whittling down a list of 14 to 8

20   vaccine manufacturer finalists; Defendants added "OWS" to the title to "move the needle," as the

21   "[k]ey message [wa]s to link Vaxart to OWS, that's the only thing people will see." Defendants knew

22   that their participation in NHP trials (that had not been finalized or 100% confirmed by the

23   government) was immaterial, admitting amongst themselves, "If we were clearly better than everyone

24   else then we could expect BARDA to announce support, this might be challenging because according

25   to Sean [Tucker] NHP stomachs are not necessarily the best model for our vaccine. A hamster

26   challenge model would have been better but that seems to be on hold right now" and "Hmmm, so this

27   NHP stomach may be a poisoned chalice so to say." Defendants also had been informed that BARDA

28   and OWS constituted different teams—the latter being the final decisionmaker, and if Vaxart quoted

PLAINTIFFS' CORRECTED SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT - 76
Case No.: 3:20-cv-05949-VC

the head of OWS (Moncef Slaoui) in the press release, "there would be the possibility that he would start looking at the proposed study in more detail, and have issues with it that *could slow things down or worse*." (Emphasis added.) Additionally, the press release's language strongly differed from the more toned-down language Vaxart used to describe the NHP both before and after the June 26 press release.[20]

190.    Internally, LifeSci—Vaxart's PR firm—criticized Vaxart's silence, "You know what, I am going to take my name of[f] the [press] release going forward" and "Sorry. . . . I don't think I can work on this client anymore. It's a good story but I'm going to burn too many contact[s] like this." Two weeks later, when Vaxart wanted to issue a new press release, LifeSci responded, "It's standard practice if you have a story to tell, not to say 'no comment.' It's also standard practice to issue announcements that are material. I don't think this release meets that standard for the reasons cited (*nor did the MOU and OWS releases for that matter*)." (Emphasis added.)

191.    Moreover, after receiving orders from Vaxart to issue the press release, certain LifeSci employees who helped Vaxart draft the OWS press release privately questioned whether Defendants were attempting a pump-and-dump fraud, even going so far as to call the false and misleading OWS press release the next episode in Vaxart's "House of Cards."

---

[20] For example, the press release language differed from how Vaxart characterized the NHP program in its communications with U.S. governmental entities. For example, in a June 5, 2020 letter to the FDA regarding the Company's pre-IND filing, Defendants represented to the FDA that the "oral vaccine has been selected *for testing* in the harmonized NHP protocol *being conducted under Operation Warp Speed by BARDA/NIH*" (emphasis added). Notably, the June 26, 2020 "OWS" press release omitted the fact that its "selection" was only for testing in a protocol conducted by BARDA/NIH. As a second example, in September, Defendants toned down the language to more accurately reflect that this was nothing more than a "preclinical program . . . being conducted in collaboration with the Biomedical Advanced Research and Development Authority (BARDA) and other entities working with Operation Warp Speed."

**F.17    June 25 & 26, 2020 Email Chain (Excerpts) Among LifeSci Employees Concerning Vaxart's HC Wainwright Fireside Chat and "Selected for" OWS Press Release**

| | |
|---|---|
| **From:** | Hans Herklots |
| **Sent:** | Friday, June 26, 2020 3:23 AM |
| **To:** | Matt Middleman |
| **Cc:** | Daniel Perlmutter;Brianna Bundshuh |
| **Subject:** | Re: Vaxart HC Wainwright fireside chat today (21 minutes) |
| **Attachments:** | 2020-06-26 -- VXRT -- Vax Selected for Operation Warp Speed -- FINAL.pdf |

Stock went up another 27% after hours. House of Card, next episode today:

It's now trending on robinhood, they're all swarming into this. Could very well become 3B before the end of the summer. Next milestone is start of P1, which I believe should be July/August.

Oh well.

> On Jun 25, 2020, at 22:20, Matt Middleman <████@lifescicomms.com> wrote:
>
> Amazing, isn't it, especially because it's all retail. How does retail drive a stock to $3bn? I feel bad for those retail investors that don't understand what they're doing well enough to separate real from fiction. This is a house of cards.
>
>
> **Matt Middleman, M.D.**
> Founding Partner, CEO
> LifeSci Communications, LLC
>
>
> On Jun 25, 2020, at 21:28, Matt Middleman <████@lifescicomms.com> wrote:
>
> We've seen this exact process play out with another FORMER client. CytoDyn. We fired them as a client bc it was shady over promotion we wanted no part of it as an agency. Not saying that's these guys but it played out similarly. CytoDyn ended up getting skewered in STAT by Feuerstein over the course of three feature stories for this shady stock pumping. Thankfully this was after we fired them.
>
> https://www.statnews.com/2020/05/04/without-showing-any-data-cytodyn-touts-treatment-for-covid-19-as-winner-while-its-ceo-sells-stock/
>
> ## Without showing any data, CytoDyn touts treatment for Covid-19 as winner — while its CEO sells stock
>
>
> **Matt Middleman, M.D.**
> Founding Partner, CEO
> LifeSci Communications, LLC

192.    Defendants had weeks to think about how to word their NHP program press release. As noted above, Defendants had discussed the NHP program as early as the June 8, 2020 Board meeting, if not earlier, and began drafting the release on June 9, with plans not to issue it until the primates were dosed. By now, this was old and obviously immaterial news to Defendants—at least until Vaxart had an actual contract with OWS or had actually begun the NHP challenge study.

193.    In fact, further diminishing the import of these trials, on February 3, 2021, Vaxart revealed that it had prematurely terminated its primate trial without results. Defendants also disclosed for the first time that it had "previous experience with the NHP model and the difficulties of oral administration in this model" and therefore strongly inferred that it was not surprised by the failure of the study to evaluate its vaccines, an important omission to their "selection for" OWS press release:

> *Non-Human Primate Study Update*
>
> As previously disclosed, the Company's oral COVID-19 vaccine was selected to participate in a non-human primate challenge ("NHP") study, organized by Operation Warp Speed and funded by the Biomedical Advanced Research and Development Authority ("BARDA") under contract with a research laboratory and in collaboration with USG partners. The Company recently received data from the NHP challenge study of its COVID-19 vaccine candidate. After reviewing the information provided by BARDA, the Company concluded that the study was unable to evaluate the Company's COVID-19 vaccine candidate because of oral vaccine delivery challenges in non-human primate model systems. *The Company has significant previous experience with the NHP model and the difficulties of oral administration in this model.* Therefore, the Company asked that an active control arm be included in the study, with a vaccine (norovirus) that has previously shown high immunogenicity in both NHP and clinical (human) studies, to validate that protocols and procedures were adequate for the NHP model. Data from the active control arm led the Company to conclude that the NHP study was unable to evaluate either vaccine.

(Emphasis added.)

1

2

**E.    The Market Reacts—Financial Press and Investors Continuously Interpret Vaxart's "Selection for" OWS Press Release as Defendants Hoped, up through July 22, 2020**

194.    As expected, the announcement that Vaxart had been "selected for the U.S. Government's Operation Warp Speed" sparked the tinderbox laid by Defendants' prior press campaign. Immediately, Vaxart's common stock soared, reaching an intra-day all-time high of $14.30, before ultimately closing at $8.04, a 28% gain against the prior day's closing price.

195.    An hour before the release, Hans Herklots of LifeSci emailed Floroiu and a Vaxart employee to ask them about the sudden decision to change course and publish the OWS press release prior to the NHP study's commencement, in addition to cautioning them on how the release could be perceived, particularly among retail investors. Herklots warned Vaxart that, though it was great to see Vaxart's market cap appreciate, Vaxart needed to "be careful not to be seen as the next plaything of teenagers"—referring to Robinhood's retail investor user base. In response, Floroiu confirmed that the monkeys had not been dosed and that there was no plan to issue a separate announcement when that occurred. Further, Floroiu covered Armistice's interference and pressure saying "we" decided the news was "material enough to release."

1

2

**F.18    Excerpt from June 26, 2020 Email Chain from Herklots to Biehn and Floroiu Regarding the June 26 Press Release and Floroiu's Response**

3

| From: | Andrei Floroiu |
| --- | --- |
| **Sent**: | 6/26/2020 8:57:16 AM |
| **To**: | Hans Herklots [████@lifesciadvisors.com]; Brant Biehn [████@vaxart.com] |
| **CC**: | David Holmes [████@lifesciadvisors.com] |
| **Subject**: | Re: PR to release Friday Morning |

No and don't think so.

We decided it's material enough to release it.

---

**From:** Hans Herklots <████@lifesciadvisors.com>
**Sent:** Friday, June 26, 2020 6:59 AM
**To:** Brant Biehn <████@vaxart.com>
**Cc:** David Holmes <████@lifesciadvisors.com>; Andrei Floroiu <████@vaxart.com>
**Subject:** Re: PR to release Friday Morning

Hi Brant, Andrei,

Has the first monkey been dosed, or you intend to issue a separate announcement when that happens? I just wondered what triggered this release.

Also, what's the visibility on the start of the P1 trial?

Andrei, you mentioned robinhood the other day, well, check out their website, they're all over this. Although it's great to see the market cap appreciate, we need to be careful not to be seen as the next plaything of teenagers. The serious government agencies and corporates you're speaking to might raise their eyebrows, and that would be unfortunate.

Thanks & fasten your seatbelts today.
Hans

196.    Within minutes of hitting the wire, Vaxart started to receive inquiries from sophisticated news outlets—including Bloomberg, *Business Insider*, Investor's Business Daily, and NBC—all seeking to speak with the Company's CEO regarding its purported selection for OWS. Each inquiry was forwarded by LifeSci to Floroiu, samples of which are provided below. Notably, none of the press inquiries received understood Vaxart's purported selection to pertain solely to an NHP challenge study.

1    **F.19    Sampling of Emails from Press to Vaxart re: Its Purported Selection for OWS**

2

3    **From:** "Hiler, Clare (NBCUniversal)" <████████@nbcuni.com>
      **Subject:** NBC News + Vaxart
      **Date:** June 26, 2020 at 16:38:16 GMT+2
4    **To:** ██@vaxart.com" <██@vaxart.com>, "████████@lifesciadvisors.com"
      <████████@lifesciadvisors.com>

5    [EXTERNAL]
      Hi All -

6    My name is Clare Hiler and I'm a booking producer at NBC News focusing on our vaccine reporting.

7    I just saw Vaxart's news of being selected for Operation Warp Speed to test the first oral Covid-19 vaccine.
      Congratulations on this milestone for your team!

8

9    Would you have time to connect early next week on how we could work with you on future potential
      coverage?

10   Thank you!
      Clare

11

12   **From:** "Cristin Flanagan (BLOOMBERG/ NEWSROOM:)" <████████@bloomberg.net>
      **Subject:** Bloomberg News Query
13   **Date:** June 26, 2020 at 16:12:57 GMT+2
      **To:** ████████@lifesciadvisors.com
14   **Cc:** ██@vaxart.com
      **Reply-To:** "Cristin Flanagan" <████████@bloomberg.net>

15

16   [EXTERNAL]
      Hi tried to reach you by phone but got an anonymous voicemail.
17   Wondering if Vaxart can clarify if the selection for Operation Warp Speed
      comes with any funding.
18   Will this primate trial also be testing other vaccines as well?
      Best,
      Cristin

19

20   **From:** Allison Gatlin <████████@investors.com>
      **Subject:** Media inquiry: Vaxart Covid-19 vaccine
      **Date:** June 26, 2020 at 16:51:14 GMT+2
21   **To:** "████████@lifesciadvisors.com" <████████@lifesciadvisors.com>

22   [EXTERNAL]
      Hi Hans,

23   My name is Allison Gatlin, I'm a reporter with Investor's Business Daily. I'm working on a story about Vaxart's
      Covid-19 vaccine being selected for Operation Warp Speed. The CEO mentions Vaxart's is the only oral
24   formulation in the program. Can Vaxart comment on how this help differentiate its vaccine from the injectable
      candidates? Are there other formulations being tested?

25   My deadline is 2 p.m. PT.

26   Thanks,
      Allison

27

28

197.    Despite LifeSci's numerous requests that Vaxart provide an "informed answer" to each media response, Floroiu refused to provide any clarity to news outlets, investors, or LifeSci regarding Vaxart's OWS claims, stating that "I don't want us to talk to the press now. We need to be thoughtful, and there are lots of things going on here."

198.    Additionally, when an associate editor from Endpoint News, a biotech site, reached out to LifeSci at about 8:30 AM (30 minutes after the press release went out), to clarify Vaxart's involvement with OWS, asking "Just wanted to follow up on today's Vaxart announcement that they're on the Operation Warp Speed list. Does that refer to the long list of 14 biotechs or the short list of 7?", Defendants refused to clarify. Responding to LifeSci's request for clarification "asap," Floroiu responded, "I think our answer is that we only know we are on in the program. We don't know anything about lists. Or better not to answer this at all?" LifeSci responded: "Andrei, We need to give an informed answer. What do we know? When we send out these announcements, we should be able to speak to them." Floroiu did not respond, letting the confusion reign and stock run.

199.    Without clarification, sophisticated news outlets and investment analysts continued to believe Vaxart's vaccine was "selected for" Operation Warp Speed up through July 2020.

200.    On June 29, 2020, for example, *Genetic Engineering and Biotechnology News* published an article titled "Vaxart Oral COVID-19 Vaccine Joins Trump's 'Warp Speed,' Ramps Up Manufacturing Capacity," reporting on Vaxart's recent announcements, including Floroiu's appointment as CEO, the Attwill MOU, and the June 26 "selected for" OWS press release. The outlet wrote, among other things, that:

> Vaxart's oral COVID-19 vaccine candidate has joined the handful of experimental vaccines being studied as part of President Donald Trump's commitment to delivering 300 million vaccine doses protecting against SARS-CoV-2 by January 2021—while the company gears up to manufacture as many as one billion doses a year.

> The South San Francisco, CA, vaccine developer said Friday that its room temperature stable tablet vaccine had been selected for a non-human primate (NHP) challenge study organized and funded by Operation Warp Speed.

*        *        *

> "We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated," Vaxart CEO Andrei Floroiu said in a statement.

*    *    *

> Vaxart announced its inclusion in Operation Warp speed a day after disclosing plans to ramp up manufacturing of its COVID-19 vaccine to one billion or more doses a year, through a Memorandum of Understanding the company signed with Attwill Medical Solutions Sterilflow (AMS).

201. On July 10, 2020, *Pharmaceutical Technology* similarly reported in an article titled "Novavax to receive $1.6B from Operation Warp Speed for the development of Covid-19 vaccine" that:

> In early June, five finalists for funding were chosen: AstraZeneca, Johnson & Johnson, Merck, Moderna, and Pfizer. Other recent announcements from vaccine developers, such as Vaxart and Inovio, have been made by the companies rather by than the HHS itself.

202. On July 22, 2020, *The Motley Fool* analyst Alex Carchidi wrote an article published by NASDAQ entitled, "Everything You Need to Know About Operation Warp Speed's Coronavirus Vaccine Accelerator," stating in relevant part:

> With the coronavirus pandemic gripping the world, governments everywhere are desperate to speed up the discovery of a vaccine. In the U.S., since May, this dire need has been addressed by a vaccine accelerator project called Operation Warp Speed (OWS), which subsidizes public and private companies to the tune of billions of dollars, to incentivize vaccine development at the fastest possible pace.

> Given the high stakes and the formidable impact of the program's grants, savvy healthcare investors looking to create a portfolio of coronavirus stocks need to learn about Operation Warp Speed and its implications for the global vaccine race.

> Ambitious timetables and meaty grants make OWS a potential equalizer for participants

> According to the Department of Health and Human Services (HHS), which sponsors the program, Operation Warp Speed aims to "deliver 300 million doses of a safe, effective vaccine for COVID-19 by January 2021, as part of a broader strategy to accelerate the development, manufacturing, and distribution of COVID-19 vaccines, therapeutics, and diagnostics." HHS runs the accelerator with the help of the

Biomedical Advanced Research and Development Authority (BARDA), a lesser-known government organization responsible for developing vaccines or therapies for novel epidemics and bioweapon attacks.

*So far, it's thought that OWS has funded at least nine independent coronavirus vaccine efforts* and a smattering of related projects, with *awards split almost evenly between large pharmas and clinical-stage biotech companies.* Most investors know big pharma participants like Pfizer (NYSE: PFE), AstraZeneca (NYSE: AZN), and Johnson & Johnson (NYSE: JNJ), whereas biotechs like Moderna (NASDAQ: MRNA), Novavax (NASDAQ: NVAX), and *Vaxart (*NASDAQ: VXRT) are newcomers to the limelight created by the program.

Most of the biotech companies funded by OWS have no products with regulatory approval for sale, but that hasn't stopped them from getting large infusions of cash. Moderna received $500 million from the program, and Novavax accepted a stunning $1.6 billion award. These OWS grants have been favorable for investors, with stocks skyrocketing on news of each company's selection for the program.

*However, it's impossible to confirm exactly which projects are receiving funding, or how much funding is being disbursed in total, thanks to ongoing and opaque negotiations about commercialization between authorities and participants in the operation.* Similarly, it's unclear which criteria OWS uses to pick vaccine candidates to accelerate, but positive preliminary results are likely a decisive factor. One thing is certain: The accelerator is only intended to aid American companies in producing vaccine doses for domestic use, and competitors from China are explicitly excluded.

(Emphasis added.)

## F.    The Armistice Defendants Liquidate Their Vaxart Holdings

203.    As planned, that same day the Armistice Defendants timed their sales with the announcement, converting the entirety of its $0.30 Warrants to common stock—16,666,667 shares—and then selling those shares, along with an additional 1,560,000 of its existing common stock holdings at prices between $7.97 and $12.89 per share for an average price of $10.38 per share. This contemporaneous sale of over 18.2 million shares grossed the Armistice Defendants $189 million and dragged down Vaxart's common stock price from its intra-day high.

204.    The following trading day, Monday, June 29, 2020, the Armistice Defendants converted the entirety of their $1.10 Warrants into common stock—4,090,909 shares—and sold those shares,

along with 5,294,477 shares of existing common stock holdings at prices between $6.58 and $9.90 per share for an average sales price of $8.29 per share. This sale of almost 9.4 million shares grossed the Armistice Defendants a further $77.8 million.

205.    Even with the 19.99% ownership limitation amended warrant threshold, the Armistice Defendants could not exercise all of their warrants at once and sell the common stock—it still took two days. As admitted by the Armistice Defendants in a related, derivative action:

> Following Vaxart's pre-market public announcement regarding the Primate Study on June 26, 2020, Vaxart's stock price increased, rising from $6.26 per share to close at $8.04. Armistice only began to exercise the Warrants after the Primate Study information was made public. To facilitate the exercises, Armistice emailed exercise notices to Vaxart, identifying the Warrant series and number of shares it was exercising each time. Armistice could not exercise all 20,757,576 Warrants at once due to the 19.99% exercise restriction (20,757,576 Warrants); (May 12, 2020 Form 10-Q) (as of May 11, 2020, Vaxart had 74,184,322 shares). Instead, it necessarily had to do so in blocks, successively selling down its holdings and then buying back below the 19.99% threshold. Armistice paid Vaxart the exercise price for the shares it received following each exercise. In total, Armistice paid Vaxart $9.5 million for the 20,757,576 warrant shares it received between June 26 and June 29.

(Citations omitted.)

206.    Thus, the Armistice Defendants almost completely liquidated all of their common stock ownership in Vaxart, retaining just 0.2% of Vaxart's outstanding common stock. All together, these contemporaneous stock sales of over 27.6 million shares grossed the Armistice Defendants approximately $267 million. When combined with their earlier sales, the Armistice Defendants grossed approximately $320 million.

207.    The very next evening, on June 30, 2020, Davis congratulated Boyd and Maher on the "terrific returns you generated for your investors and firm" and wished them well. Yedid then added "I would love to do it again," before Davis stated, "Happy to help and it has been a pleasure working with you guys." In response, Boyd thanked his controlled directors saying "THANK YOU. All three of you. . . . It was not easy. Thank you. (Hope we do it again sometime)."

208.    Yedid then wasted no time asking Boyd and Maher to meet to consider giving LifeSci more of the business of the Armistice portfolio of companies, which Boyd responded, "Would love

1    that."

2    **G.    Defendants Raise $90 Million for Vaxart on the Heels of the Ten-Day Press Release Blitz Through an ATM Facility to Private Investors**

3

4    209.    At the same time the Armistice Defendants were positioning to liquidate their holdings,

5    Vaxart, helmed by Floroiu, made its move to seize on its elevated stock price and raise millions in

6    funding. Less than an hour after the release hit the wire, Floroiu—aware that Vaxart's stock would

7    soon rise above $10 per share—emailed Vaxart's Board (excluding Boyd and Maher) to schedule a

8    call on how best to raise money with the stock price windfall and therein acknowledged that Armistice

9    was conflicted while selling when Vaxart wanted to sell. Additionally, Floroiu contacted SVB Leerink

10   to schedule a teleconference regarding rushed financing options for obtaining further funding and

11   working capital to be held that afternoon.

12   210.    Over the following weeks, the Vaxart Board considered several options for raising

13   funds and ultimately settled on an At-the-Market ("ATM") offering by July 6, 2020. Prior to the ATM

14   filing, Latour—now Chairman of the Board—asked Floroiu for updates on key deliverables, including

15   the NHP study, for which Vaxart had received no news from BARDA since the June 26 press release.

16   After Floroiu confirmed that Vaxart had received no updates, Latour inquired whether there were any

17   concerns, given that the NHP study was taking a long time to start, and what subsequent disclosures

18   Vaxart had made on the topic. As part of that conversation, Latour advised Floroiu that Vaxart should

19   "make it crystal clear" in the risk disclosures for the ATM filing "that Vaxart was selected for the NH

20   primate study only, not for the full development program like the other 5 big companies"—such as

21   Moderna and Pfizer.

22

23

24

25

26

27

28

**F.20     July 7, 2020 Email Chain Excerpt in Which Defendant Latour Pushes for Defendants to Make "Crystal Clear that Vaxart Was Selected for the NH Primate Study Only"**

From: Wouter Latour <███████@vaxart.com>
Sent: Tuesday, July 7, 2020 8:51 PM
To: Andrei Floroiu <███████@vaxart.com>
Cc: Charles, Faith <███████@thompsonhine.com>
Subject: Re: ATM, Key Deliverables

CAUTION EXTERNAL EMAIL
Andrei,

My two cents: I would make it crystal clear that Vaxart was selected for the NH primate study only, not for the full development program like the other 5 big companies.

You may also want to add wording to explain that, while Vaxart believes its vaccine will be evaluated in the NHP study funded by OWS, it is not guaranteed that the study will actually be conducted (for whatever reasons: technical, USG/OWS may change its mind, etc.). Or at least wording that you feel reflect the exact situation, and that you can substantiate - if necessary.

I hope that is helpful.  Good luck with the last steps.

CC-ing Faith to make sure she is in the loop as well.

Latour's recommendation was rejected by Floroiu, and no disclosure to that effect was included in Vaxart's ATM filing.

**H.     The Truth Emerges: Corrective Disclosure and Post-Class Period Events**

211.     On Saturday, July 25, 2020, the *New York Times* published an article primarily focused on Vaxart headlined, "Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine," which highlighted the astonishing sums Armistice earned from its contemporaneous stock sales and pierced the deliberately misleading obfuscation created by Vaxart's June 26, 2020 "selection for" OWS press release. The *New York Times* article stated in relevant part:

> **Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine**
>
> Well-timed stock bets have generated big profits for senior executives and board members at companies developing vaccines and treatments.
>
> On June 26, a small South San Francisco company called Vaxart made a surprise announcement: A coronavirus vaccine it was working on had been selected by the U.S. government to be part of Operation Warp Speed, the flagship federal initiative to quickly develop drugs to combat Covid-19.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Vaxart's shares soared. Company insiders, who weeks earlier had received stock options worth a few million dollars, saw the value of those awards increase sixfold. And a hedge fund that partly controlled the company walked away with more than $200 million in instant profits.

The race is on to develop a coronavirus vaccine, and some companies and investors are betting that the winners stand to earn vast profits from selling hundreds of millions—or even billions—of doses to a desperate public.

Across the pharmaceutical and medical industries, senior executives and board members are capitalizing on that dynamic.

They are making millions of dollars after announcing positive developments, including support from the government, in their efforts to fight Covid-19. After such announcements, insiders from at least 11 companies—most of them smaller firms whose fortunes often hinge on the success or failure of a single drug—have sold shares worth well over $1 billion since March, according to figures compiled for The New York Times by Equilar, a data provider.

In some cases, company insiders are profiting from regularly scheduled compensation or automatic stock trades. But in other situations, senior officials appear to be pouncing on opportunities to cash out while their stock prices are sky high. And some companies have awarded stock options to executives shortly before market-moving announcements about their vaccine progress.

The sudden windfalls highlight the powerful financial incentives for company officials to generate positive headlines in the race for coronavirus vaccines and treatments, even if the drugs might never pan out.

*Some companies are attracting government scrutiny for potentially using their associations with Operation Warp Speed as marketing ploys.*

For example, the headline on Vaxart's news release declared: 'Vaxart's Covid-19 Vaccine Selected for the U.S. Government's Operation Warp Speed.' *But the reality is more complex.*

Vaxart's vaccine candidate was included in a trial on primates that a federal agency was organizing in conjunction with Operation Warp Speed. But Vaxart is not among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses.

'The U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers, and we are negotiating with others. Neither is the case with Vaxart,' said Michael R. Caputo, the department's assistant secretary for public affairs. 'Vaxart's vaccine candidate was selected to participate in preliminary U.S. government studies to determine potential areas for possible Operation Warp Speed partnership and support. At this time, those studies are ongoing, and no determinations have been made.'

*Some officials at the Department of Health and Human Services have grown concerned about whether companies including Vaxart are trying to inflate their stock prices by exaggerating their roles in Warp Speed, a senior Trump administration official said. The department has relayed those concerns to the Securities and Exchange Commission, said the official, who spoke on the condition of anonymity.*

\*        \*        \*

*Vaxart, though, is where the most money was made the fastest.*

At the start of the year, its shares were around 35 cents. Then in late January, Vaxart began working on an orally administered coronavirus vaccine, and its shares started rising.

Vaxart's largest shareholder was a New York hedge fund, Armistice Capital, which last year acquired nearly two-thirds of the company's shares. Two Armistice executives, including the hedge fund's founder, Steven Boyd, joined Vaxart's board of directors. The hedge fund also purchased rights, known as warrants, to buy 21 million more Vaxart shares at some point in the future for as little as 30 cents each.

Vaxart has never brought a vaccine to market. It has just 15 employees. But throughout the spring, Vaxart announced positive preliminary data for its vaccine, along with a partnership with a company that could manufacture it. By late April, with investors sensing the potential for big profits, the company's shares had reached $3.66—a tenfold increase from January.

On June 8, Vaxart changed the terms of its warrants agreement with Armistice, making it easier for the hedge fund to rapidly acquire the 21 million shares, rather than having to buy and sell in smaller batches.

One week later, Vaxart announced that its chief executive was stepping down, though he would remain chairman. The new C.E.O., Mr. Floroiu, had previously worked with Mr. Boyd, Armistice's founder, at the hedge fund and the consulting firm McKinsey.

On June 25, Vaxart announced that it had signed a letter of intent with another company that might help it mass-produce a coronavirus vaccine. Vaxart's shares nearly doubled that day.

The next day, Vaxart issued its news release saying it had been selected for Operation Warp Speed. Its shares instantly doubled again, at one pointing hitting $14, their highest level in years.

'We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated,' Mr. Floroiu said.

Armistice took advantage of the stock's exponential increase—at that point up more than 3,600 percent since January. On June 26, a Friday, and the next Monday, the hedge fund exercised its warrants to buy nearly 21 million Vaxart shares for either 30 cents or $1.10 a share—purchases it would not have been able to make as quickly had its agreement with Vaxart not been modified weeks earlier.

Armistice then immediately sold the shares at prices from $6.58 to $12.89 a share, according to securities filings. The hedge fund's profits were immense: more than $197 million.

'It looks like the warrants may have been reconfigured at a time when they knew good news was coming,' said Robert Daines, a professor at Stanford Law School who is an expert on corporate governance. 'That's a valuable change, made right as the company's stock price was about to rise.'

At the same time, the hedge fund also unloaded some of the Vaxart shares it had previously bought, notching tens of millions of dollars in additional profits.

By the end of that Monday, June 29, Armistice had sold almost all of its Vaxart shares.

Mr. Boyd and Armistice declined to comment.

Mr. Floroiu said the change to the Armistice agreement "was in the best interests of Vaxart and its stockholders" and helped it raise money to work on the Covid-19 vaccine.

He and other Vaxart board members also were positioned for big personal profits. When he became chief executive in mid-June, Mr. Floroiu received stock options that were worth about $4.3 million. A month later, those options were worth more than $28 million.

> Normally when companies issue stock options to executives, the options can't be exercised for months or years. Because of the unusual terms and the run-up in Vaxart's stock price, most of Mr. Floroiu's can be cashed in now.
>
> Vaxart's board members also received large grants of stock options, giving them the right to buy shares in the company at prices well below where the stock is now trading. The higher the shares fly, the bigger the profits.
>
> 'Vaxart is disrupting the vaccine world,' Mr. Floroiu boasted during a virtual investor conference on Thursday. He added that his impression was that 'it's OK to make a profit from Covid vaccines, as long as you're not profiteering.'

(Emphasis added.)

212.    The article threw cold water on the idea that Vaxart was "selected for" OWS—and, further, denied that Vaxart was currently even under consideration:

> Vaxart's vaccine candidate was included in a trial on primates that a federal agency was organizing in *conjunction* with Operation Warp Speed. But *Vaxart is not among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses.*
>
> 'The U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers, and we are negotiating with others. *Neither is the case with Vaxart,*' said Michael R. Caputo, the department's assistant secretary for public affairs. 'Vaxart's vaccine candidate was selected to participate in *preliminary* U.S. government studies to determine *potential* areas for *possible* Operation Warp Speed partnership and support. At this time, those studies are ongoing, and no determinations have been made.'

(Emphasis added.)

213.    NHP study participation and "selection for" OWS are two distinct areas, the article explained. According to the HHS Spokesperson quoted in the article, the former is a "*preliminary*" study that may assist the federal government "to determine *potential* areas for *possible* Operation Warp Speed partnership and support." (Emphasis added.) These are contingent words, spoken in the future tense, by the HHS Spokesperson, showing what may happen at a later date, not the past tense language from Vaxart's June 26, 2020 press release—"We are very pleased to be one of the few companies

selected by Operation Warp Speed"—hammering home the illusion that Vaxart already belonged to the group of companies "selected for" OWS.

214.    In fact, the article stated, HHS officials took note of the misleading press release and upon learning about Armistice's contemporaneous stock sales, alerted the SEC:

> Some officials at the Department of Health and Human Services have grown concerned about whether companies including Vaxart are trying to inflate their stock prices by exaggerating their roles in Warp Speed, a senior Trump administration official said. The department has relayed those concerns to the Securities and Exchange Commission, said the official, who spoke on the condition of anonymity.

215.    That same day, HHS Office of the Assistant Secretary of Public affairs issued a message on the official account HHS Public Affairs Twitter site @SpoxHHS. The tweet stated:

> The US Department of Health and Human Resources has entered into funding agreements with certain vaccine manufacturers and we are negotiating with others. *Neither is the case with Vaxart*.

(Emphasis added.)

216.    HHS even sent out a second tweet further clarifying the de-minimis nature of Vaxart's connection with OWS:

> Vaxart's vaccine candidate was selected to participate in preliminary US government studies to *determine potential areas for possible* Operation Warp Speed partnership and support. At this time, those studies are ongoing and *no determinations have been made*.

(Emphasis added.)

1

**F.21    July 25, 2020 Tweet Issued by HHS Confirming No OWS Funding to Vaxart**



217.    HHS's concerns were justified and on October 14, 2020, Vaxart released a Form 8-K that admitted that their June 26, 2020 press release and the contemporaneous trades by Armistice have drawn scrutiny from federal investigators at the SEC and Department of Justice. According to the 8-K, in July 2020 the Company received a Grand Jury Subpoena from the U.S. Attorney's Office for the Northern District of California, calling for documents "which broadly pertain to the Company's participation in, and disclosure of, an Operation Warp Speed ('OWS')-funded nonhuman primate

study, and option grants, warrant transactions, and other corporate and financing matters."
Additionally, the same 8-K admitted that in August 2020 the SEC requested "a variety of documents
that broadly pertain to same subject matters of the documents provided to the U.S. Attorney's Office,
and related matters." One month later, in its 3Q 2020 10-Q, the Company also revealed that as of
October 2020, the U.S. Attorney for the Eastern District of New York and the Fraud Section of the
Department of Justice ("DOJ") were also investigating and that shortly thereafter the Company
received a DOJ grand jury subpoena seeking substantially the same information as the subpoena from
the Northern District of California.

218.    The following trading day after the *New York Times* article, Monday, July 27, 2020,
Vaxart's common stock fell to $11.16, a 9% drop from the prior trading day's closing price.

219.    Over the next three weeks, as the market digested the news that Vaxart overstated its
participation with the federal government in developing a COVID-19 vaccine, its common stock slid,
falling a further 17.5% through August, 19, 2020.

220.    After the market closed that day, *Business Insider* released an interview with OWS head
Moncef Slaoui that put the hammer down on Vaxart and its claim that it had been selected by OWS in
an article entitled, "The leader of Operation Warp Speed says some biotechs 'misled their
shareholders' and 'frustrated the hell' out of him by playing up connections to the secretive
government program." In relevant part, the article states:

> The head of Operation Warp Speed, the US government's secretive
> coronavirus vaccine initiative, has had it with companies that put out
> press releases claiming they're involved in the program.
>
> *            *            *
>
> "There's been a number of cases where companies have, frankly, made
> press releases that have frustrated the hell out of me because they *misled*,
> I think, *their shareholders* and their share price went up the roof just by
> saying the words Operation Warp Speed in the title of the press release,"
> Slaoui told *Business Insider*.

(Emphasis added.)

221.    While Vaxart was not named on the record by Slaoui, the article identified Vaxart as
fitting the description, and in particular Vaxart's press release entitled, "Vaxart's COVID-19 Vaccine

Selected for the U.S. Government's Operation Warp Speed," noting that Vaxart was not selected for Operation Warp Speed. The head of Operation Warp Speed went on to explain why OWS had been secretive of its selection process and why it could now talk about it:

> Warp Speed was seeking to back eight vaccines that range across four different types of technology, Slaoui said.
>
> If the program was publicly upfront about what it was looking for, Slaoui said "you'll have 25 companies with their shares going up the roof, 25 with their shares going down, every board being sued, shareholders, et cetera, et cetera. Because people will speculate what is it we are going after."
>
> Now, with the major funding deals in place and announced, Slaoui said Warp Speed is undergoing a "natural progression" where it can talk more openly about its work.

222.    As a result, Vaxart fell a further 4.3% the following day, August, 20, 2020, to close at $8.81.

## VII.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

223.    The allegations set forth above are incorporated herein by reference as further basis for this claim based on Rule 10b-5(b). Specifically, Plaintiffs incorporate by reference the press release statements, and the reasons they were false and misleading as pled in Part VI.D, *supra*.

### A.    Pre-Class Period Statements—Despite Cancelling the Norovirus Program in Late 2019, Throughout 2020 Vaxart Materially Misled Investors to Believe It Had an Ongoing Norovirus Program

224.    On January 2, 2020, Vaxart issued a press release announcing that the Board had terminated about half of the Company's employees, primarily in the manufacturing division, and henceforth, Vaxart would "prioritize and focus" its resources on its "norovirus and universal influenza programs":

> On December 26, 2019, the Board of Directors of Vaxart, Inc. approved a reduction-in-force affecting approximately 50% of our employees, which primarily impacted our manufacturing personnel. We expect to incur approximately $375,000 in severance and termination costs and to complete the reduction-in-force by January 31, 2020.
>
> We plan to prioritize and focus our resources on partnering opportunities, including our norovirus and universal influenza programs, and not on manufacturing capabilities.

225.    In Vaxart's January 22, 2020 press release announcing publication in the Lancet of positive results from a 2016-2017 influenza vaccine clinical study, the Company stated in its "About Vaxart" section that "Vaxart's development programs include oral tablet vaccines that are designed to protect against *norovirus*, seasonal influenza and respiratory syncytial virus (RSV), as well as a therapeutic vaccine for human papillomavirus (HPV)." (Emphasis added.) This exact statement was repeated no less than *20 times* throughout the end of August 2020 in press releases and Forms 8-K.

226.    Additionally, in that same January 22, 2020 press release, Vaxart claimed that "[t]hese results also confirm the value of our oral vaccine platform, particularly for mucosal pathogens such as flu, *norovirus*, RSV, as well as coronaviruses such as SARS, MERS and the virus that recently emerged in China." (Emphasis added.)

227.    In Vaxart's January 31, 2020 press release announcing initiation of its COVID-19 vaccine program, then-CEO Defendant Latour stated, "We believe our oral tablet vaccines provide substantial potential advantages, especially when targeting mucosal pathogens such as flu, *norovirus*, RSV and the recently emerged coronavirus." (Emphasis added.)

228.    In Vaxart's March 19, 2020 press release announcing its agreement with Emergent, its, 4Q and full year 2019 results, and its commitment to initiating a Phase 1 clinical study of its COVID-19 vaccine "early in the second half of 2020," the Company also explained that in light of its new focus on COVID-19, the norovirus program would be put "on hold":

> "This outbreak is a call to duty for all of us here at Vaxart and we are highly focused on the development of the COVID-19 vaccine," Dr. Latour continued. "*Accordingly, we have put several vaccine programs on hold, including the norovirus vaccine program* for which we recently successfully completed a Phase 1 study and for which we are actively seeking a development partner, as well as our therapeutic HPV vaccine program. The Janssen-partnered Universal Flu program is fully active and on track to be completed in the coming weeks."

(Emphasis added.)

229.    In Vaxart's April 28, 2020 press release announcing 1Q 2020 results and updated business strategy, the press release indicated that the Company's norovirus program was ongoing, stating:

> The Company continues to pursue strategic, financial and public-private partnerships to advance its development candidates, including its coronavirus vaccine candidates, norovirus and seasonal influenza vaccine programs.

230.    In Vaxart's May 12, 2020 press release announcing updated financial results, a reiteration of its prior animal results, and a statement that "[t]he manufacturing collaboration with Emergent BioSolutions is progressing well," the Company (i) repeated the April 28, 2020 statement indicating that the norovirus program was ongoing and (ii) cited a "decrease" in R&D expenses, "mainly due to a reduction in personnel costs after we ceased internal manufacturing as part of our December 2019 restructuring and *a reduction in expenditure on our norovirus vaccine candidate*." (Emphasis added.)

231.    The foregoing statements in ¶¶ 224-230 were materially false and misleading because, at the time they were made:

(a)    Vaxart had cancelled its norovirus vaccine program in late 2019 and discontinued its relationship with Lonza, the contract manufacturer tasked with supplementing the Company's norovirus efforts, and shortly thereafter terminated CW1, Vaxart's lead norovirus researcher, who had been tasked with developing Vaxart's norovirus vaccine, effective December 31, 2019. At the beginning of 2020, Vaxart had no norovirus program, nor any norovirus partners, as Johnson & Johnson served as the Company's lone partner, working with Vaxart to develop an influenza vaccine. Starting with Vaxart's January 2, 2020 Form 8-K, any and all statements that conveyed to readers the idea that Vaxart would "prioritize and focus" on norovirus and/or described Vaxart as a Company with development programs that "include" norovirus are false. Further, there was no "norovirus program" to put on hold, as the Company suggested in its March 19, 2020 statement. Nor was the Company continuing to pursue partnership efforts in its nonexistent norovirus program, as the Company suggested on April 28 and May 12, 2020. Moreover, Vaxart's May 12, 2020 statements about norovirus expenses omit the material fact that Vaxart had eliminated all norovirus expenses and not merely reduced them.

**B.    Vaxart Materially Misled Investors When It Claimed Attwill Had the Capacity to Manufacture a Billion or More Doses of Vaxart's COVID-19 Vaccine**

232.    On June 25, 2020, Vaxart issued a press release declaring that the Company had signed an MOU with Attwill "to manufacture a billion or more doses per year" of Vaxart's COVID-19 vaccine. The title of the press release exclaimed, "Vaxart, Inc. Signs Memorandum of Understanding with Attwill Medical Solutions Sterilflow, LP, Enabling Production of A Billion or More COVID-19 Vaccine Doses Per Year Through Large Scale Lyophilization, Tableting and Coating," and in relevant part stated:

> "We believe [Attwill] experience coupled with *its ability to manufacture a billion or more doses per year* would be a beneficial addition to our group of CDMO [contract development and manufacturing] partners *and enable the large scale manufacturing and ultimate supply of our COVID-19 vaccine for the US, Europe and other countries in need,*" said Andrei Floroiu, CEO of Vaxart Inc. "We believe our oral vaccines, generated on our proven platform, have the potential to offer superior protection against airborne viruses such as SARS-CoV-2 by triggering both mucosal and systemic immunity while being administered by a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns."

(Emphasis added.)

233.    The foregoing statement in ¶ 232 was materially false and misleading, in addition to reasons set forth in Part VI.D, *supra*, because, at the time it was made:

(a)    Attwill lacked the ability from a regulatory, personnel, or operational capacity to manufacturer Vaxart's COVID-19 vaccine. At that time, Attwill lacked FDA certification under 21 C.F.R. §§ 210 and 211, two key federal provisions known as current Good Manufacturing Practices—or cGMP—that drug manufacturers must adhere to before they are permitted to manufacture drugs under federal law. Obtaining and maintaining compliance with cGMP regulations is a time and resource consuming task, as federal regulations have long stated. *See supra*, 76 Fed. Reg. 188, 60055 (Sept. 18, 2011). As CW2, who served as Attwill's Quality Control Specialist from 2018 through July 2020, attests, in early 2020 Attwill directed CW2 to create a "Gap Assessment" report to determine what the Company would need to do to obtain cGMP

1    certification. That report, which was conveyed to Attwill leadership, repeated what
2    multiple prior "Gap Assessment" reports previously stated: Attwill faced several
3    significant regulatory gaps, which would require substantial time and expense to
4    address, before the FDA would certify Attwill as complying with §§ 210 and 211.
5    Further, CW2 explained that at the time Attwill was severely short-staffed. This fact
6    was corroborated by CW3, who supervised CW2 and served as Attwill's Quality
7    Assurance Manager from October 2016 to June 2020 and reported directly to Attwill
8    co-founder, managing partner, and Chief Operating Officer Di Fiore. According to both
9    of these CWs, Attwill was so short-staffed that personnel in one area or role
10   occasionally had to assume duties in other areas, and CW2 and CW3, in their critical
11   roles of maintaining product quality, often felt overworked and/or overwhelmed in their
12   positions. In sum, Attwill was not the manufacturer Vaxart purported it to be, a fact
13   Vaxart either knew or recklessly disregarded when it purportedly signed its MOU with
14   Attwill.

15   (b)   The press release suggested that Vaxart was closer to production than it actually was in
16         the context of its other statements, including statements that day at the H.C. Wainwright
17         Virtual Fireside Chat Series where Defendant Tucker stated, referring to a slide
18         previously shown at the June 18 Raymond James Conference, "Again, we're working
19         really fast, as fast as we've ever been able to do in for and we're about really [sic]
20         submit our IND [Investigational New Drug Application] and really open up the
21         regulatory path to start dosing people soon in the summer of this—this summer that is."
22         The slide stated that the IND would be submitted in June (it was not submitted and was
23         nowhere near ready as it was not submitted until August) and thus there was no real
24         prospect of dosing people in Phase 1 clinical trials that summer. In fact, a small clinical
25         trial of about 30 participants was not started until October at the earliest.

26   (c)   The press release would appear even more material when the next day's announcement
27         that Vaxart "was selected" as one of the few companies to participate in Operation Warp
28         Speed would come out.

**C.      Vaxart Materially Misled Investors When It Claimed It Was "Selected For" Operation Warp Speed**

234.      On June 26, 2020, Vaxart issued a press release titled "Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed," with a subheading stating, "OWS to Test First Oral COVID-19 Vaccine in Non-Human Primates." In the body, Vaxart's newly appointed CEO, Defendant Floroiu repeated, "We are very pleased to be *one of the few* companies *selected by* Operation Warp Speed, and that ours is the only oral vaccine being evaluated." (Emphasis added.) In full, the press release stated:

> **Vaxart's Covid-19 Vaccine Selected for the U.S. Government's Operation Warp Speed**
>
> OWS to Test First Oral COVID-19 Vaccine in Non-Human Primates
>
> Vaxart, Inc., a clinical-stage biotechnology company developing oral vaccines that are administered by tablet rather than by injection, today announced that its oral COVID-19 vaccine has been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed, a new national program aiming to provide substantial quantities of safe, effective vaccine for Americans by January 2021.
>
> The study is designed to demonstrate the efficacy of Vaxart's oral COVID-19 vaccine candidate.
>
> "We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated. SARS-CoV-2, the coronavirus that causes COVID-19, is primarily transmitted by viral particles that enter through the mucosa— nose, mouth or eyes—strongly suggesting that mucosal immunity could serve as the first line of defense," said Andrei Floroiu, Chief Executive Officer of Vaxart Inc. "In addition, our vaccine is a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns."

235.      The foregoing statements were materially false and misleading because, at the time they were made, Vaxart was not selected for OWS.[21] Rather, as shown above in Part VI.D, *supra*, and as

---

[21] For example, at the time, OWS imposed strict selection criteria. According to the August 26, 2020 *NEJM* article by OWS's Slaoui and Hepburn, OWS sought vaccine candidates with "the potential . . . to enter large *phase 3* field efficacy trials this summer or fall (July to November 2020)." (Emphasis added.) At the time, according to multiple Vaxart announcements, the Company's COVID-19 vaccine

Defendants now admit, BARDA, who Vaxart already worked with under contracts, merely invited Vaxart to submit its vaccine for challenge trials conducted in conjunction with OWS. And as stated by HHS's spokesperson, "Vaxart's vaccine candidate was selected to participate in *preliminary* U.S. Government studies to determine *potential* areas for *possible* Operation Warp Speed partnership and support. At this time, those studies are ongoing, and no determinations have been made." (Emphasis added.) These statements were also false and misleading for referencing the billions in funding OWS-selected companies would receive, even though Vaxart at the time was positioned to receive none.

**D.    Analysts and Journalists Interpreted Defendants' Press Releases the Way Defendants Thought They Would—Erroneously**

236.    On Vaxart's purported "selection for" OWS, its stock soared, closing up over 22% against the prior day's closing price—despite the massive sell-off by Armistice—and up an incredible 152% in just two days. At one point on June 26, 2020, before the Armistice sale, Vaxart's common stock went as high as $14.30, a 348% jump in two days.

237.    With the world searching for an answer to the pandemic, the ability to manufacture billions of doses and being "selected for" OWS was big news to investors even if a sophisticated investor might have seen through the smoke and mirrors.

238.    For example, Joe Teneruso of *The Motley Fool* wrote in a column carried by NASDAQ on its website called "Why Vaxart Stock Skyrocketed Today" that "Shares of Vaxart . . . soared on Friday after the biotech company said that its oral COVID-19 vaccine had been selected to receive funding from a federal government program . . . ."

239.    So too, *Business Insider* reported during the day on June 26, 2020, in an article entitled, "A little-known biotech working on a COVID-19 vaccine has surged 304% in 2 days—and it just said it was picked for the US government's Operation Warp Speed program (VXRT)," noting the significance of Vaxart's selection as "the only oral vaccine being evaluated" within the Operation

---

candidate was merely "on track to start a first *phase 1* study in the second half of this year, possibly as early as the summer." (Emphasis added.) Further, according to the September 2, 2020 *USA Today* article by HHS's Azar and OWS's Slaoui, OWS targeted "four vaccine-platform technologies" and aimed to select "two from each platform." Since Vaxart's COVID-19 candidate utilized a "replication defective" platform, the *same* platform utilized by two of the publicly named companies, Johnson & Johnson and AstraZeneca, it could not have been one of the companies under consideration at the time.

Warp Speed program.

240.    On June 30, 2020, *The Motley Fool* published an article by Keith Speights[22] entitled, "Is It Too Late to Buy Vaxart Stock?" stating, "But the biggest news of all for Vaxart was only a couple of days away. On June 26, the biotech announced that its oral COVID-19 vaccine had been selected for funding by the U.S. government's Operation Warp Speed."[23]

241.    On July 6, 2020, *Seeking Alpha*[24] author Damien Robbins published an article entitled, "Vaxart's Technology Could Be A COVID-19 Game Changer," again buying into Vaxart's press release that it had been selected for OWS and that the Attwill agreement meant they could manufacture billions of doses. In relevant part, the article states:

> **Summary**
>
> - VXRT is developing enterically coated vaccine tablets as an alternate method of immunization.
>
> - The technology stimulates the innate immune response through the mucosal membranes, which provide the first-line response through the nose and mouth.
>
> - VXRT has received highly-selective Operation Warp Speed designation for its preclinical COVID-19 tablet.
>
> Vaxart (NASDAQ:VXRT) has soared over 2,000% YTD amid an acceptance to the Russell 3000, joining Operation Warp Speed, and the possibility of an effective COVID-19 'tablet' vaccine. The COVID-19 hype in other small-cap, speculative vaccine players like Novavax (NVAX), Inovio (INO), and Sorrento Therapeutics (SRNE) has fueled similar strong rallies. Yet, Vaxart is producing a completely different style of vaccine technology, which could, if it shows efficacy and safety,

---

[22] Speights' bio on *The Motley Fool* states, "Keith began writing for the Fool in 2012 and focuses primarily on healthcare investing topics. His background includes serving in management and consulting for the healthcare technology, health insurance, medical device, and pharmacy benefits management industries."

[23] Keith Speights, *Is It Too Late to Buy Vaxart Stock?*, THE MOTLEY FOOL (June 30, 2020), https://www.fool.com/investing/2020/06/30/is-it-too-late-to-buy-vaxart-stock.aspx.

[24] According to Wikipedia in 2013, *Wired* named *Seeking Alpha* one of the "core nutrients of a good data diet." In 2007, *Seeking Alpha* received a *Forbes*'s Best of the Web designation and was selected by *Kiplinger*'s as Best Investment Informant. In 2011, Seeking Alpha Market Currents was listed as number one in Constantine von Hoffman's list of Essential Economic blogs. Seeking Alpha, WIKIPEDIA, https://en.wikipedia.org/wiki/Seeking_Alpha (last visited June 9, 2021).

could unlock a realm of possibilities for COVID-19 and with other viral infections as well.

\*      \*      \*

Vaxart has also reached an agreement with Attwill Medical Solutions Sterilflow to mass-produce tablets. The agreement includes 'lyophilization development and large scale manufacturing including tableting and enteric coating for Vaxart's oral COVID-19 vaccine' and an aim "to manufacture a billion or more doses per year." Should this be feasible, the mass production would "enabl[e] a greater portion of the population to be protected" bringing us closer to the herd immunity that we need.

Vaxart is now among the highly-selective Warp Speed crowd, alongside major drug makers AstraZeneca (AZN), Merck (MRK), Pfizer (PFE), Johnson & Johnson (JNJ) as well as other speculative play Moderna (MRNA). The operation is offering billions of dollars of support in its quest to provide 300 million or more doses of a vaccine by January 2021. By choosing the "most promising countermeasure candidates and providing coordinated government support", the operation is streamlining funding and trial times to search for a safe, effective vaccine with the ability to produce hundreds of millions of doses in a quick turnaround time.

Unlike some of the names mentioned above, which are already moving through clinical trials and showing positive data (Pfizer/BioNTech (PFE/BNTX); Moderna; Inovio), Vaxart is still in its preclinical, IND filing phase, leaving it behind the pack. Yet Vaxart now has the support of Warp Speed and multiple government agencies, which is very necessary, given Vaxart's minuscule $30 million cash balance as of its last quarterly report. Warp Speed designation could provide the very funding that Vaxart needs, without having to turn towards dilution or debt yet; but should Vaxart fail to convince the government of the safety and efficacy of its tablets, it could spell disaster.

\*      \*      \*

To conclude . . . Operation Warp Speed is now backing Vaxart's tablet technologies, which provide funding and streamlined development times, as well as the trust and faith in the company from the government. Vaxart's tablet technologies could be the game changer in the COVID-19 vaccination race, as it provides a unique immune response compared to the other vaccine candidates in Warp Speed.

242.    On July 15, 2020, Steven Adams, of *Investors Alley*, published an article entitled, "VXRT Stock Price Jumps on COVID-19 Operation Warp Speed Announcement." In relevant part,

the press release stated:

> Vaxart, Inc. (VXRT) has moved substantially higher recently based on high hopes for the company's COVID-19 vaccine.
>
> *VXRT was chosen by the U.S. government for inclusion in Operation Warp Speed (OWS), the government's national program with a goal of providing safe and effective vaccine doses by January of 2021.* VXRT is one of a number of companies participating in OWS.
>
> When announcing VXRT's participation in the program, CEO Andrei Floroiu said, 'We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated.'
>
>         \*     \*     \*
>
> *While news of the company's inclusion in the program has been out for several weeks, VXRT leaped higher this week when a B. Riley FBR analysis of the vaccine, led the company to place a buy recommendation on the stock and give it a price target of $22.* The stock closed last Friday at $7.98.
>
>         \*     \*     \*
>
> It should be noted that just before the B. Riley FBR buy recommendation, Vaxart raised over $90 million in an at-the-market stock offering, at a price of $7.98. That offering was led by SVB Leerink, with B. Riley FBR acting as co-lead sales agent.
>
> Vaxart said, 'The additional funds raised through the ATM facility will support the clinical and preclinical development of Vaxart's product candidates, to conduct clinical trials, to manufacture its products, and for general corporate and working capital purposes.'
>
> After the selling stock at $7.98, and following the B. Riley FBR buy recommendation, the stock has recently traded as high as $16.40.

(Emphasis added.)[25]

243. Also on July 15, 2020, Allie Nawart, of *Pharmaceutical Technology*, in an article entitled, "Covid-19 pandemic: the need for second-generation vaccines," wrote:

> Like ImmunityBio and NantKwest's candidate, *Vaxart's oral approach is one of the projects chosen to be part of the US Government's*

---

[25] Steven Adams, *VXRT Stock Price Jumps on COVID-19 Operation Warp Speed Announcement*, INVESTORS ALLEY CORP. (July 15, 2020), https://www.investorsalley.com/vxrt-stock-price-jumps-on-covid-19-operation-warp-speed-announcement-article-adams/.

*Operation Warp Speed.* Following on from positive pre-clinical results in April, Vaxart's candidate is on track to move into clinical studies this summer.

Talking about this announcement, Vaxart CEO Andrei Floroiu said: "We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated.

(Emphasis added.)[26]

244.     And as late as July 22, 2020, *The Motley Fool* analyst Alex Carchidi wrote an article published by *Nasdaq.com*, identifying Vaxart as one of the nine companies to receive OWS awards:

*So far, it's thought that OWS has funded at least nine independent coronavirus vaccine efforts* and a smattering of related projects, with *awards split almost evenly between large pharmas and clinical-stage biotech companies.* Most investors know big pharma participants like Pfizer (NYSE: PFE), AstraZeneca (NYSE: AZN), and Johnson & Johnson (NYSE: JNJ), whereas biotechs like Moderna (NASDAQ: MRNA), Novavax (NASDAQ: NVAX), and *Vaxart (NASDAQ: VXRT)* are newcomers to the limelight created by the program.

(Emphasis added.)[27]

245.     Defendants did not correct the authors of *The Motley Fool*, *Business Insider*, *Seeking Alpha*, *Investors Alley*, *Pharmaceutical Technology*, or *NASDAQ.com*. They were parroting the misleading message Defendants wanted the market to hear, allowing Armistice to dump its stock and Vaxart to raise an additional $90 million through an at-the-market facility, before the market caught on.

246.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and engaged in a fraudulent course of conduct that artificially inflated the price of Vaxart common stock and operated as a fraud or deceit on Class Period purchasers of Vaxart common stock. By failing to disclose the true state of Vaxart's business and operations, Defendants presented a

---

[26] Allie Nawrat, *Covid-19 pandemic: the need for second-generation vaccines*, PHARMACEUTICAL TECHNOLOGY (July 15, 2020), https://www.pharmaceutical-technology.com/features/covid19-second-generation-vaccines/.

[27] Alex Carchidi, *Everything You Need to Know About Operation Warp Speed's Coronavirus Vaccine Accelerator*, NASDAQ.COM (July 22, 2020), https://www.nasdaq.com/articles/everything-you-need-to-know-about-operation-warp-speeds-coronavirus-vaccine-accelerator.

misleading picture of Vaxart's condition and value. Defendants' scheme to present a company on the edge of a massive breakthrough, while systematically removing the controls in place to prevent insider trading, led to a massive sell-off that benefited insiders, while punishing common shareholders. Shareholders invested based on a false premise that Vaxart was moving quickly to create a vaccine needed to address a global epidemic, while insiders knew they were not on that path and the only money to be made was through selling after-price spikes based on false and misleading statements.

247.   As Defendants' materially false, misleading, and incomplete statements, and fraudulent scheme were disclosed, the price of Vaxart common stock fell, as the prior inflation came out of the Company's stock price. Following the revelations in the *New York Times* on Saturday July 25, 2020, the market reacted. That Monday, July 27, 2020, Vaxart common stock fell to $11.16, a 9% drop from the prior trading day's closing price. Vaxart common stock continued to slide over the next three weeks, falling an additional 17.5%. Following the revelations in the *Business Insider* article after the market closed on August 19, 2020, Vaxart common stock fell a further 4.3% the following day, August 20, 2020. As a result of their purchases of Vaxart common stock during the Class Period, Plaintiffs and the other Class members suffered economic losses.

248.   Additional prior inflation from the false statements also came out of Vaxart's stock price when on June 30, 2020, after the market closed, Vaxart filed with the SEC a Form 4 disclosing the two-day large series of sales of Vaxart stock on June 26 and 29 by Armistice identified above. Large and unusual insider trading is often seen as a signal that the insiders know something the market does not. As a direct result of this disclosure, filed after the market closed on June 30, 2020, Vaxart's stock dropped from $8.85 on June 30 to $8.00 on July 1, 2020. As this news was further digested by the market leading up to the Fourth of July holiday weekend, Vaxart's stock fell further, closing on July 2, 2020, at $7.37. Over the holiday weekend, Zacks Investment Research downgraded Vaxart from a "hold" rating to a "sell" rating after seeing the insider sales, causing the stock to drop further to $6.44 on Monday, July 6, 2020 (the same day Bloomberg reported that Vaxart insiders posted the most insider sales of any company during the week ended July 3, 2020).

249.   The decline in the price of Vaxart's common stock was a direct result of the nature and extent of Defendants' fraud (or results of its fraud) being revealed to investors and the market. The

timing and magnitude of Vaxart's common stock price declines negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic, or industry factors, or other matters unrelated to the Defendants' fraudulent conduct.

## VIII.    ARMISTICE'S CONTROL OVER DEFENDANTS' FALSE STATEMENTS

250.    At all relevant times, the Armistice Defendants exerted meaningful control over Vaxart and/or the drafting of the false and misleading statements alleged herein, for the following reasons: (1) Armistice controlled the majority of Vaxart's Board members through the appointments of Defendants Boyd, Maher, Davis, and Yedid and the resignation of other independent directors; (2) Armistice controlled Vaxart's day-to-day operations through its control over Vaxart's CEOs, Defendants Floroiu and Latour; (3) Armistice maintained a majority, and then plurality ownership stake over Vaxart's common stock (and thus its voting shares) up through its June 26 and 29, 2020 liquidation of its outstanding Vaxart holdings; (4) Vaxart's "independent advisors," including its legal counsel and investment relations manager LifeSci were beholden to Vaxart's Board rather than management or the Company; and (5) Armistice directly participated in the drafting of Vaxart's press releases, directed Vaxart to issue the Attwill press release before the markets opened on June 25, and—knowing of (i) the existence of the NHP study for over a month; (ii) the contents of the June 26 press release; (iii) management's plan to publish the release after the NHP study was confirmed to begin; and (iv) the likely effect on Vaxart's stock price—forced Vaxart to publish the NHP release.

## A.    Armistice Controlled Vaxart's Board of Directors

251.    At all relevant times, Armistice exerted meaningful control over the Vaxart Board of Directors, given Defendants Boyd and Maher's deep, personal, and business ties with Defendants Yedid and Davis.

252.    As discussed above, *see* Part V.A, *supra*, after becoming Vaxart's controlling shareholder, Armistice, under the control and direction of Defendants Boyd and Maher, promptly took over Vaxart's Board and sought to appoint Defendants Boyd, Maher, Davis, and Yedid as directors of Vaxart's then-eight-member Board. Defendants Boyd and Maher personally reached out to Defendants Davis and Yedid regarding the new Board positions. On October 1, 2019—the day after Armistice reported that it owned a majority of Vaxart's publicly traded common stock—Defendant Boyd emailed

Defendant Davis stating "Have an update. Catch up later this afternoon?" The two then arranged a call for that afternoon. Two days later, after Defendants Maher and Davis spoke as well, Maher followed up in an email to Davis, stating "It was terrific to say hello yesterday and Steve Boyd had mentioned that you might be interested in working with us." Similarly, the following day, October 4, 2019, Defendant Maher left a voicemail for Defendant Yedid, inviting Yedid to the Board as well, stating, in full:

> Hey Bob, it's Keith Maher, quick question for you.
>
> *Can you come on the board of a publicly traded company?* If you are allowed to through LifeSci. [Unintelligible] *We are taking over the company. They're looking for board members and I talked to Steve Boyd and he seemed pretty positive to have you on.* I think you could do a lot to help the company and they'd be very lucky to have you involved.
>
> And there's some interesting people on the Board, you may know some of them. But we're really reconstituting it so, please, if you have an interest or if you can, just shoot me a résumé or something because I think I have to give your résumé and I have to tell the company in confidence. But anyway, I'll try to reach you later. Bye.

(Emphasis added.)

253.    Davis—the founder and managing partner of RoyaltyRx Capital, LLC, a bio-pharma investment fund, who had previously invested alongside Armistice in other companies—was tapped to enact the Armistice Defendants' vision to transform Vaxart into a New York-based royalty pharmaceutical company. In an April 2020 email, Defendant Boyd referred to Davis as a "friend of Armistice's." In a May 1, 2020 voicemail, Maher told Yedid that Davis "did some sleazy stuff for us [Armistice]" and had purchased Vaxart shares in October 2019 "because he knew we were going to do activism on the company and bought 180,000 shares when we were buying ours knowing that we were going to buy to try to take over the company. And knowing that he was going to be nominated to the Board." As Maher's voicemail made clear, Defendant Boyd was "very upset" that Davis profited from these stock transactions without first asking or thanking Armistice. As Maher stated on the voicemail:

> So, he [Davis] did that. And then he kind of just sold stock and he didn't tell anything to anybody and like say hey guys I know—whatever—I'm

selling some stock and thanks a lot and I made a lot of money on it and blah, blah, blah. So, Steve Boyd got very upset about that it. Because he [Boyd] saw it like as kinda [sic] uncool. It's like, he never even mentioned it.

Tellingly, what angered the Armistice Defendants was Davis's failure to obtain Boyd's blessing before trading in Vaxart shares, as Maher made clear in the next few sentences of the same voicemail:

So, to the degree you want to sell stock to your client, it's no issue no one will say anything just call him [Boyd] ahead of time—say hey listen, thanks for putting me on the Board, I made a bunch of money, things have been great, and I'm going to sell some stocks. Not a lot just a little something or whatever you want to do.

254.    Yedid—a close personal friend of Defendant Maher—frequently did business with the Armistice Defendants and privately shared resources with Maher to build up each other's respective business networks. In the words of one Vaxart Director, Maher and Yedid were "like brothers." The two texted frequently during the course of their work together on personal, religious, and familial matters. After being appointed to the Board, Yedid emailed Defendant Boyd, stating he was "thrilled to be working side by side with [Boyd], Keith, and Todd on the Vaxart Board," and that he "sincerely appreciate[d]" Boyd including him as a Director. After working with Maher on Vaxart for over a year, Yedid let Maher know over email that he "value[d] [Maher's] advise and friendship" and thanked Maher for giving him a "seat at the table."

255.    While serving on the Vaxart Board, Yedid frequently leaked information and communications shared among the non-Armistice-Controlled Directors with the Armistice Defendants. To that end, one Vaxart director once commented that "if Bob [Yedid] knows [something] I bet Keith [Maher] knows, no?"

256.    Prior to Vaxart, Boyd and Maher, by virtue of their control of Armistice, had worked with Defendants Yedid and Davis when Armistice held over 3 million shares of BDSI.

257.    Following Yedid and Davis's appointments, Defendant Boyd instructed Defendant Maher to call Yedid and other people "to make sure no one [was] talking about anything about Vaxart in terms of what we're [i.e., Armistice was] hoping to do, in terms of changing the nature of the business," as Armistice was "trying to keep it really confidential because no one knows it." At all

relevant times, including the months preceding the Class Period, Defendants Boyd, Maher, Yedid, and Davis (and later, Floroiu) frequently had group meetings and email chains amongst themselves— without other directors or Vaxart management—to coordinate Armistice's strategy as to Vaxart. Members of this working group referred to the group as the Armistice "slate" of directors, and sometimes referred to the other directors in written communications as not belonging to Armistice. *See* Figure 5, *supra* (in which Floroiu states in a text message to Maher that "your slate of 4 directors [*i.e.*, Boyd, Maher, Davis, and Yedid] is one of the strongest I have seen"); ¶ 71 (following Yedid's nomination by Armistice to the Board, Yedid emails Boyd, stating he is "thrilled to be working side by side with you [Boyd], Keith, and Todd on the Vaxart Board," omitting mention of all other directors).

258.    Together, Defendants Boyd, Maher, Yedid, and Davis initially comprised four of Vaxart's eight Board seats. On November 30, 2019, however, Vaxart announced that its longtime Chairman, Richard J. Markham, had resigned from the Board effective immediately, shifting the balance of power to a four-three split in Armistice's favor.

259.    In April 2020, the Armistice Defendants expanded their control to a fifth (out of eight) Board seat by coordinating the appointment of Defendant Boyd's friend of nearly 20 years, Defendant Floroiu. As discussed above, *see* Part V.D, *supra*, Defendant Boyd had planned to install Floroiu as Vaxart's CEO as early as February 2020. To that end, the Armistice Defendants had Defendant Maher assist with Floroiu's installation, by having Maher revise Floroiu's résumé (including by deleting references to Floroiu's prior work at Armistice) and introducing Floroiu to the Armistice "slate of directors." Floroiu, in turn, drafted roadmaps for Armistice on how to transform Vaxart. When the Armistice Defendants paused their plans to transform Vaxart into a "royaltyco," they decided to appoint Floroiu to Vaxart's Board as a sign of good faith.

260.    As a member of the Board, Floroiu worked at the behest of the Armistice Defendants, and outside the knowledge of Vaxart's independent directors or management, on potential "deals" concerning Vaxart's platform and potential COVID funding sources beyond BARDA. Additionally, Floroiu regularly received instructions from the Armistice Defendants on how to advocate for Armistice's interests during Board meetings, as illustrated in the text chain below regarding spending,

as well as during the Vaxart Board's purportedly Armistice-independent discussions on whether to amend Armistice's warrant blockers.

**F.22    May 13, 2020 Text Chain Between Maher and Floroiu re: Controlling Spending**







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22



23    261.    Floroiu frequently ran Vaxart management decisions by the Armistice Defendants and

24    asked for their permission to engage in certain actions, even after the Armistice Defendants sold the

25    bulk of, and then the entirety of, their Vaxart holdings. For example, on July 16, 2020, Boyd

26    commented via text message that Floroiu's frequent need for the Armistice Defendants' aid and advice

27    made Floroiu "com[e] across like a drug addict" and that "people will be thrilled if [Floroiu would]

28

pour all of this energy and attention into running the business." Likewise, on September 9, 2020, Boyd privately texted with Floroiu regarding his plans for the Company after the truth came to light regarding Vaxart's OWS bid, stating: "*Your presentation is not original. It is reinstating the playbook that Keith [Maher], Bob [Yedid], Todd [Davis] and I dismantled when we came onto the board.* Prior mgmt took the Company from $10.00 to $0.30 with this strategy. I encourage you to be bold and be different. You are so much more capable than the legacy folks. Invest wisely. (I do think corona and noro are differentiated)." (Emphasis added.)

262.    On June 30, 2020, following Armistice's liquidation, Davis congratulated Boyd and Maher on the "terrific returns you generated for your investors and firm" and wished them well. Yedid then added, "I would love to do it again," before Davis stated, "Happy to help and it has a pleasure working with you guys." In response, Boyd thanked his controlled directors, saying, "THANK YOU. All three of you. . . . It was not easy. Thank you. (Hope we do it again sometime)."

263.    Yedid also wasted no time asking Boyd and Maher to meet to consider giving LifeSci more of the business of the Armistice portfolio of companies, to which Boyd responded, "Would love that."

**B.    Armistice Controlled Vaxart's Day-to-Day Operations Through the CEO**

264.    At all relevant times, Armistice exerted meaningful control over Vaxart's day-to-day operations through its control and influence over Vaxart's CEOs, Defendants Latour and then Floroiu.

265.    After obtaining a majority interest in Vaxart, Armistice became intimately involved in the Company's day-to-day operations for the purposes of effecting the Armistice Defendants' then-intended goal—a transaction related to vaccine assets. To that end, in December 2019, the Armistice Defendants directed Vaxart's then-CEO Latour to terminate Vaxart's norovirus program and most of the Company's employed staff, leaving only 12 to 16 full-time employees to run all of Vaxart's operations—from research to accounting and information technology—for the first half of 2020. Additionally, Boyd and Maher demanded that Latour provide them with access to Vaxart partners like Johnson & Johnson so that they could directly evaluate the "risk versus opportunity" of certain actions versus inaction.

266.    After Armistice's entry, Latour regularly sought Defendants Boyd and Maher's

approval or input on day-to-day operations, including on press releases, investor relations, and interactions with federal regulators. Additionally, Boyd and Maher would regularly provide Latour with instructions on how to run Vaxart, including by mandating his appearance at certain virtual and/or in-person networking events. As a result, outside entities like LifeSci found that working with Vaxart was "challenging" as Latour, "the CEO, need[ed] to run everything by Steve" Boyd—that is up until Armistice replaced Latour with Defendant Floroiu.

267.    Additionally, Defendants Boyd and Maher regularly sidestepped Latour and communicated via text or phone with Vaxart employees, including its Chief Science Officer, Defendant Tucker, regarding their thoughts on other companies' OWS selection, advocacy before BARDA, and Vaxart's COVID vaccine progress.

268.    By June 3, 2020, the Armistice Defendants decided to implement the ouster of Latour as CEO and finally install Floroiu—a "first time CEO" viewed by others in private communications as "smart, but clueless . . . and a plaything of Armistice." After his appointment, Floroiu communicated with the Armistice Defendants multiple times per week by phone, email, and text messages regarding how to manage Vaxart's affairs according to Armistice's game plan.

269.    Additionally, Floroiu sought the Armistice Defendants' advice on how to respond to July inquiries by the *New York Times* into the subject matter of this litigation, to which Boyd provided Floroiu links to news articles and general talking points to support Defendants' representations regarding Vaxart's Attwill agreement and its purported selection for Operation Warp Speed.

1

2

F.23    July 24, 2020 Text Chain Between Boyd and Floroiu re: *New York Times* Inquiry



270.    Floroiu's requests for the Armistice Defendants' aid became so frequent that on July 16, 2022, Boyd commented that Floroiu's need made him "com[e] across like a drug addict" and that "people will be thrilled if [Floroiu would] pour all of this energy and attention into running the business."

**C.    Armistice Controlled a Majority, and then Plurality, of Vaxart's Common Stock**

271.    In November 2019, Armistice filed a Schedule 13D, signed by Defendant Boyd, with the SEC reporting a change in its beneficial ownership of Vaxart. Therein, Armistice and Boyd, as reporting persons, both claimed an ownership interest over 25,200,000 shares of Vaxart common stock, representing 52.8% of all outstanding common stock for Vaxart (not including an additional 20,757,576 shares they could acquire by exercising its warrants). On a fully diluted basis (*i.e.*, with full exercise of its warrants), Armistice owned nearly 68% of the Company as of November 2019.[28]

272.    In March 2020, Vaxart conducted a direct offering for the issuance of an additional 4 million shares and 2 million warrants, which, in combination with warrant exercises by other entities, diluted Armistice's ownership interest in Vaxart. Nevertheless, in a Form 10-K filed March 19, 2020, the Company recognized Armistice's (and thus, Boyd's) continuing effective control, publicly stating that:

> Armistice . . . as of March 17, 2020, still beneficially owned more than 35% of the voting power of our outstanding shares.
>
> As a result, Armistice has the ability to substantially influence us and exert significant control through this ownership position. Armistice may significantly influence the elections of directors, issuance of equity, including to our employees under equity incentive plans, amendments of our organizational documents, or approval of any merger, sale of assets or other major corporate transaction. Armistice's interests may not always align with our corporate interests or the interests of other stockholders. . . .

On a fully diluted basis (*i.e.*, with full exercise of its warrants), as of March 19, 2020, Armistice owned approximately 46% of the Company (in addition to appointing and controlling four of Vaxart's then-

---

[28] From October 2019 to June 2020, the Armistice Defendants communicated about Armistice's ownership interest in Vaxart on several occasions, including to Defendants Yedid and Floroiu, on a fully diluted rather than a non-diluted basis.

1    seven Board members).

2    273.    Shareholder voting power for the June 8, 2020 Annual Meeting was based on investor

3    holdings as of April 9, 2020, with one vote for each share of common stock owned. On April 8, 2020,

4    Armistice owned 25.2 million shares (about 35%) of Vaxart common stock (about 46% fully diluted),

5    and each measure to be voted on at the June 8, 2020 Annual Meeting required a simple majority for

6    approval. Given that the Annual Meeting required a simple majority quorum, Defendant Latour opined

7    in private communications, if Armistice was in favor of a measure (and was allowed to vote on the

8    measure), there was "no way" the measure "would not pass." Armistice thus retained the ability to

9    substantially influence votes by Vaxart's shareholders up through June 8, 2020.

10   274.    As of June 3, 2020, the Armistice Defendants had sold in total 18.2 million shares of

11   Vaxart stock, retaining almost 7 million shares (approximately 10%) of Vaxart common stock. On a

12   fully diluted basis, however, they retained nearly 28% ownership of the Company. As of June 8, 2020,

13   the Armistice Defendants had successfully increased their warrant blockers to 19.99%. Additionally,

14   the Armistice Defendants had appointed and controlled five of Vaxart's now-seven Board directors

15   (with the departure of Anne VanLent) and had decided that same day to oust Defendant Latour and

16   install Armistice-Controlled Director Defendant Floroiu as the new Vaxart CEO.

17   **D.    Vaxart's Advisors Were Beholden to Armistice**

18   275.    Though Vaxart frequently relied on outside advisors in its press strategies, those entities

19   too were beholden to Armistice. With respect to LifeSci, Defendant Yedid served as a Managing

20   Director of Vaxart's investor communications advisor while simultaneously serving on Vaxart's

21   Board. Additionally, LifeSci assisted the Armistice Defendants in drafting the press strategy for the

22   CEO transition, prior to Latour's resignation, showing it was beholden to Boyd and Maher over the

23   Company and its executives.

24   276.    Likewise, Vaxart's outside legal counsel was brought in by Defendant Maher and was

25   feared by Defendant Latour to have been "too close" to Defendant Maher.

26   **E.    Armistice Directly Participated in the Drafting and/or Dissemination of Press Releases**

27   277.    The Armistice Defendants frequently reviewed, edited, or approved the release of many

28   of the public statements discussed above, as well as the timing of certain public statements' release.

278.    From January 31, 2020 (the date Vaxart announced the initiation of its COVID-19 vaccine program), through June 3, 2020, Vaxart issued nine press releases—each of which was personally reviewed, edited, or approved by the Armistice Defendants prior to release. During that same time, the Armistice Defendants also directed Latour and Tucker on matters of messaging for various COVID-19 and pharmaceutical-related conferences, including the Maxim Group's May 5, 2020 Infections Disease Virtual Conference.

279.    After Armistice's April-May-June sales of its Vaxart's holdings, the Armistice Defendants continued to play a pivotal role in Vaxart's press strategy. For example, from June 10-14, 2020, the Armistice Defendants dictated instructions to LifeSci and other directors as to the contents, tone, and specific language of Vaxart's June 15, 2020 press release announcing the CEO transition from Latour to Floroiu. The Armistice Defendants then approved the final version prior to release.

280.    Armistice's involvement also extended to the Attwill and OWS press releases. The night before the Attwill press release issued, Defendant Maher texted Defendant Floroiu with instructions that the Company release news so that it "hits the tape"—that is, the publicly viewed news wires—"early in the morning, like before 8 am." A Vaxart internal document prepared by Brant Biehn—Vaxart's Senior Vice President of Commercial Operations who also assisted in drafting all Vaxart press releases during the Class Period—which tracked who edited the OWS press release, shows that on June 25, 2020—the day before Defendants issued the OWS press release—there were a series of revisions of the release between LifeSci, Vaxart management, Vaxart Counsel, and Defendants Boyd and Maher, stating specifically, "Many revisions of NHP PR between LifeSci, VXRT mgmt and Thompson Hine, SB and KM." The legend at the top of the page defines "SB" as "Steve Boyd" and "KM" as "Keith Maher."

**F.24    Excerpt from Vaxart Document Tracking Edits to the June 26, 2020 OWS Press Release**

| | | | |
|---|---|---|---|
| 25 | Many revisions of NHP PR between LifeSci, VXRT mgmt and Thompson Hine, SB and KM | | JV, MV, FC, AF, JC, ST, HH, DH, PA, SB, KM |
| 25 | AF tells SB the company will probably put out a press release about OWS the following morning | | AF, SB |
| 25 | AF, WL, ST discuss with JC potential government / HHC reactions to Vaxart announcing our vaccine is in OWS | | AF, WL, SL, JC |
| 25 | Emails with SB re: OWS press release | | AF, ME, FC, ST, SB |
| 26 | OWS NHP PR Released at 8am ET | | |

281.    The Armistice Defendants also forced Vaxart to publish the "selected for" OWS press release over the decision of Vaxart's full management team to not issue the release until the NHP study was confirmed and Vaxart had actually administered its vaccine to the study's primates. But as discussed above, when Vaxart management initially refused Defendant Boyd's instruction, Boyd forced Vaxart's hand, responding that "[w]ith all due respect, as a Firm [*i.e.*, as Armistice], we are unsure if we agree with your assessment. If the Company is not willing to release the information, Armistice may choose to do so."

282.    Accordingly, Armistice made, disseminated, and/or meaningfully controlled Vaxart's public statements about its vaccine development, including the Company's statements regarding Attwill and its purported selection for OWS.

## IX.    NO SAFE HARBOR

283.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances and does not apply to any of the allegedly false statements pled herein, as the statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent any of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and were unaccompanied by meaningful cautionary statements that identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

284.    Alternatively, to the extent that the statutory safe harbor is found to apply to any forward-looking statements pled herein, Defendants are nonetheless liable for such statements because, at the time each such statement was made, the speaker had actual knowledge that it was materially false or misleading, and/or the statement was authorized or approved by an executive officer of Vaxart who knew that the statement was materially false or misleading when made.

## X.    CONTEMPORANEOUS TRADING

285.    During the Class Period, Plaintiffs relied on the integrity of the market for Vaxart, which was presumed to be determined by supply and demand and free from market manipulation, distortion, and insider trading made on the basis of material, nonpublic information.

286.    As set forth above, during the Class Period, Defendants Boyd and Maher, acting on

behalf of and motivated by their substantial financial interests in Armistice, caused Armistice (acting for its own account and/or the account of one or more of the Armistice entities) to sell 45,812,053 shares of Vaxart common stock.

287.    Armistice (acting for its own account and/or the account of one or more of the Armistice Funds) sold shares of Vaxart common stock on the dates and in the amounts set forth in the charts below while the Armistice Defendants were in possession of material, nonpublic information as alleged herein, including material nonpublic information concerning the truth about Vaxart's purported capacity to produce a COVID-19 vaccine and its purported "selection for" Operation Warp Speed (the "Material Inside Information").

**T.4    Armistice Inside Sales and Pre-Sale Exercises of Vaxart Warrants**
(Class Period Sales Highlighted in Grey-Blue)

| Date | Acquisition/ Sale | No. of Shares Sold or (*Acquired*) | Share Price | Total Sale Proceeds or (*Acquisition Cost*) | No. of Remaining Shares Held |
|---|---|---|---|---|---|
| 4/28/2020 | S | 1,292,070 | $3.38 | $4,367,196.60 | 23,907,930 |
| 4/29/2020 | S | 873,634 | $3.01 | $2,629,638.34 | 23,034,296 |
| 4/30/2020 | S | 4,434,296 | $2.96 | $13,125,516.16 | 18,600,000 |
| 5/1/2020 | S | 1,000,000 | $2.71 | $2,710,000.00 | 17,600,000 |
| 5/4/2020 | S | 957,469 | $2.65 | $2,537,292.85 | 16,642,531 |
| 5/5/2020 | S | 692,531 | $2.66 | $1,842,132.46 | 15,950,000 |
| 5/6/2020 | S | 50,000 | $2.58 | $129,000.00 | 15,900,000 |
| 5/7/2020 | S | 100,000 | $2.51 | $251,000.00 | 15,800,000 |
| 5/8/2020 | S | 100,000 | $2.52 | $252,000.00 | 15,700,000 |
| 5/11/2020 | S | 1,300,000 | $2.79 | $3,627,000.00 | 14,400,000 |
| 5/12/2020 | S | 1,581,076 | $3.02 | $4,774,849.52 | 12,818,924 |
| 5/13/2020 | S | 525,616 | $2.97 | $1,561,079.52 | 12,293,308 |
| 5/14/2020 | S | 834,669 | $3.02 | $2,520,700.38 | 11,458,639 |
| 5/15/2020 | S | 458,639 | $2.82 | $1,293,361.98 | 11,000,000 |
| 5/18/2020 | S | 650,000 | $2.86 | $1,859,000.00 | 10,350,000 |
| 5/20/2020 | S | 1,150,000 | $3.19 | $3,668,500.00 | 9,200,000 |
| 5/21/2020 | S | 400,000 | $2.97 | $1,188,000.00 | 8,800,000 |
| 5/22/2020 | S | 200,000 | $2.86 | $572,000.00 | 8,600,000 |
| 5/27/2020 | S | 200,000 | $2.61 | $522,000.00 | 8,400,000 |
| 6/1/2020 | S | 200,000 | $2.74 | $548,000.00 | 8,200,000 |
| 6/2/2020 | S | 800,000 | $2.75 | $2,200,000.00 | 7,400,000 |
| 6/3/2020 | S | 400,000 | $2.77 | $1,108,000.00 | 7,000,000 |

| Date | Acquisition/ Sale | No. of Shares Sold or (*Acquired*) | Share Price | Total Sale Proceeds or (*Acquisition Cost*) | No. of Remaining Shares Held |
|---|---|---|---|---|---|
| 6/26/2020 | A (exercise of warrants @ below mkt px) | (*16,666,667*) | $0.30 | (*$5,000,000.10*) | 23,666,667 |
| 6/26/2020 | S | 18,226,667 | $10.38 | $189,192,803.46 | 5,440,000 |
| 6/29/2020 | A (exercise of warrants @ below mkt px) | (*4,090,909*) | $1.10 | (*$4,499,999.90*) | 9,530,909 |
| 6/29/2020 | S | 9,385,386 | $8.29 | $77,804,849.94 | 145,523 |

**Total Shares Sold:**   **45,812,053**

**Gross Sales Proceeds:**   **$319,283,921**

**Estimated Total Realized Profits:**   **~$300,000,000**

**Total Class Period Shares Sold:**   **27,612,053**

**Gross Class Period Sales Proceeds:**   **$266,997,653.40**

**Estimated Total Class Period Realized Profits:**   **~$250,000,000**

288.     By virtue of their substantial equity interests in and control of Armistice, for purposes of liability under Section 20A, Defendants Boyd and Maher should also be deemed constructive sellers of the shares referenced above that were sold by the Armistice Defendants. Additionally, Defendant Armistice Capital should be deemed a constructive seller to the extent the shares referenced above were sold by Armistice Master Fund.

289.     As set forth in their sworn certifications previously filed in this action, Lead Plaintiff Langdon Elliott and Additional Plaintiff Ani Hovhannisyan purchased Vaxart common stock during the Class Period on the dates and for the prices indicated, and thus traded contemporaneously with Armistice. Lead Plaintiff Langdon Elliott purchased 5,000 shares of Vaxart common stock on Friday, June 26, 2020. Additional Plaintiff Ani Hovhannisyan purchased 20 and 10 shares of Vaxart common stock on Friday, June 26, 2020, and Monday, June 29, 2020, respectively.

# XI.    ADDITIONAL SCIENTER ALLEGATIONS

290.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

## A.    Boyd, Maher, and the Armistice Defendants Had Motive and Opportunity to Commit Fraud and Participate in the Pump-and-Dump Scheme

291.    Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their association with and control over the Company, which made them privy to confidential information, participated in the fraudulent scheme designed to mask the truth about Vaxart's purported capacity to produce a COVID-19 vaccine and its purported "select[ion] for" Operation Warp Speed.

292.    Defendants Boyd, Maher, and the Armistice Defendants engaged in this scheme in order to inflate the price of Vaxart common stock, enhance the value of their holdings of Vaxart common stock and warrants, and to allow for massive insider sales that yielded total proceeds of approximately $320 million and insider trading profits in the astounding total amount of approximately $300 million. By virtue of their substantial equity interests in Armistice Capital and the Armistice entities, Defendants Boyd and Maher, directly or indirectly, were the primary beneficiaries of all or a substantial portion of the Armistice Defendants' insider selling profits.

293.    Defendants' insider sales are probative of Defendants' scienter and are part of Defendants' scheme, artifice to defraud, or acts, practices or course of business in violation of Section 10(b) and Rule 10b-5. In particular, while Defendants were issuing materially false and misleading statements about Vaxart's business and concealing material adverse information about its operations and business dealings, Defendants Boyd and Maher (and, through Boyd and Maher, Armistice), who had access to confidential information and were aware of the truth about the Company and its business, reaped massive financial benefits from this illegal scheme and course of conduct by:

(a)    causing the Armistice Defendants to sell roughly 18 million shares of Vaxart common stock at artificially inflated prices during the first five months of the Class Period (through June 3, 2020);

(b)    causing Vaxart to amend its June 8, 2020 insider trading policy during a regular black-out period under that insider trading policy (which barred Armistice and other corporate insiders from selling Vaxart securities from June 24, 2020, until two days after the release of Vaxart's second quarter results on August 8, 2020) to allow Armistice to sell any shares of Vaxart common stock; and

(c)    causing the Armistice Defendants to (i) renegotiate the terms of their warrants to eliminate the timing and volume restrictions on their exercise, so as to allow the Armistice Defendants to promptly acquire (at prices substantially below the market) more than 20.7 million additional Vaxart shares; and to shortly thereafter, in late June 2020, (ii) exercise those renegotiated warrants so as to acquire (at prices ranging between only $0.30 and $1.10 per share) an additional 20,757,576 shares—and to then immediately sell (at artificially inflated prices ranging between $6.58 and $12.89 per share) those shares (as well as more than 7 million of their previously purchased and still retained shares) on Friday, June 26, and Monday, June 29, 2020.

294.    All of the foregoing sales were made by Defendants Boyd, Maher, and Armistice without disclosing the materially adverse facts about Vaxart that they were privy to. The table previously set forth entitled, "Contemporaneous Trading," *see* Part X, *supra*, shows the heavy insider sales by the Armistice Defendants, as directed by Boyd and Maher, during the Class Period.

295.    The foregoing sales by the Armistice Defendants and directed by Defendants Boyd and Maher (including the timing of the exercise of the warrants and the immediate sale of the resulting shares on June 26 and 29, 2020) were unusual in their amount and in their timing. Indeed, these sales constituted over 99.5% of the Armistice Defendants' total beneficial holdings of Vaxart shares. Further, in order to immediately sell shares obtained from its warrants, Armistice pushed the Vaxart Board to adopt an eleventh-hour change to the Vaxart's insider trading policy, which if unaltered, barred Armistice from disposing of its Vaxart shares from June 24, 2020 (one week before the end of

the fiscal quarter) up through August 8, 2020 (two days after Vaxart released its quarterly update for the second fiscal quarter of 2020). *See* Part VI.D.4, *supra*, ¶¶ 170-171.

**B.     Vaxart's Desperate Financial Position, Need to Raise Cash, and Actually Raising Cash Three Times in the Class Period Show Additional Motive**

296.     As admitted to CW1, by December 31, 2019, it was "all over" for Vaxart unless it found a partner within three months. At that time, Vaxart terminated its lead norovirus researcher (CW1), and shut down its norovirus program (which it continued to hide until it blamed its efforts to develop a COVID vaccine as the reason it put norovirus "on hold"). Thus, Vaxart was in desperate need for cash, and Armistice needed a way out to monetize its diminishing asset.

297.     Defendants then proceeded to utilize COVID-19 as an opportunity to raise $10 million through the sale of four million shares and associated warrants in February, closing the offerings on March 2, 2020. But Vaxart's stock languished and more needed to be said to sell investors on Vaxart.

298.     Vaxart then raised an additional nearly $9.5 million for Vaxart by enabling Armistice to exercise its warrants in an accelerated manner, virtually without restriction, by amending the warrant agreement with Armistice for no additional consideration as outlined above, just days before releasing its fraudulent June 25 and 26, 2020 press releases.

299.     Finally, just days after the June 25 and 26, 2020 press releases, and before the market learned the truth, Vaxart raised an additional $90 million in an at-the-market stock offering on Monday, July 13, 2020, at a price of $7.98 suggesting that it was preparing to make major investments in its clinical development pipeline or its manufacturing capacity. That offering was led by SVB Leerink, with B. Riley FBR acting as co-lead sales agent. Suspiciously, the financial press reported that B. Riley FBR initiated coverage for the first time of Vaxart on Sunday evening, July 12, 2022. The initiating and timing of coverage is something Defendants would have known from their long-standing relationship with B. Riley FBR and the fact that it acted as sales agent in the $90 million offering. Not surprising, B. Riley issued a "BUY" recommendation. Surprising, however was the recommended target price of $22—almost three times the current price, causing Vaxart's stock to soar once more.

300.     The need to raise cash (motive), and the fact that the less-than-candid or false press releases gave Defendants the opportunity to raise cash (and they did three times), strongly infers that

1    each Defendant knew the false and misleading nature of their press releases and participated in the

2    scheme to defraud investors.

3    **C.     Defendants' Imputed Knowledge of Facts Critical to the Core Operations**

4          301.    At all relevant times during the Class Period, Vaxart was an extremely small company,

5    with only about 12 to 16 full time employees. Prior to terminating it, Vaxart's norovirus vaccine

6    development program had been one of the Company's most heavily touted programs, and by late

7    March 2020 had publicly announced that it was putting "several" of its (few) other vaccine

8    development projects "on hold" in order to focus on its efforts to develop its "experimental oral vaccine

9    candidate for Coronavirus disease."

10         302.    Given Vaxart's extremely small size, and given that Vaxart's norovirus vaccine

11   program (through late 2019) and Coronavirus program (beginning in early 2020) purported to be the

12   major focus of Vaxart's limited business and core operations, it may be strongly inferred that

13   Defendant Latour (who had served as Vaxart's President and Chief Executive Officer from February

14   2018 to June 2020, who had previously served as President and Chief Executive Officer of Vaxart's

15   predecessor entities, and who continued to serve as Chairman of Vaxart's Board after June 2020) was

16   fully aware of the status of all material matters involving Vaxart's core operations throughout the Class

17   Period, including the truth as to the matters alleged herein to have been materially misrepresented to

18   and/or concealed from Plaintiffs and the members of the Class.

19         303.    Similarly, by virtue of the combination of Vaxart's small size and limited operations,

20   and Boyd's and Maher's ability to access material nonpublic information concerning Vaxart by virtue

21   of their position as directors and control over Vaxart, it may be strongly inferred that Defendants Boyd

22   and Maher—and by imputation Armistice—were all fully aware at all times during the Class Period

23   of the status of all material matters involving Vaxart's core operations, including the truth as to the

24   matters alleged herein to have been materially misrepresented to and/or concealed from Plaintiffs and

25   the members of the Class. Indeed, as alleged above, the Armistice Defendants were deeply involved

26   with and regularly apprised of Vaxart's day-to-day operations, including the status of Vaxart's

27   COVID-19 vaccine development and the extent of the Company's communications with government

28   agencies for funding and support.

304.    Given Vaxart's extremely small size, that Vaxart's Coronavirus program (from early 2020 on) purported to be the major focus of Vaxart's limited business and core operations, and that his former role as a former employee of Armistice Capital and long-standing personal and professional associations with Defendant Boyd, it may be strongly inferred that Defendant Floroiu (who had been installed by Defendants Boyd and Maher to replace Defendant Latour as Vaxart's Chief Executive Officer as of June 2020, and who had previously been installed by them as a Company director in April 2020) was fully aware of the status of all material matters involving Vaxart's core operations from no later than April 2020 through the end of the Class Period, including the truth as to the matters alleged herein to have been materially misrepresented to and/or concealed from Plaintiffs and the members of the Class.

305.    Defendants Boyd and Maher's scienter and knowledge is imputed to both Armistice Capital and Armistice Master Fund given (i) Defendant Boyd's role as the Founder, CIO, sole owner, and Managing Partner of Armistice Capital and position as Director of Armistice Master Fund; (ii) Defendant Maher's position as Armistice Capital's Managing Director; (iii) Armistice Capital and Armistice Master Fund's small size and management structure; and (iv) respondeat superior and agency principles. Given Armistice's small size and Defendants Boyd and Maher's leadership positions, it may be strongly inferred that the two were fully aware of the status of all material matters involving Armistice's core business operations throughout the Class Period, including the truth as to the matters alleged herein. During the Class Period, Defendant Boyd, on behalf of Armistice, requested preclearance from Vaxart on multiple occasions in the event Armistice wished to sell its Vaxart securities. Boyd frequently communicated with Vaxart's comptroller, Margaret Echerd, regarding Armistice's ability to exercise its warrants. Additionally, in 2019 and 2020, Armistice filed several Statements of Changes in Beneficial Ownership on Form 4 with the SEC regarding its purchases and sales of Vaxart securities. Defendant Boyd signed each of these Forms 4 as the reporting person for Armistice. In each Form 4, Armistice and Boyd noted that "the reported [Vaxart] securities may also be deemed to be indirectly beneficially owned by Steven Boyd as Managing Member of Armistice Capital, LLC."

1

## XII.    CLASS ACTION ALLEGATIONS

2          306.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure

3    23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired

4    shares of Vaxart common stock between June 15, 2020 and August 19, 2020 inclusive (the "Class

5    Period"), and were damaged thereby. Excluded from the Class are Defendants, Vaxart's and

6    Armistice's current and former officers, directors, parents, and subsidiaries, their immediate family

7    members, legal representatives, heirs, successors, or assigns of any such excluded person and any

8    entity in which Defendants have or had a controlling interest.

9          307.    The members of the Class are so numerous that joinder of all members is impracticable.

10   Throughout the Class Period, Vaxart common stock was actively traded on the NASDAQ. While the

11   exact number of Class members is unknown to Plaintiffs at this time, and can be ascertained only

12   through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in

13   the proposed Class. Stock owners and other members of the Class may be identified from records

14   maintained by Vaxart or its transfer agent and may be notified of the pendency of this action by mail,

15   using the form of notice similar to that customarily used in securities class actions.

16         308.    Plaintiffs' claims are typical of the claims of other Class members, as all members of

17   the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as

18   alleged herein.

19         309.    Plaintiffs will fairly and adequately protect Class members' interests and have retained

20   competent counsel experienced in class actions and securities litigation. Plaintiffs have no interests

21   antagonistic to, or in conflict with, those of the Class.

22         310.    Common questions of law and fact exist as to all Class members and predominate over

23   any questions solely affecting individual Class members. Common questions include:

24         (a)     whether Defendants violated the federal securities laws as alleged herein;

25         (b)     whether Defendants made public statements during the Class Period that were

26                 materially false, misleading, or incomplete or otherwise omitted material facts;

27         (c)     whether Armistice and the Individual Defendants caused Vaxart to issue false and

28                 misleading statements;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(e)     whether the prices of Vaxart common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

311.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damages suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for them to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

312.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     Vaxart common stock is traded in an efficient market;

(d)     Vaxart's shares were liquid and traded with moderate to heavy volume during the Class Period;

(e)     Vaxart traded on the NASDAQ and was covered by multiple analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Vaxart's securities; and

(g)     Plaintiffs and Class members purchased or acquired Vaxart common stock without knowledge of the omitted or misrepresented facts.

313.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

314.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United*

1   *States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period

2   statements in violation of a duty to disclose such information, as detailed above.

3   **FIRST CAUSE OF ACTION**

4   **Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder**

5   **(Against Armistice Capital, Vaxart, and the Individual Defendants)**

6   315.    Plaintiffs repeat and reallege each allegation contained above as if fully set forth herein.

7   This claim is asserted on behalf of all members of the Class against Armistice Capital, Vaxart, and the

8   Individual Defendants.

9   316.    During the Class Period, these Defendants, by their acts and omissions as alleged

10  herein, carried out a plan, scheme, and course of conduct which was intended to, and, throughout the

11  Class Period, did: (i) deceive the investing public, including Plaintiffs and the other Class members;

12  (ii) artificially inflate and maintain the market price of Vaxart common stock; and (iii) cause Plaintiffs

13  and Class members to purchase and hold Vaxart common stock at artificially inflated prices as the

14  Armistice Defendants cashed out causing a sharp decrease in value.

15  317.    Each of these Defendants, in violation of Section 10(b) of the Exchange Act and Rule

16  10b-5(b), made untrue statements of material fact and/or omitted to state material facts necessary to

17  make the statements not misleading, which operated as a fraud and deceit upon the purchasers of

18  Vaxart common stock in an effort to maintain artificially high market prices for Vaxart common stock.

19  These Defendants' material misrepresentations and omissions are alleged in Part VII, *supra*. These

20  Defendants are sued as primary participants in the wrongful conduct charged herein.

21  318.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of these

22  Defendants participated directly or indirectly in the preparation and/or issuance of the materially false,

23  misleading, and incomplete statements detailed above and the continuous course of conduct to

24  undermine the rules protecting Vaxart from insider trading.

25  319.    By virtue of their positions at or over Vaxart, these Defendants had actual knowledge

26  of the materially false and misleading statements and material omissions alleged herein, and intended

27  thereby to deceive Plaintiffs and the other members of the Class; alternatively, these Defendants acted

28

1    with reckless disregard for the truth in that they recklessly failed to ascertain and disclose such facts

2    as would reveal the materially false and misleading nature of the statements made, even though such

3    facts were readily available to these Defendants.

4         320.    Information showing that these Defendants acted knowingly or with reckless disregard

5    for the truth is peculiarly within these Defendants' knowledge and control. As Vaxart's senior officers

6    and/or directors, the Individual Defendants had knowledge of the details of Vaxart's internal affairs.

7    Defendants Boyd and Maher's knowledge of the details of Vaxart's internal affairs is imputable to

8    Armistice Capital.

9         321.    Armistice Capital and the Individual Defendants are liable both directly and indirectly

10    for the wrongs complained of herein. Because of their positions of control and authority, Armistice

11    Capital and the Individual Defendants were able to and did, directly or indirectly, control the content

12    of the statements of Vaxart. As officers and/or directors of a publicly held company, Armistice Capital

13    and the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with

14    respect to Vaxart's businesses, operations, future financial condition, and future prospects. As a result

15    of the dissemination of the false and misleading reports, releases, and public statements, the market

16    price of Vaxart common stock was artificially inflated throughout the Class Period. In ignorance of

17    the adverse facts concerning Vaxart's business and financial condition which were concealed by these

18    Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Vaxart

19    common stock at artificially inflated prices in reliance on the integrity of the market for such securities

20    and were damaged thereby.

21         322.    During the Class Period, Vaxart common stock was traded on an active and efficient

22    market. Plaintiffs and the other members of the Class, relying on the materially false and misleading

23    statements described herein, purchased or otherwise acquired shares of Vaxart common stock at prices

24    artificially inflated by Defendants' wrongful scheme and course of conduct. Had Plaintiffs and the

25    other members of the Class known the truth, they would not have purchased or otherwise acquired said

26    securities or would not have purchased or otherwise acquired them at the inflated prices that were paid.

27    At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Vaxart

28    common stock was substantially lower than the prices paid by Plaintiffs and the other members of the

Class. The market price of Vaxart common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Vaxart common stock, which inflation was removed from its price as the true facts became known.

323.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class have suffered damages in connection with their purchases of Vaxart common stock during the Class Period.

324.    By reason of the conduct alleged herein, these Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

## SECOND CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a),(c) Promulgated Thereunder
### (Against all Defendants)

325.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

326.    This Count is brought under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiffs need not allege in this Count, nor prove in this case, that each of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

327.    During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially inflate the market price of Vaxart common stock; and (iii) cause Plaintiffs to purchase Vaxart common stock at artificially inflated prices.

328.    In furtherance of this unlawful plan, scheme, and course of conduct, Defendants employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business, including the dissemination of false and misleading statements, that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their purchases of Vaxart common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-

5(a) and (c) promulgated thereunder.

329.   Defendants' fraudulent devices, schemes, artifices, and deceptive acts, practices, and course of business included deliberately releasing well-timed, but false and misleading, and therefore fraudulent, statements about Vaxart and its COVID-19 vaccine candidate. Ultimately, this conduct resulted in the Company making false statements to the market about the likelihood of its financial success and the reasons underlying the success, by, for example, falsely claiming that one of its manufacturing partners had the ability to manufacture a billion or more doses of Vaxart's COVID-19 vaccine and that the vaccine had been selected for Operation Warp Speed.

330.   Plaintiffs and the Class reasonably relied upon the integrity of the market in which Vaxart common stock traded.

331.   During the Class Period, Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct. Had Plaintiffs and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Vaxart common stock, or if they had, would not have done so at the artificially inflated prices paid for such securities.

332.   As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of Vaxart common stock during the Class Period.

333.   By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiffs and the Class for damages suffered in connection with their purchases of Vaxart common stock during the Class Period.

### THIRD CAUSE OF ACTION

**Violations of Section 20(a) of the Exchange Act as to Vaxart**
**(Against Armistice Capital and the Individual Defendants)**

334.   Plaintiffs repeat and reallege each allegation contained above as if fully set forth herein.

335.   This Count is asserted on behalf of Plaintiffs and all members of the Class against Armistice Capital and the Individual Defendants for violations of Section 20(a) of the Exchange Act ("Section 20(a)"), 15 U.S.C. § 78t(a).

336.    Armistice Capital and the Individual Defendants were and acted as controlling persons of Vaxart within the meaning of Section 20(a) as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Each of these Defendants was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

337.    Additionally, Defendants Boyd and Maher were and acted as controlling persons of Armistice Capital within the meaning of Section 20(a) as alleged herein. By virtue of their high-level positions with Armistice Capital, participation in and/or awareness of Armistice Capital's operations and/or intimate knowledge of Armistice Capital's actual performance, Boyd and Maher had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Armistice Capital, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

338.    Further, Armistice Capital and the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the transactions giving rise to the securities violations as alleged herein and exercised the same.

339.    As set forth above, Vaxart, Armistice Capital, and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their control over Vaxart, Armistice Capital, and the Individual Defendants are also liable for Vaxart's violation of Section 10(b) pursuant to Section 20(a).

**FOURTH CAUSE OF ACTION**

**Violations of Section 20A of the Exchange Act**
**(Against Armistice Capital, Armistice Master Fund, Boyd, and Maher)**

340.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

341.    This Count is asserted for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t(a) on behalf of the Section 20A Plaintiffs and all other members of a subclass (the "Subclass") of those who purchased shares of Vaxart common stock contemporaneously with the sales of Vaxart common stock by Defendants Armistice Capital, Armistice Master Fund, Steven Boyd, and Keith Maher (collectively, the "Section 20A Defendants") on or about June 26 and June 29, 2020. As previously detailed above, at the time of such sales, the Section 20A Defendants were in possession of material, nonpublic information as alleged herein concerning the truth about Vaxart's purported capacity to produce a COVID-19 vaccine and its purported "selection for" Operation Warp Speed (the "Material Inside Information").

342.    As set forth in their sworn certifications previously filed in this action, Lead Plaintiff Langdon Elliott and Additional Plaintiff Ani Hovhannisyan (collectively, the "Section 20A Plaintiffs") purchased Vaxart common stock on the dates and for the prices indicated, and thus traded contemporaneously with the previously referenced trades in Vaxart shares made on or about June 26 and June 29, 2020, by the Section 20A Defendants. More specifically, Lead Plaintiff Langdon Elliott purchased 5,000 shares of Vaxart common stock on Friday, June 26, 2020. Additional Plaintiff Ani Hovhannisyan purchased 20 and 10 shares of Vaxart common stock on Friday, June 26, 2020, and Monday, June 29, 2020, respectively.

343.    Section 20A(a) of the Exchange Act provides that:

> Any person who violates any provision of the [Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased securities of the same class.

344.    As set forth herein, and for the reasons stated in Counts I through III above, the

Section 20A Defendants violated Exchange Act Section 10(b), SEC Rule 10b-5 promulgated thereunder, and Exchange Act Section 20(a).

345.    Additionally, the Section 20A Defendants violated Exchange Act Section 10(b), Rule 10b-5, and Rule 10b5-1 (17 C.F.R. § 240.10b5-1) by selling, on or about June 26 and June 29, 2020, shares of Vaxart common stock that they owned, either directly, indirectly, or beneficially, while in possession of material, nonpublic adverse information concerning Vaxart's true business and financial condition, which information they had a duty to disclose, and which they failed to disclose in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as more fully alleged herein.

346.    Defendants Boyd and Maher, by virtue of their positions as directors of Vaxart, owed a fiduciary duty to Vaxart shareholders to not trade on, or to cause or permit entities that they controlled (including Armistice Capital and Armistice Master Fund) to trade on, undisclosed, nonpublic information, including the Material Inside Information. Defendants Boyd and Maher also benefitted, either directly or indirectly, from the ill-gotten profits obtained by Armistice Capital and/or Armistice Master Fund in connection those entities' use of the Material Inside Information in connection with their sales of Vaxart shares at inflated prices on or about June 26 and June 29, 2020.

347.    To the extent that Boyd and Maher are not deemed to have traded themselves on material inside information in violation of Section 10(b), they violated Section 10(b) by acting as tippers of Armistice Capital and Armistice Master Fund in connection with Armistice Capital and Armistice Master Fund's sales of Vaxart shares at inflated prices on or about June 26 and June 29, 2020, using the Material Inside Information provided to them by Boyd and Maher.

348.    Defendant Armistice Capital, in its capacity as the investment manager of Armistice Master Fund, was a tippee of Defendants Boyd and Maher with respect to the Material Inside Information. Defendant Armistice Capital profited from its use of the Material Inside Information by selling (or causing investment funds which it managed for a fee including a share of profits generated, including the Armistice Master Fund, to sell) Vaxart shares at inflated prices on or about June 26 and June 29, 2020, while knowing or recklessly disregarding that (a) the material Inside Information was confidential information that Boyd and/or Maher had acquired in their capacities as Vaxart directors,

and (b) Armistice Capital's acquisition and use of the Material Inside Information was wrongful and in violation of Section 10(b).

349.    Defendant Armistice Master Fund was a tippee of Defendants Boyd and Maher, and of Armistice Capital, with respect to the Material Inside Information. Defendant Armistice Master Fund profited from its use of the Material Inside Information by selling Vaxart shares at inflated prices on or about June 26 and June 29, 2020, while knowing (through its investment manager, Armistice Capital and Defendants Boyd and Maher) or recklessly disregarding that (a) the Material Inside Information was confidential information that Boyd and/or Maher had acquired in their capacities as Vaxart directors, and (b) Armistice Master Fund's acquisition and use of the Material Inside Information was wrongful and in violation of Section 10(b).

350.    Contemporaneously with the Section 20A Defendants' insider sales of Vaxart common stock, the Section 20A Plaintiffs and other Subclass members purchased shares of Vaxart common stock on a national securities exchange and in an open and efficient market, while the Section 20A Defendants were in possession of material, nonpublic information they had a duty to disclose, but failed to disclose, as alleged herein, including information concerning Vaxart's true business and financial condition.

351.    The Section 20A Plaintiffs and other members of the Subclass have been damaged as a result of the violations of the Exchange Act alleged herein.

352.    By reason of the violations of the Exchange Act alleged herein, the Section 20A Defendants are liable to the Section 20A Plaintiffs and other members of the Subclass who purchased shares of Vaxart common stock contemporaneously with the Section 20A Defendants' sales of Vaxart common stock.

353.    The Section 20A Plaintiffs and the other members of the Subclass, who purchased contemporaneously with the Section 20A Defendants' insider sales of Vaxart common stock seek disgorgement by the Section 20A Defendants of profits gained or losses avoided from the Section 20A Defendants' transactions in Vaxart common stock contemporaneous with the Section 20A Plaintiffs and other members of the Subclass.

354.    In addition, Defendants Boyd and Maher are liable for Armistice Capital and Armistice

1    Master Fund's violations of Section 20A as alleged herein as controlling persons of Armistice, as

2    provided under subsection (b)(3) of Section 20A and Exchange Act Section (2)(a).

3        355.    Pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3), Plaintiffs bring this

4    Count on behalf of a Subclass consisting of all those who purchased or otherwise acquired shares of

5    Vaxart common stock contemporaneously with the sales of Vaxart common stock by Defendants

6    Armistice Capital, Armistice Master Fund, Boyd, and Maher (collectively, the "Section 20A

7    Defendants") on or about June 26 and June 29, 2020, and were damaged thereby. Excluded from the

8    Subclass are Defendants, Vaxart and Armistice Capital's current and former officers, directors,

9    parents, and subsidiaries, their immediate family members, legal representatives, heirs, successors or

10   assigns of any such excluded person and any entity in which Defendants have or had a controlling

11   interest.

12       356.    For purposes of this Count, Plaintiffs allege that the members of the proposed Subclass

13   are so numerous that joinder of all members is impracticable. During the period that was

14   contemporaneous with the Section 20A Defendants' insider sales as alleged herein, Vaxart common

15   stock was actively traded on the NASDAQ, and the Section 20A Defendants alone are alleged to have

16   sold a total of over 27.612 million shares on June 26 and June 29, 2020. While the exact number of

17   Subclass members is unknown to Plaintiffs at this time, and can be ascertained only through

18   appropriate discovery, Plaintiffs believe that there are likely hundreds if not thousands of members of

19   the proposed Subclass. Stock owners and other members of the Subclass may be identified from

20   records maintained by Vaxart or its transfer agent and may be notified of the pendency of this action

21   by mail, using the form of notice similar to that customarily used in securities class actions. Moreover,

22       (a)    The Section 20A Plaintiffs' claims are typical of the claims of other Subclass members,

23              as all members of the Subclass were similarly affected by Defendants' wrongful

24              conduct as alleged herein.

25       (b)    The Section 20A Plaintiffs will fairly and adequately protect the Subclass members'

26              interests and have retained competent counsel experienced in class actions and

27              securities litigation. The Section 20A Plaintiffs have no interests antagonistic to, or in

28              conflict with, those of the Subclass, or with other Subclass members.

(c)      Common questions of law and fact exist as to all Subclass members and predominate over any questions solely affecting individual Subclass members. Common questions include:

     i.      whether the Section 20A Defendants violated the federal securities laws as alleged herein;

     ii      whether the Section 20A Defendants traded on inside information; and

     iii.      whether the Section 20A Defendants trading on inside information yielded profits gained or losses avoided, and if so the amount of such profits gained or losses avoided.

(d)      A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Subclass members is impracticable. Additionally, the damages suffered by some individual Subclass members may be relatively small so that the burden and expense of individual litigation make it impossible for them to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

357.      Plaintiffs and the other members of the Subclass have been damaged as a result of the violations of the Exchange Act alleged herein.

358.      This action was brought within five years after the date of the last transaction that is the subject of Armistice Capital, Armistice Master Fund, Boyd, and Maher's violation of Section 20A.

## FIFTH CAUSE OF ACTION

### Violations of Section 20(a) of the Exchange Act as to Armistice's Insider Trading
### (Against Armistice Capital, Boyd, and Maher)

359.      Plaintiffs repeat and reallege each allegation contained above as if fully set forth herein.

360.      This Count is asserted on behalf of Plaintiffs and all members of the Subclass against Armistice Capital, Boyd, and Maher for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §§ 78t(a), 78t-1(b)(3).

361.      Defendants Armistice Capital, Boyd, and Maher were and acted as controlling persons

1   of Armistice Master Fund (and, for Boyd and Maher, who also acted as controlling persons of

2   Armistice Capital) within the meaning of Section 20(a) as alleged herein. By virtue of their high-level

3   positions, these Defendants had the power to influence and control and did influence and control,

4   directly or indirectly, the decision-making of Armistice Capital and Armistice Master Fund, including

5   the Defendants' unlawful insider trading. Each of these Defendants was provided with, or had

6   unlimited access to, copies of the Company's reports, press releases, public filings, and other

7   statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were

8   issued, and had the ability to prevent the issuance of the statements or cause the statements to be

9   corrected.

10          362.    In addition, Defendants Armistice Capital, Boyd, and Maher had direct involvement in

11  the day-to-day operations of Armistice Master Fund and, therefore, are presumed to have had the

12  power to control or influence the transactions giving rise to the securities violations as alleged herein

13  and exercised the same.

14          363.    As set forth above, Defendants Armistice Capital, Armistice Master Fund, Boyd, and

15  Maher each violated Sections 20A and 10(b), and Rule 10b-5. By virtue of their control over Armistice

16  Master Fund, Defendants Armistice Capital, Boyd, and Maher are also liable for Armistice Master

17  Fund's violation of Sections 20A and 10(b) pursuant to Section 20(a). Additionally, by virtue of their

18  control over Armistice Capital, Boyd and Maher are also liable for Armistice Capital's violations of

19  Sections 20A and 10(b) pursuant to Section 20(a).

20

21

22

23

24

25

26

27

28

1

## PRAYER FOR RELIEF

2       WHEREFORE, Plaintiffs pray for relief and judgment as follows:

3       A.      Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the

4               Federal Rules of Civil Procedure on behalf of the Class defined herein;

5       B.      Awarding all damages and other remedies available under the Exchange Act in favor

6               of Plaintiffs and the members of the Class against Defendants in an amount to be proven

7               at trial, including interest thereon;

8       C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this

9               action, including attorneys' fees and expert fees; and

10      D.      Such other and further relief as the Court may deem just and proper.

11

12

## JURY DEMAND

13      Plaintiffs demand a trial by jury.

14

15  DATED: December 9, 2022                 Respectfully submitted,

16                                          **HAGENS BERMAN SOBOL SHAPIRO LLP**

17                                          By /s/ *Reed R. Kathrein*
                                            Reed R. Kathrein (139304)
18                                          Lucas E. Gilmore (250893)
                                            715 Hearst Avenue, Suite 202
19                                          Berkeley, CA 94710
                                            Telephone: (510) 725-3000
20                                          Facsimile: (510) 725-3001
                                            reed@hbsslaw.com
21                                          lucasg@hbsslaw.com

22

23                                          Raffi Melanson (admitted *pro hac vice*)
                                            1 Faneuil Hall Square, 5th Floor
24                                          Boston, MA 02109
                                            Telephone: (617) 482-3700
25                                          Facsimile: (617) 482-3003
                                            raffim@hbsslaw.com

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Steven W. Berman (admitted *pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steveb@hbsslaw.com

*Lead Counsel*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
John T. Jasnoch (281605)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
William C. Fredericks (admitted *pro hac vice*)
Jeffrey P. Jacobson (admitted *pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 233-6444
Facsimile: (212) 233-6334
wfredericks@scott-scott.com
jjacobson@scott-scott.com

**THE SCHALL LAW FIRM**
Brian J. Schall (290685)
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile: (213) 519-5876
brian@schallfirm.com

*Additional Counsel*