UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re VAXART, INC. SECURITIES LITIGATION. | Case No. 20-cv-05949-VC<br><br>**ORDER RE MOTION TO DISMISS**<br>Re: Dkt. No. 261 |

The motion to dismiss is granted in part and denied in part. This ruling assumes the reader is familiar with the allegations and the arguments made by the parties.

1.  *Request for Judicial Notice.* The Armistice Defendants ask the Court to take judicial notice of 14 exhibits. The plaintiffs object to the consideration of Exhibits 2, 5–7 and 10–12. The request is granted as to the unopposed exhibits. The request is also granted as to Exhibits 2, 5, 6, 7, and 10. Those documents are incorporated into the complaint by reference. The request is denied as to Exhibits 11 and 12. Those documents are not incorporated by reference—the complaint does not rely on them at all—and there is no other basis for taking judicial notice of them.

2.  *Rule 10b-5(b) Claim.* The motion to dismiss is granted as to the Rule 10b-5(b) claim. Under Rule 10b-5(b), it is unlawful for any person to "make any untrue statement of a material fact" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5(b). The Supreme Court has drawn a "clean line" between those who "make" a statement within the meaning of the rule and those who do not: "[T]he maker is the person or entity with ultimate authority over a statement and others are not." *Janus Capital Group, Inc. v. First Derivative*

*Traders*, 564 U.S. 135, 143 n.6 (2011). Even someone who is "significantly involved in preparing" a statement cannot be held liable under Rule 10b-5(b) if the statement was "made" by someone else. *Id.* at 148. This standard "might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said." *Id.* at 143.

It's clear that Vaxart, and not the Armistice Defendants, made the statements at issue here. The statements were attributed to Vaxart, and "in the ordinary case, attribution within a statement … is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *See id.* at 142–43. There are no well-pled allegations that the Armistice Defendants exercised "ultimate authority" of the kind discussed in *Janus*. Indeed, the plaintiffs' own allegations undermine this theory: According to the complaint, Boyd told Vaxart that Armistice might release the news about the non-human primate study ("NHP study") if Vaxart chose not to. Corrected Second Amended Class Action Complaint ("Compl.") ¶ 184. That exchange suggests that Vaxart, not the Armistice Defendants, had ultimate control over the press releases. Without that ultimate authority, the Armistice Defendants cannot be held liable as "makers" of the statements, even if they exerted some control over the timing of the press releases and influenced their content. *See Janus*, 564 U.S. at 148.

Given the facts alleged, it seems highly unlikely that the plaintiffs are presently capable of curing the defects in this claim. But in an abundance of caution, dismissal is with leave to amend. If the plaintiffs wish to file an amended complaint to assert this claim, they may do so within 21 days. Alternatively, if the plaintiffs choose not to amend and discovery on the surviving claims establishes a basis for this claim, the plaintiffs may seek leave to file an amended complaint at that time.

3. *Section 20(a) as to Vaxart.* The motion to dismiss is also granted for the section 20(a) claim. The complaint does not plausibly allege that the Armistice Defendants were "control persons" of Vaxart. Although the complaint plausibly alleges that the Armistice Defendants

2

influenced Vaxart and its board, "[c]ontrol in this context is not the mere ability to persuade, but [rather] … the practical ability to direct the actions of people who issue or sell securities." *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005). The complaint does not plausibly allege that the Armistice Defendants exercised that kind of control here. As with the Rule 10b-5(b) claim, it seems unlikely that the plaintiffs can cure the deficiencies with this claim as of now, but dismissal is with leave to amend. Alternatively, if discovery on the surviving claims reveals information relevant to this claim, the plaintiffs may seek leave to amend at that time.

4.  *Insider Trading.* The motion to dismiss is denied as to the insider trading claims under section 20A and Rule 10b-5(a) and (c). To bring a claim for insider trading, a plaintiff must allege that a defendant violated another provision of the Securities and Exchange Act of 1934 "by purchasing or selling a security while in possession of material, nonpublic information" and traded "contemporaneously" with the plaintiff. 15 U.S.C. § 78t-19(a). The Armistice Defendants move to dismiss this claim on the grounds that the plaintiffs do not adequately allege that the Armistice Defendants acted with scienter or traded on material nonpublic information.

A complaint adequately alleges scienter under the PSLRA only if "the malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). That standard is met here.

After both the Attwill and Operation Warp Speed press releases, the Armistice Defendants sold almost all of their shares in Vaxart and reaped a significant profit. Compl. ¶¶ 203–04, 206. It is true that even the sale of a significant number of shares does not alone create an inference of scienter, especially when the sales are not "dramatically out of line with prior trading practices." *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 986 (9th Cir. 1999), *as amended* (Aug. 4, 1999). But the plaintiffs do not rely solely on these sales to support their allegations.

For the Attwill press release, the Court previously explained that "[i]t is difficult to imagine that a fledgling firm like Vaxart—a firm that has never taken a successful vaccine to

3

market—would fail to do basic diligence on its key partner in developing a crucial product." *In re Vaxart, Inc. Securities Litigation*, 576 F. Supp. 3d 663, 673 (N.D. Cal. 2021). Based on the context and circumstances, it would be "absurd" to suggest that Boyd and Maher (and by extension, the other Armistice Defendants) did not know the Attwill press release overstated Attwill's capabilities. *See South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008).

The allegations of scienter are even stronger for the Operation Warp Speed press release. The complaint alleges that at the June 8 board meeting, the Armistice Defendants were informed that Vaxart had been invited to participate in the NHP study. Compl. ¶¶ 142–43. On June 25, Floroiu told Boyd that the information about the NHP study was not material, echoing the decision made by the previous CEO. ¶ 184. Boyd then said Armistice might put out the press release if Vaxart refused to do so, and that prompted Vaxart to ultimately release the news itself. ¶¶ 184–85. At a minimum, this exchange suggests that the Armistice Defendants knew of at least one piece of material nonpublic information: that Vaxart did not view its selection for the NHP study as material, even though it touted that selection as highly significant in the press release. Moreover, accepting the allegations as true, Boyd and Maher participated in drafting that press release.[1] ¶ 280. And given their involvement in Vaxart, it would again be "absurd" to suggest that the Armistice Defendants did not understand that the Operation Warp Speed press release was misleading. *See also* ¶ 130.

On top of that, the complaint alleges that the day before the Attwill press release was put out, Maher texted Floroiu to make sure that "when we release news that it hits the tape and that it hits early in the morning, like before 8am." ¶ 173. It's not difficult to infer that, based on that text and the phone call that preceded it, *id.*, Maher understood the value of these press releases to Armistice's trading plan.

---

[1] In support of this allegation, the plaintiffs rely on a document prepared by a Vaxart employee for regulators that says that Boyd and Maher participated in "many revisions" of the Operation Warp Speed press release. ¶ 280. The Armistice Defendants argue that that document was just a draft, and a later version shows that Boyd and Maher did not revise the press release. Obviously, that factual dispute cannot be decided on a motion to dismiss.

The inference of scienter is strengthened still further by the allegations that the Armistice Defendants worked to change the insider trading blackout period so that they could take advantage of the speculation about Operation Warp Speed. ¶¶ 171, 183. If the Armistice Defendants were bound to the insider trading policy, they would have been unable to sell their shares until August—plenty of time for the public to realize that the Vaxart press releases were misleading, and plenty of time for the identities of the companies that actually had been selected for Operation Warp Speed to become public. ¶ 170. Given all these allegations, the inference of scienter is at least as compelling as the opposing inference.

The plaintiffs have also plausibly alleged that Boyd and Maher were "control persons" of Armistice Capital, and Boyd, Maher, and Armistice Capital were "control persons" of Armistice Master Fund.

5.  *Rule 10b-5(a) and (c) Claim for "Scheme" Liability*. Finally, the motion to dismiss is denied as to the Rule 10b-5(a) and (c) claims for "scheme" liability. Under Rules 10b-5(a) and (c), it is unlawful to "employ any device, scheme, or artifice to defraud" or "engage in any act, practice, or course of business" that "operates … as a fraud or deceit." 17 C.F.R. § 240.10b-5(a), (c). The Supreme Court has rejected the argument that these provisions are "violated only when conduct other than misstatements is involved." *Lorenzo v. S.E.C.*, 139 S. Ct. 1094, 1101–02 (2019); *In re Alphabet, Inc. Securities Litigation*, 1 F.4th 687, 709 (9th Cir. 2021). Rather, there is "considerable overlap" between the subsections of Rule 10b-5, and scheme liability under (a) and (c) can be based on a scheme to take advantage of misleading statements—even while subsection (b) speaks to the actual making of such statements. *See Lorenzo*, 139 S. Ct. at 1102; *see also S.E.C. v. Familant*, 910 F. Supp. 2d 83, 94 (D.D.C. 2012). In *Lorenzo*, the Supreme Court held that the "dissemination of false or misleading statements with intent to defraud can fall within the scope" of subsection (a) and (c). 139 S. Ct. at 1100. But Rule 10b-5(a) and (c) prohibit more than just the dissemination of misleading statements; the language of these provisions is "expansive." *Id.* at 1102.

Accepting the allegations in the complaint as true, the Armistice Defendants did not

merely trade on material nonpublic information; they participated in an intentional scheme to manipulate the price of Vaxart shares for the purpose of selling them at an artificially inflated price. They conspired to appoint Floroiu—a "plaything of Armistice," Compl. ¶ 268—as CEO to carry out an aggressive (and misleading) PR campaign; worked to change Vaxart's insider trading blackout period to capitalize on the speculation about Operation Warp Speed, ¶¶ 170–71; pushed Vaxart to release the news about the NHP study, ¶ 184; and sold a substantial number of shares to profit from Vaxart's misleading statements, ¶ 206. Those allegations are enough to state a claim.

**IT IS SO ORDERED.**

Dated: May 25, 2023

VINCE CHHABRIA
United States District Judge