Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Counsel for Proposed Class Representatives*
*Wei Huang and Langdon Elliott*

[Additional counsel on signature page]

William C. Fredericks (*pro hac vice*)
Jeffrey P. Jacobson (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 233-6444
Facsimile: (212) 233-6334
wfredericks@scott-scott.com
jjacobson@scott-scott.com

*Counsel for Proposed Class Representative*
*Ani Hovhannisyan*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re VAXART, INC. SECURITIES LITIGATION<br><br><br><br>*This Document Relates to:*<br>    *ALL ACTIONS* | Case No. 3:20-cv-05949-VC<br><br>CLASS ACTION<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL**<br><br>Hearing Date: March 21, 2024<br>Time: 10:00 a.m.<br>Courtroom: 4, 17th Floor<br>Judge: Hon. Vince Chhabria |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on March 21, 2024, at 10:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Vince Chhabria, located at United States District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Avenue, San Francisco, California 94102, Lead Plaintiffs Wei Huang and Langdon Elliott and Additional Plaintiff Ani Hovhannisyan (collectively, "Plaintiffs") will request that, pursuant to Federal Rule of Civil procedure 23(a) and 23(b)(3), this Court:

(i)     certify a Class of all persons or entities who purchased or otherwise acquired publicly traded Vaxart, Inc. ("Vaxart") securities between June 15, 2020 and August 19, 2020, inclusive, and were damaged thereby ("Section 10(b) Class" or "Class");

(ii)    certify a Subclass of all persons or entities who purchased publicly traded Vaxart common stock contemporaneously with the June 26 and 29, 2020 sales of Vaxart common stock by Defendants Armistice Capital, LLC ("Armistice Capital"), Armistice Master Fund, Ltd. ("Armistice Master Fund"), Steven J. Boyd, or Keith Maher (collectively, "Armistice Defendants"), and were damaged thereby ("Section 20A Subclass");

(iii)   appoint Plaintiffs Wei Huang, Langdon Elliott, and Ani Hovhannisyan as Class Representatives; and

(iv)    appoint Lead Counsel Hagens Berman Sobol Shapiro LLP ("Hagens Berman") and Additional Counsel Scott+Scott, Attorneys at Law LLP ("Scott+Scott") as Class Counsel.

This Motion is based upon this Notice of Motion and Motion, the Declaration of Reed R. Kathrein ("Kathrein Decl."), the exhibits attached thereto, including the accompanying expert report of Matthew D. Cain, Ph.D. ("Cain Report"), the Court's files in this action, the arguments of counsel, and any other matter that the Court may consider.

## ISSUES TO BE DECIDED

1.  Whether the proposed Class and Subclass meet the requirements of Federal Rule 23(a) and (b)(3).

2.  Whether to appoint Plaintiffs Huang, Elliott, and Hovhannisyan as Class Representatives.

3.  Whether to appoint Hagens Berman and Scott+Scott as Class Counsel.

Case 3:20-cv-05949-VC    Document 311    Filed 12/01/23    Page 3 of 35

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND.................................................................................2

III.    ARGUMENT..........................................................................................................6

      A.      The Class and Subclass are so numerous that joinder is impractical. ........................7

      B.      This action centers on several common questions of law and fact.............................8

      C.      Plaintiffs' claims are typical of the proposed Class and Subclass.............................9

      D.      Plaintiffs and counsel will fairly and adequately protect the Class's
            interests. ...................................................................................................10

      E.      Common questions of law and fact predominate. ....................................................11

      F.      The class mechanism is the superior method for resolving this case. .......................24

IV.     CONCLUSION.....................................................................................................25

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION – ii                    No. 3:20-cv-05949-VC

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Adobe Sys., Inc. Sec. Litig.*,
139 F.R.D. 150 (N.D. Cal. 1991) .................................................................................. 6

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972) ............................................................................................. 22, 23

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ..................................................................................................... 12

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ................................................................................. 7, 12, 13, 14

*Angley v. UTi Worldwide Inc.*,
311 F. Supp. 3d 1117 (C.D. Cal. 2018) ...................................................................... 17

*In re Apple Inc. Sec. Litig.*,
2023 WL 2763952 (N.D. Cal. Mar. 28, 2023) ............................................................ 21

*In re Aqua Metals, Inc. Sec. Litig.*,
2019 WL 3817849 (N.D. Cal. Aug. 14, 2019) ............................................................ 12

*Banc of Cal. Sec. Litig.*,
326 F.R.D. 640 (C.D. Cal. 2018) .................................................................................. 9

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ........................................................................................... 2, 13, 14

*Berner v. Lazzaro*,
730 F.2d 1319 (9th Cir. 1984), *aff'd*, 472 U.S. 299 (1985) ........................................ 6

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ..................................................................................... 24

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) .......................................................................... *passim*

*Castillo v. Bank of Am., NA*,
980 F.3d 723 (9th Cir. 2020) ....................................................................................... 11

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*,
270 F.R.D. 247 (S.D. Cal. 2010) ................................................................................. 15

*In re Connetics Corp. Sec. Litig.*,
257 F.R.D. 572 (N.D. Cal. 2009) ............................................................................ 9, 13

*In re Connetics Corp. Sec. Litig.*,
  2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) ................................................................. 7

*In re Cooper Cos. Inc. Sec. Litig.*,
  254 F.R.D. 628 (C.D. Cal. 2009) .............................................................................. 8, 12

*In re Countrywide Fin. Corp. Sec. Litig.*,
  273 F.R.D. 586 (C.D. Cal. 2009) .............................................................. 15, 17, 21, 24

*Deutschman v. Beneficial Corp.*,
  841 F.2d 502 (3d Cir. 1988) ........................................................................................ 21

*Di Donato v. Insys Therapeutics, Inc.*,
  333 F.R.D. 427 (D. Ariz. 2019) ................................................................................... 19

*In re Diamond Foods, Inc., Sec. Litig.*,
  295 F.R.D. 240 (N.D. Cal. 2013) ........................................................................... 14, 24

*Edwards v. First Am. Corp.*,
  798 F.3d 1172 (9th Cir. 2015) ..................................................................................... 12

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ................................................................................................. 9, 12

*Evanston Police Pension Fund v. McKesson Corp.*,
  411 F. Supp. 3d 580 (N.D. Cal. 2019) .......................................................................... 7

*In re Gaming Lottery Sec. Litig.*,
  2001 WL 204219 (S.D.N.Y. Mar. 1, 2001) ................................................................. 20

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ............................................................................................... 13, 14

*Harris v. Palm Springs Alpine Ests., Inc.*,
  329 F.2d 909 (9th Cir. 1964) ......................................................................................... 7

*Hatamian v. Advanced Micro Devices, Inc.*,
  2016 WL 1042502 (N.D. Cal. Mar. 16, 2016) .............................................................. 7

*Hayes v. MagnaChip Semiconductor Corp.*,
  2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ........................................................ 17, 18

*Hodges v. Akeena Solar, Inc.*,
  274 F.R.D. 259 (N.D. Cal. 2011) ................................................................................. 14

*Johnson v. Aljian*,
  490 F.3d 778 (9th Cir. 2007) ....................................................................................... 13

*Junge v. Geron Corp.*,
  2022 WL 1002446 (N.D. Cal. Apr. 2, 2022) ........................................................... 17, 18

*In re Juniper Networks, Inc. Sec. Litig.*,
  264 F.R.D. 584 (N.D. Cal. 2009) ............................................................................. 16, 25

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ..................................................................... *passim*

*In re LDK Solar Sec. Litig.*,
  255 F.R.D. 519 (N.D. Cal. 2009) ................................................................................. 9

*In re Lendingclub Sec. Litig.*,
  282 F. Supp. 3d 1171 (N.D. Cal. 2017) ..................................................................... 23

*Levie v. Sears, Roebuck & Co.*,
  496 F. Supp. 2d 944 (N.D. Ill. 2007) ........................................................................ 20

*Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*,
  244 F.3d 1152 (9th Cir. 2001) ................................................................................... 10

*Malriat v. QuantumScape Corp.*,
  2022 WL 17974629 (N.D. Cal. Dec. 19, 2022) ........................................................ 17

*In re Mills Corp. Sec. Litig.*,
  257 F.R.D. 101 (E.D. Va. 2009) ................................................................................ 15

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
  2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) ..................................................... *passim*

*In re Nature's Sunshine Prods. Inc. Sec. Litig.*,
  251 F.R.D. 656 (D. Utah 2008) ................................................................................. 16

*In re NetSol Techs., Inc. Sec. Litig.*,
  2016 WL 7496724 (C.D. Cal. July 1, 2016) ................................................................ 6

*Nguyen v. Radient Pharms. Corp.*,
  287 F.R.D. 563 (C.D. Cal. 2012) ..................................................................... 7, 19, 24

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) (*en banc*) .................................................................... 22

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014) ................................................................................... 8, 9

*Petrie v. Elec. Game Card, Inc.*,
  308 F.R.D. 336 (C.D. Cal. 2015) .............................................................................. 18

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
  2021 WL 229310 (N.D. Cal. Jan. 21, 2021) ................................................... 18, 19, 20

*Pulaski & Middleman, LLC v. Google, Inc.*,
  802 F.3d 979 (9th Cir. 2015) .................................................................................... 23

*Purple Mountain Tr. v. Wells Fargo & Co.*,
    2022 WL 3357835 (N.D. Cal. Aug. 15, 2022) ............................................................... 18, 19

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ................................................................................ 13

*Scheller v. Nutanix, Inc.*,
    2021 WL 2410832 (N.D. Cal. June 10, 2021).............................................................. 21, 22

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
    571 F. Supp. 2d 1315 (N.D. Ga. 2007)............................................................................... 20

*In re Scorpion Techs., Inc. Sec. Litig.*,
    1994 WL 774029 (N.D. Cal. Aug. 10, 1994) ...................................................................... 6

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
    335 F.R.D. 276 (N.D. Cal. 2020)........................................................................... 6, 7, 23

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*,
    2023 WL 3569981 (N.D. Cal. May 19, 2023)..................................................................... 17

*Siemers v. Wells Fargo & Co.*,
    243 F.R.D. 369 (N.D. Cal. 2007)........................................................................................ 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................................. 6

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)............................................................................................................ 12

*In re Valeant Pharms. Int'l, Inc., Sec. Litig.*,
    2019 WL 2724075 (D.N.J. June 30, 2019)......................................................................... 13

*Vaquero v. Ashley Furniture Indus., Inc.*,
    824 F.3d 1150 (9th Cir. 2016) ............................................................................................ 23

*In re VeriSign, Inc. Sec. Litig.*,
    2005 WL 7877645 (N.D. Cal. Jan. 13, 2005)........................................................... 7, 8, 10

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017) ................................................................................................. 17

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).............................................................................................................. 6

*Wong v. Arlo Techs.*,
    2021 WL 1531171 (N.D. Cal. Apr. 19, 2021)...................................................................... 9

*In re Xcelera.com Sec. Litig.*,
    430 F.3d 503 (1st Cir. 2005)............................................................................................... 16

## OTHER AUTHORITIES

17 C.F.R. § 239.13 ............................................................................................................... 17

Fed. R. Civ. P. 23 ....................................................................................................... *passim*

Fed. R. Civ. P. 23(a) ............................................................................................................. 6

Fed. R. Civ. P. 23(b)(3) ........................................................................................................ 6

## I.    INTRODUCTION

In 2020, the nation, subsumed by a global pandemic, waited with bated breath for the scientific community to develop an effective weapon against the COVID-19 virus. ¶ 90.[1] Vaxart, a fledgling pharmaceutical manufacturer that had never earned a profit, threw its hat into the ring, and behind the scenes sought U.S. government funding for its unproven, oral vaccine technology. ¶¶ 82-90. By June 2020, however, it was clear to Vaxart insiders that Vaxart was far too behind mega-pharmaceutical companies like Moderna (which had already been reported as winning $483 million in government funding) to be selected as one of the few finalists for Operation Warp Speed ("OWS"). ¶¶ 128-36. In this setting, Defendants Steven J. Boyd and Keith Maher—directors on Vaxart's Board and leaders of Armistice (Vaxart's largest stakeholder)—saw an opportunity to exploit the secrecy surrounding OWS. *Id.* Their scheme, culminating with two press releases, falsely represented that (i) Vaxart had acquired the ability to produce "a billion or more" doses of its COVID vaccine through a third party, Attwill Medical Solutions Sterilflow, LP ("Attwill"), ¶ 172, and (ii) Vaxart had been "selected for" OWS, ¶ 186. As a result of these releases, Vaxart's stock price jumped from roughly $3 per share to an intra-day high of $14.30. And Defendants, knowing the truth about Vaxart's materially misleading press releases, liquidated their Vaxart holdings to reap nearly $250 million in illicit proceeds. ¶¶ 167, 194, 203-16.

Plaintiffs now seek class certification. This action—now focused solely on the Armistice Defendants' fraud scheme—is, like virtually all securities cases, particularly suited for class treatment.

First, this action meets the four prerequisites of Rule 23(a). With millions of Vaxart securities trading on the NASDAQ during the proposed Class Period, numerosity is readily satisfied, as there are likely thousands of Class members. Commonality is easily met, given that issues—such as whether Defendants traded on material, nonpublic information, whether Defendants' conduct constituted a fraud scheme, and whether Defendants acted with scienter—are all subject to common proof. The named Plaintiffs' claims are typical, as they assert the same claims as the proposed Class and are not subject to unique defenses. As evidenced by their active prosecution to date, Plaintiffs and their counsel will adequately represent and protect the proposed Class's interests.

---

[1]    "¶" refers to paragraphs in the Corrected Second Amended Consolidated Class Action Complaint (Doc. No. 303).

Rule 23(b)(3)'s predominance and superiority criteria are also satisfied. For the proposed Class's Section 10(b) claims, for example, common issues predominate on the issues of liability, causation, and the calculation of damages. Additionally, Plaintiffs have invoked the "fraud-on-the-market" theory, which creates a classwide rebuttable presumption that investors in an efficient market relied on alleged misrepresentations or omissions through their effects on the market price.[2] As the accompanying report of Plaintiffs' expert Matthew D. Cain confirms,[3] Vaxart's securities traded in an efficient market throughout the proposed Class Period. Dr. Cain's report also confirms that Class members' damages for their Section 10(b) and 20A claims can be calculated on a classwide basis using methodologies routinely applied in federal securities litigation. Given these factors, and the obvious inefficiencies of pursuing individual actions, the class mechanism is the superior method for resolving the claims at issue.

Accordingly, Plaintiffs Wei Huang, Langdon Elliott, and Ani Hovhannisyan respectfully request this Court certify a Rule 23(b)(3) Class consisting of:

> All persons or entities who purchased or otherwise acquired publicly traded Vaxart securities between June 15, 2020 and August 19, 2020, inclusive, and were damaged thereby, including a Subclass of all persons or entities who purchased publicly traded Vaxart common stock contemporaneously with the June 26 and 29, 2020 sales of Vaxart common stock by the Armistice Defendants, and were damaged thereby.

Plaintiffs also respectfully ask that the Court appoint them as Class Representatives and appoint Hagens Berman and Scott+Scott as Class Counsel under Rule 23(a)(4) and (g).

## II.    FACTUAL BACKGROUND

In 2019, Armistice Capital—a hedge fund management firm founded and wholly owned by Defendant Boyd—set its sights on Vaxart—a small clinical stage biotech company seeking to develop oral, tablet-based vaccines. ¶¶ 68-69. Throughout 2019, Vaxart's near-$1.00 stock price and its all-time-low $8 million market capitalization made it a prime target for a low-budget, outside takeover. ¶ 63. Armistice aggressively purchased Vaxart securities at prices ranging between $0.30 and $0.40 per share. ¶¶ 63-69. By October 2, 2020, Armistice managed to control nearly 65.2% of Vaxart's outstanding

---

[2]    *See Basic Inc. v. Levinson*, 485 U.S. 224, 241-42, 244 (1988) (affirming presumption).

[3]    Kathrein Decl., Ex. A.

shares. *Id.* On top of that, Armistice acquired warrants to purchase more than 20 million additional Vaxart shares, at the low cost of $0.30 or $1.10 per share, depending on the warrants involved. *Id.*

After gaining control, Boyd wasted no time in using Armistice's control to appoint a majority of Vaxart's Board of Directors (including himself, Maher, and other Armistice loyalists) in furtherance of a plan to transform Vaxart into a company that simply managed pharmaceutical royalties. ¶¶ 70-84. The arrival of COVID in early 2020, however, caused Boyd and Maher to pursue an alternative gambit. ¶ 90.

In or about February 2020, Boyd and Maher approved plans for Vaxart to apply to the federal government's Biomedical Advanced Research and Development Authority ("BARDA") for funding to develop Vaxart's unproven oral-vaccine platform into an effective COVID vaccine. *Id.* If Vaxart got the funding, Armistice planned to "sell the company." ¶ 90. But as summarized below, if Vaxart did not get this funding, Defendants had alternative strategies to profit from their Vaxart investment.

Over the next several months, Boyd and Maher actively monitored Vaxart's BARDA efforts, including the decision to issue several press releases touting Vaxart's purportedly promising vaccine program. ¶¶ 91-105. By late April 2020, news leaked that the federal government had launched a secret, "Manhattan Project"-style initiative, OWS, which would spend billions to support private research into developing one or more COVID vaccines. ¶ 106. In mid-May, the White House confirmed that OWS existed and had narrowed an original list of nearly 100 candidates for OWS funding down to just 14. ¶ 114. And amid considerable speculation, on June 3, 2020, Bloomberg and *The New York Times* reported that OWS had selected a total of seven or eight companies to receive massive taxpayer funding. ¶ 128. The articles further identified five of the eight "winners" that had already been selected—all of which were "big pharma" companies like Moderna (which BARDA had already awarded nearly $483 million to fund an mRNA vaccine that was already being tested in clinical trials). ¶¶ 99, 129-30.

By no later than early June, it had become clear to Armistice, Boyd, and Maher that Vaxart's vaccine development efforts were too far behind those of the much larger, well-established OWS candidates. ¶¶ 99, 131, 134. Boyd and Maher also knew, from their positions on Vaxart's Board and regular communications with Vaxart's CEO and its chief science officer, that Vaxart had had few contacts with the government after it had submitted its initial funding proposal to BARDA earlier in the year, and that it likely did not meet OWS's strict selection criteria. ¶¶ 100, 131, 266. Indeed, on June 8, 2020,

Vaxart's then-CEO confirmed that Vaxart's pre-OWS BARDA application remained unanswered, but noted that, in a separate development, Vaxart had been invited to participate in a single, non-human primate ("NHP") study that would test various vaccines on monkeys. ¶ 143.

In this context, the Armistice Defendants saw an opportunity to exploit the investing public's lack of visibility into the OWS process in a manner allowing them to cash out their remaining positions in Vaxart at artificially inflated prices. ¶ 151. Their scheme involved several steps.

On June 8, Boyd and Maher activated a prior plan to replace Vaxart's legacy CEO, Wouter Latour, with a new CEO they could trust and control, Andrei Floroiu—who was referred to by Vaxart's outside investment relations firm as "a plaything of Armistice." ¶¶ 143-44, 268. Over the course of a week, Boyd and Maher worked alongside two other Armistice-appointed directors—Todd Davis and Bob Yedid—to finalize the terms of the CEO switch. ¶ 146. On June 15, they announced the change in a press release. ¶¶ 155-58. This release included a quote, requested by Boyd, touting his "great confidence in [Floroiu's] ability to generate substantial shareholder value." *Id.*

Once installed, Floroiu, communicating with Armistice on a near-daily basis, began enacting the Armistice-approved plan for Vaxart, which focused in part on an aggressive press release campaign. ¶ 144. The ensuing press blitz culminated with two particularly fraudulent releases. ¶ 154 T.3.

On June 25, Floroiu had Vaxart announce it had partnered with a third-party, Attwill, "to manufacture a billion or more doses per year" of its COVID-19 vaccine, even though there was no good cause for Vaxart to believe Attwill had the then-present ability to produce any vaccines on a commercial scale—let alone "a billion or more doses"—in a manner complying with FDA-mandated cGMP manufacturing standards. ¶¶ 172-78. Indeed, Vaxart had reached out to Attwill only a week earlier to help bolster its applications for government funding. ¶ 175. Nevertheless, Floroiu told the PR team to put the "billion or more" language in the press release's title to "start with the Big Bang first." ¶ 176.

That evening, mere hours after receiving confirmation that Armistice had successfully changed Vaxart's insider trading policy, ¶¶ 171, 183, Boyd directed Floroiu to put out a second release building off the Attwill momentum, ¶¶ 184-85. This release falsely declared Vaxart had been "selected for" Operation Warp Speed, even though (as Boyd and Maher had known since June 8) Vaxart had merely been selected to participate in a BARDA-run, non-human primate study. ¶¶ 184-85. Notably, Vaxart's

management (as advised by outside counsel) had already decided weeks earlier to not make any announcement about the NHP study invitation, at least until Vaxart could report that primates had been successfully dosed. ¶¶ 184-85, 281. Further, both prior and current management deemed participation in the study to be immaterial. ¶ 185. Boyd nevertheless pressed Floroiu: "With all due respect, as a Firm, we [Armistice] are unsure if we agree with your assessment. If the Company is not willing to release the information, Armistice may choose to do so." ¶¶ 184-85. Vaxart relented to this threat.

On these releases, Vaxart's share price more than quadrupled from a closing price of $3.19 on June 24 to an unprecedented high of $14.30 on June 26. ¶¶ 167, 194; *see also* ¶¶ 236-46 (discussing media reaction). Defendants took full advantage. Under the hurriedly approved change to Vaxart's insider trading blackout window (which would have otherwise blocked insider trades from June 24, 2020 through late July—*i.e.*, after OWS was likely to announce the remaining finalists), ¶¶ 171, 183, the Armistice Defendants dumped nearly all their remaining 27.6 million Vaxart shares, including by fully exercising their warrants, across two trading days (Friday, June 26 and Monday, June 29). ¶ 287. As a result of the illicit scheme, the Armistice Defendants reaped nearly a quarter billion dollars in pure profit. ¶ 287. Investors, meanwhile, transacted in Vaxart securities believing Vaxart had been selected for OWS.

The truth—that Vaxart had not been selected for OWS—partially came to light on Saturday, July 25, 2020, when *The New York Times* reported that "Vaxart is not among the companies selected to receive significant financial support from [Operation] Warp Speed to produce hundreds of millions of vaccine doses." ¶¶ 211-15. The article further noted that the U.S. Department of Health and Human Services ("HHS") had "relayed [its] concerns" about Vaxart's misleading representations to the SEC. *Id.* That same day, HHS also posted about Vaxart's misrepresentations on Twitter, confirming that it had not entered into any funding agreements with Vaxart, nor was it negotiating any potential funding arrangement. ¶ 216. The next trading day, Vaxart's stock fell 9%. ¶¶ 218, 247.

Thereafter, in an August 19, 2020 interview with *Business Insider*, OWS head Moncef Slaoui publicly criticized companies that had "misled . . . their shareholders . . . just by saying the words Operation Warp Speed in the title of [a] press release." Vaxart's share price declined a further 4.3% the following trading day, causing additional investor losses. ¶¶ 220-22.

III.    ARGUMENT

The Supreme Court and Ninth Circuit recognize that private securities class actions serve as an important enforcement mechanism and supplement to governmental regulation of the securities markets.[4] "[C]lass actions commonly arise in securities fraud cases as the claims of separate investors are often too small to justify individual lawsuits, making class actions the only efficient deterrent against securities fraud."[5] And "'the law in the Ninth Circuit is very well established that the requirements of Rule 23 should be liberally construed in favor of [federal securities] class action cases.'"[6]

Where, as here, plaintiffs seek to certify a class under Rule 23(b)(3), class certification is a two-step process.[7] First, plaintiffs must show that Rule 23(a)'s four prerequisites are met, that is: (A) "the class is so numerous that joinder of all members is impracticable" (numerosity); (B) "there are questions of law or fact common to the class" (commonality); (C) "the claims or defenses of the representative parties are typical of the claims or defenses of the class" (typicality); and (D) "the representative parties will fairly and adequately protect the interests of the class" (adequacy).[8] Second, plaintiffs must establish (E) "the questions of law or fact common to class members predominate over any questions affecting only individual members" (predominance); and (F) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (superiority).[9]

Though a district court's class certification analysis may "entail some overlap with the merits of the plaintiff's underlying claim,"[10] "[m]erits questions may be considered to the extent—but only to the

---

[4]    *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions."); *Berner v. Lazzaro*, 730 F.2d 1319, 1322-23 (9th Cir. 1984) ("[P]rivate actions brought by investors have long been viewed as a necessary supplement to SEC enforcement actions."), *aff'd*, 472 U.S. 299 (1985).

[5]    *In re Adobe Sys., Inc. Sec. Litig.*, 139 F.R.D. 150, 152-53 (N.D. Cal. 1991).

[6]    *In re NetSol Techs., Inc. Sec. Litig.*, 2016 WL 7496724, at *3 (C.D. Cal. July 1, 2016) (citation omitted); *see also In re Scorpion Techs., Inc. Sec. Litig.*, 1994 WL 774029, at *3 (N.D. Cal. Aug. 10, 1994) ("the Ninth Circuit favors a liberal use of class actions to enforce federal securities laws").

[7]    *E.g.*, *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 282 (N.D. Cal. 2020).

[8]    Fed. R. Civ. P. 23(a).

[9]    Fed. R. Civ. P. 23(b)(3).

[10]   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."[11] Here, this case easily satisfies Rule 23(a) and (b)(3)'s requirements for class treatment.

**A.　　The Class and Subclass are so numerous that joinder is impractical.**

Rule 23(a)(1) favors class certification where "the class is so numerous that joinder of all members is impracticable." "'[I]mpracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class."[12] "While no specific minimum number of potential class members exists, a 'proposed class of at least forty members presumptively satisfies the numerosity requirement.'"[13] Courts regularly find this criteria satisfied in securities cases "when a corporation has millions of shares trading [or outstanding] on a national exchange" during the proposed Class Period.[14] Indeed, "[i]n cases involving securities traded on national stock exchanges, numerosity is practically a given."[15] This case is no different.

Throughout the proposed Class Period, investors actively traded Vaxart securities on the NASDAQ. ¶¶ 39, 307. As of the beginning of June 2020, Vaxart had approximately 74.2 million shares outstanding.[16] This rose to about 96.1 million after Armistice exercised its warrants on June 26 and 29, 2020, and up to 109.2 million after Vaxart's post-OWS press release at-the-market offering.[17] At least 170 institutions owned Vaxart securities.[18] In total, investors traded 447.5 million shares of Vaxart common stock the week following Armistice's June 26 and 29, 2020 sales.[19] And during the entire Class Period, there were 1.592 billion trades of Vaxart common stock at an average weekly trading volume of

---

[11]　*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 464-65 (2013).

[12]　*Harris v. Palm Springs Alpine Ests., Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964).

[13]　*Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *4 (N.D. Cal. Mar. 16, 2016) (citing *Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 569 (C.D. Cal. 2012)).

[14]　*See id.* (700 million shares outstanding); *SEB Inv. Mgmt. AB*, 335 F.R.D. at 283 (600,000 shares outstanding).

[15]　*In re VeriSign, Inc. Sec. Litig.*, 2005 WL 7877645, at *4 (N.D. Cal. Jan. 13, 2005).

[16]　*See* Cain Report ¶ 87.

[17]　*See id.* ¶ 87 & Ex. 10.

[18]　*See id.* ¶¶ 55 n.58, 99.

[19]　*Id.* ¶ 40 n.40; *see also, e.g.*, *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 591 (N.D. Cal. 2019) (sustaining six and nine-day contemporaneous trading period); *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *14-15 (N.D. Cal. Aug. 14, 2008) (upholding five-day window).

162.6 million shares and at an average weekly turnover rate of 38.0%.[20] Vaxart options similarly saw substantial trading.[21] These numbers suggest there are likely thousands of Class members, easily satisfying Rule 23(a) numerosity.[22]

**B.    This action centers on several common questions of law and fact.**

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Securities cases "generally . . . satisfy [this prerequisite] very easily."[23] "Plaintiffs need not show . . . that 'every question in the case, or even a preponderance of questions, is capable of class wide resolution. So long as there is even a single common question, a would-be class can satisfy . . . Rule 23(a)(2).'"[24]

Here, Plaintiffs' Section 10(b) and 20A claims present multiple common questions, including:

(i)    Whether the Armistice Defendants knew or recklessly disregarded that the Attwill press release overstated Vaxart and Attwill's joint capabilities.

(ii)    Whether Armistice knew of material, nonpublic information before liquidating its Vaxart holdings, including that Vaxart had not been "selected for" Operation Warp Speed and that Vaxart itself did not view its NHP study selection to be material.

(iii)    Whether the Armistice Defendants' misconduct constitutes a fraudulent scheme.

(iv)    Whether the Armistice Defendants' misconduct caused cotemporaneous traders and other investors to suffer damages.

These questions—common to every Class member's claims—readily satisfy Rule 23(a)(2).[25]

---

[20]    Cain Report ¶¶ 40-41.

[21]    *See id.* ¶¶ 108, 117 (noting over 450,000 Options contracts traded during the proposed Class Period).

[22]    *See In re Montage Tech. Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *3 (N.D. Cal. Apr. 21, 2016) (numerosity met where company had 26.5 million shares traded during class period); *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009) (numerosity met where company had 36 million shares outstanding during class period).

[23]    *In re VeriSign*, 2005 WL 7877645, at *5.

[24]    *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (quoting *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013)).

[25]    *See In re Montage*, 2016 WL 1598666, at *3 (finding commonality established where "the complaint alleges a common course of conduct over the entire period directed against all investors, generally relied upon, and violating common statutory provisions").

## C. Plaintiffs' claims are typical of the proposed Class and Subclass.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Under this "permissive standard[,] . . . representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical."[26] Accordingly, differences in the amount of damages, the timing, size, and the nature of the purchase or holding are insufficient to defeat class certification.[27]

Here, Plaintiffs' claims are typical of those of the proposed Class, as they "arose from 'the same set of events and course of conduct' that gave rise to other class members' claims."[28] Like the other Class members, Plaintiffs Huang, Elliott, and Hovhannisyan purchased Vaxart securities at prices artificially inflated by the Armistice Defendants' fraud, ¶ 327, with Plaintiffs Elliott and Hovhannisyan making certain purchases contemporaneously with the Armistice Defendants' insider sales on June 26 and 29, 2020, ¶ 342. Like the rest of the proposed Class, Plaintiffs are presumed—by virtue of Vaxart securities trading in an efficient market—to have relied upon misrepresentations and omissions that were a product of, and a necessary component of, Defendants' fraud scheme.[29] And like all Class members, Plaintiffs suffered losses when the truth known by Defendants' fraud came to light.[30] "There's nothing to suggest that [any Plaintiff's] injury is unique in any way, or that Defendants may have affirmative defenses against [any Plaintiff] that wouldn't apply to the rest of the class. That's enough for typicality."[31]

---

[26] *Parsons*, 754 F.3d at 685.

[27] *See In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 529 (N.D. Cal. 2009) ("potential complications regarding the computation of damages" do not defeat class certification); *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 578 (N.D. Cal. 2009) ("'Courts have . . . repeatedly recognized that putative intra-class conflicts relating to the times at which particular class members purchased their securities, and which could potentially motivate different class members to argue that the securities were relatively more or less inflated at different time periods, relate to damages and do not warrant denial of class certification.'" (quoting *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 277 (S.D.N.Y. 2008)).

[28] *See In re Connetics Corp.*, 257 F.R.D. at 576 (quoting *In re Providian Fin. Corp. Sec. Litig.*, 2004 WL 5684494, at *5 (N.D. Cal. Jan. 15, 2004)).

[29] *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811 (2011) ("*Halliburton I*").

[30] *See Wong v. Arlo Techs.*, 2021 WL 1531171, at *4 (N.D. Cal. Apr. 19, 2021) ("Lead Plaintiff's claims are typical, if not identical, to those of the class because he purchased or acquired Arlo stocks at (allegedly) artificially inflated prices during the relevant time period and suffered accompanying losses.").

[31] *Banc of Cal. Sec. Litig.*, 326 F.R.D. 640, 647 (C.D. Cal. 2018).

**D.      Plaintiffs and counsel will fairly and adequately protect the Class's interests.**

Rule 23(a)(4) permits class certification only if the "representative parties will fairly and adequately protect the interests of the class." "Representation is adequate if: (1) the class representative and counsel do not have any conflicts of interest with other class members; and (2) the representative plaintiff and counsel will prosecute the action vigorously on behalf of the class."[32]

Here, both prongs are satisfied. As to the first prong, Plaintiffs have no conflict of interest with other Class members. Plaintiffs' claims arise from the same set of facts as other members of the proposed Class and, as individual investors, have suffered very large financial losses.[33] Their interests therefore align with those of the proposed Class in proving Defendants' liability and maximizing damages.[34] Indeed, Plaintiffs have already proven their willingness and ability to take an active role in litigation to protect the interests of Class members through their filings to be appointed as lead plaintiff, their subsequent monitoring of this litigation's progress, and their collaboration with counsel through three rounds of motion-to-dismiss briefing,[35] complex discovery issues,[36] and final approval of a partial class settlement with Vaxart and its officers and directors, in their Vaxart capacities.[37] In satisfaction of the second prong, Plaintiffs intend to continue their efforts supervising, monitoring, and participating in the vigorous prosecution of this case up through trial, and are prepared to represent the interests of the proposed Class up until that end.[38]

---

[32]   *In re Montage*, 2016 WL 1598666, at *5 (citing *Staton v. Boeing, Co.*, 327 F.3d 938, 954 (9th Cir. 2003)).

[33]   *See* Huang and Elliott's PSLRA Certifications and Loss Charts (Doc. Nos. 47-3, 47-4); Hovhannisyan PSLRA Certification, *Hovhannisyan v. Vaxart*, No. 4:20-cv-06175 (ECF No. 1-1).

[34]   *See, e.g.*, *In re VeriSign*, 2005 WL 7877645, at *8 ("The Lead Plaintiffs' claims and the unnamed class members' claims do not conflict. They all arise out of the same set of facts—Defendants' alleged misrepresentations during the Class Period.").

[35]   *See, e.g.*, May 25, 2023 MTD Order (Doc. No. 293); Dec. 22, 2021 MTD Order (Doc. No. 182).

[36]   *See, e.g.*, June 22, 2022 Order Regarding 6/2/22 Joint Discovery Letter (Doc. No. 211).

[37]   *See, e.g.*, Mot. for Prelim. Approval of Prop. Settlement (Doc. No. 224); Mot. for Final Approval of Prop. Partial Class Action Settlement & Plan of Allocation (Doc. No. 255); Mot. for Award of Fees (Doc. Nos. 256 & 257); Order Granting Final Approval (Doc. No. 273).

[38]   Kathrein Decl., Ex. B, Huang Decl., ¶ 6; *id.*, Ex. C, Elliott Decl., ¶ 6; *id.*, Ex. D, Hovhannisyan Decl., ¶¶ 7-9; *see also Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) ("The record indicates clearly that [plaintiff] understands his duties and is currently willing and able to perform them. The Rule does not require more.").

Plaintiffs have also retained qualified and capable counsel in Hagens Berman and Scott+Scott. Under Rule 23(g)(1)(A), the Court must appoint class counsel after considering, among other things: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions and the types of claims asserted; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. These considerations weigh heavily in favor of appointing Hagens Berman and Scott+Scott as Class Counsel in this matter.

Hagens Berman and Scott+Scott are two highly experienced class action firms, with a proven track record of success in class actions and other complex litigation, particularly in securities cases like this one.[39] Together, the two firms have vigorously prosecuted the proposed Class's claims to date by, among other things: (i) researching the proposed Class's potential claims; (ii) vigorously pursuing discovery against Defendants and third parties; (iii) reviewing the over 100,000 documents produced to date; (iv) filing multiple amended complaints, the most recent of which (the SAC) successfully repleaded in detail Armistice's culpability, thereby bringing it back into this case; (v) successfully defeating two motions to dismiss; and (vi) retaining experts.[40] And together, Hagens Berman and Scott+Scott will jointly continue to commit the resources necessary to achieve a successful recovery for all investors.

Accordingly, Plaintiffs satisfy Rule 23(a)(4)'s adequacy requirements, and Hagens Berman and Scott+Scott warrant appointment as Class Counsel under Rule 23(g)(1).

**E.    Common questions of law and fact predominate.**

Rule 23(b)(3)'s predominance factor does not require that every question of fact or law amongst the class be identical or that "each element of their claim is susceptible to classwide proof."[41] Rule 23(b)(3) only requires that one or more common questions predominate over individual questions.[42] "Common issues predominate over individual issues when the common issues 'represent a significant

---

[39]    *See* Hagens Berman Firm Resume (Doc. No. 256-5); Scott+Scott Firm Resume (Doc. No. 256-10).

[40]    *See, e.g.*, Dec. 8, 2022 Joint Decl. in Supp. of Mot. for Final Approval of Proposed Partial Class Action Settlement ¶¶ 5, 11-27 (Doc. No. 257); May 25, 2023 MTD Order (Doc. No. 293).

[41]    *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020).

[42]    *Id.*

aspect of the case and they can be resolved for all members of the class in a single adjudication.'"[43] This "test [is] readily met in certain cases alleging . . . securities [claims]."[44] This case is no different.

**1.      Plaintiffs' case against Armistice presents common questions speaking to nearly every element of Plaintiffs' surviving claims.**

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."[45]

Here, Plaintiffs have brought claims under Sections 10(b) and SEC Rule 10b-5(a)&(c) promulgated thereunder (scheme liability), 20A (insider trading), and 20(a) (control person liability).[46] ¶¶ 315-63. To prove Rule 10b-5 scheme liability, Plaintiffs must show that the Armistice Defendants (i) committed a deceptive or manipulative act in furtherance of the alleged scheme; (ii) scienter; (iii) a connection between the alleged deceptive or manipulative act and the purchase or sale of a security; (iv) reliance upon the alleged deceptive or manipulative act; (v) economic loss; and (vi) loss causation.[47] As discussed above, this claim presents numerous common questions that "are central to all class members' claims," including "what Defendants said [and did], what they knew, what they may have withheld, and with what intent they acted."[48] "Without favorable findings on these critical questions related to liability, no member of the class can succeed."[49] Additionally, the Supreme Court has held that the elements of loss causation and materiality are "common questions" that need not be adjudicated at the certification stage.[50] Common questions thus predominate as to Section 10(b).

---

[43] *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1182 (9th Cir. 2015).

[44] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453-54 (2016) ("[T]he action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.").

[45] *In re Montage*, 2016 WL 1598666, at *6 (quoting *Halliburton I*, 563 U.S. at 809).

[46] Though not explicitly addressed below, Plaintiffs' Section 20(a) claims are derivative claims which are derivatively susceptible to common proof and present no independent, individualized issues.

[47] *See, e.g., In re Aqua Metals, Inc. Sec. Litig.*, 2019 WL 3817849, at *8 (N.D. Cal. Aug. 14, 2019).

[48] *See, e.g., In re Cooper Cos.*, 254 F.R.D. at 640.

[49] *Id.*

[50] *See Halliburton I*, 563 U.S. at 813 (loss causation is not "a condition of obtaining class certification"); *Amgen*, 568 U.S. at 470 (materiality need not be proven at class certification because "the question of materiality is common to the class" and "a failure of proof on that issue would not result in questions 'affecting only individual members' predominating").

As for Section 20A liability, Plaintiffs must ultimately show that the Armistice Defendants (i) "violated another provision of the Securities and Exchange Act of 1934" (ii) "'by purchasing or selling a security'" (iii) "'while in possession of material, nonpublic information'" ("MNPI") and (iv) did so "'contemporaneously'" with Plaintiffs' trades.[51] Section 20A thus raises common questions as to when the Armistice Defendants sold Vaxart securities and whether they did so while in possession of MNPI. Additionally, the predicate violations at issue—including the Armistice Defendants' alleged violations of Rule 10b-5(a)&(c), as well as any liability imputed to Boyd and Maher as Vaxart directors[52]—all arise from Section 10(b) claims with elements also susceptible to common proof (*e.g.*, scienter, loss causation). Common questions thus also predominate as to Plaintiffs' Section 20A claims.

**2.    No individual issues of reliance preclude class certification.**

To establish reliance, Plaintiffs have invoked *Basic*'s fraud-on-the-market presumption.[53] This well-accepted presumption arises from the premise that "the price of a security traded in an efficient market will reflect all publicly available information about a company; accordingly, a buyer of the security may be presumed to have relied on that information in purchasing the security."[54] "Even the foremost critics of the efficient-capital-markets hypothesis acknowledge that public information generally affects stock prices."[55] No individualized proof of reliance is required.[56]

---

[51]   May 25, 2023 MTD Order (quoting 15 U.S.C. § 78t-19(a)).

[52]   *See Johnson v. Aljian*, 490 F.3d 778, 781 (9th Cir. 2007) (holding that a predicate violation for purposes of Section 20A need not be viable as a separate claim); *In re Valeant Pharms. Int'l, Inc., Sec. Litig.*, 2019 WL 2724075, at *1 (D.N.J. June 30, 2019) (holding plaintiffs had sufficiently alleged Section 20A claims against an advising investment firm and its CEO based on predicate violations arising from CEO's membership in the issuing company's board of directors); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 665 (S.D.N.Y. 2007) (holding "control-person violations of § 20(a) can constitute insider trading"); Dec. 22, 2021 MTD Order (sustaining Section 10(b) claims against Vaxart and Section 10(b) and 20(a) claims against Boyd and Maher as Vaxart Directors).

[53]   *See Basic*, 485 U.S. at 246.

[54]   *Amgen*, 568 U.S. at 458.

[55]   *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272 (2014) ("*Halliburton II*"); *see also In re Montage*, 2016 WL 1598666, at *7 ("The majority of courts in this circuit agree that, for purposes of the fraud-on-the-market theory, market efficiency means that prices will reflect all relevant information[.]").

[56]   *See In re Connetics Corp.*, 257 F.R.D. at 577 ("Where, as in this case, an investor pursues a 'fraud on the market' theory of securities fraud, the investor is entitled to a presumption that it relied on any material misrepresentations by the defendant.").

To invoke this presumption at class certification, Plaintiffs must show that (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the security traded in an efficient market, and (4) "the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed."[57] "[I]f a market is shown to be efficient, courts may presume that investors who traded securities in that market relied on public, material misrepresentations regarding those securities."[58] Defendants may rebut the presumption with evidence that "severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price."[59]

Here, the material misrepresentations and omissions arising from the Armistice Defendants' allegedly fraudulent schemes, *see* ¶¶ 150-92, were publicly known, as within minutes of hitting the news wire, Vaxart began receiving several inquiries about its purported OWS selection from sophisticated news outlets. ¶¶ 196-202. And by definition, all members of the proposed Class "traded the stock between the time the[se] misrepresentations were made and when the truth was revealed."[60] The only remaining question is thus whether Vaxart's common stock traded in an efficient market.

As an initial matter, the undisputed fact that Vaxart securities traded on the NASDAQ—the most active stock trading venue in the United States by volume—prior to, during, and after the proposed Class Period, supports by itself a *prima facie* finding of market efficiency.[61] Nevertheless, courts in this District also often look to other factors as additional support for market efficiency.[62] These factors include the five, non-exclusive factors identified in *Cammer v. Bloom*[63]: "(1) the trading volume of the security

---

[57]   *Halliburton II*, 573 U.S. at 268.

[58]   *Amgen*, 568 U.S. at 462.

[59]   *Basic*, 485 U.S. at 248; *Halliburton II*, 573 U.S. at 280-83.

[60]   *See Halliburton II*, 573 U.S. at 268.

[61]   *See Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 269 (N.D. Cal. 2011) ("[p]laintiffs made a prima facie showing that the fraud-on-the-market presumption of reliance applied because [p]laintiffs sufficiently established that Akeena's stock was actively traded on an efficient market—the NASDAQ"); *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 250 (N.D. Cal. 2013) ("Nor has defendant identified any authority, binding or otherwise, that has held that common shares traded on the NASDAQ are not traded in an efficient market.").

[62]   *See, e.g.*, *In re Montage*, 2016 WL 1598666, at *8.

[63]   *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).

during the relevant period; (2) the number of analysts following the issuer of the security; (3) the issuer's ability to file an SEC Form S-3; (4) the existence of market makers and arbitrageurs; and (5) empirical evidence suggesting a causal connection between new information and stock price movements."[64] Additionally, courts in this Circuit have considered three more factors set out in *Krogman v. Sterritt*[65]: (1) the company's market capitalization; (2) the bid-ask spread for stock sales; and (3) float.[66]

As detailed in Dr. Cain's Report and demonstrated below, these factors strongly support a finding of market efficiency over the proposed Class Period.

a.    *Cammer* **Factor I: Vaxart's average trading volume suggests an efficient market.**

"Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption."[67] During the proposed Class Period, Vaxart common stock exceeded *Cammer*'s 2% trading threshold with an average weekly turnover of 162.6 million shares—nearly 169% of Vaxart's outstanding shares over the Class Period.[68] Additionally, Vaxart's daily turnover rate of 36.3% during the proposed Class Period placed it above the 95th percentile of all companies listed on the NASDAQ and the New York Stock Exchange ("NYSE") from 2016 to 2018.[69] These metrics support a "strong presumption" that Vaxart traded in an efficient market.[70]

b.    *Cammer* **Factor II: Analyst coverage of Vaxart indicates an efficient market.**

Significant industry analyst coverage supports a finding of market efficiency as it demonstrates that the security in question is closely reviewed by investment professionals who make buy or sell

---

[64]  *In re Montage*, 2016 WL 1598666, at *8 (citing *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 613-14 (C.D. Cal. 2009) (citing *Cammer*)).

[65]  *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001).

[66]  *See In re Montage*, 2016 WL 1598666, at *12 (citing cases).

[67]  *Cammer*, 711 F. Supp. at 1286.

[68]  *See* Cain Report ¶¶ 39-40, n.40 (further noting Vaxart's total trading volume from June 26 through July 2, 2020 was 447.5 million shares, or 465% of shares outstanding as of July 2, 2020).

[69]  *Id.* ¶ 41.

[70]  *See Cammer*, 711 F. Supp. at 1286; *see also City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 256 (S.D. Cal. 2010) (weekly trading volume of 2.61% indicative of efficient market); *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 107 (E.D. Va. 2009) (2-3.5% indicative).

recommendations to investors.[71] During the proposed Class Period, eight (8) securities analyst firms issued a total of 11 reports regarding Vaxart.[72] This is more than sufficient to satisfy *Cammer*.[73]

Other evidence supports a finding that information on Vaxart was broadly available to the market. Vaxart's analyst coverage during the proposed Class Period placed it above the 50th percentile of all NASDAQ and NYSE stocks.[74] In addition to the analyst reports, established news outlets published over 200 articles about Vaxart throughout the 65-day Class Period.[75] This, of course, was on top of information readily viewable on Vaxart's website, online research forums such as SeekingAlpha, and Vaxart's SEC filings available in the SEC's online database, EDGAR.[76] This broad dissemination of information about Vaxart further corroborates its securities traded in an efficient market during the proposed Class Period.

c.    *Cammer* **Factor III: The NASDAQ's market-maker structure and the presence of arbitrageurs suggest Vaxart securities traded in an efficient market.**

Market makers help ensure that news and reported financial results are reflected in the price of a company's stock.[77] Vaxart trades on the NASDAQ, which through its market maker structure, reports volume, prices, bid-ask spreads, and other trading details which ensure the market for stocks remains well-developed, liquid, and efficient.[78] Vaxart had at least 60 market makers and brokers providing similar activity over the Class Period.[79] Additionally, during the proposed Class Period, at least 170 institutions disclosed their ownership positions of Vaxart common stock through SEC filings.[80] As a

---

[71]    *Krogman*, 202 F.R.D. at 475; *Cammer*, 711 F. Supp. at 1286.

[72]    Cain Report ¶¶ 44-45.

[73]    *See, e.g.*, *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 591 (N.D. Cal. 2009) (four analysts sufficient); *In re Nature's Sunshine Prods. Inc. Sec. Litig.*, 251 F.R.D. 656, 663 (D. Utah 2008) (same); *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514-15 (1st Cir. 2005) (one analyst sufficient).

[74]    Cain Report ¶¶ 45-46.

[75]    *Id.* ¶ 47.

[76]    *Id.* ¶¶ 47-48.

[77]    *See Cammer*, 711 F. Supp. at 1286-87.

[78]    Cain Report ¶¶ 52-53.

[79]    *Id.* ¶ 54.

[80]    *Id.* ¶ 55 n.58.

---

lower-bound estimate, these institutions held between 20.6% and 33.7% of Vaxart's outstanding shares during this time.[81] This level of institutional ownership further suggests an efficient market.[82]

**d.    *Cammer* Factor IV: Vaxart's Form S-3 eligibility shows an efficient market.**

The SEC allows certain issuers to file shortened filings on Form S-3 for securities which—by virtue of their filing history and market capitalization—are generally presumed to be actively traded and widely followed.[83] Here, Vaxart's market cap averaged $83 million over the proposed Class Period, placing it above the 50th percentile of NASDAQ-listed companies from 2016-2018, as well as the $75 million requirement for filing a Form S-3.[84] Moreover, Vaxart made Form S-3 filings with the SEC before, during, and after the proposed Class Period.[85] Vaxart's common stock thus satisfies *Cammer* IV.

**e.    *Cammer* Factor V: The market's reaction to new material information regarding Vaxart confirms Vaxart securities traded in an efficient market.**

Though not required where other factors suggest an efficient market,[86] evidence that a security's price regularly reacts to new information can constitute strong evidence of an efficient market.[87] This fifth *Cammer* factor requires "empirical facts showing a cause[-]and[-]effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[88]

---

[81]    *Id.*

[82]    *See Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2023 WL 3569981, at *9 (N.D. Cal. May 19, 2023); *Junge v. Geron Corp.*, 2022 WL 1002446, at *5 (N.D. Cal. Apr. 2, 2022).

[83]    *See Cammer*, 711 F. Supp. at 1287; 17 C.F.R. § 239.13.

[84]    Cain Report ¶¶ 57-58.

[85]    *Id.*

[86]    *See Waggoner v. Barclays PLC*, 875 F.3d 79, 99 (2d Cir. 2017) (affirming finding of an efficient market based on the first four *Cammer* factors and the three *Krogman* factors without the district court reaching a conclusion as to the fifth *Cammer* factor); *Malriat v. QuantumScape Corp.*, 2022 WL 17974629, at *13 (N.D. Cal. Dec. 19, 2022) ("'[P]laintiffs may prove market efficiency without satisfying' the cause-and-effect factor, which suggests that even if this factor undisputedly favored defendants, plaintiffs still may be entitled to the fraud on the market presumption."); *Angley v. UTi Worldwide Inc.*, 311 F. Supp. 3d 1117, 1121 (C.D. Cal. 2018) ("Because there is no evidence disputing the first four *Cammer* factors and the *Krogman* factors weigh in favor of market efficiency, the Court finds Plaintiff has met its burden of showing market efficiency.").

[87]    *See In re Montage*, 2016 WL 1598666, at *8 (citing *In re Countrywide*, 273 F.R.D. at 614).

[88]    *Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *6 (N.D. Cal. Dec. 22, 2016).

Here, Dr. Cain employed an event study and concluded Vaxart common stock exhibits the type of cause-and-effect relationship described in *Cammer*.[89] Among other things, Dr. Cain compared Vaxart common stock returns on days when Vaxart disclosed purportedly material information—*e.g.*, updates on its vaccine and capital funding—to returns on trading days with "no news."[90] For three of the five "news days" Dr. Cain identified, he found Vaxart stock had statistically significant excess returns at a 95% confidence level.[91] By comparison, 0% of the "no news days" demonstrated statistically significant stock movements.[92] From this, Dr. Cain concluded that large price movements on Vaxart news days could not be attributed to random volatility or to market or industry factors; rather, the price of Vaxart common stock reacted swiftly to the release of important, unanticipated information.[93]

Dr. Cain's findings of a cause-and-effect relationship during the proposed Class Period provide strong evidence of an efficient market,[94] in addition to the other *Cammer* factors.

f.      ***Krogman* Factor 1: Vaxart's above-average market capitalization suggests an efficient market.**

A higher market capitalization can be indicative of market efficiency because "there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[95] During the proposed Class Period, Vaxart's market capitalization averaged approximately $853 million, placing it above the 50th percentile of NASDAQ and NYSE stocks from 2016 to 2018.[96] This factor is therefore satisfied.[97]

---

[89]    *See Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 352 (C.D. Cal. 2015) ("Event studies are by far the most common test for a causal connection."); Cain Report ¶¶ 61-84 (explaining the event study methodology employed).

[90]    Cain Report ¶¶ 72-77 (selecting the five press releases Vaxart filed with the SEC on Form 8-K).

[91]    *Id.* ¶¶ 78-82. These three days were the June 25 and 26 manufacturing and OWS press releases, and the July 13 press release announcing Vaxart raised nearly $90 million through its at-the-market facility. *Id.*, Ex. 6. The two other news days—the June 15 CEO announcement and the August 7 release for Vaxart's 2Q20 earnings—saw no statistically significant stock movements. *Id.*

[92]    *Id.* ¶ 82.

[93]    *Id.* ¶¶ 83-84.

[94]    *See Purple Mountain Tr. v. Wells Fargo & Co.*, 2022 WL 3357835, at *5 (N.D. Cal. Aug. 15, 2022); *Hayes*, 2016 WL 7406418, at *7.

[95]    *Krogman*, 202 F.R.D. at 478.

[96]    *See* Cain Report ¶¶ 87.

[97]    *Junge*, 2022 WL 1002446, at *4 (finding average market capitalization of $731.69 million with maximum capitalization of "more than one billion dollars" supports efficiency); *Police Ret. Sys. of*

g.   *Krogman* **Factor 2: Vaxart's low bid-ask spread further indicates an efficient market.**

The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid). "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[98] During the proposed Class Period, Vaxart's bid-ask spread averaged 0.19%.[99] This spread compares favorably to cases where courts have concluded that common stocks traded in efficient markets.[100]

h.   *Krogman* **Factor 3: The public float of Vaxart's stock indicates non-insiders could trade Vaxart securities without restrictions, thereby enhancing market efficiency.**

A large public float—that is, the percentage of shares not held by insiders—is further evidence of market efficiency, as it indicates that a large proportion of shares are available to non-insiders, who can trade without restrictions and enhance the efficiency of the marketplace.[101] On average, Vaxart insiders held 1.1% of Vaxart's common stock during the proposed Class Period. Overall, between 101.9 million and 133.0 million Vaxart shares were available for trading in the public float during the proposed Class Period.[102] This large degree of public float (~98.9%) is further evidence that Vaxart securities traded in an efficient market throughout the proposed Class Period.[103]

i.   **Additional factors examined by Dr. Cain provide further evidence of market efficiency.**

In addition to the *Cammer* and *Krogman* factors, Dr. Cain considered three more factors probative of market efficiency. First, he analyzed institutional ownership of Vaxart's common stock. Institutional investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly

---

*St. Louis*, 2021 WL 229310, at \*6 (finding "market capitalization greater than the majority of NYSE and NASDAQ stocks" supports efficiency).

[98]   *Krogman*, 202 F.R.D. at 478.

[99]   Cain Report ¶¶ 89-93.

[100]   *See, e.g.*, *Radient Pharms. Corp.*, 287 F.R.D. at 574 (spread of 0.58% supports market efficiency).

[101]   Cain Report ¶ 95.

[102]   *Id.* ¶ 96.

[103]   *See, e.g.*, *Purple Mountain Tr.*, 2022 WL 3357835, at \*5 (approximately 90% float); *Police Ret. Sys. of St. Louis*, 2021 WL 229310, at \*6 (around 99% float); *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 441 (D. Ariz. 2019) (averaging 87.2% float); Cain Report ¶ 97.

incorporated into share prices.[104] That at least 170 institutions held Vaxart securities at some point during the proposed Class Period is further circumstantial evidence of an efficient market.[105]

Second, Dr. Cain employed an autocorrelation analysis, which concerns whether a stock price movement can be predicted with a reasonable degree of statistical confidence based solely on the price movement of the prior day.[106] After running a regression analysis, Dr. Cain determined there was no systematic and persistent statistically significant autocorrelation of Vaxart's excess returns.[107] The result is consistent with the conclusions that Vaxart common stock reacted quickly to news and thus traded in an efficient market during the proposed Class Period.[108]

Finally, Dr. Cain found there was substantial trading of Vaxart options—totaling 359,546 call option contracts and 101,976 put option contracts during the proposed Class Period—further suggesting, in his view, that the market for Vaxart common stock was efficient.[109]

**j.    Like Vaxart common stock, Vaxart options traded in an efficient market.**

Option traders too are also generally entitled to *Basic*'s rebuttable presumption of reliance upon proof of market efficiency. "The relevant question is not whether . . . the market for . . . options was itself efficient. Rather, the question is whether a seller of put options is entitled to rely on the stock market to accurately reflect the value of the underlying stock upon which the put option is sold."[110]

---

[104] Cain Report ¶ 98.

[105] *Id.* ¶¶ 99-100.

[106] *Id.* ¶¶ 101-05.

[107] *Id.* ¶¶ 105-07.

[108] *See In re Gaming Lottery Sec. Litig.*, 2001 WL 204219, at *17 (S.D.N.Y. Mar. 1, 2001) (market efficiency supported by the fact that the stock "did not exhibit autocorrelation").

[109] Cain Report ¶¶ 107-08; *see also Police Ret. Sys. of St. Louis*, 2021 WL 229310, at *6 (noting "considerable option trading . . . point[ed] to efficiency").

[110] *In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1329 (N.D. Ga. 2007); *see also Levie v. Sears, Roebuck & Co.*, 496 F. Supp. 2d 944, 949 (N.D. Ill. 2007) (including put and call options traders because while they might believe there will be fluctuation in the stock price, they also rely on the integrity of the information disseminated).

Courts around the country routinely hold that option holders are entitled to a rebuttable presumption of reliance where the underlying security trades in an efficient market.[111] This is because "the market price for options is directly responsive . . . to changes in the market price of the underlying stock, and to information affecting that price."[112] And through this link, fraudulent conduct that distorts the market price for common stock also distorts the market price for options contracts.[113]

In his report, Dr. Cain reached a similar conclusion as to Vaxart options. Therein, Dr. Cain explains that "[t]here are two basic types of options: call options and put options," which give the holder the right to buy or sell common stock by a certain date and at a certain price.[114] The "price of an option, also referred to as the 'premium,' depends on a number of factors, including how the current stock price compares to the exercise price."[115] As a result of this price relationship, the academic literature "strongly supports the presumption that options prices quickly reflect value-relevant information that is also reflected in common stock prices."[116]

Because the *Cammer* and *Krogman* factors, while informative of the market efficiency for common stock, are not directly applicable, in Dr. Cain's view, as tests in options markets,[117] Dr. Cain examined alternative factors to affirm whether Vaxart options traded efficiently.

Dr. Cain first looked to how Vaxart options were traded during the proposed Class Period.[118] Dr. Cain found that Vaxart "[o]ptions benefited from significant trading opportunities on a national, liquid options exchange—the [Chicago Board Options Exchange]."[119] In his view, that over 450,000

---

[111] *See In re Apple Inc. Sec. Litig.*, 2023 WL 2763952, at *1 (N.D. Cal. Mar. 28, 2023); *Scheller v. Nutanix, Inc.*, 2021 WL 2410832, at *5 (N.D. Cal. June 10, 2021); *In re Countrywide*, 273 F.R.D. at 609 n.74.

[112] *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 504 (3d Cir. 1988) (citing Rubenstein, An Economic Evaluation of Organized Option Markets, 2 J. of Comp. Corp. Law and Sec. Reg. 49 (1979)); *see also Scheller*, 2021 WL 2410832, at *5.

[113] *See id.*; Cain Report ¶ 114 ("[A]cademic literature strongly supports the presumption that options prices quickly reflect value-relevant information that is also reflected in common stock prices.").

[114] Cain Report ¶ 110.

[115] *Id.* ¶ 111.

[116] *Id.* ¶¶ 112-15.

[117] *Id.* ¶ 116(a)-(h).

[118] *Id.* ¶¶ 117-18.

[119] *Id.* ¶ 117.

options contracts traded during the proposed Class Period indicated significant investor interest in the trading of options on Vaxart's millions of shares of common stock.[120]

Dr. Cain also examined whether the prices of Vaxart options tended to move in a directionally consistent manner with the price movements in the underlying Vaxart common stock. Dr. Cain found that, for the dates he observed statistically significant common stock returns at the 95% level or better, 21 out of 21 call option series and 20 out of 21 put option series experienced price movements that were consistent with the underlying stock's price movements.[121] For Dr. Cain, this finding further indicated that Vaxart options traded in an efficient market throughout the proposed Class Period.[122]

From his options analysis, Dr. Cain reached the following opinions: First, "during the [proposed] Class Period, the pricing for the Vaxart [o]ptions at issue was dependent on the market price of Vaxart [c]ommon [s]tock."[123] Second, "Vaxart [c]ommon [s]tock was priced efficiently and therefore reflected the value of the alleged misstatements and omissions."[124] Third, because the price of Vaxart common stock reflected the value of the alleged misstatements and omissions, "the artificial inflation caused by any misrepresentations and omissions that affects the stock price [of common stock] would quickly translate into the value of derivative instruments" such as options on Vaxart common stock.[125]

This evidence more than satisfies Plaintiffs' burden of showing by a mere "preponderance of evidence" that Vaxart options were informationally efficient during the proposed Class Period.[126]

**3.** ***Affiliated Ute* provides an additional presumption of reliance.**

The Class is also entitled to the presumption of reliance under *Affiliated Ute*, as Plaintiffs "advance[] a securities fraud claim based on a defendant's failure to disclose material information."[127]

---

[120] *Id.*

[121] *Id.* ¶ 119.

[122] *Id.*

[123] *Id.* ¶ 120.

[124] *Id.* ¶ 121.

[125] *Id.*

[126] *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663-64 (9th Cir. 2022) (*en banc*) (describing plaintiffs' burden of proof).

[127] *See In re Montage*, 2016 WL 1598666, at *6 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972)).

As a primary component of the Armistice Defendants' insider trading and pump-and-dump schemes, the Armistice Defendants failed to disclose that, among other things, (i) Attwill "lacked the ability to produce one billion or more doses" of Vaxart's vaccine;[128] (ii) "the federal government had not, in fact, chosen Vaxart as one of its leading vaccine developers, or for that matter to receive federal funding";[129] and (iii) Armistice, despite claiming to have "great confidence" in Floroiu and touting Vaxart's "potential partnership opportunities," had already initiated "an intentional scheme to manipulate the price of Vaxart shares for the purpose of selling them at an artificially inflated price."[130] Thus, regardless of market efficiency, the presumption of reliance under *Affiliated Ute* applies here.[131]

**4.    Damages can be calculated on a classwide basis using common methodologies.**

Proof of damages is not a prerequisite to class certification.[132] Nor does the need for individual damages calculations present individual issues capable of predominating over common ones.[133]

Nevertheless, Plaintiffs can prove damages on a classwide basis under methodologies that are consistent with Plaintiffs' theories of liability—(i) that the proposed Class paid artificially inflated prices for Vaxart securities due to Defendants' fraud and were damaged thereby; and (ii) that the Armistice Defendants violated federal securities laws by trading while in possession of MNPI, damaging the Subclass and making unlawful profits thereby. *See* ¶¶ 327-33, 341-54.

As Dr. Cain's report explains,[134] per share damages under Section 10(b) for all Class members are readily calculable using the standard "out-of-pocket" methodology, which is based on the inflation in the price of Vaxart's stock caused by Defendants' alleged misrepresentations and omissions.[135] While

---

[128]  Dec. 22, 2021 MTD Order at 4.

[129]  *Id.* at 5.

[130]  May 25, 2023 MTD Order at 6.

[131]  *See Affiliated Ute*, 406 U.S. at 153-54 (holding that to establish a presumption of reliance, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of his decision [to purchase securities]").

[132]  *See In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1184 (N.D. Cal. 2017).

[133]  *See Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016); *see also Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986-88 (9th Cir. 2015).

[134]  *See* Cain Report ¶¶ 124-36.

[135]  *See also SEB Inv. Mgmt. AB*, 335 F.R.D. at 288 ("Plaintiff's proposed 'out of pocket' damages methodology, which uses an event study to determine the price inflation attributable to the alleged fraud, is widely accepted for calculating damages of a class of stockholders.").

individual damages for each Class member will be calculable based on when each member purchased the stock, once liability is established, "the process of computing individual damages will be virtually a mechanical task."[136] According to Dr. Cain, Section 20A damages are also mechanically calculable on a classwide basis under common and straightforward methodologies informed by the statutory text.[137]

Dr. Cain's explanations of applicable damages methodologies are sufficient, at this procedural stage, to show that "damages can be proven on a class-wide basis, such that individual damage analyses will not engulf questions common to the class as a whole."[138] In sum, common questions capable of classwide proof predominate this action, which supports certification of the proposed Class.

**F.      The class mechanism is the superior method for resolving this case.**

Rule 23(b)(3) requires that the class device be "superior to other available methods for fairly and efficiently adjudicating the controversy." This inquiry "calls for a comparative assessment of the costs and benefits of class adjudication, including the availability of 'other methods' for resolving the controversy."[139] Class actions are a "superior way to litigate a case alleging violations of securities fraud . . . united by a common core of facts, and a presumption of reliance on an efficient market[.]"[140]

Courts consider four factors to determine superiority: "(1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action."[141]

Here, the superiority of class treatment is evident upon consideration of these four factors. First, the number of Class members is too numerous, and the typical claim is too small, for each individual

---

[136]  *In re Diamond Foods*, 295 F.R.D. at 252; *see also* Cain Report ¶¶ 124-36 (describing steps for calculating damages for each Class member).

[137]  Cain Report ¶¶ 137-45.

[138]  *In re Montage*, 2016 WL 1598666, at *13.

[139]  *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017).

[140]  *Radient Pharms. Corp.*, 287 F.R.D. at 575; *see also In re Countrywide*, 273 F.R.D. at 623-24 (finding superiority where parties "need only establish what happened within Countrywide, when, and who knew (or should have known)").

[141]  *See In re Montage*, 2016 WL 1598666, at *13.

Class member to maintain a separate action.[142] Second, Plaintiffs are unaware of any other class action brought on behalf of Vaxart common stock investors that seeks recovery under Sections 10(b), 20A, and 20(a) of the Exchange Act for the damages caused by Defendants' misconduct. As a result, there is no issue of multiplicity of suits or a risk of inconsistent adjudications.[143] Third, "it seems undisputed that this venue, being the home of [the underlying issuer, Vaxart], is a desirable and convenient place to concentrate the litigation, no other venue having been suggested."[144] Fourth, this case, like other securities actions, presents no management difficulties that would preclude it from being maintained as a class action. The Class can be ascertained because membership is based on an identifiable criterion— the dates investors purchased or otherwise acquired Vaxart securities. And putative Class members can be easily identified through stockholder records.

In sum, any "complexities of class action treatment," which are few in this case, "do not outweigh the benefits of considering common issues in one trial."[145] The superiority requirement is met.[146]

## IV.    CONCLUSION

For the reasons addressed above, this Court should: (i) certify this action as a Class action; (ii) appoint Plaintiffs Wei Huang, Langdon Elliott, and Ani Hovhannisyan as Class Representatives; and (iii) appoint Hagens Berman and Scott+Scott as Class Counsel.

---

[142] *See id.* ("Class treatment would increase the class members' access to redress by unifying what otherwise may be multiple small claims.").

[143] *See id.* (finding superiority where "to the Court's knowledge, there is no other pending litigation involving these claims").

[144] *See Siemers v. Wells Fargo & Co.*, 243 F.R.D. 369, 376 (N.D. Cal. 2007).

[145] *See In re Montage*, 2016 WL 1598666, at *13.

[146] *See, e.g., Juniper Networks*, 264 F.R.D. at 592 ("Where thousands of identical complaints would have to be filed, it is superior to concentrate claims through a class action in a single forum.").

DATED: December 1, 2023    Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Reed R. Kathrein*
Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman (pro hac vice)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Raffi Melanson (pro hac vice)
55 Cambridge Pkwy, Suite 301
Cambridge, MA 02141
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
raffim@hbsslaw.com

*Counsel for Proposed Class Representatives*
*Wei Huang and Langdon Elliott*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
John T. Jasnoch (281605)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com

William C. Fredericks (*pro hac vice*)
Jeffrey P. Jacobson (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 233-6444
Facsimile: (212) 233-6334
wfredericks@scott-scott.com
jjacobson@scott-scott.com

*Counsel for Proposed Class Representative*
*Ani Hovhannisyan*

**THE SCHALL LAW FIRM**
Brian J. Schall (290685)
2049 Century Park East, Suite 2460,
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile: (310) 388-0192
brian@schallfirm.com

*Additional Counsel*