UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re VAXART, INC. SECURITIES LITIGATION. | Case No. 20-cv-05949-VC<br><br>**ORDER DENYING MOTION FOR CLASS CERTIFICATION**<br><br>Re: Dkt. No. 311 |

    In the typical securities fraud case, a plaintiff alleges that a company misled the investing public, causing the stock price to be artificially inflated until "the truth was revealed" after some bombshell announcement. This case is different. A company called Vaxart issued press releases with headlines designed to trick the public into believing that the company was on the verge of receiving a massive infusion of federal funding to produce a vaccine for COVID-19. These statements caused a "pop" in Vaxart's stock price, allowing insiders to sell off their remaining shares at an inflated profit. But the press releases, in smaller print, also contained truthful statements—statements that one might call partial "corrective disclosures." For example, they clarified that the company was selected merely to participate in a non-human primate study—not the major vaccine program everyone was fixated on. So the "truth" likely started seeping back into the market soon after the fraud was committed.

    Nonetheless, at the class certification stage, both sides treat this as a typical securities fraud case. The plaintiffs assume that the truth was concealed by the press releases, and then finally revealed in a *New York Times* article one month later. So they assume that the price was inflated for a month, and that the defendants are liable to everyone who bought stock during that

period. Moreover, the plaintiffs' damages model does not account for the near certainty that at least some members of the investing public quickly realized that the press releases were no big deal. Instead, the damages model assumes that the effects of the fraud on Vaxart's stock price remained constant until subsequent "revelations" like the *New York Times* article. The plaintiffs offer no evidentiary support for this understanding of liability and damages.

The defendants, for their part, insist they have defeated class certification by proving that the misleading statements in the press releases had no impact on the price of Vaxart stock at all. They purport to do that by presenting an expert who says that the stock drop following the *New York Times* article was not statistically significant. Even if the expert is right about the stock drop that day, this obviously proves nothing about whether the misleading statements in the press releases affected the stock price in the days immediately following the press releases. At most, it would show that any price inflation from the misleading statements had dissipated by the time the article dropped.

In short, both sides have completely missed the point. They have not come close to giving the Court the evidence or analysis needed to decide whether class certification is appropriate. The motion for class certification is thus denied without prejudice to filing a renewed motion that has an actual connection to the realities of this case.

# I

## A

Vaxart is a biotechnology company based in San Francisco. Armistice is a hedge fund that acquired a majority stake in Vaxart back in 2019. The plaintiffs are investors who claim they overpaid for Vaxart stock after the company issued the misleading press releases. The plaintiffs sued Vaxart, Armistice, and various officers and directors for violating Section 10(b) and Rule 10b-5 of the Securities Exchange Act. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b). What follows in the remainder of this subsection is a summary of the key allegations set forth in the complaint:

True to its name, Vaxart is in the business of developing vaccines, with a focus on

vaccines administered by pill. But despite initial buzz, the company has long struggled to bring a successful vaccine to market. In 2019, Armistice jumped in and obtained a majority interest in Vaxart, with hopes of turning the company around.

Then came the COVID-19 pandemic. Vaxart promptly announced that it had "initiated a program to develop a coronavirus vaccine candidate based on its proprietary oral vaccine platform." The market responded favorably, causing Vaxart's stock price to rise. Over the next few months, Vaxart released more and more statements regarding its vaccine development program. Through it all, the company's share price continued to climb.

In May 2020, the U.S. government announced Operation Warp Speed—a multi-billion-dollar effort to accelerate the development of a COVID-19 vaccine. Speculation bubbled about which companies might be tapped to participate. The announcement suggested that as many as eight candidates could be chosen. By early June, news reports identified five companies, including industry giants like AstraZeneca and Pfizer. That left two or three slots to fill.

Vaxart took advantage of the public uncertainty about who the remaining Operation Warp Speed participants would be. Within the span of ten days, Vaxart released several more statements touting its vaccine development initiative. Two press releases in particular caught the eye of the investing public. The first, from June 25, announced that Vaxart had signed a "memorandum of understanding" with Attwill Medical Solutions to manufacture and distribute Vaxart's oral coronavirus vaccine. This partnership, the press release emphasized, would enable Vaxart to produce "a billion or more COVID-19 vaccine doses per year." But there was no real arrangement between Vaxart and Attwill—only an agreement to try to come to an agreement. And anyway, Attwill lacked the FDA certifications needed to manufacture any doses of Vaxart's coronavirus vaccine, much less the technical capacity to produce a billion or more doses.

The second press release, from June 26, announced that Vaxart's vaccine candidate had been "selected for the U.S. Government's Operation Warp Speed." But this headline was nothing but a head-fake. The text below the headline said only that Vaxart had been "selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation

3

Warp Speed." And as the Department of Health and Human Services later confirmed, Vaxart was not in fact chosen to be one of the federal government's leading vaccine developers. Nor was it chosen to receive a massive influx of federal funding. Still, on the heels of these announcements, Vaxart's stock soared—peaking at $14.30 and closing at $8.04, up 28% from the day before. At the same time, Armistice unloaded nearly all of its shares, netting hundreds of millions in instant profits. A few days later, Vaxart disclosed these sales to the SEC.

These developments raised a few eyebrows. Not long after the press releases issued, Vaxart received inquiries from several news outlets, such as whether other vaccines had been selected for the non-human primate study and whether Vaxart's "selection for Operation Warp Speed" came with any funding. Then, a month later, the *New York Times* published a story on Vaxart's "surprise announcement." It reported concerns among officials at the Department of Health and Human Services that "companies including Vaxart [were] trying to inflate their stock prices by exaggerating their roles in Warp Speed." It also included a quote from an HHS spokesperson, clarifying that the agency had not entered into any funding agreements or negotiations with Vaxart. The company's stock dropped in the wake of this article.

**B**

The defendants moved to dismiss the First Amended Complaint, contending that the allegations described above did not give rise to a claim under the Private Securities Litigation Reform Act (PSLRA). The Court granted the motion as to Armistice and its shareholders with leave to amend, concluding that the plaintiffs hadn't adequately alleged that those defendants were responsible for the press releases. But the Court denied the motion as to Vaxart and its executives. As explained in the ruling, it was easy to conclude that the press releases gave rise to a strong inference of intent to defraud. After all, what other motive could exist, beyond the desire to cause an artificial stock pop and then take advantage of it, for including a headline that screamed "Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed," at a time when the investing public was on the edge of its seat waiting to find out who would be selected for Operation Warp Speed? *See In re Vaxart, Inc. Securities Litigation*, 576 F.

4

Supp. 3d 663, 673 (N.D. Cal. 2021).[1] The challenge was figuring out whether the statements were materially misleading within the meaning of the PSLRA, given that the press releases mixed several accurate statements with highly misleading ones. But given the totality of the statements and the unusual circumstances in which they were made, the Court ruled that the complaint plausibly alleged that the press releases were materially misleading. *Id.* at 667.

Also in that ruling, the Court addressed the issue of loss causation. The parties' positions on this issue were binary: the defendants argued that there could be no loss causation because there was never any fraud to begin with, and the plaintiffs alleged that the stock drop following the *New York Times* article indicated that the misleading statements in the press releases affected the price until that article. Neither side discussed the possibility that the misleading statements in the press releases affected the stock price for a period shorter than the four weeks between their issuance and the publication of the *New York Times* article. Given the options available, the Court sided with the plaintiffs and concluded it was plausible that the fraud affected the stock price until the day the *Times* article came out. *See id.* at 674.

The plaintiffs subsequently filed a Second Amended Complaint, and this did enough to bring Armistice (and various Armistice-affiliated individuals) back into the case. *See In re Vaxart, Inc. Securities Litigation*, No. 20-CV-5949-VC, 2023 WL 3637093 (N.D. Cal. May 25, 2023). Among other things, the new version of the complaint pointed to documents suggesting that Vaxart's CEO originally didn't consider the non-human primate study to be material, but that the company reluctantly issued the "Operation Warp Speed" press release after receiving pressure from Armistice officials.

The plaintiffs have since reached a class-wide settlement with Vaxart and various Vaxart officers and directors. So now only the Armistice defendants remain. And the plaintiffs have moved to certify a class for adjudication of the claims for damages against the Armistice

---

[1] Incidentally, the complaint satisfies the PSLRA's scienter standard not just under the Ninth Circuit's odd-but-longstanding "deliberate recklessness" test, but also under the more straightforward intent standard that governs securities fraud cases in the other circuits.

defendants. They seek to represent all investors who bought Vaxart securities from June 25 (the day of the Attwill press release) until July 24 (the day before the *New York Times* article).

## II

### A

The parties make several arguments regarding class certification, but two questions jump out. First, can the issue of liability—including whether investors overpaid for Vaxart stock—be resolved in the same way for every member of the class? *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Second, can the plaintiffs present a valid method for measuring the damages suffered by the class members? *See Nguyen v. Nissan North America, Inc.*, 932 F.3d 811, 817 (9th Cir. 2019). If the answer is yes to these questions, it goes a long way towards getting the plaintiffs to class certification. But these questions can't be answered merely with reference to allegations in the complaint; the plaintiffs must show, with evidence, that these questions can be dealt with on a class-wide basis. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275–76 (2014) ("Plaintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23.").

Again, the proposed class consists of everyone who bought Vaxart shares during the month-long period between the Attwill press release and the *New York Times* article. As to liability, the plaintiffs argue that all investors in the class overpaid for Vaxart shares. That's because, as the plaintiffs see it, fraud entered the market following the press releases and remained in the market until the "truth was revealed" by the publication of the *New York Times* article. So long as an investor purchased Vaxart stock between these two events, the plaintiffs assume, that investor would have purchased an artificially inflated stock.

As to damages, the plaintiffs' position has been harder to pin down. At times, they seem to assume that every class member was affected by the fraud in the same way, with each overpaying the same amount per share of Vaxart stock. Again, that's because the plaintiffs at times seem to assume that the investing public was completely in the dark about Vaxart until the *New York Times* piece dropped. Which would mean that the effects of the fraud on the stock

price would not have dissipated at all until the *New York Times* story broke. But at other points, the plaintiffs seem to suggest that the truth about Vaxart partially came out when the company, a few days after the press releases, submitted forms to the SEC disclosing Armistice's massive sales of Vaxart stock. The plaintiffs suggest these filings could have eliminated some of the artificial inflation in the stock price, such that investors who bought Vaxart stock after the SEC filings did not overpay as much as investors who bought stock before. Still, the plaintiffs seem to assume that each class member who bought Vaxart stock after the SEC filings was affected by the fraud in the same way, with each overpaying the same amount per share of Vaxart stock. And the same goes for each class member who bought Vaxart stock before the SEC filings. Again, that's because the plaintiffs assume that, outside of the SEC forms and the *Times* story, the investing public was completely in the dark about Vaxart. Which would mean that any artificial inflation in the stock price dissipated in two discrete chunks: some right after the SEC filings, and the rest right after the *New York Times* article.[2]

To support these assertions, the plaintiffs rely on the expert opinion of Dr. Matthew Cain, a financial economist. On the liability point, the plaintiffs asked Dr. Cain to analyze the price spike following Vaxart's press releases and the price dip following the *New York Times* article. He concluded that both were highly unusual changes, not just typical price fluctuations. The plaintiffs have taken this to mean that the press releases inflated the stock price (hence the unusual spike) and that this inflation remained until the *New York Times* story (hence the unusual dip). On the damages point, Dr. Cain explained that he could estimate damages for class members by measuring how the stock price reacted to revelations like the *New York Times* article. As discussed earlier, the plaintiffs haven't been entirely consistent in their presentations.

---

[2] Part of what makes the plaintiffs' position difficult to pin down is the fact that the SEC filings are never mentioned in either the motion for class certification or Dr. Cain's initial expert report. That said, because the plaintiffs do discuss the SEC filings in their later papers, this wrinkle is worth addressing. The motion for class certification also mentions an article in *Business Insider* that was published weeks after the *New York Times* story broke. And the plaintiffs at one point suggested that this article should also be considered a "corrective disclosure" about the fraud in the press releases. But the plaintiffs have since wisely abandoned this position.

7

But regardless of how you look at it—one corrective disclosure or two—the upshot is the same: the plaintiffs propose that Dr. Cain calculate damages by measuring only how the stock price reacted to discrete disclosure events (the *Times* article and the SEC filings), without considering whether the effects of the fraud began to dissipate before those disclosures.

**B**

The defendants offer several arguments in opposition to class certification, but their primary one is this: the allegedly misleading statements in the press releases had no impact on the stock price at all. This matters because the plaintiffs invoke—just as virtually every securities fraud plaintiff does—the "fraud-on-the-market" theory to prove that investors relied on the misleading press releases when they bought Vaxart shares. To oversimplify a bit, the fraud-on-the-market theory assumes that investors relied on a misrepresentation so long as the plaintiff can show that the misrepresentation indeed affected the stock price. *See Halliburton*, 573 U.S. at 268. And so if a defendant can show that the statement had no impact on the stock price, the defendant can defeat the securities fraud claim. Moreover, the case law permits the defendant to use this "no price impact" argument as a basis for defeating class certification, with the burden being on the defendant to prove that the price was not impacted. *See id.* at 281–82; *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113, 126 (2021).

In their attempt to show that there was no price impact, the defendants—just like the plaintiffs—focus on the date of the *New York Times* article. They enlisted a financial economist of their own, Dr. Jennifer Marietta-Westberg. After adjusting for what she believed to be flaws in Dr. Cain's analysis, Dr. Marietta-Westberg concluded that the price dip after the *New York Times* article was not highly unusual, and that it had no material effect on Vaxart's stock price. And this, the defendants assert, means that the allegedly misleading press releases had no price impact—the market did not react in a material way to the information contained in the *Times* article because no fraud was baked into the stock price to begin with.

**C**

The presentations by the plaintiffs and the defendants are both useless in helping the

Court determine whether this case is susceptible to class treatment. The problem is that both sides ignore that this is not your typical securities case, where a company puts out a misleading statement that inflates the company's stock price, and later the truth "comes to light suddenly, precipitating a dramatic sell-off" which causes the inflation to dissipate. *Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 243 (D. Mass. 2004). Of course, there is little question that Vaxart made statements in its press releases that were misleading—for example, the company most certainly was not "selected for Operation Warp Speed" in any way a normal person would understand that phrase. But at least a portion of the corrective disclosures occurred immediately, in the form of smaller text specifying that Vaxart had been selected merely to participate in a non-human primate study. Although some investors, analysts, and reporters likely focused on the misleading headline and reacted rashly to it, more sophisticated actors could have little trouble parsing the words of the release (or articles describing it) and realize that the headline was nothing but a head-fake. After all, "market professionals (brokerages, investment banks, and arbitrageurs, among others) regularly conduct their own investigations to discover why a stock's price has moved, net of general market movements." *Schleicher v. Wendt*, 618 F.3d 679, 686–87 (7th Cir. 2010). Indeed, some reporters and analysts soon began to recognize that Vaxart was not actually joining the likes of Pfizer and Moderna in Operation Warp Speed. At least a few reports covering the press release specifically mentioned the non-human primate study. And some prior reporting on industry developments had already distinguished the "monkey study" from the main Operation Warp Speed initiative. Under these circumstances, there is no evidentiary basis for believing that the public was completely in the dark about Vaxart until the *New York Times* article (or even until the SEC filings, for that matter).

  Considering the actual evidence (rather than simply adopting the complaint's characterization of what happened), it's likely that one of two scenarios played out in the wake of the press releases. The first scenario is that the stock price got a significant bump as a result of the misleading statements in the press releases, then the price inflation stemming from the fraud began declining as the market started to develop a better understanding of the situation, but the

fraud continued to have some effect on the stock price until the publication of the *New York Times* article. In this scenario, the article was not a bombshell, but simply a nail in the coffin for the fraud. This is what the case law and the literature refer to as "leakage"—fraud occurs and then the truth gradually leaks out, with the stock price becoming less and less affected by the fraud over time. *See Glickenhaus & Co. v. Household International, Inc.*, 787 F.3d 408, 416 (7th Cir. 2015); *Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 484–87 (S.D.N.Y. 2022); *Swack*, 383 F. Supp. 2d at 243; *see also* Matthew L. Mustokoff & Margaret E. Mazzeo, *Loss Causation on Trial in Rule 10b-5 Litigation a Decade After* Dura, 70 Rutgers L. Rev. 175, 207–17 (2017). The second scenario is that the stock price got a significant bump as a result of the misleading statements in the press releases, but the effect of the fraud on the stock price was short-lived, because it didn't take the market a month to understand Vaxart's true role (or lack thereof) in Operation Warp Speed. In this scenario, the *New York Times* article was neither a bombshell nor a nail in the coffin for the fraud, but simply the kind of negative news story about a company in a major publication that will often cause a temporary stock drop—even if the story reveals no information that the market hadn't already absorbed.[3]

**D**

The disconnect between the parties' presentations and the actual evidence in the case raises two questions. First, must the plaintiffs' motion for class certification be denied? Second, if so, should denial be with prejudice, or should the plaintiffs get a chance to file a renewed class certification motion?

The answer to the first question is clearly yes. As noted, the plaintiffs' presentation in support of class certification assumes that if the defendants are liable for securities fraud, then they will automatically be liable to everyone in the proposed class. Not just to the people who

---

[3] A third scenario is that the misleading statements in the press release did not affect the stock price at all, and in fact the market was reacting exuberantly to the accurate parts of the press releases—that Vaxart would be participating in a non-human primate study, for example. The defendants seem intent on pressing this argument at summary judgment and/or trial. It's a free country.

10

bought shares two hours or two days after the press releases, but also to the people who bought shares four weeks after the press releases. But the plaintiffs have offered no evidence to support this assumption; they merely analyze the magnitude of the stock drop following the *New York Times* article, without assessing whether the market could have started adjusting right away. It may be that in a more typical securities fraud scenario, where the truth is indeed fully concealed and then revealed, the magnitude of the stock drop in the wake of the *Times* article would suffice to show that the liability question can be answered the same way for each class member. But not here.[4]

There are similar problems with the plaintiffs' damages model. Assume for the moment that the stock price was inflated by the misleading statements in the press releases all the way through the *Times* article. Even if that's true, there's no way the stock price was inflated to the same extent throughout that period—the evidence belies the notion that the market failed to adjust at all for a full month. Now add in the possibility that the SEC disclosure forms erased some of the initial artificial inflation in the stock price, such that investors who bought shares after the SEC filings did not overpay as much as investors who bought shares before. Even if that's true, there's still no way the stock price was inflated to the same extent between the press releases and the SEC filings—again, the evidence belies the notion that the truth wasn't discernible before the SEC filings. There's also no way the stock price was inflated to the same extent (if it was inflated at all) between the SEC filings and the *Times* story. But the plaintiffs have offered no guidance on how their expert would discern the waning effect of the fraud on the stock price as the level of artificial inflation gradually dissipated. *Cf. Glickenhaus*, 787 F.3d at 416. And so they have failed to show that damages can be measured on a class-wide basis.

The second question—whether the plaintiffs should get another crack at class certification—is more difficult. It may be reasonable to conclude that they missed the mark so badly that it would be unfair to give them a second chance. But the defendants are also at fault.

---

[4] Of course, this discussion also relates to whether the plaintiffs have identified the proper class period and whether (whatever the proper class period is) there would need to be sub-classes.

As noted, their primary argument against class certification is, to paraphrase: "we've shown that the allegedly misleading statements in the press releases had no impact whatsoever on the stock price." If the defendants had actually shown that, then of course the denial of class certification would be with prejudice. But all they did was submit an expert report arguing that the stock drop following the *New York Times* article was insignificant. This was a total waste of time. Even if their expert is right (and this seems debatable) it says nothing about whether there was a price impact in the days immediately following the press releases. In particular, it says nothing about price impact on the day the Armistice defendants dumped all their remaining Vaxart shares, in a seemingly obvious attempt to profit from an artificial stock pop generated by false headlines in press releases.

On balance, the better course is to give the plaintiffs another chance to seek class certification—this time based on the actual facts of the case rather than cookie-cutter allegations about the truth being concealed and then revealed in a bombshell disclosure. But surely it will be the last chance.

### III

The motion for class certification is denied without prejudice. Any renewed motion is due within 28 days of this order. The opposition is due 28 days later, and the reply is due 21 days after that.

**IT IS SO ORDERED.**

Dated: July 2, 2024

VINCE CHHABRIA
United States District Judge