**AKIN GUMP STRAUSS HAUER & FELD LLP**
NEAL R. MARDER (SBN 126879)
JOSHUA A. RUBIN (SBN 308421)
SINA SAFVATI (SBN 313287)
LILLIAN RAND (SBN 341581)
1999 Avenue of the Stars, Suite 600
Los Angeles, California 90067
Email: nmarder@akingump.com
        rubinj@akingump.com
        ssafvati@akingump.com
        lrand@akingump.com

Attorneys for Defendants ARMISTICE CAPITAL,
LLC, ARMISTICE MASTER FUND, LTD,
STEVEN J. BOYD, and KEITH MAHER, M.D.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re VAXART, INC. SECURITIES LITIGATION | Lead Case No. 3:20-cv-05949-VC |
| | District Judge: Hon. Vince Chhabria |
| This Document Relates to: <br>     ALL ACTIONS | <u>CLASS ACTION</u> |
| | **ARMISTICE DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL** |

**[REDACTED VERSION]**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ....................................................................................................2

III.    ARGUMENT .........................................................................................................3

        A.      The Court Must Deny Class Certification Because Plaintiffs' Articulated Leakage Theory of Damages is Unsupported and Inconsistent With Their Theory of Liability. ..................................................................................................3

                1.      Plaintiffs' Leakage Model Attributes All Daily (And in Some Cases Intra-Day) Price Movement to the Revelation of the Truth. ......................4

                2.      Plaintiffs' Measure of Front-End Price Inflation Does Not Control for Confounding Information Contained in the Allegedly Misleading Press Releases. ...............................................................................................7

                        a.      Plaintiffs Fail to Disaggregate or Control for the True Portions of the June 25, 2020 Attwill Release. ................................7
                        b.      Plaintiffs Fail to Disaggregate or Control for the True Portions of the June 26, 2020 OWS Release. ................................10

                3.      Plaintiffs' Back-End Measure of Loss Causation is Unsupported and Fails to Match Their Theory of Liability. ..................................................14

                        a.      Plaintiffs' Attribution of All Stock Price Decline to the Leakage of the Truth is Unsupported And Leads to Absurd Results ................................................................................................15
                        b.      Armistice's Sales Cannot Explain Leakage of the Truth. ..............18

                4.      Plaintiffs Have Not Demonstrated that Section 20A Damages Can Be Established on a Classwide Basis. ........................................................20

        B.      If the Class Is Certified, Which it Should Not Be, The Class Period Must Be Substantially Shortened. ..................................................................................20

                1.      If the Class is Certified, The Class Period Must End on June 26, 2020. ....21

                2.      At The Absolute Latest, the Class Period Should End on July 6, 2020. ....23

IV.     CONCLUSION ....................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*,
   568 U.S. 455 (2013)...............................................................................................3

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988).............................................................................................21

*Brazil v. Dole Packaged Foods, LLC*,
   2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) ..........................................................8

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*,
   853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd sub nom. Bricklayers & Trowel
   Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82 (1st
   Cir. 2014)...........................................................................................................7, 8

*Brown v. Ambow Educ. Holding Ltd.*,
   2014 WL 523166 (C.D. Cal. Feb. 6, 2014)............................................................16

*Brown v. China Integrated Energy Inc.*,
   2014 WL 12576643 (C.D. Cal. Aug. 4, 2014)........................................................24

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)........................................................................................ *passim*

*In re Countrywide Fin. Corp. Sec. Litig.*,
   273 F.R.D. 586 (C.D. Cal. 2009) .........................................................................24

*In re DVI, Inc. Sec. Litig.*,
   2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) ..........................................................15

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   309 F.R.D. 251 (N.D. Tex. 2015) .........................................................................22

*In re FibroGen Sec. Litig.*,
   2024 WL 1064665 (N.D. Cal. Mar. 11, 2024).........................................19, 23, 25

*Freitas v. Cricket Wireless, LLC*,
   2022 WL 3018061 (N.D. Cal. July 29, 2022)........................................................10

*Glickenhaus & Co. v. Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir. 2015) .........................................................................5, 6, 8

*Gordon v. Sonar Cap. Mgmt. LLC*,
   92 F. Supp. 3d 193 (S.D.N.Y. 2015)....................................................................20

*Greenberg v. Crossroads Sys., Inc.*,
    364 F.3d 657 (5th Cir. 2004) ...............................................................................19

*Grigsby v. BofI Holding, Inc.*,
    979 F.3d 1198 (9th Cir. 2020) .............................................................................21

*Grigsby v. CMI Corp.*,
    765 F.2d 1369 (9th Cir. 1985) ...............................................................................6

*Gruber v. Gilbertson*,
    628 F. Supp. 3d 472 (S.D.N.Y. 2022)...................................................................4

*Hatamian v. Advanced Micro Devices, Inc.*,
    2016 WL 1042502 (N.D. Cal. Mar. 16, 2016)....................................................3, 7

*Hawkins v. Comparet-Cassani*,
    251 F.3d 1230 (9th Cir. 2001) .............................................................................20

*Hubbard v. BankAtlantic Bancorp, Inc.*,
    688 F.3d 713 (11th Cir. 2012) ...............................................................................9

*In re Intuitive Surgical Sec. Litig.*,
    2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ....................................................19

*Loritz v. Exide Techs.*,
    2015 WL 6790247 (C.D. Cal. July 21, 2015) .......................................................4

*LSIMC, LLC v. Am. Gen. Life Ins. Co.*,
    2022 WL 4596597 (C.D. Cal. Aug. 4, 2022) ........................................................4

*Nguyen v. Radient Pharms. Corp.*,
    2014 WL 1802293 (C.D. Cal. May 6, 2014) ......................................................19

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ..................................................................................3

*In re Omnicom Grp., Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) .....................16, 25

*Passman v. Peloton Interactive, Inc.*,
    671 F. Supp. 3d 417 (S.D.N.Y. 2023)...................................................................7

*Phillips v. Sci.-Atlanta, Inc.*,
    489 F. App'x 339 (11th Cir. 2012) ......................................................................25

*In re Qualcomm Inc. Sec. Litig.*,
    2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) .........................................21, 22, 24

*In re Sci. Atlanta, Inc. Sec. Litig.*,
    754 F. Supp. 2d 1339 (N.D. Ga. 2010) ...................................................................16

*Sloman v. Presstek, Inc.*,
    2007 WL 2740047 (D.N.H. Sept. 18, 2007) ...........................................................16

*In re Tesla, Inc. Sec. Litig.*,
    2022 WL 7374936 (N.D. Cal. Oct. 13, 2022) ....................................................4, 14

*In re the Bear Stearns Cos., Inc. Sec.*,
    2016 WL 4098385 (S.D.N.Y. July 25, 2016) ....................................................5, 15

*In re Toll Roads Litig.*,
    2018 WL 4945531 (C.D. Cal. Oct. 3, 2018) ............................................................20

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ..................................................................................................3

*In re Williams Sec. Litig.*,
    496 F. Supp. 2d 1195 (N.D. Okla. 2007), *aff'd*, 558 F.3d 1130 (10th Cir.
    2009) .................................................................................................................15, 16

## Other Authorities

Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure
    Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883 (1990) ...................5

Fed. R. Civ. P. 23 ...............................................................................................1, 3, 20

Fed. R. Civ. P. 23(a) ..................................................................................................3

Fed. R. Civ. P. 23(b) ..................................................................................................3

I.    **INTRODUCTION**

Despite knowing this is their "last chance" to demonstrate that their claims are susceptible to class treatment,[1] Plaintiffs continue to ignore the realities of their case. They now put forth a damages model that creates more problems than it solves, and still does not satisfy their burden under Rule 23 and *Comcast*. At the hearing on Plaintiffs' initial motion for class certification, the Court rejected Plaintiffs' damages model, which treated the July 25, 2020 *New York Times* article as a "bombshell" that suddenly revealed the full extent of the truth. Recognizing that "the market figured out the reality of the situation, probably pretty quickly," the Court alerted Plaintiffs that their damages model was deficient because it did not consider the fact that "a significant portion of the investing public, we can assume, already knew what the situation was before the *New York Times* article came out." Dkt. 357 at 21:14-16, 24:11-15.

In response, Plaintiffs have changed lanes again. They now posit a "leakage theory" which, on the surface, attempts to match the Court's perspective by positing that the artificial inflation in Vaxart's stock "began to partially, and materially, dissipate within hours after the OWS Press Release hit the wires." Renewed Motion for Class Certification ("Mot.") at 1. But of course, it is not enough for Plaintiffs to simply endorse the Court's theory. Rather, it's Plaintiffs burden to set forth a damages model that tracks this unusual approach to loss causation and that can accurately calculate the extent to which investors were injured. Plaintiffs' damages model wholly fails this test for several reasons, namely:

- Supported by a results-oriented expert report, Plaintiffs' leakage theory attributes the *entirety* of Vaxart's front-end stock price increases on June 25, 2020 and June 26, 2020 to the alleged misrepresentations. In doing so, Plaintiffs fall back into their old habit of treating this like a typical securities fraud case. In this case, however, the Court has recognized that there was truth in the fine print of the press releases. Yet, Plaintiffs baselessly and erroneously assume that the truthful portions of the press releases had absolutely no impact on Vaxart's stock price, going so far as to mischaracterize fact witness testimony to support their view.

- On the back end, Plaintiffs' damages model simply *assumes* that every price decline from June 26, 2020 through July 6, 2020 was the result of the truth "leaking into the market," and does not even attempt to disaggregate

---

[1] *See* Dkt. 374 at 12.

confounding news on those dates. Not only does this assumption lack evidentiary support, but it yields absurd and untenable results like certain individuals who purchased stock *later* in the class period inexplicably recovering up to 35% *greater* damages than those who purchased earlier.

- Plaintiffs attribute leakage to Armistice's June 26, 2020 and June 29, 2020 stock trades, despite their expert performing no analysis to determine whether the market learned in real-time that Armistice was trading, and despite the fact that Armistice's sales cannot be deemed "corrective" since the market would have no way to know that the sales had anything to do with the Attwill or OWS press releases.

Because Plaintiffs fail to set forth a damages model consistent with their theory of the case, the Court must deny Plaintiffs' motion. But even if the Court is inclined to certify a class, the class period cannot extend to July 25, 2020, as Plaintiffs advocate. In light of the information environment and the significant coverage of the press releases in question, as well as the pattern of Vaxart's stock price—which dropped substantially on June 26, 2020 but then did not decline in a statistically significant way again for more than a week—this case warrants a two-day class period, as there was no price impact after June 26, 2020. At the absolute latest, the class must end on July 6, 2020, after which even Plaintiffs allege that the truth was no longer leaking into the marketplace.

## II.    <u>BACKGROUND</u>

Armistice Defendants refer the Court to the Background section of their prior class certification briefing for a full statement of the relevant facts. *See* Dkt. 318 at 3-8. In sum, Plaintiffs allege that Vaxart issued two press releases which misrepresented, respectively, Vaxart's manufacturing capabilities and that it was "one of the handful of [OWS] finalists reported to be receiving significant government support." Mot. at 5. The evidence adduced through discovery has confirmed that ████████████████████████████████████████████████████ ████████████████████████████████████████████████. *See, e.g.*, Rubin Decl., Ex. B (Vaxart 30(b)(6) Transcript) at 47:13-49:13; 64:1-65:20. Nevertheless, Plaintiffs allege that Armistice conspired to "pop" Vaxart's stock price and that it thereafter traded on material nonpublic information.

Plaintiffs' renewed motion is premised, in large part, on the new opinions offered by Plaintiffs' expert Dr. Matthew Cain in his merits and damages analysis report (the "Cain Merits

Rep."). In response to the Court's concerns about the ability of Plaintiffs to put forth a damages model consistent with their theory of liability, Dr. Cain submitted the Cain Merits Report—his third report submitted in this matter—which purports to articulate an affirmative damages model. Dr. Cain asserts a "leakage" model of loss causation in which he attributes the entire Vaxart stock decline from 9:40 am on June 26, 2020 through July 6, 2020 as resulting from the gradual leakage of the truth to the market, without any disaggregation of confounding factors. Cain Merits Rep. ¶¶ 148-164. As he did in connection with the initial motion for class certification, Dr. Cain also continues to treat the July 25, 2020 *New York Times* article as a corrective disclosure, attributing the entire abnormal stock price decline on July 27, 2020 to the alleged fraud. *Id.* ¶¶ 165-170.

## III.   ARGUMENT

"[A] party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). The Court must conduct a "rigorous" analysis of the Rule 23 elements even if that analysis "entail[s] some overlap with the merits of the plaintiff's underlying claim." *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *3 (N.D. Cal. Mar. 16, 2016) (quoting *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465-66 (2013)). At the class certification stage, plaintiffs may no longer rely on their pleadings. *Comcast*, 569 U.S. at 35. Rather, they must "prove" the elements of Rule 23(a) and must "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Id.* at 33. Plaintiffs must make these showings by a preponderance of the evidence. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022).

### A.   The Court Must Deny Class Certification Because Plaintiffs' Articulated Leakage Theory of Damages is Unsupported and Inconsistent With Their Theory of Liability.[2]

Under the Supreme Court's *Comcast* decision, plaintiffs seeking class certification "must show that 'damages are capable of measurement on a classwide basis' *and* must tie their damages

---

[2] With respect to the class definition's inclusion of Vaxart option contracts, Dr. Cain essentially repeats his analysis supporting his flawed conclusion that Vaxart's options traded in an efficient market. Cain Merits Report ¶ 49. As explained in Armistice Defendants' opposition to the initial

method to their theory of liability." *Loritz v. Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) (emphasis added) (quoting *Comcast*, 569 U.S. at 34).  To do so, they "must offer a class-wide damages model consistent with [their] theory of liability." *LSIMC, LLC v. Am. Gen. Life Ins. Co.*, 2022 WL 4596597, at *12 (C.D. Cal. Aug. 4, 2022) (citing *Comcast*, 569 U.S. at 33).

In their revised motion, Plaintiffs have now finally set forth a damages model in their expert Dr. Cain's Merits Report.  The question thus becomes whether this damages model is consistent with Plaintiffs' theory of liability as articulated in their Second Amended Complaint ("SAC") and as interpreted by the Court.  As explained below, the answer is clearly no.  Armistice Defendants begin by providing a brief overview of Plaintiffs' novel "leakage" theory and the unsupportable assumptions it makes about movements in Vaxart's stock price.  Armistice Defendants then explain how, on both the front end and back end, Plaintiffs' damages model fails to accurately measure investor injury in a manner consistent with the SAC.

    1.   <u>Plaintiffs' Leakage Model Attributes All Daily (And in Some Cases Intra-Day) Price Movement to the Revelation of the Truth.</u>

Responding to the Court's observation that the market quickly began to appreciate the truth about the Attwill and OWS press release, Plaintiffs now advance a "leakage" theory of loss causation and damages.  Under this theory, price inflation was removed from Vaxart's stock price not only through a corrective disclosure via the July 25, 2020 *New York Times* article, but also through amorphous "leakage" of the relevant truth over an earlier specified window of time (here June 26, 2020 – July 6, 2020).  *See generally In re Tesla, Inc. Sec. Litig.*, 2022 WL 7374936, at *9 (N.D. Cal. Oct. 13, 2022).  The leakage model is a significantly less common method of proving loss causation, in which a plaintiff must show that "the fraudulent inflation leaked out of a stock gradually, rather than in response to individual discrete events." *Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 484 (S.D.N.Y. 2022).

---

motion for class certification, options should not be included in the class definition because (1) the class definition in the Second Amended Complaint was limited to Vaxart common stock and Plaintiffs have not sought to amend the SAC, and, in any event, (2) Plaintiffs have not met their burden to establish that Vaxart options trade on an efficient market.

Plaintiffs acknowledge that the Ninth Circuit has never adopted the leakage model. Dkt. 358 at 11 (noting that the theory has been accepted by the Second, Seventh, and Tenth Circuits). And economists and other commentators have expressed considerable doubt as to the viability of the theory as a means to accurately measure damages. *See, e.g.*, Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883, 903 (1990) (describing tendency of model to "overestimate the true damages"); *In re the Bear Stearns Cos., Inc. Sec.*, 2016 WL 4098385, at *9 (S.D.N.Y. July 25, 2016) (leakage model has not achieved "general acceptance within the relevant scientific community"); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 422 (7th Cir. 2015) (citing additional secondary sources). As explained by Defendants' expert, Dr. Marietta-Westberg, Dr. Cain's purported leakage model as applied to the facts of this case assumes a delayed market reaction to widely-disseminated public news, and is, therefore, in tension with the efficient market theory upon which Plaintiffs' presumption of reliance is premised. *See, e.g.*, Rubin Decl., Ex. A (Expert Report of Jennifer Marietta-Westberg ("M-W Report")) ¶ 53 n.111.[3]

Notwithstanding Plaintiffs' attempts to downplay the significance of the shift in their theory of loss causation, the distinctions between the leakage model and the traditional "specific disclosure" model are pronounced. In a specific disclosure model, price inflation is back-cast onto the stock price through the abnormal stock price movement on specific "corrective disclosure" days in which Plaintiffs have identified particular statements or events which allegedly revealed the relevant truth. *Glickenhaus*, 787 F.3d at 416. In a leakage model, on the other hand, price inflation is measured as "the sum of *all* subsequent [daily] residual returns" over a specified period

---

[3] A typical leakage case is one in which news about an event starts to leak out *prior* to its formal disclosure, such that a traditional selective disclosure model looking only to the price return on the formal disclosure date would underestimate damages. Plaintiffs' theory in this case, on the other hand, assumes leakage for a week *after* the disclosure (allegedly in the fine print) of the relevant truth. This theory is thus incompatible with an efficient market thesis, which assumes that stock prices will quickly adjust to reflect all publicly-available information. M-W Report ¶ 69.

of time, whether or not tied to any specific disclosure of information. *Id.* (emphasis added). In other words, the leakage theory *assumes* loss causation, rather than empirically testing it.

Moreover, in reaching his threshold conclusion that the relevant truth *did* leak out between June 26, 2020 and July 6, 2020, Dr. Cain admits that he relied on the fact that Vaxart's stock price declined on all but one day during that period. Rubin Decl., Ex. C (Cain Transcript) at 354:17-355:4.[4] Thus, in his results-driven merits report, Dr. Cain observes a stock price decline (even if not statistically significant), assumes that stock price decline is evidence of leakage, and then calculates the amount of leakage using that same stock price decline.[5] This inherently circular analysis risks overestimating damages, and therefore mandates scrupulous attention to whether any confounding information—separate from the leakage of the truth—explains the stock price movement, lest the securities laws be improperly transformed into "a scheme of investors' insurance." *Grigsby v. CMI Corp.*, 765 F.2d 1369, 1376 (9th Cir. 1985); *Glickenhaus*, 787 F.3d at 422 (leakage model must account for firm-specific, nonfraud-related factors); *see also* M-W Report ¶ 36.

Even if a leakage theory might be viable in some instances, Dr. Cain's articulated model suffers from two major defects that prevent it from measuring damages in a manner consistent with Plaintiffs' theory of liability. Specifically, Plaintiffs (1) fail to articulate how they will disaggregate the price impact of the unquestionably true portions of the press releases at issue and (2) fail to set forth a method for calculating price inflation dissipation that is accurate and consistent with their theory of liability.

---

[4] "Q. The analysis you're doing to determine whether or not there was leakage, that occurs prior to actually measuring the change in stock price that you're attributing to the leakage; is that right? . . . A. I think those two things go hand in hand. I think they both take place at the same time. Q. So in determining that there was leakage, you are relying to a certain extent on the price decline that occurs? A. Yes."

[5] This differs from a specific disclosure model where corrective disclosure dates are identified by the *content of the disclosure*, and then statistical models are used to determine whether there was a statistically significant price movement at all following the disclosure.

2.    Plaintiffs' Measure of Front-End Price Inflation Does Not Control for Confounding Information Contained in the Allegedly Misleading Press Releases.

As explained above, Plaintiffs' leakage theory assumes that *all* stock price declines from June 26, 2020 through July 6, 2020 are attributable to the leakage of the truth, and are therefore recoverable. Because Dr. Cain has essentially assumed back-end price inflation dissipation based solely on stock price movement, it is vital that Plaintiffs accurately calculate front-end price inflation on June 25, 2020 and June 26, 2020, so as not to overestimate damages. Specifically, Plaintiffs' damages model must identify and account for confounding news released the same day as the alleged misrepresentations, so that the measure of price inflation correctly measures the alleged fraud, and only the alleged fraud. *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 190-91 (D. Mass. 2012) (rejecting loss causation model which "fail[ed] to disaggregate the effects of confounding factors" and instead "blamed it all on the defendants"), *aff'd sub nom. Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82 (1st Cir. 2014).

Plaintiffs fail to control for confounding information on either June 25 or June 26, 2020, the dates Plaintiffs describe as "inflation-creating events." M-W Report ¶¶ 36-47. Specifically, Plaintiffs fail to acknowledge—or else simply ignore—that this is a case in which the press releases at issue undoubtedly contained true information in addition to the alleged misrepresentations or alleged exaggerations. Yet, Plaintiffs fail to control for any confounding information, instead improperly attributing *the entire stock price increase* on each day to the alleged fraud.[6]

a.    *Plaintiffs Fail to Disaggregate or Control for the True Portions of the June 25, 2020 Attwill Release.*

Plaintiffs' expert report boldly asserts that there was no "confounding information" on June 25, 2020 and, therefore, no information "needs to be disaggregated from the price increase on this

---

[6] While this analysis may "overlap with the merits" of Plaintiffs' claims, the Court nonetheless must consider at class certification how this evidence impacts the question of predominance. *Hatamian*, 2016 WL 1042502, at *3. Indeed, "[c]ourts routinely reject price premium methodologies under *Comcast* when the proposed methodologies do not attempt to isolate the premium due only to the allegedly misleading marketing statement." *Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417, 464 (S.D.N.Y. 2023) (citations omitted).

date." Cain Merits Rep. ¶ 128.[7]  This conclusory "judgment call as to confounding information without any methodological underpinning" fails to satisfy Plaintiffs' burden under *Comcast*. *Bricklayers*, 752 F.3d at 95; *Glickenhaus*, 787 F.3d at 422 (expert may not simply "offer a conclusory opinion that no firm-specific, nonfraud related information affected the stock price"); *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 5794873, at *13 (N.D. Cal. Nov. 6, 2014) ("[I]t is not enough for [plaintiffs] to just say that the [damages model] controls for other factors; [they] must show the Court that the model can.").  In any event, based on the plain language of the Attwill press release, and the Court's prior rulings, Plaintiffs are clearly wrong.

Plaintiffs allege that the Attwill press release was misleading because it gave investors "the materially misleading impression that Vaxart stood at the precipice of pioneering a successful coronavirus vaccine."  *See* Dkt. 182 at 8.  Even if a fact-finder agrees, the Attwill press release *also* truthfully disclosed that Vaxart had signed a Memorandum of Understanding ("MOU") with Attwill.  Yet, *none* of the daily increase in Vaxart's stock price on June 25, 2020 is attributed by Dr. Cain to the disclosure of that important, newsworthy information.  Cain Merits Rep. ¶ 128.

The undisputed testimony from multiple Vaxart witnesses is that Vaxart's MOU with Attwill was a significant milestone, notwithstanding Plaintiffs' allegations that Attwill lacked the then-current ability to actually tablet a billion doses.  This is because of a key step in the manufacturing process that Attwill—and only Attwill—could immediately provide: lyophilization (*i.e.*, freeze-drying).  *See* Rubin Decl., Ex. D (Attwill 30(b)(6) Transcript) at 50:8-52:7.[8]  Unlike traditional vaccine manufacturers who can keep their vaccines in liquid form until they are injected, ███████████████████████████████████████████████████████████████

---

[7] Although Plaintiffs exclude $0.17 per share of the price increase (less than 6%) from the price premium calculation on June 25, they do so *not* because of confounding information, but simply to ensure that price inflation does not exceed the price declines over the leakage period and corrective disclosure events.  Cain Merits Rep. ¶ 129.

[8] ████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
████████████████████

███████████████████████. Rubin Decl., Ex. E (Tucker Transcript) at 40:16-41:17. ████

███████████████████████████████████████████████████████

██████████████████████████████████ *Id.* at 41:18-42:8.

████████████████████████████████████████████████

*Id.* at 42:9-24.  As Vaxart's Chief Science Officer, Sean Tucker, testified,█████████

████████████████████████████████████████████████

███████████████████████████████. He further explained:



*Id.* at 119:18-120:12.  Vaxart's CEO Andrei Floroiu likewise recognized that,██████████

████████████████████████████████████████████████

████████████████████████ Ex. F at 130:13-131:1.  Given this

evidence, there is no doubt that the announcement of a MOU with one of the largest providers of

lyophilization services in the world was material news for a company such as Vaxart█████████

████████████████████████████████████████████████

███████████████████████ Ex. D at 50:8-52:7; 76:6-16; 102:23-103:21.

This concededly true component of the press release should have, but was not, disaggregated in

order to calculate price inflation.[9]

It was Plaintiffs' burden under *Comcast* to explain how it would disaggregate the true

information contained in the Attwill Release.  *See Hubbard v. BankAtlantic Bancorp, Inc.*, 688

F.3d 713, 726 (11th Cir. 2012) (plaintiffs must explain how they will exclude confounding news

---

[9] To be clear, Armistice Defendants are not suggesting—certainly not at this procedural posture of the case—that the true statements in the press release or the importance of the Attwill MOU rendered the Attwill press release not materially misleading, or that the allegedly misleading portion of the press release did not itself have a price impact.  But even assuming *arguendo* that certain aspects of the Attwill press release, drafted and issued by Vaxart, were false or misleading, the MOU and Attwill's lyophilization capabilities unquestionably also constituted material information which, on its own, likely impacted the stock price.

in order to "prove the amount of damages owed to the plaintiff"). This was not an impossible task. For example, Dr. Cain could have surveyed vaccine or pharmaceutical developers who announced their intent to enter into significant manufacturing contracts and assessed the typical stock price reaction. Plaintiffs also could have engaged an expert on the vaccine manufacturing process to opine on the significance of mass lyophilization capabilities (Dr. Cain had never even heard of the term). Ex. C at 416:11-417:21. Plaintiffs chose to do nothing. *Freitas v. Cricket Wireless, LLC*, 2022 WL 3018061, at \*5 (N.D. Cal. July 29, 2022) ("There are several methods of damages analysis that one can employ to control for confounding variables . . . Plaintiff has not employed any of them. Because plaintiff's damages model does not even attempt to control for confounding variables, it fails *Comcast* . . ."). Because Plaintiffs' attribution of the entire June 25, 2020 stock price increase to the misleading aspect of the Attwill press release—the alleged implication that Vaxart stood at the precipice of imminently developing a vaccine—ignores that some portion of that increase was likely caused by the (indisputably true) fact that Vaxart had an agreement with a major lyophilizer, Plaintiffs' damages theory fails to track their theory of liability.[10]

> b. *Plaintiffs Fail to Disaggregate or Control for the True Portions of the June 26, 2020 OWS Release.*

Plaintiffs likewise entirely fail to control for potential confounding news on June 26, 2020, the day of the OWS Release. As the Court recognized at the class certification hearing, it is "obvious" that the press release, in the "fine print" (*i.e.*, the body of the press release), disclosed true information: namely, Vaxart's invitation to participate in a government-sponsored NHP study. Dkt. 357 at 39:12-22.[11] Dr. Cain concluded that this true news did not constitute confounding information, and he therefore attributed the entire stock price increase on June 26, 2020 to the

---

[10] In fact, not only did Plaintiffs put forth no such method of disaggregation in their damages model, but Plaintiffs' expert admitted at his deposition that he does not even have an idea for how to perform this disaggregation analysis. Ex. C at 414:19-415:12 ("If I come up with some sort of empirical sample to test, then it's merely something I would consider. But off the top of my head, the hypothetical that I think you're trying to describe just doesn't seem very logical to me.")

[11] Plaintiffs acknowledge that they have no personal knowledge as to whether the NHP study was in fact an OWS testing program or whether it was "organized and funded" by OWS. *See* Rubin Decl., Ex. J (Plaintiffs' Reponses to Interrogatories at 21, 23).

allegedly false portion of the press release, namely, that Vaxart had been "selected for Operation Warp Speed" and stood on the precipice of imminently developing a vaccine. *Id*. Notably, he reached this flawed conclusion despite the fact that Vaxart's stock price at the end of the class period—when Plaintiffs acknowledge the public fully understood the truth—was still over $11, *eighty percent higher* than it was immediately prior to the OWS Release.[12] This stock price pattern does not resemble that of a stock price bump caused entirely by the misleading aspect of the OWS press release. Yet, Plaintiffs made the flawed decision to treat it as such.

Unlike with respect to his analysis of the Attwill Release, Dr. Cain's Merits Report at least pays lip service to the possibility that the invitation to the NHP study might constitute confounding information. Dr. Cain claims that he analyzed whether "an *invitation* to a [NHP] study (as opposed to reports on a study's outcome *results*) . . . would be expected to result in a significant increase in stock price," ultimately concluding that it would not. Cain Merits Rep. ¶ 138 (emphasis original). However, as explained below, Dr. Cain's flawed analysis of this question lacks any support and, if anything, suggests the opposite conclusion.

In rejecting the NHP study invitation as confounding information, Dr. Cain opined that while "study outcome *results* can be economically important information or value-relevant information for investors," the "mere . . . ***initiation of or invitation to an NHP*** study is not in and of itself value-relevant information to investors." Ex. C at 467:22-468:10.[13] But Dr. Cain offers no evidence to support his speculative assertion. Dr. Cain describes an exercise in which he claims to have located only one other company—Inovio Pharmaceuticals—that issued a press release in connection with the initiation of an NHP study, and that Inovio's press release did not result in a significant price increase. Cain Merits Rep. ¶ 138. But Plaintiffs' reference to Inovio is flawed in

---

[12] In fact, the stock price was over $12 when Boyd and Maher left the board of directors in January 2021.

[13] Notably, Dr. Cain several minutes later in his deposition appeared to abandon that opinion. Ex. C at 483:6-11. "Q. Are you offering an opinion in this case that a company dosing the first monkey in an NHP study would not be material information generally? A. Ultimately I've not formed an opinion one way or another on that question."

two ways: First, Dr. Cain acknowledges that the Inovio press release itself contained confounding information, rendering speculative any inferences to be drawn from the NHP portion of the release. Ex. C at 464:1-15; M-W Report ¶ 45. Second, the Inovio press release *stated that Inovio had been selected for OWS*, just like Vaxart's OWS Release. Cain Merits Rep. ¶ 44 n.74. Thus, the lack of market reaction to the Inovio press release does not even purport to isolate the "non-fraudulent" component of the OWS Release (if anything, the lack of stock price movement cuts against Plaintiffs' theory of materiality in the case).

Dr. Cain's opinion that companies do not issue press releases disclosing the initiation of NHP studies (as opposed to the results of those studies) is also flawed because he did not specifically assess the materiality of NHP studies *that were funded by the U.S. government*. While the initiation of a *company*-funded NHP study might not be impactful to investors, the U.S. government's decision during a global pandemic to shell out millions to pay for monkeys and a lab to test Vaxart's vaccine candidate could very well signal to the market that those involved in Operation Warp Speed believed in Vaxart's science. *See* Ex. E at 75:16-77:11; Rubin Decl., Ex. G (Biehn Transcript) at 198:14-200:23.[14] Notably, only four companies were invited to participate in the specific OWS-funded NHP study at issue in this case, and three of them (Vaxart, Inovio, and NantKwest) issued press releases announcing the invitation. Rubin Decl., Ex. I (Sinha Transcript) 35:6-36:7, 60:18-62:6; M-W Report ¶¶ 45-46. As Dr. Marietta-Westberg observed in her report, NantKwest's press release specifically stated that NantKwest had been selected as "*one of the 14 companies* [*not* five or eight] for Operation Warp Speed," and its stock price nonetheless experienced a significant increase on that news. Moreover, following a published interview several days later when NantKwest's founder clarified that NantKwest had been invited for an NHP study only—and not to receive any immediate, direct government funding—its stock price continued to experience growth. M-W Rep. ¶ 46.

---

[14] This was also the view of Lead Plaintiff Wei Huang, who testified that ███████████████████████████████████████████████ Rubin Decl., Ex. H (Huang Transcript) at 106:9-107:11, 136:12-21, 137:11-138:2.

In support of his conclusion that "the mere initiation of or invitation to an NHP study is not in and of itself value relevant information for investors," Dr. Cain also relied on testimony and documents from Vaxart witnesses.  Specifically, Dr. Cain's conclusion that the NHP study does not constitute confounding information relies on the purported fact that "internally, Vaxart personnel did not view the mere invitation to an NHP study as constituting material non-public information or warranting a press release."  Cain Merits Rep. ¶ 138; Ex. C at 468:18-469:12.  On this point, Dr. Cain and Plaintiffs are simply wrong.  As Dr. Cain was forced to admit at his deposition, not a single one of the seven exhibits and transcripts cited for this proposition even remotely suggests that any Vaxart employee believed the NHP invitation was immaterial, or that Vaxart did not believe a press release was warranted until it had obtained results from the NHP study.[15]  To the contrary, these exhibits and transcripts make clear that ███████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████          *See, e.g.*, Rubin Decl., Ex. K, Rubin Decl., Ex. L.[16]

Dr. Cain and Plaintiffs' reliance on the statement that "Vaxart personnel did not view the mere invitation to an NHP study as constituting material non-public information or warranting a press release" also conveniently ignore the unrefuted testimony of Vaxart CEO Andrei Floroiu on this subject.  Floroiu testified unambiguously that ████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ Ex. F at 52:19-53:1.  Dr. Cain admits he did not even read this transcript, despite citing Floroiu in

---

[15] *See* Ex. C at 476:17-25; 483:17-486:2; 493:14-494:10; 499:1-500:18.

[16] Dr. Cain's treatment of these exhibits highlights the results-oriented and advocacy-laden nature of his testimony.  As just one example, to support of his conclusion that Vaxart's personnel did *not* view the invitation to the NHP study as material, he cites an email from Vaxart's PR firm to Floroiu, ████████████████████████████████████████████████████████████.  Yet Dr. Cain did not look for, and was not provided, with Floroiu's *answer* in the next email in the thread, in which Floroiu states ███████████████████████████████████.  Ex. C at 493:14-498:25; Rubin Decl., Ex. M.

particular as someone who believed the NHP invitation was *immaterial*. Ex. C. at 515:1-10; Cain Merits Rep. ¶ 138 & n.260. Having opened the door to the relevance of this testimony by relying on the views of "Vaxart personnel" to support their decision not to control for confounding information on June 26, Plaintiffs should not be able to escape how those witnesses actually testified.

In sum, Dr. Cain's and Plaintiffs' decision not to treat the NHP study invitation as potentially confounding information is based on a fatally flawed surveying of irrelevant data and citations to fact witness testimony that blatantly misrepresents how Vaxart's employees actually testified. As Dr. Marietta-Westberg's Report makes clear, a government-funded NHP study, through a program which (at worst) was associated with Operation Warp Speed, should have been analyzed as potentially value-relevant news to be controlled for to enable Plaintiffs' calculated price inflation to measure only the fraudulent statement. M-W Report ¶¶ 42-47. Plaintiffs' failure to do so renders their calculated front-end price inflation divorced from their theory of liability.[17]

3.    Plaintiffs' Back-End Measure of Loss Causation is Unsupported and Fails to Match Their Theory of Liability.

In addition to failing to correctly control for confounding news on the dates of the two alleged misrepresentations, Plaintiffs' damages model fails to set forth, with evidence, the manner in which the truth entered the marketplace. *See Tesla*, 2022 WL 7374936, at *8 n.6 (leakage model must "show [the] mechanism for how the truth was revealed"). Instead, relying on vague platitudes like "divergence of opinions" or "investor confusion" (Cain Merits Report ¶ 147; Mot. at 2), Plaintiffs attribute *every* stock price decline to the revelation of the fraud. In doing so, Plaintiffs' damages model improperly dispenses with proof of loss causation, ignores confounding news, and yields absurd results. And, the only corrective disclosures that Plaintiffs do identify—all of which relate to Armistice's sales of Vaxart stock—likewise do not satisfy their burden of proof.

---

[17] Once again, Armistice Defendants are not arguing at this procedural posture the OWS press release was not misleading or that the allegedly misleading portion of the press release did not itself have a price impact.

        a.     *Plaintiffs' Attribution of All Stock Price Declines to the Leakage of the Truth is Unsupported And Leads to Absurd Results*

Plaintiffs attribute every instance of Vaxart's stock declining between June 26, 2020 and July 6, 2020 as being *wholly* explained by the truth being leaked to the market. This includes intra-day price declines on June 26, 2020 and June 29, 2020. Although this approach is clearly designed to maximize damages, it is unsupported and fails to tie into Plaintiffs' theory of the case.[18]

Those few courts that have recognized the leakage theory as conceptually viable have required plaintiffs "to show *how* the truth was revealed to the market." *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *12 (E.D. Pa. Sept. 3, 2010) (emphasis added); *Bear Stearns*, 2016 WL 4098385, at *9 (rejecting leakage theory because, "sans evidence," it improperly "eliminates the loss causation requirement"). For example, in *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195 (N.D. Okla. 2007), *aff'd*, 558 F.3d 1130 (10th Cir. 2009), plaintiffs' expert proposed a leakage theory opining that, although the first specific corrective disclosure was on January 29, 2002, the truth "slowly leaked into the market" prior to that date "through various sources of information." *Id*. at 1254. The court rejected the leakage theory, holding that the expert had simply "assume[d] leakage of the relevant truth" and had not "identified any corrective disclosures before January 29, 2002 other than to insist, meaninglessly, that corrective disclosures occurred 'every day.'" *Id*. at 1266-67. The Tenth Circuit affirmed. In relevant part, it held:

> A plaintiff cannot simply state that the market had learned the truth by a certain date and, because the learning was a gradual process, attribute all prior losses to the revelation of the fraud. The inability to point to a single corrective disclosure does not relieve the plaintiff of showing how the truth was revealed; he cannot say, "Well, the market *must* have known."

---

[18] In part, Plaintiffs' newly minted damages theory suffers from the fact that Plaintiffs themselves do not appear to have a stable definition of the "truth" that they believe was leaking to the market. Dr. Cain himself proclaimed that he did not know what Armistice Defendants' counsel meant when he used the term "the truth." Ex. C at 323:4-9. At various times throughout this litigation, Plaintiffs appear to insinuate that the "truth" was that (1) Vaxart had not received massive federal funding; (2) Vaxart was not one of the "finalists" for massive OWS funding; (3) the NHP Study was not actually part of OWS; (4) the NHP Study *was* part of OWS but was not a big deal; or (5) Vaxart was not on the precipice of imminently developing a successful vaccine. The inability to articulate clearly what the alleged "truth" that entered the market consisted of makes it particularly problematic to assume that all price declines resulted from the leakage of the truth.

*Williams*, 558 F.3d at 1138.  The same fatal flaw exists here.  Although Dr. Cain attempts to attribute loss causation to "divergent opinions published by financial analysts and journalists" (Cain Merits Rep. ¶ 42), this type of vague hypothesizing falls far short of specifically identifying the mechanism by which the truth entered the market.  *See Sloman v. Presstek, Inc.*, 2007 WL 2740047, at *11 (D.N.H. Sept. 18, 2007) (rejecting allegations of leakage that were "entirely unsubstantiated" and "speculative"); *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *13 (C.D. Cal. Feb. 6, 2014) (holding that the "sentiment" that the market must have figured out the fraud is "simply is not enough to sufficiently plead loss causation") (citing *Katyle v. Penn Nat'l Gaming Inc.*, 637 F.3d 4762, 477 (4th Cir. 2011)).

Plaintiffs' back-end calculus of loss causation also fails to account for confounding news during the week-long period of leakage.  As Dr. Marietta-Westberg explains, during the alleged leakage period, positive news about Vaxart's competitors Pfizer and BioNTech likely caused a negative impact on Vaxart's stock price.  M-W Report ¶¶ 48-50.  At least one public article linked this positive news to the negative stock price reaction of other vaccine developers, including Vaxart.  *Id.*  Dr. Cain's attribution of the entire stock price decline to generalized leakage and his ignoring of this confounding information renders his damages model inadequate.  *Williams*, 558 F.3d at 1142 (rejecting damages model which assumed "that all negative information about [defendant] was a revelation of the fraud" and failed "to separate fraud-related from non-fraud-related losses"); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) ("[T]he law requires the disaggregation of confounding factors, [and] disaggregating only some of them cannot . . . establish that the alleged misrepresentations actually caused Plaintiffs' loss"), *aff'd*, 597 F.3d 501 (2d Cir. 2010); *In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1374 (N.D. Ga. 2010).

While Dr. Cain's damages model is inadequate for the entire leakage period, his reliance on intra-day stock price movements on June 26, 2020 and June 29, 2020 (which generates the majority of Plaintiffs' potential damages) poses particular problems for Plaintiffs and leads to absurd and nonsensical results.  To illustrate, Vaxart's stock reached a high trading price of

approximately $14 early in the day on June 26, 2020.  Cain Merits Report ¶ 148.  Dr. Cain's damages model then assumes that any price movement during the intra-day trading on June 26, 2020 represents varying price inflation resulting from the leakage of the truth to the market.  Ex. C at 432:25-433:5.  In other words, if the stock price was trading at a specific time during the day at 20 cents higher than the closing price, that would mean that there was price inflation at the time of 20 cents more than the closing price inflation.  And if the stock were trading at a different specific time at a price 20 cents lower than the closing price, that would mean that price inflation at that time was 20 cents less than the closing price inflation.  Dr. Cain takes the same approach for intra-trading on June 29, 2020.  What this means, in effect, is that Dr. Cain holds the "but for" price of Vaxart stock constant (assuming that "but for" the fraud Vaxart's stock price would have remained unchanged throughout the day) and attributes every stock price movement throughout the day to price inflation being either removed from, or added to, Vaxart's stock price.

This methodology is flatly inconsistent with reality and fails to measure damages in a manner consistent with Plaintiffs' theory of liability.  By holding the "but-for" price of Vaxart constant, Plaintiffs ignore the daily fluctuations in Vaxart's stock price that are driven by movements in the overall market or by the public market of pharmaceutical companies.  Ex. C at 434:13-439:5; M-W Report ¶¶ 51, 52.[19]  Of greater concern, Plaintiffs' "everything is price inflation dissipation" approach yields absurd results.  For example, because Vaxart's stock price did not continuously decline throughout the day on June 26, 2020 but, instead, occasionally increased, some individuals who purchased *earlier* in the day would paradoxically be entitled to *less damages* than those who purchased later—an outcome inconsistent with Plaintiffs' theory of gradual leakage throughout the day.  An egregious example of this occurs with those who purchased Vaxart stock first thing in the morning on June 29, 2020 who, under Plaintiffs' damages model, are entitled to approximately 35% *greater* damages than someone who purchased at the

---

[19] Although Dr. Cain accounts for market and industry indices when it comes to the calculation of *daily* returns, he conspicuously ignores them when it comes to the calculation of intraday returns which, again, generate the majority of Plaintiffs' damages.  Ex. C at 438:17-439:5.

end of the day on June 26, 2020, notwithstanding the fact that the market had the entire weekend to digest the truth and unquestionably was better informed on June 29, 2020 than on June 26, 2020. Ex. C at 557:2-562:21.[20]  Dr. Cain has no explanation for these drastic swings in price inflation that punish earlier buyers, claiming that there is no "analysis that is required on a minute-by-minute basis . . . to explain every bouncing up and down of the stock price" (despite the fact that he relies on minute-by-minute changes to calculate damages).  Ex. C at 443:3-444:6.

> *b.*    *Armistice's Sales Cannot Explain Leakage of the Truth.*

Besides the conclusory "investor confusion" and "divergent opinions," the only concrete mechanism of loss causation or leakage that Plaintiffs point to are Armistice's sales of Vaxart stock on June 26, 2020 and June 29, 2020.  Plaintiffs link Armistice's sales to dissipation of price inflation both on the days the sales actually occurred, as well as for a week-long period after Armistice publicly disclosed the sales after-market on June 30, 2020.

Despite the fact that Armistice's sales were not publicly disclosed until June 30, 2020, Plaintiffs label Armistice's sales as "corrective disclosures" that occurred on June 26, 2020 and June 29, 2020 on the theory that market makers and arbitrageurs can "infer the nature or identities of large traders in the marketplace, and react accordingly—for example, by lowering their bids to purchase stock when they believe an informed trader may be selling based on information unavailable to other investors."  Cain Merits Rep. ¶ 149.  But Dr. Cain performed no "analysis or studies to determine whether or not any of the market makers or arbitrageurs trading in Vaxart shares on June 26, 2020 actually did infer the identity of Armistice as the source of major trades."  Ex. C at 548:4-9.[21]  In reality, it is equally plausible that supply and demand drove down the price of Vaxart's stock (as millions of additional shares were offered in the market), without any

---

[20] In a different context, Dr. Cain admits that intervening weekends enable the truth to be better understood by the market.  Ex. C at 343:12-23.

[21] To support Plaintiffs' theory that the market could ascertain Armistice's identity, Dr. Cain cites the deposition transcript of Armistice's head trader.  Cain Merits Rep. ¶ 150.  But the head trader's testimony was that ███████████████████████████████████████████████████████████████ ███████████████████████████████████████    The testimony thus refutes, not supports, Plaintiffs' theory.

corrective information ever reaching investors. Plaintiffs' labeling of the sales as corrective disclosures is, therefore, entirely theoretical and unsupported by the facts of this case. *Nguyen v. Radient Pharms. Corp.*, 2014 WL 1802293, at *7 (C.D. Cal. May 6, 2014) (short sale activity was "at best speculative evidence" of leakage that did not support application of the theory).

Moreover, even if Plaintiffs could bridge this gap and establish that market makers could deduce that Armistice was behind the June 26, 2020 and June 29, 2020 stock sales, that information is still not *corrective*. *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *16 (N.D. Cal. Dec. 22, 2016) (rejecting, at class certification, disclosures that were "not corrective of [the alleged] misrepresentations"). At best, Dr. Cain has testified that Armistice's sales (if they could somehow be inferred on June 26 and 29, 2020) were "value relevant," but Plaintiffs fail to make the separate showing that the sales were "corrective of one or more prior false statements or omissions." *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024) (describing these as two separate requirements). Other than rampant speculation, investors would have no way to know *why* Armistice was selling, *e.g.*, whether they were doing so on the basis of inside information and, if so, whether that information even related to the Attwill or OWS press releases. *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 667 (5th Cir. 2004) (disclosure was not "corrective" where plaintiffs failed to make a "showing that the allegedly false, positive information was related to the negative information released").

For similar reasons, Plaintiffs' efforts to allege leakage throughout the first week of July 2020 based on Armistice's June 30, 2020 Form 4 disclosure miss the mark. Not only were the stock price movements the first two trading days after the SEC filing not statistically significant,[22] but these stock price movements suffer from the same defect, as Plaintiffs fail to disaggregate any

---

[22] M-W Rep. ¶ 77 n.171. Dr. Cain attempts to overcome this lack of statistical significance by claiming that investors were preoccupied by the Fourth of July holiday. Cain Merits Rep. ¶ 160. But the first trading day following the Form 4 was July 1, a full three days before the July 4 holiday. Dr. Cain cites no academic or economic support for the notion that the truth takes longer to enter the market during periods of time that remote from federal holidays.

revelation of the truth from the general stock price depressing effect of an institutional investor disclosing a near-complete exit from its ownership position in the company.

          4.     <u>Plaintiffs Have Not Demonstrated that Section 20A Damages Can Be Established on a Classwide Basis.</u>

Dr. Cain summarizes the statutory damages provision and asserts that he is able to calculate the profits that Armistice earned as a result of their June 2020 sales. Cain Merits Rep. ¶¶ 180-186. This mere recitation of the statutory text falls short of a "rigorous analysis" to ensure that Plaintiffs' damages model is "consistent with [their] liability case." *Comcast*, 569 U.S. at 35.

Dr. Cain also misinterprets the plain language of Section 20A, making his conclusions unreliable. Specifically, Dr. Cain assumes that damages can be calculated based on Armistice's "profits gained based on market prices," which would calculate damages by subtracting the price that Armistice acquired its Vaxart shares from the price at which it sold them. Cain Merits Rep. ¶¶ 183-184. But the "profits gained" language in Section 20A represents a damages *cap*, not a damages measure. *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 203 (S.D.N.Y. 2015) ("The limitations on damages found in Section 20A(b) are just that—limitations on damages."). Plaintiffs' 20A damages must be calculated through the same price-inflation methodology as Plaintiffs' Section 10(b) claims (narrowed by the contemporaneousness requirement), meaning that the same methodological problems discussed above apply to Plaintiffs' 20A claims.

## B.    If the Class Is Certified, Which It Should Not Be, The Class Period Must Be Substantially Shortened.

If the Court is inclined to grant this motion in any respect, the Class Period should be substantially shortened. *See In re Toll Roads Litig.,* 2018 WL 4945531, at *5 (C.D. Cal. Oct. 3, 2018) (courts "have the discretion to narrow a class to bring it within the requirements of Rule 23") (citing *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1238 (9th Cir. 2001)).

Notably, despite the Court's expressed concerns over a weeks-long class period in light of the unique facts and circumstances of this case, Plaintiffs continue to press their luck and advocate for a class period extending until the July 25, 2020 *New York Times* article. But given the nature

of the alleged misrepresentations (with the truth allegedly contained in the body of the press release), the information environment throughout the day on June 26, 2020, and the pattern of Vaxart's stock price movement, the class period should end no later than June 26, 2020.

        1.    <u>If the Class is Certified, The Class Period Must End on June 26, 2020.</u>

As explained below, investors who purchased Vaxart stock after June 26, 2020 did so when the truth was already known to the market. Armistice Defendants have thus rebutted price impact with respect to purchases made after June 26, 2020 by "sever[ing] the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . . ." *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988); *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *11 (S.D. Cal. Mar. 20, 2023). Likewise, a damages model that extends beyond June 26, 2020 fails *Comcast* because Plaintiffs cannot establish either price inflation or loss causation once the truth was already known to the market. *See Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020).

As an initial matter, the informational environment on June 26, 2020 makes clear that any price impact associated with the Attwill Release or the OWS Release would not extend beyond that date. Indeed, in trying to establish leakage on June 26, 2020, Dr. Cain himself relies on the fact that "[n]umerous financial news outlets reported on the Selected-for-OWS Press Release" on June 26, 2020. Cain Merits Rep. ¶ 89. Vaxart's announcements, especially the OWS Release, were extensively covered by media outlets throughout the day. Even before the market opened at 9:30 a.m. on June 26, 2020, several outlets had published stories on Vaxart's invitation to participate in an NHP study. While the wording of each story varied, these articles generally reported that Vaxart would be testing its vaccine candidate in an NHP study, that the NHP study was organized and funded by the Trump Administration's "Operation Warp Speed," and that the purpose of the study was to evaluate the efficacy of Vaxart's oral vaccine candidate. *See* MW-Report Ex. 2.[23] After the market opened and Vaxart's stock price increased to a high of $14, its

---

[23] *See, e.g.*, *Dow Jones Industrial News*: reporting that Vaxart's vaccine candidate "has been selected to take part in a non-human primate challenge study funded by the U.S. government's 'Operation Warp Speed' program" and that the study was "designed to evaluate the efficacy of the candidate"; *Reuters*: reporting that Vaxart "would test its potential COVID-19 vaccine on monkeys

stock price generally decreased throughout the day on June 26, 2020 while additional publications continued to report on the NHP selection. *See Id*. None of these news articles reported on any funding awards to Vaxart or stated that Vaxart had secured any funding beyond the expenses associated with the NHP study. *Id*. Following this flurry of news, Vaxart's stock price closed at approximately $8 per share, notably, *the same price it was trading at two months later at the end of August 2020*, when Plaintiffs acknowledge there was no price inflation.

Given this extensive news coverage and the ubiquitous reporting that Vaxart was invited only to a government-funded NHP study—and the conspicuous *lack* of reporting that Vaxart would receive tens of millions of dollars or that it was one of the "finalists" most likely to receive funding—it would be illogical to conclude that the market misunderstood Vaxart's OWS status as of the opening trading bell on June 29, 2020. *Qualcomm*, 2023 WL 2583306, at *13. Where "[p]ublic announcements" are made on a particular subject, "the Court is required [under the efficient market theory] to assume that the market had already absorbed that information[.]" *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 274 (N.D. Tex. 2015).[24]

Notably, in their Motion, Plaintiffs fail to put forth any evidence that the effect of the fraud persisted into the trading day of June 29, 2020.[25] To the contrary, by June 29, 2020, news outlets were clearly, and correctly, reporting on Vaxart's status in OWS. For example, a *Genetic Engineering and Biotech* article outlined Vaxart's "select[ion] for a[n NHP] study organized and

in a study organized by the Trump Administration's vaccine-acceleration program called 'Operation Warp Speed'.

[24] Critically, both experts in this case are in agreement that the truth may have fully entered the market even if some less sophisticated investors were still in the dark. Indeed, Dr. Cain acknowledges that in an efficient market, the truth can be fully absorbed and reflected in the stock price "even if some or even most investors are not subjectively aware of it, provided that a sufficient number of participants in the stock market have access to that information and are willing to trade on it." Ex. C at 335:8-15. Given the repeated disclosure and commentary throughout June 26 regarding Vaxart's NHP selection, it is highly unlikely that sophisticated arbitrageurs would not have recognized any mispricing in the stock resulting from the allegedly misleading press releases and driven the stock price down by selling. M-W Report ¶ 62.

[25] Plaintiffs also allege that price inflation was dissipated, in part, based on Vaxart's silence in the face of media inquiry. None of these alleged media inquiries occurred after June 26, 2020, further supporting June 26, 2020 as an appropriate end date for the class period.

funded by Operation Warp Speed," explained that "[f]ourteen of the 100+ vaccine candidates in development against COVID-19 were under study by Operation Warp Speed when it was announced on May 15," and clearly caveated that Vaxart was ***not*** one of the recently-reported "five vaccine candidates[] most likely to produce a vaccine for the virus" that had won varying amounts of funding from BARDA totaling more than $2 billion."  M-W Rep. ¶ 69 & n.153.

Bolstering this evidence is the fact that, for a week after June 26, 2020, Vaxart's stock price did not decrease in any given trading day in a manner statistically different from zero.  On June 29, 2020, Vaxart's stock price decreased but only to statistical significance at the 80% confidence level, far below any scientific threshold.  Cain Merits Rep. ¶ 156.  And on June 30, 2020, Vaxart's stock price *increased*, which Dr. Cain interpreted to mean that there was no leakage.  The stock price then decreased on July 1, 2020 and July 2, 2020, but not to a level of statistical significance. Even accepting Plaintiffs' assertion that leakage started again on July 1, 2020, the notion that the relevant truth about Vaxart's NHP study—which according to Plaintiffs was the subject of a storm of media attention—would simply take a break from leaking on June 30, 2020 and then resume leaking the following trading day borders on the nonsensical.  *See* Ex. C at 574:5-19.[26]

2.    At The Absolute Latest, the Class Period Should End on July 6, 2020.

Plaintiffs admit that no leakage occurred between July 7 and July 25, 2020.  Thus, the question of whether the class period can extend beyond July 6, 2020 turns on whether the "decline in stock price" on July 27, 2020 "can be attributed, in whole or in part, to a corrective disclosure." *FibroGen*, 2024 WL 1064665, at *12.  It cannot, for several reasons.

Although Dr. Cain's event study ostensibly finds a statistically significant price decline on July 27, 2020, this result is not robust in light of *ad hoc* and results-oriented choices that Dr. Cain

---

[26] Dr. Cain's efforts to attribute this "resumed" leakage to Armistice's filing of SEC Form 4s after hours on June 30 also fails for the reasons discussed *supra* Section III.A.3.b.

makes.[27]  Dr. Marietta-Westberg explains how if these unsupported methodological choices are reversed, the stock price reaction on July 27, 2020 is statistically insignificant.  M-W Report ¶ 77.

Second, the July 25, 2020 *New York Times* article did not contain any new, corrective information.  When asked at his deposition to describe the corrective information in the *New York Times* article, Dr. Cain pointed to the fact that Vaxart had not entered into a funding agreement with the government and was not actively negotiating one.  Ex. C at 601:1-25.  But given the flurry of media reports about the NHP study on June 26, 2020—and the lack of any reporting about Vaxart receiving tens of millions of dollars in funding—it would be unreasonable to conclude that the market on July 24, 2020 was still under the impression that Vaxart was on the precipice of receiving significant government funding untethered to the NHP Study.  As noted above, the information Plaintiffs allege was disclosed by the corrective disclosures—that Vaxart was lagging behind other vaccine developers, was months away from clinical studies, and had no guarantee of receiving federal funding—had already been disclosed in the weeks before the *New York Times* article.  *See Qualcomm*, 2023 WL 2583306, at *13 (price impact rebutted where information was "public prior to the corrective disclosures") (citing *Amgen*, 568 U.S. at 458).

Third, even if Plaintiffs could overcome the lack of price impact and establish that there was *some* corrective aspect of *New York Times* article, Plaintiffs fail to set forth a damages model

---

[27] Specifically, Dr. Cain, for the first time in any expert report, utilized a 40-day "estimation period" in his event study, an estimation period one-third the length of what Dr. Cain has described as the "common" choice of 120 days.  Dkt. 311-2 ¶ 66 n.66.[27]  Dr. Cain also excluded certain days from the estimation window prior to running his regressions without adequate justification.  *See* Dkt. 318 at 14-17.  Dr. Cain's report provides no explanation for how he chose those "additional news days," nor did Dr. Cain do any work to analyze or confirm that those dates should be excluded.  *Id.*  Instead, as part of his "iterative process" of selecting the "additional news days," Dr. Cain improperly considered how the removal of certain days would affect his ultimate results.  *Id.*; *see Brown v. China Integrated Energy Inc.*, 2014 WL 12576643, at *8 (C.D. Cal. Aug. 4, 2014) (criticizing market efficiency expert who made decisions about which dates to include in event study by "look[ing] to the market's reaction to the information" rather than through "objective criteria").  Removing dates from the estimation window had the effect of overstating statistical significance (Dkt. 318 at 16-17), so this results-oriented approach is particular troubling.  *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 618 (C.D. Cal. 2009) ("[U]nless the expert uses articulable objective criteria, it is difficult to evaluate the probative value of expert evidence without evaluating also the expert's own credibility.").

that can be used to isolate those damages attributable to the corrective aspects of the article. To the contrary, Dr. Cain assumes that the *entirety* of the post *New York Times* article price movement resulted from the disclosure of new, corrective information. But as the Court noted in its decision on the initial motion for class certification, Vaxart's stock price decline on July 27, 2020 was undoubtedly caused, at least in part, by "the kind of negative news story about a company in a major publication that will often cause a temporary stock drop—even if the story reveals no information that the market hadn't already absorbed." Dkt. 374 at 10. Indeed, "negative characterizations" of previously disclosed information "are among the 'tangle of factors' that plaintiffs must distinguish to prove that any loss was caused by the alleged fraud." *Omnicom*, 541 F. Supp. 2d at 554 (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005)). Thus, even if there were "shreds of new information" in the article, the failure to disaggregate those portions resulting from "negative commentary about facts already known to the market" is fatal to Plaintiffs' damages model. *Id*; *see also Phillips v. Sci.-Atlanta, Inc.*, 489 F. App'x 339, 343 (11th Cir. 2012) (where "negative characterization" in a news article "was not disaggregated at all by Plaintiffs," there was "no basis[] in the record by which any fact-finder could sufficiently determine that the revelation of the [fraud] satisfied the pertinent causation requirement").[28]

## IV.  **CONCLUSION**

Defendants respectfully request the Court deny Plaintiffs' motion for class certification. In the alternative, the class period should be shortened as described above.

//

//

---

[28] Plaintiffs may argue that the *New York Times* article's and/or HHS's negative characterizations of Vaxart's conduct was a proximate and foreseeable result of the corrective disclosures, and are thus themselves corrective. A similar argument was advanced, and rejected, by Judge Chen in a recent decision, in which the court held that "the FDA's *reaction*" to negative information "cannot properly be characterized as a corrective disclosure because it was not previously known to Defendants and did not contradict a previously uncorrected misstatement." *FibroGen*, 2024 WL 1064665, at *13. "Without a method to calculate damages that takes this into account," the court held that plaintiffs had not established that damages could be tied to plaintiffs' theory of liability as to that corrective disclosure date. *Id*. at *16.

Dated: August 27, 2024                      AKIN GUMP STRAUSS HAUER & FELD LLP


                                            By:     */s/ Neal R. Marder*
                                                    Neal R. Marder
                                                    Attorney for ARMISTICE CAPITAL, LLC,
                                                    ARMISTICE CAPITAL MASTER FUND,
                                                    LTD., STEVEN J. BOYD, and KEITH
                                                    MAHER, M.D.