# Exhibit A

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

In re VAXART, INC. SECURITIES
LITIGATION

Master Case No. 3:20-cv-05949-VC

<u>CLASS ACTION</u>

# EXPERT REPORT OF JENNIFER MARIETTA-WESTBERG, PH.D.

# AUGUST 27, 2024

# Table of Contents

I. Qualifications, Assignment, and Compensation ................................................................ 1

II. Summary of Allegations, Cain Efficiency Rebuttal Report, and Cain Merits Report ........ 3

    A. Summary of Allegations ....................................................................................... 3

        1. Alleged Misrepresentations .................................................................. 4

        2. Alleged Corrective Disclosure Events .................................................. 6

    B. Summary of the Cain Efficiency Rebuttal Report ................................................. 7

    C. Summary of the Cain Merits Report ..................................................................... 8

III. Summary of Opinions ..................................................................................................... 11

IV. Dr. Cain's Damages Model for Common Stock Is Flawed, Unreliable, and Still Cannot
Measure Only the Economic Losses Stemming from the Alleged Misrepresentations in
This Matter ........................................................................................................................ 14

    A. Dr. Cain's Calculation of Artificial Inflation ..................................................... 15

    B. Dr. Cain Has Not Provided a Methodology That Can Account for the Impact on
Vaxart Common Stock of Confounding Information Unrelated to the Alleged
Misrepresentations ............................................................................................. 18

        1. Attwill Press Release ........................................................................... 19

        2. OWS Press Release .............................................................................. 20

        3. Corrective Disclosure Dates ................................................................ 23

    C. Dr. Cain Has Not Demonstrated What Specific Information Related to the Alleged
Misrepresentations Was Revealed by the Armistice Stock Sales on June 26, 2020
and June 29, 2020 and the Form 4 Disclosure on June 30, 2020 .......................... 25

    D. Dr. Cain's Damages Model Suffers from Additional Flaws and Relies on *Ad Hoc*
and Unsupported Assumptions ........................................................................... 27

V. Based on My Review of Publicly Available Information about Vaxart's COVID-19
Vaccine Program, Dr. Cain's Finding of a Statistically Significant Residual Return on
July 27, 2020 Is Inconsistent with His Opinion That Vaxart Common Stock Traded in an
Efficient Market ................................................................................................................ 29

    A. Evidence That Allegedly Corrective Information Was Publicly Available before
July 25, 2020 Is Inconsistent with a Statistically Significant Residual Return on
July 27, 2020 If Vaxart's Stock Traded in an Efficient Market ............................ 30

    B. The Cain Event Study Model Remains Flawed and Based on *Ad Hoc* and
Arbitrary Assumptions, and Hence Does Not Produce Reliable Results .............. 37

VI. Dr. Cain's Analysis of Market Efficiency for Vaxart Options Continues to Be Flawed and
Unreliable .......................................................................................................................... 42

VII.    Dr. Cain's Damages Methodology for Vaxart Options Is Flawed and Still Cannot Measure Only the Economic Losses Stemming from the Alleged Misrepresentations in This Matter....................................................................................................... 46

VIII.   Dr. Cain's Section 20A Damages Methodology Based on Stock Price Inflation Still Cannot Measure Only the Economic Losses Stemming from the Alleged Misrepresentations in This Matter ................................................................................. 49

# I.     Qualifications, Assignment, and Compensation

1.      I am a Vice President at Cornerstone Research, an economic and financial consulting firm.  At Cornerstone Research, I consult with clients on economic and financial issues arising in litigation and regulatory investigations in financial markets and provide economic analyses pertaining to various topics, including equity and bond trading, financial reporting, valuation, market making, asset management, and mergers and acquisitions.

2.      I previously submitted an expert rebuttal report in this matter on January 26, 2024 (the "Marietta-Westberg Rebuttal Report" or "my Rebuttal Report"),[1] which includes a summary of my Securities and Exchange Commission ("SEC"), consulting, academic, and litigation experience.  A current copy of my curriculum vitae and a list of my deposition and trial testimony over the last four years are attached as **Appendix A**.  In my Rebuttal Report, I responded to the analyses and opinions provided in the expert report of Dr. Matthew D. Cain dated December 1, 2023 (the "Cain Efficiency Report").[2]  Specifically, I was asked to evaluate (i) whether Dr. Cain has demonstrated that Vaxart, Inc. ("Vaxart" or the "Company") options traded in an efficient market during the period from June 15, 2020 through August 19, 2020; and (ii) whether Dr. Cain has put forth a methodology for calculating damages on a class-wide basis for both Vaxart common stock and options in a manner that is consistent with Plaintiffs' theory of liability in this matter.[3]

3.      Dr. Cain submitted a rebuttal report dated March 7, 2024 (the "Cain Efficiency Rebuttal Report")[4] in which he purports to rebut opinions provided in my Rebuttal Report.  The Court subsequently denied certification of the proposed class, without prejudice, in an order dated July 2, 2024 ("Order Denying Motion for Class Certification")[5] and allowed Plaintiffs to submit a renewed motion for class certification.[6]  In response to this order, and as part of Plaintiffs'

---

[1] Expert Report of Jennifer Marietta-Westberg, Ph.D. dated January 26, 2024.
[2] Expert Report of Matthew D. Cain, Ph.D. dated December 1, 2023.
[3] Marietta-Westberg Rebuttal Report, ¶ 7.
[4] Expert Rebuttal Report of Matthew D. Cain, Ph.D. dated March 7, 2024.
[5] Order Denying Motion for Class Certification, *In re Vaxart, Inc. Securities Litigation*, Master Case No. 3:20-cv-05949-VC, July 2, 2024.
[6] Plaintiffs' Notice of Motion and Renewed Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel, *In re Vaxart, Inc. Securities Litigation*, Master Case No. 3:20-cv-05949-VC, July 30, 2024 ("Plaintiffs' Renewed Motion for Class Certification").

Renewed Motion for Class Certification, Dr. Cain submitted an expert report dated July 30, 2024 (the "Cain Merits Report") in which he was asked to assess "merits issues."[7]

4.      I was asked by counsel for Armistice Capital, LLC and Armistice Master Fund, LTD (together "Armistice") and the named individual defendants (collectively, and with Armistice, the "Armistice Defendants") to review and respond to the Cain Efficiency Rebuttal Report and the Cain Merits Report.  Specifically, I was asked to respond to Dr. Cain's opinions and analysis in those two reports as they relate to his conclusions that (i) Vaxart common stock traded in an efficient market between June 25, 2020 and July 24, 2020 ("Proposed Class Period"); (ii) Vaxart options traded in an efficient market during the Proposed Class Period; (iii) damages in this matter for Vaxart common stock and Vaxart options "can be calculated on a class-wide basis subject to common methodologies for Plaintiffs' pending Section 10(b), 20(a), and 20(A) claims"; and (iv) "[t]here are several common methodologies for determining damages for the subset of Class members [] with insider trading claims under Section 20A."[8]  I was also asked to evaluate Dr. Cain's finding of statistical significance provided in both the Cain Efficiency Rebuttal Report and the Cain Merits Report pertaining to Vaxart's stock price movement on July 27, 2020 following the publication of the July 25, 2020 *New York Times* article.[9]

5.      In its Order Denying Motion for Class Certification, the Court found that Plaintiffs "have failed to show that damages can be measured on a class-wide basis."[10]  As part of Plaintiffs' Renewed Motion for Class Certification, the Cain Merits Report puts forth Dr. Cain's proposed damages models for Vaxart common stock and options, including the quantification of artificial inflation, and also addresses (i) whether the alleged misrepresentations in this matter "contained value-relevant information that investors would consider economically material"; (ii) whether there is an "economic link" between the alleged misrepresentations and the "revelation of the relevant truth"; and (iii) "whether corrective information or events revealing the truth concealed by the alleged misrepresentations, omissions, and/or schemes caused any artificial inflation in the price of Vaxart Securities to dissipate."[11]  I have been asked to respond to Dr. Cain's opinions on

---

[7] Expert Report of Matthew D. Cain, Ph.D. dated July 30, 2024, ¶ 3.
[8] Cain Merits Report, ¶ 1.
[9] I understand that the Court views the statistical significance of Vaxart's residual stock price return on July 27, 2020 as "debatable."  *See* Order Denying Motion for Class Certification, p. 12.
[10] Order Denying Motion for Class Certification, p. 11.
[11] Cain Merits Report, ¶¶ 3.a, 3.b.

these issues in order to evaluate the reliability of Dr. Cain's damages models. I reserve the right to offer other opinions at the merits stage of this litigation, in the event that the proposed class is certified.

6.      In formulating the conclusions and opinions set forth in this report, I have relied on my knowledge, my prior experience, my academic research on relevant topics, and my formal training in economics and finance as well as the analyses set forth in this report. A list of documents, data, and other information that I have considered in forming the opinions set forth in this report is attached hereto as **Appendix B**. I reserve the right to revise my opinions in light of my ongoing review of the materials I have considered, as well as additional materials, including data, documents, and deposition or other testimony that may subsequently come to light, or if I am asked to perform further research or analysis.

7.      Cornerstone Research is being compensated at my standard billing rate, which is currently $1,030 per hour. I have been assisted in this matter by staff at Cornerstone Research, who worked under my direction. Neither my compensation nor the compensation of Cornerstone Research staff who assisted me is affected by the outcome of this matter.

## II.      Summary of Allegations, Cain Efficiency Rebuttal Report, and Cain Merits Report

### A.      Summary of Allegations

8.      I understand that Plaintiffs allege that Vaxart made false and misleading statements and omissions ("alleged misrepresentations") during the Proposed Class Period regarding the Company's COVID-19 vaccine program, and that "the Armistice Defendants exerted meaningful control over Vaxart and/or the drafting of the [alleged] false and misleading statements."[12] Plaintiffs claim that the Company's alleged misrepresentations inflated Vaxart securities prices during the Proposed Class Period and "allow[ed] Armistice to unload its Vaxart holdings for approximately $267 million in unlawful insider sales."[13]

---

[12] Plaintiffs' Corrected Second Amended Consolidated Class Action Complaint, *In re Vaxart, Inc. Securities Litigation*, Master Case No. 3:20-cv-05949-VC, June 29, 2023 ("Complaint"), ¶ 250.
[13] Complaint, ¶ 2.

9.     Following Plaintiffs' Renewed Motion for Class Certification, the Proposed Class Period was shortened from June 15, 2020–August 19, 2020 to June 25, 2020–July 24, 2020.[14]  Under the shortened Proposed Class Period, Plaintiffs allege that misrepresentations made in Vaxart's June 25, 2020 and June 26, 2020 press releases "artificially inflated … the prices for Vaxart Securities."[15]  Plaintiffs also allege that artificial inflation "was decidedly ***not*** constant throughout the [Proposed] Class Period … but in fact began to partially, and materially, dissipate ***within hours*** after the OWS Press Release [on June 26, 2020] hit the wires."[16]  Plaintiffs further claim that Vaxart's stock price movements during the Proposed Class Period are consistent with "leakage," which they define as "the theory that, over time, skepticism grew, and increased negative pressure on the artificially inflated prices of Vaxart Securities until it was fully dissipated."[17]  Specifically, according to Dr. Cain's purported leakage theory, the relevant truth "leaked" during the period from June 26, 2020 through July 6, 2020.[18]  Plaintiffs claim that this artificial inflation did not completely dissipate until after the final alleged corrective disclosure on July 25, 2020.[19]

### 1.     Alleged Misrepresentations

10.     Plaintiffs allege misrepresentations on two dates during the Proposed Class Period:

   a.  June 25, 2020:[20]  On this day, Vaxart issued a press release (the "Attwill Press Release") titled "Vaxart, Inc. Signs Memorandum of Understanding [("MOU")] with Attwill Medical Solutions Sterilflow, LP [("Attwill")], Enabling Production

---

[14] Complaint, ¶ 1; Plaintiffs' Renewed Motion for Class Certification, p. i.

[15] Plaintiffs' Renewed Motion for Class Certification, p. 3, footnote 12.

[16] Plaintiffs' Renewed Motion for Class Certification, p. 1 (emphasis in original).

[17] Plaintiffs' Renewed Motion for Class Certification, p. 6.

[18] *See, e.g.*, Deposition of Matthew D. Cain, Ph.D., dated August 13, 2024 ("Cain Merits Deposition"), 354:2–10 ("[L]ooking at the information environment from June 25th all the way through July 27th … it's actually fairly clear, fairly obvious, that there was leakage of the relevant truth into the stock price starting on June 26th around 9:40 [AM] through the close and then [through July 6th].", 620:25–621:4 ("So in this case there's actually a complete overlap of a leakage theory and a corrective disclosure theory of artificial inflation being dissipated from June 26th through July 6th.").  *See also* Cain Merits Report, ¶¶ 21, 143, 144, footnote 64; Plaintiffs' Renewed Motion for Class Certification, pp. 13–14.

[19] Plaintiffs' Renewed Motion for Class Certification, p. 4.

[20] On this day, Andrei Floroiu (Vaxart's CEO) presented at an H.C. Wainwright Virtual Fireside Chat Series. During his presentation, Mr. Floroiu stated that "there may be some other news on other fronts, partnering and so on that will release whenever they happen."  Plaintiffs allege that this statement was a "preview to building the excitement for" Vaxart's June 26, 2020 alleged misrepresentation.  *See* Complaint, ¶¶ 179, 182; Plaintiffs' Renewed Motion for Class Certification, p. 3, footnote 12.

of A Billion or More COVID-19 Vaccine Doses Per Year Through Large Scale Lyophilization, Tableting and Coating," in it "declaring that the Company had signed an MOU with Attwill 'to manufacture a billion or more doses per year' of Vaxart's COVID-19 vaccine."[21] Plaintiffs allege that Vaxart "misleadingly suggested that Vaxart was close to production of a vaccine" and that "Defendants knew, or should have known … [that] Attwill did not have the critically necessary FDA certifications to manufacture any doses of Vaxart's COVID-19 vaccine and lacked the personnel and operational capabilities to manufacture a billion or more doses as well."[22]

b. June 26, 2020: Before market open on this day, Vaxart issued a press release (the "OWS Press Release") stating that:

> [Its] oral COVID-19 vaccine has been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed, a new national program aiming to provide substantial quantities of safe, effective vaccine for Americans by January 2021.
>
> The study is designed to demonstrate the efficacy of Vaxart's oral COVID-19 vaccine candidate.[23]

Plaintiffs allege that Vaxart misrepresented that it was selected for Operation Warp Speed ("OWS") and "dramatically overstated"[24] its involvement with OWS "because, at the time [the statements] were made, Vaxart was not selected for OWS … [and because Vaxart referenced] the billions in funding OWS-selected companies would receive, even though Vaxart at the time was positioned to receive none."[25]

---

[21] Complaint, ¶¶ 172, 232.
[22] Complaint, ¶¶ 172, 175. *See also* Plaintiffs' Renewed Motion for Class Certification, p. 3, footnote 12; Cain Merits Report, ¶¶ 119–130.
[23] "Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed," *Vaxart*, June 26, 2020.
[24] Complaint, ¶¶ 24, 188.
[25] Complaint, ¶ 235. *See also* Plaintiffs' Renewed Motion for Class Certification, p. 3, footnote 12; Cain Merits Report, ¶¶ 119, 131–142.

## 2. Alleged Corrective Disclosure Events

11.     According to the section of Plaintiffs' Renewed Motion for Class Certification titled "Plaintiffs' Theories of Inflation and Loss Causation," Plaintiffs allege three corrective events (the "Corrective Disclosure Events"[26]) during the Proposed Class Period.  Two of those Corrective Disclosure Events occurred during a purported "leakage period" from June 26, 2020 to July 6, 2020, under "the theory that, over time, skepticism grew, and increased negative pressure on the artificially inflated prices of Vaxart Securities until it was fully dissipated"[27] on the final Corrective Disclosure Event on July 25, 2020:

a.    June 26, 2020 and June 29, 2020:  On these two days, Armistice exercised Vaxart warrants and sold the corresponding shares (the "Armistice Stock Sales").[28] Plaintiffs allege that the Armistice Stock Sales "exerted downward pressure on Vaxart's stock price" and caused "the inflation introduced by the alleged fraud … to dissipate."[29]

b.    June 30, 2020:  On this day, Plaintiffs allege that "[a]dditional prior inflation from the false statements also came out of Vaxart's stock price when on June 30, 2020, after the market closed, Vaxart filed with the SEC a Form 4 disclosing the two-day large series of sales of Vaxart stock on June 26 and [June] 29[, 2020] by Armistice."[30]  Plaintiffs claim that the information in this Form 4 (the "Form 4 Disclosure") caused Vaxart's stock price to fall (i) on July 1, 2020; (ii) on July 2, 2020, as it "was further digested by the market leading up to the Fourth of July holiday weekend"; and (iii) on July 6, 2020, after "Zacks Investment Research downgraded Vaxart from a 'hold' rating to a 'sell' rating after [purportedly] seeing the insider sales."[31]

---

[26] *See* Cain Merits Report, ¶ 21 ("I identified an event as a Corrective Disclosure Event, including the diffusion/leakage of the relevant truth into Vaxart Common Stock prices, if it revealed relevant information about the alleged misstatements, omissions, and/or schemes.").
[27] Plaintiffs' Renewed Motion for Class Certification, p. 6.
[28] Complaint, ¶¶ 27–28.
[29] Cain Merits Report, ¶ 152; Plaintiffs' Renewed Motion for Class Certification, pp. 4, 13–14.
[30] Complaint, ¶ 248.
[31] Complaint, ¶ 248.  *See also* Plaintiffs' Renewed Motion for Class Certification, pp. 3–4, 13–14.

c. July 25, 2020: On this day, Plaintiffs allege that "[t]he truth about Defendants' manipulative scheme was partially revealed in a *New York Times* article … [which] stated that 'Vaxart [was] not among the companies selected to receive significant financial support from Operation Warp Speed to produce hundreds of millions of vaccine doses'"[32] and highlighted "Armistice's concurrent stock sales."[33] On the same day as the publication of this article (the "*New York Times* Disclosure"), the Department of Health and Human Services published the following message on its Twitter page (the "HHS Tweet"):

> The US Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers and we are negotiating with others. *Neither is the case with Vaxart.*[34]

Plaintiffs claim that the *New York Times* Disclosure and HHS Tweet "dissipated the final remaining amounts of fraud-related artificial inflation in the price of Vaxart Common Stock."[35]

## B. Summary of the Cain Efficiency Rebuttal Report

12. Dr. Cain responds to my Rebuttal Report in the Cain Efficiency Rebuttal Report and asserts that my Rebuttal Report has not changed any of his opinions in the Cain Efficiency Report. As such, he continues to assert that (i) "the market for shares of Vaxart [] Common Stock was efficient throughout the [Proposed] Class Period," (ii) "the market for Vaxart Options was efficient through the [Proposed] Class Period," (iii) "damages in this matter can be calculated on a class-wide basis subject to a common methodology under Section 10(b)" for both Vaxart common stock and options, and (iv) "the Court has a choice among common methodologies for determining damages for the subset of Class members with insider trading claims under Section 20A."[36] Dr. Cain's responses to my Rebuttal Report are organized across

---

[32] Complaint, ¶ 30. *See also* Plaintiffs' Renewed Motion for Class Certification, p. 4.
[33] Complaint, ¶ 30.
[34] Complaint, ¶ 215 (emphasis in original).
[35] Plaintiffs' Renewed Motion for Class Certification, p. 4.
[36] Cain Efficiency Rebuttal Report, ¶¶ 1, 9.

three main categories of opinions:  market efficiency for Vaxart options, Dr. Cain's *Cammer* Factor 5 event study, and the out-of-pocket methodology for calculating damages in this matter.[37]

13.     In addition, Dr. Cain offers a "price impact" analysis in which he purportedly evaluates whether the "alleged misrepresentations or alleged corrective disclosures were followed by statistically significant changes in Vaxart's Common Stock price, and whether there is a logical economic link between the alleged misrepresentations and alleged corrective disclosures pled in the Complaint."[38]  In his price impact analysis, Dr. Cain provides a modified version of his *Cammer* Factor 5 event study model, which he also utilizes in the Cain Merits Report.[39]

14.     I summarize and respond to Dr. Cain's rebuttal opinions regarding my critiques of his *Cammer* Factor 5 event study in **Sections IV** and **V**.  I similarly summarize, and respond to, Dr. Cain's rebuttal opinions pertaining to my critiques of his opinion that Vaxart options traded in an efficient market in **Section VI**.  In the Cain Merits Report, Dr. Cain now offers a methodology for calculating damages in this matter.  I provide a summary of the Cain Merits Report below.

### C.     Summary of the Cain Merits Report

15.     In response to the Order Denying Motion for Class Certification, Dr. Cain submitted the Cain Merits Report.  In that report, Dr. Cain continues to opine that the markets for Vaxart common stock and Vaxart options were "efficient throughout the [Proposed] Class Period."[40]  Dr. Cain also proposes to calculate damages for each share of Vaxart common stock using his "out-of-pocket" method as "the artificial inflation per share at the time of purchase less artificial inflation per share at the time of sale (or artificial inflation at the time of purchase if the share was not ultimately sold)."[41]  Moreover, Dr. Cain proposes a methodology for measuring artificial inflation over the Proposed Class Period.

16.     Dr. Cain states that if the Attwill Press Release and the OWS Press Release (together, the "Vaxart Press Releases") "gave investors the misleading impression that Vaxart stood at the

---

[37] Cain Efficiency Rebuttal Report, Sections IV–VI.
[38] Cain Efficiency Rebuttal Report, Section VII, ¶ 81.
[39] Cain Merits Report, ¶ 109 ("After carefully reviewing and considering the relevant information environment for purposes of assessing loss causation and damages in this report, I have utilized the same event study methodology as that performed in my prior Efficiency Rebuttal Report.").
[40] Cain Merits Report, ¶ 14.
[41] Cain Merits Report, ¶ 176.

precipice of pioneering a successful coronavirus vaccine,"[42] then (i) the Vaxart Press Releases "introduced artificial inflation into the market prices of Vaxart Common Stock" on June 25, 2020 and June 26, 2020 (the "Inflation Creating Dates");[43] and (ii) certain events "partially dissipated artificial inflation from the market prices of Vaxart Common Stock" on June 26, June 29, July 1, July 2, July 6, and July 27, 2020 (the "Corrective Disclosure Dates")."[44] Dr. Cain relies on the event study that he proposed in the Cain Efficiency Rebuttal Report (the "Cain Event Study Model") to measure the evolution of artificial inflation over the Proposed Class Period.[45] For example, Dr. Cain calculates the amount of inflation dissipated based on the residual price declines in Vaxart common stock on each Corrective Disclosure Date. I describe Dr. Cain's calculation of artificial inflation in detail in **Section IV.A**.

17.     Dr. Cain also offers additional opinions on "merits issues" related to the economic importance of the alleged misrepresentations, a purported "economic link" between the alleged misrepresentations and corrective disclosures, and a methodology for calculating artificial inflation and damages for Vaxart common stock and Vaxart options.[46] I provide a summary of each of these additional opinions related to "merits issues" below.

18.     Dr. Cain opines that the alleged misrepresentations in the Vaxart Press Releases "were economically material to investors in Vaxart Securities."[47] For the purposes of his expert report,

---

[42] *See* Cain Merits Report, ¶ 127 ("[I]f the Attwill Press Release gave investors the misleading impression that Vaxart stood at the precipice of pioneering a successful coronavirus vaccine which could quickly have a 'billion or more doses' manufactured (and, with the Selected-for-OWS Press Release, bolstered the misimpression that Vaxart had been 'selected' as one of a handful of finalists for OWS), then the Attwill Press Release introduced artificial inflation into Vaxart's Common Stock."), ¶ 137 ("[I]f the Selected-for-OWS Press Releases, individually and/or collectively with the Attwill Press Release, gave investors the misleading impression that Vaxart stood at the precipice of pioneering a successful coronavirus vaccine which had been 'selected' as one of a handful of vaccine finalists the U.S. Government was focusing on as part of OWS's goal to have substantial quantities of a safe and effective vaccine available for Americans by January 2021, then the Selected-for-OWS Press Release introduced artificial inflation into Vaxart's Common Stock (in addition to potentially artificially maintaining the price of Vaxart Common Stock prior to the Press Release's publication).").
[43] Cain Merits Report, ¶ 119.
[44] Cain Merits Report, ¶ 143. *See also* Cain Merits Report, ¶ 158 ("[I]f Defendants are found to have engaged in schemes including that the Attwill and Selected-for-OWS Press Releases, individually and/or collectively, gave investors the misleading impression that Vaxart stood at the precipice of pioneering a successful coronavirus vaccine … then the Armistice Sales dissipated/diffused/leaked a portion of the artificial inflation from Vaxart's Common Stock."), ¶ 168 ("[I]f Defendants are found to have engaged in schemes including that the Attwill and Selected-for-OWS Press Releases, individually and collectively, gave investors the misleading impression that Vaxart stood at the precipice of pioneering a successful coronavirus vaccine … then the HHS Tweet and subsequent *New York Times* article dissipated the final portion of the artificial inflation from Vaxart's Common Stock.").
[45] Cain Merits Report, ¶¶ 102–111, 118, 171.
[46] Cain Merits Report, ¶¶ 3, 15–28.
[47] Cain Merits Report, ¶ 53.

Dr. Cain defines "economic materiality" as "the importance of information to the market (and thus, investors), such that it would affect the valuation of a security."[48] Dr. Cain bases his opinion on multiple factors, including (i) "publicly available information about [OWS]," (ii) "media attention," (iii) "financial analyst commentary," and (iv) his "event study analysis."[49]

19. Dr. Cain next purports to establish an "economic link" between (i) the alleged misrepresentations in the Vaxart Press Releases, and (ii) the "subsequent economic losses that occurred following" the alleged corrective disclosures in this matter.[50] Dr. Cain opines that the "value of a security is directly related to expectations about the future cash flows to holders of that security."[51] Dr. Cain then purports to link the alleged misrepresentations in this matter to subsequent losses by opining that the Attwill Press Release contained information that might impact Vaxart's "future earnings and anticipated future cash flows."[52] Similarly, Dr. Cain opines that the OWS Press Release contained information that might impact "the anticipated success and sales, profits, and cash flows to be generated from Vaxart's vaccine."[53]

20. Dr. Cain also proposes a damages model for Vaxart options based on the Cain Event Study Model and the artificial inflation band that he calculates for Vaxart common stock. Specifically, Dr. Cain opines that damages for Vaxart options can be calculated based on either the change in market price or change in artificial inflation across Corrective Disclosure Dates for each Vaxart option. I detail Dr. Cain's calculation of artificial inflation in **Section VII**.

---

[48] Cain Merits Report, ¶ 52.
[49] Cain Merits Report, ¶ 53 ("I base my opinion of the importance of this information on: (A) publicly available information about Operation Warp Speed prior to and during the [Proposed] Class Period; (B) Company reporting and Defendants' own statements related to the development, manufacturing, and funding of Vaxart's vaccines; (C) media attention and nonpublic inquiries demonstrating that the market relied upon the alleged false statements; (D) financial analyst commentary, (E) the application of basic finance, economics, and valuation principles to Vaxart's business; and (F) my event study analysis, which establishes statistically significant increases in the prices of Vaxart Common Stock on the Inflation Creating Events as well as residual declines following the Corrective Disclosure Events.").
[50] Cain Merits Report, ¶¶ 112, 117.
[51] Cain Merits Report, ¶ 114.
[52] Cain Merits Report, ¶ 114.
[53] Cain Merits Report, ¶ 115.

### III.    Summary of Opinions

21.    My opinions, as described in the Marietta-Westberg Rebuttal Report, are unchanged.  In addition, I have reached the following conclusions:

**Dr. Cain's proposed damages model for Vaxart common stock is flawed, unreliable, and still cannot measure only the economic losses stemming from the alleged misrepresentations.**

22.    Dr. Cain's damages methodology for common stock articulated in the Cain Merits Report does not reliably isolate economic losses attributable only to the alleged misrepresentations given the specific facts and circumstances of this case.  Specifically:

      a.    Dr. Cain claims to quantify artificial inflation that was purportedly introduced into Vaxart's stock price on June 25, 2020 and June 26, 2020 following the Vaxart Press Releases, and artificial inflation that was purportedly dissipated from Vaxart's stock price following each of the Corrective Disclosure Events using an event study model.  Because Dr. Cain's event study model is only designed to control for market and industry factors, it cannot parse out any stock price impact due to confounding information, that is, company-specific news contemporaneous to the Vaxart Press Releases and Corrective Disclosure Events that is unrelated to the alleged misrepresentations.

      b.    Dr. Cain appears to recognize that Vaxart's announcement of its invitation to participate in an NHP study disclosed in the OWS Press Release may represent confounding information on June 26, 2020.  However, his conclusion that such news would not "result in a significant increase in stock price," and hence, does not "need[] to be disaggregated from the price increase [on that day]" is flawed and unreliable.  Moreover, Dr. Cain ignores evidence from other potential COVID-19 vaccine manufacturers that exhibited a stock price increase following disclosures of their selection "as one of the 14 companies for Operation Warp Speed" and an invitation to participate in an NHP study.  Thus, Dr. Cain still has not proposed a damages methodology that can reliably measure only the economic losses stemming from the alleged misrepresentations in this matter in the presence of confounding information.

c. Dr. Cain does not establish that any new, corrective information was revealed to the market by the Armistice Stock Sales and the related Form 4 Disclosure. He merely speculates, without reliable basis, that information that investors may have "inferred" from potentially observing the Armistice Stock Sales or the knowledge of the Armistice Stock Sales from the Form 4 Disclosure partially revealed the alleged truth. Thus, Dr. Cain has not articulated a damages model that can reliably quantify economic losses attributable to the alleged misrepresentations.

d. Dr. Cain's damages methodology relies on *ad hoc* and unsupported assumptions that further demonstrate he has not proposed a damages model that can reliably estimate alleged inflation consistent with Plaintiffs' leakage theory and the facts and circumstances of this case. For example, he arbitrarily limits or caps the amount of inflation that he assigns to June 25, 2020 to ensure that his estimate of total inflation introduced following the Vaxart Press Releases will equal his estimate of cumulative inflation dissipated on the Corrective Disclosure Dates. As another example, because Dr. Cain's damages methodology allows inflation on June 29, 2020 to increase and decrease with increases and decreases in Vaxart's stock price, there are periods during this trading day when inflation is introduced instead of dissipated. This intraday increase in alleged inflation is not consistent with Dr. Cain's assumption that the alleged truth "leaked" out of Vaxart's stock price on this day. Thus, Dr. Cain has not proposed a damages model that can reliably estimate alleged inflation consistent with Plaintiffs' leakage theory.

**Dr. Cain's finding of statistical significance on July 27, 2020 is inconsistent with his opinion that Vaxart stock traded in an efficient market during the Proposed Class Period.**

23. Based on my review of publicly available information about Vaxart's COVID-19 vaccine program, Dr. Cain's finding of a statistically significant residual return on July 27, 2020 is inconsistent with his opinion that Vaxart stock traded in an efficient market during the Proposed Class Period. Specifically, I discuss in my Rebuttal Report that the *New York Times* Disclosure does not appear to contain new "corrective" information related to the alleged misrepresentations regarding Vaxart's COVID-19 vaccine program. In the Cain Merits Report, Dr. Cain continues

to ignore evidence that information about the alleged truth was publicly available before the *New York Times* Disclosure. If the "relevant truth" was already disclosed in the Vaxart Press Releases, or if the "relevant truth" was already part of the total mix of publicly available information about Vaxart well before the *New York Times* Disclosure and HHS Tweet on July 25, 2020, that "truth" would have been incorporated into Vaxart's stock price quickly and at those earlier points in time in an efficient market. Indeed, the Cain Event Study Model in the Cain Merits Report continues to rely on *ad hoc* and unsupported assumptions, and according to his deposition testimony, may have been results-driven instead of objectively defined. When I correct for those *ad hoc* and unsupported assumptions and examine alternative specifications of the Cain Event Study Model, I find that Vaxart's stock price decline on July 27, 2020 is not statistically significant.

**Dr. Cain's analysis of market efficiency for Vaxart options continues to be flawed and unreliable.**

24.     Dr. Cain still has not provided any reliable analysis to support his claim that Vaxart options traded in an efficient market. He continues to ignore that market efficiency for options is a hypothesis that needs to be tested and cannot simply be presumed. His criticism of my opinions in the Cain Efficiency Rebuttal Report are unfounded, and he mischaracterizes my testimony and analysis.

**Dr. Cain's proposed damages model for Vaxart options is flawed, unreliable, and still cannot measure only the economic losses stemming from the alleged misrepresentations.**

25.     Dr. Cain has not provided a reliable methodology for measuring only the economic losses stemming from the alleged misrepresentations pertaining to Vaxart options. Because his damages methodology for options requires estimating artificial inflation and a but-for price for common stock, the same deficiencies described above regarding his damages methodology for common stock would also apply to his damages methodology for Vaxart options. Furthermore, while Dr. Cain recognizes that option-pricing models depend not only on the stock price, but also on other inputs, such as the expected volatility of the stock, he does not provide a reliable methodology for estimating a but-for implied volatility. In fact, Dr. Cain acknowledges that a decline in the stock price could result in a change in the stock's implied volatility, but he still

assumes that implied volatility (as an input to the Black-Scholes option pricing model) is the same in the but-for and actual worlds.

**Dr. Cain's proposed Section 20A damages model is flawed, unreliable, and still cannot measure only the economic losses stemming from the alleged misrepresentations.**

26.    To the extent that Section 20A damages in this matter are to be calculated based on artificial inflation, if any, then Dr. Cain's methodology suffers from the same shortcomings as his proposed out-of-pocket damages methodology described for common stock above, and as such, Dr. Cain has not provided a reliable inflation-based methodology for calculating Section 20A damages.

## IV.    Dr. Cain's Damages Model for Common Stock Is Flawed, Unreliable, and Still Cannot Measure Only the Economic Losses Stemming from the Alleged Misrepresentations in This Matter

27.    As explained in the Marietta-Westberg Rebuttal Report, I understand that Plaintiffs are required to articulate a methodology for calculating damages on a class-wide basis and in a manner consistent with their theory of liability.[54]  Moreover, in order to propose such an approach, I understand that Plaintiffs are required to articulate a methodology that can isolate economic losses attributable only to allegedly misstated or omitted information given the specific facts and circumstances of this case.  I further understand that per-share recoverable damages are limited by the per-share loss following the alleged corrective disclosure(s) that is attributable to new "corrective" information that revealed the alleged fraud, and subject to statutory limits imposed by the Private Securities Litigation Reform Act of 1995.[55]

28.    In the Cain Efficiency Report and Cain Efficiency Rebuttal Report (collectively, "Cain Efficiency Reports"), Dr. Cain merely provides general descriptions of the "out-of-pocket" damages methodology and claims—without any analysis—that it can be applied on a class-wide basis to calculate damages in this matter.[56]  In the Marietta-Westberg Rebuttal Report, I explain that Dr. Cain did not provide any specific approach to show how he would implement the out-of-

---

[54] Marietta-Westberg Rebuttal Report, ¶ 67.
[55] *Dura Pharmaceuticals, Inc., et al. v. Broudo et al.*, 544 U.S. 336 (2005); Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u–4(e); Marietta-Westberg Rebuttal Report, ¶ 67.
[56] *See, e.g.*, Cain Efficiency Report, ¶ 3.e; Cain Efficiency Rebuttal Report, ¶ 8.f.

pocket methodology in this matter, and in particular, he did not show how he could calculate artificial inflation, which is an important input to the out-of-pocket methodology.[57]  In the Cain Merits Report, Dr. Cain now claims that the Cain Event Study Model that he articulated in the Cain Efficiency Rebuttal Report can be used to calculate alleged inflation in this matter.

### A. Dr. Cain's Calculation of Artificial Inflation

29. Dr. Cain utilizes the Cain Event Study Model to estimate Vaxart's residual stock price changes on the Inflation Creating Dates (the "front-end") and Corrective Disclosure Dates (the "back-end").[58]  Using the residual stock price changes on those dates, he calculates artificial inflation that was purportedly introduced into Vaxart's stock price on June 25, 2020 and June 26, 2020 following the Attwill Press Release and OWS Press Release[59] and artificial inflation that was purportedly dissipated from Vaxart's stock price on each of the Corrective Disclosure Dates.[60]

30. Dr. Cain then calculates artificial inflation over the Proposed Class Period, in large part using a "constant dollar" method based on these residual stock price changes.[61]  Specifically, he first calculates the sum of the residual stock price changes across all of the Corrective Disclosure Dates with a negative residual return (equal to an aggregate residual dollar decline of $4.79).[62]  He assumes that this aggregate residual dollar decline of $4.79 corresponds to the amount of artificial inflation incorporated in Vaxart's stock price as of market close on June 26, 2020.[63]  Dr. Cain further estimates the artificial inflation introduced on the Inflation Creating Dates based on the sum of Vaxart's residual returns on those dates.  Since the sum of Vaxart's residual returns on June 25, 2020 and June 26, 2020 is greater than $4.79, Dr. Cain limits the amount of artificial

---

[57] Marietta-Westberg Rebuttal Report, ¶ 69.
[58] Cain Merits Report, ¶¶ 102–111.  I understand that artificial inflation refers to the difference between the actual Vaxart stock price and the "but-for price" that would have prevailed absent the alleged misrepresentations.
[59] Cain Merits Report, ¶ 111, Section VIII.
[60] Cain Merits Report, ¶ 111, Section IX.
[61] Cain Merits Report, ¶¶ 172–175.
[62] Cain Merits Report, ¶¶ 172–175, Table B, Table C.
[63] Cain Merits Report, ¶¶ 129–130, 141, Table B, Table C.

inflation introduced on June 25, 2020 to ensure that the amount of inflation created will be equal to the amount of inflation dissipated.[64]

31.     Dr. Cain then applies a back-casting methodology to apportion inflation throughout the remaining Proposed Class Period.  On or after June 29, 2020 (*i.e.*, the first Corrective Disclosure Date with a negative residual return), he assumes that artificial inflation decreases by an amount equal to the residual decline in Vaxart's stock price on each Corrective Disclosure Date.[65] Therefore, between June 29, 2020 and the end of the Proposed Class Period on July 24, 2020, Dr. Cain assumes that the amount of artificial inflation is constant between Corrective Disclosure Dates.[66]  (*See* **Exhibit 1A**)

32.     Dr. Cain also allows for the amount of artificial inflation to vary intraday on June 26, 2020 and June 29, 2020.  For example, he calculates a but-for stock price of $3.25 on June 26, 2020 equal to the difference between the closing stock price ($8.04) and the amount of artificial inflation that he estimates as of market close on that day ($4.79).  He then assumes that artificial inflation can be estimated on an intraday basis as "the difference between the [intraday] trading price and the but-for implied stock price of $3.25."[67]  (*See* **Exhibits 1B–1C**)

33.     Dr. Cain refers to his calculation of artificial inflation as a purported "leakage analysis" and notes that it is "consistent with leakage models in other cases."[68]  Dr. Cain defines "leakage" as "the removal of artificial inflation from Vaxart's [] [s]tock price, including via public corrective disclosures as well as market price impacts of the Armistice Sales and subsequent disclosure of these sales."[69]  At deposition, Dr. Cain explained that the relevant truth was revealed through "a complete overlap of a leakage theory and a corrective disclosure theory of artificial inflation being dissipated from [June 26, 2020] through [July 6, 2020]" and through "one remaining corrective disclosure event on [July 25, 2020], which is not leakage but rather a

---

[64] Cain Merits Report, ¶ 129.  Dr. Cain estimates the amount of artificial inflation introduced on June 26, 2020 to be equal to $1.90, which represents the residual return on this day from the Cain Event Study Model.  Dr. Cain estimates a residual return of $3.06 on June 25, 2020.  Summing the residual returns on June 25, 2020 and June 26, 2020 yields $4.96, which is $0.17 greater than the $4.79 of artificial inflation that Dr. Cain estimates was dissipated across all of the Corrective Disclosure Dates with a negative residual return.  As a result, he excludes $0.17 from the amount of artificial inflation introduced on June 25, 2020, which yields Dr. Cain's estimate of $2.89 in artificial inflation introduced on that date.  *See* Cain Merits Report, ¶¶ 129–130, Exhibit 3, Table B, Table C.
[65] Cain Merits Report, ¶¶ 172–175, Table C.
[66] Cain Merits Report, Table C.
[67] Cain Merits Report, ¶ 175, footnote 293, Table C.
[68] Cain Merits Report, ¶¶ 23, 144.
[69] Cain Merits Report, footnote 17.

statistically significant decline following a corrective disclosure event."[70]  Moreover, Dr. Cain stated that the leakage of the relevant truth occurred in three different ways from June 26, 2020 through July 6, 2020, namely, through "media coverage," "media outreach to Vaxart that was met with silence by Vaxart insiders," and "significant selling of shares by Armistice."[71]

34.    Despite his characterization of his damages model as a purported "leakage model" through July 6, 2020, and with the exception of his intraday analysis for June 26, 2020 and June 29, 2020, Dr. Cain's estimation of artificial inflation is based on his discrete corrective disclosure events that result in stepwise decreases in artificial inflation over time and constant inflation between those corrective disclosure events.[72]  (*See* **Exhibit 1A**)  Thus, he continues to employ a typical "constant dollar" method, where the amount of artificial inflation on each Corrective Disclosure Date (or by market close on June 26, 2020 and June 29, 2020) is based on the residual returns that he estimates using the Cain Event Study Model—the same model that he employed in the Cain Efficiency Rebuttal Report.[73]

35.    I explain below that the Cain Event Study Model does not reliably measure artificial inflation because it still does not isolate economic losses attributable only to allegedly misrepresented information given the specific facts and circumstances of this case.  For this reason, his proposed damages model is flawed and unreliable.  Hence, Dr. Cain still has not proposed a damages methodology that can measure only the economic losses stemming from the alleged misrepresentations in this matter.

---

[70] Cain Merits Deposition, 621:1–9.  *See also* Cain Merits Deposition, 354:2–10 ("[L]ooking at the information environment from June 25th all the way through July 27th … it's actually fairly clear, fairly obvious, that there was leakage of the relevant truth into the stock price starting on June 26th around 9:40 [AM] through the close and then [through July 6th]."), 360:24–361:4 ("I think here it's also important to recognize that in the first five or six trading days it's not only a leakage theory but it's also overlapping with a corrective disclosure theory, because I can point to corrective disclosures as well.").

[71] Cain Merits Deposition, 578:17–20.  *See also* Cain Merits Deposition, 530:11–16 ("Q. … You said there was news coverage, there was silence following media outreach, and there were Armistice sales.  A. Yeah"), 446:10–16 ("[T]he Armistice sales occurred throughout the course of [the] trading day [on June 26, 2020, and] they had an impact on the stock price throughout the course of that trading day, as well as the divergence of opinions, as well as the media outreach to Vaxart that was met with silence, essentially, as well as other coverages.").

[72] Cain Merits Report, ¶¶ 143–144, Table C.

[73] Cain Merits Report, ¶¶ 108–109, 143–144, 172–175, Table C.

### B. Dr. Cain Has Not Provided a Methodology That Can Account for the Impact on Vaxart Common Stock of Confounding Information Unrelated to the Alleged Misrepresentations

36.     As explained in the Marietta-Westberg Rebuttal Report, because stock prices respond to all new, value-relevant, company-specific information released on a given day, an important aspect of conducting an event study is to assess the stock price impact attributable only to the event of interest—for example, the revelation of the alleged "truth."[74]  If there are multiple pieces of company-specific news entering the market during the same event window, *the residual return from a regression would measure the impact of the total mix of information revealed during that event window*.  As such, the economist would have to account for potential confounding information that could affect the stock price relative to the impact of the event of interest, which a typical event study analysis is not designed to address.

37.     As explained above, Dr. Cain claims to quantify artificial inflation introduced into Vaxart's stock price on June 25, 2020 and June 26, 2020 following the allegedly misleading Vaxart Press Releases and any artificial inflation dissipated from Vaxart's stock price on each of the Corrective Disclosure Dates.[75]  Specifically, he calculates artificial inflation based on Vaxart's residual stock price declines on these dates using the Cain Event Study Model.

38.     Because the Cain Event Study Model is a typical event study model that only controls for market and industry factors, it cannot parse out any stock price impact due to confounding information, that is, company-specific, value-relevant news contemporaneous to the Vaxart Press Releases or Corrective Disclosure Events that is *unrelated* to the alleged misrepresentations. Below, I explain that Dr. Cain ignores or does not reliably account for confounding information. As a result, Dr. Cain has not demonstrated that he can reliably measure artificial inflation in this matter, if any, and he has not put forth a damages model that can quantify economic losses attributable only to the alleged misrepresentations in the presence of confounding information.

---

[74] Marietta-Westberg Rebuttal Report, ¶ 76.
[75] Cain Merits Report, ¶ 111, Sections VIII–IX.

## 1. Attwill Press Release

39.    Plaintiffs, in their Complaint, focus on the following statement in the Attwill Press Release as allegedly misleading:  Vaxart announced that it had partnered with Attwill "to manufacture a billion or more doses per year … of [its] COVID-19 vaccine for the US, Europe, and other countries in need."[76]  Plaintiffs claim that this allegedly misleading statement "create[d] the materially false and misleading impression that Vaxart's vaccine candidate was sufficiently promising and far enough along in development … to engage a putative manufacturer (Attwill) about producing 'a billion or more' doses of Vaxart's vaccine candidate."[77]  Similarly, Dr. Cain focuses on the "billion or more doses" language in support of Plaintiffs' claim "that Attwill lacked the regulatory capacity, personnel, and wherewithal to produce even one dose, let alone one billion."[78]

40.    However, there are portions of the Attwill Press Release that Plaintiffs do not specifically allege are misleading.  For example, the Attwill Press Release announced that Vaxart had "signed a Memorandum of Understanding with Attwill … affirming the parties' intent to establish [Attwill] as a resource for lyophilization development."[79]  I understand that Plaintiffs do not specifically point to this statement as allegedly misleading, and as such, this news represents potentially confounding information—that is, such statements could potentially explain Vaxart's stock price increase on June 25, 2020 but would not introduce inflation into the stock price.[80]

41.    If the trier of fact finds such confounding information in the Attwill Press Release to be material, the Cain Event Study Model does not parse out the stock price impact of that confounding information on June 25, 2020, because an event study is designed to measure the stock price change associated with the total mix of information disclosed on that day.  Furthermore, Dr. Cain states that he limits the artificial inflation that he purportedly quantified was introduced on June 25, 2020 as an apparent attempt to ensure that the amount of inflation

---

[76] Complaint, ¶ 20.  *See also* Complaint, ¶¶ 172, 175–177.
[77] Complaint, ¶ 20.  *See also* Complaint, ¶¶ 172, 175–177.
[78] Cain Merits Report, ¶¶ 34–36.
[79] Attwill Press Release, p. 1.
[80] For example, Plaintiffs do not claim that this excerpt was one of the "false or misleading statements" in the Attwill Press Release.  *See* Lead Plaintiff Wei Huang's Objections and Responses to the Armistice Defendants' Interrogatories to All Plaintiffs, Set Two, *In re Vaxart, Inc. Securities Litigation*, Master Case No. 3:20-cv-05949-VC, June 19, 2024 ("Plaintiff Interrogatory Responses"), p. 8.

created will be equal to the amount of inflation dissipated.[81]  While one might construe this approach as an indirect way to parse out the potential stock price impact of confounding information, I explain in **Section IV.D** below that this approach is *ad hoc* and arbitrary.  Hence, Dr. Cain has not proposed a methodology that can reliably measure alleged inflation that was introduced on June 25, 2020 in the presence of such confounding information.

## 2.    OWS Press Release

42.    In the Complaint, Plaintiffs claim the following statement in the headline of the OWS Press Release as allegedly misleading:  "Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed."[82]  Plaintiffs argue that this allegedly misleading statement "dramatically overstated the Company's involvement with OWS."[83]  Similarly, Dr. Cain focuses on the "Selected for … Operation Warp Speed" language in support of Plaintiffs' claim that Vaxart "exploited the gap in the public's knowledge about OWS and Vaxart's internal affairs by exaggerating Vaxart's role, if any, in Operation Warp Speed and the prospects for government funding."[84]

43.    However, there are portions of the OWS Press Release that Plaintiffs do not specifically allege are misleading.  For example, the OWS Press Release announced that Vaxart's COVID-19 vaccine "ha[d] been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed."[85]  I understand that Plaintiffs do not specifically point to this statement as allegedly misleading, and as such it represents potentially confounding information—that is, such statements could potentially explain Vaxart's stock price increase on June 26, 2020 but would not introduce inflation into the stock price.[86]

---

[81] Cain Merits Report, ¶ 129.
[82] Complaint, ¶ 22.  *See also* Complaint, ¶¶ 186–189.
[83] Complaint, ¶ 24.  *See also* Complaint, ¶¶ 186–189.
[84] Cain Merits Report, ¶¶ 37–38.
[85] OWS Press Release, p. 1.
[86] Plaintiffs state in the Complaint that this language "was plainly calculated to give the Defendants at least some basis to later claim that they had adequately disclosed their 'selection' was only for the NHP study."  Further, the Court held in the Order Denying Motion for Class Certification that the allegedly misleading "press releases, in smaller print, also contained truthful statements … [including] that the company was selected merely to participate in a non-human primate study."  *See* Complaint, ¶ 22; Order Denying Motion for Class Certification, p. 1.  Plaintiffs also state that they are "unable to answer the question" about whether the "Non-Human Primate Study 'was' an Operation Warp Speed vaccine testing program."  *See* Plaintiff Interrogatory Responses, pp. 20–22 ("Plaintiff is

44.     Dr. Cain appears to recognize that Vaxart's announcement of its invitation to participate in an NHP study may represent confounding information.  For example, in assessing the potential presence of confounding news on June 26, 2020, Dr. Cain states that he "evaluated whether an *invitation* to a non-human primate ('NHP') study … would typically merit a press release announcement [by other COVID-19 vaccine manufacturers], and if so, whether this would be expected to result in a significant increase in stock price."[87]  Dr. Cain identifies one company, Inovio Pharmaceuticals, in the 2020–2021 period that issued a press release announcing its invitation to participate in an NHP study and notes that Inovio's stock price did not increase (but instead declined) on the day of the press release's publication.[88]  Given the lack of an increase in Inovio's stock price, Dr. Cain concludes that there is "no economic evidence of information unrelated to the Complaint's claims that needs to be disaggregated from the price increase on this date."[89]

45.     Dr. Cain's methodology for quantifying the stock price impact of news related to the invitation to participate in an NHP study is unreliable, and he has not shown that a disclosure of an invitation to participate in an NHP study would not result in a stock price increase.  *First*, Dr. Cain does not control for confounding information that may have negatively impacted the stock price of Inovio on the day that Inovio announced its invitation to participate in an NHP study. Inovio's June 30, 2020 press release included at least two pieces of information:  (i) that Inovio's COVID-19 vaccine "ha[d] been selected to participate in a non-human primate (NHP) challenge study as part of the U.S. government's Operation Warp Speed," and (ii) Inovio reported "interim clinical data … from the first two Phase 1 clinical trial cohorts" for its COVID-19 vaccine.[90]  Public press indicates that some market participants were disappointed with the lack of detail that Inovio provided about its Phase 1 clinical trial results, which may have contributed to Inovio's

unable to answer this question. Plaintiff has no personal knowledge or belief, one way or the other, as to whether the Non-Human Primate Study 'was' an Operation Warp Speed testing program.…  Plaintiff also defers to the purportedly official characterizations by HHS and BARDA that are apparent in the document records—specifically, that: (i) Vaxart's vaccine candidate was selected to participate in preliminary U.S. government studies to determine potential areas for possible Operation Warp Speed partnership and support; and (ii) Vaxart 'participat[ed] in the non-human primate challenge study, funded by BARDA … under contract with a research laboratory and in collaboration with USG partners,' as opposed to an 'OWS non-human primate study.'").

[87] Cain Merits Report, ¶ 138 (emphasis in original).
[88] Cain Merits Report, ¶ 138, footnote 259.
[89] Cain Merits Report, ¶ 139.
[90] "INOVIO Announces Positive Interim Phase 1 Data for INO-4800 Vaccine for COVID-19," *Inovio Pharmaceuticals*, June 30, 2020, 7:30 AM ET.

stock price decline on June 30, 2020. For example, a *Genetic Engineering and Biotechnology News* article noted that the "selloff followed what reports said was disappointment among investors that INOVIO had not offered further details of the Phase I results."[91] Similarly, a *Business Insider* article noted that "[i]nvestors might be selling shares today due to a lack of information from the company" about its Phase 1 clinical trial results.[92] Dr. Cain does not control for this potentially confounding negative information about Inovio's Phase 1 clinical trial results for its COVID-19 vaccine candidate and thus cannot isolate the stock price impact of Inovio's announcement of its invitation to participate in an NHP study. Dr. Cain therefore has no basis to conclude that the invitation to participate in an NHP study would not "result in a significant increase in stock price."[93]

46.     *Second*, Dr. Cain's methodology for identifying relevant press releases by other COVID-19 vaccine manufacturers is unreliable. For example, Dr. Cain does not identify a joint press release by ImmunityBio and NantKwest on May 27, 2020, despite the fact that this press release is referenced in the Complaint.[94] In the ImmunityBio / NantKwest press release, the two companies announced that ImmunityBio had been "*selected as one of the 14 companies for Operation Warp Speed*" and that ImmunityBio and NantKwest had "signed a binding term sheet for the joint development, manufacture and marketing of vaccines and therapeutics for COVID-19."[95] In addition to this press release's statement that ImmunityBio was "one of the 14 companies" selected for OWS, a *Science* article published on June 1, 2020 reported that ImmunityBio *was invited to participate in an NHP study*.[96] NantKwest's stock price increased by 39.1% and 11.3% on May 27, 2020 and June 1, 2020, respectively.[97] Dr. Cain overlooks evidence from NantKwest's stock price increases following the announcement of ImmunityBio's selection as one of the 14 companies for OWS and the subsequent *Science* article reporting on its

---

[91] "INOVIO Reports Positive Interim Phase I Data for COVID-19 DNA Vaccine, Joins 'Warp Speed' Primate Study," *Genetic Engineering and Biotechnology News*, June 30, 2020, 3:32 PM ET.
[92] "Inovio's 860% Year-to-Date Rally Takes a Breather after the Release of Phase I Data for Company's COVID-19 Vaccine Candidate (INO)," *Business Insider*, June 30, 2020, 10:33 AM ET.
[93] Cain Merits Report, ¶ 138.
[94] Complaint, ¶¶ 118–119.
[95] "ImmunityBio & NantKwest Sign COVID-19 Joint Development, Manufacturing and Marketing Agreement; ImmunityBio Selected for 'Operation Warp Speed' to Develop Novel Adenovirus COVID-19 Vaccine," *ImmunityBio*, May 27, 2020, 12:00 PM ET (emphasis added).
[96] "Operation Warp Speed Selects Billionaire Scientist's COVID-19 Vaccine for Monkey Tests," *Science*, June 1, 2020 (emphasis added).
[97] *LSEG*.

invitation to participate in an NHP study.  Thus, he has not reliably shown that the invitation to participate in an NHP study would not "result in a significant increase in stock price."[98]

47.    As discussed in **Section V** below, I understand that NHP studies involving potential COVID-19 vaccines were one component of the OWS program.  For example, the Trump administration's announcement of the program specifically noted that, as part of OWS, "non-clinical testing will be done in parallel to the extent possible … [including that] animal models may be used to assess vaccine safety and efficacy."[99]  Given the substantial attention from market participants on the development of a COVID-19 vaccine during the global pandemic in 2020, participation in OWS (including as part of NHP trials or selection to the short list of 14 candidates) could represent economically important news for a vaccine manufacturer.[100]  If the potentially confounding information in the OWS Press Release (such as Vaxart's invitation to participate in an NHP study) were determined by the trier of fact to be material, the Cain Event Study Model cannot parse out the impact of that confounding information on Vaxart's stock price on June 26, 2020 because an event study analysis is designed to measure the stock price change associated with the total mix of company-specific information disclosed on that day. Hence, Dr. Cain has not proposed a methodology that can reliably measure alleged inflation in the presence of confounding information on June 26, 2020.

### 3.    Corrective Disclosure Dates

48.    The Cain Event Study Model also does not control for potentially confounding information on multiple Corrective Disclosure Dates.  Specifically, Dr. Cain (i) does not consider or control for positive news about Vaxart's competitors' vaccines on July 1, July 6, and July 27, 2020; and (ii) does not control for intraday changes in Vaxart's stock price due to market and industry factors on June 26, 2020 and June 29, 2020.

---

[98] Cain Merits Report, ¶ 138.
[99] "Trump Administration Announces Framework and Leadership for 'Operation Warp Speed,'" *U.S. Department of Defense*, May 15, 2020.
[100] "Bioscience Industry 'One of the Great Success Stories of the Public Markets,' Says Nasdaq CEO," *Nasdaq*, June 10, 2020, 9:05 AM ET ("The bioscience industry has flourished in recent years and has proven equally resilient during the pandemic. As companies work around-the-clock toward a COVID-19 vaccine and treatment, biotech stocks have outperformed as investors repeatedly bet on progress and innovation.").

49.    *First*, market participants commented that positive news about a competitor's vaccine could contribute to Vaxart's negative stock price change on certain Corrective Disclosure Dates. For example, on July 1, 2020, Pfizer and BioNTech published a press release reporting results from ongoing Phase 1 and Phase 2 studies of its COVID-19 vaccine, and stating that "preliminary data are encouraging."[101]  Public press articles and securities analysts commented on the "promising early data" from Pfizer and BioNTech's clinical studies.[102]  Further, at least one public press article linked this positive news to the declines in stock price of other vaccine developers, including Vaxart:  "[v]accine makers sank in early trading Wednesday after Pfizer and BioNTech reported positive data from an early-stage study of their experimental Covid-19 vaccine" and noted that Vaxart's stock price had declined by 5.1% "after the news."[103, 104]

50.    Dr. Cain has not ruled out any stock price impact due to potentially confounding competitor news.[105]  As such, he still has not provided a methodology that can reliably quantify inflation attributable to the alleged misrepresentations based on Vaxart's stock price changes in the presence of confounding information.

---

[101] "Pfizer and BioNTech Announce Early Positive Data from an Ongoing Phase 1/2 study of mRNA-based Vaccine Candidate Against SARS-CoV-2," *Pfizer*, July 1, 2020, 8:59 AM ET.

[102] *See, e.g.*, "Pfizer, BioNTech Vaccine Data Show Potential for Shot by January," *Bloomberg Law*, July 1, 2020, 12:11 PM ET; "COVID Vaccine Candidate Delivers Booster," *Morgan Stanley*, July 1, 2020.

[103] "Pfizer Vaccine Rivals Tumble After Early Study Shows Promise," *Bloomberg Law*, July 1, 2020, 9:23 AM ET.

[104] As another example, on July 6, 2020, Emergent BioSolutions published a press release in which it announced "a five-year manufacturing services agreement with … Johnson & Johnson, for large-scale drug substance manufacturing for [J&J's] investigational SARS-CoV-2 vaccine."  *See* "Emergent BioSolutions Signs Five-Year Agreement for Large-Scale Drug Substance Manufacturing for Johnson & Johnson's Lead COVID-19 Vaccine Candidate," *Emergent BioSolutions*, July 6, 2020, 6:30 AM ET.  Public press linked this deal to Emergent BioSolutions' positive stock price performance on July 6, 2020:  "Shares of Emergent BioSolutions … were up 1.1% in premarket trading on Monday after it announced a five-year deal with Johnson & Johnson."  *See* "Emergent BioSolutions Inks Coronavirus Vaccine Manufacturing Deal With J&J – MarketWatch," *Dow Jones Institutional News*, July 6, 2020, 7:56 AM ET.  Similarly, on July 26, 2020, Moderna published a press release in which it announced that it had received "an additional commitment [from the U.S. government] of up to $472 million to support late stage clinical development including the expanded Phase 3 study of the Company's mRNA vaccine candidate … against COVID-19."  *See* "Moderna Announces Expansion of BARDA Agreement to Support Larger Phase 3 Program for Vaccine (mRNA-1273) Against COVID-19," *Moderna*, July 26, 2020, 10:22 AM ET.  Public press linked this additional funding to Moderna's positive stock price performance on July 27, 2020:  "Moderna shares jumped after the biotech company announced it received an additional $472 million from the U.S. government to support the development of its potential coronavirus vaccine."  *See* "Moderna Shares Jump After U.S. Ups Funding for Coronavirus Vaccine by $472 Million," *CNBC*, July 27, 2020, 8:57 AM ET.

[105] While the Cain Event Study Model is set up to account for industry news that may affect the returns of Vaxart stock using the returns on the Nasdaq Biotechnology Industry Total Return Index, Dr. Cain fails to show that it properly accounts for any potential price impacts due to such confounding competitor news.  The Nasdaq Biotechnology Industry Total Return Index included 208 constituents as of June 2020; not all constituents had COVID-19 vaccine programs and not all biotech companies engaged in COVID-19 vaccine development were included in the index (*e.g.*, Pfizer and BioNTech were not included in the index).  *See LSEG*.

51.    *Second*, Dr. Cain does not control for intraday stock price changes attributable to market and industry factors on June 26, 2020 and June 29, 2020.  On both of these days, Dr. Cain allows artificial inflation to vary over the course of the trading day.  In particular, he calculates inflation on June 26, 2020 and June 29, 2020 as the difference between the intraday price of Vaxart common stock and a "but-for implied price," where this but-for implied price represents "the difference in the *closing price* that day and the amount of artificial inflation [he] calculated" as of 4 PM ET for that day using the Cain Event Study Model.[106]

52.    Dr. Cain's methodology implies that any intraday change in Vaxart's stock price translates to a one-for-one change in alleged inflation, regardless of any intraday changes in market-wide or industry-wide factors.  For example, if Vaxart's stock price, Dr. Cain's market index, and Dr. Cain's industry index all increase by 1% over the course of one hour from 9:30 AM to 10:30 AM on either June 26, 2020 or June 29, 2020, Dr. Cain's methodology would result in a 1% increase in artificial inflation from 9:30 AM to 10:30 AM, even though some (or all) of the change in Vaxart's stock price may be due to market-wide or industry-wide factors.  Since Dr. Cain's methodology for calculating artificial inflation on June 26, 2020 and June 29, 2020 allows inflation to vary potentially due to factors unrelated to Plaintiffs' allegations (*i.e.*, market-wide or industry-wide factors), he has not proposed a damages model that can reliably quantify economic losses attributable to the alleged misrepresentations based on the intraday stock price changes on June 26, 2020 and June 29, 2020.

**C.    Dr. Cain Has Not Demonstrated What Specific Information Related to the Alleged Misrepresentations Was Revealed by the Armistice Stock Sales on June 26, 2020 and June 29, 2020 and the Form 4 Disclosure on June 30, 2020**

53.    Dr. Cain has not established that any new and corrective information was revealed to the market by the Armistice Stock Sales on June 26, 2020 and June 29, 2020 and the related Form 4 Disclosure filed after market hours on June 30, 2020.  Dr. Cain asserts that "the Armistice Sales represented partially corrective information," citing to "[a]cademic research [that] establishes [] significant stock sales—including those by informed insiders and blockholders—exert downward pressure on stock prices."[107]  He claims these academic papers show "[m]arket makers

---

[106] Cain Merits Report, footnote 305, Table C (emphasis added).
[107] Cain Merits Report, ¶¶ 140, 149.

and trading counterparties attempt to infer the nature or identities of large traders in the marketplace, and react accordingly—for example, by lowering their bids to purchase stock when they believe an informed trader may be selling based on information unavailable to other investors."[108]   However, none of the studies that he cites provides a basis for concluding that any information that investors may have "inferred" from potentially observing the Armistice Stock Sales or the knowledge of the Armistice Stock Sales from the Form 4 Disclosure partially revealed any corrective information regarding the alleged misrepresentations.[109]   It is speculative to conclude that the Armistice Stock Sales or the Form 4 Disclosure revealed information that is "corrective" of the alleged misrepresentations, and Dr. Cain has provided no basis to support his conjecture.[110, 111, 112]   Indeed, Dr. Cain has ignored that any information that investors could have

---

[108] Cain Merits Report, ¶¶ 140, 149 (emphasis removed).

[109] Cain Merits Report, ¶¶ 143, 149.  In addition, Dr. Cain's characterization of the academic papers that he cites in the Cain Merits Report (¶ 149) is misleading.  For example, Brogaard et al. (2019) examine the price impact of market orders and limit orders by high-frequency trading firms; but the paper does not study the impact of trades by "informed insiders and blockholders."  *See* Brogaard, Jonathan, Terrence Hendershott, and Ryan Riordan, "Price Discovery without Trading: Evidence from Limit Orders," *The Journal of Finance* 74, no. 4 (2019): 1621–1658.  Similarly, the other academic papers that Dr. Cain cites show that informed trading can affect security returns, but Dr. Cain still fails to demonstrate how any of the Armistice Stock Sales revealed any corrective information regarding the alleged misrepresentations.  *See* Easley, David, Soeren Hvidkjaer, and Maureen O'Hara, "Is Information Risk a Determinant of Asset Returns?" *The Journal of Finance* 57, no. 5 (2002): 2185–2221; Easley, David, and Maureen O'Hara, "Information and the Cost of Capital," *The Journal of Finance* 59, no. 4 (2004): 1553–1583; Kaniel, Ron, and Hong Liu, "So What Orders Do Informed Traders Use?" *The Journal of Business* 79, no. 4 (2006): 1867–1913.

[110] Indeed, at his deposition, Dr. Cain stated that he has no opinion on "whether investors were able to ascertain Armistice as the identity of the seller on [June 26, 2020 and June 29, 2020]."  *See* Cain Merits Deposition, 578:21–579:2.

[111] It appears that Dr. Cain considers up to a six-day event window to measure the purported "dissipation" of artificial inflation following the June 26, 2020 and June 29, 2020 Armistice Stock Sales, and attributes this to "leakage."  If the Form 4 Disclosure contained new "corrective" information (which Dr. Cain has not demonstrated), a stock price reaction to the Form 4 Disclosure of more than one trading day is inconsistent with both (i) Dr. Cain's conclusion of market efficiency, and (ii) his *Cammer* Factor 5 event study methodology that uses daily returns in his regression model and one-day event windows (*i.e.*, he is testing whether information is being incorporated in Vaxart's stock price within a trading day).  *See* Marietta-Westberg Rebuttal Report, ¶¶ 92–93, Section VII.A.3.  *See also* Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5 (1991): 1575–1617, p. 1601 ("The typical result in event studies on daily data is that, on average, stock prices seem to adjust within a day to event announcements.").

[112] Dr. Cain claims that because the Form 4 Disclosure occurred around a major holiday (July 4), "it can take longer for information to be fully reflected in stock prices even in markets that are generally efficient" due to reduced trading volumes and investor inattention around major U.S. holidays, as purportedly shown in an academic study.  However, Dr. Cain appears to misinterpret that study, and his application of a three-day event window is unsupported.  Specifically, the Hood and Lesseig (2017) paper cited by Dr. Cain focused only on the trading days immediately adjacent to stock market holidays, which in this case would be July 2, 2020 and July 6, 2020.  Thus, under the paper's methodology, July 1—the day following the after-market June 30, 2020 Form 4 Disclosure—is not a major holiday-adjacent trading day.  As such, that paper does not support Dr. Cain's use of a three-day event window.  *See* Cain Merits Report, ¶ 160.  *See also* Hood, Matthew, and Vance Lesseig, "Investor Inattention Around Stock Market Holidays," *Finance Research Letters* 23 (2017): 217–222, p. 218.

inferred from the Armistice Stock Sales and Form 4 Disclosure could also be unrelated to the alleged misrepresentations, and hence would be confounding information.[113] As discussed in the preceding section, the Cain Event Study Model is not designed to parse out the impact of confounding information.

54. Thus, Dr. Cain still has not articulated a damages model that can reliably quantify economic losses attributable to the alleged misrepresentations.

### D. Dr. Cain's Damages Model Suffers from Additional Flaws and Relies on *Ad Hoc* and Unsupported Assumptions

55. Similar to Dr. Cain's event study analysis in the Cain Efficiency Report, Dr. Cain's damages methodology relies on *ad hoc* and unsupported assumptions. For example, there is a discrepancy in his calculation of inflation, which he addresses in an *ad hoc* manner. Specifically, Dr. Cain's back-casting damages methodology results in "excess" inflation on June 25, 2020—that is, his estimate of the amount of artificial inflation purportedly "introduced" on June 25, 2020 and June 26, 2020 is greater than the cumulative inflation that he quantifies based on the Corrective Disclosure Events. To address this discrepancy, he limits or caps the amount of inflation on June 25, 2020 in an *ad hoc* manner to ensure that his estimate of total inflation introduced will equal his estimate of cumulative inflation dissipated.[114] He provides no basis for this arbitrary approach, which only further illustrates that Dr. Cain still has not provided a methodology that can reliably measure only the economic losses attributable to the alleged misrepresentations. Indeed, if any of the Corrective Disclosure Events are found to not represent corrective disclosures—or if the measure of inflation dissipated on the Corrective Disclosure Dates, as measured by the residual returns on those dates, is reduced to account for confounding

---

[113] For example, Dr. Cain states that "the Company announced it would join the Russell 3000 Index on June 29, 2020." *See* Cain Merits Report, footnote 256. Dr. Cain has ignored that any information that investors could have inferred from the Armistice Stock Sales and Form 4 Disclosure could also be unrelated to the alleged misrepresentations, such as traders re-balancing their positions in response to Vaxart joining the Russell 3000 Index. *See, e.g.*, "What Small-Caps Should Know about the Russell Rebalance," *Nasdaq*, June 22, 2020, 10:00 AM ET ("At the end of every June, FTSE Russell rebalances its U.S. indexes during its annual reconstitution. …[C]ompanies that are added to, deleted from, or simply remain in one of the Russell 3000 indexes should expect to see higher than normal volumes on June 26. With the significant amount of capital following these indexes, many companies can see a multiple of a normal day's trading volume trade in the Nasdaq Closing Cross and in 'after-hours' trading on the reconstitution day [of June 26, 2020].").
[114] Cain Merits Report, ¶¶ 129–130, footnote 305.

information—it would require him to further arbitrarily limit or cap his calculation of inflation introduced on June 25, 2020 and June 26, 2020.

56.     Dr. Cain's purported intraday "leakage analysis" also relies on unsupported assumptions, such that his proposed damages model cannot reliably estimate artificial inflation.  As I detail above in **Section IV.A**, and as illustrated in **Exhibits 1B** and **1C**, Dr. Cain allows artificial inflation to change on an intraday basis on June 26, 2020 and June 29, 2020.[115]  According to Dr. Cain, he allows artificial inflation to vary throughout the day because he assumes that "inflation was dissipated via leakage" as a result of the Armistice Stock Sales on both of these days.[116]  This assumption is flawed.  While Dr. Cain claims that on June 26, 2020 inflation was both introduced (following the OWS Press Release) and dissipated (via the Armistice Stock Sales), he only claims that inflation dissipated on June 29, 2020 (via the Armistice Stock Sales).[117]  Assuming that artificial inflation did, in fact, "leak" out of Vaxart's stock price throughout the trading day on June 29, 2020, then it follows that artificial inflation should systematically decrease over time on that day since there were no Inflation Creating Events that day.  However, as shown in **Exhibit 1C**, Dr. Cain's damages methodology allows artificial inflation on June 29, 2020 to both increase and decrease throughout the day.  This is because Dr. Cain's damages methodology assumes that any change in Vaxart's stock price translates one-for-one into a change in artificial inflation.  Specifically, he calculates a but-for stock price of $3.20 on June 29, 2020 equal to the difference between the closing stock price ($7.49) and the amount of artificial inflation that he estimates as of market close on that day ($4.29).[118]  He then assumes that artificial inflation can be estimated on an intraday basis as "the difference between the [intraday] trading price and the but-for implied stock price of $3.20."[119]  This intraday increase in artificial inflation is inconsistent with Dr. Cain's assumption that the alleged truth "leaked" out of Vaxart's stock price over time.

57.     Similarly, Dr. Cain's purported "leakage analysis" on June 30, 2020 demonstrates that his proposed damages model cannot reliably estimate artificial inflation.  Dr. Cain holds inflation

---

[115] Cain Merits Report, ¶ 23, Table C.
[116] Cain Merits Report, ¶ 23.
[117] Cain Merits Report, ¶¶ 148–159.
[118] Cain Merits Report, ¶ 157, Table C.
[119] Cain Merits Report, footnote 293.

constant for the entire day on June 30, 2020 since Vaxart's stock price increased,[120] and its residual return is positive, on this day.[121]  Choosing to hold inflation constant for this day is inconsistent with artificial inflation "leaking" out of Vaxart's stock price between June 26, 2020 and July 6, 2020 as Dr. Cain claims,[122] and further demonstrates that he has not proposed a damages model that can reliably estimate artificial inflation consistent with Plaintiffs' leakage theory.

## V.    Based on My Review of Publicly Available Information about Vaxart's COVID-19 Vaccine Program, Dr. Cain's Finding of a Statistically Significant Residual Return on July 27, 2020 Is Inconsistent with His Opinion That Vaxart Common Stock Traded in an Efficient Market

58.    In the Cain Efficiency Rebuttal Report, Dr. Cain purports to evaluate "whether any of the alleged misrepresentations or alleged corrective disclosures were followed by statistically significant changes in Vaxart's Common Stock price" using the Cain Event Study Model and claims that there was a statistically significant decrease in the price of Vaxart common stock following the July 25, 2020 *New York Times* Disclosure and HHS Tweet.[123]  In the Cain Merits Report, Dr. Cain purports to quantify the artificial inflation that allegedly dissipated from Vaxart's stock price (based on the residual dollar return on July 27, 2020) associated with allegedly corrective information in the *New York Times* Disclosure and HHS Tweet.[124]  As discussed in **Section V.A** below, Dr. Cain's quantification of inflation is inconsistent with his opinion that Vaxart's common stock traded in an efficient market and ignores evidence that allegedly corrective information was publicly available well before July 25, 2020.  As I discuss

---

[120] *See* Cain Merits Deposition, 568:23–569:9 ("Q. What led you to the conclusion that there was no leakage on June 30th?  A.  … [T]here were a few different news articles that collectively had on net [a] positive impact on Vaxart's stock price and the stock price actually increased from the close of June 29th to the close of June 30th.  And because the price increased, I've not taken any leakage of artificial inflation on that day."); Cain Merits Report, ¶ 144 ("The only date during this seven-trading day time window without any leakage was June 30, during which Vaxart's Common Stock price increased in conjunction with positive media coverage of the Company.").

[121] Cain Merits Report, ¶ 144, Table C, Exhibit 3.

[122] Cain Merits Deposition, 620:12–20.  *See also* Cain Merits Deposition, 354:2–10 ("[L]ooking at the information environment from June 25th all the way through July 27th … it's actually fairly clear, fairly obvious, that there was leakage of the relevant truth into the stock price starting on June 26th around 9:40 [AM] through the close and then [through July 6th].").

[123] Cain Efficiency Rebuttal Report, ¶¶ 81, 86; Cain Merits Report, ¶¶ 165–170.

[124] Cain Merits Report, ¶¶ 168–170, Table B.

in my Rebuttal Report, based on my review and analysis of the *New York Times* article and the information that was previously publicly available, the *New York Times* Disclosure does not appear to contain new "corrective" information related to the alleged misrepresentations regarding Vaxart's COVID-19 program.[125]  Furthermore, as discussed in **Section V.B**, the Cain Event Study Model relies on *ad hoc* and unsupported assumptions.  When I correct for those *ad hoc* and unsupported assumptions and examine alternative specifications of the Cain Event Study Model, I find that Vaxart's stock price decline on July 27, 2020 is *not* statistically significant. This finding is consistent with Dr. Cain's conclusion that Vaxart's common stock traded in an efficient market during the Proposed Class Period given that the alleged corrective information would have already been reflected in Vaxart's stock price prior to July 25, 2020.

A. **Evidence That Allegedly Corrective Information Was Publicly Available before July 25, 2020 Is Inconsistent with a Statistically Significant Residual Return on July 27, 2020 If Vaxart's Stock Traded in an Efficient Market**

59.     As summarized in the Cain Merits Report, I understand that Plaintiffs allege that "Defendants engineered or otherwise directed the publication of two deceptive press releases prior to the sales of Vaxart Securities, which when read individually and together, 'created the materially misleading impression that Vaxart stood at the precipice of pioneering a successful coronavirus vaccine.'"[126]  Plaintiffs claim that the Attwill Press Release "exaggerated the then-present capabilities of Attwill Medical Solutions Sterilflow, LP ('Attwill'), a critical partner of Vaxart in the vaccine development process."[127]  Plaintiffs further claim that the OWS Press Release was false and misleading because the "announcement that Vaxart had been 'selected for' OWS, and other representations and/or omissions made in the Selected-for-OWS Press Release, exploited the gap in the public's knowledge about OWS and Vaxart's internal affairs by

---

[125] Marietta-Westberg Rebuttal Report, ¶ 116.

[126] Cain Merits Report, ¶ 34.

[127] Cain Merits Report, ¶¶ 34–35.  Dr. Cain specifically cites two excerpts from the Attwill Press Release:  (i) "Vaxart, Inc. Signs Memorandum of Understanding with Attwill Medical Solutions Sterilflow, LP *Enabling Production of A Billion or More COVID19 Vaccine Doses Per Year* Through Large Scale Lyophilization, Tableting and Coating ['MOU']"; and (ii) "'[w]e believe AMS' experience coupled with its *ability to manufacture a billion or more doses per year* would be a beneficial addition to our group of CDMO partners and *enable the large scale manufacturing and ultimate supply of our COVID-19 vaccine* for the US, Europe and other countries in need,' said Andrei Floroiu, CEO of Vaxart Inc." (emphasis in original).  *See* Cain Merits Report, ¶ 35.  *See also* Attwill Press Release.

exaggerating Vaxart's role, if any, in Operation Warp Speed and the prospects for government funding" and that "Defendants knew or recklessly disregarded that there was effectively no chance Vaxart would be selected by the federal government as one of seven to eight OWS finalists."[128]

60.     Dr. Cain purports to provide a summary of the information environment during the Proposed Class Period[129] and claims that "the lack of information and transparency regarding the nature of Vaxart's self-reported selection to Operation Warp Speed, the structure and funding of the purported OWS selection, and the behind-the-scenes conduct by Defendants and Vaxart … creat[ed] uncertainty as to other vaccine manufacturers' possible roles in Operation Warp Speed."[130]  He then opines that "the relevant truth leaked/diffused into prices," starting with a Corrective Disclosure Event on June 26, 2020, which is the same day that the OWS Press Release was published.[131]  Dr. Cain further opines that while additional inflation was introduced into Vaxart's stock price in the morning of June 26, 2020 due to the publication of the OWS Press Release, alleged inflation also started to dissipate that day and on subsequent days through July 6, 2020 as the "relevant truth" was revealed through the Armistice Stock Sales and Form 4 Disclosure.[132]  Dr. Cain opines that inflation in Vaxart's stock price did not completely dissipate until July 27, 2020, after the *New York Times* Disclosure and HHS Tweet.[133]  Therefore, according to Dr. Cain it took *one month* for the "relevant truth" to be fully reflected in the price of Vaxart common stock.[134]

---

[128] Cain Merits Report, ¶¶ 37–41.  Dr. Cain specifically cites to four excerpts from the OWS Press Release:  (i) "Vaxart's Covid-19 Vaccine *Selected for the U.S. Government's Operation Warp Speed*," (ii) "*OWS to Test* First Oral COVID-19 Vaccine in Non-Human Primates," (iii) "[the study was] … *organized and funded by Operation Warp Speed*," and (iv) "[w]e are very pleased to be *one of the few* companies *selected by Operation Warp Speed*" (emphasis in original).  *See* Cain Merits Report, ¶ 37.  *See also* OWS Press Release.

[129] Cain Merits Report, Section IV.C.  *See also* Cain Merits Report, Sections VI.A–VI.D.

[130] Cain Merits Report, ¶ 45 (emphasis removed).

[131] Cain Merits Report, ¶¶ 21, 46.  *See also* OWS Press Release.

[132] Cain Merits Report, ¶ 21.

[133] Cain Merits Report, ¶ 21, Table C.

[134] In response to the question in his deposition about what "new information was contained in the *New York Times* article that had not been previously disclosed," Dr. Cain responded:  "What I point to is a clear disclosure coming from authoritative source -- two authoritative sources, one the *New York Times* [article] and the other the HHS or Department of Health and Human Services … tweet that U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers, and [] are negotiating with others. Neither is the case with Vaxart.…  I think I also explain from the *New York Times* article Vaxart is not among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses.").  *See* Cain Merits Deposition, 601:4–23.  Dr. Cain further stated that "it's the relevant information that's

61.     As explained in the Marietta-Westberg Rebuttal Report, in financial economics, an efficient market is defined as one in which "prices always 'fully reflect' available information."[135]  The underlying theory behind informationally efficient markets is that competition among investors eliminates the opportunities to trade and profit on publicly available information, that is, it eliminates any temporary mispricing in a security.  If there are informed investors—such as those who would have been able to "decipher the alleged truth"[136] in the Vaxart Press Releases as Plaintiffs claim—who identify mispricing in a security, they would trade that security to exploit and quickly correct any perceived mispricing given the information available to them.  Consequently, security prices quickly incorporate new, value-relevant information about the given security, generally within a trading day,[137] which is at odds with Dr. Cain's claim that "the final portion of the artificial inflation [dissipated] from Vaxart's Common Stock" on July 27, 2020.[138]

62.     In the Cain Merits Report, Dr. Cain asserts that he "did not require that all analysts and investors express[] the same consensus view about the relevant truth in assessing artificial inflation."[139]  Further, in his evaluation of the information environment throughout the Proposed Class Period, Dr. Cain cites to academic literature to claim that "a stock price reflects an aggregation of the views of numerous different investors, each of whom may hold differing views about a company and its expected value."[140]  In the Marietta-Westberg Rebuttal Report, I explain that information about the alleged misrepresentations related to Vaxart's COVID-19 vaccine program was in the public domain and discussed by market participants well before the

---

contained in both [the *New York Times* Disclosure and HHS Tweet]," but he does not explain what that "relevant information" includes.  *See* Cain Merits Deposition, 605:8–10.

[135] Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417 ("Fama (1970)"), p. 383.  *See also* Marietta-Westberg Rebuttal Report, ¶ 37.

[136] I understand that according to Plaintiffs, "inflation began to dissipate soon after the OWS Press Release's publication as pockets of investors began to decipher the truth through several partial corrective events."  *See* Plaintiffs Renewed Motion for Class Certification, pp. 3–4.  Dr. Cain states that institutional investors and "other sophisticated investors" can cause new information to be quickly incorporated into a company's stock price by trading on this information.  *See* Cain Efficiency Report, ¶ 98 ("These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly impounded into stock prices.").

[137] Marietta-Westberg Rebuttal Report, Section VI.A.

[138] Cain Merits Report, ¶ 168.

[139] Cain Merits Report, ¶ 145.

[140] Cain Merits Report, ¶ 145.

*New York Times* Disclosure and HHS Tweet on July 25, 2020.[141]  While Dr. Cain claims that there was a divergence of opinions among investors, market efficiency does not require that all investors have the same view or that all investors have to agree.[142]  The premise of an efficient market is that there are informed investors (in this case, investors who know the alleged truth) who identify mispricing in the security and trade to eliminate that mispricing.[143]  Indeed, Dr. Cain agreed at deposition that information is fully incorporated into a stock price in an efficient market when a sufficient number of investors are aware and willing to trade on that information.[144]

63.     As discussed in the Marietta-Westberg Rebuttal Report, OWS was first announced in May 2020 by the Trump administration, and the program was initiated "to accelerate the development, manufacturing, and distribution of COVID-19 vaccines, therapeutics, and diagnostics (medical countermeasures)."[145]  The announcement laid out the framework and "Elements of Operation Warp Speed" explaining that:

> Operation Warp Speed is a public-private partnership … between components of HHS, including CDC, FDA, NIH, and the Biomedical Advanced Research and Development Authority (BARDA); the Department of Defense; private firms; and other federal agencies….  It will coordinate existing HHS-wide efforts, including NIH's ACTIV partnership for vaccine and therapeutic

---

[141] Marietta-Westberg Rebuttal Report, Section VII.B.

[142] *See* Fama (1970), p. 388 ("[T]he market may be efficient if 'sufficient numbers' of investors have ready access to available information.").

[143] Mishkin, Frederic S., and Stanley G. Eakins, *Financial Markets and Institutions*, 7th ed., Pearson Education, 2012, pp. 119–120 ("Another way to state the efficient market condition is this:  *In an efficient market, all unexploited profit opportunities will be eliminated*.  An extremely important factor in this reasoning is that *not everyone in a financial market must be well informed about a security for its price to be driven to the point at which the efficient market condition holds*.  Financial markets are structured so that many participants can play.  As long as a few (who are often referred to as 'smart money') keep their eyes open for unexploited profit opportunities, they will eliminate the profit opportunities that appear because in so doing, they make a profit.  The efficient market hypothesis makes sense because it does not require everyone in a market to be cognizant of what is happening to every security.") (emphasis in original).

[144] *See* Cain Merits Deposition, 335:8–15 ("Q.  Would you agree that information can be fully incorporated into a stock price even if some or even most investors are not subjectively aware of it, provided that a sufficient number of participants in the stock market have access to that information and are willing to trade on it?  A. That can be the case, yes.").

[145] "Trump Administration Announces Framework and Leadership for 'Operation Warp Speed,'" *U.S. Department of Defense*, May 15, 2020.

development, NIH's RADx initiative for diagnostic development, and work by BARDA.[146]

64. The announcement also explicitly distinguished between the human and non-human study components of OWS:

> Fourteen promising candidates have been chosen from the 100+ vaccine candidates currently in development—some of them already in clinical trials with U.S. government support.
>
> The 14 vaccine candidates are being winnowed down to about eight candidates, which will go through further testing in early stage small clinical trials.
>
> Large-scale randomized trials for the demonstration of safety and efficacy will proceed for three to five of the candidates.
>
> *Additional non-clinical testing will be done in parallel to the extent possible.* For instance, *multiple animal models may be used to assess vaccine safety and efficacy* in order to support the clinical development program.[147]

65. Additionally, an article published around the same time by *Science* on May 12, 2020 explained that "[t]he project … will pick a diverse set of vaccine candidates and *pour essentially limitless resources* into unprecedented *comparative studies in animals*, fast-tracked human trials, and manufacturing."[148] Notably, this article differentiates between the lead vaccine candidates in fast-tracked human trials and funded parallel studies conducted in animals.

66. **Exhibit 2** shows market commentary in the period from June 26, 2020 to July 6, 2020 following the publication of the OWS Press Release. On June 26, 2020, there were at least 15 different news outlets that discussed the OWS Press Release throughout the day starting at 8:01 AM until 8:50 PM. Those outlets included general news agencies, analyst reports, and industry reports, among others. As the exhibit shows, these news outlets repeatedly reported on

---

[146] "Trump Administration Announces Framework and Leadership for 'Operation Warp Speed,'" *U.S. Department of Defense*, May 15, 2020.

[147] "Trump Administration Announces Framework and Leadership for 'Operation Warp Speed,'" *U.S. Department of Defense*, May 15, 2020 (emphasis added).

[148] "Unveiling 'Warp Speed,' the White House's America-First Push for a Coronavirus Vaccine," *Science*, May 12, 2020 (emphasis added).

Vaxart's selection to participate in a non-human primate study under the OWS program—and as discussed above, the Trump administration's May 2020 announcement described non-clinical testing in animals to be one of the components of OWS. **Exhibit 2** also shows that similar market commentary regarding Vaxart's selection to participate in a non-human primate study under OWS was provided on subsequent days through July 6, 2020.

67.     If the "relevant truth" was already disclosed in the Vaxart Press Releases, or if the "relevant truth" was already part of the total mix of publicly available information about Vaxart well before the *New York Times* Disclosure and HHS Tweet on July 25, 2020, that "truth" would have been incorporated in Vaxart's stock price quickly and at those earlier points in time in an efficient market. In other words, if there were informed investors who would have been able to "decipher" the alleged truth from the Vaxart Press Releases and trade on that information, in an efficient market, as Dr. Cain claims was the case for Vaxart during the Proposed Class Period, any perceived mispricing would be eliminated quickly.[149]

68.     Consequently, in an efficient market, repeat disclosures of information already in the public domain would not be expected to change stock prices because prices respond quickly to new, value-relevant information. Stale news, even if value-relevant, would have already been incorporated into the stock price when it first became publicly available (or within three trading days according to Dr. Cain).[150] This is consistent with the findings in my Rebuttal Report, as well as my findings in **Section V.B** below, that the decline in Vaxart's stock price on July 27, 2020 is not statistically significant (*i.e.*, not statistically different from zero).

69.     Even assuming that under a leakage theory, it took several days for Vaxart's stock price to incorporate the alleged truth, **Exhibit 2** shows that allegedly "corrective" information was publicly available before July 6, 2020. For example, Dr. Cain appears to suggest that Vaxart's

---

[149] At deposition, Dr. Cain appeared to suggest that the *New York Times* Disclosure and HHS Tweet on July 25, 2020 included new, corrective information because there was "a clear disclosure coming from [an] authoritative source." *See* Cain Merits Deposition, 601:4–5. However, Dr. Cain provides no support or analysis to establish that a repeated disclosure by an authoritative source revealed to the market any new, corrective information.

[150] *See, e.g.*, Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 9th ed., McGraw-Hill/Irwin, 2010, p. 440 ("According to the efficient-market hypothesis, a stock's abnormal return at time $t$, $AR_t$, should reflect the release of information at the same time, $t$. Any information released before then should have no effect on abnormal returns in this period because all of its influence should have been felt before. In other words, an efficient market would already have incorporated previous information into prices."). Dr. Cain assumes that information in the Form 4 Disclosure, which was filed after market close on June 30, 2020, would take three trading days (*i.e.*, through July 6, 2020) to be incorporated into Vaxart's stock price. *See* Cain Merits Report, ¶ 160.

contract with BARDA is different from OWS and that this purported difference was not communicated by Vaxart to investors.[151] However, this seems inconsistent with the Trump administration's May 15, 2020 announcement of OWS, which explained that OWS was a public-private partnership between "components of HHS, … including [BARDA]," federal agencies, and private firms.[152] Further, a June 29, 2020 *Genetic Engineering and Biotechnology News* article noted that "[f]our of the five [OWS short-listed] candidates have won varying amounts of funding from BARDA totaling more than $2 billion" and explained that "[t]he BARDA funding covers R&D, clinical trials, and manufacturing."[153] According to this article, Vaxart was not part of the five short-listed candidates that "were most likely to produce a vaccine for the virus."[154]

70.     As another example, Plaintiffs claim that Vaxart misled investors in misrepresenting that it was "one of seven to eight OWS finalists."[155] However, as shown in **Exhibit 2**, a June 30, 2020 Piper Sandler analyst reporting on Inovio explained that NHP challenge studies for Inovio were ongoing as part of OWS and that Vaxart was "reported to be excluded from the OWS finalist list":

> Viral challenge testing is ongoing in ferrets and, as part of Operation Warp Speed (OWS), in NHP challenge studies, which should be more informative on INO-4800's efficacy than the mouse data hinted at today. Selection for inclusion in NHP challenge studies as part of OWS doesn't necessarily run counter to media reports that INO-4800 is excluded as an OWS finalist, and for context we note that Vaxart (also reported to be

---

[151] Cain Merits Report, ¶ 91 ("In response to these media inquiries, OWS Chief of Staff U.S. Army Colonel Eric Shirley told the HHS Office of Public Affairs (which had received the inquiries): 'I've been informed that VaxArt entered into a contract with BARDA. They are not, however a part of the OWS [vaccine] effort at this time.' To date, I have not been able to identify any analyst reports or news articles published before the July 25, 2020 Corrective Disclosure Event which directly conveyed the distinction … that Vaxart had entered into a contract with BARDA but was not part of the OWS vaccine effort.").

[152] "Trump Administration Announces Framework and Leadership for 'Operation Warp Speed,'" *U.S. Department of Defense*, May 15, 2020.

[153] "Vaxart Oral COVID-19 Vaccine Joins Trump's 'Warp Speed,' Ramps Up Manufacturing Capacity," *Genetic Engineering and Biotechnology News*, June 29, 2020, 12:00 PM ET ("The largest award was the $1.2 billion given to AstraZeneca by BARDA. The agency also committed to Moderna up to $483 million in April and another $53 million in May toward expanding the company's domestic manufacturing capacity for mRNA-1273. Also, BARDA committed $456.2 million from development to licensure for Janssen and just over $38 million for Merck and IAVI. Pfizer and BioNTech have declined to accept Operation Warp Speed funding.").

[154] "Vaxart Oral COVID-19 Vaccine Joins Trump's 'Warp Speed,' Ramps Up Manufacturing Capacity," *Genetic Engineering and Biotechnology News*, June 29, 2020, 12:00 PM ET. *See also* **Exhibit 2**.

[155] Cain Merits Report, ¶¶ 38–41.

excepted from the OWS finalist list) recently reported participation in OWS NHP challenge studies as well.[156]

71.     Thus, even assuming that it would take more than one trading day for information to be incorporated into Vaxart's stock price, information about the alleged truth was publicly available before July 6, 2020, which supports my finding in the Marietta-Westberg Rebuttal Report that the residual stock price decline on July 27, 2020 is *not* statistically significant using alternative specifications of Dr. Cain's *Cammer* Factor 5 event study analysis.  Below, I show that Vaxart's residual stock price decline on July 27, 2020 remains statistically *insignificant* using similar alternative specifications of the Cain Event Study Model that correct for his continued use of *ad hoc* and unsupported assumptions.

**B.     The Cain Event Study Model Remains Flawed and Based on *Ad Hoc* and Arbitrary Assumptions, and Hence Does Not Produce Reliable Results**

72.     In the Marietta-Westberg Rebuttal Report, I opined that Dr. Cain's *Cammer* Factor 5 event study analysis is not robust considering the *ad hoc* and arbitrary assumptions that he makes.[157]  Similarly, I find that the Cain Event Study Model in the Cain Merits Report continues to rely on *ad hoc* and unsupported assumptions—which his deposition testimony suggests may have been results-driven.  When I correct for those *ad hoc* and unsupported assumptions and examine alternative specifications of the Cain Event Study Model, I find that Vaxart's stock price decline on July 27, 2020 is *not* statistically significant.

73.     The Cain Event Study Model is similar to Dr. Cain's *Cammer* Factor 5 event study model.  It is a two-factor linear regression model to estimate the statistical relationship between daily Vaxart stock returns and the daily returns of selected market and industry indices.[158]  To estimate his regression model, Dr. Cain uses a trailing 40-day rolling regression estimation window; that is, he uses returns data from the prior 40 trading days to analyze each trading day in the Proposed Class Period.[159]  In his regression estimations, Dr. Cain excludes certain days

---

[156] "Inovio Pharmaceuticals (INO): Neutral," *Piper Sandler*, June 30, 2020.
[157] Marietta-Westberg Rebuttal Report, Section VII.A.
[158] Dr. Cain uses the NASDAQ Composite Total Return Index as his market index and the NASDAQ Biotechnology Industry Total Return Index as his industry index.  *See* Cain Merits Report, ¶ 110.
[159] Cain Merits Report, ¶ 110.

corresponding to the following events: alleged misrepresentations, alleged corrective disclosures, Dr. Cain's "News Days" from his *Cammer* Factor 5 event study analysis, and additional "outlier" days.[160]  Below, I explain why certain assumptions made by Dr. Cain are arbitrary and unsupported.

74.  *First*, when estimating a regression model in securities cases, it is typical to exclude the alleged misrepresentation and alleged corrective disclosure days from the estimation window, given that it is the stock price movements on those days that are analyzed, so that they do not affect the estimation of the regression model.[161]  However, Dr. Cain does not exclude June 29, 2020 from his estimation window, even though it is one of the Corrective Disclosure Dates.[162]

75.  *Second*, Dr. Cain utilizes an *ad hoc* and arbitrary methodology for excluding additional "outlier" dates.  As I detail above, Dr. Cain purports to exclude certain days corresponding to the following events: alleged misrepresentations, alleged corrective disclosures, Dr. Cain's "News Days," and additional "outlier" days.  The Cain Event Study Model excludes the same "outlier" dates as his *Cammer* Factor 5 event study model.  Moreover, the Cain Event Study Model also excludes April 28, 2020 and May 13, 2020 which, according to his backup materials, are alleged misrepresentation dates (labeled as "Misrep").[163]  Dr. Cain still does not provide any objective basis for the set of outlier dates that he excludes in the Cain Event Study Model, nor does he explain why he excludes April 28, 2020 and May 13, 2020 as "Misrep" days when these occur one month before the start of the Proposed Class Period.[164]

76.  In fact, as explained in the Marietta-Westberg Rebuttal Report, Dr. Cain's deposition testimony suggests his approach for determining the dates to exclude from his estimation

---

[160] Cain Efficiency Rebuttal Report, Backup Materials, "event_calendar.xlsx"; Cain Efficiency Rebuttal Report, ¶¶ 56–57, 64–65; Cain Efficiency Report, Exhibit 7.

[161] *See, e.g.*, MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 13–39, p. 15 ("Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

[162] Cain Efficiency Rebuttal Report, Backup Materials, "event_calendar.xlsx."  At his deposition, Dr. Cain testified that he does not exclude June 29, 2020 from his regression estimation because he "didn't go back and update the event study after concluding that that was the corrective disclosure date."  *See* Cain Merits Deposition, 386:23–25.  *See also* Cain Merits Deposition, 385:23–386:6 ("My recollection is that I determined that that was a corrective disclosure event after I had already performed the event study analysis, and I didn't go back and update the event study analysis, which is something I could have done.  I don't think it would [have] any real impact here, given the minor return.  It's something I could have done after reaching my opinions in the merits report.").

[163] Cain Efficiency Rebuttal Report, Backup Materials, "event_calendar.xlsx"; Cain Efficiency Report, Backup Materials, "event_calendar.xlsx."

[164] Cain Efficiency Rebuttal Report, Backup Materials, "event_calendar.xlsx"; Cain Merits Report, ¶ 119.

window may have been results-driven instead of being objectively defined *ex-ante*.[165]  In response to my critiques, Dr. Cain asserts in the Cain Efficiency Rebuttal Report that "it is a commonly accepted practice to exclude outliers from data sets" and that he chose to exclude select dates on which "value-relevant news was disclosed that had a significant impact on Vaxart's stock returns."[166]  However, Dr. Cain still has not defined any objective, *ex-ante* criteria to determine "outlier" dates on which "value-relevant news was disclosed."[167]  Such an arbitrary and *ad hoc* process, based on Dr. Cain's subjective views for what qualifies as an "outlier" date, renders the Cain Event Study Model (and, by extension, his calculation of artificial inflation and damages) unreliable.[168]

77.    Similar to my analysis in the Marietta-Westberg Rebuttal Report, I correct for Dr. Cain's *ad hoc* and unsupported assumptions and examine alternative specifications of the Cain Event

---

[165] *See* Marietta-Westberg Rebuttal Report, ¶ 84.  As I also discuss in my Rebuttal Report, the removal of days with large returns from the estimation of the regression model has the effect of reducing the estimated residual return volatility and hence increasing the apparent significance of the estimated residual returns (as I show is the case for certain dates in **Exhibit 3** below).

[166] Cain Efficiency Rebuttal Report, ¶¶ 56–57, 64.

[167] Further, Dr. Cain's (unsupported) assumption of a three-day event window associated with the Form 4 Disclosure seems to be at odds with his choice of a one-day event window following the *New York Times* Disclosure and HHS Tweet.  For example, Dr. Cain testified at deposition that he only considered a one-day stock price reaction to the *New York Times* Disclosure and HHS Tweet because "there was a statistically significant reaction on July 27th[, and he] did not see a continued reaction on the following day," whereas for the Form 4 Disclosure, it appears that he considered a three-day stock price reaction because there was no negative and statistically significant abnormal return until the third trading day on July 6, 2020.  *See also* Cain Merits Deposition, 343:12–17.  *See also* Cain Merits Deposition, 344:3–17 ("Q.  So you looked to see whether or not the first trading day is statistically significant … and then you decide how long you think it should take the stock price to incorporate the news?  A.  … I just looked at the data and then formed opinions about how long it did take the stock price to reflect information.  In the case of [the *New York Times* Disclosure and HHS Tweet], I concluded that it was one full trading day.  Q.  And you did that after observing the first trading day was statistically significant?  A.  In that case, yes.").  These inconsistencies in his methodology further illustrate the *ad hoc* and arbitrary assumptions that he makes.

[168] In the Cain Efficiency Rebuttal Report, Dr. Cain asserts that he used a "reasonable and conservative process" that is consistent with academic literature when he excluded eight "additional news and corresponding market impact dates" as outliers from his event study model.  *See* Cain Efficiency Rebuttal Report, ¶ 64.  This assertion is not supported by the financial economics academic literature.  In academic studies, the removal of outliers is typically based on objective methodologies and criteria determined *ex ante*, and commonly accompanied by robustness checks to confirm that conclusions are not driven by the exclusion of certain observations.  In the Cain Efficiency Rebuttal Report, Dr. Cain also claims that I have "employed the same kinds of steps as [he has] taken [] to exclude 'outliers'" and cites to my publication to purportedly support this claim.  *See* Cain Efficiency Rebuttal Report, ¶ 67.  This claim is misleading, and he is mistaken.  In my academic paper that Dr. Cain cites (Loughran, Tim, and Jennifer Marietta-Westberg, "Divergence of Opinion Surrounding Extreme Events," *European Financial Management* 11, no. 5 (2005): 579–601, p. 583), I use an objectively defined event to identify outliers, and my approach is consistent with a previously published peer-reviewed academic study by other researchers.  *See* Cox, Don R., and David R. Peterson, "Stock Returns Following Large One-Day Declines: Evidence on Short-Term Reversals and Longer-Term Performance," *The Journal of Finance* 49, no. 1 (1994): 255–267.  Dr. Cain's *ad hoc* and arbitrary process to determine outliers is not supported by other studies that he cites in the Cain Efficiency Rebuttal Report.

Study Model. **Exhibit 3** shows Vaxart's residual stock returns following select Corrective Disclosure Dates had Dr. Cain only excluded the Inflation Creating Dates and Corrective Disclosure Dates from his estimation window, all else equal.[169]  In addition, I consider an alternative specification where the "Cain News Days" are also excluded from his estimation window, similar to my Rebuttal Report.[170]  Across these alternative specifications of the Cain Event Study Model, I find that Vaxart's residual stock price decline on July 27, 2020 is *not* statistically significant.[171, 172]

78.     Further, in my Rebuttal Report, I explain that Dr. Cain fails to perform any analysis or provide support for his chosen estimation window of 40 trading days, considering it differs from the 120-trading day or the 100- to 300-trading day estimation windows in the two academic

---

[169] Specifically, where applicable (if these days fall into the 40-day estimation window in Dr. Cain's regression), the days excluded from the regression estimation include June 25, June 26, June 29, July 1, July 2, July 6, and July 27, 2020.  While Plaintiffs allege a three-day event window following the Form 4 Disclosure on July 1, July 2, and July 6, 2020 (Complaint, ¶ 248), a stock price reaction of more than one day is inconsistent with both Dr. Cain's conclusion of market efficiency and his event study methodology that uses daily returns in his regression model (*i.e.*, he is testing whether information is being incorporated into Vaxart's stock price within a trading day).  Thus, I also consider an alternative specification where I do not exclude July 2, 2020 and July 6, 2020 from the regression estimation.  *See* **Exhibit 3**.

[170] I do not endorse Dr. Cain's methodology for identifying the "Cain News Days" for his *Cammer* Factor 5 analysis.  However, I note in my Rebuttal Report that Dr. Cain identifies the set of Cain News Days based on criteria determined *ex-ante*, in contrast to the *ad hoc* approach that he uses to identify other "outlier" dates.  As such, I consider an alternative specification where these Cain News Days are excluded from the estimation window.  *See* Marietta-Westberg Rebuttal Report, ¶ 80.

[171] The stock price declines on June 29, July 1, and July 2, 2020 remain statistically *insignificant*.  The residual return on July 6, 2020 is statistically insignificant in three of the four alternative specifications and not statistically significant in one of the alternative specifications shown in **Exhibit 3**.  I explain in **Section IV.C** that Dr. Cain's three-day event window for the Form 4 Disclosure filing on June 30, 2020 is inconsistent with his own conclusion that Vaxart's stock traded in an efficient market—that is, he has not provided a reliable basis for why Vaxart's stock price change on July 6, 2020 is somehow related to the Form 4 Disclosure.  Moreover, as noted in **Section IV.B**, Dr. Cain ignores potentially confounding news on July 6, 2020 that could explain Vaxart's stock price change on that day.  Specifically, there was positive vaccine-related competitor news on July 6, 2020:  Emergent Biosolutions announced a five-year contract to manufacture Johnson & Johnson's COVID-19 vaccine.  *See, e.g.*, "Emergent BioSolutions Signs Five-Year Agreement for Large-Scale Drug Substance Manufacturing for Johnson & Johnson's Lead COVID-19 Vaccine Candidate," *Emergent BioSolutions*, July 6, 2020, 6:30 AM ET.

[172] In my Rebuttal Report, I also examine an "in-class" estimation window as an alternative to correct for Dr. Cain's *ad hoc* and unsupported choice of a 40-trading day estimation window.  *See* Marietta-Westberg Rebuttal Report, ¶¶ 86–87, Exhibit 5.  In this report, I do not consider an in-class estimation window due to the shortened Proposed Class Period, which renders too few data points for a reasonable event study.  In the Cain Efficiency Rebuttal Report, Dr. Cain criticizes that my application of an in-class estimation period for a subset of alternative event study specifications is "novel" and "inappropriate" because the event study may be "contaminated by the same information [I] attempted to study" and because an in-class estimation period purportedly "lacks support in academic literature."  *See* Cain Efficiency Rebuttal Report, Section V.B; Cain Efficiency Rebuttal Report, ¶¶ 51–52.  Dr. Cain's criticism is unfounded and misleading because I exclude the alleged misrepresentations and corrective disclosures from the estimation.

papers that he cites in the Cain Efficiency Report.[173]  As such, the Cain Event Study Model continues to rely on *ad hoc* and arbitrary assumptions.  Even assuming for the sake of argument that a 40-day trading window can be used here (although Dr. Cain has not provided reliable basis for this assumption), **Exhibit 3** shows that the residual return on July 27, 2020 is not statistically significant using Dr. Cain's 40-day event window under the alternative specifications I consider.

79.     I note that in the Cain Efficiency Rebuttal Report, Dr. Cain appears to dismiss the standard in financial economics academic research of demonstrating statistical significance in empirical studies.  Specifically, he opines that "academic studies [purportedly] explain that statistical significance is a continuum, not the bright line threshold of [5%] advocated by Dr. Marietta-Westberg."[174]  At deposition, Dr. Cain further stated that "a pure leakage theory," which he claims does not apply to July 27, 2020,[175] is "not contingent on the statistical significance of the price movements."[176]  However, Dr. Cain fails to provide reliable academic support for his apparent dismissal of the importance of demonstrating statistical significance.[177]  In the context of an event study, statistical significance distinguishes whether the estimated residual return is likely due to random chance (*i.e.*, no evidence that the residual return is distinguishable from zero) or reflects the actual effect from an event (*i.e.*, if information affected the stock price).  A lack of statistical significance means that one cannot reject the null hypothesis that the residual return is zero.  Moreover, I discuss in my Rebuttal Report that the standard level of statistical significance in the field of economics is 5%.[178]  Dr. Cain himself applied this statistical significance threshold in multiple analyses in the Cain Efficiency Report, including his *Cammer*

---

[173] As noted in my Rebuttal Report, I understand that Dr. Cain has used longer estimation windows in prior matters when evaluating market efficiency and that the 40-day estimation window he adopted in the Cain Efficiency Report, and now the Cain Merits Report, is the shortest window he has used.  *See* Deposition of Matthew D. Cain, Ph.D., dated January 10, 2024 ("Cain Efficiency Deposition"), 168:4–6 ("But in terms of the market efficiency reports, I think I've used 120 days, 60 days, and now 40 days.").

[174] Cain Efficiency Rebuttal Report, ¶ 55.

[175] *See, e.g.*, Cain Merits Deposition, 360:24–361:9 ("I think here it's also important to recognize that in the first five or six trading days it's not only a leakage theory but it's also overlapping with a corrective disclosure theory, because I can point to corrective disclosures as well.…  But under just a pure leakage theory without corrective disclosures, it's not contingent on the [statistical significance] of those residual price declines.").

[176] Cain Merits Deposition, 360:21–23.

[177] *See* Marietta-Westberg Rebuttal Report, ¶ 75 ("Statistical significance establishes whether the residual return of interest is statistically distinguishable from zero, that is, the price movement is so large that it could only be due to random chance at an acceptably low threshold.").

[178] *See* Marietta-Westberg Rebuttal Report, ¶ 75, footnote 164.

Factor 5 analysis, autocorrelation analysis, and options analysis,[179] and now contradicts himself in claiming that "there is no bright line threshold" for statistical significance.[180] In stating that "a pure leakage theory" is "not contingent on the statistical significance of the price movements," he does not explain why, under his purported leakage model, the residual stock price returns that he measures during his "leakage period" are not due to random chance.

## VI. Dr. Cain's Analysis of Market Efficiency for Vaxart Options Continues to Be Flawed and Unreliable

80. Dr. Cain opined in the Cain Efficiency Report that the "market for Vaxart options was efficient throughout the [Proposed] Class Period."[181] I explained in the Marietta-Westberg Rebuttal Report that Dr. Cain has not demonstrated that Vaxart options traded in an efficient market. There is nothing in the Cain Efficiency Rebuttal Report that changes my opinions, which I explain below.

81. _First_, in the Cain Efficiency Report, Dr. Cain opines that a finding of market efficiency for Vaxart common stock inherently translates into a finding of market efficiency for Vaxart options, indicating that he does not need to investigate or analyze whether Vaxart options traded efficiently during the Proposed Class Period.[182] However, I explain in my Rebuttal Report that he ignores empirical evidence from the academic literature that documents many instances of inefficient trading in options markets.[183] Hence, market efficiency for options is a hypothesis that cannot simply be presumed and needs to be tested.

82. In the Cain Efficiency Rebuttal Report, Dr. Cain claims that I have not performed my own analysis of options market efficiency. This criticism is a red herring, as I was asked to evaluate whether Dr. Cain has reliably demonstrated that Vaxart options traded in an efficient market. Dr. Cain further claims that I mischaracterize the conclusions from the academic literature that I cite documenting inefficient trading of options.[184] His criticisms are unfounded,

---

[179] _See_ Cain Efficiency Report, Exhibits 7, 11, 12.
[180] Cain Efficiency Report, ¶¶ 41, 80, 82, 84, 119. _See also_ Cain Efficiency Rebuttal Report, ¶ 55.
[181] Cain Efficiency Report, ¶ 3.d.
[182] _See_ Marietta-Westberg Rebuttal Report, ¶ 34, Section VI.B.
[183] _See_ Marietta-Westberg Rebuttal Report, ¶¶ 40, 48, 53, 65.
[184] Cain Efficiency Rebuttal Report, Section IV. C.

and he mischaracterizes my testimony.  The academic studies that I cite in my Rebuttal Report are examples of peer-reviewed research showing situations where option prices do not adjust in an efficient manner and mispricing persists in major exchanges such as the CBOE.[185]  In the Cain Efficiency Rebuttal Report, Dr. Cain's critiques of my discussion of these studies pertain to "cherry-picked" quotes or statements taken out of context from the studies without any examination of or reference to the empirical evidence in those studies.[186]  In doing so, he evades the relevant takeaways from those studies, which document instances of inefficient trading in options markets.  For example, regarding Galai (1977), which Dr. Cain also references in the Cain Efficiency Report, Dr. Cain offers a quote from the paper[187] but selectively omitted the first sentence of that same paragraph, which states:  "[t]he market *did not seem perfectly efficient* to market makers."[188]  Thus, Dr. Cain's omission results in a misleading characterization of the paper's findings.[189]

---

[185] *See* Marietta-Westberg Rebuttal Report, ¶¶ 40, 48, 53, 65.

[186] Cain Efficiency Rebuttal Report, ¶¶ 21–22, Section IV. C.

[187] Dr. Cain states that Galai (1977) "summarized its conclusions as follows: 'The ex ante returns, *while usually statistically insignificant*, show a strong tendency to be positive. *Inclusion of transaction costs might eliminate this positive 'drift.'  In any case, it does not seem that a nonmember of the CBOE [Chicago Board of Options Exchange] can expect to achieve 'above-normal' profits consistently*,'" and claims that I "improperly extrapolate[] from the conclusions of academic research" (emphasis in original).  *See* Cain Efficiency Rebuttal Report, ¶ 21.

[188] Galai, Dan, "Tests of Market Efficiency of the Chicago Board Options Exchange," *The Journal of Business* 50, no. 2 (1977): 167–197 (emphasis added); Cain Efficiency Rebuttal Report, ¶ 21.  Similarly, Dr. Cain mischaracterizes the relevant takeaways from the other academic papers discussed in my Rebuttal Report.  Regarding Santa-Clara and Saretto (2009), Dr. Cain emphasizes the quote "[t]he contribution of this paper is to show that the returns realizable by investors subject to the margining systems are not as large as previously documented," but he does not explain how this quote that he takes from the conclusion of the study is relevant to my opinions.  In fact, he ignores that the authors show that option prices do not always adjust in an efficient manner because of margin requirements and transaction costs.  *See* Santa-Clara, Pedro, and Alessio Saretto, "Option Strategies: Good Deals and Margin Calls," *Journal of Financial Markets* 12, no. 3 (2009): 391–417; Cain Efficiency Rebuttal Report, ¶ 22; Marietta-Westberg Rebuttal Report, ¶¶ 40, 50.  Moreover, regarding Cao and Han (2013), Dr. Cain talks past me again in stating that the paper "provides a rational explanation for the higher trading costs of options relative to stocks."  He ignores that the paper shows that transaction costs impede investors' ability to take advantage of mispricing in options markets and if anything, the statements that Dr. Cain quotes only highlight that transaction costs may impede investors' ability to trade and eliminate any mispricing in options markets.  *See* Cao, Jie, and Bing Han, "Cross Section of Option Returns and Idiosyncratic Stock Volatility," *Journal of Financial Economics* 108, no. 1 (2013): 231–249; Cain Efficiency Rebuttal Report, ¶ 22; Marietta-Westberg Rebuttal Report, ¶¶ 40, 51.

[189] Dr. Cain also states that the academic studies I cite "generally discuss bid-ask spreads, or trading costs that investors must bear, that are higher in options markets than in stock markets.  As explained in [his] Efficiency Report, this phenomenon is well-known and is caused in part by, among other factors, the lower trading prices of options, which cause wider bid-ask spreads on a percentage basis."  *See* Cain Efficiency Rebuttal Report, ¶ 19.  Dr. Cain completely misses the point.  To evaluate bid-ask spreads for Vaxart options, the appropriate comparison are bid-ask spreads of option securities, and not the bid-ask spreads of common stock.  *See* Marietta-Westberg Rebuttal Report, ¶ 62.

83.     _Second_, in the Cain Efficiency Report, Dr. Cain performed one analysis (Cain Efficiency Report Exhibit 12) that he claims is "additional evidence of market efficiency for all of the [Vaxart] options."[190]  I explain in my Rebuttal Report that Dr. Cain's analysis does not test for a cause-and-effect relationship between news and Vaxart option prices, that is, it does not test whether the price of the security quickly and fully reflects new, value-relevant information.[191]  Even if one were to assume that his analysis is a direct test of market efficiency—which it is not—Dr. Cain analyzes only 24 out of the 520 unique Vaxart option series.  He appears to assume that there is a single market for Vaxart options and ignores that, from an economics perspective, each option series, with its own unique price and economic characteristics, is a distinct security that requires separate analysis.[192]  Hence, his analysis does not support his conclusion that all of the Vaxart options traded in "an efficient market."

84.     In the Cain Efficiency Rebuttal Report, Dr. Cain still does not offer any additional analysis to test market efficiency for each Vaxart option series, and instead claims that market efficiency does not need to be tested separately for each Vaxart option series,[193] despite that they are distinct securities.  To support this opinion, Dr. Cain claims that "standard option pricing models" capture "all of the 'economic characteristics'" of options that I identify, purportedly precluding the need to conduct a test of market efficiency for each Vaxart option series.[194]  This claim is misguided because theoretical option pricing models do not offer any insights into whether an option series is traded efficiently.  The existence of theoretical option pricing models that reflect the option series' economic characteristics does not cure market frictions that can impede inefficient trading of options.[195]  As I explain in my Rebuttal Report and above, instances of inefficient trading in options markets are well documented in the academic literature.  As such, Dr. Cain still has not provided any analysis of market efficiency for each individual Vaxart option.

---

[190] Cain Efficiency Report, Exhibit 12; Cain Efficiency Deposition, 252:17–252:19.
[191] _See_ Marietta-Westberg Rebuttal Report, ¶ 35, Section VI.C.
[192] _See_ Marietta-Westberg Rebuttal Report, Section VI.A.2.
[193] Cain Efficiency Rebuttal Report, ¶ 24, Section IV. D.
[194] Cain Efficiency Rebuttal Report, ¶ 25, Section IV. D.
[195] Dr. Cain opines in the Cain Efficiency Rebuttal Report that "standard option pricing models account for all of the 'economic characteristics' [I] identified."  _See_ Cain Efficiency Rebuttal Report, ¶ 25.  Option pricing models represent formulas that convert characteristics of options into _implied_ prices.  These formulas do not evaluate how quickly information is incorporated into the _observed_ prices of options.  As such, option pricing models do not shed light on whether Vaxart options traded in an efficient market during the Proposed Class Period.

85.    *Third*, in the Cain Efficiency Report, Dr. Cain's claims that bid-ask spreads and trading volume are not "directly applicable" for evaluating market efficiency for Vaxart options are flawed and misleading.[196]  I explain in my Rebuttal Report that a large number of Vaxart options exhibited large bid-ask spreads and low trading volume during the Proposed Class Period,[197] which empirical evidence shows to be associated with inefficient trading in options markets. Thus, Dr. Cain cannot dismiss the relevance of bid-ask spreads and trading volume and simply presume the efficiency of Vaxart options.  Furthermore, the variation in bid-ask spreads and trading volume of Vaxart options that I document in my Rebuttal Report only highlights that different Vaxart options had different economic characteristics, and it is flawed and misleading for Dr. Cain to extrapolate his findings from a small subset of 24 Vaxart options in Exhibit 12 of the Cain Efficiency Report to the remaining Vaxart options with different economic characteristics from those that he analyzed.  In other words, because different Vaxart options have different economic characteristics, one must test market efficiency for the different Vaxart options, which Dr. Cain still has not performed.

86.    In the Cain Efficiency Rebuttal Report, Dr. Cain states that my critiques "are misguided and irrelevant to a consideration of the efficiency of Vaxart's options" and that I offer "no benchmarks in [my Rebuttal R]eport, nor was [I] able to articulate any thresholds for bid-ask spreads or trading volumes that would delineate market efficiency versus market inefficiency."[198] His criticism here again misses the point and mischaracterizes my analyses and conclusions.  My opinion is that Dr. Cain has not performed a reliable analysis to support his conclusion that Vaxart options traded in an efficient market.  In my Rebuttal Report, I show that Vaxart Options had relatively wide bid-ask spreads compared to those documented in Cao and Han (2013), which academic literature has shown to be correlated with inefficient trading.[199]  Furthermore, the variation in bid-ask spreads and low trading volume across Vaxart option series only further illustrates that different Vaxart options have different economic characteristics, indicating that separate tests for market efficiency are required for each individual option series.  Instead, Dr.

---

[196] *See* Marietta-Westberg Rebuttal Report, ¶ 36, Section VI.D.
[197] *See* Marietta-Westberg Rebuttal Report, ¶ 36, Section VI.D.
[198] Cain Efficiency Rebuttal Report, ¶ 27, Section IV.E.
[199] *See* Marietta-Westberg Rebuttal Report, ¶¶ 51, 63.

Cain dismisses these factors as irrelevant without performing any analysis or support for his dismissal.

## VII. Dr. Cain's Damages Methodology for Vaxart Options Is Flawed and Still Cannot Measure Only the Economic Losses Stemming from the Alleged Misrepresentations in This Matter

87.     Dr. Cain puts forth a model to calculate damages for Vaxart options that were traded during the Proposed Class Period.[200]  Because his damages methodology for options requires estimating artificial inflation for common stock, the same deficiencies described above regarding his damages methodology for common stock would also apply to his damages methodology for Vaxart options.

88.     Dr. Cain opines that the out-of-pocket methodology can be used to calculate economic damages pertaining to Vaxart options.  Specifically, he states that "option damages" can be calculated as the difference between artificial inflation for call options (deflation for put options) at the time of purchase and at the time of sale.[201]  He estimates artificial inflation (deflation) in call (put) option prices on a particular date as the difference between the "observed" Black-Scholes option price and the "but-for" Black-Scholes option price ("Option Pricing Method").[202] To calculate the "observed" option price for a particular option series on a specific date, he applies the Black-Scholes option pricing model using the option's strike price, time to expiration, and implied volatility; the risk-free interest rate closest in maturity to the option's expiration date; and Vaxart's closing stock price on that date ("Observed Option Price").[203]  To calculate the "but-for" option price for a particular option series on a specific date, he applies the Black-Scholes option pricing model using the same inputs, but replaces Vaxart's closing stock price with his estimate of Vaxart's "but-for" closing stock price ("But-For Option Price")—which, as described in **Sections IV** and **V** above, is derived from his flawed and unreliable estimates of artificial inflation in Vaxart's stock price.[204]

---

[200] Cain Merits Report, Section XII.
[201] Cain Merits Report, ¶ 205.
[202] Cain Merits Report, ¶¶ 201–203.
[203] Cain Merits Report, ¶¶ 201–204.
[204] Cain Merits Report, ¶¶ 201–204.

89.     Further, Dr. Cain states that he imposes the "loss causation restriction by limiting an investor's recovery to the market price changes (after controlling for market and industry forces) on [] Corrective Disclosure Events."[205]  He calculates the amount of inflation dissipated based on the change in the market price of the option before and after each Corrective Disclosure Date. To purportedly "control[] for market and industry effects," Dr. Cain applies a multiplication factor to the change in option price, which is the ratio of the residual return (based on the Cain Event Study Model) to the raw return of Vaxart common stock, and limits the multiplication factor to a maximum of one.[206]  Because this ratio always exceeds one on the Corrective Disclosure Dates when Vaxart options traded, the multiplication factor equals one for this calculation in Dr. Cain's report (*i.e.*, each investor's recovery is limited to the sum of market price changes across Corrective Disclosure Dates that occur between the purchase and sale of the option, without any adjustment by the multiplication factor).[207, 208]

90.     As detailed in **Sections IV** and **V**, the Cain Event Study Model does not reliably measure alleged inflation because it does not isolate economic losses attributable only to allegedly misrepresented information given the specific facts and circumstances of this case.  Yet, Dr. Cain now puts forth a methodology (his Option Pricing Method) in which damages for Vaxart options are calculated based on his calculation of artificial stock price inflation and a corresponding but-for stock price that is derived from the Cain Event Study Model.  As similarly explained in the Marietta-Westberg Rebuttal Report, without a reliable methodology for estimating inflation for common stock and the corresponding but-for stock price, Dr. Cain has not provided a reliable methodology for estimating a but-for option price and the corresponding artificial inflation (deflation) for Vaxart options.

91.     Further, as discussed in the Marietta-Westberg Rebuttal Report, there are additional challenges that are specific to the calculation of damages for Vaxart options besides being able to calculate a but-for stock price to be used as one of the inputs in calculating a but-for option price. Specifically, option prices are dependent not only on the stock price, but also on how the stock

---

[205] Cain Merits Report, ¶¶ 205–206.
[206] Cain Merits Report, ¶¶ 196–197, Table F.
[207] Cain Merits Report, ¶ 197, Table F.
[208] Dr. Cain also applies the PSLRA for his "calculation of damages for options [and] incorporates the application of a 90-day lookback statutory cap."  *See* Cain Merits Report, ¶ 209.

price compares to the strike price, the option's time to expiration, the risk-free interest rate, expected dividends, and the expected volatility of the stock. With respect to volatility, Dr. Cain agrees with the academic research that a decline in the stock price could result in a change in its implied volatility,[209] yet he does not calculate a "but-for" implied volatility when estimating his "But-For Option Price," and instead uses the same implied volatility input corresponding to the "Observed Option Price."

92.     To illustrate this shortcoming in Dr. Cain's approach, Dr. Cain's data on Vaxart options show variability in the day-to-day values of implied volatility across the different option series. For example, on July 27, 2020, the trading day following the *New York Times* Disclosure and HHS Tweet, the Vaxart call option expiring on August 21, 2020 with a strike price of $10 had an implied volatility of 2.30, compared to 1.87 from the previous trading day on July 24, 2020, which corresponds to a 23% increase. Similarly, for the Vaxart call option expiring on September 18, 2020 with a strike price of $15, implied volatility increased from 1.96 to 2.26 (a 15% increase) from July 24, 2020 to July 27, 2020. For the Vaxart put option expiring on August 21, 2020 with a strike price of $15, implied volatility increased from 1.99 to 2.29 (a 15% increase) between these dates.[210] Since the removal of artificial inflation in Vaxart's stock price necessarily implies, as Dr. Cain asserts, a lower stock price in the but-for world, these examples illustrate that the but-for implied volatility associated with a lower but-for stock price could be different. Dr. Cain, however, assumes the but-for implied volatility is the same in the actual and but-for worlds.[211] As a result, Dr. Cain still has not articulated a methodology for estimating the expected volatility of Vaxart's stock price in the but-for world. Thus, Dr. Cain still has not provided a reliable methodology for measuring only the economic losses stemming from the alleged misrepresentations pertaining to Vaxart options.

---

[209] Cain Efficiency Report, ¶ 116.e ("[A] sharp decline in the stock price may lower a call option's value due to the current stock price input to an option valuation formula, yet the option value may also increase if the implied volatility of the stock increases."). *See also* Cain Efficiency Report, ¶ 118 ("[I]f the implied volatility of the underlying stock price changes at the same time as a large stock return, this volatility input to option pricing may result in a movement in the option price that differs from the prediction based only on the underlying stock price input."). *See also* Marietta-Westberg Rebuttal Report, ¶ 129.

[210] Cain Merits Report, Backup Materials, "VXRT_options.xlsx." There is also variability in the direction of the change in implied volatility following the stock price decline. For example, on July 27, 2020, the Vaxart call option expiring on January 15, 2021 with strike price of $15 had an implied volatility of 2.15, compared to 2.18 from the previous trading day on July 24, 2020, which corresponds to a decline of 1%.

[211] Cain Merits Report, footnote 323.

**VIII. Dr. Cain's Section 20A Damages Methodology Based on Stock Price Inflation Still Cannot Measure Only the Economic Losses Stemming from the Alleged Misrepresentations in This Matter**

93.     Dr. Cain proposes a damages methodology under Section 20A, which will purportedly "assess losses among investors who purchased securities contemporaneously with Defendants" in the Armistice Stock Sales.[212]  Dr. Cain opines that estimating damages under Section 20A "involves identifying profits gained by Defendants" and that "there are at least two reasonable methodologies to calculate profit gained under Section 20A."[213]  These two methodologies are (i) "profits gained based on market prices," and (ii) "profits gained based on artificial inflation."[214] Based on Defendants' sales of 18,226,667 shares of Vaxart common stock on June 26, 2020 and 9,385,386 shares on June 29, 2020, Dr. Cain calculates alleged profits gained of $250,252,421 based on market prices and $177,727,751 based on his estimate of artificial inflation.[215]

94.     To the extent that Section 20A damages are to be calculated based on "the difference between the artificial inflation in the purchase price and the artificial inflation in the sale price,"[216] then Dr. Cain's proposed methodology suffers from the same shortcomings as described in the preceding subsections.  Specifically, the Cain Event Study Model still does not isolate economic losses attributable only to allegedly misrepresented or omitted information given the specific facts and circumstances of this case.  Hence, Dr. Cain still has not provided a reliable inflation-based methodology for calculating Section 20A damages.

---

[212] Cain Merits Report, ¶ 180.
[213] Cain Merits Report, ¶¶ 181, 183.
[214] Cain Merits Report, ¶ 183.
[215] Cain Merits Report, ¶¶ 184–185.  For his calculation based on market prices, Dr. Cain assumes a cost basis of $0.40 per warrant underlying 16,666,667 shares, $2.00 per warrant underlying 3,945,386 shares, and $0.31 per warrant underlying 7,000,000 shares, resulting in an approximate purchase price of $16,745,232 for all the aforementioned shares of Vaxart common stock.  For his calculation based on artificial inflation, Dr. Cain assumes Defendants acquired their shares prior to the Proposed Class Period and thus that there was no inflation in the share price at acquisition.
[216] Cain Merits Report, ¶ 185.

Executed this 27th of August, 2024

_____

   Jennifer Marietta-Westberg, Ph.D.

# Jennifer Marietta-Westberg, Ph.D.
## Vice President

**Cornerstone Research**
2001 K St, N.W., Suite 800
Washington, DC  20006
202.912.8971
JMariettaWestberg@Cornerstone.com

## PROFESSIONAL EXPERIENCE

| | | |
|---|---|---|
| 2022-Present | **Cornerstone Research**, *Vice President* | Washington, D.C. |
| 2019-2021 | *Principal* | |
| 2016-2018 | *Senior Economist* | |

Provides economic and financial consulting services and analysis in connection with litigation and regulatory investigations involving financial markets. Addresses allegations related to financial reporting, asset management, trading, private equity, and mergers and acquisitions. Assisted respondents in enforcement actions involving the Department of Justice (DOJ) and the Securities and Exchange Commission (SEC). Experienced testifier for cases involving allegations related to Rule 10(b)-5, insider trading, corporate governance, and ERISA.

| | | |
|---|---|---|
| | **U.S. Securities and Exchange Commission** | Washington, D.C. |
| 2013-2016 | *Deputy Chief Economist/Deputy Director (Senior Officer)* | |
| 2014 | *Co-Director and Chief Economist (Acting)* | |
| 2006-2013 | *Assistant Director, Senior Economist, Visiting Scholar* | |

Advised the SEC Chair and Commissioners on economic matters. Led teams of PhD economists developing economic analysis for policy matters affecting corporate issuers, broker-dealers, investment advisors, hedge funds, mutual funds, clearing and settlement, credit rating agencies, proxy voting, and markets and exchanges. Provided economic support to the SEC Divisions of Corporation Finance, Investment Management, Trading and Markets, Enforcement, and the Office of Compliance, Inspections, and Examinations. Served as lead economist on enforcement matters involving alleged Ponzi schemes and participated in on-site exams of broker-dealers. Engaged with Congressional staff and multiple regulatory organizations including the Federal Reserve, the Commodity Futures Trading Commission, and the Department of Labor. Developed analyses for the Financial Stability Oversight Board (FSOC). Provided economic analysis in support of international securities matters and presented findings to the International Organization of Securities Commissions (IOSCO) and the Financial Stability Board.

| | | |
|---|---|---|
| | **Michigan State University** | East Lansing, MI |
| 2000-2006 | *Assistant Professor* | |

Taught Investments (MBA/undergraduate) and Statistical Analysis (MBA).

## ADVISORY BOARDS

| | |
|---|---|
| Board of Directors, Institute for Law and Economics, University of Pennsylvania | 2020-Present |
| Finance Dept. Advisory Council, Tippie College of Business, University of Iowa | 2014-Present |
| Investor Advisory Committee, U.S. Securities and Exchange Commission | 2018-2021 |
|    • Committee Chair | 2020-2021 |
| Practitioner Director, Financial Management Association | 2020-2022 |

## ACADEMIC BACKGROUND

| 2000 | **University of Iowa, Tippie College of Business** | Iowa City, IA |
| | *Ph.D., Finance* | |

| 1993 | **Southern Connecticut State University** | New Haven, CT |
| | *B.A., Mathematics* | |

## EXPERT TESTIMONY (PRIOR FOUR YEARS)

*Christina C. Seidner, Jared Mackrory v. Kimberly-Clark Corporation et al,* United States District Court, Northern District of Texas, Case No. 3:21-CV-00867-L, Deposition Testimony, August 2, 2024.

*Shela Camenisch, et al. v. Umpqua Bank,* United States District Court, Northern District of California, Case No. 3:20-cv-5905-RS, Deposition Testimony, July 8, 2024.

*Shela Camenisch, et al. v. Umpqua Bank,* United States District Court, Northern District of California, Case No. 3:20-cv-5905-RS, Deposition Testimony, May 31, 2024.

*Robert Ciarciello v. Bioventus Inc. et al*, United States District Court, Middle District of North Carolina, Case No. 1:23-cv-00032-CCE-JEP, Deposition Testimony, April 29, 2024.

*In re Vaxart, Inc, Securities Litigation,* United States District Court, Northern District of California, Case No. 3:20-cv-05949-VC, Deposition Testimony, February 26, 2024.

*Steven A.W. De Jaray, et al. v. Lattice Semiconductor Corporation,* United States District Court, District of Oregon, Case No. 3:19-cv-00086-SI, Trial Testimony, February 13, 2024.

*Halman Aldubi Provident and Pension Funds LTD. v. Teva Pharmaceuticals Industries Limited*, United States District Court, Eastern District of Pennsylvania, Case No. 2:20-cv-04660-KSM, Hearing Testimony, September 21, 2023.

*Edward Anderson, et al. v. Edward D. Jones & Co,* United States District Court, Eastern District of California, Case No. 2:18-cv-00714-JAM-AC, Deposition Testimony, September 15, 2023.

*Christina Stegemann, on behalf of the Gannett Co, Inc. 401(k) Savings Plan et al. v. Gannett Co., Inc. et al.,* United States District Court for the Eastern District of Virginia Alexandria Division, Civil Action No. 1:18-cv-00325-AJT-JFA, Trial Testimony, April 27, 2023.

*In re Kirkland Lake Gold Ltd Securities Litigation,* United States District Court, Southern District of New York, Case No. 20-cv-04953, Deposition Testimony, April 24, 2023.

*Halman Aldubi Provident and Pension Funds LTD. v. Teva Pharmaceuticals Industries Limited*, United States District Court, Eastern District of Pennsylvania, Case No. 2:20-cv-04660-KSM, Deposition Testimony, January 25, 2023.

*In re FirstEnergy Corp. Securities Litigation,* United States District Court, Southern District of Ohio, Case No. 2:20-cv-03785-ALM-KAJ, Deposition Testimony, September 20, 2022.

*Steven A.W. De Jaray, et al. v. Lattice Semiconductor Corporation,* United States District Court, District of Oregon, Case No. 3:19-cv-00086-SI, Deposition Testimony, August 10, 2022.

*Christina Stegemann, on behalf of the Gannett Co, Inc. 401(k) Savings Plan et al. v. Gannett Co., Inc. et al.,* United States District Court for the Eastern District of Virginia Alexandria Division, Civil Action No. 1:18-cv-00325-AJT-JFA, Deposition Testimony, June 17, 2022.

*John Utesch, et al. v. Lannett Company, Inc, et al.,* United States District Court for the Eastern District of Pennsylvania, Civil Action No. 2:16-cv-05932-WB, Hearing Testimony, July 27, 2021.

*John Utesch, et al. v. Lannett Company, Inc, et al.,* United States District Court for the Eastern District of Pennsylvania, Civil Action No. 2:16-cv-05932-WB, Deposition Testimony, April 21, 2021.

*In the Matter of Pepicelli v. Innocoll Holdings Public Limited Company, et al,* United States District Court, Eastern District of Pennsylvania, Case No. 2:17-cv-00341-GEKP, Deposition Testimony, December 1, 2020.

## PUBLICATIONS

"Going Public Abroad," with Cecilia Caglio and Kathleen Weiss Hanley, 2016, *Journal of Corporate Finance*, Vol. 41, 103-122.

"What Determines the Allocation of Managerial Ownership within Firms? Evidence from Investment Management Firms," with Stephen G. Dimmock and William C. Gerken, 2014, *Journal of Corporate Finance,* Vol. 30, 44-64.

"Economic Effects of SOX Section 404 Compliance: A Corporate Insider Perspective," with Cindy Alexander, Scott Bauguess, Gennaro Bernile, and Yoon-Ho Alex Lee, 2013, *Journal of Accounting and Economics,* Vol. 56, 267-290.

"The Distribution of IPO Holdings across Institutional Mutual Funds," with William C. Johnson, 2009, *Journal of Business Ethics*, Vol. 90, 119-128.

"Universal Banking, Asset Management, and Stock Underwriting," with William C. Johnson, 2009, *European Financial Management*, Vol. 15, 703-732.

"Divergence of Opinion Surrounding Extreme Events," with Tim Loughran, 2005, *European Financial Management*, Vol. 11, 579-601.

"The Timing Ability of Newly Listed NYSE Firms, 1926-1962," with Tim Loughran, 2005, *Journal of Behavioral Finance* Vol. 6, 44-56.

## HONORS AND AWARDS

| | |
|---|---|
| *Professor of the Year*, Phi Chi Theta Undergraduate Professional Business Fraternity | 2001 |
| *Excellence in Teaching*, Finance Department, Michigan State University | 2001 |

## PROFESSIONAL ACTIVITIES

| | |
|---|---|
| Elected Position: Chair, IOSCO Committee on Emerging Risk | 2015-2016 |
| Elected Position: Vice Chair, IOSCO Committee on Emerging Risk | 2014-2015 |
| Member: Financial Stability Board's Standing Committee on Assessment of | 2015-2016 |

Vulnerabilities (SCAV)

Awarded a certificate of completion for the Strategic Management of Regulatory          2015
and Enforcement Agencies Program, Harvard University, John F. Kennedy
School of Government, Executive Education

Speeches

Suffolk University and Merrill Lynch Wealth Management Symposium, Boston, MA, 2017
Coe College, Cedar Rapids, IA, 2015
Network Management Americas, Miami, FL, 2015
IOSCO Annual Stakeholders Meeting, Madrid, 2015
13th Annual Quant Congress, New York, NY, 2015
Security Ops New York Conference, New York, NY, 2015
OTC Derivatives Clearing Summit, New York, NY, 2013
DerivOps Conference, Chicago, IL, 2013
University of Colorado, Burridge Center for Securities Analysis and Valuation Annual
Conference, "Dodd-Frank Requirements and Associated Economic Issues", Boulder, CO, 2011

Panelist

Investment Company Institute: Economic Analysis and SEC Rulemaking, 2023
Cornerstone Research: Emerging Issues in Cryptocurrency, 2023
Women in Securities Litigation: Expert Panel, 2023
PLI Expert Witness Panel, 2019-2023
Securities Enforcement Forum, 2020-2021, 2017-2018
REITwise Virtual Law, Accounting & Finance Conference, 2021
The Knowledge Group, Effectively Handling an SEC Enforcement Inquiry, 2019-2021
ICI Securities Law Developments Conference, 2020
SEC Conference on the State of Our Securities Markets, Washington, D.C. 2019
Carnegie Mellon Conference on the Economics of Credit Rating Agencies, Pittsburgh, PA, 2015
Center for Professional Education, New York, NY, 2013, 2015
ICI SEC Rules Committee, Washington, D.C., 2015
SEC Speaks, Washington, D.C., 2012, 2013, 2014, 2015
Financial Stability Board's Assessment Group on Vulnerabilities, Mexico City, 2014
National Organization of Investment Professionals Conference on Equity Market Structure, New
York, NY, 2014
Consumer Financial Protection Bureau Conf. on Benefit-Cost Analysis, Washington, D.C., 2014
Southwest Regional Securities Conference, Fort Worth, TX, 2013
NBER Credit Rating Agency Meeting, Boston, MA, 2013
Notre Dame Conference on Dodd Frank and the Future of Finance, Washington, D.C., 2013
Financial Markets Association, Legal and Legislative Issues Conference, Washington, D.C.,
2011, 2012
Financial Management Association, Annual Meeting, Dallas, TX, 2010

Discussant

Penn Law ILE Spring Corporate Roundtable, Philadelphia, 2019
FINRA Fixed Income Conference, Washington, DC, 2017
University of Notre Dame Regulatory Conference, South Bend, IN, 2009, 2010, 2011, 2015

University of Indiana, Conference on Financial Economics and Accounting, Bloomington, IN, 2011
Oxford University IPO Symposium, Oxford, UK, 2008
University of Notre Dame Ethics Conference, South Bend, IN, 2008
Washington Area Finance Association, 2008, Washington, D.C., Annual Meeting
European Financial Management Association Annual Meeting, Stockholm, 2006
People and Money Conference, Depaul University, Chicago, IL, 2005
Financial Management Association, 1999, 2002-2005, 2007, 2010 Annual Meetings

# Documents Considered by Jennifer Marietta-Westberg, Ph.D.

## Academic Articles

- Brogaard, Jonathan, Terrence Hendershott, and Ryan Riordan, "Price Discovery without Trading: Evidence from Limit Orders," *The Journal of Finance* 74, no. 4 (2019): 1621–1658

- Cao, Jie, and Bing Han, "Cross Section of Option Returns and Idiosyncratic Stock Volatility," *Journal of Financial Economics* 108, no. 1 (2013): 231–249

- Cox, Don R., and David R. Peterson, "Stock Returns Following Large One-Day Declines: Evidence on Short-Term Reversals and Longer-Term Performance," *The Journal of Finance* 49, no. 1 (1994): 255–267

- Easley, David, Soeren Hvidkjaer, and Maureen O'Hara, "Is Information Risk a Determinant of Asset Returns?" *The Journal of Finance* 57, no. 5 (2002): 2185–2221

- Easley, David, and Maureen O'Hara, "Information and the Cost of Capital," *The Journal of Finance* 59, no. 4 (2004): 1553–1583

- Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417

- Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5 (1991): 1575–1617

- Galai, Dan, "Tests of Market Efficiency of the Chicago Board Options Exchange," *The Journal of Business* 50, no. 2 (1977): 167–197

- Hood, Matthew, and Vance Lesseig, "Investor Inattention around Stock Market Holidays," *Finance Research Letters* 23 (2017): 217–222

- Kaniel, Ron, and Hong Liu, "So What Orders Do Informed Traders Use?" *The Journal of Business* 79, no. 4 (2006): 1867–1913

- Loughran, Tim, and Jennifer Marietta-Westberg, "Divergence of Opinion Surrounding Extreme Events," *European Financial Management* 11, no. 5 (2005): 579–601

- MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 13–39

- Santa-Clara, Pedro, and Alessio Saretto, "Option Strategies: Good Deals and Margin Calls," *Journal of Financial Markets* 12, no. 3 (2009): 391–417

**Analyst Reports**

- "COVID-19 Vaccine Landscape Quick Recap 'Need-to-Know' Updates on the COVID-19 Vaccine Landscape Over the Past ~2 Weeks," *Raymond James*, June 26, 2020
- "Inovio Pharmaceuticals (INO): Neutral," *Piper Sandler*, June 30, 2020
- "COVID Vaccine Candidate Delivers Booster," *Morgan Stanley*, July 1, 2020

**Data**

- Bloomberg
- Factiva
- LSEG

**Depositions**

- Deposition of Matthew D. Cain, Ph.D. dated August 13, 2024
- Deposition of Matthew D. Cain, Ph.D. dated January 10, 2024

**Expert Reports**

- Expert Report of Matthew D. Cain, Ph.D. dated December 1, 2023, including all documents cited therein and backup materials
- Expert Report of Jennifer Marietta-Westberg, Ph.D. dated January 26, 2024, including all documents cited therein and backup materials
- Expert Rebuttal Report of Matthew D. Cain, Ph.D. dated March 7, 2024, including all documents cited therein and backup materials
- Expert Report of Matthew D. Cain, Ph.D. dated July 30, 2024, including all documents cited therein and backup materials

**Legal Documents and Pleadings**

- *Dura Pharmaceuticals, Inc., et al. v. Broudo et al.*, 544 U.S. 336 (2005)

- Lead Plaintiff Wei Huang's Objections and Responses to the Armistice Defendants' Interrogatories to All Plaintiffs, Set Two, *In re Vaxart, Inc. Securities Litigation*, Master Case No. 3:20-cv-05949-VC, June 19, 2024

- Order Denying Motion for Class Certification, *In re Vaxart, Inc. Securities Litigation*, Master Case No. 3:20-cv-05949-VC, July 2, 2024

- Plaintiffs' Corrected Second Amended Consolidated Class Action Complaint, *In re Vaxart, Inc. Securities Litigation*, Master Case No. 3:20-cv-05949-VC, June 29, 2023

- Plaintiffs' Notice of Motion and Renewed Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel, *In re Vaxart, Inc. Securities Litigation*, Master Case No. 3:20-cv-05949-VC, July 30, 2024

- Private Securities Litigation Reform Act, 15 U.S.C. §78u–4(e)


**Press Releases**

- "Emergent BioSolutions Signs Five-Year Agreement for Large-Scale Drug Substance Manufacturing for Johnson & Johnson's Lead COVID-19 Vaccine Candidate," *Emergent BioSolutions*, July 6, 2020

- "ImmunityBio & NantKwest Sign COVID-19 Joint Development, Manufacturing and Marketing Agreement; ImmunityBio Selected for 'Operation Warp Speed' to Develop Novel Adenovirus COVID-19 Vaccine," *ImmunityBio*, May 27, 2020

- "INOVIO Announces Positive Interim Phase 1 Data for INO-4800 Vaccine for COVID-19," *Inovio Pharmaceuticals*, June 30, 2020

- "Moderna Announces Expansion of BARDA Agreement to Support Larger Phase 3 Program for Vaccine (mRNA-1273) Against COVID-19," *Moderna*, July 26, 2020

- "Pfizer and BioNTech Announce Early Positive Data from an Ongoing Phase 1/2 study of mRNA-based Vaccine Candidate Against SARS-CoV-2," *Pfizer*, July 1, 2020

- "Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed," *Vaxart*, June 26, 2020

- "Vaxart, Inc. Signs Memorandum of Understanding with Attwill Medical Solutions Sterilflow, LP," *Vaxart*, June 25, 2020

**Public Press**

- "A Little-Known Biotech Working on a COVID-19 Vaccine Has Surged 304% in 2 Days — and it Just Said it was Picked for the US Government's Operation Warp Speed program (VXRT)," *Business Insider*, June 26, 2020

- "Biopharma Update on the Novel Coronavirus: 26 Jun 2020," *BioSpace*, June 26, 2020

- "Bioscience Industry 'One of the Great Success Stories of the Public Markets,' Says Nasdaq CEO," *Nasdaq*, June 10, 2020

- "BRIEF-Vaxart's Covid-19 Vaccine Selected for the U.S. Government's Operation Warp Speed," *Reuters News*, June 26, 2020

- "Coronavirus Update: U.S. Sets Another Record for New Cases and Some States Scramble to Revisit Their Reopening Plans; Florida, Idaho, Kansas, Oregon, South Carolina and Utah Record their Highest Single-Day Case Numbers," *MarketWatch*, June 27, 2020

- "Coronavirus Update: U.S. Sets Record for New Cases in a Single Day, as Texas Becomes First State to Reimpose Restrictions; Nike Shares Slide after Company Swings to Loss and Sales Slide Almost 40% in Latest Quarter," *MarketWatch*, June 26, 2020

- "Covid Report: Tiny Biotech Stock Catapults 28% as Feds Eye its Vaccine," *Investor's Business Daily*, June 26, 2020

- "Daily COVID-19 Roundup: WHO Costs Delivery of 2 Bil. Vaccine Doses at USD18.1 Bil., Vaxart's Oral COVID-19 Candidate Selected for US Warp Speed Programme," *IHS Global Insight Daily Analysis*, June 29, 2020

- "Dow Closes 730 Points Lower After Spike in Coronavirus Cases Forces Texas and Florida to Close Bars Again, While Bank Stocks Sink on Stress Tests; Social Media Stocks Take a Hit as More Companies Pull Ad Spending on Hate Speech Concerns," *MarketWatch*, June 27, 2020

- "Emergent BioSolutions Inks Coronavirus Vaccine Manufacturing Deal With J&J – MarketWatch," *Dow Jones Institutional News*, July 6, 2020

- "Factbox: Latest on the Worldwide Spread of the Coronavirus," *Reuters News*, June 26, 2020

- "Global Cases Reach 9.68m as Australia Braces for Surge – As it Happened," *The Guardian*, June 26, 2020

- "Industry Brief – Vaxart's Covid-19 Vaccine Candidate to be Evaluated in US Operation Warp Speed NHP Study," *BMI Industry Insights Reports*, June 29, 2020

- "INOVIO Reports Positive Interim Phase I Data for COVID-19 DNA Vaccine, Joins 'Warp Speed' Primate Study," *Genetic Engineering and Biotechnology News*, June 30, 2020

- "Inovio's 860% Year-to-Date Rally Takes a Breather after the Release of Phase I Data for Company's COVID-19 Vaccine Candidate (INO)," *Business Insider*, June 30, 2020

- "Latest on the Worldwide Coronavirus Spread," *AAP Bulletins*, June 27, 2020

- "Moderna Shares Jump after U.S. Ups Funding for Coronavirus Vaccine by $472 million," *CNBC*, July 27, 2020

- "Operation Warp Speed Selects Billionaire Scientist's COVID-19 Vaccine for Monkey Tests," *Science*, June 1, 2020

- "Pfizer, BioNTech Vaccine Data Show Potential for Shot by January," *Bloomberg Law*, July 1, 2020

- "Pfizer Vaccine Rivals Tumble After Early Study Shows Promise," *Bloomberg Law*, July 1, 2020

- "Reuters Health News Summary," *Reuters News*, June 26, 2020

- "Stock Alert: Vaxart Hits New 52-week High as COVID-19 Vaccine Selected for OWS," *RTT News*, June 26, 2020

- "Trump Administration Announces Framework and Leadership for 'Operation Warp Speed,'" *U.S. Department of Defense*, May 15, 2020

- "Unveiling 'Warp Speed,' the White House's America-First Push for a Coronavirus Vaccine," *Science*, May 12, 2020

- "Update 3-Vaxart Says Potential COVID-19 Vaccine Picked for 'Operation Warp Speed,'" *Reuters News*, June 26, 2020

- "Vaxart: A Speculative Buy for its Oral COVID-19 Vaccine," *Seeking Alpha*, July 6, 2020

- "Vaxart's COVID-19 Vaccine Candidate Tapped for Operation Warp Speed Primate Study," *BioSpace¸* June 26, 2020

- "Vaxart Leaps 79% After Winning Warp Speed Backing, Novavax Drops," *Bloomberg Law*, June 26, 2020

- "Vaxart's Oral Coronavirus Vaccine Candidate Gets Chosen by OWS," *Yahoo Finance*, June 29, 2020

- "Vaxart Oral COVID-19 Vaccine Joins Trump's 'Warp Speed,' Ramps Up Manufacturing Capacity," *Genetic Engineering and Biotechnology News*, June 29, 2020

- "Vaxart: OWS To Test Oral COVID-19 Vaccine Candidate in Non-Human Primates," *RTT News*, June 26, 2020

- "Vaxart Rallies on Double Dose of Positive Coronavirus Vaccine Developments," *Benzinga.com*, June 26, 2020

- "Vaxart Says COVID-19 Vaccine Selected for Operation Warp Speed," *FDAnews Drug Daily Bulletin*, June 29, 2020

- "Vaxart Says Potential COVID-19 Vaccine Picked for 'Operation Warp Speed,'" *Reuters News*, June 26, 2020

- "Vaxart Shares Gain Over 44% After Covid-19 Vaccine Chosen for Federal Study," *Dow Jones Institutional News*, June 26, 2020

- "Vaxart Shares Jump after Federal Vaccine-Program Selection," *Dow Jones Institutional News*, June 26, 2020

- "Vaxart Shares Skyrocket on News Its COVID-19 Vaccine Candidate to Be Part of 'Operation Warp Speed' – MarketWatch," *Dow Jones Institutional News*, June 26, 2020

- "Vaxart Soars After Winning Warp Speed Backing; Novavax Drops (1)," *Bloomberg Law*, June 26, 2020

- "Vaxart +70% after Covid-19 'Warp Speed' Designation for its Vaccine," *Seeking Alpha*, June 26, 2020

- "What Small-Caps Should Know about the Russell Rebalance," *Nasdaq*, June 22, 2020

- "Why the Stock of this Potential Covid Vaccine Maker Jumped Nearly 456% this Week," *San Francisco Business Times Online*, June 26, 2020

- "Why Vaxart Stock Skyrocketed Today," *Motley Fool*, June 26, 2020

- "08:01 EDT Inovio downgraded to Hold from Buy at MaximMaxim analyst Jason…," *Theflyonthewall.com*, July 1, 2020

- "08:01 EDT Vaxart's COVID-19 vaccine selected for U.S. Government's Operation…," *Theflyonthewall.com*, June 26, 2020

- "11:05 EDT Vaxart Already Had Vaccine Deals with Emergent, Kindred, Notes Raymond…," *Theflyonthewall.com*, June 26, 2020

- Articles obtained from Bloomberg Law and Factiva

**Textbooks**

- Mishkin, Frederic S., and Stanley G. Eakins, *Financial Markets and Institutions*, 7th ed., Pearson Education, 2012

- Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 9th ed., McGraw-Hill/Irwin, 2010

**In addition to the documents on this list, I considered all documents and data cited in my report and exhibits, as well as all materials cited in my Rebuttal Report dated January 26, 2024, to form my opinions.**

# Vaxart, Inc.
## Illustration of Dr. Cain's Daily Artificial Inflation
6/25/20 – 7/27/20



Source:  Cain Merits Report; Cain Merits Report Backup Materials, "event_study.xls"

Note:  Vaxart common stock daily artificial inflation per share is obtained from Table C of the Cain Merits Report.  Dr. Cain's estimate of artificial inflation is displayed as of market close (4 PM ET) for June 26, 2020 and June 29, 2020.

# Vaxart, Inc.
## Illustration of Dr. Cain's Intraday Artificial Inflation
### 6/26/20



Source:  Cain Merits Report; Cain Merits Report Backup Materials,  "Exhibits 5-6 - Intraday Charts.xlsx"

Note:  Vaxart common stock intraday artificial inflation per share is obtained from Table C of the Cain Merits Report.  Dr. Cain estimates intraday artificial inflation as the purchase price of Vaxart common stock less his estimated but-for price of $3.25 as of market close on June 26, 2020.  Intraday prices are obtained from the Cain Merits Report backup materials and represent the volume-weighted average trading prices over five-minute intervals.



**Vaxart, Inc.**
**Illustration of Dr. Cain's Intraday Artificial Inflation**
6/29/20

Source: Cain Merits Report; Cain Merits Report Backup Materials, "Exhibits 5-6 - Intraday Charts.xlsx"

Note: Vaxart common stock intraday artificial inflation per share is obtained from Table C of the Cain Merits Report. Dr. Cain estimates intraday artificial inflation as the purchase price of Vaxart common stock less his estimated but-for price of $3.20 as of market close on June 29, 2020. Intraday prices are obtained from the Cain Merits Report backup materials and represent the volume-weighted average trading prices over five-minute intervals.

Exhibit 2

# Vaxart, Inc.
## Select Commentary on OWS Press Release[1]
### 6/26/20 – 7/6/20

| Date | Time[2] | Source | Title | Excerpts |
|------|---------|--------|-------|----------|

**Alleged Misrepresentation: OWS Press Release**

| Date | Time | Source | Title | Excerpts |
|------|------|--------|-------|----------|
| 6/26/20 | Pre-Market Open | Vaxart | Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed | • Vaxart, Inc., a clinical-stage biotechnology company developing oral vaccines that are administered by tablet rather than by injection, today announced that its oral COVID-19 vaccine has been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed, a new national program aiming to provide substantial quantities of safe, effective vaccine for Americans by January 2021.<br><br>• The study is designed to demonstrate the efficacy of Vaxart's oral COVID-19 vaccine candidate.<br><br>• "We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated. SARS-CoV-2, the coronavirus that causes COVID-19, is primarily transmitted by viral particles that enter through the mucosa - nose, mouth or eyes - strongly suggesting that mucosal immunity could serve as the first line of defense," said Andrei Floroiu, Chief Executive Officer of Vaxart Inc. "In addition, our vaccine is a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns." |

**Select Commentary**

| Date | Time | Source | Title | Excerpts |
|------|------|--------|-------|----------|
| 6/26/20 | 8:01 AM | Theflyonthewall.com | 08:01 EDT Vaxart's COVID-19 vaccine selected for U.S. Government's Operation... | • Vaxart's COVID-19 vaccine selected for U.S. Government's Operation Warp Speed Vaxart announced that its oral COVID-19 vaccine has been selected to participate in a non-human primate challenge study, organized and funded by Operation Warp Speed, a new national program aiming to provide substantial quantities of safe, effective vaccine for Americans by January 2021. The study is designed to demonstrate the efficacy of Vaxart's oral COVID-19 vaccine candidate. |
| 6/26/20 | 8:09 AM | Dow Jones Institutional News | Vaxart Shares Skyrocket On News Its COVID-19 Vaccine Candidate To Be Part Of 'Operation Warp Speed' -- MarketWatch | • Vaxart Inc. (VXRT) said Friday its oral COVID-19 vaccine has been selected to take part in a non-human primate challenge study funded by the U.S. government's 'Operation Warp Speed' program, that aims to accelerate development of a vaccine. The study is designed to evaluate the efficacy of the candidate. |
| 6/26/20 | 8:15 AM | Reuters News | Vaxart says potential COVID-19 vaccine picked for 'Operation Warp Speed' | • Vaxart Inc said on Friday it would test its potential COVID-19 vaccine on animals under the U.S. program titled "Operation Warp Speed", which is meant to speed up the development of COVID-19 therapeutics and vaccines. Shares of the U.S. drug developer jumped 63% before the opening bell. |
| 6/26/20 | 8:22 AM | Dow Jones Institutional News | Vaxart Shares Jump After Federal Vaccine-Program Selection | • Vaxart's proposed vaccine, administered orally, will be studied in primates with funding from Operation Warp Speed, the federal government's program to rapidly develop a vaccine for the new coronavirus. |
| 6/26/20 | 8:23 AM | RTT News | Vaxart: OWS To Test Oral COVID-19 Vaccine Candidate In Non-Human Primates | • Vaxart, Inc. said its oral COVID-19 vaccine has been selected to participate in a non-human primate challenge study, organized and funded by the U.S. Government's Operation Warp Speed. The study is designed to demonstrate the efficacy of the oral COVID-19 vaccine candidate. |

Exhibit 2

# Vaxart, Inc.
## Select Commentary on OWS Press Release[1]
### 6/26/20 – 7/6/20

| Date | Time[2] | Source | Title | Excerpts |
|---|---|---|---|---|
| 6/26/20 | 8:25 AM | Seeking Alpha | Vaxart +70% after Covid-19 'Warp Speed' designation for its vaccine | • Vaxart (NASDAQ:VXRT) is surging for the second day in a row, up 70% pre-market, after the U.S. Government selected their oral vaccine as eligible to participate in a non-human study organized and funded as part of Operation "Warp Speed." |
| 6/26/20 | 8:58 AM | Reuters News | BRIEF-Vaxart's Covid-19 Vaccine Selected For The U.S. Government's Operation Warp Speed | • Vaxart - Co's oral COVID-19 vaccine selected to participate in a non-human primate challenge study organized & funded by operation warp speed |
| 6/26/20 | 8:59 AM | Reuters News | Reuters Health News Summary | • Vaxart Inc said on Friday it would test its potential COVID-19 vaccine on monkeys in a study organized by the Trump Administration's vaccine-acceleration program called "Operation Warp Speed". Shares of the U.S. vaccine developer jumped 63% before the opening bell. |
| 6/26/20 | 9:14 AM | Bloomberg Law | Vaxart Leaps 79% After Winning Warp Speed Backing, Novavax Drops | • Vaxart surged 79% after revealing the company was selected to take part in the Trump administration's Operation Warp Speed, meant to speed up development of a vaccine for Covid-19. Vaxart's experimental oral vaccine will be studied in primates in a trial organized and funded by the program. |
| 6/26/20 | 9:25 AM | Benzinga.com | Vaxart Rallies On Double Dose Of Positive Coronavirus Vaccine Developments | • The South San Francisco, California-based company said its oral COVID-19 vaccine has been selected to participate in a non-human primate challenge study, or animal study, organized and funded by Operation Warp Speed. The study is designed to demonstrate the efficacy of the vaccine candidate, according to Vaxart. |
| 6/26/20 | 10:01 AM | RTT News | Stock Alert: Vaxart Hits New 52-week High As COVID-19 Vaccine Selected For OWS | • Shares of Vaxart Inc. (VXRT) are surging more 90 percent or $5.65 in Friday's morning trade at $11.91 after touching a new 52-week high of $14.30 earlier. The clinical-stage biotechnology company's COVID-19 vaccine candidate has been selected for the U.S. Government's Operation Warp Speed or OWS. Vaxart said that its oral COVID-19 vaccine has been chosen to participate in a non-human primate or NHP challenge study, organized and funded by Operation Warp Speed, a new national program aiming to provide substantial quantities of safe, effective vaccine for Americans by January 2021.<br><br>• The study is designed to demonstrate the efficacy of Vaxart's oral COVID-19 vaccine candidate. Vaxart said its vaccine is the only oral vaccine being evaluated and it provides an enormous logistical advantage in large vaccination campaigns as it is a room temperature-stable tablet. |
| 6/26/20 | 10:25 AM | Raymond James | COVID-19 Vaccine Landscape Quick Recap "Need-to-Know" Updates on the COVID-19 Vaccine Landscape Over the Past ~2 Weeks | • VXRT announced that the company has been selected to participate in the OWS program and will be running a non-human primate (NHP) challenge study funded by OWS. |

Exhibit 2

# Vaxart, Inc.
## Select Commentary on OWS Press Release[1]
### 6/26/20 – 7/6/20

| Date | Time[2] | Source | Title | Excerpts |
|---|---|---|---|---|
| 6/26/20 | 10:32 AM | MarketWatch | Coronavirus update: U.S. sets record for new cases in a single day, as Texas becomes first state to reimpose restrictions; Nike shares slide after company swings to loss and sales slide almost 40% in latest quarter | • Vaxart Inc. stock(VXRT, US) skyrocketed 77%, on the news that its oral COVID-19 vaccine has been selected to take part in a non-human primate challenge study funded by the U.S. government's Operation Warp Speed program, that aims to accelerate development of a vaccine. The study is designed to evaluate the efficacy of the candidate. |
| 6/26/20 | 11:05 AM | Theflyonthewall.com | 11:05 EDT Vaxart already had vaccine deals with Emergent, Kindred, notes Raymond... | • After Vaxart (VXRT) announced that it has been selected to participate in the U.S. government's Operation Warp Speed progrma [sic] and will be running a non-human primate challenge study funded by OWS, Raymond James analyst Steven Seedhouse said in a research note that Vaxart has already entered into agreements with Emergent BioSolutions (EBS) and Kindred Biosciences (KIN) to begin cGMP manufacturing of their vaccine candidate. Vaxart anticipates an IND submission soon with first clinical studios expected as early as summer 2020, the analyst noted. In late morning trading, Vaxart shares has skyrocketed nearly 70% and Kindred shares have jumped roughly 27%. |
| 6/26/20 | 11:14 AM | Bloomberg Law | Vaxart Soars After Winning Warp Speed Backing; Novavax Drops (1) | • Vaxart more than doubled, climbing as much as 128% on Friday, after revealing the biotech company was selected to take part in the Trump administration's Operation Warp Speed, meant to crank up development of a vaccine for Covid-19. Vaxart's experimental oral vaccine will be studied in primates in a trial organized and funded by the program. |
| 6/26/20 | 12:04 PM | Reuters News | UPDATE 3-Vaxart says potential COVID-19 vaccine picked for 'Operation Warp Speed' | • Vaxart Inc said on Friday it would test its experimental oral COVID-19 vaccine on monkeys infected with the new coronavirus in a study funded by the U.S. government to fight COVID-19 pandemic. Shares of the U.S. vaccine developer surged 66% to $10.38 in noon trading, extending a dizzying run in its stock price this year as investors bet on drug developers pushing ahead with vaccines or treatments to stop the COVID-19 pandemic.<br><br>• Vaxart said the study would be organized by "Operation Warp Speed", a joint program by the U.S. Department of Health and Human Services (HHS) and the Department of Defense that aims to speed up the development of coronavirus vaccines, treatments and diagnostics. |
| 6/26/20 | 12:56 PM | Business Insider | A little-known biotech working on a COVID-19 vaccine has surged 304% in 2 days — and it just said it was picked for the US government's Operation Warp Speed program (VXRT) | • Vaxart, a clinical-stage biotechnology company focused on developing vaccines administered by tablet rather than injection, said on Friday that it had been selected to participate in the US government's Operation Warp Speed program. The news sent Vaxart's stock as much as 106% higher on Friday morning. The firm said that its oral COVID-19 vaccine candidate would be involved in a nonhuman primate challenge study and that it was "the only oral vaccine being evaluated" in the program.<br><br>• Operation Warp Speed is a private-public partnership by the federal government designed to speed up the development and production of a COVID-19 vaccine, therapeutics, and related diagnostics. |

Exhibit 2

# Vaxart, Inc.
## Select Commentary on OWS Press Release[1]
### 6/26/20 – 7/6/20

| Date | Time[2] | Source | Title | Excerpts |
|------|---------|--------|-------|----------|
| 6/26/20 | 1:37 PM | Motley Fool | Why Vaxart Stock Skyrocketed Today | • Vaxart said its experimental vaccine, which is administered by tablet rather than by injection, will participate in a nonhuman primate (NHP) challenge study organized and funded by Operation Warp Speed, a program created by the Trump administration to 'accelerate the development, manufacturing, and distribution of COVID-19 vaccines, therapeutics, and diagnostics,' according to the U.S. Department of Health & Human Services. |
| 6/26/20 | 1:49 PM | BioSpace | Vaxart's COVID-19 vaccine candidate tapped for operation warp speed primate study. | • One month after Vaxart announced the selection of its lead vaccine candidate for COVID-19, the US-based company said it has been selected to participate in the US government's Operation Warp Speed programme. The South San Francisco company said this 26 Jun 2020 that its oral COVID-19 vaccine has been selected to participate in a non-human primate (NHP) challenge study, which was organized by the federal programme that has a goal of developing hundreds of millions of doses of vaccines to protect against COVID-19.<br><br>• The government's goal is to identify the most promising vaccine candidate while it is still under development and provide as much support as possible in order to move it through the clinical and regulatory process in order to have it available for the public. Vaxart's vaccine candidate is one of a handful of potential preventative drugs selected by the government for additional funding and study. |
| 6/26/20 | 2:49 PM | Dow Jones Institutional News | Vaxart Shares Gain Over 44% After Covid-19 Vaccine Chosen for Federal Study | • Shares of Vaxart Inc. are trading higher on the Nasdaq Friday, following news the company's oral vaccine for Covid-19 "has been selected to participate in a non-human primate challenge study, organized and funded by Operation Warp Speed."<br><br>• Operation Warp Speed is a public-private, federally-funded program looking to quickly develop a vaccine for Covid-19. |
| 6/26/20 | 4:49 PM | San Francisco Business Times Online | Why the stock of this potential Covid vaccine maker jumped nearly 456% this week | • An experimental Covid-19 vaccine from Vaxart Inc. will be part of a "challenge study" assembled by a federal government team charged with accelerating development of vaccines against the viral disease that has killed nearly 125,000 people in the United States alone. The news built on earlier gains to send the South San Francisco company's (NASDAQ: VXRT) stock 456% higher from its $2.57 price at the start of the week.<br><br>• Vaxart's is the only oral vaccine (a tablet instead of oft-used injectable vaccines) in the non-human primate challenge study organized and funded by Operation Warp Speed, the White House program aimed at delivering safe and effective Covid vaccines by January. |

**Exhibit 2**

# Vaxart, Inc.
## Select Commentary on OWS Press Release[1]
### 6/26/20 – 7/6/20

| Date | Time[2] | Source | Title | Excerpts |
|------|---------|--------|-------|----------|
| 6/26/20 | 4:58 PM | Investor's Business Daily | Covid Report: Tiny Biotech Stock Catapults 28% As Feds Eye Its Vaccine | • Vaxart stock rocketed Friday after the federal government selected its coronavirus vaccine for the Operation Warp Speed program. Operation Warp Speed aims to provide a safe, effective coronavirus vaccine for Americans by January. In total, the program enlisted 14 candidates and plans to whittle that number down to seven. Those seven get additional development assistance.<br><br>• Biotech company Vaxart (VXRT) is among the smaller companies on the docket. And earlier this month, the New York Times reported the White House also selected Moderna (MRNA), AstraZeneca (AZN), Johnson & Johnson (JNJ), Merck (MRK) and Pfizer (PFE) for the program. |
| 6/26/20 | 6:04 PM | Reuters News | Factbox: Latest on the worldwide spread of the coronavirus | • Vaxart Inc said it would test its experimental oral COVID-19 vaccine on monkeys infected with the coronavirus in a study funded by the Trump administration's vaccine-acceleration program called "Operation Warp Speed". |
| 6/26/20 | 8:39 PM | The Guardian | Global cases reach 9.68m as Australia braces for surge – as it happened | • Vaxart Inc said on Friday it would test its potential Covid-19 vaccine on monkeys in a study organised by the Trump Administration's vaccine-acceleration program called Operation Warp Speed. Shares of the US vaccine developer jumped 63% before the opening bell. |
| 6/26/20 | 8:50 PM | BioSpace | Biopharma update on the novel coronavirus: 26 Jun 2020. | • Vaxart Inc announced its oral COVID-19 vaccine was selected by Operation Warp Speed to participate in a non-human primate challenge study. The study will evaluate the efficacy of the oral COVID-19 vaccine. |
| 6/27/20 | 7:55 AM | MarketWatch | Coronavirus update: U.S. sets another record for new cases and some states scramble to revisit their reopening plans; Florida, Idaho, Kansas, Oregon, South Carolina and Utah record their highest single-day case numbers | • Vaxart Inc. stock(VXRT, US) skyrocketed 77%, on the news that its oral COVID-19 vaccine has been selected to take part in a non-human primate challenge study funded by the U.S. government's Operation Warp Speed program, that aims to accelerate development of a vaccine. The study is designed to evaluate the efficacy of the candidate. |
| 6/27/20 | 9:16 AM | MarketWatch | Dow closes 730 points lower after spike in coronavirus cases forces Texas and Florida to close bars again, while bank stocks sink on stress tests; Social media stocks take a hit as more companies pull ad spending on hate speech concerns | • Vaxart Inc. (VXRT, US) said Friday its oral COVID-19 vaccine has been selected to take part in a nonhuman primate challenge study funded by the U.S. government's "Operation Warp Speed" program, that aims to accelerate development of a vaccine. Shares were up more than 28%. |
| 6/27/20 | | AAP Bulletins | Latest on the worldwide coronavirus spread | • Vaxart Inc said it would test its experimental oral COVID-19 vaccine on monkeys infected with the coronavirus in a study funded by the Trump administration's vaccine-acceleration program called "Operation Warp Speed". |

Exhibit 2

# Vaxart, Inc.
## Select Commentary on OWS Press Release[1]
### 6/26/20 – 7/6/20

| Date | Time[2] | Source | Title | Excerpts |
|------|---------|--------|-------|----------|
| 6/29/20 | 12:00 PM | Genetic Engineering and Biotechnology News | Vaxart Oral COVID-19 Vaccine Joins Trump's "Warp Speed," Ramps Up Manufacturing Capacity | • Vaxart's oral COVID-19 vaccine candidate has joined the handful of experimental vaccines being studied as part of President Donald Trump's commitment to delivering 300 million vaccine doses protecting against SARS-CoV-2 by January 2021—while the company gears up to manufacture as many as one billion doses a year. The South San Francisco, CA, vaccine developer said Friday that its room temperature stable tablet vaccine had been selected for a non-human primate (NHP) challenge study organized and funded by Operation Warp Speed.<br><br>• Among the Trump administration's responses to COVID-19 has been Operation Warp Speed, which commits the federal government to funding and coordinating development of vaccines, drugs, and diagnostics across agencies of the Departments of Defense (DoD) and Health and Human Services (HHS)—the latter agency including the FDA, the NIH, the Centers for Disease Control and Prevention (CDC),and the Biomedical Advanced Research and Development Authority (BARDA).<br><br>• Fourteen of the 100+ vaccine candidates in development against COVID-19 were under study by Operation Warp Speed when it was announced on May 15, with former GlaxoSmithKline (GSK) vaccines chairman Moncef Slaoui, MD, as chief advisor and General Gustave F. Perna as chief operating officer.<br><br>• Earlier this month The New York Times reported that the program had concluded that developers of five vaccine candidates were most likely to produce a vaccine for the virus, citing unnamed "government officials," and that a formal announcement would come in weeks. The five candidates were Ad26.COV2-S by Johnson & Johnson (Janssen Pharmaceutical); AZD1222 by AstraZeneca, University of Oxford, and Vaccitech; BNT-162 by Pfizer and BioNTech; mRNA-1273 by Moderna; and an unnamed vaccine being developed by Merck & Co. and IAVI, a nonprofit scientific research organization dedicated to addressing urgent, unmet global health challenges.<br><br>• Four of the five candidates have won varying amounts of funding from BARDA totaling more than $2 billion. The largest award was the $1.2 billion given to AstraZeneca by BARDA. The agency also committed to Moderna up to $483 million in April and another $53 million in May toward expanding the company's domestic manufacturing capacity for mRNA-1273. Also, BARDA committed $456.2 million from development to licensure for Janssen and just over $38 million for Merck and IAVI. Pfizer and BioNTech have declined to accept Operation Warp Speed funding. The BARDA funding covers R&D, clinical trials, and manufacturing. |

**Exhibit 2**

**Vaxart, Inc.**
**Select Commentary on OWS Press Release[1]**
6/26/20 – 7/6/20

| Date | Time[2] | Source | Title | Excerpts |
|------|---------|--------|-------|----------|
| 6/29/20 | 12:42 PM | Yahoo Finance | Vaxart's Oral Coronavirus Vaccine Candidate Gets Chosen by OWS | • VXRT announced that its oral COVID-19 vaccine candidate has been selected for investigation in a non-human primate (NHP) challenge study.  The new study will be organized and funded by Operation Warp Speed (OWS), which is a new national program, to provide substantial quantities of safe, effective vaccine for Americans by January 2021.<br><br>• Per a New York Times report, earlier this month, the Trump administration identified five companies, which are most likely to be successful in making vaccines to prevent COVID-19.  As part of the OWS initiative to rapidly develop a vaccine for SARS-CoV-2, the virus that causes COVID-19, the administration narrowed down to five promising candidates from an extensive list of probables, currently being developed by around a dozen companies.  The five shortlisted companies are Moderna MRNA, the partnership between Oxford University and AstraZeneca AZN. J&J JNJ. Merck and Pfizer.  The report mentioned that the five companies will get extra federal funds to run their clinical studies and manufacturing assistance. |
| 6/29/20 | | BMI Industry Insights Reports | Industry Brief - Vaxart's Covid-19 Vaccine Candidate To Be Evaluated In US Operation Warp Speed NHP Study | • Vaxart's Covid-19 vaccine candidate has been selected to participate in the US government's operation warp speed non-human primate (NHP) study. The NHP study is organised by the federal programme with the objective of developing hundreds of millions of vaccine doses to protect against Covid-19. The study is scheduled to begin at the end of 2020, with the aim of identifying the most promising vaccine candidate and providing support to progress through the clinical and regulatory process. |
| 6/29/20 | | FDAnews Drug Daily Bulletin | Vaxart Says COVID-19 Vaccine Selected for Operation Warp Speed | • Vaxart has announced that its COVID-19 vaccine has been selected to participate in an animal study on primates funded by the Trump administration's Operation Warp Speed |
| 6/29/20 | | IHS Global Insight Daily Analysis | Daily COVID-19 roundup: WHO costs delivery of 2 bil. vaccine doses at USD18.1 bil., Vaxart's oral COVID-19 candidate selected for US Warp Speed programme | • Clinical-stage biotechnology company Vaxart (US) has announced that its oral COVID-19 vaccine candidate has been selected for participation in the non-human primate (NHP) challenge trial under Operation Warp Speed (OWP). OWP will organise and fund the study, which aims to demonstrate the potential efficacy of Vaxart's investigational COVID-19 vaccine tablet. Vaxart's vaccine candidate is the only orally administered vaccine being evaluated by OWP, which aims to bring at least 300 million doses of a vaccine to the US population by January 2021.<br><br>• [T]he US Department of Health and Human Services (HHS) has signed a deal with Emergent worth around USD 628 million to expand the manufacturing capabilities and capacity for production of a COVID-19 vaccine and therapeutics (see United States: 2 June 2020: US government adds USD 628 mil. to manufacturing contract with Emergent BioSolutions for COVID-19 Operation Warp Speed). |

**Exhibit 2**

# Vaxart, Inc.
## Select Commentary on OWS Press Release[1]
### 6/26/20 – 7/6/20

| Date | Time[2] | Source | Title | Excerpts |
|------|---------|--------|-------|----------|
| 6/30/20 | 9:43 AM | Piper Sandler | Inovio Pharmaceuticals (INO): Neutral | • Next up: NHP challenge, data in older patients, and regulatory discussions. Viral challenge testing is ongoing in ferrets and, as part of Operation Warp Speed (OWS), in NHP challenge studies, which should be more informative on INO-4800's efficacy than the mouse data hinted at today. Selection for inclusion in NHP challenge studies as part of OWS doesn't necessarily run counter to media reports that INO-4800 is excluded as an OWS finalist, and for context we note that Vaxart (also reported to be excluded from the OWS finalist list) recently reported participation in OWS NHP challenge studies as well. Dose selection for the P2/3 appears TBD, though we wonder if INO will have a better idea after dosing patients >50yrs old in additional P1 cohorts (note Part B of the trial is enrolling 120 subjects age 19-64 ). Pending discussions with regulators, INO continues to expect to initiate a P2/3 efficacy trial this summer. |
| 6/30/20 | 10:33 AM | Business Insider | Inovio's 860% year-to-date rally takes a breather after the release of Phase I data for company's COVID-19 vaccine candidate (INO) | • Inovio also said its vaccine candidate was selected to participate in a non-human primate challenge study as part of the US government's Operation Warp Speed. Vaxart is another company working on a vaccine for COVID-19 that was selected to participate in the same challenge study, which sent its stock soaring. |
| 6/30/20 | 3:32 PM | Genetic Engineering and Biotechnology News | INOVIO Reports Positive Interim Phase I Data for COVID-19 DNA Vaccine, Joins "Warp Speed" Primate Study | • INOVIO's inclusion in the program comes days after Vaxart announced that its room temperature stable tablet vaccine for COVID-19 will be evaluated by Operation Warp Speed… as well, in the name NHP study. |
| 7/1/20 | 8:01 AM | Theflyonthewall.com | 08:01 EDT Inovio downgraded to Hold from Buy at Maxim Maxim analyst Jason… | • McCarthy adds that Vaxart (VXRT) has also been selected to participate in a non-human primate challenge study as part of the government's "Operation Warp Speed" pandemic response, though given the recent surge in cases, there is room for "multiple players". |
| 7/6/20 | 2:08 PM | Seeking Alpha | Vaxart: A Speculative Buy For Its Oral COVID-19 Vaccine | • On June 26, Vaxart announced: "its oral COVID-19 vaccine has been selected to participate in a non-human primate (NYSE:NHP) [sic] challenge study, organized and funded by Operation Warp Speed, a new national program aiming to provide substantial quantities of safe, effective vaccine for Americans by January 2021". |

Note:
[1] Dr. Cain cites to several of the news sources shown in the exhibit, including Business Insider, MarketWatch, RTT News, Seeking Alpha, theflyonthewall.com, and Yahoo Finance. The complete OWS Press Release is displayed in the exhibit, except for the portions "About Vaxart" and "Forward-Looking Statements."
[2] All times presented are in Eastern Time. When the timestamp is missing, it is unavailable from the underlying document or public sources.

**Exhibit 3**

## Vaxart, Inc.
## Residual Returns on Select Days during the Proposed Class Period

| | | June 29, 2020 | | July 1, 2020 | | July 2, 2020 | | July 6, 2020 | | July 27, 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Residual Return | p-Value[6] | Residual Return | p-Value[6] | Residual Return | p-Value[6] | Residual Return | p-Value[6] | Residual Return | p-Value[6] |
| **Cain Event Study Model[1]** | [a] | -6.2% | 0.191 | -10.2% | 0.072 | -8.8% | 0.123 | -13.7% | 0.021 * | -13.7% | 0.021 * |
| *Alternative Days Excluded From the Regression Estimation* | | | | | | | | | | | |
| **Inflation Creating Dates and Corrective Disclosure Dates** (*Assumes Multi-Day Impacts*)[2] | [b₁] | -6.5% | 0.262 | -10.8% | 0.096 | -9.6% | 0.143 | -13.7% | 0.043 * | -17.9% | 0.203 |
| **Inflation Creating Dates and Corrective Disclosure Dates** (*Assumes Impacts Limited to One Day*)[3] | [b₂] | -6.5% | 0.262 | -10.8% | 0.096 | -9.6% | 0.143 | -13.4% | 0.049 * | -17.1% | 0.219 |
| **Inflation Creating Dates, Corrective Disclosure Dates, and Cain News Days** (*Assumes Multi-Day Impacts*)[4] | [b₃] | -6.4% | 0.272 | -10.7% | 0.103 | -9.5% | 0.152 | -13.5% | 0.047 * | -18.1% | 0.123 |
| **Inflation Creating Dates, Corrective Disclosure Dates, and Cain News Days** (*Assumes Impacts Limited to One Day*)[5] | [b₄] | -6.4% | 0.272 | -10.7% | 0.103 | -9.5% | 0.152 | -13.3% | 0.054 | -17.2% | 0.141 |

Source: Cain Efficiency Report; Cain Efficiency Rebuttal Report; Cain Efficiency Rebuttal Report Backup Materials; Cain Merits Report

Note:
[1] Event study model as described in Section V of the Cain Efficiency Rebuttal Report. This is a two-factor regression model with market and industry indices estimated over the prior 40 trading days for each trading day in the Proposed Class Period, excluding the following dates: 4/21/20, 4/28/20, 4/30/20, 5/13/20, 5/20/20, 6/15/20, 6/24/20, 6/25/20, 6/26/20, 7/1/20, 7/2/20, 7/6/20, 7/7/20, 7/13/20, 7/14/20, 7/15/20, and 7/27/20.
[2] The Cain Event Study Model, but only excluding from the estimation window the Inflation Creating Dates and Corrective Disclosure Dates. The dates excluded from the estimation window are: 6/25/20, 6/26/20, 6/29/20, 7/1/20, 7/2/20, 7/6/20, and 7/27/20.
[3] The Cain Event Study Model, but only excluding from the estimation window the Inflation Creating Dates and Corrective Disclosure Events impacts limited to one day. The dates excluded from the estimation window are: 6/25/20, 6/26/20, 6/29/20, 7/1/20, and 7/27/20.
[4] The Cain Event Study Model, but only excluding from the estimation window the Inflation Creating Dates, Corrective Disclosure Dates, and Cain News Days. The dates excluded from the estimation window are: 6/15/20, 6/25/20, 6/26/20, 6/29/20, 7/1/20, 7/2/20, 7/6/20, 7/13/20, and 7/27/20.
[5] The Cain Event Study Model, but only excluding from the estimation window the Inflation Creating Dates, Corrective Disclosure Events impacts limited to one day, and Cain News Days. The dates excluded from the estimation window are: 6/15/20, 6/25/20, 6/26/20, 6/29/20, 7/1/20, 7/13/20, and 7/27/20.
[6] p-values marked with the asterisk * denote statistical significance at the 5% level (corresponding to using the 95% confidence interval), using a two-tailed test.