# Exhibit C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

In Re VAXART, INC. )
SECURITIES LITIGATION )
------------------------- )
This Document Relates to: ) Master Case No.
ALL ACTIONS ) 3:20-cv-05949-VC
------------------------- )

Volume 2

* * * C O N F I D E N T I A L * * *

August 13, 2024
10:58 a.m.

Videoconferenced deposition of MATTHEW D. CAIN, held virtually with the witness located in Chagrin Falls, Ohio, pursuant to notice, before Laurie A. Collins, a Registered Professional Reporter and Notary Public of the State of New York.

represent that to you.

And my question to you is do you believe that it is important for purposes of your loss causation and damages analysis to know whether or not the truth was contained in the body of the press release that was issued on June 26 or June 25th.

ATTORNEY MELANSON: Objection to form.

A. Again, it's the same answer as before. My goal here is not to take all court hearing transcripts and provide an analysis of that in my merits report. My purpose of my merits report is to explain the evolution of artificial inflation over the course of the class period, which is what I've done.

Q. Dr. Cain, I wasn't asking you to provide an analysis of this court opinion; I was asking you a very simple question. For purposes of your report in this case, is it important for you to know -- let me read the question.

So do you believe that it is important for purposes of your loss causation and damages analysis to know whether or not the truth was contained in the body of the press release that was issued on June 26 and June 25th? It's a

simple question. Is it important for you to know that or not?
ATTORNEY MELANSON: Objection to form.
A. I'm not sure that I'm understanding your question. I'm not sure what you mean when you say "the truth."
Q. You don't understand what I mean when I say "the truth"?
A. Correct.
Q. I believe I asked you earlier isn't your goal in your report to identify when the truth enters the market.
A. My goal in my merits report -- I'm happy to turn to that and show you what I explain in the merits report -- is to focus on the relevant truth for investors and how that injured the stock price.
So if that's what you're asking about, then what I can say is what I show in my merits report is that the full relevant truth was not fully disclosed to the market until Saturday, July 25th of 2020, but that a portion of the relevant truth did make its way into market prices very quickly on the same day as the "selected for OWS" press release came out.

that market reflect all material, widely available public information up to the point that any marginal profits to be gained from trading on existing information do not exceed trading costs?

Is that still the definition of efficiency that you're proceeding under?

A. Yeah, I think I would agree with that.

Q. Would you agree that information can be fully incorporated into a stock price even if some or even most investors are not subjectively aware of it, provided that a sufficient number of participants in the stock market have access to that information and are willing to trade on it?

ATTORNEY MELANSON: Objection to form.

A. That can be the case, yes.

Q. In an efficient market -- well, scratch that.

One of the characters of an efficient market is information is incorporated into a stock price or security price quickly; is that right?

A. Well, I would say prices react quickly to information. So when I talk about market efficiency, I'm talking about informational efficiency and not fundamental efficiency. So the stock price may not reflect the true value of

stock price within one trading day; right?
A. Yes, I have seen many instances of that.
Q. And, for example -- we'll get to this a little bit more later -- but you attempt to measure price inflation with respect to the July 25th New York Times article by looking at a one-day trading window; right?
A. Yes.
ATTORNEY MELANSON: Objection to form.
A. Yes, on July 27th, that's correct.
Q. Why did you look at only one day to see the price reaction for the New York Times article?
A. My recollection is that there was a statistically significant reaction on July 27th, and I did not see a continued reaction on the following day.
You know, I guess just to make sure we're talking about the same thing, investors did have -- in terms of time to digest that information, they had Saturday, July 25th; they had Sunday, July 26th; and then the market impact date of Monday, July 27th.
But in terms of trading days, yes, that's one single trading day where I observed the

at the information environment for a company. So for the situation here, it's actually looking at the information environment from June 25th all the way through July 27th.

And when you look at the information environment, it's actually fairly clear, fairly obvious, that there was leakage of the relevant truth into the stock price starting on June 26th around 9:40 a.m. through the close and then June, July 1st, 2nd, and 6th.

So it's actually fairly clear when you look at the -- and I can explain why that's clear, but it's fairly clear when you look at the information environment over this roughly five or six trading days there was leakage of relevant truth into the marketplace.

Q. The analysis you're doing to determine whether or not there was leakage, that occurs prior to actually measuring the change in stock price that you're attributing to the leakage; is that right?

ATTORNEY MELANSON: Objection to form.

A. I think those two things go hand in hand. I think they both take place at the same time.

Q. So in determining that there was leakage, you are relying to a certain extent on the price decline that occurs?
A. Yes.
ATTORNEY RUBIN: We've been going for about an hour. Why don't we take a brief break.
ATTORNEY MELANSON: Fine.
THE VIDEOGRAPHER: This is the videographer. The time is 11:59. We're going off the record. This ends media file 1.
(Recess taken from 11:59 to 12:11.)
THE VIDEOGRAPHER: We are back on the record. The time is 12:11. This begins media file 2.
Q. Dr. Cain, before we took our last break, you had mentioned a Piper Sandler article that came out on June 30th. Do you recall that discussion?
A. Yes.
Q. And I believe that that was cited in Footnote 272 of your report?
A. Let's see.
Yes, I see that.
Q. My recollection of your testimony is

included within that.
Q. Right. I understand it would be included within that. My question is more you don't call out that specific piece of news; you say you referenced it because it was included within that broad description?
ATTORNEY MELANSON: Objection.
A. It is included within that description, yes.
Q. We'll get to this in a moment, but, for example, in the June 26 press release one of the things that you did was you tried to answer the question as to whether or not the invitation to the nonhuman primate study was confounding information, and you specifically said, Now I'm going to test to see whether or not this fact was confounding information; right?
A. That is correct.
Q. You didn't do that level of specificity with respect to the Attwill press release? You didn't specifically call it out that you were testing that and do the test in the same way you did for the NHP study; right?
ATTORNEY MELANSON: Objection to form.
A. Well, it's a question I considered.

But, again, I'm not aware of a sample of companies making announcements with essentially no content in those announcements. So you're trying to describe some sort of hypothetical memorandum of understanding that's stripped of all of the content that plaintiffs alleged was false and misleading.

If I come up with some sort of empirical sample to test, then it's merely something I would consider. But off the top of my head the hypothetical that I think you're trying to describe just doesn't seem very logical to me.

Q. As you sit here today, you can't think of any way you could test specifically whether or not the mere fact of the alleged -- excuse me.

As you sit here today, you can't think of any way that you could test whether or not the mere announcement of the partnership or the memorandum of understanding would be confounding information? That's not something that you can think of as you sit here today?

ATTORNEY MELANSON: Objection to form.

A. Again it's something that I considered, and I concluded that it wasn't confounding, in terms of any nonfraud-related component. It is a

question that I considered.
Q. Right. But you didn't specifically say that you were considering it in those words, that you were considering it -- that you were considering specifically the memorandum of understanding with Attwill, like you did for the NHP study?
A. Again, it's included within the description in paragraph 128.
Q. Okay.
Do you know what type of company Attwill is?
A. It's not something I looked -- it's not something I've researched specifically.
Q. Do you know what type of manufacturing they specialize in?
A. Broadly, no, I don't. My recollection is that they included potential ability to manufacture drugs or vaccines. But that's not a company that I separately researched for this case.
Q. Do you know what the process of lyophilization means?
A. No.
Q. So fair to say that you don't know if

prior to entering into an agreement with Attwill Vaxart had the ability to lyophilize its COVID-19 tablets?
A. I don't know one way or the other.
Q. Fair to say you don't know whether or not Attwill provided lyophilization resources?
A. I don't know.
Q. And just to wrap this up, you don't know whether any other companies other than Attwill provide lyophilization services; right?
A. That's right, I don't know.
Q. Did you review the deposition testimony of Dr. Sean Tucker where he discussed the importance of the Attwill memorandum of understanding?
A. Not that I recall.
Q. Did you review the deposition testimony of Andrei Floroiu where he discussed the importance of the Attwill memorandum of understanding?
A. I don't believe so.
Q. And despite not having reviewed that information, you still concluded that the fact of the MOU in and of itself was not material, firm-specific, confounding information that needed to

pump-and-dump cases for the SEC.
Q. In those cases did you measure an inflation ribbon or is that not something you would do unless there was a class action?
A. Typically we don't have to form an inflation ribbon, because in those cases the case is typically disgorgement of ill-gotten gain. You think of it in a very similar dynamic as 20A damages that I calculate in this report. I think there are some similarities there. In the SEC cases we don't typically have to calculate an artificial inflation ribbon.
Q. Just to round that out -- I just want to make sure that we're on the same page -- you were not aware of any other case that you've worked on prior to this one where you had a premarket alleged misrepresentation and you created an inflation ribbon using intraday inflation variation; is that right?
A. I think that is correct. Like I say, I've worked on -- I have seen similar dynamics in other cases, but I do think that those did not involve an inflation ribbon because of the dynamics.
Q. Because the but-for stock price of

Vaxart on June 26th is held constant over the entire day, that means that you attribute all intraday stock price movement to changing inflation; is that right?
A. Yes.
Q. You would agree with me that the NASDAQ composite total return index and the NASDAQ biotechnology total return index varied throughout the day on June 26th; right?
A. I don't think that they had significant variation relative to the movements in Vaxart's stock price.
Q. Well, my question is just whether they moved at all. They weren't -- they didn't sit at the exact same to two decimal points throughout the entire day; right?
A. I don't know the decimal points, but I don't believe that they had significant variation relative to the movements in Vaxart's stock price.
Q. Would it be surprising to you, as an economist who has done this for a long time, that these two indices did not change one penny throughout the entire day on June 26th? Is that something you would expect to be the case?
ATTORNEY MELANSON: Objection to form.

A. I don't have an expectation of how much indices move from day to day.
Q. Is that something you checked, to see what the price movement was of those indices during the day on June 26th?
A. I believe I did. I don't know the numbers off the top of my head, though.
Q. So let's assume that those indices had some level of variation. I'm not saying it was dramatic or making any representation about the amount but that there was some intraday change of those two indices.
Your model assumes that in the absence of a fraud Vaxart's stock price would have remained exactly $3.25 the entire day; right?
A. I don't know that I would -- obviously I'm not predicting the stock price would have remained constant at 3.25, but that's my estimate, a reasonable estimate, of the implied but-for price for purposes of calculating damages.
Q. Your damages calculation makes that assumption; right?
A. Yes, it holds -- it holds it constant for purposes of calculating damages.
Q. You could have modeled Vaxart's

intraday stock price movement against the industry and market intraday price movements; right?
A. We don't typically model intraday movements. So obviously I could do anything, but I stuck with the standard approach of sticking with daily event study results.
Q. You said it's a standard approach, but didn't you just say this is the first time you have ever done this in this type of case with a premarket press release?
A. It's certainly not the first time I have looked at intraday movements, no. I do -- like I said earlier, this case was I think somewhat novel in terms of the dynamics on this -- well, just the allegations in this case, yes.
Q. You didn't think it was necessary to determine what percentage of Vaxart's intraday stock price movement could be explained by industry or market events?
A. I absolutely did. That's what the event study did. What the event study shows is the movements of Vaxart's stock price on this day were not driven by the market or the industry movements.
Q. That's the 4 p.m. to 4 p.m. change;

right?
A. Intraday too. The stock price I think more than doubled on this day. There was no comparable change in the market or the industry on this day. So it was clearly caused by the "selected for OWS" press release.
Q. You said it was clear -- I'm sorry.
A. I think -- it's important to take a step back and remember that the analysis I did is premised upon a review of the information environment and an understanding of what was going on with Vaxart and the market around this time period.
So I certainly considered this question of what was Vaxart's variation throughout the day and the price being driven by very large movements in the overall stock market or the industry. I quickly concluded that that was not the case. So that was certainly part of the analysis that I did up front.
Q. As you're sitting here today, you can't tell me precisely how the intraday price ribbon of Vaxart's stock would have changed if you had modeled it against the intraday price movement of the market or industry indices? You can't tell me

exactly how it would have changed; right?
A. Again, I don't think that it had a significant impact on it, a noticeable effect on the price on these days. The overall market and the industry were fairly unremarkable in terms of their movement in this time period, in contrast to Vaxart's stock price movement.
Q. Again, Dr. Cain, I'm just asking a very specific question. I understand you don't think it would have substantially changed your conclusions, and I'm really just trying to ask you the specific question of as you sit here today you do not know how the inflation ribbon precisely would have changed in the intraday June 26th if you had modeled it against the industry or market effects.
You can't tell me if it would have changed it by a penny, by two pennies. That's just not something you're able to do because you didn't do the modeling; right?
ATTORNEY MELANSON: Objection to form.
A. I considered it and I concluded there was no change necessary to control for. There was no significant impact on it on this day, and therefore there was no need for me to do some sort

of further analysis.
Q. You modeled the market and industry effects from the 4 p.m. to 4 p.m. June 25th and June 26th change; right?
A. Yes.
Q. You weren't satisfied by looking at the change in the market and industry effects on that day that you were okay skipping that step?
ATTORNEY MELANSON: Objection to form.
A. I'm sorry, I don't really understand what you're asking.
Q. Well, you just said a few minutes ago that the market and the describe indices were fairly calm and not moving very much as compared to Vaxart; right?
A. Yes.
Q. My question is you didn't -- you still nonetheless modeled the 4 p.m. to 4 p.m. price movements of Vaxart's stock against the market and industry indices in order to calculate the 4 p.m. to 4 p.m. price inflation change; right?
A. Yes, I did.
Q. But you did not do that same modeling for the intraday price movements; right?
A. I didn't do -- I didn't do -- you can't

take a daily event study approach and then just apply that to intraday data. It's not the same. But, right, so that's -- you are sort of comparing apples and oranges, and that's not something I did.

Q. Take a look at Exhibit 5 of your report. This is something that we've looked at a couple times already today. This is the intraday stock price movement of Vaxart on June 26, 2020; right?

A. Yes.

Q. I'm going to direct your attention to -- it looks like it's associated with a time stamp of around 2:10 p.m. on June 26. Do you see that the stock price hits a valley at that point?

A. Yes.

Q. That specific point isn't labeled, but based off of the stock chart as you prepared it, why don't you tell me approximately ballpark what does that stock price respond to.

A. It looks like a little bit over $8 per share.

Q. Can we call it 8.10, just to pick a random number? I understand it might not be exact.

information that was in the marketplace during that point in time.

But beyond that there's no -- there's no analysis that's required on a minute-by-minute basis the way you're trying to set up some sort of false requirement to conduct a minute-by-minute analysis to explain every bouncing up and down of the stock price.

Q. You are --

A. Or what I explain in my report is there's significant degree of uncertainty and significant divergence of opinions among different market participants during this period of time that followed the OWS press release.

Q. Do you believe that a difference of opinion can constitute an inflation-creating event?

ATTORNEY MELANSON: Objection to form.

A. It's not -- that's not a question that I've sought to form an opinion on one way or another.

Q. You said you're not obligated to perform a minute-by-minute -- let me read it. You said, There's no analysis that's required on a minute-by-minute basis to explain every bouncing

up and down of the stock price.
Just to be clear, Dr. Cain, you are assuming that price inflation changes minute by minute -- right? -- by the way that you've defined price inflation on June 26th?
A. Yeah, absolutely. For example, like I said, investors who bought earlier that day likely suffered far greater damages than investors who bought later in that day, because over half of the inflation came out throughout the course of the trading day on June 26th.
Q. But you actually think that somebody who bought at 2:10 suffered more -- excuse me, suffered less damage than someone who bought at 2:50; right?
ATTORNEY MELANSON: Objection to form.
A. Again, I was talking about somebody who, for example, bought at 9:45 a.m. at 13 or 14 dollars a share versus somebody who bought at 1, 2, 3, 4 p.m. at much lower stock prices. As you can see on the graph, it bounces up and down throughout the day, not just 2:10, 2:45. But throughout the day, the stock price bounces around due to the uncertainty that is created by the OWS press release.

Q. Was the fact that there was no price movement associated with the Inovio press release something that you considered or relied upon in forming your conclusions?
A. It's something that I looked at. But, like I said earlier, it's very possible that the price could increase if they had announced really strong results from their other studies. And therefore that in and of itself would be confounded because that would not be a clear stock price measure of the impact of the mere initiation of an NHP study.
Like I said, there were no press releases that only announced the initiation of an NHP study, based on my research parameters.
Q. Dr. Cain, I really want to focus you on my question. Was the fact -- you included the fact that there was no stock price movement associated with Inovio's press releases.
I'm asking you whether or not you relied on that fact as supporting your conclusions that there needed to be no disaggregation of the NHP invitation for Vaxart. Did that support those conclusions?
ATTORNEY MELANSON: Objection to form.

going off the record.
(Recess taken from 3:24 to 3:34.)
THE VIDEOGRAPHER: The time is 3:34. We're back on the record. This begins media file 5.
Q. Dr. Cain, I want to stay on this topic of your conclusion there was no confounding information on June 26th, 2020. Okay?
A. Okay.
Q. And specifically your conclusion that the initiation of the NHP study was not material firm-specific, confounding information. Okay?
A. Okay.
Q. Let's look at paragraph 138, which I think where we left off. If you look at the second sentence of paragraph 138, you're drawing a distinction between the materiality or importance of the invitation to an NHP study as compared to a publication of the results of the NHP study; right?
A. I do talk about that, yes.
Q. Is your conclusion generally based off of your review of the analysis that we just talked about before the break that you believe that the results of an NHP study could be material but that

the mere announcement of an NHP study is not material; is that right?
ATTORNEY MELANSON: Objection to form.
A. In part, yes. My opinion is that study outcome results can be economically important information or value-relevant information for investors but the invitation, the mere invitation -- initiation of or invitation to an NHP study is not in and of itself value-relevant information to investors.
Q. If you look other page 138 to the second half of the study -- this is looking at your report, the second half of -- excuse me, the paragraph 138, do you see where it starts, I also understand that internally? Do you see where that sentence starts?
A. Yes.
Q. You state, I also understand that internally Vaxart personnel did not view the mere invitation to an NHP study as constituting material nonpublic information or warranting a press release.
Do you see that?
A. Yes.
Q. So as part of the analysis that you did

to determine whether or not the invitation to the NHP study was material, one of the things that you based that on was your understanding that the Vaxart personnel did not view it as material nonpublic information or warranting a press release; right?

A. Well, I think my analysis was based on the empirical sample, empirical research that I did. So that's what I would describe as my analysis. But I also considered internal case documents as well as further supporting the conclusions that I reached from the analysis.

Q. So if the further analysis that you did or that further -- whatever word you want to use -- further review that you did gave you outcomes that were contrary to what the empirical research showed, would that factor into your opinions or is that something you would want to note in your report?

ATTORNEY MELANSON: Objection to form.

A. Again, that's not an analysis. Like the analysis was looking at what companies tended to do -- right? -- looking at a large sample of companies to see what they do. That's the analysis. But I also noted further internal case

selected to participate in NHP studies, you were drawing a distinction between those companies that issued a press release upon the initiation of the study versus those that waited until they had results; right?

ATTORNEY MELANSON: Objection to form.

A. It's not only page 98 -- it's also page 97 at the beginning of paragraph 138 -- where I say, For example, I evaluated whether an invitation to a nonhuman primate study as opposed to reports on a study's outcome results would typically merit a press release announcement.

This is my report, my words. And I think you're trying to sort of confuse or distort the analysis I've done here, the opinions that I'm providing.

Q. Just to be clear, nothing in this -- in Exhibit 85 supports the conclusion that Vaxart personnel believed that the initiation or the beginning of an NHP study preresults was not material; is that right?

ATTORNEY MELANSON: Objection to form.

A. I don't really have an opinion one way or another on the question you're asking. That's not the question I was asking in my report.

that that's what you mean. But I'm not going to accept that that's what all companies necessarily mean when they talk about it.

Q. Okay. Then I'll ask -- I'll put it in the question so that there's no confusion.

Are you offering an opinion in this case that a company dosing the first monkey in an NHP study would not be material information generally?

A. Ultimately I've not formed an opinion one way or another on that question.

Q. Let's look at --

ATTORNEY RUBIN: Chris, can you mark Tab 13, which is Exhibit 91.

ATTORNEY BARWICK: Introducing what has been previously marked as Exhibit 91.

Q. This is Exhibit 91, which, Dr. Cain, is the second exhibit that you cite in Footnote 260.

A. Okay.

Q. Let me know when you have that in front of you.

A. All right. I've got it.

Q. All right. This is an email from -- the top email is from an individual named Mike Sinclair to Hans Herklots. Do you see that?

A. Yes.
Q. And he's forwarding an earlier email that Mr. -- or he's responding to an earlier email that Mr. Herklots sent him on June 26 at it looks like 16:01? I'm not sure what time zone that is. But do you see that email?
A. Yeah, I do.
Q. Is this another document that you rely on to support your conclusion that -- your conclusion as stated in Footnote 260 and the corresponding sentence in the report?
ATTORNEY MELANSON: Objection to form.
A. I don't think I'm stating a conclusion in Footnote 260, but I do state a conclusion in paragraph 139 that there was nothing to disaggregate.
Q. No, I'm not asking --
A. This was one of the documents that I relied on in performing that assessment, yes.
Q. Dr. Cain, you state in the preceding sentence of Footnote 260: I also understand how internally Vaxart personnel did not view the mere invitation to an NHP study as constituting material nonpublic information or warranting a press release.

A. That's in the paragraph, not the footnote.
Q. Correct. And what I'm -- the footnote -- the documents cited in that footnote are meant to support the statement that you are making in that sentence; right?
A. Yes.
Q. And this is another document that's in Footnote 260. So my question to you is nowhere in this email does any Vaxart personnel or anyone else state that the NHP study itself is not material; right?
A. I don't believe they used those exact -- I don't believe they used your exact words, correct.
Q. You would also agree that Mr. Herklots is indicating that the moment that Vaxart was waiting for to issue the press release was when the monkey was dosed. Do you see that?
A. That's what it looks like, yes.
Q. And, again, that would be before any -- in your understanding of the way that studies work, that would be before any results of the NHP study were available to be published; is that right?

A. I think that's consistent with my general understanding, yes.

Q. So you would agree that according to this document that you relied on Vaxart was planning on issuing a press release upon the first monkey being dosed and not waiting until the results of the NHP study; is that right?

A. I don't know. I don't have an opinion one way or another of what their plans were in terms of timing of issuing press releases.

Q. Why did you cite this document in Footnote 260 if you don't have an opinion on that?

A. Because you're asking about completely unrelated questions like we talked about a few times.

But I'll say it again: The question that I'm asking here is if you were to jump up to paragraph 131 and you look at the "selected for OWS" press release, the question I'm asking is whether there's any information in this press release that I would expect to have caused Vaxart's stock price to move by a significant amount that is nonfraud related and clearly needs to be disaggregated as confounding information. And the analysis that I'm doing is geared towards

their mind would have warranted the issuance of a press release beyond what I've explained in my report.

ATTORNEY RUBIN: Let's mark what's previously been introduced as Exhibit 107. This is Tab 14.

ATTORNEY BARWICK: Introducing what's been previously marked as Exhibit 107.

Q. Do you have it in front of you, Dr. Cain?

A. It's loading up.

(Pause.)

A. Okay. I've got it.

Q. This is another -- this is Exhibit 107, which if you look at your Footnote 260 is another email that you cite for supporting the sentence that precedes the footnote in the body of your report.

A. I see it, yep.

Q. This is an email from Hans Herklots to Brant Biehn and Mr. Herklots writes, Hi, Brant, Andrei, has the first monkey been dosed or do you plan to issue a separate announcement when that happens? I just wonder what triggered this release.

Do you see that?
A. I do.
Q. And feel free to review the rest of the email thread as well. I just want to make sure there's no reference in this email to anyone believing that the NHP study was not material; right?
A. I think there's a question about that maybe raised by Hans, but I don't think that they use your exact phrasing.
Q. Would you be interested to know if anybody responded to that question?
A. I don't know. It would depend on I guess what the responses were.
Q. So Mr. Herklots is asking what triggered the release, and your answer to me is that you wouldn't want to look at the answer unless you knew beforehand what it said?
ATTORNEY MELANSON: Objection to form.
A. That's not what I said.
Q. I just asked you if you wanted to review what the answer to that question was, and you said it would depend on what it said, right?
ATTORNEY MELANSON: Objection to form.
Can we take a tone down again?

ATTORNEY RUBIN: My tone is fine, Raffi.

ATTORNEY MELANSON: The question has a little snippiness to it.

ATTORNEY RUBIN: My apologies.

A. I guess in terms of the question of the way that I'm relying on the documents in terms of internal views that the mere invitation to an NHP study did not tend to trigger the issuance of a press release, I certainly would be willing to consider any additional internal documents or replies along these lines.

Q. Did you take any affirmative steps to check to see whether there was a response to this email?

A. None that I recall.

Q. Let's show you what's previously been marked as Exhibit 476. This is Tab 15.

ATTORNEY BARWICK: Introducing what's been previously marked as Exhibit 476.

Q. Let me know when you have this in front of, Dr. Cain.

A. I have.

Q. This is Exhibit 476, which is not one of the -- not one of the documents that's listed

in your Footnote 260. Do you see how the second most recent email in the thread is the email we just looked at from Hans Herklots asking the question has the first monkey been dosed or do you intend to issue a separate announcement when that happens?

A. I see that.

Q. You see there's a response from Andrei Floroiu?

A. Yes.

Q. Andrei Floroiu was the CEO of Vaxart at this time; right?

A. Yes.

Q. And Mr. Floroiu responds, No, and don't think so. We decided it's material enough to release it.

Do you see that?

A. Uh-huh.

Q. That's yes?

A. I do see it, yes.

Q. So going back to your report, the statement that you say is I also understand that internally Vaxart personnel did not view the mere invitation to an NHP study as constituting starting material nonpublic information or

warranting a press release.
And so just to be clear, you did not look at, consider, or rely on this email where Mr. Floroiu says, We decided it's material enough to release it before reaching that conclusion?
A. I don't recall seeing this -- I do recall seeing other things related to this time period, but I don't recall this specific exhibit number.
Q. Previously you said that depending on what the answer was if it -- let me get your exact language right. You said that you would be willing to consider a response to this email if it reflected the internal views that the mere invitation to an NHP study did not tend to trigger the issuance of a press release.
A. Correct.
Q. Certainly Mr. Floroiu is offering an opinion in this email that the information in the press release warranted the issuance of the press release; right?
A. Actually, I think it's a lot more complicated than the way you're trying to present this. So first of all they're not referring to the mere invitation to an NHP study as necessarily

trigger the issuance of a press release.

Secondly, plaintiffs allege that Armistice pressured -- I believe pressured the company to issue the press release. So I think there's a lot of allegations going on behind the scenes I'm not fully familiar with.

Again, that's why I'm not forming my opinion based on analysis just of the documents. Like I said earlier, my opinion is based on -- or my conclusion is based on an analysis of other companies and whether they tended to issue press releases regarding the mere invitation to an NHP study. And I do think that these internal documents are consistent with that conclusion.

Q. Just to be clear, in support of your statement that Vaxart personnel did not view the mere invitation to an NHP study as constituting material nonpublic information or warranting a press release, you included a citation to Mr. Herklots' question at 6:59 a.m. but did not include a citation to Mr. Floroiu's answer where he says the words: We decided it's material enough to release it. Is that true?

A. Yes, but he's not answering the same question that you're trying to present. But yes.

Q. I'm going to quickly show you what's previously been marked as Exhibit 176. This is Tab 16.

ATTORNEY BARWICK: Introducing what's been previously marked as Exhibit 176.

A. Okay.

Q. And this should be a quick one. I just want to confirm this was cited as a separate exhibit in your Footnote 260, but I wanted to confirm that this is the same as Exhibit 85 that we looked at previously. Does it appear to be?

A. I believe Exhibit 85 has the actual press release draft, so it's a little bit different. I think the email is the same, yeah.

Q. Let's look at -- let's mark -- sorry, let's show you what's previously been marked as Exhibit 306. This is Tab 17.

ATTORNEY BARWICK: Introducing what's been previously marked as Exhibit 306.

(Discussion off the record.)

A. Okay. I've got it.

Q. This is another email that you included in Footnote 260; right?

A. Yep.

Q. I just want to confirm again the way

that you read this email is that, quote/unquote, The way this should go down is that the press release should be issued when the first monkey is dosed; is that right?
A. So can you ask -- what's your question?
Q. Let me lay some foundation. Dr. Sean Tucker, he is an employee of Vaxart, to your understanding; is that right?
A. I believe so, yes.
Q. I just want to clarify you cited to this document as part of your report, and so I'm trying to establish you understand from reading this email that the plan that Dr. Tucker is describing on June 11th, 2020, is that the press release should be issued once the monkeys are dosed; is that right?
A. That's what it looks like he's saying, yes.
Q. You can put that aside.
ATTORNEY RUBIN: Let's go off the record.
THE VIDEOGRAPHER: Thank you. The time is 4:17. We're going off the record.
(Recess taken from 4:17 to 4:27.)
THE VIDEOGRAPHER: We are back on the

Q. I'm going to have you turn to -- well, let me say for the record this is the deposition transcript of Andrei Floroiu. I asked you prior to entering the exhibit whether you reviewed this in connection with this section, and you said you didn't recall.
Do you recall reviewing Mr. Floroiu's transcript in any capacity for purposes of your work in this case?
A. No, I don't.
Q. So if you can turn to page 52.
A. Okay.
Q. So I'm going to direct your attention to the top -- line 4 on page 52 that starts with "so we." Do you see that?
A. Yep.
Q. So Mr. Floroiu says, So we -- when we talked about whether this is a material development for the company, that's the view that we're taking. You know, we -- and I mean the management -- not being lawyers, to us, the view was is this a material development for the company, which means is this likely to translate into an actual study and is it going to be imminent?

A. I think the hypothetical question you just asked is I don't see that would necessarily be a corrective disclosure.

Q. Do you do any analysis or studies to determine whether or not any of the market makers or arbitrageurs trading in Vaxart shares on June 26 actually did infer the identity of Armistice as the source of major trades?

A. No, that was not part of my analysis.

Q. In paragraph 150 you refer to deposition testimony from Armistice's head trader; is that right?

A. Yes.

Q. You believe that his testimony supports your conclusion that market makers can infer the identity of large traders?

A. Sorry, which paragraph are you looking at?

Q. 150 and 151.

A. Oh, okay. Yeah, I don't think that 150 is related to market makers, but let me read through it.

I don't see that in 150. Let me look at 151.

Q. And I would say 152 as well.

A. Okay.
Q. So the closing trading price on June 26 was $8.04; is that right?
A. Yes.
Q. And as we talked about, you measured inflation at 4 p.m. on June 26th as $4.79; is that right?
A. Yes.
Q. The opening trading price on June 29th was $9.87; is that right?
A. Yes, that's correct.
Q. You can do the math if you want to, but according to the formula we just discussed, the price inflation for someone who purchased at 9:30 a.m. on June 29th was $6.67; is that correct?
A. Can you say that again?
Q. The price inflation of someone who purchased at 9:30 a.m. on June 29th was 6.67 per share; is that right?
A. Yes.
Q. So is it your testimony that almost $2 worth of price inflation was introduced into the stock price between the hours of 4 p.m. on June 26th and 9:30 a.m. on June 29th?
A. So I think this is similar to what you

asked about earlier today with the June 26th graph, which is basically following the OWS press release the stock price bounced around as the inflation was dissipating.

So there were points in time where more of that inflation had dissipated and where less of the inflation had dissipated. So there's no singular inflation-creating event over the course of June 27th, June 28th, or, you know, after market on the 26th or premarket on the 29th.

But the stock price did open up at a higher price because of that with the implied but-for price somebody who purchased stock at the open on June 29th is going to be purchasing the stock with more inflation than someone who purchased later that day or even someone who purchased at the end of the day on June 26th.

Q. But my question to you is -- so I'm not sure you answered my question. Is it correct that under your damages model $2 worth of price inflation was introduced into the stock price between the hours of 4 p.m. on June 26th and 9:30 a.m. on June 29th?

ATTORNEY MELANSON: Objection to form.

A. No, again, it's less than $2 of an

increase, but it's not an inflation-creating event that's introducing inflation. It's just that continued volatility in the stock price bouncing around as either more or less of inflation has been dissipated, that was introduced by 9:40 a.m. on June 26th.

Q. So your testimony is that truth can be dissipated and then removed?

A. I'm not sure what you mean by that.

Q. I'm trying to understand what you mean when you said stock price bouncing around as either more or less inflation has been dissipated.

So my question to you is once inflation has dissipated your testimony is that it can be re-added back into the stock price through something other than an inflation-creating event?

A. Of course. I think we had a long discussion about this earlier today as it pertains to June 26th. And that's -- I mean -- and that's what you would actually expect in a case where a company puts out a press release and then refuses to answer questions that are coming in from the media -- right? -- as investors are sort of left in the dark trying to figure out what's going on and the price is bouncing around.

So an investor who purchases at some point in the day when the price is higher, they're purchasing with more inflation than somebody else who purchases at a different point in the day when the stock is trading at a lower amount. That's -- that's the nature of sort of intraday leakage of the relevant truth into the stock price as it bounces around.

Q. Describe for me -- and I understand that you're not calling it an inflation-creating event if it happens intraday in this circumstance.

Describe for me mechanically how it is that inflation can be higher at a point further along in the class period. Like what is -- what is explaining that increase in inflation specifically?

A. Sure. So first of all I'll explain it just in a very broad general sense. If you've heard of -- as you know, in my report I use the constant dollar approach between corrective disclosure events to hold -- to calculate the level of artificial inflation each day during the class period.

But an alternative of that is constant percentage which says that, well, let's say that

the stock price throughout a class period is inflated by 40 percent; right? So then each day during the class period the amount of the actual inflation could be going up or going down throughout a class period, even without corrective disclosures.

And it's a similar idea here where the investors are trying to figure out what's the -- you know, the true value of the but-for stock price. They don't get to that until July 27. But up until that point in time, they're trading around, and you see on both June 26th and June 29th, the next trading day, the price is bouncing around.

And so an investor who purchases at a higher price is overpaying by a larger amount than an investor who's purchasing at a smaller price. That's the nature of the stock price fluctuating throughout the day.

Q. So your damages model in certain instances will have investors who purchased later in the class period will have suffered more damages under your damages model than investors who purchased earlier in the class period? The way your damages model is calculated, that would

be the case?

ATTORNEY MELANSON: Objection to form.

A. Absolutely. So, for example, an investor who purchases on June 25th is purchasing with much less inflation than an investor who purchased on June 26th after the OWS press release.

So that's the nature of artificial inflation throughout any class period. You can have inflation coming in and going out at different points in time.

But then on an intraday basis it's really only for the first trading day. So it's June 26th and then the next trading day, June 29th, where we see the fluctuations intraday. And beyond that point in time it's just a daily inflation ribbon.

So it's not the case that an investor who purchased on any day after June 29th could have that dynamic that's going on with the intraday fluctuations on June 26th and 29th.

Q. You referenced constant percentage as an example of a situation where you may have later investors who are purchasing with a larger amount of inflation. Just to be clear, if you're doing a

Q. So do you believe that the phenomenon described in this paragraph was occurring on July 1st, July 2nd, and July 6th?
A. Yes.
Q. So you believe that on June 29th -- based on the absence of meaningful or clear information about Vaxart's manufacturing ability and its purported selection for OWS -- a growing subset of investors began to become increasingly skeptical, that on July 1st, July 2nd, and July 6th a growing subset of investors began to become increasingly skeptical but on June 30th that was not occurring or you did not see any evidence of that occurring?
A. I did not see any evidence of that occurring in the stock price on June 30th.
Q. But you saw evidence of that occurring on June 29th, July 1st, July 2nd, and July 6th?
A. Yes.
Q. There was a statistically significant price increase on June 30th; is that right?
A. Yes.
Q. Are you offering any opinion as to what explains that increase on June 30th?
A. I noted we talked about earlier some

Q. What was the new information that was contained in the New York Times article that had not been previously disclosed?
A. What I point to is a clear disclosure coming from authoritative source -- two authoritative sources, one The New York Times and the other the HHS or Department of Health and Human Services stating that from quoting the tweet that U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers, and we are negotiating with others. Neither is the case with Vaxart.
Q. So you believe that the new information that was disclosed by the July 25th New York Times article was that the U.S. Department of Health and Human Services had not entered into a funding agreement with Vaxart and was not negotiating a funding agreement with Vaxart?
A. In part. I think I also explain from the New York Times article Vaxart is not among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses. So it's both the quote from the New York Times article as well as the HHS sweets.

C E R T I F I C A T E

STATE OF NEW YORK )
: ss.
COUNTY OF NEW YORK )

I, LAURIE A. COLLINS, a Registered Professional Reporter and Notary Public within and for the State of New York, do hereby certify:

That MATTHEW D. CAIN, the witness whose continued deposition is hereinbefore set forth, was previously duly sworn and that such continued deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of August 2024.

LAURIE A. COLLINS, RPR