# EXHIBIT N

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

In Re VAXART, INC. )
SECURITIES LITIGATION )
------------------------- )
This Document Relates to: ) Master Case No.
ALL ACTIONS ) 3:20-cv-05949-VC
------------------------- )

Volume 2

* * * C O N F I D E N T I A L * * *

August 13, 2024
10:58 a.m.

Videoconferenced deposition of MATTHEW D. CAIN, held virtually with the witness located in Chagrin Falls, Ohio, pursuant to notice, before Laurie A. Collins, a Registered Professional Reporter and Notary Public of the State of New York.

that question.

You keep asking about monkey dosing, but that's not what this press release is talking about; right? This is the "selected for OWS" press release.

And my question is would the body of the press release, in terms of a selection to participate in a nonhuman primate challenge study, would that in and of itself be expected to move the stock price.

And the conclusion that I've reached is that no, there's no nonfraud-related information causing movements in Vaxart's stock price. And that's what these Footnote 260 -- the internal documents in Footnote 260 are perfectly consistent with that conclusion.

Q. What about Exhibit 91 supports your opinion that you just laid out?

A. Exhibit 91?

Q. Uh-huh.

A. So what's being communicated here is that there seems to be some sort of expectation or plan in place that the company would not view the information as important enough to warrant a press release until some later point in time, which

seems to be what they're talking about at least in this email, an actual successful dosing taking place which, as I understand it, would be some later point in time.

And that's consistent with I think -- when they say they jumped the gun with this release upon the mere invitation to participate in an NHP study.

Q. So your view is that the opinion of Vaxart at this time was that the first dosing of the NHPs would be material but the invitation to do a future NHP study is not material?

ATTORNEY MELANSON: Objection to form.

A. Again, that's not -- that's not an opinion or conclusion that I've reached. I'm really just asking whether there's information that needs to be disaggregated, and the answer is no. That's my opinion. And I think this document is consistent with that opinion.

But I'm not providing an opinion about materiality of monkey dosing. You keep on trying to put opinions in my mouth or into my report that aren't there.

Q. You used this document to try to establish that Vaxart personnel did not believe

said you saw evidence of broad skepticism about Vaxart and its stock price; is that correct?
A. Yes.
Q. Is that an accurate sort of characterization of your prior testimony?
A. Yes.
Q. In a general manner as skepticism of Vaxart -- as a foundation -- scratch that. Let me ask a foundational question.
Is it your opinion in this case that as the class period progressed skepticism about Vaxart grew until the truth was totally disclosed?
ATTORNEY RUBIN: Objection to form.
A. Yes. Certainly I document sort of the effect of that growing skepticism from, you know, what I explained 9:40 a.m. on June 26th, certainly all the way through July 6th in terms of that leakage time period.
Q. What were the effects of that growing skepticism?
A. The effect was a reduction in the stock price of Vaxart and therefore a dissipation or a leakage of artificial inflation from the stock price.
Q. Today you've been talking about the

concept of leakage; that's correct?
A. Yes.
Q. You've also been talking about corrective disclosures; correct?
A. Yes.
Q. Are those two concepts, corrective disclosures and leakage, mutually exclusive?
ATTORNEY RUBIN: Object to form.
A. No.
Q. Can you explain why they're not mutually exclusive?
A. Yeah. One of the things that I explained today and in my report is that there's a time period over the first roughly five trading days starting on June 26th through July 6th, roughly five -- excluding June 30th, roughly five trading days where artificial inflation is leaking out of Vaxart's stock price through residual stock price declines each day, which is what we would observe under a leakage theory.
But also at the same time there's corrective information that I can point to that explains the dissipation of artificial inflation from the stock price.
So in this case there's actually a

complete overlap of a leakage theory and a corrective disclosure theory of artificial inflation being dissipated from June 26th through July 6th.

After July 6th I just point to one remaining corrective disclosure event on July 25th, which is not leakage but rather a statistically significant decline following a corrective disclosure event.

Q. Are you offering the opinion in this case that leakage on any specific day in a class period is a result of the information environment as of that day?

ATTORNEY RUBIN: Object to form, leading.

A. Can you repeat the question?

Q. Sure. I'll ask it differently.

What causes sort of leakage during a class period?

A. So there can be a couple of causes, and we see both of those in this case. One cause is after the press releases come out there's growing investor skepticism over time. We see that starting at 9:40 a.m. on July -- on June 26th through July 6th. So just an increasing investor

C E R T I F I C A T E

STATE OF NEW YORK )
: ss.
COUNTY OF NEW YORK )

I, LAURIE A. COLLINS, a Registered Professional Reporter and Notary Public within and for the State of New York, do hereby certify:

That MATTHEW D. CAIN, the witness whose continued deposition is hereinbefore set forth, was previously duly sworn and that such continued deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of August 2024.

LAURIE A. COLLINS, RPR