# Exhibit E

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

In Re VAXART, INC. )
SECURITIES LITIGATION )
------------------------- )
This Document Relates to: ) Master Case No.
ALL ACTIONS ) 3:20-cv-05949-VC
------------------------- )

* * * C O N F I D E N T I A L * * *

April 17, 2024
8:02 a.m.

Videoconferenced deposition of SEAN TUCKER, held virtually with the witness located in San Francisco, California, pursuant to notices, before Laurie A. Collins, a Registered Professional Reporter and Notary Public of the State of New York.

agreements with both Emergent and Kindred Bio; correct?

A. Correct.

Q. And did you view those agreements with those two manufacturers as very important to the process of trying to obtain BARDA funding?

ATTORNEY FREDERICKS: Objection to form.

A. We do -- we think it was critical from both standpoints to be able to, one, move this forward fast; two, have backup in case something went wrong with one or the other; and, three, we do think it was important to show that we had the plans to move things quickly along from the critical path for support of the government, yes.

Q. Can you explain what the lyophilization -- am I pronouncing that correctly?

A. Lyophilization, yes.

Q. -- process is as part of creating a vaccine tablet?

A. Yes. So all vaccines that are like ours that are made with nonreplicating or replicating viruses are grown in tanks, essentially, or big bags. They are grown in high concentrations. That material have then purified

through columns. At the end of it, most of the time it is formulated for syringes, not for tablets.

Our vaccine is different. We had to do a drying step, and the drying step is called lyophilization. And how it works is you put the vaccine in a chamber that is under vacuum -- not very complicated -- and it's chilled. And by putting it under vacuum, the water will evaporate at a higher rate at lower temperatures.

So then you're left with the powders, which are then mixed. And for us, we put it into tablet, coated them, and then used that for our vaccine, which is unusual in the vaccine business. Most vaccines are made for syringe under sterile sill-filled finish. Ours is nonsterile tableting, and it is a dry vaccine.

Q. Did Kindred Bio have any role in connection with that process?

A. They do not have any bio capabilities or expertise.

ATTORNEY FREDERICKS: Objection to form.

Q. And what about Emergent, did they have any expertise in that process?

A. They did not have any resources that I am aware of for lyophilization.
Q. And so that was still part of the process that you needed help with from another manufacturer; is that correct?
A. We had some expertise in-house from doing that, but we definitely needed more capabilities than we had internally.
Q. And is that the reason why the company pursued an agreement with a company called Attwill?
ATTORNEY FREDERICKS: Objection to form.
A. It was actually critical from the standpoint of the company's standpoint to be able to do this at a larger scale. As I mentioned before, lyophilization occurs in a little box. The box that we had at Vaxart was about the size of, you know, maybe an oven. It could fit three small trays. We needed to find a resource that was much larger to do this at a reasonable scale.
Attwill had some of the largest lyophilizers in the U.S. that were available, and that's why we pursued going after Attwill.
Q. Okay. We're going to talk about

form.
A. Yes, that is true.
ATTORNEY MARDER: Madam Court Reporter, did you get his answer?
THE REPORTER: Yes.
A. I said, yes, I agree with your statement, we did share the enthusiasm that we were part of Operation Warp Speed. I just wasn't sure if we needed to include it in this memo or not; is that fair?
Q. Yeah, that's fair.
A. Okay.
Q. The fact you were included --
ATTORNEY FREDERICKS: I object to the foundation as well, which isn't on the record.
Q. Let me move on. I want to ask you some questions about the funding of the NHP study. The NHP study that Vaxart was participating in as part of Operation Warp Speed, did you say that was being run by a company called Battelle?
A. That's correct.
Q. And to the best of your knowledge was OWS paying for the cost of Battelle to run the NHP study?
A. It was all part of OWS, yes.

Q. And so was that a cost that the government was essentially subsidizing for Vaxart?
ATTORNEY FREDERICKS: Objection to form, foundation.
A. Yes. And it was an expensive study, to say the least.
Q. About approximately how much was the study?
ATTORNEY FREDERICKS: Same objections.
ATTORNEY LANCIAULT: Objection to form.
A. I don't have exact figures, but I would say that, you know, similar studies would probably cost, you know, somewhere between 200 to 600 thousand dollars.
Q. And so if OWS wasn't subsidizing that expense, Vaxart would have potentially be paying Battelle a significant amount of money, like you just referenced, to do the study; is that right?
ATTORNEY FREDERICKS: Objection to form.
A. Sounds correct.
Q. And this morning we looked at a number of documents concerning Vaxart's invitation to participate in OWS. Did you view that invitation as a significant milestone for the company?

ATTORNEY FREDERICKS: Objection to form.
A. It was a big deal.
Q. And did you believe at the time that Vaxart's selection to participate in the NHP study might ultimately result in Vaxart receiving funding from the OWS down the line if the study went well?
ATTORNEY FREDERICKS: Objection to form.
A. Absolutely.
Q. I want to shift gears and talk to you about two related companies known as NantKwest and ImmunityBio.
Are you familiar with those companies?
ATTORNEY FREDERICKS: Objection to form.
A. Yes.
Q. Let me ask to bring up the next document that's been previously marked as Exhibit 287, Bates reference number is 37974. This looks like -- and in particular I want to ask you to look at the bottom of the chain, an email from Brant Biehn to you and Dr. Latour and Margaret Echerd, Shaily Garg, and Richard Schwartz on June

emergency.
Do you see that?
A. I do.
Q. And then could you read what's in blue after that language?
A. You're saying the edit "up to a billion doses of vaccine tablets per year," is that what you're referring to?
Q. Yeah.
A. Okay.
Q. Is that a comment that you added there to the MOU?
ATTORNEY FREDERICKS: Objection to form.
A. I'm actually not sure, but probably, given this is coming from -- I'm not sure, actually.
Q. Do you believe it was feasible for Attwill to ramp up its lyophilization capacity to a billion doses of vaccine tablets at this time?
A. I believe that --
ATTORNEY FREDERICKS: Objection.
A. I believe Attwill had the lyo capacity to up to a billion doses of vaccine tablets equivalent per year, yes.

Q. And what's the basis for that belief?
A. Because the size of their facilities were immense comparatively to what we had internally, and I believed they could do it. And in the course they said they could do it as well.
So keep in mind our vaccine lyophilizer was the size of less than an oven. Their size of lyophilizers -- and if they had multiple lyophilizers -- were the size of a railcar. I mean, they were gigantic comparatively. So my feeling was they had enough capacity to do up to a billion doses a year.
Q. Did you ever do any kind of mathematical calculations or otherwise to reach that belief that they had that capacity?
A. I did a little back-of-the-envelope calculation and just size of, you know, the volume and between us and them and figured that, yeah, they could certainly do lyophilization at that quantity -- those quantities.
Q. And when you say that -- you said of course they said they could do it as well. Who is it at Attwill that you recall confirming their ability to manufacture -- to have that lyophilization capacity?

A. Well, our plan was -- tableting equipment is easy to come by, and you can have tableting machines that do 10,000 tablets a minute. And we were planning to, you know, use government money to put in those capabilities at Attwill to be able to handle that kind of load. But that is not hard to do.

Lyophilization is hard to find people that do it so -- and the facilities that exist.

Q. And you felt like you had found the right people in Attwill; correct?

ATTORNEY FREDERICKS: Objection to form.

A. They were -- they were one of the few people who could do it, yes, at that scale.

Q. Let's mark next -- or let's bring up next what's been previously marked as Exhibit 197. This is an email thread. The Bates numbers are 1051 to 1054. And bring that up, and I'm going to ask you about an email thread that's at page 1054 first, which looks like an email from Mark Logomasini to Bill Jackson, who you mentioned earlier, that you're copied on where the subject is draft MOU.

A. Okay.

C E R T I F I C A T E

STATE OF NEW YORK )
: ss.
COUNTY OF NEW YORK )

I, LAURIE A. COLLINS, a Registered Professional Reporter and Notary Public within and for the State of New York, do hereby certify:

That SEAN TUCKER, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 23rd day of April 2024.



LAURIE A. COLLINS, RPR