Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Counsel for Proposed Class Representatives Wei Huang and Langdon Elliott*

[Additional counsel on signature page]

William C. Fredericks (*pro hac vice*)
Jeffrey P. Jacobson (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 233-6444
Facsimile: (212) 233-6334
wfredericks@scott-scott.com
jjacobson@scott-scott.com

*Counsel for Proposed Class Representative Ani Hovhannisyan*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

In re VAXART, INC. SECURITIES LITIGATION

*This Document Relates to:*
*ALL ACTIONS*

Case No. 3:20-cv-05949-VC

CLASS ACTION

**PLAINTIFFS' NOTICE OF MOTION AND RENEWED MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL**

Hearing Date: October 10, 2024
Time: 10:00 a.m.
Courtroom: 4, 17th Floor
Judge: Hon. Vince Chhabria

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on October 10, 2024, at 10:00 a.m., in the courtroom of the Honorable Vince Chhabria, at the U.S. District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Avenue, San Francisco, California 94102, Plaintiffs will request that, pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3), this Court:

(i) certify a Class of all persons or entities who purchased or otherwise acquired the publicly traded shares of Common Stock of Vaxart, Inc. ("Vaxart"), or purchased Call Options or sold Put Options thereon ("Options"), between June 25, 2020 and July 24, 2020, inclusive, and were damaged thereby ("Section 10(b) Class");

(ii) certify a Subclass of all persons or entities who purchased publicly traded Vaxart Common Stock contemporaneously with the June 26 and 29, 2020 sales of Vaxart Common Stock by Defendants Armistice Capital, LLC ("Armistice Capital"), Armistice Capital Master Fund Ltd. ("Armistice Master Fund"), Steven J. Boyd, or Keith Maher (collectively, "Armistice Defendants"), and were damaged thereby ("Section 20A Subclass");

(iii) appoint Plaintiffs Wei Huang, Langdon Elliott, and Ani Hovhannisyan as Class Representatives; and

(iv) appoint Hagens Berman Sobol Shapiro LLP ("Hagens Berman") and Scott+Scott Attorneys at Law LLP ("Scott+Scott") as Class Counsel.

This Motion is based upon this Notice of Motion and Motion, the Declaration of Reed R. Kathrein ("Kathrein Decl."), the exhibits attached thereto, including the accompanying expert report of Matthew D. Cain, Ph.D. ("Merits Report"), Dr. Cain's prior reports in this matter, the Court's files in this action, the arguments of counsel, and any other matters the Court may consider.

## ISSUES TO BE DECIDED

1. Whether the proposed Class and Subclass meet the requirements of Rule 23(a) and (b)(3).
2. Whether to appoint Plaintiffs Huang, Elliott, and Hovhannisyan as Class Representatives.
3. Whether to appoint Hagens Berman and Scott+Scott as Class Counsel.

## TABLE OF CONTENTS


INTRODUCTION ....... 1

SUMMARY OF RELEVANT FACTS AND DR. CAIN'S MERITS REPORT ....... 3

A. Plaintiffs' Theories of Inflation and Loss Causation ....... 3

B. Dr. Cain's Supporting Economic Analysis ....... 4

ANALYSIS ....... 8

A. Common Questions Will Predominate on Liability and Damages Issues ....... 8

1. Reliance can be established for Plaintiffs' Section 10(b) claims on a classwide basis through *Basic*. ....... 9

a. Vaxart Securities traded in an efficient market. ....... 9

b. The scheme and Press Releases had price impact on Vaxart Securities. ....... 11

c. The dissipation of inflation over time on the back-end—*i.e.*, loss causation—is susceptible to classwide proof. ....... 13

d. The hypothetical presence of investors who purchased Vaxart Securities without believing Vaxart had been selected for OWS does not defeat class certification. ....... 16

e. *Affiliated Ute* provides an additional presumption of reliance. ....... 18

2. Damages for Plaintiffs' Section 10(b) and 20A Claims can each be calculated using a common methodology that can account for the dissipation of artificial inflation. ....... 19

a. Section 10(b) damages are calculable using a common formula. ....... 20

b. Section 20A damages are calculable using a common formula. ....... 21

c. Options damages are calculable using a common formula. ....... 22

B. The Proposed Class Satisfies All Other Rule 23(a) and Rule 23(b)(3) Criteria ....... 23

CONCLUSION ....... 23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972) .......... 19

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .......... 8

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) .......... 8, 18

*In re Apple Sec. Litig.*,
2022 WL 354785 (N.D. Cal. Feb. 4, 2022) .......... 20

*In re Apple Sec. Litig.*,
2023 WL 2763952 (N.D. Cal. Mar. 28, 2023) .......... 10, 22

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .......... 11, 17

*In re BofI Holding, Inc. Sec. Litig.*,
2021 WL 3742924 (S.D. Cal. Aug. 24, 2021) .......... 20

*In re Broadcom Corp. Sec. Litig.*,
2005 WL 8152913 (C.D. Cal. Sept. 12, 2005) .......... 14

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) .......... 9, 10

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
337 F.R.D. 193 (D. Minn. 2020) .......... 16

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) .......... 16

*City of Miami Gen. Emps.'& San. Emps.' Ret. Tr. v. RH, Inc.*,
2018 WL 4931543 (N.D. Cal. Oct. 11, 2018) .......... 20

*In re Computer Scis. Corp. Sec. Litig.*,
288 F.R.D. 112 (E.D. Va. 2012) .......... 3, 17

*In re Connetics Corp. Sec. Litig.*,
257 F.R.D. 572 (N.D. Cal. 2009) .......... 22

*In re Cooper Cos. Sec. Litig.*,
254 F.R.D. 628 (C.D. Cal. 2009) .......... 8

*In re Diamond Foods, Inc., Sec. Litig.*,
295 F.R.D. 240 (N.D. Cal. 2013) .......... 17, 20

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .......... 8

*Edwards v. First Am. Corp.*,
798 F.3d 1172 (9th Cir. 2015) ....................8

*Goldman Sachs Grp., Inc. v. Ark. Teachers Ret. Sys.*,
141 S. Ct. 1951 (2021) ....................11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .................... *passim*

*Homyk v. ChemoCentryx, Inc.*,
2024 WL 1141699 (N.D. Cal. Mar. 6, 2024) .................... *passim*

*Khadera v. ABM Indus. Inc.*,
2012 WL 581580 (W.D. Wash. Feb. 22, 2012) ....................18

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ....................9, 10

*In re LDK Solar Sec. Litig.*,
255 F.R.D. 519 (N.D. Cal. 2009) ....................22

*Malriat v. QuantumScape Corp.*,
2022 WL 17974629 (C.D. Cal. Dec. 19, 2022) ....................10

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
332 F.R.D. 370 (N.D. Ga. 2019) ....................13

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) ....................19, 23

*Moskowitz v. Lopp*,
128 F.R.D. 624 (E.D. Pa. 1989) ....................18

*Nguyen v. Nissan N. Am., Inc.*,
932 F.3d 811 (9th Cir. 2019) ....................20

*Pulaski & Middleman, LLC v. Google, Inc.*,
802 F.3d 979 (9th Cir. 2015) ....................15

*Schleicher v. Wendt*,
618 F.3d 679 (7th Cir. 2010) ....................2, 16

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
335 F.R.D. 276 (N.D. Cal. 2020) ....................19, 20

*In re Tesla, Inc. Sec. Litig.*,
2022 WL 7374936 (N.D. Cal. Oct. 13, 2022) ....................21

## STATUTES

15 U.S.C. § 78t-1(b)(1) ....................21

## OTHER AUTHORITIES

Fed. R. Civ. P. 23 .................... *passim*

## TABLE OF DEFINED TERMS

| TERM | DEFINITION |
|---|---|
| ¶ | Paragraph |
| Ex. | Refers to exhibits in the Kathrein Declaration filed herewith |
| Armistice | Refers collectively to Armistice Capital and Armistice Master Fund |
| Armistice Capital | Defendant Armistice Capital, LLC |
| Armistice Master Fund | Defendant Armistice Capital Master Fund Ltd. |
| Attwill | Attwill Medical Solutions Sterilflow, LP |
| Attwill PR | The June 25, 2020 Press Release titled "Vaxart, Inc. Signs Memorandum of Understanding with [Attwill] Enabling Production of A Billion or More COVID-19 Vaccine Doses Per Year …" (Ex. B) |
| Class Period | June 25, 2020 through July 24, 2020, inclusive |
| Complaint | Corrected Second Amended Consolidated Class Action Complaint (ECF No. 303) |
| HHS | U.S. Department of Health and Human Services |
| Eff. Rpt. | Cain Efficiency Report, dated December 1, 2023 (ECF No. 311-2) |
| Reb. Rpt. | Cain Rebuttal Report, dated March 7, 2024 (ECF No. 325-2) |
| Merits Rpt. | Cain Loss Causation and Damages Report, dated July 30, 2024 (Ex. A) |
| OWS | Operation Warp Speed |
| OWS PR | The June 26, 2020 Press Release titled "Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed" (Ex. C) |
| Plaintiffs | Langdon Elliott, Wei Huang, and Ani Hovhannisyan |
| PSLRA | The Private Securities Litigation Reform Act of 1995 |
| Section 10(b) Class | All persons or entities who purchased or otherwise acquired publicly traded Vaxart, Inc. securities between June 25, 2020 and July 24, 2020, inclusive, and were damaged thereby |
| Section 20A Subclass | All persons or entities who purchased publicly traded Vaxart Common Stock contemporaneously with the June 26 and 29, 2020 sales of Vaxart Common Stock by Defendants Armistice Capital, Armistice Master Fund, Steven J. Boyd, or Keith Maher |
| Vaxart Securities | Common Stock and Options, collectively |
| The Press Releases | The Attwill and OWS Press Releases, collectively |
| Vaxart | Vaxart, Inc. |

## INTRODUCTION[1]

Twenty-eight days ago, this Court denied class certification without prejudice, finding that the parties' initial submissions failed to narrow in on the unique facts of this case and did not provide sufficient evidence to decide class treatment.[2] In particular, the Court expressed concern that this is "not your typical securities case" where defendants misled the investing public, causing the stock price to be artificially inflated, only to have "the truth 'come[] to light suddenly'" after a bombshell announcement.[3] Instead, here, Defendants participated in a scheme involving the issuance of two misleading Press Releases, which caused a "pop" in Vaxart's stock price (that started to dissipate within hours of the second Press Release) and allowed Armistice, an insider, to sell a huge number of shares at inflated prices. Accordingly, the Court sought assurance that (a) Plaintiffs' damages model would ***not*** assume that the truth remained fully (or even mostly) concealed until certain disclosures were made in late July by the *New York Times* ("*NYT*") and the U.S. Department of Health and Human Services ("HHS"), and that (b) Plaintiffs' damages model would instead "account for the near certainty that at least some members of the investing public quickly realized that the press releases were no big deal."[4]

With the Court's concerns in mind, Plaintiffs submit this renewed motion and accompanying Merits Report by their expert, Dr. Cain, to show that Plaintiffs' damages model does in fact appropriately address the Court's concerns, and is expressly tailored to handle the atypical, loss-causation-related aspects of this case. Specifically, Plaintiffs herein:

- Make clear that, under Plaintiffs' loss causation theories, the level of artificial inflation caused by the scheme through the issuance of the misleading Attwill and OWS Press Releases was decidedly ***not*** constant throughout the Class Period (*i.e.*, from June 25 through July 24), but in fact began to partially, and materially, dissipate[5] ***within hours*** after the OWS Press Release hit the wires;

---

1 All internal citations are omitted, and all emphasis is added, unless otherwise noted.

2 July 2, 2024 Order Denying Motion for Class Certification at 1 (ECF No. 374) ("Class Certification Order").

3 *Id.* at 9.

4 *Id.* at 2.

5 Herein, Plaintiffs use "dissipation," "diffusion," and "leakage" interchangeably, as the technical differences between the terms add nothing to the relevant analysis. *See* Merits Rpt.

- Highlight the aspects of Dr. Cain's loss causation analysis that explain how, over the course of the Class Period, inflation dissipated at different rates, and on different days, as the truth was absorbed following various Corrective Disclosure Events (including Defendants' insider trading, news of these insider sales, and the issuance of divergent news and analyst opinions)—all of which occurred against a backdrop of continuing investor confusion and lack of corroboration or clarification from OWS or Vaxart;

- Reaffirm that common questions of law and fact predominate, because even though the amount of inflation was not constant (but rather decreased at different rates over different days), all Class members were similarly damaged by Defendants' common course of conduct, which artificially inflated the prices at which the Class members bought their Vaxart Common Stock or Call Options (or sold their Put Options);

- Show how their Section 10(b) and Section 20A damages models for purchasers of Vaxart Common Stock and Call Options (and sellers of Put Options) not only satisfy *Comcast*'s requirement that plaintiffs have a common, classwide damages methodology, but also appropriately account for the differing artificial inflation levels (and resulting decline in recoverable Section 10(b) damages) over the course of the Class Period; and

- Show how their damages models can also be readily tailored to a shortened Section 10(b) class period, if (contrary to Plaintiffs' position) the findings of this Court, or a jury, make it appropriate to use a further shortened class period.[6]

By focusing this renewed motion on the fact-specific matters highlighted in the Court's Class Certification Order, Plaintiffs respectfully submit that they have shown that ***this*** case—despite its perceived peculiarities—remains well-suited for class treatment. First and foremost, "issue[s] of liability—including whether investors overpaid for Vaxart [Securities]"—can be resolved "in the same way for every member of the class,"[7] regardless of whether they traded early or late in the Class Period. Moreover, there can be no question that the claims at issue—the who, what, where, when, and why of the alleged fraud schemes—are susceptible to common proof.

---

¶ 21 and n.17. Whether inflation comes out gradually or at discrete intervals, "the fraud lies in an intentionally false or misleading statement, and the loss is realized when the truth turns out to be worse than the statement implied." *Cf. Schleicher v. Wendt*, 618 F.3d 679, 684 (7th Cir. 2010).

6 The temporal scope of any Section 20A insider trading class period is typically decided by the Court *after* class certification is decided, as the Court's determination of what constitutes "contemporaneous trading" is typically viewed as a merits question common to all putative Section 20A subclass members. *See, e.g.*, *Homyk v. ChemoCentryx, Inc.*, 2024 WL 1141699, at *6 (N.D. Cal. Mar. 6, 2024).

7 *See* Class Certification Order at 6 (posing the question).

The presence of sophisticated investors who *may* have seen through the misleading headlines or who *may* have quickly figured out the truth also does not defeat class certification. Simply stated, "[m]ost investors purchase stock based on the belief that the market is, in some way and for some reason, undervaluing the stock and that the stock will thereafter appreciate; *the investor's decision is not a statement that the market does not reflect a collective assessment of currently available information*."[8] As the Supreme Court has indicated, those investors who actually buy inflated shares will still be damaged from having transacted at "a market price tainted by fraud,"[9] even if they were not deceived by (or were completely unaware of) the alleged scheme.

Simply put, this case readily meets every Rule 23 requirement. The Court should thus certify the Section 10(b) Class and Section 20A Subclass, appoint Plaintiffs as Class Representatives, and appoint Hagens Berman and Scott+Scott as Class Counsel.

## SUMMARY OF RELEVANT FACTS AND DR. CAIN'S MERITS REPORT

The facts are well known to this Court and need not be repeated here.[10] Plaintiffs incorporate by reference the facts alleged in the Complaint and as interpreted by this Court in its Orders.[11] Plaintiffs instead focus this brief on filling in the gaps regarding the theories of inflation and loss causation they intend to present at trial, as informed by a healthy discovery record and the accompanying merits and damages analysis of their expert, Dr. Cain.

### A. Plaintiffs' Theories of Inflation and Loss Causation

In short, Plaintiffs contend that Defendants engaged in a pump-and-dump, insider trading scheme that artificially inflated (and/or also artificially maintained) the prices for Vaxart Securities.[12] As supported by the factual record, this inflation began to dissipate soon after the

---

8 *In re Computer Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 123 (E.D. Va. 2012).

9 *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 273 (2014) ("*Halliburton II*").

10 *See* Class Certification Order at 2-4 (summarizing the pertinent case facts).

11 *See ChemoCentryx*, 2024 WL 1141699, at *3 ("Courts 'must take the substantive allegations of the complaint as true' but 'need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through class action.'" (quoting *Keilholtz v. Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 335 (N.D. Cal. 2010)).

12 *See also* Merits Rpt. ¶¶ 32-43 (summarizing Plaintiffs' claims); *id.* ¶¶ 119-142 (discussing inflation creating events on June 25 and 26, including the Press Releases and Floroiu's statement at HC Wainright on June 25 that "***there may be some other news on other fronts***.").

OWS Press Release's publication as pockets of investors began to decipher the truth through several partial corrective events, including:

- Armistice's insider sales on Friday, June 26 and Monday, June 29, 2020;[13]
- The disclosure of these sales via an SEC Form 4 filed after market-hours on June 30;[14]
- The subsequent market impact of the information in the SEC Form 4 over the next three trading days, Wednesday, July 1, Thursday, July 2, and Monday, July 6.[15]

As noted in Dr. Cain's Merits Report, the corrective (and inflation dissipating effect) of these events was supplemented by continuing uncertainty created by divergent media reporting on the Press Releases,[16] the continuing lack of government corroboration of Vaxart's touted OWS selection, and Vaxart's refusal to clarify the truth despite several media inquiries.[17] The *NYT* article and HHS tweets of July 25, 2020 dissipated the final remaining amounts of fraud-related artificial inflation in the price of Vaxart Common Stock.[18]

**B. Dr. Cain's Supporting Economic Analysis**

In preparing for the merits portions of this case, Plaintiffs tasked Dr. Cain with not only addressing the Court's expressed concerns and observations, but also with laying out in detail:

---

13 *See* Ex. D, Blotter for Armistice's Vaxart Transactions.

14 *See* Ex. E, Armistice Form 4 (June 30, 2020).

15 *See also* Merits Rpt. ¶¶ 143-164 (discussing dissipation of inflation after these events).

16 *See, e.g.*, Ex. F, Morgan Stanley, "Pfizer, Covid vaccine candidate delivers booster" (July 1, 2020) ("On June 3, *The New York Times* reported that the U.S. Government[] has selected five companies …. ***A sixth company, Vaxart, announced on June 26 that its vaccine candidate was selected to participate in OWS***.").

17 *See, e.g.*, Merits Rpt. ¶ 21 (opining the corrective events "represented further diffusion/leakage of the relevant truth"); *id.* ¶ 23 (opining that inflation dissipated via leakage on June 26 and 29); *id.* ¶¶ 44-46 (discussing information environment that lacked transparency).

18 *See* Ex. G, David Gelles, "Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine," *New York Times* (July 25, 2020) ("Vaxart's vaccine candidate was included in a trial on primates that a federal agency was organizing in conjunction with Operation Warp Speed. But Vaxart is not among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses."); *accord* Ex. H, July 25, 2020 HHS Tweets ("The U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers and we are negotiating with others. Neither is the case with Vaxart. Vaxart's vaccine candidate was selected to participate in preliminary US government studies to determine potential areas for possible Operation Warp Speed partnership and support. At this time, those studies are ongoing, and no determinations have been made.").

(i) how (and to what extent) the Press Releases inflated Vaxart's stock price; (ii) how quickly (and by what means or events) this inflation began to dissipate; (iii) the amount of artificial inflation in the price of Vaxart Securities on any given day in the Class Period; and (iv) how damages per share can be calculated for each member of the Class (and Section 20A Subclass)—no matter when they bought—in a manner consistent with Plaintiffs' theories.[19] His findings as to each of these tasks are detailed in his Merits Report, and include the following:

**An Information Environment That Lacked Clarity and Transparency**: Plaintiffs contend that, in addition to certain Corrective Events (*see* below), the failure by Vaxart and/or Defendants to provide meaningful, reliable, and clear information contributed to uncertainty and increased skepticism about the true (and concealed) status of Vaxart's then-existing manufacturing capabilities and the significance of the headline that Vaxart had been "selected for" OWS (and thus was one of the handful of finalists reported to be receiving significant government support). Dr. Cain's Report summarizes the information environment—*i.e.*, the major Vaxart-specific news and developments that occurred during the Class Period.[20] His report also explains how "divergence of opinions among analysts and investors is commonplace in the stock market," how "a stock price reflects an aggregation of … numerous … differing views about a company," and how, as a result, increasing investor skepticism can exert downward pressure on a company's stock price.[21]

**Evolving Artificial Inflation**: Far from assuming constant inflation until the July 25 *NYT* article, Dr. Cain calculates that artificial inflation peaked at $11.05 per share about two hours after the OWS Press Release issued; this inflation then began dissipating, with a large initial drop on June 26.[22] By market close on June 26, over half of the artificial inflation ($6.26) had already

---

[19] Plaintiffs also tasked Dr. Cain to assess additional issues more pertinent to summary judgment and trial—*e.g.*, the economic materiality of the false and misleading statements. *See* Merits Rpt. ¶¶ 52-111. His analysis and opinions on such topics are best left for a later date.

[20] *Id.* ¶¶ 44-46.

[21] *Id.* ¶¶ 42, 145-149.

[22] *Id.* ¶¶ 20, 140-141, 153-154.

leaked out.[23] Vaxart's Common Stock continued to experience negative, abnormal returns (*i.e.*, price drops net of industry and overall market effects) over four of the five next trading days.[24]

**Corrective Disclosure and Leakage Models**: To assess the dissipation of inflation over time, Dr. Cain examined the corrective events identified in Part A, *supra*.[25] For each of these corrective events, Dr. Cain found that the corresponding price movements—which were statistically significant in their own right—were also consistent with leakage—that is, the theory that, over time, skepticism grew, and increased negative pressure on the artificially inflated prices of Vaxart Securities until it was fully dissipated.[26]

**Intraday Analysis**: For June 26 and 29, Dr. Cain performed intraday artificial inflation calculations to account for rapid price movements as Armistice sold its holdings.[27]

**Confounding Information**: As a check on his findings of inflation, Dr. Cain looked to see whether there was any confounding non-fraud related information that could explain the observed price movements on key dates.[28] This included the true aspects of the OWS Press Release—*i.e.*, the announcement that Vaxart would in the future test its vaccine in a non-human primate study. No confounding information that could explain Vaxart's stock price movements could be found.

**Plug-and-Play Damages Formula**: To calculate Section 10(b) damages, Dr. Cain proffers a model based on a plug-and-play damages formula that calculates per-share damages based on the inflation (if any) in Vaxart's stock price when an investor bought and sold Vaxart Securities.[29]

Inflation per-share at time of purchase

— Inflation per share remaining at time of sale

---

Per-Share Damages

---

23 *Id.* ¶ 171.

24 *Id.* ¶ 171, Table B.

25 *Id.* ¶¶ 148-169. June 26 through July 6 constitute six back-to-back trading days, as markets closed on July 3 for the Independence Day weekend.

26 *See id.* ¶¶ 154, 159, 164, 170.

27 *Id.* ¶¶ 153, 157.

28 *Id.* ¶¶ 128, 138, 158, 162, 168.

29 *Id.* ¶¶ 176-179.

**Flexible Damages Model**: Dr. Cain also explains how the out-of-pocket damages methodology and formula he has offered will incorporate an evolving inflation ribbon (reflecting rapid *increase* in inflation at the start of the Class Period and its subsequent *dissipation* beginning within hours of the OWS Press Release's publication), which can also be easily adjusted based on potential alternative factual findings by a jury (such as a finding that the market understood the truth prior to the last of Plaintiffs' alleged corrective events on July 25, 2020).[30]

**Addressing Hyper-Informed Traders**: Dr. Cain directly addresses the Court's comments about potential, hyper-informed traders who may have seen the Press Releases' headlines as nothing more than a head-fake. Dr. Cain explains how even investors who may have seen through the misleading Press Releases would—if they actually bought shares during the Class Period at artificially inflated prices—suffer compensable damages just like any other Class members, which can be calculated under the *same* common, damages formula.[31]

**Section 20A Damages**: For insider trading claims, Dr. Cain calculates the statutory ceiling—Defendants' profits gained—under both market price and artificial inflation approaches.[32]

**Options Analysis**: In addition to common stock, Dr. Cain provides a detailed analysis of artificial inflation and/or deflation (depending on the type) for Vaxart Options.[33] Like common stock, per-option damages can be calculated using widely accepted methodologies.[34]

* * *

By providing a comprehensive analysis that expressly recognizes and accounts for gradual leakage of the truth—and rejects the notion of constant inflation throughout the Class Period—Dr. Cain's report directly addresses the Court's concern that the case does not fit the typical pattern of inflation remaining constant until a sudden corrective disclosure. His evolving inflation ribbon and flexible damages model demonstrate how common questions will predominate, with damages

---

[30] *Id.* ¶¶ 187-193, 211.

[31] *Id.* ¶¶ 145-147.

[32] *Id.* ¶¶ 180-186.

[33] *Id.* ¶¶ 194-210.

[34] *Id.*

that can and will be calculated on a common classwide basis using a common methodology that accommodates the relatively complex inflation pattern here.

## ANALYSIS

The Class Certification Order asks two key questions: "First, can the issue of liability—including whether investors overpaid for Vaxart stock—be resolved in the same way for every member of the class? Second, can the plaintiffs present a valid method for measuring the damages suffered by the class members?"[35] These two questions essentially concern the predominance requirement for a Class under Rule 23(b)(3). As shown below, common questions predominate.

### A. Common Questions Will Predominate on Liability and Damages Issues

"Common [questions] predominate over individual [ones] when the common issues 'represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication.'"[36] This "test [is] readily met" in securities fraud cases.[37] The essential elements for a Section 10(b) claim—(i) material misstatements, omissions, or misconduct in connection with the purchase or sale of securities; (ii) scienter; (iii) reliance; (iv) causation; and (v) economic loss[38]—present many common questions that "are central to all class members' claims," including "what Defendants said [and did], what they knew, what they may have withheld, and with what intent they acted."[39] "Without favorable findings on these critical questions related to liability, no member of the class can succeed."[40] As such, whether common questions predominate hinges in this case, as it often does, on reliance. Additionally, predominance hinges on addressing the Court's loss causation and damages model questions. These issues are addressed in turn.

---

35 Class Certification Order at 6 ("If the answer is yes to these questions, it goes a long way towards getting the plaintiffs to class certification.").

36 *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1182 (9th Cir. 2015).

37 *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

38 *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

39 *See, e.g.*, *In re Cooper Cos. Sec. Litig.*, 254 F.R.D. 628, 640 (C.D. Cal. 2009); *accord Amgen*, 568 U.S. at 475 (the "essential elements" of a 10b-5 claim are subject to common proof).

40 *Cooper Cos.*, 254 F.R.D. at 640.

### 1. Reliance can be established for Plaintiffs' Section 10(b) claims on a classwide basis through *Basic*.[41]

#### a. Vaxart Securities traded in an efficient market.

As noted in Plaintiffs' first motion to certify,[42] Plaintiffs and the Class intend to invoke *Basic*'s fraud-on-the-market presumption to show reliance. That presumption is based on the well-founded principle that "a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation."[43] To invoke *Basic's* presumption, a plaintiff must show at the class certification stage that (1) the alleged misrepresentations were publicly known, (2) the plaintiff purchased the stock between when the misrepresentations and the alleged corrective disclosures were made, and (3) the securities at issue traded in an efficient market.[44] "When the presumption applies, investors do not need to demonstrate individual reliance."[45] Thus, investors are not required to show that they saw and believed the misleading aspects of the Attwill and OWS Press Releases prior to trading Vaxart Securities.

In Dr. Cain's Efficiency Report (submitted with Plaintiffs' first motion to certify), he showed how the *Cammer* and *Krogman* factors[46] strongly support a finding that Vaxart common stock traded in an efficient market from June 15 through August 2020.[47] Defendants did not dispute this finding of market efficiency in the first round of briefing, and declined to even have their expert address it.[48] Nor did they offer any case-specific evidence undermining the "essentially

---

41 Reliance is not an element of Plaintiffs' Section 20A claims.

42 Pls. Mot. to Certify at 2, 13-14 (ECF No. 311).

43 *Halliburton II*, 573 U.S. at 283-84.

44 *Id.* at 268.

45 *ChemoCentryx*, 2024 WL 1141699, at *3.

46 *See Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989) (outlining five factors); *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) (identifying three additional factors).

47 *See* Pls. Mot. to Certify at 14-20; Eff. Rpt. ¶¶ 39-108.

48 *See* Westberg Rpt. ¶ 8 (ECF No. 318-2).

settled" presumption that options markets are efficient where the underlying common-stock market trades in an efficient market.[49]

The shorter Class Period sought in this Motion does nothing to change this calculus. "[B]ecause [Dr. Cain] concluded that the market was efficient ***throughout*** the [previously] proposed Class Period, this conclusion applies to any ***subset*** of the proposed Class Period as well, including the current Class Period from June 25, 2020 through July 24, 2020" or any subset thereof.[50] This finding intuitively makes sense, as the factors assessed under *Cammer* and *Krogman*—*e.g.*, analyst coverage, market-maker structure, Form S-3 eligibility—remained similar, if not identical, under the shortened Class Period.[51] Dr. Cain's updated *Cammer* and *Krogman* analysis for the June 25 to July 24 period confirms this.[52]

The same is true for derivative securities like Vaxart Options, "whose value is presumptively dependent on the market price of an underlying security or asset" and are thus presumed to trade efficiently where the common stock trades in an efficient market.[53] Given that Plaintiffs have shown that the market for Vaxart Common Stock was efficient, no further evidence is required to show efficiency of the market for the related Options.[54] Accordingly, classwide reliance is presumed.

---

49 *See In re Apple Sec. Litig.*, 2023 WL 2763952, at *1-2 (N.D. Cal. Mar. 28, 2023) (certifying options class where plaintiffs' expert explained "there is little academic literature in recent years regarding the efficiency of derivatives, including options, because their efficiency 'is essentially settled' such that 'academics rarely, if ever, test this matter anymore'"); *Malriat v. QuantumScape Corp.*, 2022 WL 17974629, at *11-12 (C.D. Cal. Dec. 19, 2022) (rejecting challenges to Dr. Cain's opinion that an options market traded efficiently, as well as argument that an individualized analysis for each "option series" was needed for class certification).

50 Merits Rpt. ¶ 47.

51 *See id.* ¶ 48 (re-assessing *Cammer* and *Krogman* factors for June 25 through July 24 period).

52 *See id.*

53 *Id.* ¶ 49; *see also* Eff. Rpt. ¶¶ 109-122 (discussing the academic literature and Dr. Cain's corroborative cause-and-effect analysis); Reb. Rpt. ¶ 14.

54 *See Apple*, 2023 WL 2763952, at *1-2 (no separate showing for options required where market for underlying stock is efficient); *Malriat*, 2022 WL 17974629, at *11-12 (same).

**b. The scheme and Press Releases had price impact on Vaxart Securities.**

To rebut the fraud-on-the-market presumption, Defendants must show that the misstatements and omissions "did not lead to a distortion of price."[55] To succeed, Defendants must completely "sever[] the link between the alleged misrepresentation[s] and either the price received (or paid) by the plaintiff."[56] Defendants' burden is to "prove[] a complete lack of price impact during the Class Period, not whether the stock price decline following individual corrective disclosures was caused by the alleged misrepresentations."[57] This includes showing that there was no price impact on the "front end" when the misstatements or omissions were made[58]—a near impossible task here given the market's strong reaction to the Attwill and OWS Press Releases.

To study Vaxart's stock price movements over the Class Period, Dr. Cain performed an event study—the hallmark methodology for securities class actions— for his Merits Report.[59] This event study included a regression model, through which Dr. Cain modeled the predicted daily return of Vaxart Common Stock, based on market and industry returns. By subtracting the predicted return from the actual return, Dr. Cain calculated the "abnormal" return in Vaxart's daily stock price movement, representing the component of the daily stock price return that was not attributable to market-wide or industry-wide movements, but rather, was attributable to company-specific news.[60]

Dr. Cain found that, after Vaxart published the June 25, 2020 Attwill Press Release, Vaxart's stock price jumped up by 95.8% (up by $3.06 per share) by the close of trading—an increase that

---

55 *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988).

56 *Id.* at 248 (1988); *see also Goldman Sachs Grp., Inc. v. Ark. Teachers Ret. Sys.*, 141 S. Ct. 1951, 1962-63 (2021) (further noting that "a defendant's mere production of some evidence relevant to price impact would rarely accomplish that feat").

57 *ChemoCentryx*, 2024 WL 1141699 at *4 (quoting *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 2023 WL 2932485, at *12 (D. Conn. Apr. 13, 2023)).

58 *See, e.g.*, *id.* at *5 (finding defendants failed to rebut price impact where there was impact on the front end).

59 Merits Rpt. ¶¶ 102-105.

60 *Id.* ¶¶ 106-107; *see also id.* ¶¶ 109-111 (describing event study parameters and results).

is significant at the 99% confidence level (controlling for market and industry movements).[61] Several media outlets attributed the observed price increase directly to the Attwill Press Release.[62] And over 141.9 million Vaxart shares traded that day—a 30-fold increase over the average daily trading volume for the prior month.[63] Dr. Cain found no other news released that day that could explain the observed stock reaction.[64]

Similarly, after the OWS Press Release was picked up by media outlets, Vaxart's stock price increased to a then-all-time high of $14.30 by 9:40 a.m. Again, media outlets reported the price surge and attributed it to the premarket news.[65] By the end of the trading day, after some inflation dissipated, Vaxart's stock price was up 30.4%, or $1.90 per share, versus the day before (controlling for market and industry movements).[66] This end-of-day increase is significant at the 99% level, even after much of the intraday inflation had dissipated. Additionally, over 230.6 million Vaxart shares traded that day—50 times more than the average daily trading volume for the month prior to June 25.[67] No confounding information unrelated to the fraud could explain this reaction.[68] On the front end alone, Defendants' attempts to completely sever price impact conspicuously fail.

Defendants' efforts on the back-end fare no better. In prior briefing, Defendants tried to meet their burden of proving no price impact by focusing on the "back-end," that is, on the price reactions on July 1, 2, 6, and 27 (the first trading dates after the release of the June 30 SEC Form 4 and the July 25 *NYT* and HHS corrective disclosures). Plaintiffs reserve the right to update their briefing should Defendants adapt or modify their back-end price impact arguments. Still, Plaintiffs

---

61 *Id.* ¶ 126; *see also id.* ¶ 125 (noting that the same day, Andrei Floroiu told investors at a virtual fireside chat that "***there may be some other news on other fronts, partnering and so on that [we] will release whenever they happen***").

62 *Id.* ¶ 122.

63 *Id.* ¶ 126.

64 *Id.* ¶ 128.

65 *Id.* ¶ 132.

66 *Id.* ¶ 135.

67 *Id.*

68 *Id.* ¶¶ 138-139.

note that, in his Merits Report, Dr. Cain identifies notable abnormal returns on his June and July Corrective Event dates.[69] Further, after carefully evaluating whether there was any other news outside of these events that could explain the observed stock price decreases on these dates, Dr. Cain found none.[70] Thus, to meet their burden of showing no price impact on the back-end, Defendants must show that these abnormal returns on July 1, 2, 6, and 27 had ***no relation to the alleged misstatements, omissions, and/or fraudulent acts***.[71] Further, they must offer a compelling explanation of how Vaxart's stock price dropped by nearly 50% from the intraday high on June 26 beyond just claiming there was no fraud.[72] They have conspicuously failed to do so.

**c. The dissipation of inflation over time on the back-end—*i.e.*, loss causation—is susceptible to classwide proof.**

Plaintiffs intend to argue at trial that the alleged scheme—which culminated in the issuance of the misleading Attwill and OWS Press Releases and subsequent Armistice insider sales—caused Vaxart Securities to trade at artificially distorted prices throughout the Class Period. This inflation, however, did ***not*** remain constant over the Class Period.[73] It evolved and dissipated over time.[74]

As detailed in Dr. Cain's loss causation analysis, the inflation introduced by the alleged fraud started to dissipate within hours of the OWS Press Release's publication, as Armistice liquidated its holdings, and media organizations, financial analysts, and the market generally tried to figure out whether Vaxart had truly been "selected for OWS."[75] The dissipation of inflation continued when markets reopened on June 29, when Armistice sold the near-remainder of its

---

69 *Id.* ¶¶ 153, 156, 161, 168.

70 *Id.* ¶¶ 158, 162, 168.

71 *See, e.g.*, *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 393 (N.D. Ga. 2019) ("the existence of non-statistically-significant stock price declines does not prove the absence of price impact").

72 *Cf. ChemoCentryx*, 2024 WL 1141699, at *4 ("Although the Court must analyze all evidence and use a 'good dose of common sense' to analyze price impact, this argument borders on a procedurally improper attack on falsity and materiality.").

73 *See* Class Certification Order at 1, 5.

74 *See* Eff. Rpt. ¶¶ 125, 127, 130, 132 (previewing that a loss causation analysis would "document[] how artificial inflation per share evolved throughout the Class Period … based on the timing of specific information or statements").

75 Merits Rpt. ¶¶ 45-46, 148-154 (providing intraday analysis of inflation).

holdings, and as well as on July 1, 2, and 6, as the market digested (i) the news that Armistice—an insider—had been dumping shares and (ii) diverging media accounts about the significance of the Attwill and OWS Press Releases.[76] Though Vaxart's stock price fluctuated during the latter half of the Class Period—including, for example, its upward movement from the news that Vaxart had raised $90 million on July 13—it dropped by a statistically significant amount again on Monday, July 27—the first trading day after the *New York Times* and HHS reported that Vaxart's vaccine candidate had been selected only to participate "in *preliminary* US government studies to determine *potential areas* for *possible* Operation Warp Speed partnership and support," and that HHS had neither "entered into funding agreements" nor were "negotiating" such agreements with Vaxart.[77]

How and to what extent artificial inflation dissipated from Vaxart's stock price following the Attwill and OWS Press Releases poses no individualized issues.[78] Whether using a specific-disclosure model, a pure leakage model, or something in between, the question of what amount of artificial inflation remaining in the price of a security at any given time does not depend on any specific investor.[79] This does not mean that all Class members were damaged by the scheme to the same extent. As Dr. Cain illustrates, if Vaxart's stock was inflated at the time an investor transacted,

---

76 *Id.* ¶¶ 155-164. As Dr. Cain notes in his report, these dates form a near continuous leakage period: Monday, June 29 was the next trading day after Friday, June 26. On Tuesday, June 30, Vaxart's stock price temporarily increased when news sites published positive articles about Vaxart's OWS selection and upcoming clinical studies. After markets closed on June 30, Armistice filed a Form 4 disclosing its insider sales to the public. Vaxart's stock price dropped on Wednesday and Thursday (July 1 and 2). The market was closed on Friday, July 3 for the July 4 holiday. And Vaxart's stock price continued to fall on Monday, July 6, after markets reopened. *See id.* ¶ 44; Ex. 4 to Merits Rpt. (showing event study results for initial leakage period in calendar form).

77 Exs. G-H. As Dr. Cain notes, his analysis also confirmed that there was no other news that he could identify that could plausibly explain the observed stock drop in Vaxart's share price in the wake of the Saturday, July 25 disclosures. Merits Rpt. ¶ 168.

78 As this Court has recognized, "there are a variety of ways that inflated value can be dissipated short of corrective disclosures." *In re Broadcom Corp. Sec. Litig.*, 2005 WL 8152913, at *4 (C.D. Cal. Sept. 12, 2005). "Dissipation may flow, for example, from 'a growing quiet awareness on the part of certain highly sophisticated market participants—arbitrageurs and sell-side analysts—that previously publicly available fact[s], which for a time … seemed unimportant, were in fact inconsistent with the misstatements.'" *Id.*

79 *See* Merits Rpt. ¶¶ 171-175 (describing how artificial inflation is calculated).

then that investor overpaid or otherwise made investment decisions based on a price affected by fraud at that time. Investors who bought earlier in the Class Period, when inflation was higher, tended to overpay more per share than those who bought later (assuming all else being equal).[80] But such "differences in damage[s] calculations [are] not sufficient to defeat class certification," provided that (as Dr. Cain also shows) each Class member's damages may be calculated using a common methodology.[81]

Defendants' anticipated attempts to have the Class Period end before July 25 similarly pose no barrier to class certification. Assuming, for example, that the Court (or a jury) were to find that all artificial inflation had dissipated prior to the July 25, 2020 *NYT* article and Twitter posts. (This assumption would be error, given (i) the reporting throughout July that repeated that Vaxart had been selected for OWS[82] and (ii) the abnormal negative returns observed in the wake of the July 25 *NYT* article and tweets, which persisted, rather than rebounded, in the days thereafter.) The fact that investors who purchased Vaxart Securities later in the Class Period, after the date inflation assumingly fully dissipated, could not show losses under this hypothetical says nothing about

---

[80] Merits Rpt. ¶¶ 25, 175; *see also id.* ¶ 147 ("investors purchasing Vaxart's Common Stock at different points in time during the Class Period would be impacted by the fraud differently (irrespective of their individual beliefs and/or whether they had personally evaluated the alleged misrepresentations), based on the amount of artificial inflation reflected in the prevailing market price at the time of purchase").

[81] *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986-87 (9th Cir. 2015).

[82] *See* Merits Rpt. ¶ 92 (summarizing news about Vaxart and OWS published after the OWS Press Release issued), including: Ex. I, Genetic Engineering and Biotechnology News (June 29, 2020) ("Vaxart's oral COVID-19 vaccine candidate has joined the handful of experimental vaccines being studied as part of [OWS]. … Vaxart announced its inclusion in Operation Warp speed a day after disclosing plans to ramp up manufacturing of its COVID-19 vaccine to one billion or more doses a year,"); Ex. J, Seeking Alpha (July 6, 2020) ("Vaxart is now among the highly-selective Warp Speed crowd, alongside major drug makers AstraZeneca (AZN), Merck (MRK), Pfizer (PFE), Johnson & Johnson (JNJ) as well as other speculative play Moderna (MRNA). … Vaxart now has the support of Warp Speed and multiple government agencies, which is very necessary, given Vaxart's minuscule $30 million cash balance as of its last quarterly report. … To conclude ... Operation Warp Speed is now backing Vaxart's tablet technologies, which provide funding and streamlined development times, as well as the trust and faith in the company from the government."); Ex. K, Investors Alley (July 15, 2020) ("VXRT was chosen by the U.S. government for inclusion in Operation Warp Speed (OWS)"); Ex. L, Motley Fool (July 22, 2020): "So far, it's thought that OWS has funded at least nine independent coronavirus vaccine efforts [including Vaxart].")).

whether investors who bought earlier in the Class Period—*i.e.*, in the days or hours following the Press Releases—were injured (and could thus bring claims as a Class).[83]

As noted by the Seventh Circuit in *Schleicher*, insisting that the Court need "pin down *when* the stock's price was affected by any fraud … before any class can be certified … gets the cart before the horse."[84] "That decision, like the other issues, can be made on a class-wide basis, because it affects investors in common."[85] As such, absent a showing that the July 25 disclosures in no way were conceivably corrective, the question of whether to shorten the Class Period is not for class certification, but one "appropriately left to trial or a motion for summary judgment."[86]

#### d. The hypothetical presence of investors who purchased Vaxart Securities without believing Vaxart had been selected for OWS does not defeat class certification.

The Court's Class Certification Order notes that, while some investors, analysts, and reporters likely focused on the Press Releases' misleading headlines and contents, it is possible that "more sophisticated actors could have little trouble parsing the words of the release (or articles describing it) and realiz[ing] that the headline was nothing but a head-fake."[87] However, the presence of such hypothetical investors in the Class poses no issue for *Basic*'s fraud-on-the-market presumption. Nor would it cause individualized issues to predominate.

To be a member of the Class, an investor ***must*** have purchased Vaxart Securities after the Attwill or OWS Press Releases inflated the market price. And of course, there will always be differences among investors as to the amount of knowledge they have, and the reasons they choose

---

83 *Cf. Schleicher*, 618 F.3d at 686 ("Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win.").

84 *Id.* at 687 (sentence sequence altered).

85 *Id.*

86 *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *40 (S.D.N.Y. Oct. 18, 2019), *R&R adopted in part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020); *accord In re CenturyLink Sales Pracs. & Sec. Litig.*, 337 F.R.D. 193, 214 (D. Minn. 2020). In its July 2, 2024 Order, the Court questioned whether sub-classes should proactively be created to parse out later-in-the-Class-Period investors who would have no loss causation if certain corrective events were not actually corrective. Plaintiffs see no need to carve out sub-classes at this time. To the extent any Class Member purchased Vaxart Securities after the date a factfinder found the truth was fully revealed, those investors would have zero damages.

87 Class Certification Order at 9.

to buy or sell. Nonetheless, "[m]ost investors purchase stock based on the belief that the market is, in some way and for some reason, undervaluing the stock and that the stock will thereafter appreciate."[88] But while individual trades may reflect the investor's thinking that they "see opportunities [that] others[, on average] have missed,"[89] the fact remains that the market as a whole "reflect[s] a ***collective*** assessment of currently available information"[90] Accordingly, both individual and overall market assessments of value "can be skewed by a market price tainted by fraud,"[91] *even if* some subset of investors were not directly deceived by a misstatement or omission. This is because, "[u]ltimately, a stock price reflects an aggregation of the views of numerous different investors, each of whom may hold differing views about a company and its expected value."[92] And what all Class members have in common here—as in the overwhelming majority of Section 10(b) class cases—is that they all purchased (or sold Put Options) at a ***market price*** that was artificially inflated by the scheme at issue**.**

Here, nothing suggests that there exists some hypothetical, super sophisticated investor, who (i) read the Attwill and OWS Press Releases, (ii) ***knew*** the Releases were misleading, (iii) ***knew*** with certainty that the Releases were deceiving other investors and thus artificially inflating the market price of Vaxart Securities; but then (iv) purchased Vaxart Securities anyway at what he or she knew was an inflated price without care for market integrity. As the Supreme Court observed in *Basic*, what investor "would knowingly roll the dice in [such] a crooked game."[93]

---

88 *In re Computer Scis. Corp. Sec. Litig.*, 288 F.R.D. at 123.

89 *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 253 (N.D. Cal. 2013).

90 *In re Computer Scis. Corp. Sec. Litig.*, 288 F.R.D. at 123 (emphasis added).

91 *Halliburton II*, 573 U.S. at 274.

92 Merits Rpt. ¶ 145; *see also Basic*, 485 U.S. at 246 ("The idea of a free and open public market is built upon the theory that competing judgments of buyers and sellers as to the fair price of a security brings about a situation where the market price reflects as nearly as possible a just price. Just as artificial manipulation tends to upset the true function of an open market, so the hiding and secreting of important information obstructs the operation of the markets as indices of real value.").

93 *Basic*, 485 U.S. at 247.

Moreover, even if some of these hypothetical investors did exist, it would not defeat class certification here. *Basic* "never denied the existence" of investors indifferent to fraud-affected prices. Instead, "*Basic* concluded only that 'it is reasonable to presume that *most* investors—knowing that they have little hope of outperforming the market in the long run based solely on their analysis of publicly available information—will rely on the security's market price as an unbiased assessment of the security's value in light of all public information.'"[94] Moreover, "[i]t can be stated without fear of gainsay that the shareholders of every large, publicly traded corporation includes institutional investors, short-sellers, arbitragers etc."[95] Yet despite these differences, courts ***routinely*** certify investor classes that make no distinction between, for example, ordinary individuals and the most sophisticated and well-informed institutional traders. There is no reason to take a different tact here,[96] particularly where the posited hypothetical investors would still have overpaid for Vaxart Securities compared to their but-for value as a consequence of Defendants' scheme or would have declined to buy Vaxart altogether. Notably, as Dr. Cain explains, the existence of informed traders is consistent with the leakage or diffusion of investors:

> Market makers and trading counterparties attempt to infer the nature or identities of large traders in the marketplace, and react accordingly—for example, by lowering their bids to purchase stock when they believe an informed trader may be selling based on information unavailable to other investors. This is consistent with the leakage theory of information diffusion: some investors may learn a portion of the relevant truth while other investors may simply react to informed traders' selling by lowering their bid prices to purchase stock or simply declining to purchase altogether.[97]

**e. *Affiliated Ute* provides an additional presumption of reliance.**

The Class is also entitled to the presumption of reliance under *Affiliated Ute*, as Plaintiffs "advance[] a securities fraud claim based on [D]efendant[s'] failure to disclose material

---

94 *Halliburton II*, 573 U.S. at 273 (quoting *Amgen*, 568 U.S. at 462).

95 *Moskowitz v. Lopp*, 128 F.R.D. 624, 631 (E.D. Pa. 1989).

96 *Khadera v. ABM Indus. Inc.*, 2012 WL 581580, at *4 (W.D. Wash. Feb. 22, 2012) ("the possible existence of undamaged Plaintiffs within the class at large did not warrant decertification").

97 Merits Rpt. ¶¶ 149, 152.

information."[98] As a primary component of Defendants' insider trading and pump-and-dump schemes, Defendants failed to disclose that (i) Attwill "lacked the ability to produce one billion or more doses" of Vaxart's vaccine;[99] (ii) "the federal government had not, in fact, chosen Vaxart as one of its leading vaccine developers, or for that matter to receive federal funding";[100] and (iii) Armistice had secretly initiated "an intentional scheme to manipulate the price of Vaxart shares for the purpose of selling them at an artificially inflated price."[101] Additionally, Plaintiffs contend that Defendants' failure to offer meaningful, reliable, and clear information, both before and after liquidating their Vaxart holdings, steadily contributed to increasing skepticism and/or uncertainty about the true status of Vaxart's then-existing manufacturing capabilities and its mere invitation to an NHP study. Thus, regardless of market efficiency, the presumption of reliance under *Affiliated Ute* applies here.[102]

**2. Damages for Plaintiffs' Section 10(b) and 20A Claims can each be calculated using a common methodology that can account for the dissipation of artificial inflation.**

To satisfy "predominance" with respect to damages, Plaintiffs need only show "that damages are capable of measurement on a classwide basis"—*i.e.*, that the damages from Defendant's misconduct that created the legal liability "can 'feasibly and efficiently be calculated once the common liability questions are adjudicated.'"[103] "[U]ncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed for

98 *See In re Montage Tech. Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *6 (N.D. Cal. Apr. 21, 2016) (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972)).

99 Dec. 22, 2021 MTD Order at 5 (ECF No. 182).

100 *Id.*

101 May 25, 2023 MTD Order at 6 (ECF No. 293).

102 *See Affiliated Ute*, 406 U.S. at 153-54 (to establish a presumption of reliance, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of his decision [to purchase securities]").

103 *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 288 (N.D. Cal. 2020).

calculating those damages."[104] Courts routinely find that the out-of-pocket methodology, proposed by Plaintiffs, satisfies *Comcast*'s requirements in Section 10(b) cases.[105]

**a. Section 10(b) damages are calculable using a common formula.**

For Section 10(b) damages, Plaintiffs propose the out-of-pocket methodology to calculate damages on a classwide basis. The out-of-pocket method uses an inflation ribbon representing "an estimate of the … level of artificial inflation in the prices of [the] common stock caused by the alleged misrepresentations and omissions."[106] It then "measures damages as the artificial inflation per share at the time of purchase less the artificial inflation per share at the time of sale (or the artificial inflation at the time of purchase if the share was not ultimately sold)."[107] While individual damages for each Class member will be calculable based on when each member purchased the stock, once liability is established, "the process of computing individual damages will be virtually a mechanical task."[108] "Courts regularly reaffirm that the out-of-pocket, or event study, method matches Plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method for calculating damages in virtually every Section 10(b) class action."[109]

In his Merits Report, Dr. Cain goes beyond what is required at class certification by quantifying (with the aid of an event study regression) the artificial inflation introduced and/or maintained by the Press Releases and then showing, through examples, how the common, classwide, plug-and-play formula will result in damages-per-share outputs that will vary based only on when a given Class member bought and sold during Class Period.[110] As Dr. Cain explains,

---

[104] *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817 (9th Cir. 2019).

[105] *In re BofI Holding, Inc. Sec. Litig.*, 2021 WL 3742924, at *7 (S.D. Cal. Aug. 24, 2021) ("Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of [Section 10(b)] liability ... making it the standard method for calculating damages in virtually every [Section 10(b)] class action."); *City of Miami Gen. Emps.'& San. Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) (same).

[106] *SEB Inv. Mgmt. AB*, 335 F.R.D. at 288.

[107] Merits Rpt. ¶¶ 176-179 (also clarifying what happens during the 90-day lookback period).

[108] *In re Diamond Foods*, 295 F.R.D. at 252.

[109] *In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at *12 (N.D. Cal. Feb. 4, 2022) (quoting *City of Miami*, 2018 WL 4931543, at *3 (collecting cases)).

[110] Merits Rpt. ¶¶ 176-179.

his damages methodology thus works regardless of whether the jury adopts a corrective-disclosure or leakage model of loss causation and inflation dissipation.[111] His inflation inputs also account for whether confounding information, such as the true aspects of the Attwill and OWS Press Releases, had significant price effects (they did not).[112] And the damages formula and inputs can be easily modified should a jury reach any alternative findings of fact that might warrant their adjustment, including as to "(1) confounding information versus corrective information; (2) how to back-cast inflation over the Class Period; (3) the date of the first actionable misstatement and/or omission; and (4) the latest date it took the market to fully understand Vaxart's true role (or lack thereof) in Operation Warp Speed."[113]

**b. Section 20A damages are calculable using a common formula.**

Section 20A damages are similarly calculable on a classwide basis under common and straightforward methodologies informed by the statutory text. Under the statute, "[t]he total amount of damages imposed … shall not exceed the profit gained or loss avoided in the transaction or transactions that are the subject of the violation."[114] Per Dr. Cain, "[t]here are at least two reasonable methodologies to calculate profits gained under Section 20A: (1) profits gained based on market prices; and (2) profits gained based on artificial inflation."[115] Using Defendants' trading records, Dr. Cain calculated both values and found that profits gained on market prices was $250,252,421 and that inflation-based profits equaled nearly $170,219,442.[116] To the extent a jury finds damages under Section 20A are linked to artificial inflation per share, Dr. Cain explains that the calculation of artificial inflation per share would be similar to the calculation discussed above for Section 10(b).[117]

---

111 *See id.* ¶¶ 187-193; *see also In re Tesla, Inc. Sec. Litig.*, 2022 WL 7374936, at *9-12 (N.D. Cal. Oct. 13, 2022) (finding leakage model could properly account for alternative findings of fact).

112 Merits Rpt. ¶¶ 128, 138.

113 *Id.* ¶¶ 187-192 (including examples for each scenario).

114 15 U.S.C. § 78t-1(b)(1).

115 Merits Rpt. ¶ 183.

116 *Id.* ¶¶ 184-185.

117 *Id.* ¶ 186.

**c. Options damages are calculable using a common formula.**

Finally, the computation of artificial inflation (deflation) and damages for Vaxart Options—both Put and Call—are all calculable using routine methodologies.[118] As Dr. Cain notes, "during the Class Period, the pricing for Vaxart Options was dependent on the market price of Vaxart Common Stock."[119] But "[t]he price of an option, and therefore, the embedded inflation contributing to an option's price, can change based on a number of factors, even if the inflation in the underlying stock is constant."[120] To account for these factors, Dr. Cain applies the well-known and standard Black-Scholes pricing model to determine the price of a Vaxart Option both with and without assuming artificial inflation was present in Vaxart Common Stock.[121] By changing the underlying price of the security in the Black-Scholes model to reflect the removal of the artificial inflation, one can assess how the value of the option would be impacted over time.[122] From this process, one can measure damages-per-option using the out-of-pocket method—*i.e.*, by taking the difference between the observed and but-for Black-Scholes option prices—subject to additional limits described by Dr. Cain.[123]

As the example calculations in Dr. Cain's report show, calculating damages is formulaic, can adapt to alternative findings, and will not raise individualized issues.[124] Damages can therefore

---

[118] *See id.* ¶¶ 194-210.

[119] *Id.* ¶ 194.

[120] *Id.* ¶ 199.

[121] *See, e.g.*, *Apple*, 2023 WL 2763952, at *2 (approving use of Black-Scholes method).

[122] Merits Rpt. ¶ 200.

[123] *Id.* ¶¶ 201-206.

[124] *See In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 529 (N.D. Cal. 2009) ("potential complications regarding the computation of damages" do not defeat class certification); *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 578 (N.D. Cal. 2009) ("Courts have … repeatedly recognized that putative intra-class conflicts relating to the times at which particular class members purchased their securities, and which could potentially motivate different class members to argue that the securities were relatively more or less inflated at different time periods, relate to damages and do not warrant denial of class certification." (quoting *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 277 (S.D.N.Y. 2008)); Merits Rpt. ¶¶ 205, 211.

"be proven on a class-wide basis, such that individual damage analyses will not engulf questions common to the class as a whole."[125]

**B. The Proposed Class Satisfies All Other Rule 23(a) and Rule 23(b)(3) Criteria**

The questions, issues, and concerns articulated in the July 2, 2024 Class Certification Order all fall under the element of predominance. The Court has already received full and ripe briefing as to the other Rule 23 requirements—numerosity, commonality, typicality, adequacy, and superiority. Plaintiffs are unaware of any newly discovered evidence since the initial class certification briefs were filed that would materially move the needle or alter the Court's analysis on these elements.[126] Nor are Plaintiffs aware of any meaningful changes of relevant law.

Accordingly, in the interests of litigation efficiency, Plaintiffs incorporate the arguments made in their prior class certification briefing by reference.[127] Plaintiffs reserve the right to reply should Defendants bring any new attacks on Plaintiffs' prior showings for these elements.

**CONCLUSION**

For the reasons addressed above, this Court should: (i) certify this action as a Class action; (ii) appoint Plaintiffs Wei Huang, Langdon Elliott, and Ani Hovhannisyan as Class Representatives; and (iii) appoint Hagens Berman and Scott+Scott as Class Counsel.

---

[125] *In re Montage*, 2016 WL 1598666, at *13.

[126] Plaintiffs note that, of the remaining Rule 23 elements, numerosity is the only one whose analysis must be updated. During the current Class Period, investors traded Vaxart common stock on the NASDAQ at an average weekly trading volume of 260.1 million shares (with an average weekly turnover rate of 252.7%). Merits Rpt. ¶ 48, n.95. *Compare with* Pls. Mot. to Certify at 7-8 (finding average weekly trading volume of 162.6 million shares and average weekly turnover rate of 38.0% for a longer alleged Class Period that ended in August 2020). During both periods, at least 170 institutions owned Vaxart shares. Merits Rpt. ¶ 48, n.95. These updated trading volume and turnover numbers provide even stronger support for finding that there are likely thousands of Class members—thus easily satisfying Rule 23 numerosity.

[127] *See* Pls. Mot. to Certify; Pls. Class Cert. Reply (ECF No. 325).

DATED: July 30, 2024

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Reed R. Kathrein*
Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Raffi Melanson (*pro hac vice*)
1 Faneuil Hall Sq 5th Floor
Cambridge, MA 02142
Telephone: (708) 628-4966
Facsimile: (708) 628-4950
raffim@hbsslaw.com

*Counsel for Proposed Class Representatives Wei Huang and Langdon Elliott*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

John T. Jasnoch (281605)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com

William C. Fredericks (*pro hac vice*)
Jeffrey P. Jacobson (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 233-6444
Facsimile: (212) 233-6334
wfredericks@scott-scott.com
jjacobson@scott-scott.com

*Counsel for Proposed Class Representative Ani Hovhannisyan*

**THE SCHALL LAW FIRM**

Brian J. Schall (290685)
2049 Century Park East, Suite 2460,
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile: (310) 388-0192
brian@schallfirm.com

*Additional Counsel*