Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Counsel for Proposed Class Representatives Wei Huang and Langdon Elliott*

[Additional counsel on signature page]

William C. Fredericks (*pro hac vice*)
Jeffrey P. Jacobson (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 233-6444
Facsimile: (212) 233-6334
wfredericks@scott-scott.com
jjacobson@scott-scott.com

*Counsel for Proposed Class Representative Ani Hovhannisyan*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

In re VAXART, INC. SECURITIES LITIGATION

*This Document Relates to:*
*ALL ACTIONS*

Case No. 3:20-cv-05949-VC

CLASS ACTION

**PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL**

Hearing Date: October 10, 2024
Time: 10:00 a.m.
Courtroom: 4, 17th Floor
Judge: Hon. Vince Chhabria

## TABLE OF CONTENTS


**Page**

INTRODUCTION ....................................................................1

PLAINTIFFS' DAMAGES MODEL: THE OUT-OF-POCKET METHOD ....................2

ARGUMENT ........................................................................3

A. Defendants' Opposition Advances Inappropriate Loss Causation Arguments. ....................3

B. Defendants' Loss Causation Attacks Lack Merit In All Procedural Postures. ....................4

1. Plaintiffs' Inflation Measures Control for Confounding Information. ....................4

a. Defendants fail to identify any *actually* confounding information in the June 25, 2020 Attwill Press Release. ....................4

b. Defendants' disagreement with the conclusions of Dr. Cain's disaggregation analysis for the OWS Press Release is a jury issue. ....................6

2. Plaintiffs' Back-End Measure of Loss Causation Tracks Plaintiffs' Theory of Liability and the Facts of this Case. ....................9

3. Armistice's Insider Trades Were Corrective. ....................11

4. Section 20A Damages Can Be Established on a Classwide Basis. ....................12

C. The Court Should Certify the Full Class Period. ....................12

1. The Effects of Defendants' Fraud Scheme Persisted Well Past June 26, 2020. ....................12

2. The July 25, 2020 *NYT* Article and HHS Tweets Reported New Information. ....................14

CONCLUSION ....................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Acuity Brands, Inc. Sec. Litig.*,
2020 WL 5088092 (N.D. Ga. Aug. 25, 2020) ....4

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ....1, 3

*Baker v. SeaWorld Ent., Inc.*,
423 F. Supp. 3d 878 (S.D. Cal. 2019) ....7

*BofI Holding Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ....11

*Bond v. Holland Am. Line N.V.*,
2019 WL 2287952 (W.D. Wash. May 29, 2019) ....6

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ....1, 3

*FibroGen Sec. Litig.*,
2024 WL 1064665 (N.D. Cal. Mar. 11, 2024) ....14, 15

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) ....4

*Hubbard v. BankAtlantic Bancorp, Inc.*,
688 F.3d 713 (11th Cir. 2012) ....4

*Jaffe v. Household Int'l, Inc.*,
2016 WL 374132 (N.D. Ill. Feb. 1, 2016) ....9

*Knollenberg v. Harmonic, Inc.*,
152 F. App'x 674 (9th Cir. 2005) ....11

*Luna v. Marvell Tech. Grp., Ltd.*,
2017 WL 4865559 (N.D. Cal. Oct. 27, 2017) ....4

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ....11

*Novatel Wireless Sec. Litig.*,
2013 WL 12144150 (S.D. Cal. Oct. 25, 2013) ....6

*Omnicom Grp., Inc. Sec. Litig.*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008) ....15

*Phillips v. Sci.-Atlanta, Inc.*,
489 F. App'x 339 (11th Cir. 2012) ....................................................15

*Police Ret. Sys. v. Granite Constr. Inc.*,
2021 WL 229310 (N.D. Cal. Jan. 21, 2021) ....................................................3

*REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. Apr. 21, 2010)....................................................7

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ....................................................11

*Sayce v. Forescout Techs., Inc.*,
2024 WL 2750003 (N.D. Cal. May 28, 2024) ....................................................3, 4, 12

*Schleicher v. Wendt*,
618 F.3d 679 (7th Cir. 2010) ....................................................1, 12

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
335 F.R.D. 276 (N.D. Cal. 2020)....................................................4

*SEC v. Leslie*,
2010 WL 2991038 (N.D. Cal. July 29, 2010)....................................................6, 9

*Sheet Metal Workers Nat'l Pension Fund v. Aktiengesellschaft*,
2023 WL 3569981 (N.D. Cal. May 19, 2023) ....................................................4

*Snap Inc. Sec. Litig.*,
334 F.R.D. 209 (C.D. Cal. 2019) ....................................................12

*Tesla, Inc. Sec. Litig.*,
2022 WL 7374936 (N.D. Cal. Oct. 13, 2022)....................................................6, 9, 14

*Williams Sec. Litig.-WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009) ....................................................14

*Utesch v. Lannett Co.*,
2021 WL 3560949 (E.D. Pa. Aug. 12, 2021) ....................................................3

## TABLE OF DEFINED TERMS

| TERM | DEFINITION |
|---|---|
| ¶ | Paragraph |
| Ex. | Refers to exhibits in the Kathrein Declaration filed herewith |
| Armistice | Refers collectively to Armistice Capital and Armistice Master Fund |
| Armistice Capital | Defendant Armistice Capital, LLC |
| Armistice Master Fund | Defendant Armistice Capital Master Fund Ltd. |
| Attwill | Attwill Medical Solutions Sterilflow, LP |
| Attwill PR | The June 25, 2020 Release titled "Vaxart, Inc. Signs Memorandum of Understanding with [Attwill] Enabling Production of A Billion or More COVID-19 Vaccine Doses Per Year …" (ECF No. 383-3) |
| Class Period | June 25, 2020 through July 24, 2020, inclusive |
| Defendants | Refers collectively to Armistice, Stephen Boyd, and Keith Maher |
| HHS | U.S. Department of Health and Human Services |
| Eff. Rpt. | Cain Efficiency Report (December 1, 2023) (ECF No. 311-2) |
| Reb. Rpt. | Cain Rebuttal Report (March 7, 2024) (ECF No. 325-2) |
| Merits Rpt. | Cain Loss Causation and Damages Report (July 30, 2024) (ECF No. 380-2) |
| Merits Reb. Rpt. | Cain Merits Rebuttal Report (Sept. 17, 2024) (Ex. M) |
| MOU | Memorandum of Understanding |
| M-W 2nd Rpt. | Expert Report of Jennifer Marietta-Westberg, Ph.D. ("Dr. Marietta"), dated Aug. 27, 2024 (ECF No. 383-2) |
| *NYT* | The *New York Times* |
| OWS | Operation Warp Speed |
| OWS PR | The June 26, 2020 Release titled "Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed" (ECF No. 383-4) |
| Plaintiffs | Langdon Elliott, Wei Huang, and Ani Hovhannisyan |
| Vaxart Securities | Common Stock and Options, collectively |
| Vaxart | Vaxart, Inc. |

## INTRODUCTION

Defendants again cede that numerosity, commonality, and superiority are met. They say nothing on typicality, adequacy, or *Basic*'s reliance presumption. They now even accept that the misleading aspects of the Attwill and OWS Press Releases impacted Vaxart share price. Their renewed opposition challenges only (i) the sufficiency of Plaintiffs' damages model and (ii) the Class Period's end date. But even those attacks pay only lip service to Rule 23's standards.

Defendants do not seriously dispute that the out-of-pocket method—which they do not even mention—can calculate damages on a classwide basis under *Comcast*. Instead, they erroneously assert that Dr. Cain's model cannot accurately calculate the extent to which investors were injured. But case law is clear: calculating ***actual inputs*** under the out-of-pocket method is a loss causation issue, which presents common, ***merits questions*** that are inappropriate to resolve at class certification.[1] And in any event, Defendants' assertion that Dr. Cain fails to consider confounding information, including the purportedly truthful aspects of the Press Releases, is simply wrong. Their brief acknowledges that Dr. Cain considered whether parts of the Attwill and OWS Press Releases needed to be disaggregated. They simply disagree with his conclusions, not fidelity to his process. But their mere disagreements and hollow recitations of Rule 23 buzzwords are not grounds for premature loss causation rulings or otherwise denying class certification.

Defendants' request for a shorter Class Period fails for similar reasons. Despite claiming that the market fully understood by the end of June 26 that Vaxart had only been selected for an NHP study, Defendants fail to engage with multiple reports over the following days, including those identified by their expert, that placed Vaxart among the other OWS finalists. Nor do they identify any media prior to July 25 that reported the ***full story*** about Vaxart's OWS status. At best, Defendants' attacks rest on the flawed premise that "class certification is proper only when the class is sure to prevail on the merits" based on their view of the evidence—a false standard that must be rejected.[2] As ***all actual Rule 23 requirements have been met***, the Class should be certified.

---

[1] To do so would be reversible error. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 475 (2013); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011).

[2] *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010).

## PLAINTIFFS' DAMAGES MODEL: THE OUT-OF-POCKET METHOD

Throughout their briefing, Defendants conflate Plaintiffs' damages model—the plug-and-play out-of-pocket method—with the loss causation approaches Plaintiffs intend to use to calculate the inflation inputs for that method. As Plaintiffs' opening motion at pp. 3-7 explains: Plaintiffs will use the out-of-pocket damages method to establish a common, classwide formula to calculate each Class member's damages. At its core, this method involves constructing an "inflation ribbon" that reflects the ***varying amount of inflation*** in the value of Vaxart shares over the Class Period.

As explained by Dr. Cain, two analytical theories, (i) "leakage" and (ii) corrective disclosures, can be used here as part of a broader event study analysis to identify inflation amounts that were dissipated at different points over the Class Period. Under Dr. Cain's "Scenario 1" ("leakage"), the truth "leaked out" on each trading day from June 26 through July 6, 2020 (except June 30) through the ongoing digesting of news, the lack of any confirmation of "OWS selection" from government sources, and later reports of government support for *other* COVID-19 vaccines.[3] The remaining inflation dissipated on July 25 when the *NYT* and HHS ***definitively*** clarified the true status of Vaxart's purported OWS involvement. Under Cain's "Scenario 2," from a loss causation perspective, the same disclosure events referenced in Scenario 1 can, alternatively, also be viewed as traditional corrective events (some with multi-day disclosure windows) that impacted the market for Vaxart shares on the same days and by the same amounts as under Scenario 1.[4] As Dr. Cain's Merits Report explains at ¶¶187-93, the measure of inflation determined under either loss causation "scenario" (to the extent choosing between them is even necessary) can easily be plugged into Plaintiffs' common, classwide out-of-pocket method damages formulas.

Significantly, regardless of which tool (or combination of the two) the jury finds is best to measure inflation-per-share, the appropriate inflation ribbon ***will be the same***.[5] And even if the

---

[3] Dr. Cain excludes price movements on June 30 from his inflation ribbon calculation under both of his scenarios, as Vaxart-specific information that was not fraud-related impacted Vaxart securities that day. Merits Rpt. ¶144. He otherwise found no confounding information to explain the price drops during the June 26 to July 6 period. *See, e.g.*, Merits Rpt. ¶19.

[4] *See generally* Merits Rpt. ¶¶21-23, 143-75 (analyzing the diffusion/leakage of truth on each corrective disclosure day).

[5] Ex. N, Cain Tr. 619:25-621:9 ("in this case, there's actually complete overlap of a leakage

jury ultimately finds that inflation per share on a particular day is different than what Dr. Cain found (or that the Class Period should end before July 25), this would ***not*** disprove the out-of-pocket method's appropriateness as a common method; as Dr. Cain's Merits Rebuttal Report ¶¶ 78-80 explain, it would simply require modifying relevant inflation inputs for the damages formula.

## ARGUMENT

### A. Defendants' Opposition Advances Inappropriate Loss Causation Arguments.

Defendants purport to challenge Rule 23 predominance by claiming that Plaintiffs failed to offer a damages model that is consistent with their theory of liability. Defendants' arguments, however, patently misread the standards governing class certification in this Circuit.

"The Ninth Circuit reads *Comcast* to demand that plaintiffs 'be able to show that their damages stemmed from the defendant's actions that created the legal liability.'"[6] Here, Plaintiffs have demonstrated a workable ***damages method, the out-of-pocket method***, that can feasibly calculate damages on a classwide basis should loss causation be established using corrective disclosure or leakage analyses. Defendants in no way "challenge the central premise of Plaintiffs' argument for why predominance is satisfied as to damages—[*i.e.*, that] damages can be calculated on a class-wide basis using the out-of-pocket method."[7] Instead, they assert that Dr. Cain's loss causation analysis cannot accurately calculate the extent to which investors were injured.

"Calculating the actual inputs into the out-of-pocket method by parsing and scaling the abnormal returns requires an analysis of 'loss causation.'"[8] The Supreme Court has made clear that, even when "intervening causes" beyond the alleged misrepresentation "such as 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events' ... were responsible for the loss or part of it," loss causation is a common question that need not be adjudicated before a class is certified.[9] "Numerous courts in

theory and a loss causation theory," such that ***the inputs to the out-of-pocket formula***—the inflation ribbon—***is the same under either and/or both approaches***).

6 *Sayce v. Forescout Techs., Inc.*, 2024 WL 2750003, at *11 (N.D. Cal. May 28, 2024).

7 *Utesch v. Lannett Co.*, 2021 WL 3560949, at *17 (E.D. Pa. Aug. 12, 2021).

8 *Police Ret. Sys. v. Granite Constr. Inc.*, 2021 WL 229310, at *7 (N.D. Cal. Jan. 21, 2021).

9 *Halliburton I*, 563 U.S. 804, 813 ("The Court of Appeals erred by requiring [plaintiff] to show loss causation as a condition of obtaining class certification."); *accord Amgen*, 568 U.S. at 475.

this District have similarly held that inquiries into loss causation are inappropriate at the class certification stage."[10] Thus, even where a plaintiff "may face substantial hurdles in actually proving loss causation and out-of-pocket damages, … the fact that calculating damages is a complex undertaking does not undermine the use of the out-of-pocket model, nor does it militate against certifying the class."[11] This case warrants no special exception.

## B. Defendants' Loss Causation Attacks Lack Merit In All Procedural Postures.

### 1. Plaintiffs' Inflation Measures Control for Confounding Information.

Defendants contend that Plaintiffs' loss causation model fails to control for information that they posit, without any evidence, might be ***potentially*** confounding. At the core, their argument is that, "to be legally sufficient, any loss-causation model must itself account for, and perfectly exclude, any firm-specific, nonfraud related factors that may have contributed to the decline in a stock price"; this is a false standard.[12] "[N]othing in *Comcast* requires an expert to perform [such pure loss causation] analyses at the class certification stage."[13] Moreover, even if *Comcast* did, once a plaintiff's expert "explains in nonconclusory terms" how "no-firm-specific, nonfraud related information contributed" to their damages calculations, ***the burden shifts to defendants*** to identify "some significant, firm-specific, nonfraud related information that could have affected the stock price." Defendants' pure speculation fails this burden.

#### a. Defendants fail to identify any *actually* confounding information in the June 25, 2020 Attwill Press Release.

On June 25, 2020, when the public was still speculating about the identities of the two OWS finalists not identified by the *NYT*, Vaxart announced it had entered into a memorandum of

---

10 *Forescout*, 2024 WL 2750003, at *12; *see also, e.g.*, *Luna v. Marvell Tech. Grp., Ltd.*, 2017 WL 4865559 at *6 (N.D. Cal. Oct. 27, 2017) (defendants' argument that the plaintiff's expert had "not shown how he will disaggregate price inflation attributable to confounding events" is an inquiry into loss causation which need not be analyzed at the class certification stage); *accord SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 288 (N.D. Cal. 2020).

11 *Sheet Metal Workers Nat'l Pension Fund v. Aktiengesellschaft*, 2023 WL 3569981, at *8 (N.D. Cal. May 19, 2023) (citations omitted).

12 *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 422 (7th Cir. 2015).

13 *Acuity Brands, Inc. Sec. Litig.*, 2020 WL 5088092, at *9 (N.D. Ga. Aug. 25, 2020) (citation omitted). Defendants' sole support for their position that *Comcast* requires disaggregation at class certification—*Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 726 (11th Cir. 2012)—is a ***post-verdict*** loss causation order that makes no mention of *Comcast*.

understanding ("MOU") with Attwill. Though Vaxart at the time had its own ability to lyophilize between 50 to 100 thousand doses of vaccine,[14] the Press Release suggested that, through Attwill, Vaxart could go further through Attwill's purported, then-present ability to lyophilize a "billion or more doses" per year. This fake news gave the misleading impression that Vaxart stood at the precipice of pioneering a successful coronavirus vaccine that would need a "billion or more doses" manufactured, and bolstered the misimpression that Vaxart was an OWS finalist that would soon need those billion or more doses.[15] Dr. Cain found that, assuming Plaintiffs prevail on the merits, there was "no economic evidence of information unrelated to the Complaint's claims that needs to be disaggregated from the price increase on this date."[16]

Defendants contend the mere announcement of this MOU, independent of the manufacturing capacity it claimed to enable, was "material news" for Vaxart, "even if Attwill's capabilities" in areas that could bottleneck production "needed to be ramped up."[17] Under Plaintiffs' theory of liability, these bottlenecks included the lack of regulatory clearances needed for Attwill to manufacture just one dose of Vaxart's biologic vaccine.[18]

Defendants' loss causation argument tries to manufacture some arbitrary distinction between (i) the mere fact Vaxart and Attwill had entered into an MOU and (ii) the false or misleading description of what that MOU would achieve—"enabling production of a billion or

---

14 *See* Ex. O, Biehn Tr. 154:3-10 (Q: "How many doses a month could Vaxart's internal facility lyo" A: "Ballpark in the 50s – 50s to 100,000 not enough to meet the government's requirements.").

15 *See id.* 155:15-156:7 (stating the Attwill release was drafted "to announce to the potential government partners, … that [Vaxart] had the capacity now to move forward" and "could actually produce the doses [it] had in [its] application[s]" for funding).

16 Merits Rpt. ¶128; *see also* Merits Reb. Rpt. ¶39 (noting market linking Vaxart's stock surge to the large-scale manufacturing ability the MOU would enable).

17 Opp. at 9.

18 Ex. P, Attwill Tr. 177:2-17 ("The auditor would recommend a phased approach to improve … the quality systems in order to build a late-stage development commercial facility capable of complying with the expectations set forth for a commercial biologic product. Do you see that?" A. "… As I have said numerous times, we knew that overnight we weren't going to be building a billion tablets [and that] they had to go through a clinical phase before we'd ever be making commercial product and that there were a number of things that would have to fall into place over time. And so I believe this [] statement was reflective of what needed to be done.").

more COVID-19 vaccine[s]."[19] But Defendants' own record citations confirm that Attwill's touted capacity to manufacture ***at a large scale***, rather than at the 50 to 100 thousand doses Vaxart could do internally, was what was important "for a company like Vaxart … to have any chance of bulk manufacturing."[20] Beyond these record facts, Defendants' expert confirmed she had not "done any discrete analysis to determine whether" an MOU affirming the intent to establish Attwill as a lyophilization resource, without information as to increased capacities or capabilities, would be "economically material to investors."[21] Nor had she opined that "any portions of the … Attwill press release that defendants contend are truthful, in fact, had a price impact."[22] Thus, Defendants offer only conjecture as to whether news of an MOU, without context, needs disaggregation.

To the extent Plaintiffs' loss causation model "relie[s] on an improper assumption, in general such issues are for a jury to assess," not a court deciding if common questions predominate for certifying a class.[23] And as Dr. Cain's Merits Report explains at ¶188, "the appropriate percentage of abnormal return that can be attributed to the release of corrective versus confounding information" found by a jury "can easily be inserted into … the out-of-pocket formula."

**b. Defendants' disagreement with the conclusions of Dr. Cain's disaggregation analysis for the OWS Press Release is a jury issue.**

Defendants absurdly contend that Plaintiffs "entirely fail to control for potential

---

19 *See Tesla, Inc. Sec. Litig.*, 2022 WL 7374936, at *11 (N.D. Cal. Oct. 13, 2022) (allowing leakage analysis of purportedly separate statements where the "two statements" were "part of the same tweet and concerned the same topic … form[ed] an interwoven bundle").

20 Opp. at 9 (quoting Attwill Tr. 50:8-52:7, 76:6-16, 102:23-103:21).

21 Ex. Q, M-W Tr. 403:7-404:18.

22 *Id.* 408:2-10. Though Defendants' expert has "read about cases" involving leakage "at a high level," she has never "worked on one [her]self," does not recall "review[ing] any academic literature about the use of leakage," and could not explain what makes a model a leakage one. *Id.* 463:9-464:24. Her critiques are not reliable, *see* Merits Rep. Rpt. ¶¶19-27, and at minimum, must be heavily discounted. *See, e.g.*, *Bond v. Holland Am. Line N.V.*, 2019 WL 2287952, at *1 (W.D. Wash. May 29, 2019) ("lack of particularized expertise and the factual basis for an expert's opinion go to the credibility of testimony" (citation omitted)).

23 *See Tesla*, 2022 WL 7374936, at *11; *Novatel Wireless Sec. Litig.*, 2013 WL 12144150, at *8 (S.D. Cal. Oct. 25, 2013) ("[T]he failure to include one of the relevant [non-fraud] variables does not dictate exclusion of the report as unreliable."); *SEC v. Leslie*, 2010 WL 2991038, at *15 (N.D. Cal. July 29, 2010) ("While [defendant] certainly may argue to the jury that [the expert] did not reliably filter out other confounding variables that would have affected the stock price[,] ... he has not shown that [the] opinion is so unreliable that it must be excluded.").

confounding information on June 26, 2020, the day of the OWS Release," yet on the very next page, they concede that Dr. Cain ***did*** analyze whether "an invitation to a [NHP] study (as opposed to reports on a study's outcome results) … would be expected to result in a significant increase in stock price."[24] Their failure-to-disaggregate argument thus fails from the start.

To test whether a mere invitation to an NHP study was material news typically reported in press releases, Dr. Cain searched for public companies listed in the U.S. that completed a COVID-related NHP study. Of 28 such companies, he identified 9 that had discussed NHP studies in their SEC filings and found that (excluding Vaxart) only one—Inovio—had issued a press release for the initiation of an NHP.[25] Inovio issued this release four days after Vaxart. And following that release, Inovio's shares fell.[26] Given the lack of press releases about NHP initiations, and Inovio's stock price reaction, Dr. Cain concluded that news of a mere invitation to an NHP study was not economically important information that needed to be disaggregated.

Defendants contend Dr. Cain's analysis is flawed because Inovio's release contained confounding information, namely results from another study that were positive but still fell short of investor expectations. But Defendants miss the larger point. In 2020 and 2021, other than Vaxart, Inovio was the only company to issue a release about an NHP study initiation (and Inovio's timing, four days after Vaxart, suggests it was copying Vaxart). Defendants' expert performed no quantitative assessment into whether Inovio shares would have risen but for the clinical news.[27] And their expert made clear she was not offering any opinions that an initiation to an NHP study "funded by [OWS] was, in fact, confounding information" or "economically material."[28]

Defendants also falsely represent that a third company, NantKwest, issued a press release regarding an NHP invitation that Dr. Cain overlooked. In fact, NantKwest issued a release on May

---

24 Opp. at 11; *see also, e.g.*, *REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1218 (S.D. Cal. Apr. 21, 2010) (concluding that the expert "explains the steps of his analysis and justifies the numbers he used; consequently, his expert opinion is admissible"); *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 934 (S.D. Cal. 2019) (rejecting attack on an expert's disaggregation analysis where defendants failed to "suggest a superior approach to disaggregation").

25 Merits Rpt. ¶138.

26 *See* Merits Rpt. ¶53 (noting how price dropped before July 1 news about Pfizer, *see* Part B.2).

27 Ex. Q, M-W Tr. 425:6-14.

28 *Id.* 410:3-411:12.

27, 2020—about a week before the *NYT* leaked the names of five OWS finalists—stating it was "one of the 14 companies" that OWS was whittling down to a shortlist of seven or eight.[29] This release caused NantKwest shares to rise 39.1% but ***did not mention any NHP study***. Defendants also note that days later *Science* magazine reported that OWS was "arranging monkey tests of [NantKwest's] vaccine by a federal lab."[30] Though Dr. Marietta claims this article caused NantKwest shares to rise 11.3%, she (i) could not say whether it contained potentially confounding information (*e.g.*, planned studies in June); (ii) did not look at analyst reactions or net-out industry or market return factors to assess what had caused NantKwest shares to rise that day; and (iii) could not say if any net residual price change would be statistically significant.[31]

Finally, Defendants fault Dr. Cain's disaggregation conclusion for not adopting their preferred view of their select record evidence. As corroborating support for his disaggregation analysis, Dr. Cain noted that, prior to Armistice's late night communications with Floroiu on June 26, Vaxart did not internally view the mere invitation to an NHP study as constituting material non-public information necessitating the immediate issuance of a press release.[32] In furtherance of their lack of candor, Defendants falsely represent that Dr. Cain admitted that none of the record documents he cited "even suggests that any Vaxart employee believed the NHP invitation was immaterial."[33] To the contrary, Dr. Cain testified that the exhibits he highlighted showed "that there seems to be some sort of expectation or plan in place that the company would not view the information as important enough to warrant a press release until some later point in time."[34]

Defendants also suggest that Andrei Florou's testimony that the NHP invite "was very notable," offered four years after he capitulated to Boyd's June 25 demand to issue the Release, somehow refutes Dr. Cain's disaggregation conclusion. "While [Defendants] certainly may argue

---

29 Ex. R (May 27, 2020 NantKwest and Immunity Bio press release).

30 Ex. S (June 1, 2020 *Science* article).

31 Ex. Q, M-W Tr. 440:16-446:23.

32 Merits Rpt. ¶138 n.260 (noting that on June 26, 2020, Andrei Floroiu told Boyd, "We just had a full management team meeting ... and concluded that what was discussed at the last Board meeting [the NHP study] was not [material non-public information], and therefore we confirm the previous CEO's decision that we do not need to put out a press release.").

33 Opp at 13.

34 *See, e.g.*, Ex. N, Cain Tr. 487:17-488:8.

to the jury that [Dr. Cain] did not reliably filter out other confounding variables that would have affected the stock price,"[35] such factual disputes go to the weight of Dr. Cain's testimony, not its admissibility,[36] and certainly are not grounds for denying class certification under *Comcast*.

**2. Plaintiffs' Back-End Measure of Loss Causation Tracks Plaintiffs' Theory of Liability and the Facts of this Case.**

Defendants assert that Plaintiffs' damages model "fails to set forth, with evidence, the manner in which the truth entered the marketplace."[37] As their header for this argument makes clear, Defendants' "damages" argument is really a loss causation one that simply disregards Dr. Cain's extensive analysis of news and analyst reactions that followed the OWS Press Release.

As Dr. Cain describes at ¶21 of his Merits Report: on June 26, after the OWS Press Release caused Vaxart's stock price to peak at $14.30 per share at 9:40 am ET, artificial inflation began to dissipate as a result of three corrective events: (i) Armistice's substantial sales on June 26 and 29; (ii) Armistice's June 30 filing of a Form 4 confirming it had sold virtually all of its holdings; and (iii) the *NYT* and HHS reports on July 25 stating Vaxart had not been selected to receive significant financial support, and instead had merely been invited to a preliminary study to determine potential areas for possible OWS partnership. Additionally, following the OWS Press Release, "there was intense scrutiny from investors, analysts, and the media into Vaxart's self-proclaimed selection for OWS. … The lack of any confirmation from official government source[s], Vaxart's decision to ignore media inquiries in the days following the allegedly false and misleading press releases, and subsequent reports about U.S. Government support for other COVID-19 vaccines [as well as Armistice's stock sales] contributed to increased skepticism about the allegedly false and misleading statements, and thus further partially dissipated, diffused, and/or leaked artificial inflation from the market prices up until the market learned the full truth."[38]

---

35 *Leslie*, 2010 WL 2991038, at *15.

36 *See, e.g.*, *Tesla*, 2022 WL 7374936, at *11.

37 Opp. at 14 (featuring header: "Plaintiffs' Back-End Measure of ***Loss Causation*** is Unsupported and Fails to Match Their Theory of Liability…." (emphasis added)).

38 Merits Rpt. ¶21. As Dr. Cain notes, he excluded price movements observed on June 30, given that Vaxart-specific information unrelated to the fraud impacted Vaxart's stock price that day. Merits Rpt. ¶144; *see also Jaffe v. Household Int'l, Inc.*, 2016 WL 374132, at *2 (N.D. Ill. Feb.

Defendants, quoting inapposite loss causation cases to create the illusion of authority, suggest that Dr. Cain's description of how the truth entered the market is "speculative" and "entirely unsubstantiated."[39] In doing so, they disregard the numerous news articles and analyst posts reviewed by Dr. Cain in his report, which document how the public was digesting the true and false contents of the Attwill and OWS Press Releases over time. As Dr. Cain notes, these news outlets and analysts reached divergent conclusions on whether Vaxart had been selected for OWS, with decreasing reports of OWS involvement over time.[40] Still, as late as July 1, 2020, analysts like Morgan Stanley were reporting that Vaxart had claimed to be the "sixth" OWS finalist,[41] and medical and financial news outlets similarly suggested Vaxart was an OWS finalist up to July 22.[42]

Defendants also argue Dr. Cain's "back-end calculus of loss causation" fails to account for positive news about Vaxart's rivals, which they contend caused negative stock price reactions for other vaccine developers. In support, Defendants aver that "[a]t least one public article linked … positive [Pfizer] news to the negative stock price reaction of other vaccine developers, including Vaxart."[43] This sole, July 1 article, however, did not assign any causal link. It only noted that on the same day Pfizer's stock price increased on positive news, the rest of the industry (barring Vaxart and Inovio, whose price dropped before the article, *see supra*) experienced minor fluctuations in their respective stock prices. Defendants also fail to explain why such industry fluctuations would not be captured by Dr. Cain's regression analysis, which netted out industry and market effects.[44]

Finally, Defendants attack Dr. Cain's analysis of intraday stock prices on June 26 and 29—when trading was most active and Armistice was dumping—asserting such an approach ignores daily fluctuations driven by overall market movements. They omit that "the market and industry

1, 2016) (experts need only analyze days with price drops). Dr. Cain otherwise found no confounding information explaining the price drops during each trading day covered under his overlapping leakage or corrective disclosure analyses. *See* Merits Rpt. ¶¶19, 138, 158, 172.

39 Opp. at 16 (quoting *Sloman v. Presstek, Inc.*, 2007 WL 2740047, at *11 (D.N.H. Sept. 18, 2007) and *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *13 (C.D. Cal. Feb. 6, 2014)).

40 Merits Rpt. ¶¶88-97, 145-47.

41 *See* ECF No. 380-7.

42 Merits Rpt. ¶92 (collecting examples).

43 Opp. at 16 (citing M-W 2nd Rpt. ¶¶48-50); *see also* Ex. T (July 1, 2020 *Bloomberg* article).

44 Merits Reb. Rpt. ¶¶52-54 (noting how the event study accounted for such industry-wide news).

were essentially flat throughout both trading days" and thus could "not meaningfully contribute to" fluctuations caused by the market grappling with misleading, Vaxart information.[45]

**3. Armistice's Insider Trades Were Corrective.**

Defendants assert that neither their insider sales on June 26 and June 29 nor the confirmation of their sales in their June 30 Form 4 can constitute corrective events, as investors would have no way to know *why* Armistice was selling or whether it specifically related to the Attwill or OWS Press Releases. The law in the Circuit is clear, however, that investors did not need to know the precise reason Armistice was selling. To prove that "the truth became known," a plaintiff need show only "the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading."[46] An event can be corrective when it merely discloses a consequence of concealed information, even if the connection between the cause and the consequence is not made explicitly in the disclosure.[47]

Here, Defendants' insider sales certainly related to concealed information—*i.e.*, that they had allegedly forced Vaxart to issue misleading press release(s) for non-material news as part of an intentional scheme. The timing, percentage, and magnitude of sales were particularly "suspicious" given the Press Releases' misleading suggestions that Vaxart's prospects were on the rise and could continue to grow under OWS.[48] As Dr. Cain explains, such "[i]nformed trading significantly affects market price and transaction dynamics" as "market makers and trading counterparties attempt to infer the nature or identities of large traders in the marketplace, and react accordingly."[49] Following Armistice's June sales (comprising roughly 29% of Vaxart's then-total outstanding shares), Vaxart's stock price decreased significantly net of market and industry effects. Outside the Press Releases (and the market's evolving understanding thereof), neither expert has

---

45 Merits Reb. Rpt. ¶¶30-32 (also noting how Defendants' cherry-picked examples of absurd results caused by fluctuating inflation, *see* Opp. at 17-18, are not "unique to this matter" and are entirely consistent with leakage predicated on the market's lack of consensus).

46 *BofI Holding Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) (citation omitted).

47 *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018).

48 *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 682 (9th Cir. 2005); *cf. Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) (noting how suspicious insider trading can serve as circumstantial evidence of fraud) (abrogated on other grounds).

49 Merits Reb. Rpt. ¶¶59-62.

identified any confounding information that could explain these price changes.[50]

#### 4. Section 20A Damages Can Be Established on a Classwide Basis.

Dr. Cain's Merit Report at ¶¶180-86 provides two inputs for calculating Section 20A damages—(i) Defendants' profits gained and (ii) artificial inflation—and shows how each is calculated. Defendants do not attack Dr. Cain's profits calculations. Nor do they dispute that artificial-inflation damages are susceptible to classwide proof. They only challenge whether Section 20A *also* permits disgorgement—a clear merits question with no connection to Rule 23.

### C. The Court Should Certify the Full Class Period.

Recognizing that their damages attacks ring improper and hollow, Defendants ask this Court to shorten the Class Period, first to June 26, 2020 and, if not that, then July 6, 2020. "Arguments regarding the impact or lack of impact of different disclosures on the market are generally reserved for the merits stage."[51] That is because the decision, like most others, "can be made on a class-wide basis, because it affects investors in common," and thus has little relevance to Rule 23 predominance.[52] Nevertheless, Defendants' pleas rest on a distorted characterization of the news and information available during the Class Period. The Court should quickly reject them.

#### 1. The Effects of Defendants' Fraud Scheme Persisted Well Past June 26, 2020.

Defendants claim the effects of the alleged fraud ceased after June 26, 2020 because, on that date, there was "extensive news coverage and ubiquitous reporting that Vaxart was invited *only* to a government-funded NHP study."[53] But their own expert's report says otherwise.

Defendants' expert notes how on June 26, several outlets like Raymond James reported that Vaxart had been "selected to participate in the OWS program ***and*** will be running a non-human primate (NHP) challenge study funded by OWS."[54] She also documents how these misleading

---

[50] Defendants conclusorily assert that an institutional investor's near-complete exit from its ownership position will generally depress a security's price, regardless of fraud, Opp. at 19-20, but they provide no authority for this proposition, and their expert offers no such opinion.

[51] *Forescout*, 2024 WL 2750003, at *10 (citation omitted); *accord Snap Inc. Sec. Litig.*, 334 F.R.D. 209, 225 (C.D. Cal. 2019).

[52] *Schleicher*, 618 F.3d at 687.

[53] Opp. at 22.

[54] M-W 2nd Rpt. at 71 (emphasis added). *See also id.* at 70-74 (quoting Bloomberg Law ("Vaxart

reports continued on June 29, with outlets like *Genetic Engineering and Biotechnology News* reporting Vaxart had "joined the handful of [] vaccines being studied as part of President Donald Trumps's [OWS commitment]-while the company gears up to manufacture as many as one billion doses a year."[55] Defendants misleadingly suggest that this article "caveated that Vaxart was ***not***" an OWS finalist, when it only noted that earlier in June the *NYT* had identified five finalists (only four of which had "won varying amounts of funding").[56]

Most egregiously, neither Defendants nor their expert acknowledge how on July 1, 2020, based on the OWS Press Release, Morgan Stanley, highlighted Vaxart as the "sixth company" to join the previously identified five OWS finalists; nor do they address later SeekingAlpha, Pharmaceutical Tech, and Motley Fool reports that also identified Vaxart as an OWS finalist.[57] If the market truly understood by end of day on June 26 that Vaxart had ***only*** been invited to an NHP study, why did Morgan Stanley and other outlets continue reporting that Vaxart was an OWS finalist? Why did the *NYT* devote part of its July 25 front page to report that Vaxart had not been selected for OWS? And why did HHS—a government agency that had never previously commented on its interactions with Vaxart—tweet that it had not entered nor was negotiating any agreements with Vaxart, who was only invited to preliminary studies "to determine ***potential*** areas for possible [OWS] partnership." Neither Defendants nor their expert have any cogent answer.

Defendants also offer no explanation for the negative residual price drops from June 26-July 6 that are not already accounted for by Dr. Cain's event study analysis. Defendants' expert offers no affirmative model of her own. And even after manipulating Dr. Cain's event study to fold in outliers (which Dr. Cain explains must be excluded to get accurate results), she fails to explain

surged 79% after revealing [it] was selected to take part in [OWS]"), Business Insider ("Vaxart, … said on Friday that it had been selected to participate in [OWS]. The news sent Vaxart's stock as much as 106% higher…."), Investor's Business Daily ("Vaxart stock rocketed Friday after the federal government selected its coronavirus vaccine for [OWS].… Vaxart (VXRT) is among the smaller companies on the docket. And earlier this month, the [*NYT*] reported the White House also selected Moderna (MRNA), AstraZeneca (AZN), Johnson & Johnson (JNJ), Merck (MRK) and Pfizer (PFE) for the program.")).

55 *Id.* at 75.

56 ECF No. 380-10 (June 29, 2020 *Genetic Eng'g and Biotech News* article) (emphasis added).

57 *See* ECF No. 380-7, Merits Rpt. ¶95 (Morgan Stanley); *id.* ¶92 (quoting news and financial media reports on June 29-30, July 6, July 10, July 15, and July 22).

why the net residuals and still-high confidence levels she offers are not "sufficiently probative of the ultimate fact in issue, regardless of the statistical significance levels associated with them." [58]

### 2. The July 25, 2020 *NYT* Article and HHS Tweets Reported New Information.

As for the events of July 25, 2020, Defendants recognize that the relevant question "is whether th[e] decline in stock price" that followed "can be attributed, in whole or in part, to a corrective disclosure.[59] The answer to that question is clearly "yes."

Defendants assert the July 25 *NYT* article "did not contain any new, corrective information," as "the information Plaintiffs allege was disclosed … had already been disclosed," but cites ***no evidence*** to support this assertion.[60] Defendants identify no public reports from before July 25 confirming that, despite the intimations of the Attwill and OWS Press Release, that HHS was not entertaining any funding agreements with Vaxart.[61] Nor do they highlight any reports explaining that, despite the OWS Press Release's misleading claim that Vaxart had been selected for OWS, Vaxart had merely been invited to "participate in preliminary US government studies to determine potential areas for ***possible*** [OWS] partnership," which as of July 2020, were "ongoing and no determinations ha[d] been made."[62] They simply conclude that, "given the flurry of media reports about the NHP study" (which Dr. Cain shows were mixed about Vaxart's OWS selection) and "the lack of any reporting about Vaxart receiving tens of millions of dollars in funding" (which Plaintiffs show contributed to leakage), the market, through some unspecified means, must have figured out the truth before July 25, 2020.[63] The totality of the evidence suggests otherwise.

---

58 *See, e.g.*, *Tesla*, 2022 WL 7374936, at *13; *High-Tech Employee Antitrust Litig.*, 2014 WL 1351040, at *15 (N.D. Cal. Apr. 4, 2014) ("[T]hat these two variables are not statistically significant at the 1%, 5%, and 10% levels goes to the weight, not the admissibility of expert's model[.]"); Merits Reb. Rpt. ¶19 n.24 (finding statistically significant price drops).

59 Opp. at 23 (quoting *FibroGen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024)).

60 *See* Opp. at 24. Despite making similar claims, Defendants' expert struggled to identify any information in the article alleged to be corrective. Ex. Q, M-W Tr. 498:14-508:19. She also conceded that, in summarizing reports about Vaxart's OWS status, she did not consider it to be part of "the exercise [she was] doing" to include contrary information. *Id.* 522-9-525:13.

61 *See* ECF No. 380-8 (July 25, 2020 *NYT* article).

62 *See id.*; *compare with* Merits Rpt. ¶92 (identifying reports on Vaxart's purported selection to OWS throughout July, including on July 1, July 6, July 10, July 15, and July 22).

63 Opp. at 24; *see Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1138 (10th Cir. 2009) (A

Defendants, citing *Omnicom*, also conclusorily assert that the July 25, 2020 *NYT* and HHS disclosures included confounding information—specifically, "'negative characterizations' of previously disclosed information"—which "undoubtedly caused, at least in part," Vaxart's stock price decline on July 27, 2020.[64] Defendants never specify what news on July 25 was stale and confounding. At her deposition, Defendants' expert rejected their proposition, noting that in an efficient market, she generally "would not expect" negative news repeated days later "to have a statistically significant stock price impact."[65] And in *Omnicom,* the court relied on the fact that news outlets explicitly "blamed [the] stock price decline on the general tone of [a negative article], and not on the slivers of new … information." Defendants, in contrast, identify no case-specific facts suggesting that the market here was swayed solely by negative, repeated information or that the market's reaction was just temporary.[66] To the contrary, at least one outlet reported that "Vaxart tumbled" after the *NYT* reported that HHS was concerned that Vaxart was trying to inflate its share price by exaggerating its OWS role, and Vaxart's stock price never sustainably recovered.[67]

Regardless, as *Omnicom* and other cases make clear, to prove loss causation from a corrective disclosure, plaintiffs "need not quantify the fraud-related loss"; they need only "ascribe some rough proportion of the whole loss to [the alleged] misstatements."[68] Dr. Cain's analysis of the residual stock drop following July 25, 2020, the information publicly available before that date, and the clear link between the alleged misstatements and disclosures, easily meets this standard.

## CONCLUSION

The Court should grant Plaintiffs' renewed motion in its entirety.

---

party "cannot simply state that the market had learned the truth by a certain date and, because the learning was a gradual process, attribute all prior losses to the revelation of the fraud." They must describe "some mechanism for how the [full] truth was revealed.").

[64] Opp. at 25 (quoting *Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008)).

[65] Ex. Q, M-W Tr. 488:7-21.

[66] *See Omnicom*, 541 F. Supp. 2d at 554 (also noting that "other analysts commented on the article's impact while noting that it revealed nothing new"). Defendants' reliance on *Phillips v. Sci.-Atlanta, Inc.*, 489 F. App'x 339 (11th Cir. 2012), is also inapposite, as the "negative characterization" there concerned a company's explanations of how industry-wide trends "*were affecting it specifically*" during the quarter, which "was new information when released."

[67] Merits Reb. Rpt. ¶28. *FibroGen*, by comparison, concerned reactions to stale news.

[68] *Omnicom*, 541 F. Supp. 2d at 554.

DATED: September 17, 2024

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Reed R. Kathrein*
Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Raffi Melanson (*pro hac vice*)
1 Faneuil Hall Sq 5th Floor
Cambridge, MA 02142
Telephone: (708) 628-4966
Facsimile: (708) 628-4950
raffim@hbsslaw.com

*Counsel for Proposed Class Representatives Wei Huang and Langdon Elliott*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

John T. Jasnoch (281605)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com

William C. Fredericks (*pro hac vice*)
Jeffrey P. Jacobson (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 233-6444
Facsimile: (212) 233-6334
wfredericks@scott-scott.com
jjacobson@scott-scott.com

*Counsel for Proposed Class Representative Ani Hovhannisyan*

**THE SCHALL LAW FIRM**

Brian J. Schall (290685)
2049 Century Park East, Suite 2460,
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile: (310) 388-0192
brian@schallfirm.com

*Additional Counsel*