# EXHIBIT Q

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Master Case No. 3:20-cv-05949-VC
- - - - - - - - - - - - - - - - - - x
In re:

VAXART, INC. SECURITIES LITIGATION

- - - - - - - - - - - - - - - - - - x
This Document Relates to
ALL ACTIONS
- - - - - - - - - - - - - - - - - - x

September 9, 2024
9:36 a.m.

VOLUME 2

CONFIDENTIAL VIDEO RECORDED DEPOSITION of JENNIFER MARIETTA-WESTBERG, Ph.D., an Expert Witness for the Defendant, held remotely via Zoom video conference before Sara K. Killian, a Registered Professional Reporter, Realtime Certified Reporter and Notary Public.

alleged misrepresentations, that one needs to understand whether other things, other news, potential confounding news could have affected that residual return before one can conclude that you can translate that directly into a dollar value for inflation.

Q. You said the word "potentially" a few times.

You're not affirmatively offering the opinion that the quote you put in paragraph 40 of your report about the Attwill MOU was, in fact, confounding information, correct?

A. No, I'm not offering that affirmative opinion, but I'm pointing out that should this partnership -- the announcement of this partnership and MOU be determined to be confounding that Dr. Cain's damages model doesn't deal with that.

Q. Even though it might not be mentioned in your report, have you yourself done any discreet analysis to determine whether the example you offer in paragraph 40 about the Attwill MOU would be economically material to investors?

A. No, I've not been asked to do that assessment. I've been asked to evaluate Dr. Cain's conclusions around this date and so my opinion is that this is a potential piece of confounding information that needs to be addressed.

Q. Have you done any discreet analysis to determine whether any statement in the June 25th, 2020 Attwill press release would be economically material to investors?

A. No. As I mentioned, I've not been asked to conduct that analysis. I've been asked to evaluate what Dr. Cain has put forward and so his conclusions about inflation on this date potentially could be impacted by confounding information also in this release and that's the point that I'm making.

Q. So to be clear, you have not done any analysis to determine whether any statement in the June 25th, 2020 Attwill press release is actually confounding information, correct?

MR. RUBIN: Objection to form. Asked and answered.

information for this date.
Q. Are you offering the affirmative opinion that any portions of the June 25th, 2020 Attwill press release that defendants contend are truthful, in fact, had a price impact?
A. No. I've answered I'm not providing that opinion. I'm pointing out that there's potential for confounding information.
Q. Let's move on past Attwill and go to paragraph 43 of your report.
There, we're talking about the June 26, 2020 OWS press release, correct?
A. Correct.
Q. There, you state that there are portions of the OWS press release that represent potentially confounding information, correct?
A. That's correct in paragraph 43.
Q. As an example, you note that the press release, the OWS press release, announced that Vaxart reported it was included in a non-human primate study organized and funded by Operation Warp

potential confounding information within this study of confounding information.

Q. We'll jump into that in one second. Before we do, I just want to clarify that you're not offering the affirmative opinion that the announcement about an NHP study organized and funded by Operation Warp Speed was, in fact, confounding information, correct?

A. I'm not offering the opinion that it is confounding. I've not been asked to do that. But I'm noting that it's a potential piece of confounding information.

Q. We'll talk about your critiques about Dr. Cain's confounding information analysis in a moment.

Have you done any discreet analysis to determine whether the example you offer in paragraph 40 of your report about an NHP study would be economically material to investors?

A. No, I've not been asked to affirmatively make a materiality assessment here. So I'd refer back to my prior answer. I'm pointing out that this is potentially

confounding information and I take issue with how Dr. Cain assesses it.

Q. Not limited to the example you offer, have you done any discreet analysis to determine whether any statement in the June 26th, 2020 OWS press release is -- would be economically material to investors?

A. No. As I just answered, I've not been asked to do a materiality assessment, but I am critiquing the way that Dr. Cain has assessed the potential for confounding information here.

Q. Let's talk about what Dr. Cain did. I believe he summarizes it in paragraph 138 of his report, but you also give a summary I believe in paragraph 44 of your report.

Let me know when you have the materials in front of you.

A. I do.

Q. Just to understand what Dr. Cain did, first, Dr. Cain reviewed all companies listed on the NIH's website as having completed a coronavirus-related NHP study, correct?

study and the quote goes on and then the second piece is that Inovio reported interim clinical data from the first two Phase I clinical trial cohorts for its COVID-19 vaccine.

Q. Have you done any discreet analysis to assess whether Inovio's stock price would have increased but for the news on the interim clinical data?

A. If you are asking have I done a quantitative assessment of those two pieces of news, no, I have not. I am pointing them out as the second piece is potentially confounding.

Q. You said quantitative assessment.

How about qualitative assessment?

A. What do you mean by quantitative assessment?

Q. I'm just making sure that -- have you done any analysis -- quantitative or otherwise -- to assess whether Inovio stock price would have increased but for the news on the interim clinical data?

is not a press release, correct?
A. I describe it as a Science article. That's what I note in this paragraph.
Q. That's not a press release, correct?
A. A press release from whom?
Q. That's not a press release from NantKwest or ImmunityBio, correct?
A. No, it's a Science article.
Q. Is science an adjective describing the article or is science the name of the publication?
A. It's the name of the publication.
Q. Did you perform any analysis to assess whether there was any confounding information in the June 1st, 2020 Science article?
A. I don't recall at this time whether there was potentially confounding information there. I'm making the two points about the two releases in this paragraph, the one from the company and then the Science article.

Q. So your answer was you don't recall whether there was potentially confounding information.

Did you do any analysis to determine if there was any potentially confounding information?

A. Again, I don't recall if there's the potential for confounding information in this Science article. That was the second piece of news that I noted in this paragraph. The first was the company's release itself.

Q. I'm going to ask the question one more time because I think we're missing a detail.

So I hear you when you say you cannot recall if there was a potential for confounding information in the article.

I'm asking whether you can recall performing an analysis of the article to see if there was confounding information in there?

A. Well, I've certainly reviewed the article and I don't recall at this time any potentially confounding information in

the article. But again, that's the second piece of news that I'm noting in this paragraph. The first is the ImmunityBio's release itself.

Q. You noted there was a price change in ImmunityBio -- sorry -- in NantKwest stock price following the Science article.

Did you look at any analyst reactions to see what was causing the stock price change on that day?

A. No, I don't recall looking at analyst reports per se. I may have. I don't recall at this point.

What I am pointing out here is that this is another release -- that's the main point I'm making -- that Dr. Cain does not cite and of course the stock price reaction is different for ImmunityBio than it is for Inovio.

Q. Did you run any regressions to assess the residual results of the stock price reaction after the June 1st article -- after the June 1st article that could account for industry and market factors?

A. No, I did not do that. I'm pointing this out, again, as a similar announcement that Dr. Cain did not consider. And of course, I note the potential for confounding information with his Inovio announcement as well.

Q. So you don't know whether the stock price reaction for NantKwest's stock price following the June 1st, 2020 article was statistically significant?

A. No, I did not conduct an event study of that announcement and Dr. Cain has not conducted an event study of the Inovio announcement either.

Q. I've added Exhibit 188 to the folder. After you have had a chance to open up the exhibit, do you recognize Exhibit 188?

A. Yes, this is the Science article.

MR. MELANSON: I'm going to represent for the record there's some highlighting in the first paragraph of the Exhibit 188.

This is the exhibit as it was

used during the Brant Biehn deposition. You could go back later to find out why that highlighting was added then. It wasn't added for purposes of this deposition.

THE WITNESS: So are you telling me to ignore the highlighting?

MR. MELANSON: I'm just saying -- there's no question pending. Don't worry about it.

BY MR. MELANSON:

Q. One question I will ask you, Dr. Marietta, is that in the first paragraph of the Science article, it again notes that NantKwest/ImmunityBio is on the short list of 14 candidates being evaluated by Operation Warp Speed, correct?

A. Correct.

Q. Go to the second page.

In the second paragraph, the article provides more information about NantKwest and ImmunityBio's interactions with HHS and the monkey studies, correct?

A. Well, there's -- in the paragraph starting although --

Q. The paragraph starting on page two of the article, with Soon-Shiong says after he and his team ...
A. Okay.
Q. In that paragraph, it provides additional information about a presentation to HHS on April 9th, 2020, correct?
A. It does, yes.
Q. If I could refer you down to the bottom of the content of the article, in the last paragraph beginning with Soon-Shiong says his company signed -- are you there?
A. The last paragraph of the article? Okay.
Q. In the last paragraph of Exhibit 188, the article explains that Warp Speed has set its plans to whittle down the 14 candidates from its initial selection to about eight for early stage human trials, correct?
A. I see that.
Q. The article also states that Soon-Shiong said his companies hope to receive approval from the FDA to begin an

additional safety trial of humans in June, correct?
A. That's paraphrased from the first sentence, yes.
Q. Is that an accurate representation of what's in the paragraph?
A. He says his company signed an agreement with HHS, hope to receive approval from the FDA to begin initial safety trial in humans in June. I've paraphrased the first sentence, yes.
Q. Did you perform any analysis to determine whether NantKwest or ImmunityBio's beginning of initial safety trials in humans in June would be confounding information?
MR. RUBIN: Objection to form. Misstates the document.
A. So as I noted, I've not done a quantitative analysis of any potential impact from any potential confounding information. I'm pointing this out as another similar announcement that Dr. Cain does not consider in addition to Inovio.
Q. Let's jump back to your report, around paragraphs 51 and 52.

11:28.
We're going off the record.
(Recess taken)
THE VIDEOGRAPHER: We are back on the record.
The time is 11:36.
This begins media file three.
BY MR. MELANSON:
Q. Dr. Marietta, for Dr. Cain's inflation analysis, he looks at both the exposure model and a leakage model?
A. That's my understanding, yes.
Q. Are you familiar with leakage models?
A. Yes, I'm familiar with them at a high level and I'm familiar with how Dr. Cain is approaching it.
Q. Have you yourself ever worked on a case with a leakage model?
A. I've certainly read about cases with leakage models, again, at a high level. I don't believe I've worked on one myself.
Q. Earlier, when you said you were familiar with leakage models, is that from you reading cases -- other cases in which a

leakage model may have been involved?
A. Yes, again, it's just at a high level and I'm focused here on how Dr. Cain analyzes for leakage.
Q. What do you mean when you say at a high level?
A. Just that I'm aware that there are sometimes hypotheses that leakage may happen, but here I'm focused on how Dr. Cain is analyzing it.
Q. Have you reviewed any academic literature about the use of leakage models in securities cases?
A. I don't recall specifically, no. I just have a general understanding.
Q. Do any leakage cases court opinions come to mind to you right now?
A. No.
Q. What is your understanding of what makes a leakage model a leakage model?
A. I don't think I could answer that in general. I'm focused on what Dr. Cain has put forward for his analysis of leakage.
Q. Generally speaking, what is

stock price reaction when that news is repeated. That's hypothetically, but again, one needs to look at the specific facts and circumstances of the case at hand.

Q. I'm trying to understand the last answer. Give me one second.

So conversely then, is it your opinion that a negative news story about a public company should not cause a decrease in that company's stock price when the news being reported is not new?

A. So hypothetically, it would be similar. If news had been released prior and the same news was being repeated some days later that's negative news, assuming an efficient market for that company's stock price, I would not expect it to have a statistically significant stock price impact, but of course it will depend on the specific matter I'm investigating, so that's just a general response.

Q. Go down to paragraphs 59 and 60 of your report.

A. Okay.

Q. So section five of your report

article dated June 3rd, 2020 with a title "Trump Administration Selects Five" -- let's go off the record for a second.

THE VIDEOGRAPHER: Thank you.

The time is 12:25.

We're going off the record.

(Recess taken)

THE VIDEOGRAPHER: We are back on the record.

The time is 12:46.

This begins media file four.

BY MR. MELANSON:

Q. Dr. Marietta, before the lunch break, we were talking about the alleged corrective disclosure on July 25th, 2020, correct?

A. Yes.

Q. In section five of your second report, you contend that there's evidence that the alleged corrective information in the July 25th, 2020 corrective disclosures was publically available prior to that date, correct?

A. That's correct.

Q. To be clear, are you opining affirmatively that all of the information alleged to be corrective in the July 25th, 2020 corrective disclosures was publically available before July 25th, 2020?

A. The information that to my understanding plaintiffs are alleging as misleading, yes. In this section of the report, I'm walking through in my report that it's publically available.

Again, I have a second opinion in this report or in this section about the finding of statistical significance on this date, but ...

Q. I'm sorry. I'm reading your answer. I don't think it's clear, so I'm going to ask the question again.

Are you opining affirmatively that all of the information alleged to be corrective in the July 25th, 2020 New York Times article and HHS tweets about Vaxart, are you opining that that information was disclosed completely before July 25th, 2020?

A. Yes, based on my understanding of plaintiff's allegations and what they

claim was corrective on that date. So that's my Section 5A, that that evidence that is allegedly corrective was available prior to the return on July 27th.

Q. Just so we have a common understanding, can you identify for me all the information that plaintiffs allege was corrective in the July 25th, 2020 New York Times article?

MR. RUBIN: Objection to form.

A. Again, I'm going by my general understanding about the billion doses, from the Attwill -- in terms of what was allegedly misrepresented, starting there, the billion doses and the capabilities and the Attwill release and then in the OWS release whether they were selected as one of the finalists.

So I lay that out in paragraph 59. I think I paraphrased that, but that's my understanding of what plaintiff's allegations are, exaggerated the then-present capabilities of Attwill and that the OWS press release was false and misleading because it announced allegedly

that Vaxart had been selected for OWS. The quote goes on there.

Q. So I see you in paragraph 59 describing what plaintiffs are alleging is false and misleading about the Attwill press release.

My question was can you identify for me what plaintiffs allege was corrective information in the July 25th -- July 25th, 2020 -- New York Times article?

A. So I'm just -- my understanding is that it was information related to the allegations that I just walked through, but I'm going to my report in case there's any additional information around there.

That's my understanding of the allegations as laid out in paragraph 59 that would be relevant for the information released on July 25th. So I didn't read the full quote I have, but there's more.

So the third claim that the OWS press release was false and misleading because of the announcement that Vaxart had been selected for OWS, other misrepresentations and omissions made in

that same press release exploiting the gap in the public's knowledge about OWS and Vaxart's Internal Affairs exaggerating Vaxart's rule, if any, in Operation Warp Speed and the prospects for government funding and that defendants knew or recklessly disregarded that there was effectively no chance that Vaxart would be selected by the federal government as one of seven to eight OWS finalists.

That's my general understanding.

MR. MELANSON: I'm going to move to strike the entire answer.

BY MR. MELANSON:

Q. I'm not asking about your understanding about what was alleged to be false on June 25th or June 26th.

The question, again, is please identify the information that plaintiffs allege was corrective information in the July 25th, 2020 New York Times article?

MR. RUBIN: Objection. Asked and answered.

A. I think you're asking me to

specifically explain plaintiff's position, which I'm explaining it to the best I can in terms of my understanding of their allegations.

I'm also responding to Dr. Cain. I have footnote 134 here. When he was asked what new information was contained in the New York Times article that had not been previously disclosed, he did not say specifically what the "relevant information" was that was contained in either of those.

So in responding to his report, he has not stated what the specific information is that was disclosed in the New York Times article or the HHS tweet, so I'm going back to what the allegations are from my understanding of why plaintiffs are focused on that, the July 25th information.

Q. You still have not identified for me -- my question -- what is the information in the July 25th, 2020 New York Times article that plaintiffs allege was corrective?

MR. RUBIN: Objection.

Asked and answered now for the third time.
A. I'm not sure how else to respond to that. I have an understanding of the allegations. I know this information came out in a New York Times article and an HHS tweet. I'm responding to how Dr. Cain is approaching those. When he was asked what is the relevant information that's new and value relevant, he said there was relevant information, but never described what it was, so that --
MR. MELANSON: Move to strike the entire answer.
BY MR. MELANSON:
Q. I will show you the New York Times article. Maybe that will help your recollection. I've entered into the Marked Exhibits folder Exhibit 35.
Do you recognize Exhibit 35?
A. Yes, I see the article now.
Q. What is Exhibit 35?
A. It is the New York Times article released on July 25th.
Q. Now that you have the article

in front of you, can you please identify for me the information in this article that plaintiffs allege was corrective?

A. I don't know how to respond other than how I just have responded.

Q. Please go through this article and identify the sentences that plaintiffs allege contain corrective information regarding the alleged misrepresentations in this case.

MR. RUBIN: Objection. Assumes facts that plaintiffs have identified corrective sentences that have corrective information.

A. I don't know how to do that exercise.

Q. You don't know how to scroll through this article and choose the sentences that contain information that plaintiffs allege is corrective?

MR. RUBIN: Objection. Argumentative. Asked and answered.

A. Again, this is plaintiff's allegations. I have set out my

understanding of what plaintiff's allegations are. I gave you a lot of detail around that.

I understand when Dr. Cain was asked what information is new, valued, relevant, corrective here that he did not cite to specific information.

So in responding to him, I go back to what are alleged misrepresentations and then I looked for information related to the alleged misrepresentations prior to July 25th. That's the exercise that I'm doing.

Q. Are you telling me that because you believe Dr. Cain did not identify the alleged corrective information in this exhibit that you are -- you do not have to answer my question to identify the specific information in this exhibit that is corrective?

MR. RUBIN: Objection.

Counsel, the witness has answered your question multiple times, explained what she can answer and what she's not able to answer and why.

Unless you just want to harass the witness, I don't understand why you keep asking this question.

MR. MELANSON: The witness has not identified any statements in this alleged corrective disclosure that contains corrective information.

I'm trying to give her a fair opportunity to do so before I present this information in a motion or in a video to a fact finder audience.

So I'm going to give her one last opportunity.

BY MR. MELANSON:

Q. Dr. Marietta, can you go through Exhibit 35, which is alleged to be a key corrective disclosure in this case and a focal point of your expert report, and identify the information within that is alleged to be corrective information by the plaintiffs?

MR. RUBIN: Objection.

Asked and answered.

Argumentative.

Misstates the record.

A. So I've been focused on that section of my report and noting what I had discussed there. I have another section of my report that is on page seven, which is about the alleged corrective disclosure events.

So there's a statement there from plaintiffs alleging that the truth about the defendant's manipulative scheme was partially revealed in a New York Times article which stated that Vaxart was not among the companies selected to receive significant financial support from Operation Warp Speed to produce hundreds of millions of vaccine doses.

Q. What paragraph are you looking at again?

A. I am looking at paragraph 11C of my report.

So I mention that as part of the alleged --

MR. MELANSON: There's no question pending.

MR. RUBIN: Dr. Marietta, were you answering the last question that

articles that are talking about how Vaxart is participating as part of a non-human primate study and then information from May of 2020 that talked about the fact that it would be both human and non-human studies, so it's -- I do reference the sort of culmination of information around that topic.

Q. You are aware that on July 1st, 2020, Morgan Stanley reported that a sixth company, Vaxart, announced on June 26th, that its vaccine candidate was selected to participate in Operation Warp Speed?

A. That may have been the case in the Morgan Stanley article. I'm happy to look at it. Here, I'm referencing a Piper Sandler article that said Vaxart was excluded as an OWS finalists.

Q. But you are aware that the Morgan Stanley article came out on July 31st, correct?

A. I believe so. Again, I'm referencing another article here that notes Vaxart was not selected as a finalist.

Q. Why are you referencing here

around paragraph 70 one article saying that Vaxart wasn't a finalist without mentioning other articles saying that Vaxart was a finalist?

A. Well, here --

MR. RUBIN: Objection.

I'm sorry.

Objection.

Misstates testimony.

MR. MELANSON: Keep the objections to form, please.

MR. RUBIN: Misstates testimony is a form objection. It's an objection to the way you have asked the question.

MR. MELANSON: Objection.

The witness can say if I'm misstating her testimony. She is very competent. She's an expert in securities law. She's been participating very actively this whole time. She can easily correct the record if I misstate her testimony.

THE WITNESS: Just clarifying, I'm an economist. So I'm not an expert in securities law, although obviously

my work is -- touches on some of those issues as well. I defer to you and Josh for topics of law.

A. So I think both Dr. Cain and I have a discussion related to your question that not all market participants have to agree in the marketplace for information to be ultimately incorporated into the stock price.

So there is an article here from Piper Sandler saying that they were not selected as a finalist and that's the part of what I am discussing.

Q. In your forming of the expert opinions in this case, did you give more weight to the June 30th Piper Sandler analyst reports compared to the July 1st, 2020 Morgan Stanley report?

A. Well, I'm noting -- I wouldn't say that I'm giving more weight to one or another. I have not done that particular exercise. As I note in this section, I'm walking through information related to plaintiff's allegations of what information was misrepresented and pointing out where

that information is available in the public record.
Q. But you're not pointing out contradictory information in the public record in this section?
MR. RUBIN: Objection to form.
A. I don't think that's the exercise that I'm doing. The exercise is information that plaintiffs say was allegedly misrepresented, was that available in the public record and that's what I'm pointing to here with the Piper Sandler article.
Q. In footnote 149 of your report, you comment that Dr. Cain has provided -- let me know when you're there.
A. Yes.
Q. In footnote 149 of your report, you comment that Dr. Cain provides no support or analysis to establish that a repeated disclosure by an authoritative source reveals to the market any new corrective information, correct?
A. Mm-hmm. Yes.
Q. Are you offering the

CERTIFICATION

I, SARA K. KILLIAN, RPR, RCR, CCR, do hereby certify that JENNIFER MARIETTA-WESTBERG, Ph.D., the witness whose examination under oath is hereinbefore set forth, was duly sworn, and that such deposition is a true record of the testimony given by such witness.

I FURTHER CERTIFY that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 9th day of September, 2024.



______________________________
SARA K. KILLIAN, RPR, RCR, CCR