UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re VAXART, INC. SECURITIES LITIGATION | Case No. 20-cv-05949-VC<br><br>**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 479 |

The motion for summary judgment is denied. The plaintiffs' motion to strike is denied. This order assumes the reader's familiarity with the facts, governing legal standards, and arguments made by the parties.

*Scheme liability.* A reasonable jury could find that the defendants engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of a scheme to defraud. *E.g.*, *SEC v. Hui Feng*, 2017 WL 6551107, at *11 (C.D. Cal. Aug. 10, 2017). The documentary evidence tends to show that the defendants tried to change Vaxart's insider trading policy and then pushed Floroiu to release the OWS press release the next day. While the documentary evidence doesn't show with certainty how much Boyd and Maher knew about the OWS press release's contents, it shows that they knew something about them: Boyd emailed Floroiu that he had "learned of" the release, and emailed Maher asking whether Maher had any material non-public information "beyond [the] press release." From this evidence—and the deleted texts—a reasonable jury could conclude that Boyd and Maher knew enough about the press release's contents that their push to get it issued had the purpose and effect of creating a false appearance of fact in furtherance of a scheme to defraud. That Vaxart planned to issue the

press release eventually anyway doesn't change this: A jury could also conclude that it was deceptive to publish the release in late June because that timing would create the misimpression that Vaxart was one of the companies chosen for the massive infusion of OWS dollars—and that Boyd would have known the importance of this timing, given that he consumed "as much" OWS news "as humanly possible."

It's a much closer question with respect to the Attwill release, but ultimately, a reasonable jury could also find that the defendants acted to deceive investors through that release. The day before the release was issued, Boyd and Maher discussed how there was a "news vaccum" [*sic*] with Floroiu. Maher then said he'd called Floroiu and was waiting for a call back. He called Floroiu twice more over the next few hours, with the second call lasting about nine minutes. Less than an hour after that call, Floroiu sent an email in a thread about the Attwill release (which included Vaxart's outside public relations contact) and suggested that they "flip the subtitles" to "start with the Big Bang first." That night, Maher also told Floroiu to release news before 8 am so that it would "hit the news wires." The next morning, after the press release issued, the defendants discussed it with no obvious expression of surprise. And importantly, all of Boyd and Maher's texts from this period were deleted. To be sure, it's possible, maybe even likely, that a jury would consider this evidence and conclude that Boyd and Maher knew nothing about the Attwill release before it was issued. But it's also possible that a reasonable jury would consider this evidence—and draw an adverse inference against Boyd because of his deleted texts—and decide that the defendants knew about the Attwill release and, through Floroiu, used it to deceive the public.

*Insider trading.* A reasonable jury could also find that the defendants engaged in insider trading. In addition to the evidence discussed above, Floroiu told Boyd that Vaxart didn't think the NHP study was material. And after first learning about the study, Boyd twice affirmed he had no MNPI.[1] So a reasonable jury could conclude that the defendants knew that the OWS press

---

[1] The defendants argue that, when Boyd said he had no MNPI, he meant MNPI other than that regarding the NHP study. It's true that Echerd was at the board meeting where that study was

release overstated the importance of the NHP study or otherwise misled investors with respect to Vaxart's odds of receiving substantial government funding. Indeed, the evidence is even stronger with respect to these claims than with respect to the scheme claim, because the OWS press release was issued before Armistice started trading on June 26, and so the defendants would have known what the release communicated to the market.

Separately, given Floroiu's email to Boyd, a reasonable jury could find that the defendants held MNPI insofar as they knew that Vaxart did not view its selection for the NHP study as material (even if they always thought it was, as they maintain and as Armistice's restricted list could indicate). And the defendants fail to rebut the inference of scienter that the jury will be entitled to draw from the deletion of the text messages.

Again, it's a closer call as to Attwill. But there too, consider the evidence discussed above, the fact that the defendants had seen both that release and the OWS release by the time they traded, and the deleted text messages. In light of all that evidence, it's impossible to say that no reasonable jury could conclude that the defendants had and traded on MNPI about the Attwill MOU.

*Loss causation.* The defendants' arguments about loss causation fail. The plaintiffs did not identify any corrective disclosures as to the Attwill release in particular. But they did point to evidence tending to show that the Attwill and OWS releases were considered together by the market and thus together created an impression that Vaxart would soon have both the ability and the need to manufacture many, many doses of its vaccine. While the *New York Times* article did not mention Attwill by name, it did say that Vaxart "was not among the companies selected to receive significant financial support from Warp Speed *to produce hundreds of millions of vaccine doses*" (emphasis added). A reasonable jury could find that this corrected a misimpression created in part by the Attwill release. Nor does the other evidence referenced by

---

discussed, and so might have known that Boyd knew about it. But the defendants' insistence that these statements of Boyd's show only that he wanted to trade once the study was disclosed does not make complete sense. Boyd first told Echerd that he had no MNPI on June 18—when he claims he did not know about the press release.

3

the defendants show that a reasonable jury could not find that the *Times* article caused the plaintiffs' loss. While some press coverage from July 2021 could be read as reflecting an understanding that Vaxart would not receive substantial OWS funding, other coverage, such as the articles referenced by the plaintiffs' expert, could be read to reflect the opposite understanding. And Vaxart's S-3 was too vague to compel the conclusion that a jury would necessarily find that it fully revealed the truth to the market.[2]

**IT IS SO ORDERED.**

Dated: July 7, 2025

VINCE CHHABRIA
United States District Judge

---

[2] No reasonable jury, however, could find that Armistice's stock sales constituted corrective disclosures. The extent to which this conclusion affects what evidence and arguments the parties can present at trial—or to which it affects the verdict form the jury should be given—can be determined through motions in limine or a discussion at the pretrial conference.