UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re VAXART, INC. SECURITIES LITIGATION. | Case No.  20-cv-05949-VC<br><br>**ORDER RE MOTIONS IN LIMINE**<br>Re: Dkt. Nos. 539, 551, 552, 553, 554, 555, 556, 557, 558, 559, 571 |

This summarizes the Court's rulings on the parties' motions in limine and motions to exclude expert testimony. As a reminder, a ruling on a motion in limine may be revisited at trial depending upon how the evidence comes in. *See City of Pomona v. SQM North America Corporation*, 866 F.3d 1060, 1070 (9th Cir. 2017).

**The defendants' motion to exclude expert Matthew Cain's opinions regarding Section 20A damages is granted in part.** Section 20A(b)(1) states that in private actions for insider trading, the total amount of damages imposed "shall not exceed the profit gained or loss avoided in the transaction or transactions that are the subject of the violation." 15 U.S.C. § 78t-1(b)(1). The plaintiffs seek to have their damages expert Cain testify about two alternative methods for calculating the cap on damages for the Section 20A claims. The first, which Cain calls "profit gained based on market prices," is calculated by comparing the stock price when the defendants sold their stock to the price when they bought it. The second, which Cain calls "profit gained based on artificial inflation," is calculated by estimating the amount of artificial inflation in the stock price due to the press release misrepresentations at the time the defendants sold their stock. For their part, the defendants argue that the Section 20A damages cap should instead be

calculated based on the difference in the stock price when the defendants sold their stock and the price after the truth was fully revealed to the market. Cain will be permitted to testify only about the artificial inflation method for calculating the Section 20A damages cap. Cain's market prices method and the defendants' proposed method will be off limits.

Although Section 20A does not specify how the profit gained or loss avoided should be calculated, the artificial inflation method reflects the best and most common-sense understanding of the statutory phrase, "profit gained or loss avoided in the transaction or transactions that are the subject of the violation." Under the artificial inflation method, a defendant's liability is capped at the total amount the defendant profited (or avoided losses) by trading on information that was unavailable to the rest of the investing public. In other words, a defendant is liable up to the total amount he gained by ripping off investors who didn't have access to the inside information. By contrast, under Cain's market prices method, a defendant would be liable for all profits gained from increases in the stock price over the period he owned it, which could include price increases wholly unrelated to the undisclosed information. Thus, depending on what price the defendant bought the shares at, the defendant might be liable for profits that have nothing to do with his harmful conduct. The same is true for the defendants' proposed methodology based on the stock price after the truth was fully revealed: because the price may have changed after the defendant's transactions for reasons other than the revelation of the inside information, the damages cap would be affected by price fluctuations unrelated to the harmful conduct. The artificial inflation method does the best job of measuring how much the defendant gained from trading while possessing inside information.

This is also the only sensible way that Section 20A's damages cap provision can interact with the contemporaneous trading period requirement that appears alongside it. As explained in a prior ruling, Section 20A's contemporaneous trading requirement serves as a rough substitute for requiring privity between private plaintiffs and insider trader defendants while purposefully being overinclusive to allow anyone who might have traded with the defendant to recover. *In re Vaxart, Inc. Securities Litigation*, 2025 WL 3676949, at *1 (N.D. Cal. Dec. 18, 2025). Thus, the

number of shares purchased by people in a Section 20A class will, by definition, be greater than the number of shares sold by the defendants, which means that the class members' total damages have the potential to far exceed the amount the defendant gained from the insider trading. Applying the artificial inflation method ensures that total damages correspond to the defendant's gain and thus strikes a balance between the relaxed proof requirement for plaintiffs to bring a Section 20A claim and the risk of imposing liability disproportionate to the defendant's wrongful conduct (and wrongful gains from that conduct).[1] The other proposed methods would not reliably achieve that balancing, because the damages cap would be dependent on other unrelated factors that may have increased or decreased the stock price during the relevant period.

The cases cited by the plaintiffs and defendants in support of their other proposed methods do not undermine this analysis. For reasons already discussed, the Court is unpersuaded by the reasoning in favor of the market prices method in *In re Allergan, Inc. Proxy Violation Securities Litigation*, 2018 WL 3912934, at *41 (C.D. Cal. Aug. 14, 2018), and in favor of the defendants' method in *Kaplan v. S.A.C. Capital Advisors, L.P.*, 40 F. Supp. 3d 332, 339-40 (S.D.N.Y. 2014). To the extent caselaw from before the creation of the Section 20A statutory right of action assists in interpretation of the damages cap, it seems to confirm that liability should be limited to what the inside trader gained from the possession and use of the information. *See Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 172-73 (2d Cir. 1980).[2]

The defendants also argue that Cain should not be permitted to testify about the Section

---

[1] The legislative history is sparse, but it seems to provide mild support for this interpretation of Section 20A. In a committee hearing on an earlier version of the bill, which did not include a damages cap for Section 20A claims, the SEC Chair proposed adding a damages cap that would limit liability "to the amount of profit gained or loss avoided by the defendant as a result of the violation." *Insider Trading*, Hearing Before the Subcommittee on Telecommunications and Finance, House Committee on Energy and Commerce, 100th Cong. 41 (1988) (Serial No. 100-225). The SEC Chair argued that a damages cap would avoid imposing "Draconian" liability on defendants given that Section 20A allows all contemporaneous traders to recover. *Id.* at 98-99. The next version of the bill after this hearing included a damages cap provision. This seems to suggest that when Congress added the damages cap provision, it was trying to accomplish what the SEC Chair was proposing. But even absent this piece of legislative history evidence, the Court would rule the same way, based on the text of the relevant statutory phrase and the context in which it appears in Section 20A.

[2] The SEC Chair cited *Elkind* in support of his proposal for a damages cap. *Id.* at 41.

3

20A damages cap without also testifying about how to calculate Section 20A damages. But the number of shares purchased by the class during the contemporaneous trading period—the two days on which the defendants sold their shares while possessing inside information—is far greater than the number of shares actually sold by the defendants. It is therefore unnecessary for Cain to separately testify about how to calculate Section 20A damages; he need only present evidence that more shares were purchased by the class than were sold by the defendants on the two trading days in question.

**The defendants' motion to exclude David Kessler's expert testimony is granted in part.** The plaintiffs seek to call Kessler, a former FDA commissioner, to offer opinions on OWS and the vaccine development process, and they have presented seven topics they want him to testify about. As explained at the October Pretrial Conference, Kessler may testify about the five following topics because they are within the scope of his expertise and appropriate under Federal Rule of Evidence 403:

(1) What was OWS (including its goals and functions)?

(2) What was the scientific and practical significance of being one of the vaccine companies that OWS worked with?

(3) What is a non-human primate study and what is its connection to OWS selection and/or a vaccine company's progress towards developing an approved vaccine?

(4) What is the general development path for vaccines and what does each step mean from a science and testing basis? This testimony should be without regard to where Vaxart was on the development path.

(5) What does it mean to be able to safely develop and manufacture vaccines under the FDA's regulations for good manufacturing practices?

Kessler will not be permitted to testify about whether the press releases were accurate.

At the Pretrial Conference, the Court allowed further briefing on the question of whether Kessler should be permitted to testify about Attwill's tableting capabilities. The parties now seem to be in agreement that, as of the date of the Attwill press release, Attwill was not remotely

capable of tableting a billion vaccine doses in compliance with FDA regulations, and that it is therefore unnecessary for Kessler to testify about this topic.

**The defendants' Motion in Limine No. 1 to exclude evidence of the New York Times article and HHS tweet is granted in part.** The defendants seek to exclude (1) the July 25, 2020, NYT article about Vaxart's OWS participation and (2) the HHS tweet that recited the article's quote from HHS public affairs officer Michael Caputo. The plaintiffs argue that this evidence is admissible to show the effect on the listener because, under the plaintiffs' theory of the case, the truth about Vaxart's participation in OWS was fully revealed in the NYT article. As discussed at the October Pretrial Conference, only the following portions of the NYT article are admissible: the first paragraph of the article, as well as the final four paragraphs of page 1 of the article copy submitted at Dkt. No. 556-2 (the paragraph beginning with "Some companies are attracting government scrutiny," through the end of the paragraph that begins with "The U.S. Department of Health and Human Services has entered into funding agreements"). The word "government" in the phrase "attracting government scrutiny" should be redacted. These are the only portions of the article that discuss the scope of Vaxart's OWS participation. The rest of the article, including the headline, are not admissible because they contain negative information about Vaxart that is not pertinent to the plaintiffs' theory of liability. As to the HHS tweet, given that the admissible portion of the NYT article contains the same quote, there is no need to admit the tweet for the same purpose. However, there may be an argument that the tweet is admissible to counter the testimony by BARDA employees and Vaxart employees that BARDA understood the non-human primate study to be part of OWS. The parties should be prepared to discuss this at the next pretrial conference.

**The defendants' Motion in Limine No. 2 to exclude evidence of the total profits the defendants realized from their purchase and sale of Vaxart stock is denied.** Evidence of the defendants' total profits is admissible because it is highly probative of the defendants' motive. *See United States v. Reyes*, 660 F.3d 454, 465 (9th Cir. 2011). The jury will not be allowed to use the total profits to determine the Section 20A damages cap.

**The defendants' Motion in Limine No. 3 to exclude references to spoliation sanctions is granted.** The defendants originally sought to exclude any reference to the Court's findings on Boyd's spoliation of text messages. The parties have since informed the Court that this motion is mooted because they have reached a stipulation on how the spoliation issue will be presented at trial, but they have not yet filed this stipulation. For the reasons stated on the record at the October Pretrial Conference, the Court will not instruct the jury about its finding that Boyd intentionally deleted the text chain. Any reference to the Court's finding is off limits for trial.

**The defendants' Motion in Limine No. 4 to exclude evidence of the late 2019 business changes is denied.** The defendants seek to preclude the introduction of evidence that in late 2019 the Armistice defendants pushed Vaxart to lay off employees in the manufacturing division, shut down its norovirus vaccine program, and switch auditing firms. This evidence is admissible because it makes it more probable that the defendants were closely involved in Vaxart decisionmaking, knew what was going on with OWS and Attwill, and pushed Floroiu to issue the press releases. The evidence's probative value outweighs the danger of unfair prejudice. To avoid unfair prejudice regarding the Christmas layoffs, the parties are ordered to instruct their witnesses to say only that those layoffs happened in "late 2019," or "December 2019" or "Winter 2019-20." (The plaintiffs proposed the phrase "Winter 2019-2020," but these other options are also fine.)

**The plaintiffs' Motion in Limine No. 1 to exclude Ashish Jha's expert testimony is granted in part.** The defendants seek to call Jha, a former White House COVID-19 response coordinator, to rebut Kessler's testimony. Jha's testimony will be limited to responding to Kessler's testimony on the five topics specified in the Court's ruling above.

**The plaintiffs' Motion in Limine No. 2 to exclude evidence about class action litigation is granted.** The plaintiffs seek to preclude evidence about "the nature of modern class action litigation," including class counsel's practices and the procedural history of this case. The motion is granted. If the defendants believe there is some specific exception to the general bar on this type of evidence, they can raise that at trial, but they will need to make an offer of proof.

**The plaintiffs' Motion in Limine No. 3 to preclude testimony by the BARDA employees is granted in part.** The plaintiffs seek to preclude testimony from two BARDA employees, Tanima Sinha and Christopher Houchens, about (a) whether the non-human primate study was part of OWS, (b) whether Vaxart was participating in OWS via the non-human primate study, and (c) whether the OWS press release was misleading. The BARDA employees cannot provide an opinion about whether the press release was misleading, but they can testify from personal knowledge about what happened, what they communicated to Vaxart, and what their understanding of OWS participation was.

**The plaintiffs' Motion in Limine No. 4 to preclude Vaxart employee witnesses from testifying about whether the press releases were false or misleading is granted in part.** The defendants seek to ask Vaxart employees Sean Tucker (lead scientist), Brent Biehn (communications lead), Andre Floroiu (CEO), Wouter Latour (former CEO), Michael Finney (board member), and Margaret Echard (board member) for their views about the veracity of the press releases. To the extent these employees and board members were personally involved in the press releases, they can testify about what they did and what they were thinking at the time. They cannot give an opinion about the impression the press releases gave to investors.

**The plaintiffs' Motion in Limine No. 5 to preclude evidence about the partial settlement is granted.** The plaintiffs seek to preclude evidence of the amount of the partial settlement and Boyd's and Maher's participation in the settlement. The defendants do not oppose the plaintiffs' motion, provided that (a) the parties can reference the existence of the settlement to explain why some defendants are absent, (b) the parties can reference the existence of the settlement for impeachment purposes, and (c) the plaintiffs cannot argue that this lawsuit is the only way the class members can recover for their injuries. The motion is granted subject to the defendants' requested caveats.

**IT IS SO ORDERED.**

Dated: March 19, 2026

_____

VINCE CHHABRIA
United States District Judge

8