**AKIN GUMP STRAUSS HAUER & FELD LLP**
JOSHUA A. RUBIN (SBN 308421)
LILLIAN RAND (SBN 341581)
1999 Avenue of the Stars, Suite 600
Los Angeles, California 90067
Telephone: (310) 229-1000
Email: rubinj@akingump.com
         lrand@akingump.com

CHARLES F. CONNOLLY (*admitted pro hac vice*)
STACEY H. MITCHELL (*admitted pro hac vice*)
2001 K Street N.W.
Washington, DC 20006
Telephone: (202) 887-4070
Email: cconnolly@akingump.com
         shmitchell@akingump.com

KAITLIN D. SHAPIRO (*admitted pro hac vice*)
DAVID M. GILLER (*admitted pro hac vice*)
One Bryant Park, 44th Floor
New York, NY 10036
Telephone: (212) 872-8096
Email: kshapiro@akingump.com
         dgiller@akingump.com

Attorneys for Defendants ARMISTICE CAPITAL,
LLC, ARMISTICE MASTER FUND LTD,
STEVEN J. BOYD and KEITH MAHER, M.D.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re VAXART, INC. SECURITIES LITIGATION | Lead Case No. 3:20-cv-05949-VC |
| | District Judge: Hon. Vince Chhabria |
| This Document Relates to:<br>    ALL ACTIONS | <u>CLASS ACTION</u> |
| | **ARMISTICE DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW** |
| | Date:    April 27, 2026<br>Ctrm:    4, 17th Floor |

## <u>NOTICE OF MOTION AND MOTION</u>

PLEASE TAKE NOTICE that on April 27, 2026, or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Vince Chhabria, located at United States District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Avenue, San Francisco, California 94102, Defendants Armistice Capital, LLC ("Armistice Capital"), Armistice Master Fund LTD ("Armistice Master Fund"), Steven J. Boyd, and Keith Maher, M.D. (collectively, "Armistice" or "Defendants") will and hereby do move for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) and the Northern District of California Civil Local Rules 7-2 and 7-4.

This Motion is based upon this Notice of Motion and Motion; the attached memorandum of points and authorities; all pleadings and papers on file in this action; such other evidence or arguments as may be presented to the Court; the argument of counsel; and any other matter that the Court may consider.

Dated:  April 27, 2026

**Akin Gump Strauss Hauer & Feld LLP**

By:    _/s/ Charles F. Connolly_
    Charles F. Connolly (admitted _pro hac vice_)
*Attorney for ARMISTICE CAPITAL, LLC,*
*ARMISTICE CAPITAL MASTER FUND LTD.,*
*STEVEN J. BOYD, and KEITH MAHER, M.D.*

## **ISSUES TO BE DECIDED (Civil Local Rule 7-4(a)(3))**

1. Should the Court grant judgment as a matter of law to Defendants on Plaintiffs' 10b-5 claims because no reasonable jury could find that either the Attwill Press Release or OWS Press Release was materially false or misleading?

2. Should the Court grant judgment as a matter of law to Defendants on Plaintiffs' 10b-5 claims because no reasonable jury could find that Defendants knowingly or recklessly engaged in a fraudulent scheme with respect to either the Attwill Press Release or OWS Press Release?

3. Should the Court grant judgment as a matter of law to Defendants on Plaintiffs' Section 20A claims because no reasonable jury could find that Defendants possessed material nonpublic information contradicting the statements in either the Attwill Press Release or OWS Press Release?

4. Should the Court grant judgment as a matter of law to Defendants on Plaintiffs' Section 20A claims because no reasonable jury could find that Defendants intentionally traded on material nonpublic information?

5. Should the Court grant judgment as a matter of law to Defendants on all Plaintiffs' claims because no reasonable jury could find Plaintiffs satisfied their burden to prove loss causation?

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................................................1

II.   FACTS ......................................................................................................................3

III.  LEGAL STANDARD ..............................................................................................5

IV.   ARGUMENT ...........................................................................................................5

    A.    No Reasonable Jury Could Find That Plaintiffs Proved That Defendants Engaged In A Scheme To Deceive Or Defraud........................................................5

        1.    Plaintiffs have not proved that either the Attwill Press Release or OWS Press Release was materially false or misleading. ...........................5

            a.    The Attwill Press Release. ...............................................................6

            b.    The OWS Press Release....................................................................7

        2.    Plaintiffs have not proved that Defendants knowingly or recklessly engaged in a fraudulent scheme with respect to the Attwill Press Release and OWS Press Release...............................................................8

            a.    The Attwill Press Release. ...............................................................8

            b.    The OWS Press Release....................................................................9

        3.    A spoliation inference cannot supply the missing evidence. ......................11

    B.    No Reasonable Jury Could Find That Defendants Intentionally Traded On Material Non-Public Information ................................................................12

        1.    Plaintiffs have not proved that Defendants possessed MNPI with respect to either the Attwill Press Release or OWS Press Release. ...........12

            a.    The Attwill Press Release. .............................................................12

            b.    The OWS Press Release..................................................................13

         2.    Plaintiffs have not proved that Defendants intentionally traded on MNPI with respect to either Press Release. ...............................................13

            a.    The Attwill Press Release. .............................................................14

            b.    The OWS Press Release..................................................................14

    C.    No Reasonable Jury Could Find That Plaintiffs Met Their Burden To Prove Loss Causation................................................................................14

V.    CONCLUSION........................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Avis Budget Grp., Inc. v. Cal. State Tchrs.' Ret. Sys.*
552 U.S. 1162 (2008)...................................................................................................11

*Chappell-Johnson v. Bair*,
574 F. Supp. 2d 87 (D.D.C. 2008) ..............................................................................12

*Cullinan v. City of Los Angeles*,
752 F. Supp. 3d 1180 (C.D. Cal. 2024) ........................................................................5

*Desai v. Deutsche Bank Sec. Ltd.*,
573 F.3d 931 (9th Cir. 2009) .........................................................................................5

*DJCBP Corp. v. City of Baldwin Park*,
2025 WL 3776035 (C.D. Cal. Dec. 22, 2025) ...........................................................11

*In re Glob. Cord Blood Corp. Sec. Litig.*,
No. 24-CV-3071 (PKC), 2026 WL 444770 (S.D.N.Y. Feb. 17, 2026) ........................8

*Greenberg v. Cooper Companies, Inc.*,
No. 11-cv-05697 (YGR), 2013 WL 2403648 (N.D. Cal. May 31, 2013)...................14

*Lakeside-Scott v. Multnomah Cty.*,
556 F.3d 797 (9th Cir. 2009) .........................................................................................5

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ....................................................................................14

*In re Novatel Wireless Sec. Litig.*,
830 F. Supp. 2d 996 (S.D. Cal. 2011)..........................................................................12

*Patterson v. Jump Trading LLC*,
710 F. Supp. 3d 692 (N.D. Cal. 2024) .......................................................................2, 8

*In re REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010)...................................................................11, 14

*In re Retek Inc. Sec. Litig.*,
621 F. Supp. 2d 690 (D. Minn. 2009)..........................................................................14

*Simpson v. AOL Time Warner, Inc.*,
452 F.3d 1040 (9th Cir. 2006) ...................................................................................2, 11

**Other Authorities**

Fed. R. Civ. P. Rule 10b-5(a), (c) ........................................................................................1, 5, 8

Fed. R. Civ. P. Rule 50 ..............................................................................................................5

Fed. R. Civ. P. Rule 50(a)(1) ................................................................................................1, 5

## I.    <u>INTRODUCTION</u>

Defendants respectfully move for judgment as a matter of law under Federal Rule of Civil Procedure 50(a)(1).  No reasonable juror could find in favor of Plaintiffs on their claims.

*First*, Plaintiffs have not introduced sufficient evidence from which a jury could find a materially false or misleading misrepresentation or a scheme to defraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a), (c).

As an initial matter, Plaintiffs have introduced no evidence that either the June 25, 2020 press release (the "Attwill Press Release," TX 33) or the June 26, 2020 press release (the "OWS Press Release," TX 34, and with the Attwill Press Release, the "Press Releases") contained materially false or misleading statements.  Trial testimony and admitted evidence instead show that the statements in both Press Releases were true and accurate when made.  The Attwill Press Release disclosed that Vaxart, Inc. ("Vaxart") had entered a non-binding memorandum of understanding ("MOU") with Attwill Medical Solutions ("Attwill"), which expressed nothing more than an "intent to establish [Attwill] as a resource for lyophilization development and large scale manufacturing[.]"  TX 33.  Testimony from Attwill's CEO William Jackson confirmed that the Attwill Press Release's representation was accurate:  Attwill "had the lyophilization capacity to manufacture a billion or more doses of vaccine tablets per year."  Jackson Tr. 124:3-8.

The OWS Press Release likewise truthfully disclosed that Vaxart's "COVID-19 vaccine ha[d] been selected to participate in a non-human primate ('NHP') challenge study, organized and funded by Operation Warp Speed ['OWS']."  TX 34.  The OWS Press Release did not say or suggest that Vaxart was the recipient of substantial government funding.  Instead, it relayed a simple truth: that Vaxart had been selected by OWS to participate in a NHP study organized and funded by OWS.  There can be no scheme to defraud if both Press Releases are accurate.

Even if the Press Releases were somehow misleading—and they are not—judgment as a matter of law would still be appropriate because Plaintiffs have not shown that Defendants' "*own conduct*" both "contribut[ed] to the transaction or overall scheme" and had "a deceptive purpose

and effect." *Patterson v. Jump Trading LLC,* 710 F. Supp. 3d 692, 717 (N.D. Cal. 2024) (quoting *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006)) (emphasis in the original). Plaintiffs have marshaled no evidence that Defendants knew the Press Releases contained any false or misleading statements, much less that Defendants contributed in any way to their content. The evidence instead shows that far from contributing to any "scheme" regarding the Attwill Press Release, Defendants were not even aware of the Attwill Press Release until Vaxart issued it publicly. Likewise, Plaintiffs have not introduced any evidence that Defendants played any role in drafting the OWS Press Release. Rather, the evidence reflects that Defendants were unaware of the content of the OWS Press Release until Vaxart issued the OWS Press Release.

Plaintiffs' continued focus on spoliation of one text chain between Mr. Boyd and Dr. Maher does not change the result. Uncontroverted evidence reflects that neither the Press Releases nor drafts of the Press Releases were sent to any Defendant. No amount of spoliated text messages *between* the Defendants can possibly affect the veracity of Press Releases they never saw, never reviewed, and never edited. An adverse inference cannot serve as a substitute for affirmative proof.

***Second***, Plaintiffs have not introduced sufficient evidence from which a jury could find that Defendants traded while in possession of material, nonpublic information ("MNPI"), much less that they intentionally did so. As described above, Plaintiffs have failed to demonstrate either the Attwill or OWS Press Release contained any material information that was inaccurate. And while Plaintiffs have alleged Defendants possessed MNPI that *Vaxart* did not consider the NHP study to be significant, they elicited no evidence to support that allegation. Trial testimony overwhelmingly shows that Vaxart's management considered the NHP study to be "highly significant." Even were that not the case, Plaintiffs have not demonstrated that *Defendants* doubted any of the statements made in either Press Release or believed the NHP study was immaterial.[1]

---

[1] Defendants understand that Plaintiffs are not pursuing a claim against Dr. Maher that he traded while in possession of MNPI.

ARMISTICE DEFENDANTS' MOTION
FOR JUDGMENT AS A MATTER OF LAW

CASE NO.: 3:20-cv-05949-VC

*Finally*, Plaintiffs have failed as a matter of law to demonstrate loss causation. Specifically, Plaintiffs have failed to show that the New York Times article discussing Vaxart and OWS was a corrective disclosure. In addition, Plaintiffs' other theories of loss causation are speculative and lack any basis in evidence. Plaintiffs' have also not set forth any reliable measure of the amount or existence of price inflation resulting from the alleged misrepresentations.

For these reasons, the Court should grant judgment as a matter of law in favor of Defendants.

## II.   <u>FACTS</u>

Vaxart is a bio-medical company that has been in existence for over 20 years. Trial Day 3 Tr. 393:20-21. Around January 2020, Vaxart began developing a COVID-19 vaccine. Biehn Tr. 24:20-25:03. On May 12, 2020, Vaxart received an email from the U.S. Government reflecting Vaxart's participation in Operation Warp Speed's vaccine testing program. TX 354. On May 18, 2020, Vaxart signed a material transfer agreement with Biomedical Advanced Research and Development Authority ("BARDA") as part of a NHP study with OWS. TX 60. On May 20, 2020, Vaxart received an email from BARDA on behalf of OWS confirming that Vaxart was "participating in OWS" through an NHP study being funded by the federal government. TX 325; Day 3 Tr. 404:06-11. Vaxart's Chief Science Officer, Dr. Sean Tucker, testified that the government-funded NHP study could cost as much as one million dollars. Day 3 Tr. 405:01-09. On June 8, 2020, Vaxart's management notified the Board of Directors that Vaxart had been "invited to participate in a non-human primate study organized by Operation Warp Speed." TX 189. There was a sense of "euphoria" at Vaxart surrounding the NHP study. Biehn Tr. at 109:3-7.

At all relevant times, Mr. Boyd and Dr. Maher sat on the Vaxart Board of Directors (the "Board") and had no managerial role at the company. Day 2 Tr. 306:20-22 (Ms. Echerd explaining that Mr. Boyd and Dr. Maher were not part of Vaxart's management); Day 3 Tr. at 423:18-24 (Dr. Tucker stating that "none of the directors were on the management team"). Andrei Floroiu, Vaxart's CEO, and Brant Biehn, Vaxart's senior vice president of business operations, testified that

members of the Board were not involved in editing or reviewing Vaxart press releases before they were issued during the relevant period. Floroiu Tr. 44:25-46:24; Biehn Tr. 59:03-59:12.

On June 25, 2020, Vaxart issued the Attwill Press Release, titled "Vaxart, Inc. Signs Memorandum of Understanding with Attwill Medical Solutions, LP." TX 33. The Attwill Press Release accurately stated that the Attwill MOU enables "Production of A Billion or More COVID-19 Vaccine Doses Per Year Through Large Scale Lyophilization, Tableting and Coating." *Id*. The MOU with Attwill was important for Vaxart because it greatly increased Vaxart's lyophilization capabilities, a critical step in the manufacturing process for its COVID-19 tablet vaccine. *See* Day 3 Tr. 416:18-417:16; Biehn Tr. 155:15-156:07. At the time that Vaxart and Attwill signed the MOU, Attwill had the capability to lyophilize one billion doses of Vaxart's COVID-19 vaccine. Jackson Tr. at 47:20-48:09. There is no credible evidence that Defendants were aware of the Attwill Press Release before Vaxart issued it on the morning of June 25, 2020.

On June 26, 2020, Vaxart issued the OWS Press Release, titled "Vaxart's Covid-19 Vaccine Selected for Operation Warp Speed." TX 34. The sub-heading announced: "OWS to Test First Oral COVID-19 Vaccine in Non-Human Primates." *Id*. The OWS Press Release noted that Vaxart's COVID-19 vaccine candidate had "been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed," *id.*, reflecting what Vaxart was told in multiple emails. *E.g.*, TX 325, TX 354. While Defendants were aware on June 25, 2020 that Vaxart planned to issue a press release concerning the OWS NHP study, the Defendants were not involved in drafting, editing, or reviewing the OWS Press Release. Floroiu Tr. 46:18-24; Biehn Tr. 253:03-17; Day 3 Tr. 470:09-24 (Dr. Tucker's Testimony).

On June 26 and June 29, Armistice sold substantially all of its Vaxart stock. TX 770. On July 25, 2020, the New York Times published an article concerning Vaxart. TX 35. The article stated that "the reality" regarding Vaxart's selection for OWS was "more complicated" than the headline of the OWS Press Release suggests. *Id*.

## III.   LEGAL STANDARD

Under Rule 50(a), when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:  (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  Fed. R. Civ. P. 50(a)(1).  Judgment as a matter of law is required when a party fails to present a legally sufficient basis for a jury to find in its favor.  *See Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797, 802 (9th Cir. 2009).  "[I]n reviewing a Rule 50 motion, a court should review all of the evidence in the record." *Cullinan v. City of Los Angeles*, 752 F. Supp. 3d 1180, 1183 (C.D. Cal. 2024).

## IV.   ARGUMENT

### A.   No Reasonable Jury Could Find That Plaintiffs Proved That Defendants Engaged In A Scheme To Deceive Or Defraud

To demonstrate that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a), (c) promulgated thereunder, Plaintiffs must at the very least show that: (1) each Press Release was materially false and misleading, and (2) that the Defendants knowingly or recklessly engaged in a fraudulent scheme or course of business to manipulate Vaxart's stock price by issuing the Press Release.  *See Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009) (elements of a 10b-5 claim include "use or employ[ment of] any manipulative or deceptive device or contrivance" and, with respect to Rule 10b-5(a) and (c) in particular, "a scheme . . . to defraud" or a "course of business which operates . . . as a fraud or deceit upon any person").  No reasonable jury could find that Plaintiffs have proved either element.

#### 1.   Plaintiffs have not proved that either the Attwill Press Release or OWS Press Release was materially false or misleading.

Plaintiffs have not proved that any statements in either the Attwill Press Release or OWS Press Release were materially false or misleading.  In fact, uniform testimony and admitted evidence demonstrate that the statements in both Press Releases were accurate.

>    *a.    The Attwill Press Release.*

No reasonable jury could find that the Attwill Press Release is false or misleading. Plaintiffs' theory is that the Attwill Press Release misrepresented Attwill's manufacturing capacity. As an initial matter, the Attwill Press Release provided no guarantees. Instead, the Attwill Press Release made clear that Attwill and Vaxart had signed only an MOU, which merely affirmed their "*intent* to establish [Attwill] as a resource for lyophilization development and large scale manufacturing." TX 33 (emphasis added). By its plain terms, and contrary to Plaintiffs' arguments, the Attwill Press Release did not guarantee or promise investors that an agreement between Vaxart and Attwill for lyophilization development would be forthcoming.

Regardless, the Attwill Press Release did not misrepresent Attwill's manufacturing capacity. Plaintiffs presented no evidence that Attwill lacked the "ability to manufacture a billion or more doses per year." TX 33. Trial testimony and admitted evidence leave no doubt that Attwill had such capability. Attwill's CEO, Bill Jackson, provided uncontroverted testimony that Attwill "had the lyophilization capacity to manufacture *a billion or more doses of vaccine* tablets per year." Jackson Tr. 124:03-08; *see also id*. 44:1-48:9; 117:09-16. Accordingly, Attwill's internal legal counsel signed off on the Attwill Release's language, stating that it "look[ed] great" from his end. TX 407. Vaxart also conducted due diligence into Attwill's manufacturing capacity. Vaxart's Chief Science Officer, Dr. Sean Tucker, testified that at the time of the Attwill Press Release, Vaxart "believed that [Attwill] could do tableting at mass scale," and explained that Vaxart had arrived at that conclusion "based on the scale of lyophilizers." Day 3 Tr. 463:11-22, 464:6-11; *see also* Biehn Tr. 278:14-23 (confirming that Attwill had the capacity to manufacture a billion doses annually). Finally, every witness at trial who was involved in the drafting or editing of the Attwill Press Release confirmed that it was accurate. *See* Biehn Tr. 283:7-10; Floroiu Tr. 230:3-14; Jackson Tr. 131:16-132:8; Day 3 Tr. 465:21-23 (Dr. Tucker's testimony).

   b.    *The OWS Press Release.*

Nor could a reasonable jury find that the OWS Press Release contained any false or misleading statements.  The OWS Press Release simply and accurately stated that Vaxart's "oral COVID-19 vaccine ha[d] been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed[.]"  TX 34.  Nothing in the OWS Press Release suggested that the federal government had provided substantial funding to Vaxart.  *See* Day 3 Tr. 469:13-16 (Dr. Tucker testifying that the OWS Press Release could not be read "to imply that Vaxart had already received hundreds of millions of dollars in direct funding from OWS").

Evidence adduced at trial confirms that the NHP study was in fact part of OWS, and Plaintiffs elicited no testimony to the contrary.  Dr. Tucker received numerous emails stating that the NHP Study was being funded by OWS and that Vaxart was part of OWS. *See* TX 60, TX 185. In fact, after Vaxart returned a fully executed material transfer agreement, Vaxart's primary government contact responded that BARDA "look[ed] forward to working with you on these studies *as part of Operation Warp Speed*."  TX 60 (emphasis added).  In contemporaneous email correspondence to Vaxart's CEO, Vaxart's Chief Science Officer ticked off all the reasons why he had "no reason to think [the NHP study] isn't part of OWS":  "Every preclinical request for information document is marked OWS.  We have been told several times that this is part of OWS. We got invited to meetings with 20 people all related to OWS."  TX 350.  As Dr. Tucker testified: "There was no doubt in my mind we were part of OWS."  Day 3 Tr. 456:3-7.  Vaxart's senior vice president for commercial operations, Brant Biehn, confirmed the same:  "All of these people that we had been dealing with over the past whatever it was there—week, week and half, two weeks— were all OWS people."   Biehn Tr. 193:23-194:03; *see also* Latour Tr. 171:17-19 (it was "completely crystal clear" that Vaxart was "working with Operation Warp Speed").  Tanima Sinha, a project officer at BARDA, further testified that she communicated to Vaxart that it was part of OWS.  Sinha Tr. 34:10-34:15; 127:19-127:24.

In addition, every witness at trial who was involved at any point in the drafting or editing of the OWS Release confirmed that they believed it was accurate. *See* Day 3 Tr. 468:4-7 (Dr. Tucker's testimony); Floroiu Tr. 203:08-19; Biehn Tr. 234:21-234:24; Latour Tr. 171:09-19.

2.  <u>Plaintiffs have not proved that Defendants knowingly or recklessly engaged in a fraudulent scheme with respect to the Attwill Press Release and OWS Press Release.</u>

No reasonable jury could find that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a), (c) for an independent reason:  Plaintiffs have offered no legally sufficient evidence that Defendants knowingly or recklessly engaged in conduct that "contribut[ed] to" the Press Releases' purportedly deceptive effects. *See Jump Trading LLC,* 710 F. Supp. 3d at 717. Nor can Plaintiffs rely on actions purportedly taken by Defendants in support of an overall "scheme" that do not relate to the issuance of a specific deceptive statement. *In re Glob. Cord Blood Corp. Sec. Litig.*, No. 24-CV-3071 (PKC), 2026 WL 444770, at *21 (S.D.N.Y. Feb. 17, 2026).  Put simply, there is no evidence that the Defendants were aware of the content of the Press Releases or that they personally had any role in their creation.

*a.    The Attwill Press Release.*

Plaintiffs have presented no evidence that Defendants contributed in any way to drafting the Attwill Press Release, let alone did so in furtherance of a deceptive scheme.  Quite the opposite: The evidence shows universally that Mr. Boyd and Dr. Maher, like the rest of the Vaxart Board, had *no* knowledge of the MOU with Attwill or the Attwill Press Release before its publication.

Dr. Wouter Latour, who was no longer Vaxart's CEO but was still a member of its Board at the time, testified that he had no prior knowledge of the Attwill MOU, and only learned of it when Vaxart issued the Attwill Press Release.  Latour Tr. 177:15-23.  That is not surprising.  At the time, it was not management's practice to inform the Board of press releases before they were issued.  *Id*. at 103:08-21; Floroiu Tr. 44:25-45:04; Biehn Tr. 58:23-59:12.  In addition, Mr. Biehn, Dr. Tucker, and Mr. Floroiu all testified that they did not discuss the Attwill Press Release with Mr. Boyd or Dr. Maher.  Floroiu Tr. 230:15-25 (stating that he did not discuss the Attwill Press

Release with "anyone from Armistice"); Biehn Tr. 262:15-22; (affirming that neither Mr. Boyd, nor Dr. Maher, nor Armistice were "involved" in discussions regarding the Attwill MOU); Day 3 Tr. 460:23-461:3 (Dr. Tucker stating that he "didn't have any conversations" with Armistice regarding the Attwill Press Release). Attwill's CEO also testified that he had *never* spoken with Mr. Boyd or Dr. Maher—he did not even know their names. Jackson Tr. 114:03-114:16.

Finally, both Defendants testified that they had never seen the Attwill Press Release or even heard of Attwill before they saw the Attwill Press Release the day it was issued. Day 5 Tr. 699:17-19 (Maher: "I never saw the press release. I had no input."); Day 6 Tr. 881:17-18. (Boyd: "I had not heard of Attwill prior to the press release being released to the public at 8:00 A.M. on June 25th."). Plaintiffs' evidence, on the other hand, consists of just two vague texts from Dr. Maher to Floroiu—one on June 24 urging Floroiu to "make sure that when we release news that it hits the tape and that it hits early in the morning, like before 8:00 AM" (TX 500), and one on June 25 where Dr. Maher says without elaboration: "Hopefully he leaves you alone now to do your job" (TX 683)—and a Bloomberg chat exchange between Sergio Smiriglio and Mr. Boyd after the Attwill Press Release became public. There is no evidence to demonstrate knowledge of or input into the Attwill Press Release. As to the June 24 text, Dr. Maher testified that he was suggesting only that, as a "best practice," press releases should go out at 8:00am, so that "any information, good or bad, to hit the news wires because that was the appropriate thing to do." Day 5 Tr. 661:2-5; 702:23-703:4. As to the June 25 text, Plaintiffs elicited no testimony from Dr. Maher other than that he was not sure whom he was referring to. *Id*. 683:22-23. Meanwhile Mr. Smiriglio testified that his comment about one billion doses said in a Dr. Evil voice was a "joke" meant to elicit a response from Boyd. Smiriglio Tr. 96:5-96:8.

At summary judgment, this Court called it a "much closer question" whether Defendants acted to deceive investors through the Attwill Press Release. The evidence introduced at trial clearly shows that this is no longer a close call.

                *b.*      *The OWS Press Release.*

Plaintiffs' similarly have presented no evidence that Defendants played any role in drafting the OWS Press Release, much less a material one. Every single Vaxart witness testified that Mr. Boyd and Dr. Maher did not see the OWS Press Release before it was issued, did not draft the OWS Press Release, and did not edit the OWS Press Release. Plaintiffs presented no contrary evidence demonstrating that Mr. Boyd or Dr. Maher ever saw the OWS Press Release before it was issued.

As an initial matter, the evidence is clear that the first draft of the OWS Press Release was written before Mr. Boyd or Dr. Maher had any knowledge of Vaxart's participation in the OWS NHP study. *See* TX 174. Similarly, the entire editing process—which was led by Dr. Tucker and Mr. Biehn—did not include Mr. Boyd or Dr. Maher. Biehn Tr. 60:4-16; 100:20-25; Day 3 Tr. 448:05-11. In addition, Dr. Latour, who was CEO at the time, testified that no board members, such as Mr. Boyd and Dr. Maher, were involved in drafting the OWS Press Release. Latour Tr. 103:08-21. And the evidence shows that Vaxart's outside public relations firm, LifeSci Advisors, was responsible for moving the reference to OWS into the title. *See* TX 178 (LifeSci advisor explaining they had "added OWS to title of release, since that will move the needle").

Further, the uncontroverted testimony of all witnesses was that Mr. Boyd and Dr. Maher had never seen the OWS Press Release before it became public and were unaware of its contents. Floroiu stated that he "did not discuss the contents of the [OWS] press release with either" Mr. Boyd or Dr. Maher, and "[t]hat would not be part of the protocol or something we would do." Floroiu Tr. 44:25-45:04. In addition, Dr. Tucker said that Mr. Boyd was not "involved in any of the content" of the OWS Press Release. Day 3 Tr. 470:9-11. Mr. Biehn, who oversaw the development of the OWS Press Release, confirmed that *only* the management team, outside counsel, and Vaxart's PR firm, LifeSci, played a role in drafting the OWS Press Release. Biehn Tr. 58:23-59:12.

Mr. Boyd's email urging Mr. Floroiu to issue the OWS Press Release is insufficient evidence that Defendants contributed to the OWS Press Release's purportedly deceptive effects

for two independent reasons. First, Mr. Boyd did not issue the OWS Press Release; that decision was made by Mr. Floroiu. Floroiu testified that, as Vaxart's CEO, it was he who "ultimately made the decision that on June 26th, 2020 Vaxart should issue the OWS Press Release," and that he did so in consultation with Vaxart's "consultants" and "counsel." Floroiu Tr. 212:24-213:12.[2] As both a legal and factual matter, then, Mr. Boyd's email does not show that he was "engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds by Avis Budget Grp., Inc. v. Cal. State Tchrs.' Ret. Sys.*, 552 U.S. 1162 (2008).

Second, even if Plaintiffs had adduced evidence that Defendants bore legally significant responsibility for either the OWS Press Release's contents or its publication date, they have not shown that Defendants had reason to believe the statements in the OWS Press Release were false. As described above, all the evidence demonstrates that Vaxart's management believed the NHP study was part of OWS, as government employees repeatedly confirmed. Plaintiffs have marshaled no evidence that Defendants had reason to believe or in fact believed any differently. *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1251-53 (S.D. Cal. 2010) (reasonable reliance on professionals to provide accurate reports further rebuts any inference of scienter).

### 3. A spoliation inference cannot supply the missing evidence.

A spoliation inference based on deleted messages exclusively between Mr. Boyd and Dr. Maher does not change matters. As a legal matter, Plaintiffs cannot prove liability based on an adverse spoliation inference alone. *See DJCBP Corp. v. City of Baldwin Park*, 2025 WL 3776035, at *12 (C.D. Cal. Dec. 22, 2025) (evidence is legally insufficient to establish liability where "no evidence other than adverse inferences [is] offered at trial to show" an element of the alleged

---

[2] There is also no credible evidence that Mr. Boyd controlled Mr. Floroiu. Mr. Floroiu testified that at all times he exercised his "own independent judgement." Floroiu Tr. 162:15-162:25. This was corroborated by Doctor Michael Finney, a long-time board member who approved Floroiu's hiring. Dr. Finney testified that he did not believe Armistice had any control or leverage over Floroiu and that Floroiu would be independent. Day 7 Tr. 1194:16-25.

ARMISTICE DEFENDANTS' MOTION
FOR JUDGMENT AS A MATTER OF LAW

claim); *see also e.g.*, *Chappell-Johnson v. Bair*, 574 F. Supp. 2d 87, 102 (D.D.C. 2008) ("Simply put, without any evidence, a generalized adverse inference, alone, will not support a jury verdict.").

Here, the spoliation inference does not—indeed, could not—alter the accuracy of the Press Releases. Nor could it demonstrate that either Mr. Boyd or Dr. Maher played any role in their drafting, given that Plaintiffs possess all of Defendants' communications with Vaxart. Plaintiffs have elicited no other facts to support a contrary conclusion. They can point to no communication between Defendants and Vaxart management demonstrating any Defendant's input into the Press Releases. To the contrary, multiple witnesses testified that Defendants had nothing to do with the contents of either Press Release. *See* pp. 8-11, above.

### B.  No Reasonable Jury Could Find That Defendants Intentionally Traded On Material Non-Public Information

To prove their insider trading claim, Plaintiffs must establish, at a minimum, that: (1) Defendants "possessed material and nonpublic information at the time" they sold Vaxart securities; and (2) Defendants were "aware that the information [they] possessed was material and nonpublic" and had the "intent to deceive, manipulate, or defraud." *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1022 (S.D. Cal. 2011).[3] No reasonable jury could conclude that Defendants possessed any MNPI, much less that they intentionally traded on it.

1.  Plaintiffs have not proved that Defendants possessed MNPI with respect to either the Attwill Press Release or OWS Press Release.

Plaintiffs' theory that Defendants possessed MNPI with respect to the Attwill and OWS Press Releases while trading Vaxart securities depends on the two Press Releases being inaccurate. But as stated above, the evidence confirms that neither Press Release was inaccurate.

a.  *The Attwill Press Release.*

---

[3] As previously outlined at the charge conference (Day 8 Tr. 1366:17-1367:02; 1367:19-1368:02) and in Defendants' proposed jury instructions [dkt 681], Defendants contend (for preservation purposes) that a third element of an insider trading clam is that "the material nonpublic information played a causal role" in Mr. Boyd's decision to sell Vaxart stock." 830 F. Supp. 2d at 1022. Plaintiffs offered no evidence to demonstrate any causal connection between any MNPI and Mr. Boyd's decision to sell Vaxart stock.

ARMISTICE DEFENDANTS' MOTION
FOR JUDGMENT AS A MATTER OF LAW

CASE NO.: 3:20-CV-05949-VC

The Attwill Press Release accurately disclosed that Vaxart had entered a MOU with Attwill and truthfully stated that Attwill had "the lyophilization capacity to manufacture a billion or more doses of vaccine tablets per year." *See* pp. 5-6, above. As a matter of law, Plaintiffs cannot prove this key element of their Section 20A claim.

<p style="text-align:center;">b.     *The OWS Press Release.*</p>

The OWS Press Release likewise accurately stated that Vaxart's oral vaccine had been selected to participate in a NHP study organized and funded by OWS. *See* pp. 7-8, above. Plaintiffs also claim, however, that Defendants possessed MNPI because they knew that *Vaxart* did not consider the NHP trial to be significant. The evidence demonstrates overwhelmingly that Plaintiffs are dead wrong. Vaxart considered the trial to be "huge[ly]" significant.

Biehn explained that when Vaxart got confirmation "that we were going to be included in the nonhuman primate study," Vaxart believed "this [wa]s huge from an organizational perspective." Biehn Tr. 79:09-79:19. The value of the NHP study was also important: "between 500,000 up to . . . a million dollars." Day 3 Tr. 405:1-9. Additionally, Dr. Latour, Vaxart's former CEO, testified that Vaxart's selection for OWS was a "significant" event because it "could be a path to . . .a successful Vaxart and its vaccine." Latour Tr. 117:22-23; 118:07; *see also* Floroiu Tr. 52:20–53:01 ("To me, the mere selection of our program in Operation Warp Speed even for a non-human primate trial was very notable. This was a huge endorsement and validation of the potential that an oral type of vaccine had to change how we fight pandemics."). Mr. Biehn summed up Vaxart's position regarding its participation in an OWS non-human primate challenge study: "I think we as a management team were for sure excited when we heard about this. There was a certain amount of euphoria within the organization because this was the first funding we got from the U.S. government." Biehn Tr. 109:3-7.

<p style="margin-left:2em;">2.    <u>Plaintiffs have not proved that Defendants intentionally traded on MNPI with respect to either Press Release.</u></p>

At the very least, no reasonable juror could find that Defendants *knew* any of the Press Releases' statements were inaccurate and thus did not intentionally trade on the basis of any MNPI.

> a.      The Attwill Press Release.

As described above, the evidence shows overwhelmingly that Defendants did not know of Vaxart's MOU with Attwill until the Attwill Press Release was made public. *See* pp. 8-9, above. Plaintiffs have produced no evidence that, upon receipt of the Attwill Press Release, Defendants had any reason to doubt Attwill's manufacturing capacity. Defendants were permitted to "rel[y] on [management] to prepare accurate" press releases. *REMEC*, 702 F. Supp. 2d at 1251.

> b.      The OWS Press Release.

The same logic applies to Defendants' knowledge of the accuracy of the OWS Press Release. As discussed, Plaintiffs have no evidence that Defendants doubted Vaxart's representation that its vaccine had been selected to take part in an NHP study that was part of OWS. Moreover, far from considering the news of the NHP study to be immaterial, Defendants considered the news regarding Vaxart's participation in an OWS NHP study to be highly material. The very day that this information was communicated to Mr. Boyd and Dr. Maher at the June 8 Board meeting, Vaxart was placed on Armistice's restricted list. *See* Day 5 Tr. 705:13-24 (Dr. Maher Tesimony); Day 6 Tr. 888:21-25 (Mr. Boyd testified that "the stock was on a restricted list . . . because on June 8th, we found out that Vaxart was working with Operation Warp Speed, which we deemed to be incredibly material."). According to Mr. Boyd, Vaxart remained on the restricted list, and Armistice did not trade Vaxart stock, until after the OWS Press Release was publicly issued. Day 6 Tr. 978:4-14; TX 770.

**C.      No Reasonable Jury Could Find That Plaintiffs Met Their Burden To Prove Loss Causation**

"In order to recover damages in a securities fraud action, plaintiffs must . . . 'adequately . . . prove the traditional elements of causation and loss.'" *In re Retek Inc. Sec. Litig.*, 621 F. Supp. 2d 690, 698 (D. Minn. 2009) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)). Specifically, Plaintiffs must prove that "the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008); *see also Greenberg v.*

*Cooper Companies, Inc.*, No. 11-cv-05697 (YGR), 2013 WL 2403648, at *14 (N.D. Cal. May 31, 2013) ("To plead loss causation, Plaintiff must allege three elements: (1) a misrepresentation or omission inflated the share price; (2) a corrective disclosure revealed the statement was fraudulent; and (3) as a result of the disclosure, share price fell.").

Beyond their failure to show a misrepresentation or omission, Plaintiffs have failed to carry their burden to show that any "corrective disclosure revealed" that any statement in the Releases was fraudulent or that share price fell "as a result of th[at] disclosure[.]" Plaintiffs' only non-speculative evidence of loss causation is a New York Times article stating Vaxart was not selected to "receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses." *See* TX 35. But neither the Attwill Press Release nor the OWS Press Release ever suggested that Vaxart was receiving significant financial support from OWS, or that it was imminently going to produce hundreds of millions of vaccine doses. In addition, Plaintiffs have adduced no evidence that the share price of Vaxart stock "fell" due to any purported corrective disclosure in the New York Times article.

Further, Plaintiffs' expert Dr. Cain has failed to set forth any reliable measure of the amount or existence of price inflation resulting from the alleged misrepresentations. Day 8 Tr. 1248:7-1249:4 (Dr. Marietta testifying that Dr. Cain's calculation of artificial inflation and damages for Vaxart is flawed and unreliable.). This is fatal and is dispositive. In addition, Dr. Cain has failed to show that there are any losses arising from any alleged misrepresentation. *Id*. 1258:13-18.

## V.   **CONCLUSION**

Defendants respectfully request the Court grant its motion for judgment as a matter of law as to all counts. Even if the Court does not grant judgment as a matter of law on all counts, at minimum it should do so with respect to the Attwill Press Release given the dearth of evidence that Defendants knew of the Attwill Press Release before its publication, had any reason to believe its representations were inaccurate, or intentionally traded based on any such knowledge.

Dated: April 27, 2026                    AKIN GUMP STRAUSS HAUER & FELD LLP


                                         By:    */s/ Charles F. Connolly*
                                                Charles F. Connolly (admitted *pro hac vice*)
                                                Attorney for ARMISTICE CAPITAL, LLC,
                                                ARMISTICE CAPITAL MASTER FUND,
                                                LTD., STEVEN J. BOYD, and KEITH
                                                MAHER, M.D.